UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x

AVALON HOLDINGS CORPORATION,

                      *Plaintiff*,

                                                 Case No.: 1:18-cv-7291-VSB-RWL

      – against –

GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.,

                      *Defendants*

-----------------------------------------------------------------------------x

## **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

FORD O'BRIEN LLP

Adam Ford
Robert S. Landy
Danielle M. McLaughlin
575 Fifth Avenue
17th Floor
New York, New York 10017
aford@fordobrien.com
rlandy@fordobrien.com
dmclaughlin@fordobrien.com
(212) 265-1047

*Attorneys for Defendants Guy Gentile
and Mintbroker International, Ltd.*

August 10, 2020

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................ ii-iii

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ......................... 3

LEGAL STANDARD ...................................................................................... 12

ARGUMENT ................................................................................................... 13

   I.    Section 16(b) of the 1934 Securities Act Does Not Apply Here ................... 13

   II.   Defendants Were Never "Beneficial Owners" of the Shares and are Therefore not Subject to Rule 16(b)'s Disgorgement Rules ................................................. 13

       A.   Plaintiff has not Established that Defendants had any Voting Power in Actual Avalon Securities .................................................................................... 14

       B.   Plaintiff has not met its Burden to Demonstrate Defendants Purchased or Sold Actual Avalon "Securities" .................................................................... 15

           1.   *The "Trades" are Mere Book Entries* ........................................ 15

       C.   Defendants had no Pecuniary Interest in Actual Avalon Securities .................. 18

   III.   Defendants are not the Statutory Insiders that Section 16(b) is Designed to Safeguard Against ................................................................................................. 19

       A.   Defendants had no Access to Inside Information ................................. 20

       B.   Section 16(b)'s Perverse Incentives Create Unjust Windfalls for Companies and their Lawyers ......................................................................................... 21

CONCLUSION ................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bershad v. McDonough,*
  428 F.2d 693, 696 (7th Cir. 1970). ........................................................................... 19

*Blau v. Lamb*,
  363 F.2d 507 (2d Cir. 1966) .................................................................................... 20

*Bulldog Investors General Partnership v. Deborah Donoghue et al.*,
  569 U.S. 994, 133 S. Ct. 2388, (cert. denied May 20, 2013) .................................... 21

*Celotex Corp. v. Catrett,*
  477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ...................................... 12, 13

*Chechele v. 12 Sperling*,
  Fed. Sec. L. Rep. P. 96786 (S.D.N.Y. Mar. 29, 2012], aff'd, 758 F3d 463 (2d. Cir. 2014) ..... 19

*Donoghue v. Casual Male Retail Grp., Inc.,*
  375 F. Supp. 2d 226 (S.D.N.Y. 2005) .................................................................... 13

*Donoghue v. Centillium Commc'ns Inc.*,
  No. 05 Civ. 4082 (WHP), 2006 WL 775122 (S.D.N.Y. Mar. 28, 2006) .................. 19

*Gallo v. Prudential Residential Servs. Ltd.,*
  22 F.3d 1219 (2d Cir.1994) .................................................................................... 12

*Goenaga v. Mar. of Dimes Birth Defects Found.*,
  51 F.3d 14, 18 (2d Cir. 1995) ................................................................................ 12

*Gollust v. Mendell*,
  501 U.S. 115, 111 S. Ct. 2173 (1991) .................................................................... 13

*Gwozdzinsky ex rel. Revco D.S. v. Zell/Chilmark Fund, L.P.*,
  156 F.3d 305 (2d Cir.1998) ..........................................................................13, 15, 20

*In re: XO Communications, Inc.*
  330 B.R. 394, 426 (U.S. Bankr. Ct. S.D.N.Y. Sept. 23, 2005) ................................ 19

*Meridian Mortg. Corp. v. United States*,
  24 Cl. Ct. 811, *aff'd*, 980 F.2d 745 (Fed. Cir. 1992)............................................... 15

*Morales v. Holiday Inns, Inc.*,
  366 F. Supp 760 (S.D.N.Y. 1973) .......................................................................... 22

*Morales v. New Valley Corp*,
   999 F. Supp. 470 (S.D.N.Y. 1998) ............................................................................... 13

*Provident Secs. Co. v. Foremost-McKesson, Inc.*,
   331 F. Supp. 787 (N.D. Cal. 1971) *aff'd*, 506 F.2d 601 (9th Cir. 1974), aff'd, 423 U.S. 232
(1976) ...................................................................................................................................20

*Reliance Electric Co. v. Emerson Elec. Co.*,
   404 U.S. 418, 92 S. Ct. 596 (1972) .................................................................... 19, 22

*Rosen ex rel. Price Communications Corp. v. Price*,
   1No. 95-cv-5089 (CSH), 1997 WL 401793 (S.D.N.Y. July 16, 1997) .................................... 13

*Rubenstein v. Live Nation Entm't*,
   No. 16 CIV. 7283, 2017 WL 2670749 (S.D.N.Y. June 20, 2017) ........................................20

*Travelers Indem. Co. of Illinois v. 28 E. 70th St. Const. Co.*,
   296 F. Supp. 2d 476 (S.D.N.Y. 2003) ...................................................................... 12

## Statutes and Rules

Fed. R. Civ. P. 56 ...................................................................................................... 1, 12

Securities Exchange Act of 1934 Section 13 .................................................................. 14, 20

Securities Exchange Act of 1934 Section 16 .......................................................................4

17 C.F.R. § 240.16a–1(a)(2)(i) ...................................................................................... 14

17 CFR § 240.13d-3(a)........................................................................................ 14, 15

15 U.S.C. § 78a et seq ......................................................................................5, 13

## Treatises and Law Review Articles

John E. Munter, SECTION 16(B) OF THE SECURITIES EXCHANGE ACT OF 1934: AN ALTERNATIVE
TO BURNING DOWN THE BARN IN ORDER TO KILL THE RATS, 52 Cornell L. Rev. 71-72 (1966). ..21

Peter L. Romeo and Alan L. Dye, SECTION 16 TREATISE AND REPORTING GUIDE (4th ed. 2012)
§ 9.01[b]. ........................................................................................................20

Pursuant to Fed. R. Civ. P. 56 and the Local Rules of the United States District Court for the Southern District of New York, Defendants, by their undersigned counsel, submit this Memorandum of Law in Support of their Motion for Summary Judgment.

