UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

AVALON HOLDINGS CORPORATION,

                              *Plaintiff*,

          – against –

GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.,

                              *Defendants*

Case No.: 1:18-cv-7291-VSB-RWL

------------------------------------------------------------------------x

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF <u>UNDISPUTED MATERIAL FACTS</u>

Defendants Guy Gentile and Mintbroker International, Ltd. hereby submit this Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 to set forth the material facts to which it contends there is no genuine issue to be tried.

1. Avalon Holdings Corporation ("Avalon") is a Warren, Ohio-based provider of waste management services to industrial, commercial, municipal and governmental customers in selected northeastern and midwestern U.S. markets. Avalon also owns the Avalon Golf and Country Club, which operates golf courses and related facilities. McLaughlin Declaration ("McLaughlin Decl.") Exhibit 1.

2. For approximately the first seven months of 2018, up until July 24, 2018, Avalon's closing share price ranged from approximately $2.00 to $2.40. McLaughlin Decl. Exhibit 2.

3. On June 15, 2018, Mintbroker, through Interactive Brokers, opened a position on Avalon securities with the purchase of 200 shares. McLaughlin Decl. Exhibit 3.

4. On August 2, 2018, Mintbroker netted its position in Avalon securities to zero with the purchase of 1,000 Avalon securities. McLaughlin Decl. Exhibit 4.

5. For approximately the last five months of 2018, after July 31, 2018, Avalon's closing share price ranged from approximately $2.65 to $4.80. McLaughlin Decl. Exhibit 2 and, Yahoo Finance Avalon Share Price Chart, January 1, 2018 to December 31, 2018.

6. The highest closing share price of $4.80 in the second half of 2018 represents a 100% increase over the highest closing share price of $2.40 in the first half of 2018, and the lowest closing share price of $2.65 in the second half of 2018 represents a 32.5% increase over the lowest closing price of $2.00 in the first half of 2018. McLaughlin Decl. Exhibit 2 and ¶ 4.

7. Between its opening and closing positions, Mintbroker undertook some 18,460 trades in purported Avalon securities. McLaughlin Decl. ¶ 6.

8. On July 7, 2018, Mintbroker filed a SEC Form 3 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating that it had taken a position in 1,922,095 shares of Avalon. McLaughlin Declaration ("McLaughlin Decl.") Exhibit 5.

9. On August 1, 2018, Mintbroker filed a SEC Form 4 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating it had decreased its position in Avalon securities by 202,642 shares. McLaughlin Decl. Exhibit 6.

10. On August 22, 2018, Mintbroker filed a SEC Form13-D pursuant to Section 16(a) of the Securities Exchange Act of 1934, to which it attached all of its trading records reflecting positions in Avalon stock effected during the prior sixty days by Mintbroker. Gentile, by virtue of his relationship to MintBroker, noted in this form

that he "may be deemed to indirectly beneficially own (as that term is defined in Rule 13d-3 under the Exchange Act of 1934, as amended) those Shares which MintBroker had owned" and that he "disclaim[ed] beneficial ownership of all such Shares for all other purposes." McLaughlin Decl. Exhibit 7.

11. The periods during which Defendants purported to hold a greater than 10% of the outstanding common stock of Avalon based on the Interactive Brokers' trade blotter (which does not account for T+2 settlement) are July 24, 2018 for eleven seconds between 2:46:41 p.m. and 2:46:52 p.m. and July 24, 2018 for less than four minutes between 2:54:21 p.m. and 2:58:08 p.m. At 3:06 p.m. on July 24, 2018, Mintbroker entered a greater than 10% position in AWX, which it exited on July 31, 2018 at 12:02 p.m. (the "Alleged Short Swing Period"). McLaughlin Decl. ¶ 11.

12. Defendants made 15,511 trades during the Alleged Short Swing Period. McLaughlin Decl. ¶ 12.

13. Based upon the trade blotter produced by Interactive Brokers (which does not account for T+2 settlement), Defendants' maximum position was 57.5 % of the Avalon outstanding stock on July 27, 2018 at 1:56 p.m. McLaughlin Decl. ¶ 13.

