# EXHIBIT 9

entitled to vote because the broker and the proxy holder do not have the authority to vote the shares with regard to the plan."[47] Thus, broker nonvotes are accorded the same treatment under Rule 16b-3(d) as Section 216(2).

### [3] Summary Chart

The following chart summarizes the treatment of abstentions and broker nonvotes for the most common quorum and vote requirements:

| Requirement[48] | Treatment | |
|---|---|---|
| | Abstentions | Broker Nonvotes |
| Majority of the shares entitled to vote, present in person or by proxy. (DGCL §216(1)—quorum) | Considered "present" and "entitled to vote"; included in the numerator. | Not considered "entitled to vote"; excluded from quorum calculation.[49] |
| Majority of shares present in person or represented by proxy. | Considered "present"; included in the denominator but not the numerator; same effect as "Against" votes. | Considered "present"; included in the denominator but not the numerator; same effect as "Against" votes. |
| Majority of the shares present in person or by proxy at the meeting and entitled to vote on the matter. (DGCL §216(2); Exchange Act Rule 16b-3(d) (but "entitled to vote *at a meeting*")) | Considered "present" and "entitled to vote"; included in the denominator but not the numerator; same effect as "Against" votes. | Not conisdered shares "entitled to vote" and thus not included in the calculation, but reduce the aggregate number of "For" votes required to pass the proposal. |
| Majority of votes cast. (New York, Pennsylvania) | Not considered "votes cast" and thus not included in the calculation, but reduce the aggregate number of "For" votes required to pass the proposal. | Not considered "votes cast" and thus not included in the calculation, but reduce the aggregate number of "For" votes required to pass the proposal. |
| Majority of shares outstanding. | Included in the denominator, but not the numerator; same effect as "Against" votes. | Included in the denominator, but not the numerator; same effect as "Against" votes. |

---

47. American Bar Ass'n, SEC No-Action Letter, 1993 SEC No-Act. LEXIS 782 (June 24, 1993).

48. Note that these requirements may generally be altered by a provision in the company's charter or by-laws.

49. It is theoretically possible that a company could receive broker nonvotes when there is a single, nonroutine proposal. In the vast majority of cases, the quorum is established on the routine proposals where there are broker discretionary votes. *See* Hanks, at 28, n.4 (questioning whether broker's delivery of nonvote may conflict with beneficial owner's decision *not* to be present for quorum purposes).

## § 12.5 POST-RECORD DATE SALES AND SHARE LENDING

When a corporation sets a record date in connection with a shareholder meeting, only the holders of record are entitled to vote at that meeting. The corporation is entitled to rely exclusively upon the contents of the share registry to determine record ownership.[50] Two issues frequently come up in connection with voting rights: (i) who is entitled to vote shares purchased after the record date but before the meeting? and (ii) who is entitled to vote shares that have been loaned to another investor (before or after the record date)?

### [1] Post-Record Date Stock Sales

Only the legal holder as of the record date is entitled to vote and grant proxies with respect to its shares, and issuers and inspectors of election are not generally required to look further than the share register to determine whether one is entitled to vote.[51] The record date mechanism enables the issuer to ascertain who is entitled to vote, to print a proper number of proxy statements and proxy cards and to disseminate them to the holders an appropriate amount of time in advance of the meeting.[52]

When shares are purchased after the record date but before the meeting, the question arises as to who is entitled to vote the purchased shares. For instance, over the course of a proxy contest, it is not uncommon for contestants to attempt to increase their voting power by purchasing additional shares after the record date and prior to the meeting. The post-record date purchaser, however, is *not* the legal owner as of the record date and is not permitted to vote this stock directly even if no vote or proxy is ultimately presented by the record owner.[53] To overcome this problem, purchasers who wish to vote the shares require, as a

---

50. *See, e.g., Shaw v. Foster*, 663 A.2d 464, 469-70 (Del. 1995).

