# EXHIBIT 19

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - -x
AVALON HOLDINGS CORP.,
                    No. 18-cv-7291(VSB)
         Plaintiff,    (ECF Case)

         -against-

GUY GENTILE and MINTBROKER INTERNATIONAL,
LTD.,
         Defendants.
- - - - - - - - - - - - - - - - - - - - -x
Related to:
- - - - - - - - - - - - - - - - - - - - -x
NEW CONCEPT ENERGY, INC.,
                    No. 18-cv-8896(VSB)
         Plaintiff,    (ECF Case)
         -against-
GUY GENTILE and MINTBROKER
INTERNATIONAL, LTD.,

         Defendants.
- - - - - - - - - - - - - - - - - - - - -x
         Virtual Deposition
         New York, New York

         May 27, 2020
         10:07 a.m.

         VIRTUAL DEPOSITION of BRAD
KLAUSEGER, a Non-Party Witness in the
above-entitled action, held at the above
time and place, taken before Jennifer
Brennan, a Notary Public of the State of
New York, pursuant to Subpoena.

Page 98

1  B. Klauseger
2  went over the maintenance margin
3  requirement, you didn't have enough cash
4  in your account to support the
5  maintenance margin, then we would have to
6  liquidate your positions, so we could get
7  that cash value.
8  Q    So that would just go with like
9  the last -- how would you determine which
10 positions to liquidate, just whatever the
11 trade --
12 A    It's an automated process that
13 I believe does randomization on it.
14 Q    So is that true for the B codes
15 as well, like, is it random?
16 A    No, the buy-in is specific to
17 the product because there is a failure
18 somewhere along the lines by somebody to
19 deliver the shares.  So it relates to the
20 specific product.
21       The liquidation is associated
22 with the -- is a margin function really,
23 so it's trying to get the account back up
24 to above the maintenance margin
25 requirement.

Page 99

1  B. Klauseger
2  Q    Is there ever a case where you
3  have a high -- we talked initially about
4  how we're going to sell short, you have
5  to borrow the stock?
6  A    Yes.
7  Q    So does that mean there should
8  never be a situation where you have a
9  higher negative balance in your short
10 account, than you have a positive balance
11 in your long account because the
12 assumption is you are borrowing the
13 shares from the long account; is that
14 right?
15 A    No, that's not right.  When
16 you're selling short, you're selling
17 short to market, not necessarily your
18 related account.  So you are looking out
19 there to the market and say, there are a
20 million shares to be shorted in this
21 security and/or to be lent to be borrowed
22 as part of the short position.
23       So there is a locate that gets
24 generated and is disseminated or is
25 available to, you know, the brokers, at

Page 100

1  B. Klauseger
2  any particular point in time.  And if
3  everybody -- if one broker decides to
4  sell short all million shares, but
5  another broker at the time they did their
6  locate, also saw that there was a million
7  shares to be sold short, there would
8  essentially be 2 million shares to be
9  sold short.
10       And that's when the clearing
11 function happens, over the course of a
12 few days and those shares should be
13 delivered or be available as part of this
14 borrowing.  But what will happen is, they
15 say no, all the shares were already
16 borrowed by broker A, therefore, you got
17 to close out your -- the other million
18 shares that were sold short by broker B
19 and it causes a buy-in.
20 Q    So that correspondence we
21 looked at before, about borrowing GBR
22 shares, I forget which exhibit that was.
23 I think it was Exhibit 23?
24 A    Right.
25 Q    So would you -- in the short

Page 101

1  B. Klauseger
2  account, right, we talked about how you
3  would expect the first trade you see to
4  be a sale; right?
5  A    Yes, uh-huh.
6  Q    Does that mean there would be a
7  correspondence similar to that GBR borrow
8  request, for every sale in the short
9  account?
10 A    There would be a --
11 Q    So would you expect that any
12 time that the short account has a
13 negative balance, that a request had
14 been -- had a negative share balance --
15 A    Uh-huh.
16 Q    -- that a request was made to
17 borrow that amount of shares?
18 A    Yes, in some sense of that
19 statement, yes.  I mean, this is a very
20 fast and automated process as well, so I
21 wouldn't -- based on my understanding of
22 this request, is he was attempting to
23 sell short this position and they were
24 getting either rejections, saying there
25 are no shares available, I'm not exactly

