**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AVALON HOLDINGS CORP., | |
| Plaintiff, | No. 18-cv-7291 (VSB) (RJL) |
| v. | ECF Case |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | |
| Defendants. | |

Related to:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC. | |
| Plaintiff, | No. 18-cv-8896 (VSB) (RJL) |
| v. | ECF Case |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | |
| Defendants. | |

**BRIEF IN SUPPORT OF**
**AVALON HOLDING CORP.'S MOTION FOR SUMMARY JUDGMENT**

Miriam Tauber
MIRIAM TAUBER LAW PLLC
885 Park Avenue 2A
New York NY 10075
(323) 790-4881
MiriamTauberLaw@gmail.com

David Lopez
LAW OFFICES OF DAVID LOPEZ
PO Box 323, 171 Edge of Woods Road
Southampton NY 11968
(631) 287-5520
DavidLopezEsq@aol.com

*Attorneys for Plaintiff Avalon Holdings Corp.*

# TABLE OF CONTENTS

Page

| | |
|---|---|
| **TABLE OF AUTHORITIES** | ii |
| **OVERVIEW** | 1 |
| **DECISIONAL STANDARD** | 4 |
| **FACTS** | 5 |
| **ARGUMENT** | 5 |
| **I. Sec. 16(b) Creates Strict Liability, Requiring the Defendants to Disgorge Their Short-Swing Profits Without Proof of Misuse of Inside Information or of Intent to Violate the Statute** | 5 |
| **A.  The Framework of the Statute** | 5 |
| **B.  Each Defendant Was a Beneficial Owner of the Avalon Shares Traded** | 5 |
| **II. MintBroker and Gentile Purchased and Sold Avalon Shares During a Brief Time Period Between July 24 and July 31, 2018, While They Were Beneficial Owners of More Than 10% of the Outstanding Shares of Avalon Class A Common Stock** | 9 |
| **III. If Defendants Do Not Accept Exhibit M as Correctly Computed, the Matter of Damages Should Be Referred to a Master for Further Proceedings Pursuant to F.R.C.P. 53(a)(1)(B)(ii)** | 10 |
| **IV. The Affirmative Defenses Are Unsupported by Articulation or Evidence. They Are Pure Fabrications, Without any Merit Whatsoever.** | 11 |
| **A.  First Affirmative Defense: "Clearing" or "Delivery" Failures Attributed to "Short Selling"** | 11 |
| 1.  Defendants Have Not Identified or Demonstrated a Single Clearing Failure | 12 |
| 2.  The "Clearing" of Trades Is Irrelevant to Defendants' Insider Status and to Their Short Swing Trading Liability | 14 |
| 3.  Defendants Profited From any "Naked" Short Selling by Their Counterparties | 17 |
| **B.  Second and Third Affirmative Defenses: "Waiver" and "Unclean Hands"** | 21 |
| 1.  Neither of These Defenses Are Recognized Under Section 16(b) | 21 |
| 2.  There Are No Allegations or Evidence Supporting Either Defense | 22 |
| **CONCLUSION** | 25 |

i

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*,
No. 06 Civ. 2692 (KMW), 2008 WL 4443828 (S.D.N.Y. Sept. 29, 2008) ............................ 21

*Blau v. Hodgkinson*,
100 F. Supp. 361 (S.D.N.Y. 1951) ....................................................................................... 11

*Blau v. Mission Corp.*,
212 F. 2d 77 (2d Cir. 1954) .................................................................................................... 8

*Connell v. Johnson*,
No. 20 Civ. 1864 (LLS), 2020 WL 2748439 (S.D.N.Y. May 27, 2020) ................................ 15

*Donoghue v. Bulldog GP*,
696 F. 3d 170 (2d Cir. 2012) ................................................................................................... 6

*Donoghue v. Casual Male Retail Group, Inc.*,
375 F. Supp. 2d 226 (S.D.N.Y. 2005), ................................................................................... 8

*Donoghue v. Genomica Corp.*,
No. 02-cv-110, 2003 WL 1609191 (S.D.N.Y. Mar. 7, 2003); ................................................ 8

*Donoghue v. Natural Microsystems*,
198 F. Supp. 2d 487 (S.D.N.Y. 2002) .................................................................................. 21

*Foremost McKesson, Inc. v. Provident Secs. Co.*,
423 U.S. 232 (1976) ............................................................................................................. 15

*Gratz v. Claughton*,
187 F. 2d 46 (2d Cir. 1951), ................................................................................................... 4

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*,
156 F. 3d 305 (2d Cir. 1998). ................................................................................................. 1

*Huppe v. Special Situations Fund III QP, L.P.*,
565 F. Supp. 2d 495 (S.D.N.Y. 2008), .................................................................................. 4

*Huppe v. WPCS International Inc.*,
670 F.3d 214 (2d Cir. 2012) ................................................................................................... 8

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Amsted Indus. Inc.*,
No. 05-cv-5886 (RO), 2007 WL 2106114 (S.D.N.Y. July 17, 2007) ..................................... 17

*Morales v. Gould Investors Trust*,
445 F. Supp. 1144 (S.D.N.Y) ............................................................................................... 14

*Mueller v. Korholtz*,
449 F.2d 82 (7th Cir. 1971) .................................................................................................. 10

*Oliff v. Exchange International Corp.*
449 F. Supp. 1277 (N.D. Ill 1978) ....................................................................................... 14

## CASES *(continued)*

*Packer v. Raging Capital Management, LLC*,
242 F. Supp. 3d 141 (2017) ........................................................................................ 12

*Plumbers' Union Local No. 12 Pension Fund v Swiss Reinsurance Co.*,
753 F. Supp. 2d 166 (S.D.N.Y. 2010) ........................................................................ 14

*Prager v. Sylvestri*,
449 F. Supp. 425 (S.D.N.Y 1975). ............................................................................. 15

*Reece Corp. v. Walco National Corp.*,
565 F. Supp. 158 (S.D.N.Y. 1981) ............................................................................. 22

*Riseman v. Orion Research, Inc.*,
No. 83-1990-S, 1984 WL 282 (D. Mass. Mar. 20, 1984). .......................................... 22

*Roth v. Jennings*,
No. 03-cv-7760 (DAB), 2009 WL 1440670 (S.D.N.Y. May 21, 2009) ........................ 11

*Rubenstein v. Cosmos Holdings, Inc.*,
No. 19 Civ. 6970 (KPF), 2020 WL 3893347 (S.D.N.Y July 10, 2020); ........................ 14, 15

*SEC v. Gentile*,
939 F.3d 549 (3d Cir. 2019) ......................................................................................... 3

*SEC v. Sierra Brokerage Services, Inc.*,
608 F. Supp. 2d 923 (S.D. Ohio 2009) ........................................................................ 8