## PRELIMINARY STATEMENT

For Plaintiff to survive beyond summary judgment it had to obtain evidence in discovery that Defendants possessed more than 10% of actual Avalon shares and then sold those shares. Plaintiff failed to even adduce evidence that Defendants' broker, Interactive Brokers, possessed *any* actual Avalon shares, let alone 10% of the total outstanding shares.  Nor did it establish that any of the Avalon shares that Interactive Brokers ordered were actually obtained and deposited into Defendants' account.  What discovery has made clear is that Defendants' "trades" were not in actual shares, but rather were in derivatives of Avalon shares – simple book entries, tied to the actual share price, thus removing this case from the reach of Section 16(b) of the 1934 Securities Exchange Act.  This is because the trading and settlement records show that the number of "shares" purchased and sold on the relevant days *vastly* exceed the number of actual shares available to trade on the market.  This "trading" can only be mathematically possible because of counterparties selling "naked" shorts, all in an environment where there were vastly insufficient actual shares to cover those shorts.  Were this a game of musical chairs, had the music stopped at any point during the alleged short swing window, there did not exist sufficient shares to satisfy all of the purported trades in Plaintiff's stock (by Defendants or any other market participant) and the vast majority of trades would necessarily have canceled.

What actually occurred here falls outside the reach of Section 16(b) in both in its actual wording as well as its intent.  As shown in discovery, Defendants here never took possession of any of Plaintiff's shares, and nor could they have, because the "trades" at issue were done in

such a large volume and on an exchange where "trades" are not completed by the exchange of actual shares, but rather by "book entries" that are tied to the published share value (with the expectation of future settlement and delivery of actual shares). These "book entries" themselves are not actual shares, and they could not grant voting or dividend rights due to the volume of shares purporting to be exchanged, and the speed at which the book entry positions were unwound. In addition, though "book entries" are recorded with the expectation that actual shares will follow, they are by no means a guarantee of settlement. For example, it is impossible to square Plaintiff's allegation that Defendants at one point possessed 60% of Avalon's shares, with the fact that only 52% of the company's stock was ever actually available for trading.

Moreover, neither Defendants nor their broker, Interactive Brokers, ever appear on any registered list of shareholders. Indeed, there is no evidence that Interactive Brokers ever took possession of *any* actual shares, let alone more than 10% of outstanding Avalon shares. As such, Plaintiff cannot present any evidence at trial to support their argument that Defendants ever became beneficial owners of more than 10% of Plaintiff's actual shares. Without this evidence, there is no material dispute of facts, and this case must be disposed of on summary judgment.

Beyond the facts of this unique case, the arguments regarding whether Section 16(b) applies here should be considered in the context of the policy prescriptions of the Section, and not in a vacuum. This case is the latest in a line of more than three hundred other cases in the Southern District of New York alone in which Plaintiff's counsel have created a cottage industry, combing through SEC filings and then filing Section 16(b) cases with the actual plaintiff issuer being dragged along for the ride. The actions of the 16(b) Plaintiff's bar have, over decades distorted the original policy considerations Congress intended to further and that underpin Section 16(b) – a mechanism designed *to prevent insider trading* – by the practice of forced and

aggressive, serial litigation, often against non-insiders, resulting in a combination of nuisance settlements and massive windfalls where the subject companies were not harmed (and in some cases, like here, benefited from the trading at issue in this case).  It is within this context that the Court should consider that Plaintiff has failed to meet its burden – and it *is* Plaintiff's burden – to demonstrate that Defendants were ever "beneficial owners" of Avalon securities subject to Section 16(b) liability.  The evidence overwhelmingly establishes that Defendants possessed no insider information, and traded in book entries or "positions" in Avalon securities because it was a factual impossibility (even in a reality of modern high-speed trading) for Defendants to ever actually possess all of the securities that Plaintiff alleges they purchased.

Because Plaintiff cannot prove that the shares purported to have been purchased and sold by Defendants actually existed and were anything more than book entries, Defendants are entitled to summary judgment as to all alleged short swing trading in Avalon "securities."  In the alternative, if the Court determines that notwithstanding the fact that more "shares" were purchased than actually existed (akin to one house being sold many times over), an issue of material fact exists as to the number of Avalon shares Defendants "beneficially owned", and Defendants seek a ruling requiring Plaintiff to establish at trial that every share it alleges Defendants purchased or sold actually existed and came into Defendants' possession during the alleged short swing period.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### *Avalon Holdings Corporation*

Avalon Holdings Corporation ("Avalon") is a Warren, Ohio-based provider of waste management services to industrial, commercial, municipal and governmental. Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("R-56.1") ¶ 1.  On June 15, 2018, Mintbroker, through Interactive Brokers, opened a position on Avalon securities with the

purchase of 200 shares.  R-56.1 ¶ 3.  During this period and for approximately the first seven

months of 2018, up until July 24, 2018, Avalon's closing share price ranged from approximately

$2.00 to $2.40.  R-56.1 ¶ 2.  On August 2, 2018, Mintbroker netted its position in Avalon

securities to zero with the purported purchase of 1,000 Avalon securities.  R-56.1 ¶ 4.  During

the last five months of 2018, after July 31, 2018, Avalon's closing share price ranged from

approximately $2.65 to $4.80.  R-56.1 ¶ 5.  Between its opening and closing positions,

Mintbroker undertook some 18,460 trades in purported Avalon securities.  R-56.1 ¶ 7.