14. The number of Avalon shares outstanding during the Short Swing Window was 3,263,585. McLaughlin Decl. Exhibit 8, ¶ 15.

15. A company's share register sets forth the legal owners of that company's stock. McLaughlin Decl. Exhibit 9, at 12-5. These "registered owners" or "record owners" (the "record date" is the date upon which they legally own the shares) generally possess share certificates that "represent their ownership in the company." *Id.* The vast majority of publicly traded shares in the United States are registered in the name

of Cede & Co., the nominee of The Depository Trust Company ("DTC"). *Id.* at 12-3. DTC is the largest "legal" owner of most public companies' stock. *Id.* at 12-5. "Shares registered in this manner are commonly referred to as being held in "street name." *Id.* "The street name registration system was created to facilitate securities trading, eliminate paperwork and preserve the confidentiality of beneficial owners' identities." *Id.* "Beneficial owners are divested of the rights incident to legal ownership when they hold their shares in street name." *Id.*

16. Transactions involving street name shares are conducted using DTC's electronic "book-entry" system of accounting for share transfers. McLaughlin Decl. Exhibit 9 at 12-6. Whcn one participant's client sells shares in a particular company, that participant's DTC account is debited and the purchasing participant's account is credited by the same amount. Id. DTC's "book-entry" system negates the need to keep a large inventory of physical stock certificates. The shares of each company held by DTC are typically represented by only one or more immobilized jumbo stock certificates held in DTC's vault. *Id.*

17. Avalon shares are DTC eligible securities, as evidenced by the DTC settlement data produced in this litigation. McLaughlin Decl. Exhibit. 10.

18. The number of Avalon shares possessed by "Cede & Co" during the Short Swing Window is 3,250,012 (the "Float"). McLaughlin Decl. Exhibit 8, ¶ 16.

19. Based upon Avalon's own analysis of its shareholders, as of July 24, 2018 there were only approximately "1.7 million shares" left to publicly trade when backing out the greater than 5% shareholders who had not traded their shares during the relevant period, identified as Ron Klingle, Anil Nalluri, Dimension Fund Advisors LP, and

Comprehensive Financial Planning (the "Available Float"). The Available Float equates to 52% of Avalon's outstanding shares. McLaughlin Decl. Exhibit 27 at NYSE000076, Exhibit 28, and ¶ 54.

20. On July 24, 2018, **2,486,200** Avalon shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

21. The July 24, 2018 trading by all market participants in Avalon shares represented **76.49%** of the Float and **146.25%** of the Available Float. McLaughlin Decl. ¶ 22.

22. On July 24, 2018, **763,945** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of **1,527,890** trades. McLaughlin Decl. Exhibit. 10.

23. The July 24, 2018 trading by Interactive Brokers' customers represented **47.01%** of the Float and **89.88%** of the Available Float. McLaughlin Decl., ¶ 29.

24. On July 25, 2018, **10,660,300** Avalon shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

25. The July 25, 2018 trading in Avalon shares by all market participants represented **328%** of the Float and **627.08%** of the Available Float. McLaughlin Decl. ¶ 23.

26. On July 25, 2018, **1,083,950** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of 1,167,900 trades. McLaughlin Decl. Exhibit 10.

27. The July 25, 2018 trading by Interactive Brokers' customers represented **66.71%** of the Float and **127.53%** of the Available Float. McLaughlin Decl. Exhibit 10, ¶ 30.

28. On July 26, 2018, **10,306,900** Avalon shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

29. The July 26, 2018 trading in Avalon shares by all market participants represented **317.13%** of the Float and **606.29%** of the Available Float. McLaughlin Decl. ¶ 24.

30. On July 26, 2018, **1,082,250** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of **2,164,500** trades. McLaughlin Decl. Exhibit 10.

31. The July 26, 2018 trading by Interactive Brokers' customers represented **66.6%** of the Float and **127.32%** of the Available Float. McLaughlin Decl. Exhibit 10, ¶ 31.