51. DGCL § 212; *see also In re Giant Portland Cement Co.*, 21 A.2d 697, 701 (Del. Ch. 1941).

52. In Delaware, notice of the meeting must be given at least ten but no more than 60 days in advance of the meeting. DGCL § 222(b). The federal securities laws do not stipulate when proxy materials must be sent, but do require the issuer to give 20 business days' notice to banks and brokers to allow them time to capture the record date holders and otherwise prepare for the solicitation. Exchange Act Rule 14a-13. The New York Stock Exchange recommends, but does not require, that listed companies distribute proxy materials at least 30 days in advance of the meeting. NYSE Listed Company Manual § 402.05.

53. *Tracy v. Brentwood Village Corp.*, 59 A.2d 708, 709 (Del. Ch. 1948); *see also* Thomas, Randall S. & Dixon, Catherine T., *Aranow & Einhorn on Proxy Contests for Corporate Control (3d. Ed.)*, § 14.03[B] (hereinafter "Aranow & Einhorn").

condition of the purchase, that sellers execute irrevocable proxies in favor of the purchaser.[54]

If the shares are purchased directly from a registered holder, the irrevocable proxy is issued directly from the registered holder in favor of the purchaser. If, however, the shares are purchased on the open market—*i.e.*, not pursuant to a privately negotiated transaction with a registered holder—it becomes considerably more difficult for the purchaser to ensure that the shares are voted in its favor. The purchaser must identify the beneficial owner of a large block of shares, contact the beneficial owner directly and negotiate the sale. Because the beneficial owner selling the shares is not the "holder of record," it does not have the authority to grant an irrevocable proxy. Therefore, it must first obtain a "legal proxy"[55] from its custodian giving it the power to grant an irrevocable proxy to the purchaser. Because this process is cumbersome, contestants are advised to endeavor to acquire as many shares as possible in advance of the record date.[56]

### [2] Loaned Stock

Shares are frequently loaned for legitimate business purposes, *i.e.*, in connection with "short sales."[57] When shares are loaned by an institutional investor or its custodian prior to the record date, it is the borrower (or other record date holder)—not the institutional lender—that is entitled to vote those shares.

> *Example.* Corporation sets record date of January 1 for its March 1 annual meeting. Institution—which holds 1,000,000 shares of Corporation stock—loans 200,000 shares to Short Seller on December 20. To effectuate the loan, the shares are transferred from Institution's custodian bank (a DTC participant) to Short Seller's custodian bank (also a DTC participant). On December 22, Short Seller sells the 200,000 shares on the open market to a variety of unknown purchasers. On January 1, DTC issues an Omnibus Proxy in favor of its participants, reflecting their record date positions. On February 1,

---

54. *See, e.g., Commonwealth Associates v. Providence Health Care, Inc.*, 641 A.2d 155, 156 (Del. Ch. 1993). In certain circumstances, it may be preferable to obtain a power of attorney from the seller in lieu of a proxy because it affords greater flexibility in exercising the voting power of the stock. Aranow & Einhorn, 12.03[B]. Note that it is not necessary that the trade settle prior to exercising proxy powers because the irrevocable proxy becomes effective upon execution.

55. *See* Note 14, *supra*.

56. *See* Constance E. Bagley & David J. Berger, *Proxy Contests and Corporate Control: Strategic Considerations*, 69 C.P.S. (BNA) at A-52, for legal caveats regarding the acquisition of shares in this context.

57. A "short sale" of stock is a transaction in which the short seller sells borrowed shares to a purchaser at a fixed price in the expectation of a decline in price. If the price declines, the short seller profits by repurchasing the shares in the market at the lower price and returning them to the lender.

Short Seller uses a portion of the proceeds from the previous sale to repurchase an equal number of shares on the open market, and causes its custodian bank to return them to Institution's custodian bank. The loaned shares, however, resided on January 1 in the DTC accounts of the *custodians of the unknown purchasers of the loaned shares* from Short Seller—not the account of Institution's custodian bank. Therefore, Institution is only entitled to give voting instructions with respect to the 800,000 shares.