26 (Pages 98 - 101)

Page 114

1         B. Klauseger
2  the proxy voting rights if you hold the
3  long position.  And that would be the
4  underlying customer of the Omnibus
5  structure.
6      Q    So if it was a propriety
7  account, which would just be
8  Mintbroker's --
9      A    Yes, correct.
10     Q    So before we looked at the
11 transfer of the 4,000 some odd share, AWX
12 shares, from the long to the short
13 account.
14         Do you remember that?
15     A    Yes.
16     Q    Do those 4,000 shares, when
17 they were in the long account, would they
18 have been -- would they have been within
19 Mintbroker's right to vote those shares?
20         MR. FORD:  Could the witness
21    possibly know the answer to that?
22     A    I don't know the answer to
23 that.
24     Q    If you have a customer that has
25 the shares in their account, generally

Page 115

1         B. Klauseger
2  speaking, are they able to vote those
3  shares?
4      A    Yes, if they long the position,
5  they are able to vote the shares,
6  generally speaking.
7      Q    In what situation would they
8  not be able to vote them?
9      A    If they don't hold the shares.
10     Q    When we saw that 4,000 share
11 balance of AWX in the long account,
12 before those shares were transferred, is
13 there any reason why Mintbroker wouldn't
14 be able to vote them?
15     A    Well, I mean, there is --
16         MR. FORD:  Objection.  You can
17    answer, but objection.
18     A    If given -- I mean, given this
19 account structure, I'm unable to
20 determine, I guess, we're making an
21 assumption that all the activities were
22 propriety account and if they were flat
23 position, an aggregate, I don't know the
24 answer to that because I'm not sure if
25 they were flat, at any point in time,

Page 116

1         B. Klauseger
2  what their net, long or short position
3  was.
4      Q    Flat, meaning like --
5      A    If they were zeroed out.  If
6  they had a long position in the UL
7  account and they held the same amount in
8  the short account, would that be
9  considered to be flat or aggregate, zero,
10 you know, and therefore, not giving them
11 proxy voting rights.
12     Q    Okay.
13     A    So I'm uncertain around that.
14     Q    Okay.  So what is the procedure
15 for exercising the right to vote shares?
16         Is it this, what I'm seeing in
17 this e-mail, is that generally what
18 happens, that the customer sends an
19 e-mail asking for the proxy vote
20 instructions?
21     A    I believe that we would have
22 some automated system set up to identify
23 the holders of any particular position
24 and inform them that they have the --
25 have proxy voting rights, with respect to

Page 117

1         B. Klauseger
2  some type of voting event.
3      Q    And so for a broker who holds
4  customer account, like assuming, let's
5  assume for a second that Mintbroker had
6  some customers trades in these
7  statements, would Interactive have the
8  record of the customer names, in order to
9  send that information to them?
10     A    No, we would not, due to the
11 Omnibus structure.
12     Q    Sorry, what was that?
13     A    We do not because of the
14 Omnibus structure.
15     Q    So you would send it just to --
16     A    Mintbroker.
17     Q    And have them send it out;
18 correct?
19     A    Correct.
20     Q    And so do you -- I don't
21 remember seeing this in Interactive's
22 production, but do you have a record any
23 time that proxy voting instructions were
24 sent to Mintbroker for any stock?
25     A    My understanding is that this