*Smolowe v. Delendo Corp.*,
136 F. 2d 231 (2d Cir. 1943) ....................................................................................... 4

*Stella v. Graham-Paige Motors Corp.*,
232 F. 2d 299 (2d Cir. 1956) ..................................................................................... 10

*Teachers' Retirement Systems Of Louisiana v. A.C.L.N., Ltd.*,
No. 01-cv-11814 (MP), 2004 WL 304018 (S.D.N.Y. Feb. 18, 2004) ......................... 17

*Texas International Airlines v Natl. Airlines*,
714 F.2d 533 (5th Cir. 1983) ...................................................................................... 21

*Tyco Labs., Inc. v. Cutler-Hammer, Inc.*,
490 F. Supp. 1 S.D.N.Y. 1980) .............................................................................. 6, 21

## STATUTES

15 U.S.C. § 78cc. .................................................................................................................. 22

15 U.S.C. § 78p .............................................................................................................. passim

## RULES

17 C.F.R. § 240.13d-3(a) ..................................................................................................... 15

17 C.F.R. § 240.15c6-1 ................................................................................................. 15, 18

17 C.F.R. § 240.16a-1(a)(1) ................................................................................................. 15

F.R.C.P. Rule 53(a)(1)(B)(ii) ............................................................................................... 11

## REGULATIONS

17 C.F.R. § 242.200 (Ex. O) ......................................................................................... passim

## OTHER AUTHORITIES

*Interpretive Release on Rules Applicable to Insider Reporting and Trading,*
   SEC Release No. 34-18114, 1981 WL 31301 (Sept. 24, 1981). ................................................. 4

Peter J. Romeo & Alan L. Dye,
*Sec. 16 DeskBook* (summer 2019 ed.)                                                        4, 8, 9

**OVERVIEW**

This suit is brought by Avalon Holdings Corp. ("Avalon"), an issuer of publicly traded common stock registered under Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78 *et. seq.*, as amended (the "Act").  It seeks to recover short-swing profits realized and retained by the defendants in violation of Section 16(b) of the Act, 15 U.S.C. § 78p(b), the so-called "short-swing trading" statute.

Section 16(b) imposes strict liability, *inter alia,* on any beneficial owner of more than 10% of any equity security of an issuer registered under Section 12 of the 1934 Act, 15 U.S.C. § 78*l*.  All that need be shown for liability to attach is: (a) the insider status of a defendant; (b) who purchased and sold shares of the registered class, within any period of less than six months; (c) at a profit. *Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F. 3d 305, 308 (2d Cir. 1998).

Although proof of violations by the Defendants of Section 9 of the Act, 15 U.S.C. § 78*i*, the anti-manipulation statute, need not be pleaded or proven by Avalon to arrive at a finding of liability under Section 16(b), the trading activity and trading patterns of the Defendants are inexplicable without recognizing them as consistent with both a pump-and-dump scheme, which is pleaded, and more specifically, with a scheme to create a short-squeeze, which became clear during case development.

Over the course of 5 trading days, the Defendants accumulated and then liquidated a majority position in the Plaintiff's common stock. Their high-frequency day trading of Avalon stock manipulated the stock price to their advantage and constituted a brazen violation of Section 16(b): After accumulating the majority of the "float" of publicly traded Avalon shares, the Defendants sprang their trap on less informed short-sellers, who needed, under the Securities & Exchange Commission's (SEC's) Regulation SHO, voluntarily or not, to buy covering shares to

1

make delivery. It was, of course, the Defendants who provided the required buy-in shares to the market at whatever prices the market would bear.

As alleged in the related case of *New Concept Energy, Inc. v. Guy Gentile* and *MintBroker International, Ltd*., a similar *modus operendi* was used a few weeks earlier by the same Defendants to the same ends.

An academic paper entitled "*Squeezing the Shorts in Small Cap Stocks*" by Roberto Ricco of Bocconi University (*Universita Commerciale Luigi Bocconi*; Milan, Italy), analyzing the application Regulation SHO to the two related cases appears at Exhibit J.[1] Neither of the Plaintiffs in these related cases, nor their counsel, in any way, directly or indirectly, acted to induce, sponsor or encourage the writing of this paper or exercised any editorial influence over its content. They learned of its existence only after publication.

**The Protagonists:**

**Avalon:**    The Plaintiff, Avalon Holdings Inc. ("Avalon"), is an Ohio corporation whose Class A Common Stock is listed and traded on the NYSE American Stock Exchange, a National Securities Exchange. (Shares of Avalon trade under stock symbol: AWX.) Trading of Avalon shares also takes place on NASDAQ and through so-called "dark pools."

**MintBroker:**  One of the Defendants, MintBroker International, Ltd. ("MintBroker"), is a Bahamas corporation which was engaged at this suit's inception in stock brokerage and proprietary securities trading from its office in Nassau, Bahamas. While this case has been pending, in or about November of 2019, MintBroker ceased doing business. Shortly thereafter, the Bahamas Securities Commission petitioned the Bahamian Supreme Court for, and on March 19, 2020, was granted, an order placing MintBroker in court-supervised liquidation. The order provisionally appointed two

---

[1] Exhibits refer to exhibits attached to the accompanying Affidavit of Miriam Tauber.

Ernst & Young (E&Y) partners as administrators in liquidation. In a statement reported in the Nassau newspaper *The Tribune Business* on April 6, 2020, Christina Rolle, the Bahamas Securities Commission's Executive Director, described MintBroker's business model as "akin to a Ponzi scheme." (*See* Ex. N.)

**Guy Gentile:** Guy Gentile ("Gentile"), the other Defendant, is the sole owner of MintBroker. His pecuniary interest in the earnings of MintBroker is 100%, and he directed and managed MintBroker's trading of Avalon shares. All of MintBroker's purchases and sales were initiated by Gentile or by algorithms under his direction.

Gentile was previously an "FBI informant in which role he allegedly helped it uncover and arrest several share trading scammers and con artists." (Ex. N.) Gentile has been and currently is the subject of one or more SEC legal actions. *See, e.g.*, *SEC v. Gentile*, 939 F.3d 549 (3d Cir. 2019), *cert. denied*, No. 19-878, 2020 WL 1906575 (Apr. 20, 2020), and Plaintiff's counsel have provided to the SEC New York Regional Office portions of their investigative files under subpoena. Gentile is experienced and knowledgeable in securities trading matters.

**<u>Limited Reach of This Motion</u>:**

This Motion seeks: (i) a declaration of liability under F.R.C.P. 56(a); and (ii) should the Defendants not accept Avalon's computation of damages (Ex. M), a reference of all accounting matters relevant to a determination of damages, and the amount of damages, to the assigned Magistrate Judge (Hon. Robert W. Lehrburger) or another designee, acting as a master pursuant to F.R.C.P. 53(a)(1)(B)(ii).