***Mintbroker's SEC Filings and Trading Activity***

On July 7, 2018, Mintbroker filed a SEC Form 3 pursuant to Section 16(a) of the

Securities Exchange Act of 1934 stating that it had taken a position in 1,922,095 shares of

Avalon.  R-56.1 ¶ 8.  On August 1, 2018, Mintbroker filed a SEC Form 4 pursuant to Section

16(a) of the Securities Exchange Act of 1934 stating it had decreased its position in Avalon

securities by 202,642 shares.  R-56.1 ¶ 9.  On August 22, 2018, Mintbroker filed a SEC Form13-

D pursuant to Section 16(a) of the Securities Exchange Act of 1934, to which it attached all of its

trading records reflecting positions in Avalon stock effected during the prior sixty days by

Mintbroker.  R-56.1 ¶ 10.  Mr. Gentile, by virtue of his relationship to MintBroker, noted in this

form that he "*may* be deemed to indirectly beneficially own (as that term is defined in Rule 13d-

3 under the Exchange Act of 1934, as amended) those Shares which MintBroker had owned" and

that he "disclaim[ed] beneficial ownership of all such Shares for all other purposes."  *Id.*

(emphasis added).

Notwithstanding the settlement delays (discussed more fully *infra*), the periods during

which Defendants purportedly held a greater than 10% "position" in the outstanding common

stock of Avalon are July 24, 2018 for eleven seconds between 2:46:41 p.m. and 2:46:52 p.m. and

4

July 24, 2018 for less than four minutes between 2:54:21 p.m. and 2:58:08 p.m.  R-56.1 ¶ 11.  At 3:06 p.m. on July 24, 2018, Mintbroker entered a greater than 10% position in Avalon, which it exited on July 31, 2018 at 12:02 p.m. (the "Alleged Short Swing Period").  *Id.*

***The Complaint***

On August 13, 2018, 2018, just 12 days after Defendants filed their SEC Form 4, Plaintiff filed a Complaint pursuant to Sections 16(a) and 16(b) of the 1934 Securities Exchange Act, as amended, 15 U.S.C. § 78a et seq., attaching Defendants Forms 3 and 4, alleging Defendants had engaged in so-called "short swing" trading and demanding Defendants file a Form 13-D. Complaint, ECF Doc. No. 1, ¶ 13.  On September 28, 2018,  Plaintiff filed an Amended Complaint (ECF Doc. No. 19) ("Am. Cmp."), alleging that Defendants had engaged in "short swing" trading from July 24, 2018 at 14:38:18 until July 31, 2018 at 11:45:32.  Am. Cmp. ¶ 6. Setting aside that the Complaint and Amended Complaint were filled with libelous (were they not privileged) and irrelevant personal invective about Defendant Gentile, Plaintiff sought by its Amended Complaint to disgorge "any and all short-swing trading profits Defendants may have realized through their purchases and sales of the Class A Common Stock of Avalon during the short swing trading period" which Plaintiff estimated to be "$7,247,027.56."  *Id.* at ¶¶ 19, 39.  In rote language, and drafted as a virtual analog of the companion case brought by New Concept Energy, Plaintiff alleged that Defendants had, during that time, been "beneficial owners" of Avalon stock, and had increased their ownership of Avalon stock at one point to "roughly 60% of Avalon's total outstanding share issue of Common stock" during the alleged short swing period.  *Id.* at ¶ 2.  Plaintiff alleged (contrary to the facts) that after the short swing trading set forth in its Complaint, "trading in [Avalon] shares reverted to historical normality."  *Id*. at ¶ 32.

*The role of the Depository Trust Co., and Avalon share ownership*

A company's share register sets forth the legal owners of that company's stock.  R-56.1 ¶ 15.  These "registered owners" or "record owners" (the "record date" is the date upon which they legally own the shares) generally possess share certificates that "represent their ownership in the company."  *Id.*  Cede & Co is the nominee of the Depository Trust Co., ("DTC") a depository that legally owns the vast majority of publicly traded securities in the United States.  *Id.*  For each security, Cede & Co. owns a master certificate known as the 'global security,' which never leaves its vault.  *Id.*  Transactions on stock exchanges are recorded as debits and credits to DTC members' securities accounts, but the "registered" or "record" owner of most securities – DTC, through Cede & Co – remains the same.  *Id.*  DTC, through Cede & Co., is the registered holder of [DTC eligible securities], routinely processing dividend and interest payments and managing the electronic 'book-entry' transfer of interests in the securities at the direction of their customers, including ultimate beneficial owners.  *Id.*  Avalon shares are DTC eligible securities. R-56.1 ¶ 17.  Transactions involving street name shares are conducted using DTC's electronic' 'book-entry' system of accounting for share transfers.  R-56.1 ¶ 16.  When one participant's client sells shares in a particular company, that participant's DTC account is debited and the purchasing participant's account is credited by the same amount.  *Id.*  DTC's 'book-entry' system negates the need to keep a large inventory of physical stock certificates.  *Id.*  According to Avalon's transfer agent, the number of Avalon shares outstanding during the alleged short swing window was 3,263,585.  R-56.1 ¶ 14.  The number of Avalon shares owned by "Cede & Co." "through June 23, 2018" and supposedly available for street-side trading was 3,250,012 (the "Float).  R-56.1 ¶ 18.  That said, based upon Avalon's own analysis of its known shareholders, as of July 24, 2018 there were only approximately "1.7 million shares" left for the public to trade when backing out the greater than 5% shareholders who had not traded shares during the relevant

time, which the company identified as Ron Klingle, Anil Nalluri, Dimension Fund Advisors LP,

and Comprehensive Financial Planning.  R-56.1 ¶ 19.  This, then, was the total available number

of shares publicly available to trade (the "Available Float").