32. On July 27, 2018, **12,799,500** Avalon shares were traded by all market participants. McLaughlin Decl. 11.

33. The July 27, 2018 trading in Avalon shares by all market participants represented **393.83%** of the Float and **752.91%** of the Available Float. McLaughlin Decl. ¶ 25.

34. On July 27, 2018, **886,938** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of **1,773,867** trades. McLaughlin Decl. Exhibit 10.

35. The July 27, 2018 trading by Interactive Brokers' customers represented **54.6%** of the Float and **104.35%** of the Available Float. McLaughlin Decl. Exhibit 10, ¶ 32.

36. On July 30, 2018, **5,707,000** Avalon shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

37. The July 30, 2018 trading in Avalon shares by all market participants represented **175.60%** of the Float and **335.94%** of the Available Float. McLaughlin Decl. ¶ 26.

38. On July 30, 2018, **884,610** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of **1,769,220** trades. McLaughlin Decl. Exhibit 10.

39. The July 30, 2018 trading by Interactive Brokers' customers represented **54.4%** of the Float and **104.07%** of the Available Float.  McLaughlin Decl. Exhibit 10, ¶ 33.

40. On July 31, 2018, **3,976,900** Avalon shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

41. The July 31, 2018 trading in Avalon shares by all market participants represented **122.37%** of the Float and **233.37%** of the Available Float.  McLaughlin Decl. ¶ 27.

42. On July 31, 2018, **990,140** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of 1,980,280 trades. McLaughlin Decl. Exhibit 10.

43. The July 31, 2018 trading by Interactive Brokers customers represented **60.9%** of the Float and **127.76%** of the Available Float.  McLaughlin Decl. Exhibit 10, ¶ 34.

44. The combined trading in Avalon shares by all market participants during the alleged Short Swing Period was **45,936,800** shares, constituting **1413.43%** of the Float and **2,702.16%** of the Available Float.  McLaughlin Decl. ¶¶ 21, 28.

45. The combined trading in Avalon shares by Interactive Brokers' customers during the alleged Short Swing Period was **11,383,666** shares, representing **350.3%** of the Float and **669.63%** of the Available Float.  McLaughlin Decl. ¶ 34.

46. On July 24, Mintbroker opened a position in **624,073** shares representing **19.2%** of the Float and **36.71%** of the Available Float and closed a position in **99,086** shares representing **3.05%** of the Float and **5.83%** of the Available Float; its total trades were **723,159** "shares" representing **22.25%** of the Float and **42.54%** of the Available Float.  McLaughlin Decl. Exhibit 12.

47. On July 25, Mintbroker opened a position in **703,602** shares representing **21.65%** of the Float and **41.39%** of the Available Float and closed a position in **118,277** shares representing **3.64%** of the Float and **6.95%** of the Available Float; its total trades were **821,879** "shares" representing **25.29%** of the Float and **48.34%** of the Available Float.  McLaughlin Decl. Exhibit 12.

48. On July 26, Mintbroker opened a position in **690,184** shares representing **21.24%** of the Float and **40.60%** of the Available Float and closed a position in **215,677** shares representing **6.64%** of the Float and **12.69%** of the Available Float; its total trades were **905,861** "shares" representing **27.87%** of the Float and **53.29%** of the Available Float.  McLaughlin Decl. Exhibit 12.

49. On July 27, Mintbroker opened a position in **327,406** shares representing **10.07%** of the Float and **19.26%** of the Available Float and closed a position in **192,340** shares representing **5.92%** of the Float and **11.31%** of the Available Float; its total trades were **519,746** "shares" representing **15.99%** of the Float and **30.57%** of the Available Float.  McLaughlin Decl. Exhibit 12.

50. On July 30, Mintbroker closed a position in **719,885** shares representing **22.15%** of the Float and **42.35%** of the Available Float.  McLaughlin Decl. Exhibit 12.