Although this practice of share lending by institutions does not often result in errors in the voting process, it has been addressed by the Department of Labor.[57.1] In a letter issued to an institutional investor advisory firm in 1992, the DOL cautioned that ERISA fiduciaries (*e.g.*, certain large pension funds) should be mindful of the value of the voting rights attached to the security they lend.[58] Share lending satisfies one fiduciary duty—maximization of the value of the assets under management—while arguably diminishing another—maximization of voting rights on important corporate matters. The DOL concluded that the "potential inability to vote on proxy proposals that may arise while the loan is outstanding . . . should be considered by a fiduciary as part of the decision to loan shares of stock."[58.1] The DOL's letter has been interpreted as requiring ERISA fiduciaries to have some system in place to ensure they are in physical possession of shares on the record date for meetings at which significant proposals are being considered.[59]

Share lending also can present problems when shares held in so-called "margin accounts" are loaned by brokers. An investor can purchase shares "on margin" by putting a percentage of the total cost down and borrowing the rest from his or her broker. The shares purchased in this fashion are typically pledged as collateral for the loan and, pursuant to a standard margin agreement, may be loaned by the broker without notice to the investor. NYSE rules obligate brokers to provide proxy materials and request voting instructions from the beneficial owners of shares in the brokers' "possession or control" on the

---

[57.1] In 2004, the International Corporate Governance Network (ICGN) formed a committee on securities lending to address the cross border proxy issues raised by lending of securities. The committee is in the process of developing a code of best practice related to securities lending. The code would contain guidelines that would apply to all of the parties in a lending transaction—lenders, borrowers, issuers, and intermediaries. *See* www.icgn.org.

[58] Letter to James E. Heard from Ivan L. Strasfeld dated February 20, 1992.

[58.1] Exhibit 4, *infra*, is an example of a securities lending policy statement by the College Retirement Equities Fund (CREF), which is the principal retirement fund for employees in the education and research fields in the United States. CREF's policy, which is centered around the fiduciary duty it owes its participants, has been approved by the trustees of the fund. *See* www.tiaa-cref.org.

[59] Margaret Price, *Stock Lending, Proxy Votes Don't Always Mix*, Pensions & Investments (March 16, 1992).

record date.[60] In addition, a broker may only vote—whether pursuant to client voting instructions or the broker discretionary vote—the shares that are in its possession or control on the record date.

Shares that have been loaned are no longer in the lending broker's possession or control. However, in response to a Congressional inquiry relating to this issue, the NYSE took the position that NYSE Rule 451 still requires the dissemination of proxy materials and the requesting of voting instructions with respect to those shares.[61] The NYSE also indicated that voting instructions for shares on loan are routinely assigned to other unvoted shares in the broker's possession.[62] In other words, the NYSE appears to permit the practice of assigning voting instructions to shares with respect to which voting instructions have not been received, so long as there is no "overvote"—*i.e.*, the votes do not exceed the shares in the broker's possession on the record date. The following example illustrates this practice:

> *Example.* Merrill Lynch holds 1,000,000 shares of IBM on behalf of its clients, with 500,000 of such shares in margin accounts. Merrill Lynch loans 250,000 of the margin shares prior to the record date for an upcoming IBM shareholders meeting. Merrill Lynch's record date position—*i.e.*, the number of shares it is entitled to vote—is 750,000. Merrill Lynch disseminates IBM proxy materials to, and solicits voting instructions from, the holders of the original 1,000,000 shares. The beneficial owners of the 250,000 loaned shares issue voting instructions to vote those shares "FOR" the proposals. The remaining beneficial owners issue instructions for vote 200,000 shares "FOR" and 250,000 shares "AGAINST." 300,000 shares remain uninstructed. Merrill Lynch is only entitled to vote its record date position, or 750,000 shares. The vote would be 200,000 "FOR," 250,000 "AGAINST," and the remaining 300,000 would be voted in Merrill Lynch's discretion (if routine proposal) or not voted at all (if nonroutine). However, under the NYSE's interpretation, Merrill Lynch would be permitted to apply the voting instructions from the beneficial owners of the loaned shares to 250,000 of the uninstructed shares. Thus, the final vote would be 450,000 votes "FOR," 250,000 votes "AGAINST," and only 50,000 voted in Merrill Lynch's discretion or not at all.