Page 154

1            B. Klauseger
2     A    Yeah, I think T minus three. I
3  believe there was an update to T minus
4  two though.
5     Q    Okay, so two minus two.
6     A    At the time the trades
7  happened, I believe it was T minus three.
8     Q    I think it was.
9     A    T plus three, not minus three.
10    Q    T plus, yes, you have the three
11 days.
12          Now, you had testified that if
13 you have a situation where a customer has
14 purchased shares, put in -- not purchased
15 shares, put in an order to be filled,
16 right, Interactive Broker agrees to fill
17 that order when there is a counterparty
18 that has agreed to take the other side of
19 that order; is that correct? Does that
20 make sense?
21    A    It's not -- I mean, we reroute
22 it to the exchange to get filled.
23    Q    So a customer puts in their
24 order and Interactive Broker routes it to
25 the exchange and then it's filled on the

Page 155

1            B. Klauseger
2  exchange?
3     A    Uh-huh.
4     Q    And it's filled by a
5  counterparty?
6     A    Correct.
7     Q    And as you testified before, if
8  it's outside IB, you don't know whether
9  that counterparty actually owns the share
10 or not; is that correct?
11    A    Correct.
12    Q    Now, if what we just talked
13 about, that happens occasionally or with
14 some frequency, that there are more
15 shares that have been shorted than actual
16 shares in existence, if the trade -- if
17 the order gets to that T plus three and
18 the counterparty does not have the share,
19 you testified that -- let me just ask,
20 can you explain to me again what happens
21 if the counterparty simply does not have
22 the share and cannot locate it?
23    A    On the short sale side, they
24 are bought in. It's called a buy-in.
25 They are bought in, I believe it's the

Page 156

1            B. Klauseger
2  day after, T plus four.
3     Q    Now, what does that mean,
4  bought in?
5     A    So that would mean that we
6  essentially -- IB is obligated to close
7  out that short sale position that can't
8  be as failed to deliver and so what we do
9  is, we acquire the long position, to
10 close out against the short position.
11    Q    But -- and you would do that,
12 without regard to the possession of any
13 shares; is that correct?
14    A    Can you say that again, what do
15 you mean by that?
16    Q    Absolutely, sorry about that.
17 What I'm saying, if you have -- if the
18 counterparty just doesn't have the
19 shares, they're not in their position and
20 they don't exist, they don't exist to the
21 extent that you got 1 million actual
22 shares and 6 million and people -- you
23 have six people, each who sold short a
24 million shares, there are only a million
25 shares; right?

Page 157

1            B. Klauseger
2     A    Uh-huh.
3     Q    That means with respect to 5
4  million of those sort of shares or short
5  sales, there just are not shares to
6  deliver; right?
7     A    Yes.
8     Q    So when IB closes that position
9  out, it's not because they have a million
10 shares, they're just making -- is it a
11 fair statement that they're just making a
12 book entry, in terms of the value of what
13 the share would be?
14    A    Just a book entry?
15    Q    You can use your words, but I'm
16 trying to get at the point that you're at
17 that point, you're not dealing with the
18 actual shares, you're dealing with just a
19 proxy for the shares?
20    A    So, right, when we do a buy-in
21 because the short sale is going to be
22 closed out, how do we do that, yes, it's
23 a book entry accounting function, but
24 there are shares that need to be bought
25 back in, which is part of the buy-in

Page 162

B. Klauseger

2 at because with what I understand, Brad,
3 tell me if I'm correct, what I understand
4 what Carlos just explained, is that there
5 is the amount of shares in the float,
6 right, does not necessarily equal the
7 amount of shares available to short; is
8 that correct?
9    A   That's correct, yes.
10   Q   And in fact what that means,
11 the shares available to short, is
12 necessarily less than, in those cases
13 would be less than the shares in the
14 float?
15   A   Yes.
16   Q   But to go back to our example,
17 where if you have 5 million shares
18 shorted --
19   A   Uh-huh.
20   Q   -- across brokers, but there
21 are only actually 1 million shares, not
22 all of those shares can be obtained and
23 can be available for delivery, only 1
24 million of them can be --
25   A   That's correct, yes.