Where there are multiple purchases and sales within a short swing period (i.e., a period of less than six months), damages under Section 16(b) are determined by arbitrarily matching trades on the basis of "lowest price in, highest price out." *See Smolowe v. Delendo Corp.*,

136 F. 2d 231, 239 (2d Cir. 1943); *see also Gratz v. Claughton*, 187 F. 2d 46, 51 (2d Cir. 1951); *cert. denied*, 341 U.S. 920 (1951); *see generally* Peter J. Romeo & Alan L. Dye, *Sec. 16 DeskBook* (summer 2019 ed.) at 488-489.

> "Profit is computed by matching the highest sale price with the lowest purchase price within six months, the next highest sale price with the next lowest purchase price within six months, and so on, until all share have been included in the computations." *Interpretive Release on Rules Applicable to Insider Reporting and Trading,* SEC Release No. 34-18114, 1981 WL 31301, at *28 & n.102 (Sept. 24, 1981).

As Defendants' Schedule 13D (Ex. F) and their brokerage trading records covering the short-swing trading period (Ex. D & Ex. E) evidence, we are dealing with thousands of trades (2,331 transactions involving 2,325,244 shares purchased and 2,351,858 shares sold, more or less). As demonstrated by Plaintiff's provisional computation of damages at Ex. M, the lowest-in, highest out exercise in matching is, in this case, highly complex. It would be child's play to raise an objection to any one of those matches, making damages an unsuitable subject for determination under the Rule 56 decisional standard applicable only where there are no material facts in dispute. The resolution of the quantum of damages in this case is precisely the type of scenario appropriate for referral to a master, acting under a trial standard of proof, pursuant to F.R.C.P. 53 (a)(1)(B)(ii).

## DECISIONAL STANDARD

A Section 16(b) plaintiff is entitled to summary judgment where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See Huppe v. Special Situations Fund III QP, L.P.*, 565 F. Supp. 2d 495, 497 (S.D.N.Y. 2008), *aff'd* sub. nom. *Huppe v. WPCS Internat'l*, 670 F.3d 214 (2d Cir. 2012) (citing F.R.C.P. 56(c)). A genuine issue means more than a "metaphysical doubt" as to material facts;  but requires evidence that could support a reasonable jury in returning a verdict for the nonmoving party.'" *Id.* (quoting *Caldarola*

4

*v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); and *Holtz v. Rockefeller & Co.*, 258 F. 3d 62, 69 (2d Cir. 2001); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On cross-motions for summary judgment, the Court is to "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)).

## FACTS

Plaintiff relies upon and refers to the Statement of Undisputed Facts submitted together with this Motion pursuant to S.D.N.Y. Local Rule 56.1.

## ARGUMENT

**I. Sec. 16(b) Creates Strict Liability,
Requiring the Defendants to Disgorge Their Short-Swing Profits
Without Proof of Misuse of Inside Information or of Intent to Violate the Statute**

**A. The Framework of the Statute**

The elements of a violation of Section 16(b) are set forth in the Overview section of this Brief. (*See supra,* citing *Gwozdzinsky,* etc.)

Section 16(b) is prophylactic in nature. The statute is intended to remove all profits from trading by statutory insiders within periods of less than six months, and thereby to remove all financial incentive to engage in such trading. The purpose of Section 16(b) is expressly stated in its preamble as the prevention of misappropriation of information not known to the general public by insiders charged with fiduciary responsibilities. *See* 15 U.S.C. § 78p ("For the purpose of preventing the unfair use of information …"). The method of prevention chosen by Congress is

described as "Draconian," as no showing of actual misuse of information need be shown to establish liability. *Tyco Labs., Inc. v. Cutler-Hammer, Inc.,* 490 F. Supp. 1, 5 (S.D.N.Y. 1980).

The law of the Second Circuit as, indeed, of every other Circuit, is perhaps most clearly expressed in the unanimous panel decision in *Donoghue v. Bulldog GP,* 696 F. 3d 170, 174 (2d Cir. 2012), in which one of the authors of this Brief was plaintiff's counsel:

> "The purpose of Sec. 16(b) is stated in its opening clause: to prevent 'the unfair use of information which may have been obtained by a beneficial owner, director or officer by reason of his relationship to the issuer." 15 U.S.C. § 78p(b)…. Congress did not simply proscribe trading on inside information; rather, it enacted a 'flat rule' that takes the profits out of an entire 'class of transactions' occurring within a prescribed time frame 'in which the possibility of abuse' of inside information 'was believed to be intolerably great.' *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. at 422.

> In discussing the reason for Sec. 16(b)'s rule of strict liability, Judge Learned Hand observed that 'if only those persons were liable, who could be proved to have a bargaining advantage, the execution of the statute would be so encumbered as to defeat its whole purpose.' *Gratz v. Claughton*, 187 F.2d 45, 50 (2d Cir. 1951) (reiterating well-settled principle 'that a statute may provide any means which can reasonably be thought necessary to deal with the [identified] evil, even though they may cover instances where it is not present').

> … Sec. 16(b)'s flat rule effectively makes 10% 'beneficial owners fiduciaries as directors and officers were anyway,' at least to the extent of making all short-swing transactions by such persons in the issuer's stock 'breaches of trust.' *Id.* at 49 (internal quotation marks omitted); *see also Adler v. Klawans*, 267 F.2d 840, 844 (2d Cir. 1959) (commenting that Congress' 'intent in the enactment of Sec. 16(b) was to discourage what was reasonably thought to be a widespread abuse of a fiduciary relationship' by 'three classes of persons').

Thus, Bulldog cannot maintain that it owed no fiduciary duty to Invesco. That fiduciary duty was created by Sec. 16(b), and it conferred upon Invesco an enforceable legal right to expect Bulldog to refrain from engaging in any short-swing trading in its stock.

Nor can Bulldog deny any injury to the issuer from its short-swing trading by pointing to the fact that Sec. 16(b) operates without regard to whether the statutory fiduciaries were actually privy to inside information or whether they traded with the intent to profit from such information. This confuses the wrongdoing that prompted the enactment of Sec. 16(b) – trading on inside information – with the legal right that Congress created to address that wrongdoing

6

– a 10% beneficial owner's fiduciary duty to the issuer not to engage in any short-swing trading.