***Trading activity during the alleged Short Swing period***

Table A sets out the number of Avalon shares *purportedly* traded during the Alleged

Short Swing period by all market participants, and those trades as a percentage of the Float and

the Available Float:

| Table A: Market Participants | | | |
|---|---|---|---|
| Date | All market trades (purchases and sales) | Trades as % of Float | **Trades as % of Available Float** |
| 7/24/18 | 2,486,200 | 76.49% | **146.25%** |
| 7/25/18 | 10,660,300 | 328% | **627.08%** |
| 7/26/18 | 10,306,900 | 317.13% | **606.29%** |
| 7/27/18 | 12,799,500 | 393.83% | **752.91%** |
| 7/30/18 | 5,707,000 | 175.60% | **335.94%** |
| 7/31/18 | 3,976,900 | 122.37% | **233.94%** |
| TOTAL | 45,936,800 | 1413.43% | **2,702.16%** |

Tables B and C set out the number of Avalon securities *purportedly* traded during the

Alleged Short Swing Period by all Interactive Brokers' customers, and those trades as a

percentage of the Float and the Available Float:

| Table B: Interactive Brokers' Customers/Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | IB purchases | % of Float | IB sales* | % of Float | All IB trades (purchases + sales) | Trades as % of Float |
| 7/24/18 | 763,945.00 | 23.51% | 763,945.00 | 23.51% | 1,527,890 | 47.01% |
| 7/25/18 | 1,083,950 | 33.35% | 1,083,950 | 33.35% | 2,167,900 | 66.71% |
| 7/26/18 | 1,082,250 | 33.3% | 1,082,250 | 33.3% | 2,164,500 | 66.6% |
| 7/27/18 | 886,938 | 27.29 | 886,938 | 27.29% | 1,773,876 | 54.6% |
| 7/30/18 | 884,610 | 27.22% | 884,610 | 27.22% | 1,769,220 | 54.4% |
| 7/31/18 | 990,140 | 30.47% | 990,140 | 30.47% | 1,980,280 | 60.9% |
| TOTAL | 5,691,833 | 175.14% | 5,691,833 | 175.14% | 11,383,666 | 350.3% |

R-56.1 ¶¶ 20, 21,  24, 25, 28, 29, 32, 33, 36, 37, 40, 41, 44.

| Table C: Interactive Brokers' Customers/Available Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | IB purchases | % of Available Float | IB sales | % of Available Float | All IB trades (purchases + sales) | Trades as % of Available Float |
| 7/24/18 | 763,945.00 | **44.94%** | 763,945.00 | **44.94%** | 1,527,890 | **89.88%** |
| 7/25/18 | 1,083,950 | **63.76** | 1,083,950 | **63.76** | 2,167,900 | **127.53%** |
| 7/26/18 | 1,082,250 | **63.66%** | 1,082,250 | **63.66%** | 2,164,500 | **127.32%** |
| 7/27/18 | 886,938 | **52.17%** | 886,938 | **52.17%** | 1,773,876 | **104.35%** |
| 7/30/18 | 884,610 | **52.04%** | 884,610 | **52.04%** | 1,769,220 | **104.07%** |
| 7/31/18 | 990,140 | **58.24%** | 990,140 | **58.24%** | 1,980,280 | **116.49%** |
| TOTAL | 5,691,833 | **334.81%** | 691,833 | **334.81%** | 11,383,666 | **669.63%** |

R-56.1 ¶¶ 22, 23, 26, 27, 30, 31, 34, 35, 38, 39, 42, 43, 45.

Tables D and E set out the number of Avalon securities *purportedly* traded during the

Alleged Short Swing Period by Mintbroker, and those trades as a percentage of the Float and the

Available Float:

| Table D: Mintbroker/Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | Mintbroker purchases | % of Float | Mintbroker sales* | % of Float | Mintbroker total trades | Trades as % of Float |
| 7/24/18 | 624,073 | 19.2% | 99,086 | 3.05% | 723,159 | 22.25% |
| 7/25/18 | 703,602 | 21.65% | 118,277 | 3.64% | 821,879 | 25.29% |
| 7/26/18 | 690,184 | 21.24% | 215,677 | 6.64% | 905,861 | 27.87% |
| 7/27/18 | 327,406 | 10.07% | 192,340 | 5.92% | 519,746 | 15.99% |
| 7/30/18 | 0 | 0% | 719,885 | 22.15% | 719,855 | 22.15% |
| 7/3118 | 0 | 0% | 799,720 | 24.61% | 799,720 | 24.61% |
| TOTAL | 2,345,265 | 77.16 | 2,144,985 | 66.00 | 4,490,250 | 138.16% |

*including "short sales"

| Table E: Mintbroker/Available Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | Mintbroker purchases | **% of Available Float** | Mintbroker sales* | **% of Available Float** | Mintbroker total trades | **Trades as % of Available Float** |
| 7/24/18 | 624,073 | **36.71%** | 99,086 | **5.83%** | 723,159 | **42.54%** |
| 7/25/18 | 703,602 | **41.39%** | 118,277 | **6.95%** | 821,879 | **48.34%** |
| 7/26/18 | 690,184 | **40.60%** | 215,677 | **12.69%** | 905,861 | **53.29%** |
| 7/27/18 | 327,406 | **19.26%** | 192,340 | **11.31%** | 519,746 | **30.57%** |
| 7/30/18 | 0 | **0%** | 719,885 | **42.35%** | 719,855 | **42.35%** |
| 7/3118 | 0 | **0%** | 799,720 | **47.04%** | 799,720 | **47.04%** |
| TOTAL | 2,345,265 | **137.96** | 2,144,985 | **126.18%** | 4,490,250 | **264.13%** |

*including "short sales"

R-56.1 ¶¶ 46-51.

*Settlement*

Rule 15c6-1(a) requires that all broker-dealer securities transactions settled two business days after a trading position is opened.  R-56.1 ¶ 57.  As the SEC explained in guidance, "When an investor sells a security, the investor must deliver to the brokerage firm the investor's security no later than two business days after the sale."  R-56.1 ¶ 58.  This rule is known as "T+2".  R-56.1 ¶ 57.  Interactive Brokers offered its clients T+2 Settlement, but for a higher price, customers could opt into T+1 Settlement.  R-56.1 ¶ 59.  Defendants did not opt into T+1 settlement.  Mintbrokers' Interactive Brokers annual trading statements as well as its long activity statement set out separate line items for "starting cash", "ending cash", and "ending settled cash."  Rule 56.1 Statement ¶¶ 61-63.  The T+2 "settlement date" is better described as a theoretical settlement date, as it has not been established in discovery that even on T+2, actual shares are transferred between accounts.  There is no evidence in the records that Interactive Brokers obtained the actual shares necessary to "settle" the trades its customers placed.