51. On July 31, Mintbroker closed a position in **799,720** shares representing **24.61%** of the Float and **47.04%** of the Available Float.  McLaughlin Decl. Exhibit 12.

52. The combined trading in Avalon shares by Mintbroker during the Alleged Short Swing Period was **4,490,250** "shares", representing **138.16%** of the Float and **264.13%** of the Available Float.  Mintbroker's positive book entry position during the Alleged Short Swing Period was **2,345,265** "shares" and its negative book-entry

position during the Alleged Short Swing Period representing sales and short sales was **2,144,985** "shares."  McLaughlin Decl. Exhibit 12.

53. Account #I1043365 was a proprietary trading account held by MintBroker at Interactive Brokers ("Interactive") and it served as the "Master Account" for two proprietary sub- accounts: (i) Account #UL1043811; and (ii) Account #US1043812 (the "Trading Accounts").  McLaughlin Decl. Exhibit 13.

54. The "Activity Statements" produced by Interactive for each of the Trading Accounts accurately reflect the Avalon (AWX) and New Concept (GBR) trades executed in those Trading Accounts by Gentile, as the sole owner of MintBroker. (See #UL1043811 "Activity Statement" (filename: Annual Statements/MINT 2018 UL.pdf), AWX trades at pp.933 –1000; GBR trades at pp.1150 –1202; see also #US1043812 "Activity Statement" (filename: Annual Statements/MINT 2018 US.pdf), AWX trades at pp.203-206; GBR trades at pp. 431-433).  McLaughlin Decl. Exhibit 13.

55. The trades reflected in the Activity Statements for the Trading Accounts include the Avalon and New Concept trades reflected in the records produced by the Defendants at Bates Numbers MINT-AWX000001-140 and MINT-GBR-000001-159. McLaughlin Decl. Exhibit 13.

56. Cash was credited or debited to the Trading Accounts, as applicable, in connection with each AWX or GBR trade listed on the "Activity Statements," in the amount of the "Proceeds" indicated on the "Activity Statements" for each such trade. McLaughlin Decl. Exhibit 13.

57. On May 22, 2017, the SEC amended Rule 15c6-1(a) to shorted by one business day the standard settlement cycle for broker-dealer securities transactions from trade date plus 3 business days ("T+3") to trade date plus 2 business days, known as T+2. McLaughlin Decl. Exhibit 14.

58. "Generally, this change would mean that when an investor buys a security, the brokerage firm must receive payment from the investor no later than two business days after the trade is executed.  When an investor sells a security, the investor must deliver to the brokerage firm the investor's security no later than two business days after the sale.  For example, if an investor sells shares of a particular stock on Monday, the transaction would settle on Wednesday."  McLaughlin Decl. Exhibit 14.

59. Interactive Brokers informed its clients that "[e]ffective September 5, 2017, the standard settlement period for securities traded on U.S. and Canadian exchanges will be reduced from 3 business days (T+3) to 2 business days (T+2) and that clients currently utilizing T+2 (which had a higher execution cost) would be amended to T+1. McLaughlin Decl. Exhibit 15, 17.

60. "Most stock exchange transactions settle on the trade date plus two business days . . ." McLaughlin Declaration Exhibit 16 at p. 11.

61. Mintbroker's Interactive Brokers 2018 Annual Statement features line items for starting cash, ending cash, and ending settled cash." McLaughlin Declaration Exhibit 16 at pp 1-2.

62. Mintbroker's Interactive Brokers Long Account Activity Statement, January 1, 2018-December 31, 2018 features line items for starting cash, ending cash, and ending settled cash.  McLaughlin Declaration Exhibit 17 at pp. 772-773.

63. The Interactive Brokers Activity Statements explain that "Ending settled cash reflects the cash that has actually settled." McLaughlin Declaration Exhibit 17 at p. 5210.

64. The Interactive Brokers code "SS" indicates that a customer has "designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market." McLaughlin Declaration Exhibit 17 at p. 5210.

65. None of Mintbroker's AWX long trades during the relevant period were designated "SS." McLaughlin Declaration Exhibit 17 at p. 933-1000.