---

60. NYSE Listed Company Manual § 402.06(B) (citing NYSE Rule 451).

61. *Letter from the NYSE to the Commerce, Consumer and Monetary Affairs Subcommittee of the Committee on Government Relations* dated February 19, 1991.

62. *Id.* ("Longstanding experience has shown that not all beneficial owners return proxy instructions and there are ample votes associated with the unreturned proxies to allow interested beneficial owners to vote.")

It is clear from this example that the NYSE's position can directly impact the outcome of a close vote. If, in this example, the borrower of the 250,000 shares issued voting instructions to its broker, those 250,000 shares would have effectively been voted twice on the same proposal. The NYSE stated that it has no formal guidelines addressing the situation where voting instructions were returned to Merrill Lynch with respect to more than 500,000 of the shares that were not loaned (bringing the total number of shares instructed to more than 750,000).

## § 12.6 CONCLUSION

Street name ownership presents a variety of complex issues to corporations, shareholders and their advisors in the context of the proxy process. Failure to review carefully the corporation's charter and by-laws, the laws of the state of its incorporation, federal securities laws and the rules of its stock exchange can result in critical errors that mean the difference between success and failure in a proxy campaign.

The isssues discussed in this chapter have traditionally been technical matters of concern primarily to lawyers and corporate secretaries overseeing the conduct of shareholder meetings. With the passage of Sarbanes-Oxley Act, share voting has achieved greater prominence as a means of achieving corporate accountability and protection of shareholder rights. More recently, the SEC's director election proposal has raised serious questions about the fairness and adequacy of the proxy process.[63] The Business Roundtable has submitted a rulemaking petition calling for fundamental reform of the shareholder communications systems, with particular attention to street name accounts.[64] If the business Roundtable proposals were implemented, back office procedures for street name accounts would be simplified. Companies would benefit through direct communication with beneficial owners, greater transparency, and reduced costs. Shareholdrers would benefit through the creation of an audit trail, end-to-end vote confirmation, and elimination of discretionary broker voting under the NYSE 10-day rule. Finally, the issue of majority voting for the election of directors of public companies, which has received broad attention recently in the investment community, also implicates shareholder communications. In June 2005, the American Bar Association's Committee on Corporate Laws released a "Discussion Paper on Voting by Shareholders for the Election of Directors." The Discussion Paper reviews alternatives to the standard of plurality voting for diretors including the adoption of a majority standard as well as

---

63. Proposed Rule: Security Holder Director Nominations, SEC Release No. 34-48286 (October 14, 2003) at www.sec.gov. *See* "Shareholder Access to the Corporate Ballot" (L. Bebchuk, ed. Harvard University Press, 2004.)

64. Business Roundtable Petition for Rulemaking Regarding Shareholders Communications, Rule No. 4-493, at www.sec.gov.

other "hybrid" approaches. The Discussion Paper also identifies issues that would be raised at the state level as a consequence of such changes and possible related amendments to the Model Business Corporation Act. Counsel should monitor these developments carefully.

[*Next page is 12-21.*]

## EXHIBIT 1—CUSTODIAL OWNERSHIP CHART



### EXHIBIT 2—SAMPLE DTC PARTICIPANT REQUEST FOR STOCKLIST DEMAND LETTER—DELAWARE CORPORATION

[DTC PARTICIPANT LETTERHEAD]

[DATE]

The Depository Trust Company

Proxy Department
55 Water Street–50th Floor
New York, NY 10041

Re: [COMPANY NAME & CUSIP NUMBER; PARTICIPANT DTC ACCOUNT NUMBER]

Gentlemen:

Please cause your nominee, Cede & Co., to sign the attached letter and affidavit, and have Cede & Co.'s signature notarized, in order to enable our customer, [BENEFICIAL OWNER'S NAME] ("Customer"), to exercise rights to inspect the stock ledger and corporate records of [COMPANY NAME], a Delaware corporation (the "Company"), with respect to _____ shares (the "Shares") of the above-referenced securities credited to our DTC Participant account on the date hereof.