Page 163

B. Klauseger

2    Q   I think that might be it on
3 that point.  Let me switch topics.
4        You had testified earlier with
5 respect to why Mr. -- why the Mintbroker
6 international account was closed?
7    A   Uh-huh.
8    Q   You had said there was another
9 compliance review?
10   A   Yes.
11   Q   Was that compliance review
12 initiated by any complaint, either
13 customer or outside party complaint?
14   A   I don't recall.
15   Q   And you had mentioned that the
16 determination to close the account, was
17 based on public domain information.
18       Do you know what public domain
19 information was --
20   A   Yes, from what I remember,
21 there was allegations out there that he
22 was being investigated by federal
23 agencies.
24   Q   Was the complaint filed in
25 these cases, part of that review and

Page 164

B. Klauseger

2 contribute to the decision to close the
3 account?
4    A   I can't recall if that was
5 identified in the compliance review or
6 not.  It may have, but it -- I'm not
7 certain one way or the other if it was
8 identified.
9    Q   Would that be -- would that
10 information be identified in the
11 compliance review?
12   A   Whether or not it was --
13 whether or not this complaint was part of
14 that, yes, it would be identified.  It
15 would likely be identified if it was part
16 of the reason, yes.
17       MR. FORD:  I think I just need
18   two minutes for Danielle and I to
19   discuss off line and then we're
20   likely done, but for maybe a couple
21   of follow-up questions.
22       [At this time, a short recess
23   was taken.]
24       MR. FORD:  I did hear you at
25   the end, that you had some follow-up.

Page 165

B. Klauseger

2 I have a couple more questions, then
3 you can ask your follow-up.
4 BY MR. FORD:
5    Q   Very quickly, to go back to
6 sort of basics on orders and what happens
7 once an order is placed and filled.
8        The concept with the T plus
9 three, am I correct that that means that
10 when Mintbroker places an order for AWX
11 shares to purchase, when that order is
12 filled, at that time, the shares of AWX
13 are not transferred to Mintbroker
14 immediately upon the filling of that
15 order; is that correct?
16   A   So the account will show that
17 it purchased the shares as of that date,
18 but it will be accounting behind it
19 declaring settlement of the position and,
20 you know, the funds behind the position
21 and transference of the shares, that
22 happens on the T plus three.
23   Q   So is it fair then to say that
24 if Mintbroker places an order for 100
25 shares of AWX on day one and then sells

Page 166

1          B. Klauseger
2  100 shares of AWX on day two, that at no
3  point did any actual shares come into
4  Mintbroker's possession?
5      A    No, that's incorrect.
6      Q    I thought you just testified
7  that the shares do not come into -- the
8  shares will not transfer until the T plus
9  three?
10     A    That's an accounting function
11 essentially, but on day two, it's T plus
12 three, so you're closing the position one
13 day after -- the accounting piece of it
14 happens one day after as well.  So I'm
15 trying to think of the best way to put
16 this.
17         So if you buy the shares, you
18 sell -- you buy the shares on day one and
19 sell the shares on the day two, they're
20 going to clear on Thursday, the sell is
21 going to clear on Friday.
22     Q    I'm not sure I understood that.
23 I understood that the transfer of the
24 shares takes place on T plus three?
25     A    So I guess it's -- it's the

Page 167

1          B. Klauseger
2  clearing function of the -- on T plus --
3  on the trade date, you make the trade and
4  on that, you are taking possession of
5  those shares, but there is a clearing
6  function, clearing settlement function,
7  that acts as an accounting function that
8  happens on T plus three.
9      Q    But if that is -- if that's the
10 case, then when we go back to our prior
11 example of there being --
12     A    I also want to be clear,
13 it's -- I mean, I guess it's coming down
14 to technicality of the sole process and
15 I'm trying to clarify my description of
16 it.
17     Q    Maybe I can help you, not to
18 cut you off, but maybe I can ask it this
19 way:  When a customer places an order to
20 be filled for shares in IB --
21     A    Uh-huh.
22     Q    -- at the moment that that
23 order is filled, isn't it fair to say
24 that IB has not placed any shares into
25 that customer's account?