As Judge Hand explained, even at common law, a fiduciary's duty to a beneficiary often required more than the avoidance of actual unfair dealing. A trustee with power to sell trust property is under a duty not to sell to himself either at private sale or at auction, whether the property has a market price or not, and whether the trustee makes a profit thereby.' *Gratz v. Claughton,* 187 F. 2d at 49 (quoting Restatement of Trusts 170(*l*). cmt b). Drawing an analogy between trust law and the fiduciary duty created by Sec.16(b), Judge Hand observe that 'nobody is obliged to become a director, an officer, or a beneficial owner; just as nobody is obliged to become the trustee of a private trust' but, as soon as he does so, he accepts whatever are the limitations, obligations and conditions attached to the position, and any default in fulfilling them is as much a 'violation of law as though it were attended by the sanction of imprisonment.' *Id.*

Thus, pursuant to Sec. 16(b), when a stock purchaser chooses to acquire a 10% beneficial ownership stake in an issuer, he becomes a corporate insider and thereby accepts the limitation that attaches to his fiduciary status: not to engage in any short-swing trading in the issuer's stock. *Id.* At that point, injury depends not on whether the Sec. 16(b) fiduciary traded on inside information, but on whether he traded at all.

To be sure, this statutory arrangement provides issuers (and their shareholders) with an incentive to police short-swing trading by beneficial owners, directors and officers, to the benefit of the market as a whole. Nevertheless, because the issuer's right to profits under Sec. 16(b) derives from breach of a fiduciary duty created by the statute in favor of the issuer, the issuer is no mere bounty hunter but, rather, a person with a cognizable claim to compensation for the invasion of a legal right."

### B.  Each Defendant Was a Beneficial Owner of the Avalon Shares Traded

Gentile was the sole owner of MintBroker at all times relevant, including the times that Mintbroker was a more-than-10% beneficial owner of Avalon Class A Common Stock. Gentile was also MintBroker's Board Chairman, and totally controlled MintBroker's actions in all respects, including with respect to the hands-on trading of Avalon stock at the heart of this case. At all times that MintBroker was a more-than 10% beneficial owner of Class A Common Stock, Gentile was thereby also a more-than-10% beneficial owner of Avalon Class A Common Stock.

A sole shareholder of a corporation is deemed the beneficial owner of the corporation's portfolio securities, because the corporation is, in effect, the shareholder's *alter ego. See, e.g., Blau v. Mission Corp.,* 212 F. 2d 77, 80 (2d Cir. 1954), *cert. denied,* 347 U.S. 1016 (1954) (insider corporation deemed the beneficial owner of securities held by a subsidiary over which it has "absolute-control"); *see also Blau v. Lamb,* 242 F. Supp. 151, 159 (S.D.N.Y. 1965), *aff'd in part, rev'd in part*, 363 F. 2d 307 (2d. Cir. 1966), *cert. denied*, 385 U.S. 1002 (1967) (insider deemed beneficial owner of issuer securities held by wholly owned corporation); *Grossman v. Young,* 72 F. Supp 375, 376 (S.D.N.Y. 1947) (without discussion, court treated insider as beneficial owner of securities held by "wholly owned and controlled corporation"); *see generally Huppe v. WPCS Internat'l, Inc.*, 670 F.3d 214, 221-22 (2d Cir. 2012) (holding that a controlling shareholder or employee of a corporation, who has authority to vote or dispose of securities owned by the corporation, is deemed an *additional* beneficial owner of the securities beneficially owned by the corporation for purposes of Sec. 16, which imports Sec. 13(d) concepts into the definition of beneficial ownership relevant to the determination of "insider" status) (citing Romeo & Dye, *Sec. 16 Treatise & Reporting Guide (*3d. ed. 2008), at 134-35)); *see also* Romeo & Dye, *Sec. 16 DeskBook* at 285.

Instructions for reporting on Form 3 under Section 16(a) of the Act accordingly direct that securities are deemed "beneficially owned" by shareholders with a direct or indirect pecuniary interest in them. *See* SEC Form 3 Gen. Instr. 5(b) (*available at* https://ww.sec.gov/files/form3data.pdf). *See also Donoghue v. Casual Male Retail Grp., Inc.,* 375 F. Supp. 2d 226, 234 (S.D.N.Y. 2005), *vacated on other grounds*, 427 F. Supp. 2d 350 (S.D.N.Y. 2006); *Donoghue v. Genomica Corp.,* No. 02-cv-110, 2003 WL 1609191, at *1 (S.D.N.Y. Mar. 7, 2003); *SEC v. Sierra Brokerage Svcs., Inc.,* 608 F. Supp. 2d 923, 956 (S.D. Ohio 2009).

Thus, transactions in Avalon securities by Gentile's wholly-owned and controlled entity MintBroker are treated as if they were Gentile's own transactions. *See generally* Romeo & Dye, *Sec. 16 Deskbook* at 285.

## II.  MintBroker and Gentile Purchased and Sold Avalon Shares During a Brief Time Period Between July 24 and July 31, 2018, While They Were Beneficial Owners of More Than 10% of the Outstanding Shares of Avalon Class A Common Stock

The Defendants traded shares of Avalon during a time period in which their beneficial ownership of Avalon Class A Common Stock exceeded 10% of the outstanding shares of Class A common stock, as reflected in their Schedule 13D filed on August 22, 2018, which reported their Avalon transactions (Ex. F). Defendants also produced a spreadsheet of their Avalon transactions (Ex. G).

Defendants' broker, Interactive Brokers, Inc., produced "Activity Statements" reflecting the Avalon trades executed in MintBroker's trading accounts held at Interactive. These "Activity Statements" were authenticated by Interactive's F.R.C.P. 30(b)(6) deponent (Brad Klauseger), who further testified that every trade appearing on each of the "Activity Statements" was routed to and executed on a securities exchange. (*See* Ex. C, Interactive Dep. Tr. at pp. 10-43). The Defendants have further stipulated that the trading reflected on the "Activity Statements" accurately reflects the Defendants' "proprietary" trading in the Interactive accounts. (*See* Ex. B).

To the extent there are discrepancies between the trades reported on Defendants' Schedule 13D, the trades reflected on the spreadsheet produced by the Defendants, and/or the "Activity Statements," the "Activity Statements" are relied on for purposes of computing the Defendants' liability. Relevant pages from the "Activity Statements" are attached as Exhibit D & Exhibit E, and the transactions reflected on the Activity Statements are consolidated at Exhibit H.

As reflected at Exhibit H, simple arithmetic places Defendants' entry into insider status on July 24, 2018, at 14:46:00, and their exit on July 31, 2018, at 11:46:00. In the interim, Defendants' "beneficial ownership" dipped below the 10% threshold for a few minutes on July 24, 2018—from 14:47:24 through 14:53:54, and again from 15:03:54 through 15:05:52. A total of 8 transactions were executed during these time frames. (*See* Ex. H. pp. 4-5 & p.37). These 8 transactions are not included in the matching analysis performed by Plaintiff to calculate Defendants' liability at Exhibit M.