*Short Selling and the "pool" of shares available for trading*

The number of shares available for a short seller to actually locate and borrow is necessarily less than the number of shares in the float of a given stock.  R-56.1 ¶ 67.  Despite this, the practice of "short selling" means that multiple brokers will attempt to short sell the same finite "pot" of shares on any given trading day, meaning there might be one million shares available, but many multiples of that amount of shares can be and are sold short every day.  R-56.1 ¶ 69.  Over the next two trading days, the shorted shares will either be borrowed and delivered, or the short will be closed out because the shares are unavailable.  *Id.*  If on a given trading day, market participants are looking to borrow shares to short sell five million shares, but only one million shares exist, only one million shares can be obtained and are available for delivery on that day.  R-56.1 ¶ 68.  Indeed, in this case there was only a total of 1.7 million

available shares outstanding -- and yet tens of millions shares were "bought" over successive days. R-56.1 ¶¶ 20-36.

### Short Selling and the "pool" of shares available for trading

As the Interactive Brokers representative testified at deposition, when Interactive Brokers accepts an open trade from a customer, the brokerage routes the order to an exchange and then it is filled on the exchange by a counterparty.  R-56.1 ¶ 70.  Interactive Brokers does not know whether or not the counterparty, (if not also an Interactive Brokers customer, which was never established to be the case here), actually owns the shares it purports to be selling.  R-56.1 ¶ 71. If a counterparty is not an Interactive Brokers' customer, these counterparties' identities are unknown.  Interactive Brokers does not place any securities into its customer's account until the trade has settled.  R-56.1 ¶ 72.

### Voting Shares

Voting power is a legal incident to share ownership, which is vested in the legal owner of stock, which includes registered owners, who appear in the company's share registry, and DTCC, which registers the shares it owns under "Cede & Co."  R-56.1 ¶ 73.  Only legal owners can vote shares.  *Id.*  DTC assigns to each market participant (including Interactive Brokers) the voting rights associated with shares in that participant's account "as of the record date."  *Id.*  The "record date" is the date that a shareholder obtains legal ownership.  *Id.*  The customers of market participants may vote shares by instructing their brokers.  R-56.1 ¶ 74.  A short seller never has any voting rights because it never takes possession of any shares.  R-56.1 ¶ 76.

### Defendants' Lack of Inside Knowledge

During the relevant period, Avalon executives did not have any knowledge of either Defendant; in fact, Avalon specifically identified its greater than 5% owners in a complaint made to the NYSE on July 24, 2018 and this list did not include Defendants.  R-56.1 ¶¶ 79.  During the

11

Alleged Short Swing Period, internal emails also established that "no members of management have bought or sold any shares of stock" and that "no current or potential investor" had contacted Avalon regarding the trading activity described herein.  In short, neither Defendant was an insider with access to any inside information. R-56.1 ¶¶ 80.

### Counsel's involvement in The Short Swing Bar

Counsel for Avalon, David Lopez, has brought some 325 Section 16(b)-related cases in the Southern District of New York since 1973.  R-56.1 ¶ 81. Lopez's co-counsel, Miriam Tauber, has brought some 45 Section 16(b)-related cases in the Southern District of New York since 2014.  R-56.1 ¶ 21.  Counsel have a small pool of shareholder-plaintiffs named Deborah Donoghue, Richard Morales, Aaron Rubenstein, and Mark Rubenstein (and less recently, C.R.A. Realty Corp), who they represent in 16(b) disgorgement cases.  R-56.1 ¶¶ 83-88.  Serial plaintiff Deborah Donoghue has alone brought approximately 146 16(b)-related cases.  R-56.1 ¶ 83. Serial plaintiff Richard Morales brought approximately 88 16(b)-related cases.  R-56.1 ¶ 84. Deborah Donoghue is apparently related to Richard Morales and was executrix of his will; Ms. Donoghue was substituted as plaintiff in eight of Mr. Morales' 16(b) cases after his death in 2001.  R-56.1 ¶ 85.  Serial Plaintiff C.R.A. Realty Corp has brought approximately 50 16(b)-related cases.  R-56.1 ¶ 86.

## LEGAL STANDARD

Summary judgment may be granted where " the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Travelers Indem. Co. of Illinois v. 28 E. 70th St. Const. Co.*, 296 F. Supp. 2d 476, 478 (S.D.N.Y. 2003) *citing* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Gallo v. Prudential Residential Servs. Ltd.,* 22 F.3d

1219, 1223 (2d Cir.1994).  In moving for summary judgment against a party who will bear the

ultimate burden of proof at trial, the movant's burden is satisfied if she can point to an absence of

evidence to support an essential element of the nonmoving party's claim." *Goenaga v. Mar. of*

*Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) *citing Celotex Corp.* 477 U.S. at 322–

23.

## ARGUMENT

I.      **Section 16(b) of the 1934 Securities Act Does Not Apply Here**

In order to recover disgorged profits pursuant to Section 16(b) of the 1934 Securities

Exchange Act, as amended, 15 U.S.C. § 78a et seq., (the "Act"), a Plaintiff must prove "there

was '(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a

shareholder who owns more than ten percent of any one class of the issuer' securities (4) within

a six-month period." *Gwozdzinsky ex rel. Revco D.S. v. Zell/Chilmark Fund, L.P.*,156 F.3d 305,

308 (2d Cir.1998) (internal citations omitted) (emphasis added).  Section 16(b) renders

"beneficial owners" of more than 10% of a corporation's stock "liable to suits requiring them to

disgorge their profits even if they did not trade on inside information or intend to profit on the

basis of such information." *Donoghue v. Casual Male Retail Grp., Inc.,* 375 F. Supp. 2d 226,

231 (S.D.N.Y. 2005) *citing Gollust v. Mendell*, 501 U.S. 115 at 122, 111 S. Ct. 2173 (1991).  *See*

*also Rosen ex rel. Price Communications Corp. v. Price*, 1No. 95-cv-5089 (CSH), 1997 WL

401793, at *1, (S.D.N.Y. July 16, 1997) (noting that the statute has been described as "harsh,"

"crude," and "Draconian").