66. None of Mintbroker's AWX short trades during the relevant period were designated "SS." McLaughlin Declaration Exhibit 18.

67. The number of shares available for a short seller to borrow is necessarily less than the number of shares in the float of a given stock. McLaughlin Decl. Exhibit 19 at 162:2-15.

68. For example, if on a given day, market participants are looking to borrow shares to short sell five million shares, but only one million shares exist, only one million shares can be obtained and are available for delivery on that day. McLaughlin Decl. Exhibit 19 at 162:16-25.

69. Multiple brokers can short the same "pot" of shares on any given trading day, meaning there might be one million shares available, but two million shares to be sold short. Over the next two trading days, the "clearing function" means the shorted shares will either be delivered or available to borrow, or the short will be closed out because the shares are unavailable. McLaughlin Decl. Exhibit 19 at 99:15-100:19

70. When an Interactive Brokers customer puts an order for shares to be filled, Interactive Brokers routes the order to an exchange and then it is filled on the exchange by a counterparty. McLaughlin Decl. Exhibit 19 at 154:12-155:6.

71. Interactive Brokers does not know whether or not the counterparty, if not also an Interactive Brokers customer, actually owns the shares it purports to be selling. McLaughlin Decl. Exhibit 19 at 155:4-11.

72. Interactive Brokers does not place any securities into its customer's account until the trade has settled. McLaughlin Decl. Exhibit 19 at 167:22-168:8.

73. Voting power is a legal incident to share ownership, which is vested in the legal owner of stock, which include registered owners, who appear in the company's share registry, and DTCC, which registers the shares it owns under "Cede & Co." McLaughlin Decl. Exhibit 9 at p. 12-6. Only Legal owners can vote shares, while street name holders are not "technically entitled to vote shares or grant proxy authority." *Id*. at p. 12-7. However, DTC assigns to each market participant (including Interactive Brokers) the voting rights associated with particular shares in that participant's DTC account "as of the record date." *Id.* at p. 12-7. The "record date" is the date that a shareholder obtains legal ownership. *Id.* at p. 12-5. Absent special circumstances, proxy authority is never transferred down to the ultimate beneficial owners. *Id.* at pp. 12-7 to 12-8.

74. In order to vote shares, the customers of market participants may, by contract with the market participant, have the right to provide voting instructions to their bank or broker, who, in turn, has the legal right to actually vote those shares. *Id*. at pp. 12-7 to 12-8.

75. According to Interactive Brokers, a customer may, "generally speaking," have voting power in securities, but only to the extent they have a long position. McLaughlin Decl. Exhibit 19 at 114:24-125:6.

76. A short seller never has any voting rights because it never takes possession of any shares. McLaughlin Decl. Exhibit 9 at pp. 12-18 to 12-20.

77. The Interactive Brokers 30b(6) deponent in this matter did not know if a customer could vote shares after an order had been placed but before the shares were placed into the customer's account. McLaughlin Decl. Exhibit 19 at 170:18-117:8.

78. This deponent did not establish that the contract between Interactive Brokers and Mintbroker enabled Mintbroker to provide voting instructions to Interactive Brokers, and nor did he establish that Mintbroker exercised any voting power during the period that it held a position in Avalon securities.

79. During the relevant period, Avalon executives did not have any knowledge of either Defendant as a greater than 5% (or 10% owner); in fact, Avalon specifically identified its greater than 5% owners in a complaint made to the NYSE on July 24, 2018 and this list did not include Defendants. McLaughlin Decl. Exhibit 27.

80. During the relevant period, internal emails also established that "no members of management have bought or sold any shares of stock" and that "no current or potential investor" had contacted Avalon regarding the trading activity described herein. McLaughlin Decl. Exhibit 30 at AV0009-10, AV0026-29.

81. Counsel for Avalon, David Lopez, has brought at least 325 Section 16(b)-related cases in the Southern District of New York since 1973. McLaughlin Decl. Exhibit 20, PACER Search results for "attorney" Firstname "David" Lastname "Lopez.