In addition to acknowledging that this request is subject to the indemnification provided for in DTC Rule 6, the undersigned certifies to DTC and Cede & Co. that the information and facts set forth in the attached letter are true and correct, including the following:

1. The Shares credited to our DTC Participant account are beneficially owned by Customer;

2. Customer will bear the reasonable costs incurred by the Company, including those of its transfer agent(s) and/or registrar(s) in connection with the production of the information requested in the attached documents; and

3. The purpose of the demand is as described in the attached letter.

Please make the requested letter and affidavit available as soon as possible to _____.

Very truly yours,

[DTC PARTICIPANT NAME]

By:_____
Name:
Title:

## EXHIBIT 3—SAMPLE DTC STOCKLIST DEMAND LETTER—DELAWARE CORPORATION

CEDE & CO.
c/o The Depository Trust Company
55 Water Street - 50th Floor
New York, NY 10041

[DATE]

[COMPANY NAME & ADDRESS]

Dear Ladies & Gentlemen:

Cede & Co., the nominee of The Depository Trust Company ("DTC"), is holder of record of outstanding shares of Common Stock, par value _____ per share (the "Common Stock"), of [COMPANY], a Delaware corporation (the "Company"). DTC is informed by its participant, [PARTICIPANT'S NAME] ("Participant"), that on the date hereof, _____ shares of Common Stock (the "Shares") credited to Participant's DTC account are beneficially owned by [BENEFICIAL OWNER], a customer of Participant (the "Customer").

At the request of Participant, on behalf of the Customer and pursuant to Section 220 of the Delaware General Corporation Law, Cede & Co., as holder of record of the Shares, hereby demands the right, during the usual hours for business, to inspect the following records and documents of the Company and to make copies or extracts therefrom:

1. A complete record or list of shareholders of the Company, certified by its transfer agent(s) or registrar(s), showing the name and address of each shareholder and the number of shares of stock registered in the name of each such shareholder, dated as of the date of this demand and updated as of the date which is set as the record date (the "Record Date") for the Company's _____ Annual Meeting of Shareholders (the "Meeting").

2. A magnetic computer tape list of the holders of the Company's stock, dated as of the date hereof and updated as of the Record Date, showing the name, address and number of shares held by each shareholder, such computer processing data as is necessary to make use of such magnetic computer tape, and a printout of such magnetic computer tape for verification purposes.

3. All daily transfer sheets now or hereafter in the Company's or its transfer agent's or registrar's possession or control, or which can reasonably be obtained from brokers, dealers, banks, clearing agencies, voting trustees or their nominees, showing the changes in the record or list of

  shareholders of the Company referred to in paragraph (1) above from the date hereof through the Record Date.

4. All information and listings now or hereafter in the Company's possession or control, or which can reasonably be obtained from brokers, dealers, banks, clearing agencies, voting trustees or nominees of any central certificate depository system concerning the number and identity of, and the number of shares held by, the banks, brokers and other financial institutions holding the Company's stock as of the date of this demand, and updated as of the Record Date, including a breakdown (in alphabetical order, if available) of any holdings in the name of any depository (*e.g.*, Cede & Co.) or other nominee.

5. All omnibus proxies and related respondent bank listings issued pursuant to Rule 14b-2 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in connection with the solicitation described below and which now or hereafter are in the Company's possession or control, or which can reasonably be obtained by the Company.

6. All information now or hereafter in the Company's possession or control, or which can reasonably be obtained from brokers, dealers, banks, clearing agencies, voting trustees or nominees, acquired pursuant to Rule 14b-1(b) and/or Rule 14b-2(b) of the Exchange Act, or otherwise, concerning the names and addresses of, and the number of shares held by, the beneficial owners of the Company's stock whose shares are held of record by brokers, dealers, banks or their nominees, including, but not limited to, any list of non-objecting or consenting beneficial owners (commonly referred to as a "NOBO" or "COBO" list, respectively), in the format of a printout and magnetic tape, each in descending balance order, dated as of the date of this demand and updated as of the Record Date.