Page 168

1          B. Klauseger
2      A    Because of the clearing aspect,
3  yes.
4      Q    And -- right, because the
5  shares don't actually -- by the clearing
6  aspect of it, you mean because the shares
7  do not actually clear until T plus three?
8      A    Yes, yeah.
9          MR. FORD:  Danielle, do we have
10     anything further?
11         MS. McLAUGHLIN:  No, I don't
12     believe so.
13         MR. FORD:  Okay, I think that's
14     all that we have, unless there is
15     something on redirect.  Thank you.
16         MS. TAUBER:  I have one
17     question about that and unfortunately
18     it goes back to the voting again.
19 FURTHER EXAMINATION BY
20 MS. TAUBER:
21     Q    In the example that Adam just
22 gave of, you buy the shares on day one
23 and the order is filled, on day two,
24 before the clearing process is complete,
25 can the customer vote the stock, do you

Page 169

1          B. Klauseger
2  know?
3          Do you know if they have the
4  record, if they are the record owner?
5          MR. PROVENCIO:  Let me just
6     interject that to the extent that
7     that is asking for a legal
8     conclusion, Brad is not a lawyer and
9     as a lawyer, I'm not sure I know the
10    answer, but let's see what he knows.
11        MR. FORD:  I would second that
12    objection.  That's right.
13     A    I don't.  I can't answer that
14 with a certainty.
15     Q    I thought you had mentioned
16 before something about assigning the
17 shares, when we discussed that about the
18 assignment, if the shares are assigned to
19 the account, in a situation where, for
20 example, the person sells short, hasn't
21 been found --
22     A    Are you talking about the
23 buy-in?
24     Q    Yeah, I think so.  And I think
25 you had mentioned that the voting would

Page 170

1      B. Klauseger
2  get sorted out with the assignment
3  somehow, maybe that was separate from the
4  clearing process, but I don't know if
5  that was in the clearing process?
6     A    I think that had to do with the
7  transfer, the transfer positions; is that
8  right?
9     Q    Yeah, sure.  I'm not sure if
10 that's the context in which we discussed
11 this, but --
12    A    So I just want to make sure
13 that I'm referencing the right question
14 that you discussed previously.
15        So you said the assignment, I'm
16 trying to determine what you mean by
17 that.
18    Q    Remember I had asked you, has
19 it ever happened before that a customer
20 has tried to vote shares before they were
21 actually assigned to their account?
22    A    Right, and I said I could not
23 answer that question because I was
24 uncertain about it.  And I think I would
25 have to discuss it with Corporate Actions

Page 171

1      B. Klauseger
2  Department, to see if they have voting
3  rights at that time.
4     Q    Would that department also know
5  if they had voting rights on this day two
6  period, between order fulfilment and
7  clearing?
8     A    They may.
9        MS. TAUBER:  I have nothing
10    further.  Thank you.
11       MR. FORD:  Danielle, anything
12    further?
13       MS. McLAUGHLIN:  Nothing
14    further.
15       MR. FORD:  We're good.  Thank
16    you, Brad and Carlos and Jennifer,
17    most importantly.  Thank you, Miriam.
18       THE COURT REPORTER:  Do you
19    want a copy of this transcript?
20       MS. McLAUGHLIN:  Yes, please.
21       (Time noted:  3:21 p.m.)
22
23
24
25

Page 172

1
2        A C K N O W L E D G M E N T
3  STATE OF NEW YORK)
4             )ss:
5  COUNTY OF      )
6
7    I, BRAD KLAUSEGER, hereby certify that
8  I have read the foregoing record of my
9  testimony taken at the time and place
10 noted in the heading hereof and I do
11 hereby acknowledge it to be a true and
12 correct transcript of same.
13
14           _____
15           BRAD KLAUSEGER
16
17 Subscribed and sworn to before me
18 this    day of         , 20__.
19
20
21           NOTARY PUBLIC
22
23
24
25

Page 173

1
2    EXAMINATION BY           PAGE
3       MS. TAUBER           5
4                168
5       MR. FORD             144