### III.   If Defendants Do Not Accept Exhibit M as Correctly Computed, the Matter of Damages Should Be Referred to a Master for Further Proceedings Pursuant to F.R.C.P. 53(a)(1)(B)(ii)

In the "Overview" of this Brief, Plaintiff demonstrates with citations to authority that damages must be computed by matching purchase and sales on basis of "lowest-in , highest out within less than six months."

A total of 1,694 transactions were executed by the plaintiffs during the short swing period (i.e., the period of time when their beneficial ownership exceeded 10% of outstanding Avalon Class A Common Stock); involving 1,976,629 shares purchased, and 2,025,218 shares sold (more or less). Avalon has computed damages and those computations appear at Exhibit M. They amount to $6,235,908. (*See* Ex. M p.30.) This is Avalon's "*prima facie* proof of a maximum amount of profits." *Stella v. Graham-Paige Motors Corp.,* 232 F. 2d 299, 302 (2d Cir. 1956), *cert. denied*, 352 U.S. 831 (1956).

The calculations submitted with this Motion discharge Plaintiff's initial burden of establishing Defendants' maximum liability under Section 16(b). The burden of proof of a lesser amount as the correct measure of recovery now shifts to the Defendants. *Id; see also Mueller v. Korholtz*, 449 F.2d 82, 95-86 (7th Cir. 1971), *cert. denied*, 405 U.S. 922 (1972). Should Defendants

accept Exhibit M as showing a correct measure of damages, no further proceedings will be needed. Judgment can be entered for Plaintiff in the amount of the computed damages, plus pre-judgment interest. *See Roth v. Jennings*, No. 03-cv-7760 (DAB), 2009 WL 1440670, at *1 (S.D.N.Y. May 21, 2009) (pre-judgment interest awarded consistent with the remedial purpose of Sec. 16).

If not, Plaintiff suggests that further proceedings will be necessary and best carried out by the Magistrate Judge assigned to the case, who has some familiarity with the issues, acting as a master under F.R.C.P. Rule 53(a)(1)(B)(ii), or by any other suitable person designated by Your Honor to undertake that role. Because of the large number of trades, the matching exercise—the accounting—will involve considerable complexity and will best be carried out by an officer vested with fact-finding powers. Nonetheless, the numbers (i.e., the shares traded by the Defendants, and the prices of Defendants' trades) have been known to the parties since inception of this case, and Defendants' brokerage records, which more specifically identify Defendants' executed trades, have now been produced and stipulated as accurate by the Defendants. There is no need for further delay in proceeding to determine the precise amount of Defendants' liability and entering judgment for the Plaintiff. *See Blau v. Hodgkinson*, 100 F. Supp. 361, 374 (S.D.N.Y. 1951) ("The parties to this litigation should be able to calculate and agree upon the profits derived by each of the defendants … . If the parties cannot so agree, the court will name a special master to hear testimony on that issue and determine the amount due the corporation on those transactions, under Sec. 16(b)").

## IV. The Affirmative Defenses Are Unsupported by Articulation or Evidence. They Are Pure Fabrications, Without any Merit Whatsoever.

### A. First Affirmative Defense: "Clearing" or "Delivery" Failures Attributed to "Short Selling"

As a FIRST AFFIRMATIVE DEFENSE, Defendants assert:

"Without assuming the burden of proof, Defendants state that some or all of Plaintiffs claims or asserted damages fail because many of the alleged trades at

issue either failed to clear or were related to shares that did not exist (because the trades were "naked" short sales made by market makers that had not borrowed shares and had failed to obtain a "locate" before the short as required by SEC regulations)." (Dkt #39 pp.7-8.)

### 1. __Defendants Have Not Identified or Demonstrated a Single Clearing Failure__

There is no defense to Section 16(b) based on purported "clearing" failures or "naked" short selling. The clearing of Defendants' trades and the actual delivery of shares, by short sellers or otherwise, is irrelevant to Defendants' Section 16(b) liability.

Defendants bear the burden of proof on affirmative defenses and cannot decline to "assume" that burden. *See Packer v. Raging Capital Mgmt.,* LLC, 242 F. Supp. 3d 141, 149 (2017) (Defendants had burden of pleading and proving entitlement to the registered investment advisor (RIA) exemption under Sec. 16, and could not require plaintiff to disprove an issue of fact that Defendants "created" in support of this defense; citing *Egghead.com, Inc. v. Brookhaven Capital Mgmt. Co.*, 340 F.3d 79, 82 (2d Cir. 2003)). Defendants, throughout discovery have been unable to identify a single trade that failed to clear.

Defendants' lack of evidence in support of this defense was laid bare at Gentile's deposition:

> "Q.  Okay. Great.
> Okay. So now moving on, about those trades, one of your defenses in this case is that some of these trades failed to clear; is that correct?
>
> A.  I don't know what -- they put in there.
>
> Q.  Well, we can go to the answer if you want but –
>
> A.  I don't know if we said they failed clear. Assumed they would have. I don't remember."
>
> (Ex. A, Gentile Dep. Tr. p. 87 at l:24 - p. 88 at l: 8).

It is clear from Gentile's testimony that the First Affirmative Defense is lawyer's boiler plate without a factual foundation or consultation with Gentile. We include at Exhibit A several pages of follow-on examination, which meanders in evasion of the simple inquiry into what transactions failed to clear.

Beginning at page 89 at l:16 (Ex. A), the examiner asks:

Q.    So is it your contention that many of the trades on the 13Ds, which are Exhibits 3 and 4, I believe? No. 1 and 2, just to be clear, 1 and 2, that they failed to clear?

A:    I believe that they were most of the shares. I believe many of the shares were shorted, and that they were also done illegally, or illegally shorted. And had I not sold the shares, that they would have all failed, or most would have failed to clear."

Gentile's testimony is that he saved the naked shorts from failing to clear by selling to the shorts he was squeezing shares that he had acquired from them. And so, by his own words, he is testifying that the naked shorts did not fail at delivery. The cavalry to the rescue!

It is the essence of a short squeeze that the person engineering the squeeze buy, or otherwise gain control of, as many shares as possible before springing the trap. When the the naked short sellers are forced to cover under Regulation SHO, the squeezer will be the main source of supply for covering the shares, and will offer to sell at "asking price" as high as the market will bear. *See* Regulation SHO, 17 C.F.R. § 242.200 (Ex. O). *(See also* Ex. P, SEC's "Key Points About Reg. SHO").