II.     **Defendants Were Never "Beneficial Owners" of the Shares and are Therefore not**
        **Subject to Rule 16(b)'s Disgorgement Rules.**

Section 16 requires a "two-tier" analysis to determine whether is an individual can be

classified as a beneficial owner of shares.  *Morales v. New Valley Corp*, 999 F. Supp. 470, 473,

n.2 (S.D.N.Y. March 20, 1998).  SEC Rule 16a–1(a) provides that, in determining whether an individual is a beneficial owner under § 16(b) of the Act, courts should look to the definitions under § 13(d) of the Act.  Section 13(d), 17 CFR 240.13d-3(a), provides in relevant part:

(a) For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

> (1) Voting power which includes the power to vote, or to direct the voting of, *such security*; and/or,

> (2) Investment power which includes the power to dispose, or to direct the disposition of, *such security*. (Emphasis added).

Once status as a ten percent beneficial owner of actual shares is established, "the reporting and short-swing profit provisions of section 16 apply only to those securities in which the insider has a pecuniary interest." *Id.*  Pecuniary interest is defined as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the *subject securities*."  17 C.F.R. § 240.16a–1(a)(2)(i) (emphasis added).  All of these factors share a common requirement: that there be an *actual* security of the issuer over which the investor obtains the required dominion.

As set out below, because Plaintiff cannot establish that during the Alleged Short Swing period, Defendants (1) had any voting power in actual and existing Avalon securities; (2) ever owned or possessed actual and existing Avalon securities; and, (3) had any pecuniary interest derived from transactions in actual and existing Avalon securities, Plaintiff cannot establish that Defendants were ever "beneficial owners" of Avalon securities subject to Section 16(b).

### A.    Plaintiff has not Established that Defendants had any Voting Power in Avalon Securities.

There is no document or testimony in the record that demonstrates that Defendants possessed any voting power in a single Avalon security, let alone in over 10%.  Interactive

Brokers' 30b(6) deponent Brad Klauseger testified that "generally speaking", a customer "may" have voting power in securities in which they have a long position, but could not say that Defendants definitively did.  R-56.1 ¶ 81.  No document or testimony established that the contract between Interactive Brokers and Mintbroker gave Mintbroker the right to provide voting instructions to Interactive Brokers, or that such instructions were ever given.  R-56.1 ¶ 78. Moreover, and crucially here, Mr. Klauseger did not know if a customer could vote shares after an order had been placed but during T+2 settlement period (and nor did he establish what would occur when Interactive Brokers sold more shares to its customers than it could deliver).  It should go without saying, but if an investor sells shares they do not have (short), and there are insufficient shares in the market to cover that short, the purchaser will never obtain voting rights (among other things).

Because Plaintiff cannot establish that Defendants had any voting power in Avalon securities during the Alleged Short Swing Period, they have not satisfied the first prong of 17 CFR 240.13d-3(a).

**B.  Plaintiff has not met its Burden to Demonstrate Defendants Purchased or Sold Actual Avalon "Securities"**

In order to disgorge short-swing profits under Section 16(b) of the 1934 Act, a Plaintiff must be able to prove "(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period."  *Gwozdzinsky*, 156 F.3d at 308.  No evidence in the record supports this contention.

1.   *The "Trades" are Mere Book Entries*

Since August 1986, all marketable securities, whether classified as definitive or not, have been treated as issued in book-entry form.  *Meridian Mortg. Corp. v. United States*, 24 Cl. Ct.

811, 815, *aff'd,* 980 F.2d 745 (Fed. Cir. 1992).  Cede & Co, the nominee of DTC, possesses all DTC-eligible share certificates, including those of Avalon not owned by the small number of registered shareholders.  R-56.1 ¶¶ 15, 18.  Rather than exchanging share certificates, "securities traders" participate in transactions which record trades as debits and credits in their securities account.  R-56.1 ¶ 16.  As relevant here, the amount of outstanding stock in Avalon during the alleged short swing period was 3,263,585 shares. R-56.1 ¶ 14.  The number of street-side securities theoretically available for trading (i.e., owned by Cede & Co.), was 3,250,012 (the "Float").  R-56.1 ¶ 18.  However, because certain of the greater than 5% known shareholders in Avalon did not make any trades during the relevant time, the actual number of shares available for trading was 1.7 million shares (the "Available Float").  R-56.1 ¶ 19.

Plaintiff alleges that Defendants owned more than 10% of the outstanding stock of Avalon between July 24, 2018 and July 31, 2018, and that at one point, Defendants actually "owned" 60% of Avalon stock.  Am. Cmp. ¶ 2, 6.  No evidence whatsoever supports this assertion.  First, it is an impossibility, because Avalon itself established that the Available Float was 1.7 million shares, which is 52% of the company, meaning if Defendants purchased every available share in Avalon, they could only possess a maximum of 48% of the company.  R-56.1 ¶ 19.  While the Interactive Brokers trading records show book entries for greater than 10% position in total Avalon stock, these entries do not reflect the possession of *actual* shares, nor could they because they do not account for either the T+2 settlement period or for the fact that Interactive Brokers' customers *alone* purchased and sold more than 100% of the actual shares available on five days of the alleged six-day long short swing period, notwithstanding the rest of the market's considerable trading activity.  R-56.1 ¶¶ 57-59 and Tables A and C, *supra*.  Because of the two-business day lag between any shares settling and Defendants obtaining possession of

16

any Avalon securities, these records reflect only a "position" related to Avalon stock. The Interactive Brokers activity statements reflect this reality, with lines for "cash" and "settled cash." R-56.1 ¶¶ 61-64.