82. Counsel for Avalon, Miriam Tauber, has brought some 45 Section 16(b)-related cases in the Southern District of New York since 2014.  McLaughlin Decl. Exhibit 21.

83. Lopez and/or Tauber have represented Plaintiff Deborah Donoghue in at least 146 16(b)-related demand action 146 times since 2001.  McLaughlin Decl. Exhibit 22.

84. Lopez represented Plaintiff Richard Morales in approximately 88 16(b)-related demand action 146 times prior to 2001.  McLaughlin Decl. Exhibit 23.

85. Plaintiff Deborah Donoghue was substituted for Plaintiff Richard Morales or designated as plaintiff/executrix of Richard Morales in eight cases in 2001 after he died:

    a. *Donoghue, et al v. Flightserv.Com, et al.*, No. 1:00-cv-03987-JSM

    b. *Donoghue, et al v. Miracor Diagnostics, et al.*, No. 1:00-cv-06696-JGK

    c. *Morales, et al v. Natural Microsystems, et al.*, No. 1:01-cv-00708-RWS

    d. *Morales, et al v. CT Holdings Inc., et al.*, No. 1:01-cv-01303-KMW-KNF

    e. *Donoguhe v. Integrated Business, et al.*, No. 1:01-cv-02407-KMW

    f. *Donoghue v. Opti, Inc., et al.*, No. 1:01-cv-02447-MP

    g. *Donoghue v. Equitex, Inc., et al.*, No. 1:01-cv-06132-WK

    h. *Donoghue v. Spatializer Audio, et al.*, No. 1:01-cv-07286-AKH

       McLaughlin Decl. Exhibit 22.

86. Lopez has represented Plaintiff C.R.A. Realty Corp. in approximately 50 16(b)-related cases.  McLaughlin Decl. Exhibit 24.

87. Lopez and/or Tauber have represented Plaintiff Aaron Rubenstein in approximately 24 16(b)-related demand actions since 2015.  McLaughlin Decl. Exhibit 25.

88. Lopez and/or Tauber have represented Plaintiff Mark Rubenstein in approximately 10 16(b)-related demand actions since 2015.  McLaughlin Decl. Exhibit 26.

89. A great number of this cohort's 16(b) cases are dismissed within months of being brought, including, for example, as to Richard Morales, the following cases: *Morales v. Underwriters Group, et al.*, No 1:93-cv-06228-LAP (filed 9/7/1993, closed 11/17/1993); *Morales v. IEC Electronics, et al*., No 1:00-cv-017553-BSJ, (filed 3/7/00, closed 7/29/00; *Morales v. Coleman Co. In., et al*., No. 1:00-cv-02482-VM (filed 3/31/11, closed 5/1/00); *Morales v. Memberworks Inc., et al*., No. 1:00-c-03122-JSM (filed 4/24/00, closed 8/28/00); *Morales v. Zale Corporation, et al.*, No. 1:95:cv-01653 (filed 3/10/95, closed 4/19/95).  McLaughlin Decl. Exhibit 23.

90. Following the filing of *Huppe v. Special Solutions Fund III QP, L.P.* in 2006 and six years of litigation thereafter, Ayro informed shareholders in its 2013 Annual Report that a settlement reached against alleged short-swing shareholders in the case constituted $529,280 in disgorgement of short-swing profits, less the fees and expenses agreed upon by the plaintiffs of $272,539, leaving a remainder of $254,361 for Ayro which would be "recorded as additional paid-in capital."  McLaughlin Decl. Exhibit 29.

FORD O'BRIEN LLP

  /s/ Danielle M. McLaughlin
Adam Ford
Robert S. Landy
Danielle M. McLaughlin
575 5th Avenue, 17th Floor
New York, NY 10017
aford@fordobrien.com
rlandy@fordobrien.com
dmclaughlin@fordobrien.com
*Attorneys for Defendants Guy Gentile and Mintbroker International, Ltd*

Dated: New York, New York
August 10, 2020