7. A complete magnetic tape record and list of shareholders of the Company who are participants in any Company employee stock ownership plan, employee stock purchase plan, dividend reinvestment plan or any similar plan in which voting of stock under the plan is controlled, directly or indirectly, individually or collectively, by such plan's participants, dated as of the date of this demand and updated as of the Record Date, and showing (i) the name and address of each such shareholder, (ii) the number of shares of stock of the Company held by any such plan in the name of each such participant and (iii) the method by which the Shareholder or its agents may communicate with each such participant.

Pursuant to Cede & Co.'s right to inspect the aforementioned documents of the Company and to make copies and extracts therefrom, Cede & Co. demands, at the request of Participant and on behalf of the Customer, that the Company immediately furnish to the Customer or its authorized representatives any modifications or additions to, or deletions from, any of the information referred to in paragraphs (1) through (7) above from the date of the list referred to in paragraph (1) to (7), as such modifications, additions or deletions become available to the Company or its agents or representatives.

Cede & Co. has been advised by Participant that the Customer will bear the reasonable costs incurred by the Company including those of its transfer agent(s) and/or registrar(s) in connection with the production of the information demanded. Cede & Co. has been advised by Participant that the purpose of this demand is to enable the Customer to communicate with its fellow Company shareholders on matters relating to their mutual interests as shareholders including, but not limited to, communications with respect to the Customer's solicitation of proxies in connection with the Meeting.

Cede & Co., at the request of Participant and on behalf of the Customer, hereby designates and authorizes [NAME AND ADDRESS OF CUSTOMER'S LAW FIRM] and Georgeson & Company Inc., Wall Street Plaza, New York, New York 10005, their partners and employees, and any other persons designated by them or by the Customer, acting singly or in any combination, to conduct, as its agents, the inspection and copying of the materials and information requested herein.

Please promptly advise _____ at (__) _____ where and when the requested information will be made available. Please promptly acknowledge receipt of this demand letter by signing the enclosed copy of this letter and returning it in the enclosed, postage-prepaid, self-addressed envelope.

While Cede & Co. is furnishing this demand as the stockholder of record of the Shares, it does so at the request of Participant and only as a nominal party for the Customer, the true party in interest. Cede & Co. has no interest in this matter other than to take those steps which are necessary to ensure that the Customer is not denied its rights as the beneficial owner of the Shares, and Cede & Co. assumes no further responsibility in this matter.

Very truly yours,

CEDE & CO.

By: _____
Title: _____

\* \* \*

## OATH

County of _____ )
                          )  ss.:
State of _____  )

_____, having been first duly sworn according to law, deposes and says on this _____ day of _____, _____ that he is a partner of Cede & Co., that he is authorized on behalf of Cede & Co. to execute the foregoing demand for stockholder list and corporate records and to make the demand designations, authorizations and representations contained therein and that the facts and statements contained in the foregoing demand for a stocklist and corporate records are true and correct.

_____
Notary Public

### EXHIBIT 4—COLLEGE RETIREMENT EQUITIES FUND POLICY STATEMENT ON SECURITIES LENDING

TIAA-CREF Investment Management LLC, as the investment adviser for CREF, has the responsibility to manage each CREF account to achieve the best possible returns consistent with their stated investment strategies. Accordingly, our policy on securities lending is guided solely by our responsibility to act in the best long-term economic interest of our participants.

When we lend portfolio securities, income from lending fees increases account returns but voting rights on the loaned shares are passed to the borrower. Our lending agreements give us the right to recall loaned shares. We recognize that voting rights are an important governance mechanism and that the exercise of voting rights may be necessary to protect the long-term value of our investments.

In keeping with our responsibility to our participants to achieve the best possible returns, we use our best efforts to evaluate the relative benefits of lending fees versus voting rights. If we believe that the benefit of lending is greater than the benefit of voting, we will not recall the loaned shares. If we believe that the benefit of voting is greater than the benefit of lending, we will refrain from lending the security or recall shares in order to vote them.

Our investment and lending staff, in consultation with our governance staff, are responsible for analyzing these issues and making determinations regarding lending and recalling of securities consistent with this policy.