On day 3 following a naked short sale (i.e., "Trade date" plus 3 trading days, or "T+3"), Regulation SHO requires the sellers' brokers to go into the market and buy-in shares to cover their customers' short positions at whatever price the market calls for, charging the customers' accounts. In effect, the brokers are guarantors of their customers' performance at their customers' expense. As the Amended Complaint recites, during a few days (roughly corresponding

to Defendants' T+3 dates), the trading price of Avalon stock skyrocketed. (Dkt #19 ¶31; *see also* Ex. I). But all of Defendants' executed trades cleared, as required by SEC Rules, including Regulation SHO—unless Gentile, on this Motion, can answer the deposition questions he uniformly evaded.

### 2. The "Clearing" of Trades Is Irrelevant to Defendants' Insider Status and to Their Short Swing Trading Liability

Without any evidence Defendants assert that an unspecified number ("many") of their trades "failed to clear." "Clearing" refers to the mechanics of settling stock transactions, the process by which shares of stock are transferred or delivered by the seller in exchange for payment of the purchase price by the buyer. The "clearing" of trades has no bearing on whether Defendants were subject to Section 16(b) or realized short swing profits.

What constitutes a purchase under the 1934 Act is a matter of federal law. *See Rubenstein v. Cosmos Holdings, Inc.*, No. 19 Civ. 6970 (KPF), 2020 WL 3893347, at *5 (S.D.N.Y July 10, 2020); *see also Morales v. Gould Inv. Trust,* 445 F. Supp. 1144, 1151 (S.D.N.Y) *aff'd,* 578 F. 2d 1369 (2d Cir. 1978); *Oliff v. Exch. Int'l Corp.* 449 F. Supp. 1277, 1293 (N.D. Ill 1978), *aff'd* 669 F. 2d 1162 (7th Cir. 1980).

The Exchange Act provides that "unless the context otherwise requires," the terms "buy" and "purchase" each includes any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78(a)(13). This language has been interpreted to make an individual a "purchaser" for purposes of Section 16 at the time when he or she "incur[s] an irrevocable obligation to take and pay for the stock." *Plumbers' Union Local No. 12 Pension Fund v Swiss Reinsurance Co.,* 753 F. Supp. 2d 166, 177 (S.D.N.Y. 2010) (citing *Blau v. Ogsbury,* 210 F. 2d 426, 427 (2d Cir. 1954)). Thus, a stock is "purchased" within the meaning of Section 16(b) when "the investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction

in any way that could be turned to speculative advantage by the investor." *Prager v. Sylvestri,* 449 F. Supp. 425, 432-33 (S.D.N.Y 1975).

Federal courts have been clear that technicalities such as the passing of title, e.g., by the "clearing" process referred to in this case, or the exchange of actual shares following the execution of trades, are of no import for Section 16(b) purposes. *See Cosmos*, 2020 WL 3893347, at **5-6; *cf. Connell v. Johnson*, No. 20 Civ. 1864 (LLS), 2020 WL 2748439, at **2-3 (S.D.N.Y. May 27, 2020) (orders that were placed, *but not executed*, did not give rise to Sec. 16(b) liability). As the Supreme Court has noted, "the crucial point in the acquisition of securities is not the technical 'purchase' but rather the decision to make an acquisition." *Foremost McKesson, Inc. v. Provident Secs. Co.,* 423 U.S. 232, 254 & n. 28 (1976).

Defendants were insiders subject to Section 16 at all times when their "beneficial ownership" exceeded 10% of Plaintiffs' outstanding shares. For purposes of determining their insider status under Section 16(a) and SEC Rule 16a-1, Defendants were "beneficial owners" of all shares over which Defendants exercised voting or dispositive authority (ie., any shares that the Defendants had the right to vote or sell) within 60 days. *See* 17 C.F.R. § 240.16a-1(a)(1) (defining "beneficial ownership" for purposes of determining insider status by reference to the definition applicable under Section 13(d); 17 C.F.R. § 240.13d-3(a) ("beneficial ownership" includes all shares over which voting and dispositive authority may be exercised within 60 days).

Under SEC Rule 15c6-1, securities transactions executed through a brokerage account (like Defendants' trades executed in the Interactive Brokers Trading Accounts, Exhibit D) are required to provide a "settlement" date—i.e., the date for completion of the clearing process, with shares delivered and payment received—within 2 trading days of execution (a time frame known as "T+2"). 17 C.F.R. § 240.15c6-1. Regulation SHO provides for clearing failures

attributed to short selling to be remedied by requiring the sellers broker to buy the shares needed for delivery and settlement on the following trading day ("T+3"). 17 C.F.R. § 242.200 *et. seq.* (*See* Ex. O; *see also* Ex. P).

Defendants acquired "beneficial ownership" of shares of stock when their purchase orders were executed by their broker (Interactive), because upon execution, Defendants acquired immediate dispositive authority over the shares purchased—even prior to settlement, and irrespective of any settlement delays caused by clearing failures or attributable to short selling. Because Regulation SHO provides for specific performance of executed brokerage orders at the sole expense of the seller. The purchaser's right of delivery and interest in the shares—and crucially, their right to sell the shares—is not contingent on the clearing process or the timing of settlement. He who can sell shares can speculate in those shares.

Thus, any purported "clearance" problems associated with Defendants' executed transactions do not provide Defendants with a defense to liability as a matter of law (and in fact the clearing or settlement process required by Regulation SHO worked in the Defendants' favor, by requiring them to sell shares to the naked shorts at exorbitant prices, as further discussed below). And in any event, every share pleaded as purchased or sold is shown by the Defendants' own brokerage records (Ex. D & Ex. E) to have cleared and settled.

Interactive Broker's F.R.C.P. 30(b)(6) witness testified that a purchase by the Defendants that failed to clear would result in a "liquidation" of the position, which would appear as a "long account" transaction designated with code "L." (Ex. C, Interactive Dep. Tr. pp. 94-97.) None of the transactions in the long account have an "L" designation—consistent with the expectation and requirement that all trades either cleared by the T+2 settlement date, or that any clearing failures associated with shares purchased from short sellers were remedied by T+3.

16

Interactive's witness further testified that a sale by Defendants that failed to clear would result in a "buyout" of the position, appearing as a "short account" transaction designated with transaction code "B." (Id.) This is in line with the "buy to cover" obligations of short sellers under Regulation SHO. None of the "short account" transactions are designated with code "B," meaning that Defendants owned the shares they sold at settlement and did not "fail to deliver" the shares to their counterparties.

Defendants have suggested that records produced by Plaintiff's transfer agent support their "clearing" defense because the documents do not identify either of the Defendants as "record owners" of Avalon stock. When transactions are executed through brokerage accounts (like the Defendants' Trading Accounts at Interactive), the clearing process is accomplished electronically, without the issuance of physical stock certificates. The brokerage firm is the "record owner," but their clients are the "beneficial owners" of the stock in their accounts, even though stock certificates would not be issued to, or exist in the name of, individual brokerage customers unless specifically requested. *See, e.g.*, *Teachers' Ret. Sys. Of La. v. A.C.L.N., Ltd.*, No. 01-cv-11814 (MP), 2004 WL 304018, at *2 (S.D.N.Y. Feb. 18, 2004) (noting that brokers were record owners and not beneficial owners); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Amsted Indus. Inc.*, No. 05-cv-5886 (RO), 2007 WL 2106114, at **1-2 (S.D.N.Y. July 17, 2007) (notice of beneficial ownership provided although record ownership was not perfected).