By way of example, it is mathematically and logically impossible for Defendants to have actually possessed the requisite threshold shares on July 26 (or, for that matter, any day in the relevant timeframe). On July 26, 2018, one of the largest volume trading days of the Alleged Short Swing period, market participants purchased and sold, or sold and purchased, over ten million Avalon "shares" - this is just over 600% of the Available Float. R-56.1 ¶ 28. On the same day, all of Interactive Brokers' customers purported to purchase 1.083 million shares, which is equivalent to 67% of the Available Float. R-56.1 ¶ 30, and Table C *supra*. Interactive Brokers' customers represent a small fraction of all market participants, and at most, 10% of the Avalon shares purchased on July 26, based on trading volume, *see* Tables A, B, and C.[1] *Even if* Interactive Brokers' customers actually received all the shares they purported to purchase and sell – and no evidence suggests that they did – 10% of the Avalon Available Float is 170,000 shares – or approximately 5% of the company. Defendants' trades, of course, did not make up all of Interactive Broker's trading activity – at best their trades represented less than half of the purported Interactive Brokers purchases, which is concomitantly at best less than 2.5% of the company.[2] There is no factual basis on which to find that Defendants ever could have come into possession of 10% of Avalon shares.

---

[1] Of 10,306,900 purported purchases and sales for all market participants on July 26, 2018, Interactive Brokers customers purported to purchase 1.083 million shares on July 26, 2019, or approximately 10% of all shares traded. *See* Table C, *supra*.

[2] Defendants' "purchases" minus "sales" for July 26, 2018 netted out to a position in 474,507 Avalon shares. This represents 44%, or less than half of Interactive Brokers' purported purchases of 1,082,250 on the same day. *See* Tables C, D, and E, *supra*.

As the Interactive Brokers representative testified, the finite "pot" of securities available for short selling in any listed company on any given trading day is necessarily smaller than the number of shares in the float.  R-56.1 ¶ 73.  Mr. Klauseger did not testify to the specifics of the Avalon Float, or the extent to which one or many market participants took short positions in Avalon securities.  However, when presented with a hypothetical, he acknowledged that the number of shares in the "pot" available to short might be one million, but two or more brokers could feasibly each take a short position for those million shares, meaning there would be short sales of two million shares when only one million actual shares existed that could be available to cover the short positions.  R-56.1 ¶ 75.  *Such an event does not create more shares*.  Rather, it means that many of the short sales could never settle because the sales did not represent actual and deliverable stock.  The fact that 2,702% of Avalon's Available Float purported.to exchange hands during the alleged Short Swing period – and that Mintbroker alone purported to purchase and sell nearly 4.5 million shares in Avalon stock – trading the Available Float nearly three times over –  leads to the unavoidable conclusion that an unknown, but large portion of the "trades" were in fact naked short sales by market participants purporting to borrow the same, limited number of shares available for actual trading.  *See* Tables A-E *supra*.  Plaintiff has not and cannot establish otherwise, making any trial here unnecessary.

### C.      Defendants had no Pecuniary Interest in Actual Avalon Securities

Pecuniary interest is defined as the "opportunity, directly or indirectly, to profit or share in any profit derived from *a transaction in the subject securities*" (Rule 16a-1(a)(2)(i)). (Emphasis added).  Cash—but not "settled cash"—was variously credited and debited to Defendants' trading accounts during the relevant trading period.  Rule 56.1 Statement ¶¶ 61, 63. Plaintiff failed to obtain any discovery supporting its argument that *actual securities* settled into Interactive Brokers, let alone into Defendants' account.

III.     **Defendants are not the Statutory Insiders that Section 16(b) is Designed to Safeguard Against.**

"When a transaction does not fall within the literal terms of Section 16(b), the statute must be interpreted in a way that is consistent with its legislative purpose." *Chechele v. 12 Sperling*, Fed. Sec. L. Rep. P. 96786 (S.D.N.Y. Mar. 29, 2012], aff'd, 758 F3d 463 (2d. Cir. 2014). As such, "Section 16(b) liability depend[s] on 'whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information.'" *Id. quoting Donoghue v. Centillium Commc'ns Inc.*, No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *5 (S.D.N.Y. Mar. 28, 2006). Because this case involves trading in phantom shares (i.e. trading in amounts that vastly exceeded the actual Float available to buy or sell) akin to trading in derivatives of shares, these transactions do not fall withing the literal terms of Section 16(b) and a consideration of the legislative purpose is required.

The purpose of Section 16(b) is "to protect security holders from statutory insiders who unfairly abuse their access to inside information in dealing with the issuing corporation's securities and to protect the integrity of the equity markets." *In re: XO Communications, Inc.* 330 B.R. 394, 426 (U.S. Bankr. Ct. S.D.N.Y. Sept. 23, 2005). Congress saw 16(b) as a "relatively arbitrary rule capable of easy administration." *Reliance Electric Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, (1972) *quoting Bershad v. McDonough,* 428 F.2d 693, 696 (7th Cir. 1970). But this "arbitrary rule" has gained a reputation for injustice and exploitation, not least because Section 16(b) has no scienter component and decades ago some courts found that "there is, in effect, a conclusive presumption that the insider traded on the basis of inside information when conducting a short-swing transaction.... [I]ssues of scienter, materiality, reliance and causation ... are irrelevant." Peter L. Romeo and Alan L. Dye, SECTION 16 TREATISE AND

19

REPORTING GUIDE (4th ed. 2012) § 9.01[b].  *Rubenstein v. Live Nation Entm't*, No. 16 CIV.

7283, 2017 WL 2670749, at *2 (S.D.N.Y. June 20, 2017).[3]   Numerous courts have noted that

history has shown 16(b) "to be an 'extremely crude rule of a most deformed and misshapen

thumb.'"  *Provident Secs. Co. v. Foremost-McKesson, Inc.*, 331 F. Supp. 787, 792 (N.D. Cal.