### 3.     Defendants Profited From any "Naked" Short Selling by Their Counterparties

Defendants also assert that some of the shares traded "did not exist" because they were sold "by naked short sellers" who failed to "borrow" or "locate" the shares prior to selling, as required by SEC Regulations (specifically, Regulation SHO). Whether or not "locate" or

"borrow" rules were followed—and that they did not is pure speculation—is a matter for dispute between the naked short sellers (if any), and their brokers.

The broker's obligation to timely deliver shares sold by short selling customers to the purchasing counterparties by the required settlement date is governed by Regulation SHO, which has four basic requirements for short selling, summarized by the SEC as follows:

1) "*Marking Requirements*." Brokers are required to mark executed sales as "long or short." ("Long" where the seller owns the security and expects to own and deliver the security at settlement; "short" where the seller does not own the security, or does not expect to own the security at settlement).

2) "*Short Sale Price Test Circuit Breaker*." Short sale price "circuit breakers." Short sales are prohibited at certain prices when a stock experiences a price decline of 10% or more in a given day.

3) "*Locate Requirement.*" Prior to executing a short sale, brokers are required to borrow or "locate" shares, i.e., document their identification of shares that could be borrowed to fulfill their (or their customers') delivery obligations at settlement (i.e., on T+2).

4) "*Close-out Requirement.*" If any short sales resulted in fails to deliver on T+2, the executing broker must "close out" the position on the next trading day (T+3), by buying shares of "like kind and quantity" as needed to satisfy, or "cover," the broker's short-selling client's delivery obligations to the purchaser.[2] The broker's obligation to "close" the short position continues as long as fails persist; and the broker is prohibited from executing further short sales without "pre-borrowing" the shares until the short positions are cleared.

(Ex. O; *see also* Ex. P)[3]

---

[2]    If brokers can establish that long positions held by their clients caused a delivery failure, the broker is nonetheless required to close out the position although additional trading days may be permitted for the broker to sort out the issue and clear the trade. (Ex. O; *see also* Ex. P at p. 4.) Accordingly, Regulation SHO required Defendants' broker to remedy any clearing issue or delivery failure associated with the Defendants' executed trades, regardless of whether the Defendants or their counterparties were short sellers.

[3]    The SEC summary accompanying the text of Regulation SHO at Exhibit P refers to the outdated T+3 settlement date, and refers to the next-day delivery "close out" requirement for short sellers as T+4. The required timing for settlement was subsequently shortened to T+2; and the Regulation SHO next-day delivery date is now T+3. *See* 17 C.F.R. § 240.15c6-1.

While Defendants focus on the "locate" requirement, it is the "close out" requirement that is central to their apparent manipulative trading—and to their Section 16(b) liability.

At his deposition, Mr. Gentile clarified that he does not claim to have engaged in any naked short selling himself; but speculates that some of his counterparties were naked short sellers. (Ex. A, Gentile Dep. Tr. pp. 89-176.) Interactive's witness testified that there was no way to determine whether any of Defendants purchases were from short sellers—let alone from "naked" short sellers, or sellers that failed to "borrow or locate" shares. (Ex C, Interactive Dep. Tr. pp. 106-109, 145-157.) As discussed above, this is consistent with Regulation SHO, which requires seller's broker to cure any failure to deliver by buying the shares they failed to locate, while the buyer's interest in (and "beneficial ownership" of) the shares is unimpaired.

As Interactive's witness explained, the failure to "locate" or deliver shares does not mean the shares "did not exist," but only that the shares were not within the possession of the seller to transfer to the buyer on the T+2 settlement date. (Id. pp. 158-170.) Shares of Avalon existed and might be purchased by the sellers, at an artificially inflated price, to fulfill their delivery obligations. Reg. SHO requires the seller's broker to purchase and deliver those shares on the next trading day—even if the price is significantly higher than the price at which the seller expected the shares would be "located."

If more shares are shorted than are available to locate, some of the short sales will result in failures to deliver on the required settlement date. But even if all of the outstanding short sales cannot be settled on the same day, they can and will be settled on following days when the short sellers are required to buy the shares at any "asking" price demanded by owners of the stock.

Regulation SHO not only resolves delivery failures in favor of the purchasers, but also allows purchasers to profit from selling shares that their counterparties are unable to deliver. In the event of excessive short selling causing widespread delivery failures, as occurred in Avalon stocks, the buyers (i.e., the long parties to the short sales, e.g., the Defendants in this case) are not left empty-handed as the purchasers of stock that "does not exist." Instead, the short sellers' brokers are required to cure their delivery failures by buying the failed securities—at the short seller's expense, and at any cost. The mandated demand for shares drives up the asking price for the shares causes a "short squeeze."

The squeeze provides owners of the stock—including those who purchased the stock from short sellers in the first place—with the opportunity to sell the shares back to short sellers scrambling to "cover" their positions at inflated prices. By virtue of the "close out" requirement, Defendants, as purported purchasers of stock from short sellers, would suffer no loss, and would only stand to benefit, from any failure by their counterparties to comply with the "locate" requirement. Merely glancing at the historical trading prices for Avalon during and surrounding the Defendants' trading activity confirms that a "short squeeze" is precisely what occurred in this case. (*See* Ex. I)

The data on delivery failures further suggests that the Defendants both orchestrated and profited from the short squeeze. Defendants accumulated the bulk of their Avalon position in their lowest-priced purchases a few trading days before the dates on which delivery failures appeared in these stocks. (*See* 56.1 Statement ¶ 9 & Ex. J p. 32.) Defendants' sold the bulk of these stocks—and at the most profitable prices—when demand was subsequently driven by the "close out" requirement. (*See* id. & Ex. H.) In other words, Defendants bought up all the shares they could

to fuel a delivery fire, and then charged exorbitant prices to sell back the shares needed to put the fire out.

Plaintiff's claim does not fail because of possible "locate" or "borrow" violations by Defendants' counterparties. It is precisely because of Regulation SHO compliance that Defendants were able to manipulate the price of these thinly traded stocks, and reap profits at the expense of short sellers required to close out their positions within 2 days. (*See generally* Ex. J.)