1971) *aff'd*, 506 F.2d 601 (9th Cir. 1974), aff'd, 423 U.S. 232 (1976).  As the Second Circuit

pointed out in *Blau v. Lamb*, 363 F.2d 507, 515 (2d Cir. 1966), "Congress decided in order to

throw out the bathwater that the baby had to go too."

### A.   Defendants had no Access to Inside Information

Section 16(b) polices trading of securities by insiders.  It "seeks to deter 'insiders,' who

are presumed to possess material information about the issuer, from using such information as a

basis for purchasing or selling the issuer's equity securities at an advantage over persons with

whom they trade."  *Rubenstein v. Live Nation Entm't,* No. 16 CIV. 7283, 2017 WL 2670749, at

*2 (S.D.N.Y. June 20, 2017) *citing Gwozdzinsky*, 156 F.3d at 308.  Defendants here had no

access to inside information—Plaintiff's own documents prove that Defendants were strangers to

Avalon and there could not possibly have had access to information they could use to their

advantage over other market participants.  R-56.1 ¶¶ 79.  Plaintiff does not allege otherwise.

### B.   Section 16(b)'s Perverse Incentives Create Unjust Windfalls for Companies and their Lawyers

Notwithstanding the one-time sound principles underlying 16(b), "it has significant flaws

in terms of the administration of justice" as "the structure of the statute creates recovery for

companies that have not been harmed, and perverse incentives for lawyers to institute actions

---

[3] In contrast, when a group pursuant to Section 13(d) is alleged to have 16(b) liability, "a common objective among its members is required." *Morales v. Quintel Entm't, Inc.,* 72 F. Supp. 2d 344, 348 (S.D.N.Y. 1999), *aff'd in part, vacated in part,* 249 F.3d 115 (2d Cir. 2001).

solely for the purpose of obtaining legal fees."[4]  The facts below (which are not, in fact, in dispute) are presented to impress upon the court that this case not only fails to fit into the Section 16 paradigm, but this lawsuit does not serve the policy ends that Section 16(b) was enacted to further, and in fact further perverts them.

As explained in *In Bulldog Investors*, "Respondent Deborah Donoghue ("Donoghue"), a serial § 16(b) plaintiff, and her regular § 16(b) lawyer [David Lopez], followed the standard process devised by the "specialty bar" of lawyers who sift through publicly available forms filed by purported 10% holders with the Securities and Exchange Commission and sued Bulldog derivatively on Invesco's behalf, in the United States District Court for the Southern District of New York.  *See, e.g.,* Petition for Writ of Certiorari, *Bulldog Investors General Partnership v. Deborah Donoghue et al.*, 133 S. Ct. 2388 ( No.12-818) at 1, (denied May 20, 2013).  The Court there noted their tactics are "well known" and that such lawyers "look[] for such transactions, from which they can then profit through fee awards in § 16(b) lawsuits.  These lawyers employ house plaintiffs to buy a nominal amount of the stock and sue." *Id.*

This case, like in *Bulldog Investors*, is one of 325 Section 16(b)-related cases brought by Plaintiff's counsel Lopez in the last thirty years in the Southern District of New York *alone*.  R-56.1 ¶ 81. Lopez has, for decades, largely used the same small pool of plaintiff "shareholders"; Ms. Tauber has done the same since 2014 – Deborah Donoghue of New York (approximately 146 cases), Richard Morales of New York (approximately 88 cases), C.R.A. Realty Corp. (approximately 50 cases); Aaron Rubenstein (approximately 23 cases); Mark Rubenstein (approximately 10 cases) (a review of this memorandum of law's table of authorities is telling of

---

[4] John E. Munter, SECTION 16(B) OF THE SECURITIES EXCHANGE ACT OF 1934: AN ALTERNATIVE TO BURNING DOWN THE BARN IN ORDER TO KILL THE RATS, 52 Cornell L. Rev. 71-72 (1966).

this fact).  R-56.1 ¶¶ 82-88.  This small band of litigants has operated for years to force

companies to bring 16(b) suits whether they wish to or not.  *See, e.g., Morales v. Holiday Inns,*

*Inc.*, 366 F. Supp 760, 762 (S.D.N.Y. 1973).

Here, Avalon was not harmed by Defendants' trading activity.  In fact, Avalon's high

share price in the six months following the Alleged Short Swing Period was 100% higher than

the high share price in the six months preceding the Alleged Short Swing Period.  R-56.1 ¶ 6.

Not only was the company not harmed by the trading at issue, it reaped a windfall, that it now

seeks to compound.[5]

## **CONCLUSION**

This case involves high-speed computer trading by non-insiders who "purchased" shares

that could not mathematically exist.  This set of facts – a collection of book entry positions,

derived from Avalon shares, does not present transactions "in which the possibility of abuse [is]

intolerably great."  *Reliance*, 404 U.S. at 422.  This is simply not a 16(b) case.  For all of the

foregoing reasons, Defendants respectfully request that this Court grant its motion for summary

judgment and in the alternative, issue a ruling requiring Plaintiff to establish at trial that every

share it alleges Defendants purchased or sold actually existed and came into Defendants'

possession.

---

[5] E.g., following the filing of *Huppe v. Special Solutions Fund III QP, L.P.* and six years of
litigation thereafter, Ayro informed shareholders that a settlement reached by Huppe, a
shareholder of Ayro (also a Lopez client) and the alleged short-swing shareholders in the case
constituted $529,280 in disgorgement of short-swing profits, less the fees and expenses agreed
upon by the plaintiffs of $272,539 leaving a remainder of $254,361 for Ayro, which would be
"recorded *as additional paid-in capital*."  R-56.1 ¶ 96.

FORD O'BRIEN LLP


  /s/ Danielle M. McLaughlin
Adam Ford
Robert S. Landy
Danielle M. McLaughlin
575 5th Avenue, 17th Floor
New York, NY 10017
aford@fordobrien.com
rlandy@fordobrien.com
dmclaughlin@fordobrien.com
*Attorneys for Defendants Guy Gentile and*
*Mintbroker International, Ltd.*

Dated: New York, New York
      August 10, 2020