### B. Second and Third Affirmative Defenses: "Waiver" and "Unclean Hands"

#### 1. Neither of These Defenses Are Recognized Under Section 16(b)

This is a suit at law to enforce a statutory right of recovery created by Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). Section 16 is prophylactic, and intended to proscribe trading deemed to be apparently and inherently unfair to other market participants. The defenses of unclean hands is an equitable defense, applicable only to suits in equity. There is no "equitable" right of recovery similar to Section 16 provided under the law, and equitable defenses are not compatible with the strict liability imposed by the statute.

Accordingly, Defendants' "unclean hands" defense is invalid as a matter of law. *See Analytical Surveys, Inc. v. Tonga Partners, L.P.*, No. 06 Civ. 2692 (KMW), 2008 WL 4443828, at *7 (S.D.N.Y. Sept. 29, 2008), *aff'd,* 684 F.3d 36 (2d Cir. 2012) ("nothing in the statute permits the Court to consider as a mitigating factor the issuer's intent or any benefit inuring to the issuer, nor is there any equitable defense available based on such theories"); *see also Donoghue v. Natural Microsystems,* 198 F. Supp. 2d 487, 491 (S.D.N.Y. 2002) (Sweet, J.) (*in pari delicto* "and other such equitable defenses are generally not available in actions under Section 16(b)"); *Tyco*, 490 F. Supp. at 8 ("equitable estoppel" is not a valid defense to Section 16 liability); *Tex. Internat'l Airlines v Natl. Airlines*, 714 F.2d 533, 536-37 (5th Cir. 1983) ("The case law uniformly rejects

equitable defenses in 16(b) cases"); *Riseman v. Orion Research, Inc.*, No. 83-1990-S, 1984 WL 282, at *4 (D. Mass. Mar. 20, 1984).

The defense of "waiver" is likewise incompatible with the strict liability for insider short swing trading profits imposed on insiders, and the unequivocal right of recovery provided to issuers, under Section 16(b). Moreover, a "wavier" defense is directly at odds with Section 29 of the Act, which expressly prohibits the "waiver" of rights provided by the Act. *See* 15 U.S.C. § 78cc. There is no recognized "waiver" defense to Section 16(b) claims. *See Reece Corp. v. Walco Nat'l Corp.*, 565 F. Supp. 158, 162 (S.D.N.Y. 1981) (both insider and company "knew or should know" of Section 16(b) restrictions, which they could not agree to "waive" or disregard).

**2.   <u>There Are No Allegations or Evidence Supporting Either Defense</u>**

In the absence of any basis identified by the Defendants to support their Second or Third Affirmative Defenses, Plaintiff's counsel asked Gentile to explain. The testimony elicited at Gentile's deposition made clear that there were no facts (whether real or imagined) claimed in support of either defense.

The discussion as to "unclean hands" proceeded as follows:

Q.    Okay.  Let's move to the second affirmative defense. It says, 'Plaintiff's Claims are barred in whole or part by the doctrine of unclean hands;' do you know what 'unclean hands' means?

A.    No. Explain it to me.

MR. FORD:  You shouldn't ask questions but, again, it's a legal defense.

Q.    Yeah.

MR. FORD:    You asked if he knew what it meant.  He said no. You can ask another question.

Q.    Usually, unclean hands refers to some kind of bad faith on the part of the person being accused of unclean hands.  Do you have any reason to think that either of these companies acted in bad faith?

A.      The companies.

Q.      Avalon, my clients. Avalon or New Concept.

A.      Do I have reason to believe that they acted in bad faith for what, for what
        Specifically?

Q.      Well, you tell me. I mean – so I'm trying to understand the factual basis
        for this defense which, to me is suggesting, kind of, bad faith allegation.

        MR FORD:  This is – it's an affirmative defense.

Q.      Uh-huh.

        MR. FORD:  The information that supports it will be based on the discovery
        that's currently being taken, so he doesn't have to give a full explanation of
        what our affirmative defenses are.

(Ex. A, Gentile Dep. Tr. p.178 at l:20 – p.181 at l:6; and continuing in the same vein
for several more pages.)

        We are dealing with lawyers' reflexive pleading of something, anything, as an

affirmative defense without a legal basis or a shred of underlying factual support.

        As to the Third Affirmative Defense ("waiver"), again we go to Gentile's testimony:

Q.      Okay.  The third affirmative defense is – back in Exhibit 9 – is waiver.  Do
        you have any basis, factual basis, that you can think of for that defense?

A.      I don't know.

        MR. FORD:  It's not clear.  Do you know what a legal doctrine means?

A.      THE WITNESS: No.  I need another water actually.  Thanks.  Coming from
        a tropical weather, and it's so dry here that – (Pause).

Q.      Waiver actually means you relinquished your claims in some way.  Do you
        have any basis, factual basis, that you can think of for that defense?

A.      I have no idea what –

        MR. FORD:  These are legal issues.  It's not for him to explain them.
        They're legal positions.

Q.      MS. TAUBER:  You understand there are some facts we never got to that
you were contending supported these defenses.  This is the time we have to
inquire about those facts, so we're not surprised by allegations –

MR. FORD:  Understand – if he understands what our legal argument based
on legal waiver means, he can explain that.

Q.      MS. TAUBER:  But also facts you're intending to produce in support of
these questions.

MR. FORD:  The issue, this whole line of questions, he doesn't understand
the legal concept.  So he doesn't understand what facts would be supportive
of that. That's something the lawyers know, and you know this.

Q.      MS. TAUBER:  Right. That's why I'm describing the concept and saying
what facts do you know of that might fit into these –

MR. FORD:  He has no idea what we could possibly put in a legal brief.

(Ex. A, Gentile Dep. Tr. pp. 181 at l:7 - p. 182 at l:18).

… And neither do we. Once again, an aspect of the pleading is a mystery to the

Defendant for whom it speaks, and even more of a mystery to Plaintiff's counsel. The Second and

Third Affirmative Defenses are both frivolous filler.

## **CONCLUSION**

MintBroker and Gentile, while more-than-10% beneficial owners of the Class A

Common Stock of Avalon, purchased and sold shares of that class with resulting profit. That profit

belongs to Avalon and the court should so declare with a finding of liability.

Avalon's provisional computation of profits has been submitted on this Motion. It

is $6,235,908. (Ex. M.) If MintBroker and Gentile accept it as correct, that sum (plus pre-judgment

24

interest) may be entered as part of the final judgment. If MintBroker and Gentile do not accept it as correct, it is their burden to show what lower number might instead be correct. This will involve further proceedings and Avalon asks that a master be appointed to hear and decide, or to hear and report.

Respectfully submitted,

*s/ Miriam Tauber*

_____

Miriam Tauber, Esq.
*Attorney for Plaintiff*

*s/ David Lopez*

_____

David Lopez, Esq.
*Attorney for Plaintiff*

25