# EXHIBIT A

**In The Matter Of:**

*AVALON HOLDINGS CORPORATION v.*

*GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.*

---

*GUY GENTILE*

*February 24, 2020*

---

*DALCO Reporting, Inc.*

*170 Hamilton Avenue, Suite 303*

*White Plains, NY 10601*

*(914) 684-9009*

*dalcoreporting.com*



Original File GENTILE, GUY (2_24_2020).txt

**Min-U-Script® with Word Index**

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

**GUY GENTILE**
**February 24, 2020**

---

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - - - - - - -x
                        Plaintiff,
 4   AVALON HOLDINGS CORPORATION,
        -against-           Case No.
 5                          1:18-cv-7291
     GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.,
 6                        Defendants.
 7   RELATED TO:
 8   - - - - - - - - - - - - - - - - - - -x
 9   NEW CONCEPT ENERGY, INC.,
                        Plaintiff,
10      -against-           Case No.
                            1:18-cv-08896
11   GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.,
                        Defendants.
12   - - - - - - - - - - - - - - - - - - -x
13                   February 24, 2020
                     9:00 a.m.
14
15
16   DEPOSITION of GUY GENTILE, a Defendant herein, taken
17   pursuant to Court Order, and held at the offices of
18   DALCO Reporting, Inc., 280 Madison Avenue, New York,
19   New York, before Debra A. Levinson, CSR-RMR-CRR, a
20   Court Reporter and Notary Public of the State of New
21   York.
22
23
24
```

---

Page 2

```
 1   A P P E A R A N C E S :
 2
 3   FOR PLAINTIFFS:
 4      MIRIAM TAUBER LAW, PLLC
           885 Park Avenue, Suite 2A
           New York, New York 10075
 5      BY:  MIRIAM TAUBER, ESQ.
 6      LAW OFFICE OF DAVID LOPEZ
           171 Edge of Woods Road
 7           P.O. Box 323
             South Hampton, New York 11968
 8      BY:  DAVID LOPEZ, ESQ.
 9
10   FOR DEFENDANTS:
11      FORD O'BRIEN LLP
           575 Fifth Avenue, 17th Floor
           New York, New York 10017
12      BY:  ADAM C. FORD, ESQ.
             DANIELLE M. McLAUGHLIN, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 3

```
 1      IT IS HEREBY STIPULATED AND AGREED by and between
 2   the attorneys for the respective parties herein, that
 3   filing and sealing be and the same are hereby waived.
 4
 5      IT IS FURTHER STIPULATED AND AGREED that all
 6   objections, except as to the form of the question,
 7   shall be reserved to the time of the trial.
 8      IT IS FURTHER STIPULATED AND AGREED that the
 9   within deposition may be signed and sworn to before any
10   officer authorized to administer an oath, with the same
11   force and effect as if signed and sworn to before the
12   Court.
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1   GUY GENTILE,
 2   having been first duly sworn by the Notary Public
 3   (Debra A. Levinson), and stating his address as San
 4   Juan, Bahamas, was examined and testified as follows:
 5
 6   EXAMINATION
 7   BY MS. TAUBER:
 8      Q.  Good morning, Mr. Gentile.  My name is Miriam
 9   Tauber.  I'm the counsel for the plaintiffs in this
10   case.  Thank you for coming today.  I guess, start with
11   just basic confirmation.  You said you're a resident of
12   Puerto Rico?
13      A.  Correct.
14      Q.  Could we have a full address, for the record?
15      A.  I'm not going to disclose my full address.
16   It's San Juan, Puerto Rico.
17      Q.  Okay.  Are you a U.S. citizen?
18      A.  Yes.
19      Q.  Okay.  Are you a citizen of any other
20   countries?
21      A.  Yes.
22      Q.  What countries are those?
23      A.  Italy and Jamaica.
24      Q.  Okay.  Do you have an Italian passport?
```

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 5

1     A.  Yes.
2     Q.  Do you have a Jamaican passport?
3     A.  Yes.
4     Q.  Do you have any other residences in the
5  United States, besides the San Juan, Puerto Rico
6  location?
7     A.  That's my legal residence.  It's just San
8  Juan, Puerto Rico.
9     Q.  Okay.  So do you have other residence in
10  other states?
11     A.  I own other properties but not in -- not in
12  the US.
13     Q.  Okay.  So that's your only current residence,
14  Puerto Rico?
15     A.  That's where I live.  I'm there most of the
16  time.
17     Q.  Okay.  Where else do you live when you're not
18  living there?
19     A.  Well, right now, it's just -- right now, I
20  just live in Puerto Rico.  Prior to that, I lived in the
21  Bahamas for a number of years.
22     Q.  Okay.
23     A.  And prior to that, I lived in New York.
24     Q.  Okay.

Page 6

1     A.  And also in Miami, for a brief period, but
2  right now, my only full-time residency is San Juan,
3  Puerto Rico.
4     Q.  Okay.  So I wanted to go through some
5  entities that we know, well, your -- I think your
6  attorney said in court that MintBroker which is the
7  defendant in this case is the same thing as SureTrader;
8  is that correct?
9     A.  SureTrader is not a legal entity.
10     Q.  Okay.  So what is the relationship between --
11  is SureTrader just the name, the DBA name of MintBroker?
12     A.  Just a website.
13     Q.  Just a website.  Okay.  So can I give you a
14  -- can I go through a list of other names that I've
15  started to come across and you tell me if they're also
16  the same company, if they're related companies, just
17  because of the confusion of SureTrader and MintBroker?
18     MR. FORD:  Yes.  Just also the same company
19  as what.
20     Q.  As SureTrader, slash, MintBroker, is that --
21  those are the same thing, right, like SureTrader?
22  You're saying it's a website but that refers to
23  MintBroker, is that what you meant?
24     A.  It used to; it's no longer in business.

Page 7

1     Q.  Okay.  So -- but when it was in business,
2  it's the same entity as MintBroker?
3     A.  It's not an entity.  I said that already.
4     Q.  Was it ever an entity?
5     A.  No.
6     Q.  Okay.  What other names did it go by?
7     A.  Which; did what go by?
8     Q.  Either.  This -- is this the same business
9  MintBroker and Sure -- I guess I'm trying to figure out
10  what is meant by I think you said that they're the same
11  thing?
12     MR. FORD:  I'm not certain what you're
13  referring to.
14     Q.  So I think last time you were in court, you
15  had said MintBroker and SureTrader are the same thing;
16  that's not correct?
17     MR. FORD:  Can I just -- I'm happy to help.
18  I want to be helpful but I think it's a little --
19  maybe if you just asked Mr. Gentile the question
20  and he'll answer it.
21     Q.  So are they the -- in your opinion, are they
22  the same thing, MintBroker and SureTrader, do you use
23  those names interchangeably to refer to the same
24  business?

Page 8

1     A.  Which business?
2     Q.  Okay.  So MintBroker is currently in
3  existence; right?
4     A.  MintBroker what though?  MintBroker --
5     Q.  International LTD, the defendant in this
6  case?
7     A.  Okay.
8     Q.  Is that the same?
9     A.  In which jurisdiction?
10     Q.  What do you mean which jurisdiction?  The
11  defendant in this case, MintBroker International LTD, is
12  I think a Bahamas entity?
13     A.  Okay.  But you've named this case --
14  defendants in UK, you've named defendants in Bahamas.  I
15  don't know which one you're talking about.
16     Q.  Okay.  So the -- let me show you the caption
17  of the case here, and you can see what I'm talking
18  about.
19        So here is a document from this case.  I
20  think you've seen this.  It's your responses.  Your
21  attorney may have helped prepare these.  There is a
22  caption on there.  You see the defendant is MintBroker
23  International LTD?
24     A.  I remember in the first complaint that you

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 9

1  guys wrote; you -- you mentioned MintBroker
2  International UK.  So I don't know if this is for UK or
3  for Bahamas.  Which one is it for?
4      Q.  I don't recall that we had UK --
5      MR. LOPEZ: Bahamas.
6      Q.  -- in the caption?  But --
7      MR. FORD: I'll try and speed this along.  I
8  think as of now --
9      MS. TAUBER: Yeah.
10     Q.  -- you guys correct me, the complaint,
11 whatever might have been because I think there may have
12 been some confusion earlier, but as of right now, this
13 complaint, this case is Avalon Holdings against Guy
14 Gentile and You and MintBroker International LTD, that
15 is the -- that is a Bahamian corporation; is that
16 correct?
17     A.  Yes.
18     Q.  Okay.  And so the business that's known as
19 SureTrader -- they're the website SureTrader, is that
20 the business that MintBroker operated or operates?
21     A.  SureTrader was owned -- the website was owned
22 by MintBroker International for that time that that was
23 in business.
24     Q.  That which was in business; that SureTrader

Page 10

1  was in business or --
2      A.  SureTrader is not a business.  It was a
3  website like I said, MintBroker International was the
4  business.
5      Q.  Okay.  So how is the website related to the
6  business?
7      A.  It offered products and services that that
8  business offered.
9      Q.  What services are those?
10     A.  Online trading services.
11     Q.  So meaning what; what is an example of a
12 service that it offered?
13     A.  Similar to E-Trade or Ameritrade.
14     Q.  So you can -- like a customer can open an
15 account and place trades in the account similar to
16 E-Trade; is that what you mean?
17     A.  Similar to E-Trade, yes.
18     Q.  Okay.  So in this -- okay.  Let me go back to
19 my initial question which was I wanted to go through a
20 list of entities and can you tell me if they are the
21 same -- part of the same business or I guess the same --
22 I guess, first of all, the same entity.  I guess they're
23 different entities, but if they relate to the same
24 business or not?

Page 11

1      A.  Okay.
2      Q.  Okay.  So the first one is DAS Trader, is
3  that an entity that is affiliated with you?
4      A.  I don't own that business.
5      Q.  Is that an affiliate of any business
6  that you do own?
7      A.  No.  I don't own that business directly or
8  indirectly.
9      Q.  Okay.  Does your ex-wife, I think, own that
10 business, Karen Gentile?
11     A.  I mean, I don't know if she owns it.  I don't
12 keep track of what she owns.
13     Q.  Okay.  Did she own it at one time?
14     A.  I believe so but that's a belief.  I'm not
15 certain if she owned it or if another company she had
16 owned it or if a trust owned it.
17     Q.  Okay.
18     A.  Or relatives owned it.
19     Q.  Directly or indirectly somehow.
20         Did you ever own it with her?
21     A.  That entity specifically that she has now,
22 no.
23     Q.  The business of DAS Trader.  I don't know
24 if --

Page 12

1      A.  Well, DAS Trader is a platform.  It's not a
2  business.
3      Q.  Okay.
4      A.  It's a technology.
5      Q.  The business is DAS Inc.; is that right?
6      A.  DAS Inc.
7      Q.  Okay.
8      A.  And I don't have any interest in DAS, Inc.,
9  and I never had an interest in DAS Inc. Other than
10 it was a marital asset prior.
11     Q.  Is that a company that you founded or that
12 you started with your ex-wife or that she started?
13     A.  I was never an owner of that, in DAS Inc., in
14 the actual trading platform, probably 18 years ago, I
15 helped and I had an ownership interest in the platform
16 but I don't, and have not had one in many years.
17     Q.  Okay.  And then DayTrader or DayTrader Pro?
18     A.  DayTrader Pro is a website.
19     Q.  Was that the same website as SureTrader, like
20 did it become SureTrader or is it different?  What's the
21 difference between SureTrader and DayTrader?
22     A.  They're unrelated businesses.
23     Q.  Did they both exist at the same time?  Does
24 Daytrader Pro still exist?

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 13

1    A.  Daytraderpro.com?  There's no business by
2  that name.  There's a website by that name.
3    Q.  Okay.  That's just a website?
4    A.  Yes.
5    Q.  Okay.  And does that still exist, the
6  website?
7    A.  Yes.
8    Q.  Okay.  GBox Trading?
9    A.  That business does not exist.
10    Q.  Okay.  Is that a business that you used to
11  own?
12    A.  I had an interest in it.  I was a member of
13  it, years ago.
14    Q.  Is that -- was it affiliated with any of the
15  other entities I just mentioned, like DAS Trader,
16  DayTrader, SureTrader, MintBroker?
17    A.  It was not affiliated.  It was just a company
18  I was a member of.
19    Q.  Okay.  And was it also a trading platform
20  website or --
21    A.  No.
22    Q.  What was that company?
23    A.  I don't see how that's related to what we're
24  talking about.

Page 14

1    Q.  I guess -- it's usually because there's a lot
2  of names and I --
3    A.  It's unrelated to your complaint.  Next
4  question.
5    Q.  Well, I disagree.  Let's keep going.  So
6  Gilmore Capital?
7    A.  I have no ownership in Gilmore Capital.
8    Q.  Is that a related entity?
9    A.  I --
10    Q.  I'm just -- if you could just tell me -- it
11  will go faster if you just tell me if they're affiliated
12  or not or related or if they're companies that you own
13  or --
14    MR. FORD:  I'm sorry.  Just to be clear:  The
15  question that you're asking, and I also do want to
16  move this along.
17    MS. TAUBER:  Yeah.
18    MR. FORD:  The question that you're asking is
19  when you name a name, you want to know whether he
20  owns it -- one, whether he owns it and two,
21  whether it's affiliated with MintBroker.
22    MS. TAUBER:  Correct.
23    MR. FORD:  So he'll do each of those names in
24  two parts and he can say yes or no, if that's

Page 15

1  helpful.
2    MS. TAUBER:  Right.  So -- right.  Yes,
3  perfect.
4    MR. FORD:  Those are the two --
5    MS. TAUBER:  An affiliate wouldn't mean like
6  did they change their name to become that company
7  or something got presently affiliated but is it a
8  successor or a predecessor company to the
9  defendant; yeah?  Okay.
10  BY MS. TAUBER:
11    Q.  Okay.  So Instant X Trading?
12    A.  I don't own it.
13    Q.  And is it affiliated?
14    A.  I have no ownership.  I've never owned it.
15    Q.  So it's -- okay.
16    A.  It's not affiliated to me.
17    Q.  With MintBroker, no.  Okay.
18    Investors Live or Investors Underground?
19    A.  I never owned it.  It's not affiliated with
20  me.
21    Q.  Okay.  Jolt Securities?
22    A.  That company, I owned for a brief period, but
23  it's been out of business for almost a decade.
24    Q.  Okay.  And that's not -- wasn't a predecessor

Page 16

1  entity to MintBroker or SureTrader.com.
2    A.  No.
3    Q.  KAG Holdings?
4    A.  It's unrelated to MintBroker International.
5    Q.  Okay.  So you -- but you do own that company?
6    A.  I don't own it.
7    Q.  Oh, okay.
8    MR. FORD:  You do not.
9    THE WITNESS:  (Indicating no.)
10    Q.  Mint Bank?
11    A.  That was never even incorporated.
12    Q.  Okay.  So it's just a name that you
13  registered or --
14    A.  Tried to register.
15    Q.  Okay.  Mint Funds?
16    A.  It's still in business.
17    Q.  Affiliated with MintBroker?
18    A.  It's not affiliated.  I own it.
19    Q.  Okay.  Mint Global Markets?
20    A.  Okay.  There's -- that is still in business
21  but unaffiliated.
22    Q.  And do you own that company?
23    A.  Not directly.
24    Q.  Okay.  Mint Trade?

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 17

1      A.   Don't own Mint Trade.
2      Q.   It exists?
3      A.   I don't know.  Never heard of it.  Mint
4    Trade.
5      Q.   Mint Investor?
6      A.   That I own, unaffiliated.
7      Q.   Unaffiliated?
8      A.   Unaffiliated with that business.
9      Q.   With MintBroker, okay.
10         And then Speed Trader or Speed Trader Pro?
11     A.   That is a website.  It's not a business.
12     Q.   Is it the name as Sure -- like did it change
13   its name to SureTrader.com., at some point?
14     A.   No.
15     Q.   Separate?
16     A.   Separate entities.
17     Q.   It existed the same time?
18     A.   They existed at the same time.
19     Q.   Okay.  Stock USA or Stock USA Execution?
20     A.   It's unaffiliated.
21     Q.   Is that the same as Mint Global Markets?
22     A.   Yes.
23     Q.   Okay.  And then SureTrader is a website you
24   said?

Page 18

1      A.   Yes.
2      Q.   Okay.  Swiss America Securities?
3      A.   Well, that is the same as MintBroker
4    International.
5      Q.   So Swiss America Securities changed its name
6    to MintBroker; is that --
7      A.   Correct, MintBroker International.
8      Q.   When did that name change happen?
9      A.   I don't remember exactly when, but I guess it
10   was around 2016 or 2017 range.
11     Q.   Okay.  Why did it change its name?
12     A.   Because I wanted to change the name.
13     Q.   Just like you didn't like -- you were sick of
14   the other name?  Were there any -- there was no reason?
15         MR. FORD:  Objection.  You have to --
16         MS. TAUBER:  What --
17         MR. FORD:  -- phrase the question better.
18     Q.   There was no reason that you recall for the
19   name change?
20     A.   I wanted to change the name.  It was a
21   business decision.
22     Q.   Okay.  And the last one is ProTrade?
23     A.   ProTrade what?
24     Q.   Dot com.

Page 19

1      A.   I never owned ProTrade.com.
2      Q.   Like how about ProTrade Inc.?  Or I don't
3    really know what the suffix would be.
4      A.   I didn't own a company named ProTrade Inc. Or
5    ProTrade.com.
6      Q.   Okay.  Did you own a company with ProTrade in
7    its name?
8      A.   Yes.
9      Q.   What was that called?
10     A.   ProTrade Securities.
11     Q.   Okay.  And is that the same as the other
12   entities I just mentioned like Mint Global Markets --
13     A.   Unrelated to any other business.
14     Q.   -- or anything like that?
15         Okay.  So of these companies, the ones that
16   are presently in business, are MintBroker International,
17   is that correct, the defendant in this case?
18     A.   Define "in business."
19     Q.   I guess -- it's a good point.
20         Does it still exist as an entity?
21     A.   Yes.
22     Q.   And is there still an active business?
23     A.   No.
24     Q.   Does it have offices right now?

Page 20

1      A.   No.
2      Q.   A phone number, any employee?  A phone
3    number?
4      A.   Doesn't have any operation.
5      Q.   No employees?
6      A.   (Indicating no.)
7      Q.   Okay.  When is the last day that it was in
8    business?
9          MR. FORD:  You have to -- if the record could
10         reflect, he said -- he shook his head no.  Just
11         remember to say yes or no so the court reporter
12         can get it.
13     A.   Yes.  Sorry.
14     Q.   When was the last day that MintBroker
15   International was in business?
16     A.   I don't know the exact day.
17     A.   More or less.
18     A.   Give you a month.
19     Q.   Sure.
20     A.   I believe it was November or December of last
21   year.
22     Q.   Of 2018?
23     A.   Yeah.
24         MR. LOPEZ:  '19.

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 21

1    A. '19.
2    Q. '19. Thank you. When -- like -- so before
3 it closed, let's say, in October of 2019, how many
4 people worked there?
5    A. Between 50 or 60.
6    Q. Okay. And were -- the offices were in the
7 Bahamas; is that correct?
8    A. Yes.
9    Q. Were there any other office locations?
10   A. No.
11   Q. How many people who worked there were
12 registered broker/dealers in the U.S.?
13   A. I don't understand the question.
14   Q. Meaning -- okay. Let me just start with --
15 was -- is MintBroker International or was it a
16 registered broker/dealer?
17   A. In what jurisdiction?
18   Q. In the United States. Let's start with that.
19   A. No.
20   Q. No. Was it registered with the Bahamas?
21   A. Yes.
22   Q. Okay. How many people who worked there --
23 did anybody who worked there, other than you worked with
24 there, was anybody a registered U.S. broker/dealer?

Page 22

1    A. No.
2    Q. Okay. Were there Bahamas broker/dealers who
3 worked there?
4    A. I mean I don't know what you mean by the word
5 "broker/dealer" because I'm just not familiar with the
6 way you're using the word "broker/dealer" because
7 individuals are not broker/dealers. Companies are
8 broker/dealers.
9    Q. Okay. So a registered -- well, so you're
10 aware that United States brokers have to be registered
11 with FINRA; correct? Are you aware of that requirement?
12   A. Broker/dealers are required to be registered
13 with FINRA.
14   Q. Individuals also have to have licenses?
15   A. They're licensed with their firms as far as
16 I'm concerned. As far as I'm aware, they're licensed by
17 the firm, they don't get licensed directly with FINRA.
18   Q. Okay. So was -- is Mint Global Markets, the
19 one that's still in business, I think you said, is that
20 a registered U.S. broker/dealer?
21   A. As far as I'm aware, yes.
22   Q. Okay. And did you say that was affiliated
23 with MintBroker? I can't recall?
24   A. I did not. They're separate entities.

Page 23

1    Q. Are they affiliated with each other? Do they
2 have -- do they share any of the same like officers,
3 directors, employees?
4    A. No.
5    Q. Okay. Are you an officer of either of Mint
6 Global Markets?
7    A. No.
8    Q. Are you an officer of MintBroker?
9    A. MintBroker International LTD Bahamas.
10   Q. Yes.
11   A. Yes.
12   Q. Okay. Who are the other officers of
13 MintBroker International?
14   A. Right now? I don't believe there's anyone
15 else right now.
16   Q. Okay.
17   A. Maybe -- maybe the secretary is still on
18 board.
19   Q. And who is that?
20   A. Michael Miller.
21   Q. And when -- if you recall, when was
22 MintBroker International formed?
23   A. In 2008, I believe. Formed as Swiss America
24 Securities.

Page 24

1    Q. And so you have been an officer the entire
2 time; is that correct?
3    A. Yes.
4    Q. And so along with you throughout its
5 existence, who have been other officers, if you recall?
6    A. Well, like I said, Michael Miller was the
7 secretary. And trying to remember, Philip Dorset was an
8 officer of the company, the compliance officer for -- at
9 the time, and Antonio Collie was -- became a director
10 probably, I don't remember exactly what year, maybe
11 2016. And then the compliance, a new compliance officer
12 then joined to become an officer.
13   Q. And who was that?
14   A. I can come back to that. I just -- losing
15 his name for the moment. Cooper, Mr. Cooper.
16   Q. And so are these individuals, any of them,
17 Mr. Cooper, Collie, Miller, Dorset, are they U.S.
18 citizens?
19   A. Not to my knowledge.
20   Q. So are they residents of the Bahamas?
21   A. Yes.
22   Q. Okay.
23     Can I read you some other names of possible
24 employees of MintBroker and you tell me if they are

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 25

1  employees and if they're U.S. citizens; so a two-part
2  question?
3  　　　　MR. LOPEZ: At July and August 2018, not
4  everyone, just the relevant dates.
5  　　　　MR. FORD: Miriam, I'm sorry. You just want
6  to run through a list of names --
7  　　　　MS. TAUBER: I want to know if they still
8  work there or worked at these companies. They're
9  just names that appeared in the documents that
10  were produced to us; so I want to know if they are
11  his employees or not.
12  　　　　MR. FORD: I'm sorry. I thought I understood
13  you were asking whether he knew if they were U.S.
14  citizens.
15  　　　　MS. TAUBER: Oh, right, and U.S. citizens,
16  right.
17  　　　　MR. FORD: Yeah. Okay. So you want to know
18  what their citizenship is.
19  　　　　MS. TAUBER: Well, yeah. They I guess are
20  residents of the United States if he doesn't know
21  if they're U.S. citizens or not. Yeah? It's just
22  a few names.
23  　　Q. So Justin Richie?
24  　　A. As far as I know he's a Bahamian citizen.

Page 26

1  　　Q. Okay. And he's an employee of MintBroker?
2  　　A. Was.
3  　　Q. Was.
4  　　　　Antonio Collie -- Cooper, you said, his name
5  was Edward?
6  　　A. Yes.
7  　　Q. Okay. Irvin Raming?
8  　　A. I believe he's always Bahamian; he worked for
9  the company.
10  　　Q. So anybody -- I've come across people who
11  have SureTrader.com email addresses just in some
12  documents. Are these all people that, to your
13  knowledge, if they had a SureTrader.com email address,
14  does that mean that they worked in the Bahamas for
15  SureTrader or for MintBroker or is there a different
16  entity they could be working for?
17  　　A. As far as I'm aware that would be just people
18  from the Bahamas.
19  　　Q. Okay. Just go past that. And then who is
20  Nicholas Abatotakies; is that how you pronounce his
21  name? I don't know.
22  　　A. He's someone that used to work for Mint
23  Global Markets, and he's also a trustee for a trust.
24  　　Q. What trust?

Page 27

1  　　A. I mean, do I have to disclose the name of my
2  trust? It's not relevant to this.
3  　　Q. What's his relationship with you?
4  　　A. I just told you. He's a trustee. It's a
5  trust that was created.
6  　　Q. What's your relationship with the trust?
7  Meaning --
8  　　A. This is a trust that was created a decade
9  ago. It has nothing to do with this.
10  　　Q. I'm just trying to -- how he's -- does he
11  work with you; like how -- what's your relationship with
12  him?
13  　　A. He's a friend.
14  　　Q. Is he not a business partner of yours?
15  　　A. He's not a business partner of mine. He's
16  worked for my company when it was my company, my company
17  in New York.
18  　　Q. Okay. Is that Mint Global Markets or --
19  　　A. Yes, he was working there. He's, I believe,
20  one of the directors of that entity.
21  　　Q. Okay. When you said your company in
22  New York, that's what you meant?
23  　　A. Yes. It's not my company anymore because
24  that's the company I'm referring to that's in a trust

Page 28

1  that he is the trustee of.
2  　　Q. Okay.
3  　　A. So I don't own that company for the last --
4  almost ten years I think.
5  　　Q. Okay. Okay. So let's move to the trading
6  process. So you were saying that MintBroker -- can you
7  explain a little bit about how MintBroker's business
8  worked until it went out of business. I guess how --
9  what -- what its main business was and how -- sort of --
10  well, I guess -- what is MintBroker's main business?
11  　　　　MR. FORD: Miriam, I'll give you a little
12  leeway on this but the relevancy here on -- to
13  this case.
14  　　　　MS. TAUBER: I'm trying to get to like the
15  document issue and like where the documents are,
16  the records and how they would be kept just in the
17  normal course of business, and like clear this
18  issue of whether MintBroker had relevant documents
19  that it could produce to us.
20  　　　　MR. FORD: I'm perfectly happy with you
21  asking about the documents and where they might be
22  kept sort of but going into the full business of
23  the company strikes me as just really far afield.
24  I'm giving you leeway. I'm trying not to

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 29

1 interrupt.
2     **MS. TAUBER:** Right.
3     **MR. FORD:** But I just want to -- this is not
4 a case about the fullness of MintBroker
5 International's business.
6     **MS. TAUBER:** Okay.
7     **MR. FORD:** But if you want to ask about
8 document collection, you're welcome to go there of
9 course.
10     **MS. TAUBER:** If you could take -- well, okay,
11 taking us back to our hearing about this like you
12 had said and I'll just paraphrase you, and said
13 oh, like Mr. Gentile's sitting in the computer and
14 trading, I just want to sort of get into that a
15 little bit and if you could take me through that
16 and explain to me what that means like when you're
17 on the computer trading and what kind of sort of
18 account statements or things like that you might
19 be seeing when you're trading and that are
20 generated as you're doing that.
21     **MR. FORD:** Miriam, respectfully that is not a
22 question.
23     **MS. TAUBER:** No, that's not my question.
24 That's an overview of this topic.

Page 30

1     **MR. FORD:** Okay.  Very good.
2     **MS. TAUBER:** To clear the ambiguity of where
3 it's going.  That's where I'm trying to get to.
4     **MR. FORD:** Okay.
5 BY MS. TAUBER:
6     Q.  So what is MintBroker's business in the
7 Bahamas?
8     **A.  It's an online trading firm.**
9     Q.  Okay.  And you are a manager of that
10 business; right?
11     **A.  Well, when it existed, I was the manager of**
12 **that business.**
13     Q.  Right, and it -- does MintBroker trade on
14 behalf of clients, customers?
15     **A.  It doesn't make decisions on behalf of**
16 **clients, if that's what you mean.**
17     Q.  Yeah, sure.  But does it -- so we'll do the
18 client part later but does MintBroker also trade for its
19 own account?
20     **A.  It did.**
21     Q.  Okay.  And then when MintBroker is trading
22 for its own account, is that you doing the trading?
23     **A.  Yes.**
24     Q.  Okay.  How do you actually do the trading?

Page 31

1     **A.  With a computer.**
2     Q.  So you log on to a website?
3     **A.  I --**
4     **MR. LOPEZ:** Can I consult with Miriam for a
5 minute.
6     **MR. FORD:** Of course, absolutely.  Yes.
7     **MS. TAUBER:** Yes, okay.  All these questions
8 relate to July and August 2018.  Is that clear?
9 That's the relevant time period.  So I don't need
10 to know anything beyond that.
11     **MR. FORD:** Thank you.
12     Q.  So you log on to a website to do the trading
13 for MintBroker's own account; is that correct?
14     **A.  I would basically log on to the trading**
15 **platform that MintBroker had access to, which one of**
16 **them for example is Interactive Brokers and plus the**
17 **trades.**
18     Q.  And what -- so you would go to
19 interactive.com and then log in?
20     **A.  I wouldn't have to just go to the website if**
21 **I have the platform already installed on my computer.**
22     Q.  The platform being on the Interactive
23 software?
24     **A.  Yeah.**

Page 32

1     Q.  And so you would open that program and then
2 do you have a log-in or anything like that?  How do you
3 actually get in?
4     **A.  There would be a log-in credential.**
5     Q.  And when you get in to that, when you log in,
6 do you see like options to look at your trading history
7 or your trading confirmations or any kind of past
8 activity?
9     **A.  The platform would give you limited access to**
10 **that type of information to get into history you have to**
11 **go to their website.**
12     Q.  Okay.  So you could go to their website and
13 then print out your account history?
14     **A.  Your past trades.**
15     Q.  Your past trades.  And then do you also have
16 account statements like monthly statements that you
17 would get in the mail?
18     **A.  I don't remember ever seeing a monthly**
19 **statement from Interactive Brokers.**
20     Q.  Okay.  How about trade confirmations when
21 you'd place a trade?
22     **A.  I don't remember ever seeing a trade**
23 **confirmation that came in the mail from Interactive**
24 **Brokers.**

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 85

1  get us to that answer.  So --
2      **MS. TAUBER:** Okay.  What would -- maybe you
3  could tell me that.  Like what -- if I wanted to
4  look at 13D, and let's see.  Going back to
5  Exhibits 1 and 2 --
6      **THE WITNESS:** Well, you know, you said you're
7  going to do a comparison; so you can start with
8  that.
9   Q.  Right.  But then let's say -- let's say we do
10  the comparison -- I mean -- so I'm just trying to
11  foresee a possible -- you know, we have you today.  So
12  see possible things that might come up.  So if I wanted
13  to figure out -- let's say -- and I see, Oh, there is
14  some extra trading in here.  Must be some client trades,
15  right?  How do I determine which clients?
16      **MR. FORD:** Could I suggest -- because I'm not
17  certain he can answer that.  Can I suggest, maybe,
18  if you compare the trades from Interactive Brokers
19  to the 13D, not now, I mean, after this.
20      **MS. TAUBER:** Right.
21      **MR. FORD:** And if there are any discrepancies
22  between those, that I think that's a perfectly
23  appropriate avenue for you to inquire into -- with
24  us or, you know, sort of further -- rather than

Page 86

1  him trying to -- I just don't want him sitting
2  here, sort of, guessing as what the next steps
3  are.
4      **MS. TAUBER:** Right.
5      **MR. FORD:** Because it's entirely possible
6  that they may match up.  I don't know sitting here
7  today.
8      **MS. TAUBER:** Right.
9      **MR. FORD:** But I feel that they might match
10  up.  And if so, we're done, and if they don't, I
11  feel, like, this is, sort of, maybe something we
12  can figure out without having Mr. Gentile, sort
13  of, guess try in how to figure out who it is
14  here.
15      **MS. TAUBER:** Okay.  As long as there are
16  assurances that, like, if that does become a
17  question, that we will have some way of figuring
18  out which clients owned these stocks, if there are
19  any clients that owned these stocks.
20      **MR. FORD:** Yeah.
21      **MS. TAUBER:** Okay.
22      **MR. FORD:** Well, we will --
23      **MS. TAUBER:** There is a way to do that?
24  Okay.  Yeah.

Page 87

1      **THE WITNESS:** I mean, the firm's closed at
2  this time; right?  So it's going to be a lot
3  harder to get to certain things.
4      **MR. FORD:** This is why I just -- let's see if
5  they match up.  And if they don't match up, we
6  will work with you to figure it out.
7      **THE WITNESS:** Besides the fact that there's
8  laws that prohibit me disclosing client trade
9  records with their names on it in the Bahamas.
10  There's privacy laws there.
11      **MS. TAUBER:** Uh-hum.  Okay.
12      **THE WITNESS:** There might be a process where
13  you have to go through court there to get that
14  information.  Which individual client, you know,
15  traded in, but --
16      **MR. FORD:** I --
17      **THE WITNESS:** I really -- honestly, I don't
18  believe it's going to be material.
19      **MS. TAUBER:** Okay.  All right.  That's fair.
20  BY MS. TAUBER:
21   Q.  So you believe that most of the 13D, Exhibits
22  1 and 2 trades, are MintBroker trades?
23   **A.  A majority of them should be.**
24   Q.  Okay.  Great.

Page 88

1      Okay.  So now moving on, about those trades,
2  one of your defenses in this case is that some of these
3  trades failed to clear; is that correct?
4   **A.  I don't know what -- what they put in there.**
5   Q.  Well, we can go to that answer if you want
6  but --
7   **A.  I don't know if we said they failed to clear.**
8  **Assumed they would have.  I don't remember.**
9      **MS. TAUBER:** Let's do that.
10      So this is going to be 8, 9.
11
12      (Plaintiff's Exhibit 8,
13  ANSWER CASE NO. 18-cv-08896, was marked for
14  identification.)
15
16      (Plaintiff's Exhibit 9,
17  ANSWER CASE NO. 1:18-cv-7291 was marked for
18  identification.)
19
20   Q.  So if you flip to the end, you'll see
21  affirmative defenses on the last two pages.  This is
22  Exhibit 9.  Here's 9.  It's the same, just different
23  caption.
24      Okay.  So Exhibits 8 and 9 are the answers in

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 89

1 this case, to identify them for the record, and have you
2 seen these documents before?
3    **A. I believe I have.**
4    Q. Okay. So if you look at Affirmative Defense
5 Number 1 or first affirmative defense, it says that they
6 related to trades that, well, I can read it. I have
7 another copy. Okay. It's -- the first affirmative
8 defense says -- let's start. It says, "Some or all of
9 plaintiff's claims or asserted damages fail, because
10 many of the alleged trades at issue either failed to
11 clear, or were related to shares that did not exist,
12 because the trades were naked short sales made by market
13 makers that have not borrowed shares and failed to
14 obtain a locate before the short as required by SEC
15 regulations."
16    So is it your contention that many of the
17 trades on the 13Ds, which are Exhibits 3 and 4, I
18 believe? No, 1 and 2, just to be clear, 1 and 2, that
19 they failed to clear?
20    **A. I believe that they were most of the shares.**
21 **I believe many of the shares were shorted, and that they**
22 **were also done illegally, or illegally shorted. And had**
23 **I not sold the shares, that they would have all failed,**
24 **or most would have failed to clear.**

Page 90

1    Q. Sorry. So let's just break it down --
2    **A. There's proof of that in -- in some documents**
3 **I've recently seen that came from ETC where hardly any**
4 **shares moved from the clearing firm, and IB barely got**
5 **any shares. So I don't see how they would have been**
6 **able to clear those trades. And I also know, at this**
7 **point, that the SEC is looking into naked short selling,**
8 **not just in this particular deal, but it's an area of**
9 **topic that they're looking at; that many firms have been**
10 **violating this rule, which allowed this to happen.**
11    Q. Okay. So naked short selling is -- would you
12 describe that for me; what you think that is?
13    **A. That they don't actually get an affirmative**
14 **locate from someone that's long to borrow those shares**
15 **to be able to short it. What has been happening is they**
16 **might get a small low-key, and then they flip it over**
17 **and over and over and over again, and the shorts end up**
18 **shorting hundreds of thousands of shares, of shares that**
19 **did not locate, you know, in hopes that a seller will**
20 **come in, and that they can buy it back cheaper.**
21    Q. Uh-hum. Okay.
22    **A. All right. It's also known that market**
23 **makers do this all the time. In fact, there was a**
24 **market maker recently about less than a year ago that**

Page 91

1 **blew up their whole entire firm and almost a clearing**
2 **firm. He shorted, I think, almost a million shares of a**
3 **stock that only had 600,000 shares in existence. So how**
4 **did he do it? Naked short selling, and that's exactly**
5 **what happened here, my belief is.**
6    Q. Okay.
7    **A. There was no insiders that I saw that sold**
8 **any shares. So how can someone accumulate 1.9 million**
9 **shares or a million shares if the insiders own a**
10 **majority of the shares don't sell; where did they come**
11 **from? They're phantom shares.**
12    Q. So I don't know exactly what you're talking
13 about. Are you talking about this case, or are you
14 talking about another case when you say that?
15    **A. I'm talking about these cases. You have the**
16 **CEO of Avalon came out and said he's not selling a**
17 **share. He hasn't sold any shares. There was no filings**
18 **done from any insiders that sold shares. So how can**
19 **someone buy 66 percent of the company and no one sold?**
20    Q. Well, so -- okay. I mean, not paying
21 attention to theory, but if, let's say, there's a
22 hundred shares of a company outstanding, right, it's
23 still possible for someone to buy and sell thousands of
24 shares that day; isn't that correct?

Page 92

1    **A. Legally?**
2    Q. Yes, because you could buy-sell, buy-sell,
3 buy-sell all day long --
4    **A. No.**
5    Q. -- the same shares?
6    **A. You're wrong, because under what the SEC is**
7 **saying, They can only do it once, and that's it. If you**
8 **locate shares -- you located a hundred shares. That's**
9 **all that exists; you only short a hundred shares. If**
10 **you then buy those shares back, you cannot short it**
11 **gain.**
12    Q. But forget about short selling for a moment.
13 Like you -- it's possible to trade more than the number
14 of shares there are outstanding, just establishing that;
15 right?
16    **A. Yes. There's companies that have traded more**
17 **than the float that exists. But many times, that's**
18 **because it's a massive float, you know, taking a company**
19 **that has 30 million shares. If there's news, it might**
20 **trade 50 million shares in a single day, but that's what**
21 **insiders actually selling some shares, a real seller**
22 **coming into the market for those shares that rotate**
23 **hands.**
24    Q. Okay. I mean you -- the fact that you can

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 93

1 trade like -- it is possible to trade more shares than
2 there are outstanding; do you agree with that statement?
3 **A. I don't believe it can be done legally,**
4 **unless there's a real seller that comes into the market.**
5 Q. Right. But so if you look at these -- some
6 of that -- Plaintiff's 1 and 2, like -- there's like
7 many, many purchases and sells in the same day; do you
8 recall that?
9 **A. Uh-hum.**
10 Q. Or just take a few minutes to --
11 **MR. FORD:** I'm sorry. Just take it from --
12 Q. If you look at a line item of like -- for
13 example, if you go to the right page, like the second
14 page of this Exhibit 1. These trades are all on the
15 same day, I believe, on this one page, June 28th. Okay.
16 **MR. FORD:** And I'm sorry. You're saying that
17 they are --
18 **MS. TAUBER:** So I'm saying --
19 **MR. FORD:** -- buys and sells.
20 Q. Well, I don't think these pages don't have
21 buys and sells, but if you turn to the next page, you
22 probably will see some.
23 **A. But it wasn't more than the shares existed.**
24 **There's a difference.**

Page 94

1 Q. Okay. But I'm just saying that you could buy
2 and sell -- like you could buy from one seller and then
3 sell to another seller, right, the same shares?
4 **A. Yeah.**
5 Q. And then buy -- that seller who just bought,
6 they can buy those shares back, and then sell to
7 somebody else; right? So I can sell those shares a
8 thousand times in one day?
9 **A. That's not what happened here.**
10 Q. Okay. Why do you think that?
11 **MR. FORD:** Wait. Why does he think what?
12 **MS. TAUBER:** That that's not what happened
13 here.
14 **MR. FORD:** What does the "what" mean.
15 **MS. TAUBER:** What I just described; that you
16 could buy and sell the same shares, you know, from
17 -- the same shares can change hands many times in
18 one day.
19 **MR. FORD:** I'm sorry. Could you -- do you
20 understand that? I don't, because I'm not --
21 could you just start plain fresh question --
22 Q. Imagine a scenario where the same buyer, me,
23 I'm a buyer. I buy the shares from Seller A. I sell
24 them to seller -- to buyer, another buyer, then I buy

Page 95

1 them back from that buyer, and I sell them to a
2 different buyer, right, and then I buy them back from
3 that buyer, and sell to a different buyer. So that it
4 seem -- I can buy and sell the same actual shares all
5 day long if I wanted.
6 **A. Okay. But you're talking about day trading.**
7 Q. Okay.
8 **A. Right. You're talking about someone just day**
9 **trading back and forth.**
10 Q. Sure.
11 **A. Right. But there's also -- in day trading,**
12 **there's short sellers, right, and those short sellers**
13 **have to borrow shares in order to short. And what**
14 **causes these type of movements is when you have naked**
15 **short selling.**
16 Q. I'd rather not get at why you think there's
17 any short selling here, right, as opposed to just buying
18 and selling, the same as day trading, what you just
19 described as day trading.
20 **A. Because look at the DTC sheets. You're going**
21 **to see a certain number of shares, at clearing firms.**
22 **Interactive Brokers buys 1.9 million shares. There's no**
23 **reflection of 1.9 million shares ever going to**
24 **Interactive Brokers, right. So all that trading was**

Page 96

1 **happening internally against short sellers, because no**
2 **one actually sold or very few people sold.**
3 Q. Okay. So we have -- you mentioned the DTC
4 documents. We also have -- you know, the exchanges have
5 produced to us. I don't know if you've seen these.
6 They're trading records of all the trades that took
7 place.
8 **A. I didn't see that. Does it tell you how many**
9 **orders were short?**
10 Q. I mean, there's a lot of information on
11 there. I don't -- maybe some do, and some don't. But
12 my understanding is that the trades that are reflected
13 in those records existed. Like those trades actually
14 took place, even if -- right. So you were describing
15 that shares might not have moved, right, from -- because
16 they're internal but the --
17 **MS. McLAUGHLIN:** Excuse me, Counsel. We can
18 go off the record if you'd like.
19 (Off the record.)
20 **MS. TAUBER:** Back on the record.
21 **MR. FORD:** Actually, before you ask the next
22 question: There was a conversation held off the
23 record where the parties discussed that certain
24 documents that have been produced by third

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 97

1 parties, specifically the New York Stock
2 Exchange --
3     MS. TAUBER: NASDAQ.
4     MR. FORD: -- NASDAQ.  It appears that
5 plaintiff has received those copies and defendants
6 have not yet received a copy.  The parties are
7 going to work together to make sure everyone has
8 all the documents.
9     MS. TAUBER: Great.
10 BY MS. TAUBER:
11     Q.  So -- okay.  Did you engage in this naked
12 short selling, or you on behalf of MintBroker?
13     A.  No.
14     Q.  Or any of the trades -- is it your contention
15 that any of the trades that are in this 13D are -- pages
16 1 and 2, are naked shorts?
17     A.  No.
18     Q.  No.  Okay.  So what is the relevance of this
19 naked-short discussion then?
20     A.  Because you asked me a question on why do I
21 believe that they failed to deliver.
22     Q.  Failed to clear is what I think --
23     A.  Well, deliver, it's the same thing -- 
24         MR. FORD: I think that's -- those --

Page 98

1     A.  That was the question you asked.
2         MR. FORD: That was the question you asked.
3     It would be relevant.
4     A.  That was my answer.
5     Q.   Right.  So I asked the question: Why do you
6 think the trades on Exhibit 1 and 2 failed to clear, any
7 of the trades on Exhibits 1 and 2 failed to clear?  You
8 described this naked short-selling practice, but then I
9 asked if you if you think any of these trades are naked
10 shorts, and you said no; right?
11     A.  These are not shorts.  Other people --
12         MR. FORD: You asked if his trades were naked
13     shorts.
14     Q.  Okay.  Yes, but I thought we established that
15 like --
16     A.  My shares were not shorting, and
17 specifically, I did not want these shares to be lent out
18 to any shorts.  But it happened anyway, and that's why
19 it's naked short selling.  I specifically asked
20 Interactive Brokers not to lend out these shares.  So
21 how could I have bought 1.9 million shares?  No insider
22 sold, but yet I was able to buy all those shares.  Where
23 did think come from?  The only place they could have
24 come from is naked short sellers, and the evidence will

Page 99

1 prove that through the DTC that that's exactly what
2 happened.  And, also, if the exchanges break down their
3 orders of whether it was marked short or not, you're
4 going to see a lot of the selling I'm -- I don't know
5 for sure.  I'm going to guess.  But I'm going to guess
6 70 percent of the -- I'm going to say -- maybe 60 to 70
7 percent of the sell orders were actually short orders.
8     Q.  Okay.  And of the sell orders, are you
9 referring to the sales that we're seeing on Plaintiff's
10 1 and 2, these 13Ds?
11     A.  No, I'm referring to the -- these are buy
12 orders.  Someone else had to sell.  So it was either a
13 long sell or a short sell.  I'm saying it was mostly
14 short sells against these buy orders and not -- people
15 that actually had shares.
16     Q.  Okay.  But what about the sales that are on
17 the 13Ds?
18     A.  Well, those are sales against the long
19 position that the firm had; so that cannot be a short.
20         MR. FORD: It's a sale, not a short.
21     Q.  But --
22     A.  If I have a million shares, and I sell my
23 million shares, that's a sale.
24     Q.  But you're saying you didn't have -- aren't

Page 100

1 you saying that you didn't have a million shares,
2 because it began to clear?
3     A.  I'm saying that whoever sold those shares
4 didn't have those shares.
5     Q.  Right.
6     A.  And, therefore, if I never sold, they never
7 would have been able to clear; they would have all
8 failed to clear.
9     Q.  Okay.  So let's break it down.  There's buys
10 and sells --
11     A.  Yeah.
12     Q.  -- on these Plaintiff's 1 and 2; right?
13     A.  Uh-huh.
14     Q.  Let's talk about the buys first.  The buys,
15 you are saying -- are you saying that a lot of those
16 buys that says some unknown numbers of them were being
17 bought from naked short sellers?
18     A.  Yes.
19     Q.  Okay.  But then --I'll just posit to you
20 that, like, there's almost an equivalent number of
21 shares that are indicated as having been sold and bought
22 on these 13Ds?
23     A.  On here.
24     Q.  Yeah.

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 101

1    A.  So what I believe is that when these shares
2  were bought, they were mostly bought by naked short
3  sellers.  And that when these shares were sold, that's
4  when the naked short sellers covered it.  They bought
5  against their shorts.
6    Q.  Bought and sold by MintBroker.
7    A.  Well, MintBroker or a client.  Like I said,
8  We don't know for sure.
9    Q.  Right.  But you also said that you think it's
10 mostly MintBroker's trades on this; right?
11   A.  Yep.  I believe.
12   Q.  Let's assume for this conversation that it's
13 all MintBroker's trades.  Just let's assume that for one
14 second.  So for this conversation.  So assume it's all
15 MintBroker trades on Plaintiff's 1 and 2, are you saying
16 the buys listed as MintBroker's buys assuming they are
17 MintBroker's and not clients were bought from naked
18 short sellers --
19   A.  Yes.
20   Q.  -- who are not MintBroker; right?
21   A.  Correct.
22   Q.  But other parties; right?
23   A.  Yes.
24   Q.  And then --

Page 102

1    A.  Unrelated third parties.  I have no idea who
2  they are.
3    Q.  Not customers.  Okay.  So --
4    A.  I mean, there could have been some customers
5  that sold short, as well, but it wouldn't have been that
6  many, maybe 10- or 20,000 shares.  I have no idea.  I
7  don't know.
8      MR. FORD: You're --
9      THE WITNESS: It's a guess.  Customers can
10     short also.  At that time, customers were able to
11     short.
12   Q.  Okay.  So now, you're saying those buys, the
13 ones I just described, MintBroker's buys that you're
14 saying were coming from short sellers, those buys would
15 have failed to clear under your -- what you're saying?
16   A.  Yes.
17   Q.  Okay.  And you're saying that you can tell
18 they failed to clear is that the shares were not
19 transferred?
20   A.  That's right.  Between clearing firms, they
21 basically mostly stayed at the same place.  But the
22 before and after snapshots, you don't have the 1.9
23 million shares moving between clearing firms.
24   Q.  Okay.

Page 103

1    A.  And Interactive Brokers actually doesn't even
2  -- if you look at theirs, they only received, like,
3  30,000 shares, which means that they've been -- they've
4  actually never received delivery of the long shares.
5    Q.  But we just talked about how, on the same
6  day, a random day on this 13D, let's say, June 28,
7  there's buys and sells, right, a lot of both?  From --
8      MR. FORD: That MintBroker is doing?
9      MS. TAUBER: Well, this is -- again, this
10     goes to the issue of what is on the 13Ds?  Is it
11     only MintBroker's trades or not; right.
12     MR. FORD: No, but if we assume for this
13     conversation --
14     MS. TAUBER: Right.
15     MR. FORD: We'll deal with that.  I'm sorry.
16     You're suggesting that there are buys and sells on
17     the same day.
18     MS. TAUBER: Yeah.  Yeah.
19     MR. FORD: Okay.
20     MS. TAUBER: Yes.  So now I'm saying that
21     you -- let's -- that you would have --
22   Q.  You wouldn't necessarily expect every share
23 you bought to be, just be transferred, because you also
24 sold some shares that day?

Page 104

1    A.  But you're talking about --
2    Q.  Netting out the position.
3    A.  You're talking about from my recollection,
4  which is a year and a half ago of -- let's just say I
5  bought half-a-million shares, I may have only sold 50
6  thousand.
7    Q.  Right.
8    A.  Right.  So the net long position is 450,000.
9    Q.  And that's the number of shares you'd expect
10 to see transferred, not the full amount that you bought?
11   A.  Exactly.
12   Q.  Right.
13   A.  And out of that, I don't believe hardly any
14 of it came.
15   Q.  Out of the net --
16   A.  Less, less, yeah.  Less -- out of the whole
17 thing, less than two or three percent actually comes
18 into IB.
19   Q.  The whole thing meaning?
20   A.  The 1.9 million shares.
21   Q.  Okay.  Let's say you buy 500 and you sell 400
22 that same day.
23   A.  No.  I wasn't doing that.  I wasn't doing
24 that.  I was buying 500 and, maybe, selling 50 or a

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 105

1 hundred; so net -- net building a position, 400,000.
2 Q. Okay.
3 A. But IB never receives those 400,000.
4 Q. The 400,000, we're talking about now; right?
5 A. Yeah.
6 Q. So again, well -- so it's been -- I guess I'm
7 trying to establish it's not the case that you would
8 expect every share you bought to be transferred into
9 your account, because you also sold shares.
10 A. Yes.
11 Q. Okay.
12 A. And within the same day, all right. If it's
13 the sales the next day, then those shares still come to
14 the account.
15 Q. The next day, right.
16 A. If I bought today and I sell tomorrow, those
17 shares still need to come to my account.
18 Q. Well, I don't know if there's, like, a
19 three-day clear -- you know, I don't know what the time
20 period is for clearing, but it could be not the next
21 day.
22 A. Trade day plus two, I believe, or could have
23 been trade day plus three back then. I'm not sure.
24 Q. Right. So they could be netting out trades

Page 106

1 over the course of several days, and then you would
2 expect the net over three days, the three-day trading
3 period, to be transferred; right? Right? Is that what
4 you're saying?
5 A. It should be there by settlement.
6 Q. Unless you sold them?
7 A. Unless you sold them.
8 Q. Okay.
9 A. Which then you never received delivery of
10 those shares.
11 Q. The shares that you bought and sold, you
12 would never receive --
13 A. You would never receive delivery.
14 Q. Exactly, right, but you still would have
15 bought and sold those shares; isn't that right?
16 A. Yeah. You would have still bought and sold
17 those shares, but you would never have -- actually
18 physically had those shares -- -
19 Q. Receive them.
20 A. -- at that clearing firm.
21 Q. Correct. And so that's why --
22 A. Because it's -- like I said, short sellers
23 were selling those shares.
24 Q. Well, not just because of short sellers.

Page 107

1 We're also talking about how you might not see the
2 shares transferred, because you might have sold them the
3 next day; right?
4 A. No. They should still come in, not the next
5 day, but within a few days' time. They still need to
6 come in.
7 MR. FORD: They need to come in by
8 settlement; is that what you mean.
9 A. But even if -- if I bought it today, if I
10 bought a hundred thousand shares today, and I sell it
11 tomorrow, on settlement, a hundred thousand shares still
12 needs to come in, and then the next day, the hundred
13 thousand shares leaves. They never came.
14 Q. Okay. Well, but Interactive -- like, you're
15 saying they have to come in, but if you sold them,
16 right, let's say it's like a three-day period where
17 you're buying and selling. And so yes, on one -- like
18 each day is like --
19 A. If I bought --
20 Q. Each day is like, you're saying Day 1, you
21 want to say within three days you want that net position
22 to --
23 A. To be sold.
24 Q. -- come into your account. Right. But if on

Page 108

1 Day 2, you then sell that net position; right, those
2 shares would never be put into your account, like, from
3 -- cause Interactive is the one that has the shares;
4 right?
5 A. They still need to clear those shares.
6 Q. They need to, but you don't necessarily see
7 that in your account if you had sold them already?
8 A. Well, I mean, there's settlement. There's a
9 trade date, and then there's a settlement date; right?
10 So they still have to settle those trades; they still
11 need to receive those shares.
12 Q. Uh-huh. Okay. But you don't have to receive
13 them in your account. In other words, like, you've
14 already sold them by the point that they'd be receiving
15 them?
16 A. I mean, there is situations that have
17 happened in the past I've seen from my years of
18 experience in the industry. There would -- there could
19 be a situation where you bought a hundred thousand
20 shares; right, from a naked short seller. And because
21 those shares never come in, even though you sold them,
22 you're still on the hook for those shares, because
23 whoever you sold them to now, you can't deliver it to
24 them; you understand?

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 109

1  Q. Well, but I'm not responsible for delivery
2  anyway. From my perspective in that example, I still
3  bought and sold those shares regardless of whether or
4  not there's a problem down the line with the clearing;
5  right?
6  A. Well, I mean it depends. The clearing firm
7  could -- could make it be a problem if they wanted to.
8  Q. Okay. I'll give that -- okay. So back to
9  the question about the naked short selling: When you
10 were describing naked short selling, you did not mean
11 that you, yourself, engaged in naked sort selling and -
12 like, in this time period of this docs on the 13D?
13 A. Correct. I did not.
14 Q. So all the sales that you reported were not
15 naked, like, you had that stock in your account?
16 A. I don't know that -- I don't believe the
17 clearing firm had those shares.
18 Q. Okay. But from your perspective, they
19 weren't naked.
20 A. So they could have been. Even though my
21 orders are marked long sales, IB did not have those
22 positions. IB did not have those trades. They did not
23 have that inventory in their account. They're hoping
24 that it's going to come in, right, but they didn't have

Page 110

1  it, and the DTC sheets prove that.
2  Q. Okay. And what difference does that make to
3  you with a --
4  A. What difference does it make to me?
5  Q. What difference does it made for those sales?
6  MR. FORD: Hold on. What do you mean? What
7  -- I don't understand that question.
8  Q. Meaning, let's say this is -- let's -- I'll
9  just -- let's just assume that you're right. Okay. And
10 I give you this whole thing, and you're right. You buy
11 the shares. They're not going to get them for you.
12 They're naked short seller selling them, and you sell
13 them. Right. Now, you're saying that -- but you never
14 had those shares to begin with, and so you can't sell
15 them potentially. But do you still get paid for that
16 trade?
17 MR. FORD: On that question, this is -- what
18 you've been doing is asking Mr. Gentile to
19 describe our legal defense. And you've been
20 putting it in factual questions, and so I've been
21 permitting it.
22 MS. TAUBER: Okay.
23 MR. FORD: But Mr. Gentile is not going to be
24 here to explain our legal position --

Page 111

1  MS. TAUBER: No. I'm asking --
2  MR. FORD: -- which you're aware of. Right.
3  MS. TAUBER: Okay. I'm just asking -- well,
4  trying to figure out facts based on what his
5  position is based.
6  MR. FORD: Yes. That, you can do.
7  MS. TAUBER: Yes. I guess I'm just wondering
8  -- asking, Did you -- any sales that are on --
9  listed on this 13D, assuming again, they're all --
10 for now, they've all been broker sales, were you
11 paid for all those sales.
12 A. What do you mean by "paid"?
13 Q. Like, say, on one, let's say you sold, on
14 one day, a thousand shares, at $10 a share, were you
15 paid that money, regardless of whether or not --
16 A. Did they -- did they reflect the sale in the
17 account?
18 Q. Did you actually get the money in your
19 account? Like, you sold them for some money, like you
20 sold stock for cash, but did you get the cash?
21 A. Well, it was basically a buy and a sell. So
22 are you asking if there was a profit on the trade?
23 Q. No. I'm asking like -- you were saying that
24 -- I'm just exploring this defense a little bit were

Page 112

1  you're saying that the trade -- that some of the sales
2  -- like you bought the stock, and the stock didn't
3  exist, and you couldn't sell it and so -- or you have
4  sales listed here, but those sales can't be -- those
5  shares can't be delivered is that what you're saying; is
6  that right?
7  A. I'm saying that naked short sellers sold --
8  Q. To you?
9  A. -- sold -- not to me but to -- to MintBroker
10 International, and that's where it bought the shares
11 from. That those shares never came into Interactive
12 Brokers, and then it did liquidate its long position
13 shortly after.
14 Q. Who's "it," MintBroker?
15 A. MintBroker International.
16 Q. Okay. So, I guess, I'm trying to understand:
17 You get -- when MintBroker buys, puts a buy order in;
18 right?
19 A. Uh-hum.
20 Q. Even if the buy order is being purchased from
21 naked short seller, you still are paying money for that
22 trade; right?
23 A. Yeah. There was money paid for the trade;
24 there was commissions paid for the trade --

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 113

1    Q.  Right.
2    A.  -- and vice versa.
3    Q.  And then when you sell the stock, even if
4  there's some clearing issue, you're still getting paid
5  for that sale; right?
6    A.  I mean, I wouldn't refer to it as being paid
7  for the sale.  You're just liquidating your position,
8  and taking your own money back basically; what you used
9  to purchase the trades with.
10    Q.  Okay, but you're taking money from the buyer
11  though, a third party.
12    A.  Well, I mean, if you spend a hundred thousand
13  dollars to buy securities, and then you sell them, then
14  you're going to get a hundred thousand dollars back in
15  your account, or more or less depending if there was a
16  difference in price.
17    Q.  Could be more or less -- exactly.  So it's
18  not the money back.
19    A.  You know --
20    Q.  It's like buying a house, selling a house;
21  right?
22    A.  Uh-huh.
23    Q.  So a third-party is --
24    A.  But the difference is the person selling the

Page 114

1  house, they own the house.  And, therefore, they could
2  not have delivered me the title.
3    Q.  Right.
4    A.  That's the difference.
5    Q.  But they still walked away with the cash.  In
6  my scenario, you could have -- that could happen?
7    A.  Yeah.
8    Q.  Okay.  Do you -- could you -- you were saying
9  that you thought a lot of -- are you saying that you
10  think a lot of the trades on these 13Ds are trades --
11  let's say, the buys in 13Ds, that you didn't actually
12  receive the stock for those buys?
13    A.  The clearing firm did not receive the stock
14  as evidenced in files --
15    Q.  And so how do you know -- or do you know
16  which trades were trades that actually weren't from
17  short sellers, and which trades were; is there a way
18  that you can tell?
19    A.  Well, that would be in the discovery that you
20  guys didn't provide, just to actually give an actual
21  number.
22    Q.  What discovery are you talking about?
23    A.  The records from the exchanges that would
24  potentially --

Page 115

1    Q.  Oh, the exchange.  Okay.
2    A.  Which orders were sells, and which orders
3  were sell shorts.  I mean, I don't know if it could be
4  reversed engineered back to each individual trade,
5  maybe.  It would take a lot of time but, potentially,
6  can be done.
7    Q.  But from your perspective, you have some buys
8  here, let's say at $5 and some at $10; right?  How
9  do you -- do you --
10    A.  At that time, I don't --
11    Q.  You have no idea.
12    A.  At that time of purchasing, there's no way
13  for me to know whether it's a long sale or a short sale.
14  The way that I end up finding out is after a few days go
15  by, and there's no form force from any insider selling,
16  or CEO comes out and says, I'm not selling any shares;
17  then it's easy to assume that those are all shorts.  If
18  he owns --
19    Q.  That's the way that you would confirm?
20    A.  -- 65 percent of the company, how can I own
21  65 percent, and someone else owns 65 percent?
22    Q.  Okay.  So that's the way you would confirm it
23  was short selling, not based on the DTC that you were
24  describing?  The DTC that --

Page 116

1    A.  Well, now, you can rely on DTC.  Then it was
2  just from -- just from instinct, I guess, at that point.
3    MR. FORD:  From an assumption based on the
4  facts that you had?
5    THE WITNESS:  Exactly.
6    Q.  So as you're trading, you had no -- you --
7  these stocks, did you know, in your mind, you were
8  thinking, Oh, I'm buying all these shares from short
9  sellers?
10    A.  No.  I didn't know who was selling the
11  shares.  It was so many shares being sold.  So I didn't
12  -- I didn't know that it was short sellers until after
13  really, you know, the company either came out and said
14  that they're not selling, or that either the stock price
15  would keep going up.  There was other assumptions I was
16  making on a day-to-day basis to try and figure out what
17  is happening.  Is there an insider selling, or isn't
18  there an insider selling?
19    Q.  Did you have a situation where, like, you
20  bought these shares, and then you -- then you saw in
21  your -- that your account didn't have the number of
22  shares that you thought should be in there?
23    A.  No.
24    MR. FORD:  I'm sorry.  Just -- do you mean

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 117

1   with, like -- do you want to just tie it to a
2   specific.
3   Q.  Like?
4   MR. FORD: Like one of the stocks or one of
5   the --
6   Q.  Yeah. Sure. Like you're saying, let's just
7   take Avalon for example. You're saying -- you're buying
8   Avalon shares, but there's all short sales and then you
9   -- right. So that you, at some point, either during
10  this trading period or after, you were like, I couldn't
11  possibly have bought all these shares; is that what
12  you're saying?
13  A.  From a long seller.
14  Q.  Okay. So then did you have then -- so that
15  would be confirmed by then seeing, according to you,
16  that, Oh, there's not -- I thought I bought a hundred
17  shares, but I only see 25 in my account; is that right?
18  A.  No. That's not what I'm saying.
19  Q.  So how would you -- how would this
20  short-seller issue affect you? Like how would you
21  expect it to be reflected in your records?
22  A.  Well, it's not necessarily something that
23  would show up in my records. It's just something that
24  was showing up in the way the stock was behaving. That

Page 118

1   it wasn't a long seller; it was a short seller.
2   Q.  Okay. And what if -- so would that make a
3   difference to you in how you would be trading, like, in
4   any way if you knew that it was a short seller versus a
5   long seller?
6   A.  Yes.
7   Q.  Okay. Why or how?
8   A.  Well, because if it's a short seller, that
9   person has to buy those shares back, and it changes the
10  way the stock is going to trade. Making it difficult to
11  buy more at lower prices, because that short seller's
12  now also trying to buy back shares. And now, I'm
13  fighting with someone to buy shares versus if it was an
14  insider selling, you know, which I thought it was
15  initially, because the shares weren't going up that much
16  but --
17  Q.  This is the Avalon, you're talking about?
18  A.  Either one. It was the same situation.
19  Q.  Okay.
20  A.  If it was an insider selling, then I would
21  have been able to buy more at lower prices. But because
22  it was a short seller, once a short, you know, exhausted
23  how much he can short, then you'd notice that the stock
24  skyrocketed, because he had to buy back shares, because

Page 119

1   he couldn't hold his short anymore. But if it was a
2   real seller, the stock would not have went up.
3   Q.  Okay.
4   A.  It would have just stayed down, and I would
5   have been able to buy more.
6   Q.  So I think you mentioned, like, some of the
7   customers were also selling short, or could have been
8   selling short.
9   A.  If it was, it was very small amount. It
10  wouldn't have mattered.
11  Q.  Okay.
12  A.  Insignificant amount, 10- or 20,000. I don't
13  remember.
14  Q.  Okay.
15  A.  But it wouldn't have been a significant
16  amount. They're small accounts with $500 in their
17  account. They're not going to be able to --
18  Q.  If -- so if the customers were selling short,
19  would you have known about that?
20  A.  I mean, if I was specifically looking to see
21  what customers were doing, which I don't -- I never
22  really did on a daily basis. I wasn't doing that part
23  of the business.
24  Q.  But in order for them to sell short, wouldn't

Page 120

1   you have to give them the shares to borrow?
2   A.  It would -- like I said, it's the same way it
3   worked before as we said. It's an automated system. Is
4   there a customer to offset? Do we have inventory? What
5   is it, you know? They might have been selling short
6   against inventory. They might have been selling short
7   against the street or -- I don't know exactly. But --
8   Q.  What about other customers; is that possible?
9   A.  Yes. That -- that stock from either one,
10  from my recollection, were available for shorting.
11  Maybe just like the one or two days. And then after
12  that, the clearing firms restricted shorting on them,
13  because everyone was naked short selling. Not my
14  customers, but other firms were naked short selling, and
15  the clearing firms restricted the short selling of it,
16  because that was happening.
17  Q.  During --
18  A.  Which also, you know, inflates the price, as
19  well, because now shorts can't short more, because their
20  clearing firms are stopping them basically after,
21  because they probably shorted too much. And, now,
22  they're failing to deliver so they stop shorting, stop
23  allowing shorting. And then what happens is those
24  shorts have to buy it back, which is what -- that's how

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 121

1  I knew they were short sellers that sold shares and not
2  an insider or a long seller.
3      Q.  Because they're being bought back?
4      A.  They're being bought back, and it wasn't me.
5      Q.  Okay.  Why is the fact that shares are being
6  bought mean short selling versus -- why -- why is there
7  only two options?  Like why couldn't it just be a
8  regular market activity, people buying and selling?
9      A.  Well, it just didn't -- that doesn't make any
10  sense.
11      Q.  Okay.  So back to what I was asking before:
12  Are customers able to lend shares to each other for
13  shorting purposes?
14      A.  I mean, they're not talking -- customers are
15  not talking to each other; it's an automated system.
16  It's based on where the clearing firm had that share --
17  those shares available for shorting.  If they did, then
18  we would allow the shorting, as well.  And if they
19  didn't, then we wouldn't allow shorting.
20      Q.  Do customers have to get permissions if they
21  want to allow the shares to be lent out?
22      A.  That's something that they do when they open
23  their account.
24      Q.  Okay.

Page 122

1      A.  Pretty much, all firms industry-wide where --
2  or that's -- if you're in a cash account, then you could
3  ask for your broker not to lend your shares.  But if
4  you're in a margin account, the broker owns your shares,
5  and they can lend it out.
6      Q.  Okay.  So did you have a margin account with
7  Interactive?
8      A.  I did have a margin account with Interactive,
9  but I wasn't barring money from them, and I specifically
10  didn't want these shares lent to.
11      Q.  But did you give them permission to do that?
12  Like you were saying, most people in there with
13  accounts, they --
14      A.  No.  This account was set, as far as I
15  remember, to not lend out these shares.
16      Q.  Both the long and the short?
17      A.  Well, it would only be the long; right?
18      Q.  Okay.
19      A.  If you're short already, you can't lend the
20  short.
21      Q.  Uh-huh.
22      A.  You can only lend the long.  And I couldn't
23  lend it anyway, because they never settled.  The
24  clearing firm never had it; so how is IB going to lend

Page 123

1  to someone else.  They never had it.
2      Q.  Okay.  But technically, you did give
3  permission to borrow -- to lend out your shares or not?
4      A.  I --
5      Q.  Did you check the box saying, Yes, my shares
6  can be lent out?
7      A.  No, I set this account so that shares would
8  not be lent out.
9      Q.  Okay.
10      A.  For any positions, not just for these.  For
11  any positions, we we're not lending out shares, and we
12  were cash position.
13      Q.  So I have, like, your account opening
14  documents from Interactive.  Somewhere in there, I'm
15  going to see that you checked a box saying, No, I don't
16  want these shares to be lent out; is that what you're
17  saying?
18      A.  I don't know that you're going to see that in
19  an account opening document, you know.  That's something
20  that was on their online platform on whether you -- I
21  don't remember exactly what it was called, but it was
22  something that you can change in real-time.  So I don't
23  think that would be reflected in an account opening
24  document.  Like I said, we had a margin account.  The

Page 124

1  account was set by default to -- you know, if you have a
2  margin account, to lend -- that allows them to
3  hypothecate your stock.  However, you know, I had set
4  this account up, not from the very beginning, but later
5  on, to not lend out shares.
6      Q.  Okay.
7      A.  At least, that's what I remember doing.  I
8  remember doing that.
9      Q.  Okay.
10      THE WITNESS:  Can I use the restroom real
11  quick.
12      (Recess taken.)
13      MS. TAUBER:  I'm going to mark Exhibit 10.
14
15      (Plaintiff's Exhibit 10,
16  DEFENDANTS' RESPONSES TO PLAINTIFF'S SECOND SET OF
17      INTERROGATORIES, was marked for
18      identification.)
19
20      Q.  Have you seen this document before?
21      A.  I mean, I remember discussing it.
22      Q.  Okay.  So the -- Exhibit 10, for the record,
23  is defendants' responses to plaintiff's second set of
24  interrogatories.  So I'd like to go through these

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 125

1 questions with you, and see if you have any answers to
2 them, because I think that, you know, we don't -- I
3 don't know if -- the objections are on procedural
4 grounds, I think, mostly. So I wanted to get to the
5 substance.
6 So the first interrogatory, Interrogatory
7 13, because the first one on this document talks about
8 what we were just discussing about; which trades failed
9 to clear, and the naked short selling and all of this.
10 And it asks whether you're able to go through the 13D
11 that you filed and identify any trades that you think
12 failed to clear, or that were naked short or buys from
13 naked short sellers. Are you able to, you know, the
14 13D or not, say that were there any specific trades
15 that failed to clear?
16     MR. FORD: Let me just stop. What we've said
17 in our -- if I understand these responses. It --
18 the issue with both, I think, the question here
19 and what you just posed to him, is you're asking
20 for him to go through information that is just --
21 that is, only exists in the documents, and that he
22 does not have. So the answers to all of these are
23 in their discovery records that are still being
24 exchanged. So he can't answer -- he can't answer

Page 126

1 which trade did not clear or not clear, because he
2 doesn't have that information in his mind.
3     MS. TAUBER: Okay.
4     MR. FORD: That information is in the
5 documents, which we don't have all of it yet.
6     MS. TAUBER: You're talking about the
7 documents that we have -- that you think we have
8 that we're going to give to you in a --
9     MR. FORD: It is. The answer to this
10 question of which trades clear and don't clear is
11 the whole point of all the discovery we're taking,
12 and it's not in his possession in his mind.
13     MS. TAUBER: Right.
14     MR. FORD: You can't answer -- it's not a
15 fair question to ask him. He can't answer that.
16     MS. TAUBER: Well, what --
17     MR. FORD: It's in the records.
18     MS. TAUBER: What -- I'm trying to understand
19 what documents you think exist in the world that
20 would have that information.
21     MS. McLAUGHLIN: I mean, that's for purpose
22 of the discovery for us all to go out and --get
23 the records that they had. Because Mr. Gentile
24 does not have, to my colleague's point, in his

Page 127

1 mind, whether any trade on any given day cleared
2 or not.
3     MR. LOPEZ: All right. May I make a
4 suggestion.
5     MS. McLAUGHLIN: Please.
6     MR. LOPEZ: If he's capable -- Mr. Gentile is
7 capable of getting a trade history, why can he not
8 look at that trade history, and see which sales
9 did not result in a credit to his account.
10     MR. FORD: It's a different question. It's a
11 completely different question.
12     MR. LOPEZ: How so.
13     MR. FORD: Well, the first question was about
14 trades clearing or failing to trade.
15     MS. TAUBER: Okay.
16     MR. FORD: And you just asked a question
17 about a credit to his account.
18     MR. LOPEZ: If it's been cleared, did he, by
19 looking at his trade history, determine, Hey, I
20 sold these shares three days ago, and there's no
21 cash credit here.
22     MR. FORD: I really don't understand.
23     THE WITNESS: That's not the question that's
24 on here. This is asking -- you're asking me to

Page 128

1 tell you which trades settled, and which ones
2 didn't settle.
3     MR. LOPEZ: Yeah, by looking at your cash
4 proceeds.
5     THE WITNESS: And that information is --
6 well, it doesn't say that part here. That
7 information's going to be in the DTC sheets and
8 the exchanges and the clearing firms, not
9 something that I would have.
10     MR. LOPEZ: And your trade history.
11     MR. FORD: You have his trade history. You
12 have his trade history.
13     MR. LOPEZ: Don't we have -- doesn't --
14 didn't your trading produce, on a daily basis, a
15 record of what you sold and, three days later at
16 settlement, a record of what was credited from
17 those sales.
18     THE WITNESS: You had the buys and the sells.
19     MR. LOPEZ: Money, money, money, follow the
20 money.
21     MR. FORD: Hold it. Wait. That's not a
22 question.
23     MR. LOPEZ: But we're not on the record.
24     MR. FORD: Of course, we're on the record.

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 129

1  Do you want to ask a question?
2      MR. LOPEZ: Yes.
3      MR. FORD: Okay. Go ahead.
4      MR. LOPEZ: Did you, at any time, during the
5  five or six days that you were trading Avalon
6  shares in the short swing trading period become
7  aware of sales by you of shares that did not
8  produce a credit to your account.
9      THE WITNESS: I didn't look at what my trades
10  -- I don't look at it like that.  I didn't log-in
11  to look and see what money was in and out.  I
12  wasn't doing that; so I didn't log-in to see if
13  the trade settled or not.
14      MR. LOPEZ: Can you not do that now.
15      THE WITNESS: Well, we provided you those
16  records already.
17      MR. FORD: Are you suggesting that there are
18  records that we have not produced.  So you can
19  direct that to us and we can --
20      MR. LOPEZ: I can say prior to the trade
21  history being available on a log-in, and he can
22  pull down your trade history.  And that on Day 1,
23  you sell.  By Day 3, there should be a credit in
24  your account.  And if not, what kind of

Page 130

1  businessman are you?  You're selling for nothing.
2      MR. FORD: David, I'm not following you, at
3  all.  You have the trade history.  You have all
4  the trades.  Is there a document that you don't
5  have?
6      MR. LOPEZ: I presume --
7      MR. FORD: -- that you're asking for.
8      MR. LOPEZ: Yes.  I presume that the online
9  trade history will include the daily cash balances
10  and daily credits.
11      MR. FORD: So you're asking for the account's
12  daily -- by the way, isn't that the document that
13  we were just looking at earlier.
14      MS. TAUBER: We have the Interactive
15  statement; is that what you're talking about.
16      MR. FORD: So you -- and you're asking for
17  something different than the Interactive
18  statement.
19      MS. TAUBER: So that's a year-long statement.
20  It's not like through all the period necessarily.
21      MR. FORD: Okay.  So are you --
22      MS. TAUBER: We're saying more granular for
23  the relevant trading period.
24      MR. FORD: Why don't you put this in the form

Page 131

1  of a document request after the -- after the
2  deposition, because now, we're talking about you
3  asking us for documents, as opposed to you asking
4  Mr. Gentile questions.
5      MR. LOPEZ: No.  I'm asking Mr. Gentile to
6  refresh his recollection by doing what he has
7  testified he can do, which is look at his trade
8  history.
9      MR. FORD: I don't understand.  I --
10      THE WITNESS: I did not generate a report
11  during that period that would show me what cleared
12  and what didn't clear.
13      MR. LOPEZ: Can you not now go into history
14  and generate it now.
15      THE WITNESS: But we provided you that
16  already.  That's what we provided you.
17      MR. FORD: We're getting completely crossed.
18  If you're asking for a document, you should put
19  that to us after the deposition.
20      MR. LOPEZ: No, I'm asking for testimony.
21      MR. FORD: Okay.  And he just took it; so he
22  just answered.
23      MR. LOPEZ: Which is.
24      MR. FORD: Why don't you -- if you could read

Page 132

1  back the record.  If you could read back his
2  answer.
3      (Record read.)
4      MR. LOPEZ: Can you not go back now, and
5  generate a report historically, that will show
6  what cleared, and what did not clear by looking on
7  whether you got paid for it.
8      MR. FORD: No.  Time out.  The question of
9  what cleared and what did not clear is at the
10  heart of this dispute, and that's what all of
11  these documents that we're trying to collect --
12      MR. LOPEZ: Except the shortcut document.
13      MS. TAUBER: Do you not have that accessible
14  to you, something that shows what cleared and what
15  did not clear?  That's the question.  Do you have
16  any kind of record --
17      THE WITNESS: We don't know whether the
18  clearing firm --
19      MR. FORD: It's not in our possession.
20      THE WITNESS: -- cleared it or not -- was
21  able to clear it or not.  All we see is the buys
22  and the sells.  I don't know if it says whether it
23  cleared or not.
24  Q.  So you have no way of determining, in real

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 133

1 time or three days later, whether any of your trades
2 cleared or didn't clear?
3     **MR. FORD:** From his account.
4     Q. From your own log-ins, accessible, like
5 things that you can access online using a log-in and a
6 password?
7     **A. I'm not aware of, specifically, a report that**
8 **tells me, specifically, what the clearing firm settled**
9 **or did not settle. I just know that I'm able to log-in**
10 **and provide the data that I did provide you, which is**
11 **the trade history; which is what you asked for. I don't**
12 **know if the clearing firm was able to receive delivery**
13 **of those shares or not. There's no record that I would**
14 **have that would tell me that. I don't believe I have**
15 **access to that information.**
16     **MR. LOPEZ:** You have no record of being paid
17 or not paid?
18     **MR. FORD:** It's a different.
19     **THE WITNESS:** It's a different question.
20     **MR. FORD:** It's a different question.
21     **MR. LOPEZ:** I'm phrasing it differently.
22     **MR. FORD:** I'm sorry. Could you rephrase the
23 question and, specifically, what you're referring
24 to?

Page 134

1     **MR. LOPEZ:** Would you mind reading it back.
2 (Record read.)
3     **MR. FORD:** I don't know what that means. If
4 you know what that means, you can answer.
5     **THE WITNESS:** Being paid by who.
6     **MR. LOPEZ:** Having your -- or the MintBroker
7 account credited for sales three days earlier.
8     **THE WITNESS:** So you want to know -- I'm
9 going to rephrase your question. You want to know
10 if Interactive Brokers -- when I placed a sell
11 order.
12     **MR. LOPEZ:** Yeah.
13     **THE WITNESS:** And did they clear -- not
14 clear, because that's what we're talking about.
15 Did they put the sale if my account? Yes, they
16 put the sale in my account.
17     **MR. LOPEZ:** And what document would show
18 that.
19     **THE WITNESS:** The one that I provided.
20     **MR. LOPEZ:** And if there was a sale and no
21 credit to your -- the MintBroker account --
22     **THE WITNESS:** What I will say is that before
23 settlement, that the clearing firm could have -- I
24 forget what the right term is, but they could

Page 135

1 have -- it's not called rejected. They could have
2 -- they could have break -- they could have --
3 what's called "break the trade." Every single one
4 of those trades could have been broken.
5     **MR. LOPEZ:** Right. But that's speculation.
6     **THE WITNESS:** But they weren't. They could
7 have been broken. So I don't know if the clearing
8 firm received delivery, or the clearing firm just
9 said here -- here's the trades done on your side,
10 and they're going to handle it on your side and
11 try and receive delivery some other way. But I
12 have no access to that information.
13     **MR. LOPEZ:** Do you have an accountant, or
14 does MintBroker have an accountant.
15     **THE WITNESS:** It had an accountant.
16     **MR. LOPEZ:** And who is he; can you identify
17 him.
18     **THE WITNESS:** Antonio Collie.
19     **MR. LOPEZ:** Do you have an address for him.
20     **THE WITNESS:** No.
21     **MR. LOPEZ:** Do you have any way of
22 communicating with him.
23     **THE WITNESS:** Yes.
24     **MR. LOPEZ:** Would you ask him to provide us

Page 136

1 with an address.
2     **MR. FORD:** Why don't you put these questions
3 to us after the deposition.
4     **MR. LOPEZ:** Okay.
5     You gave an example of selling or of buying
6 short shares, naked short shares, and then
7 reselling them a few days later for the same price
8 you paid for them. Now, what if, as is the fact,
9 you have many purchases that you sold three days
10 later for higher prices, again, were -- was the
11 broker account credited for that higher price.
12     **THE WITNESS:** You said buy short, which I
13 don't know how you would buy short.
14     **MR. LOPEZ:** You buy shares that are being
15 sold to you by someone you contend is a naked
16 short seller.
17     **THE WITNESS:** Okay.
18     **MR. LOPEZ:** And then you sell those shares
19 for a substantially higher amount as though it
20 were a short squeeze.
21     **THE WITNESS:** Okay.
22     **MR. LOPEZ:** And where does the money go.
23     **THE WITNESS:** In the short squeeze? In --
24 or --

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 137

1    MR. LOPEZ: In this transaction.
2    THE WITNESS: So you're saying someone were
3 to buy.
4    MR. LOPEZ: MintBroker were to buy.
5    THE WITNESS: $5.
6    MR. LOPEZ: From a short -- a naked short
7 seller, and then three days later, the time
8 required by regulation as HSO for a buy-in, you
9 sell those shares; would you not notice whether
10 you were paid for them.
11    MR. FORD: What -- stop. David, that was --
12 I cannot make any sense of that question. I
13 apologize. I don't like to do this, but do you
14 have, sort of, a direct question about actual
15 facts without the would or the could or the might
16 or hypothecating?
17    MR. LOPEZ: 13D.
18    MS. TAUBER: This is Plaintiff's Exhibit 2.
19    MR. LOPEZ: Which is 13D for which one?
20    MS. TAUBER: Avalon.
21    MR. LOPEZ: Avalon. On July 24th, you
22 purchased MintBroker purchased -- no. I need a
23 calculator to get a per-share price. Okay. I'll
24 -- I'll give it back to Miriam if you have more

Page 138

1 questions.
2    MS. TAUBER: Okay. I think the question is
3 just like: Is it possible that you would sell
4 shares that you had bought from a short seller and
5 still get paid for those shares.
6    MR. FORD: I don't -- I don't -- the
7 possible --
8    MS. TAUBER: Meaning you could --
9    MR. FORD: Do you have a question about the
10 facts at issue in this case, and he'll answer it.
11    MS. TAUBER: I'm trying to differentiate
12 between money you get in your account from selling
13 shares, and the notion that the shares were not in
14 your account. Like we're trying to see if those
15 things are related to each other. If they're
16 necessarily related to each other, or if that is
17 -- or if they're completely unrelated. Like, in
18 other words, like, does it matter -- I guess, to
19 the ultimate point, does it matter to the profits
20 that he made if the shares were or were not in his
21 account, which is the contention of the defense;
22 right? So --
23    MR. FORD: Yes. That's not a question for
24 him to answer though.

Page 139

1    MS. TAUBER: Why not? Because he knows the
2 profit he made or what profit he would expect to
3 make whether or not this -- whether -- if the
4 shares totally cleared and there were no issue.
5 But -- so --
6    MR. FORD: Miriam, let's try again. Go
7 ahead. Ask your question.
8 BY MS. TAUBER: (Continued.)
9    Q. Okay. So you have this record of how many
10 shares you bought and sold, and you would know how much
11 money you'd expect to make, right, not including
12 commissions and all kinds of stuff like this, like, how
13 many -- like, you know, you bought at 10; you sold at
14 20. You expect to make 10; right?
15    A. Yeah. I mean, that's generally -- general
16 accounting.
17    Q. So did you notice any issue that -- with
18 these trades that are reported on the 13Ds on the --
19 Exhibits 1 and 2; did you notice any shortfall in money
20 that you expected to appear in your account?
21    A. I didn't look for any shortfalls; so I wasn't
22 specifically -- I didn't log-in to IB, and see if they
23 shorted me money or not. So I don't know if they did.
24 I don't know if any trades were broken, because I didn't

Page 140

1 examine the records to that level to see if they paid me
2 for every sale, if there was trade breaks that could
3 happen. There's trade -- you know, when you're running
4 a firm there's trade breaks on a daily basis, basically.
5    Q. So "trade breaks," are you referring to a
6 situation where they would, like, only partially fill an
7 order; is that what you mean?
8    A. No. When the counterparty completely cancels
9 the trade as if it never happened.
10    Q. Okay.
11    A. That's a trade break.
12    Q. And you would expect that just to be -- like,
13 to not show up in your account, at all?
14    A. Yeah. I mean, it could show up there one
15 day, and the next day, be gone, because there was a
16 trade break. If it was a bad price or -- there's many
17 things that could have happened. It's not something
18 that I manage on a day-to-day basis. That was -- the
19 trading desk would review trade breaks and reconcile
20 that information; so I was not looking at that on a
21 daily basis.
22    Q. And when you pull out -- when you pull up
23 these records like these, like Plaintiff's Exhibit 4,
24 would these include, like, broken trades like that?

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 141

1  A. I believe that it should.
2  Q. It would. Okay.
3  A. It should. I mean, actually, I don't know.
4  I'll say it again: It might just include the trades
5  that did not break.
6  Q. Uh-huh.
7  A. So a trade that's broken probably would not
8  show up there. But again, I don't know how Interactive
9  Brokers compiles their records, but I'm going to go
10  under the assumption that the trades that Interactive
11  Brokers provided are trades that did not break.
12        MR. FORD: But you don't know that for a
13     fact?
14        THE WITNESS: I don't know that for a fact.
15        MS. TAUBER: Okay.
16  Q. Okay. So Interactive would know that
17  information then?
18  A. Yes.
19  Q. Presumably. Okay.
20  A. I just want to go back to a question you
21  asked earlier.
22  Q. Sure.
23  A. That I just remembered. You asked if I had
24  any businesses with Nick.

Page 142

1  Q. Okay.
2  A. And I recently became -- not myself, but one
3  of my entities became a member of one of his LLCs.
4  Q. Okay.
5  A. You asked if we did business together; so I
6  just wanted to clear the record.
7  Q. What entity is that?
8  A. It's an entity unrelated to any of us.
9  Q. Okay. So in terms of MintBroker, the entity,
10  do you own 100 percent of that entity?
11  A. MintBroker International Bahamas.
12  Q. Uh-hum, LTD?
13  A. Yes.
14  Q. Okay.
15
16        (Plaintiff's Exhibit 11,
17     EMAIL FROM IB SURVEILLANCE TO G. GENTILE, was
18     marked for identification.)
19
20  Q. This is Exhibit 11.
21        MS. TAUBER: I have a copy if you want a
22     copy.
23  Q. Do you recall -- Exhibit 11 is an email from
24  IB surveillance to you; correct?

Page 143

1  A. To G. Gentile at Swiss Americas dot com.
2  It's one of the company's email addresses, yeah, I had
3  access to this one.
4  Q. So you would have received this email?
5  A. I did see this email when it came in through
6  discovery. Adam showed it to me. I didn't remember it.
7  Q. Okay.
8  A. But I did recently see it just the other day
9  again.
10  Q. But this account is an account that you
11  checked and monitored, G. Gentile at Swiss Americas dot
12  com?
13  A. I mean, mostly Guy at Suretrader dot com was
14  my main email.
15  Q. Okay.
16  A. This was the old name; so it wasn't something
17  that I was checking. I think compliance had access to
18  check it or was receiving those emails.
19  Q. Okay. This was the old name, right. I see
20  on the bottom. Okay. So did you -- do you remember
21  responding to this email? I assume --
22  A. Uhm, I think that I remember compliance
23  mentioning it in drafting a response. I don't remember
24  if I sent it back to them, or if the compliance officer

Page 144

1  sent it back to them. I don't remember.
2  Q. So I haven't seen a response to this email if
3  you sent one. Do you recall what the response said?
4  A. Like I said, Compliance received it.
5  Compliance would have -- this is something that
6  compliance would have responded to. I don't remember,
7  because it's a while ago, if they sent it to me to send,
8  or if they just send the response. But I don't remember
9  if -- even if there was a response, or if there was just
10  a phone call. Maybe compliance just called them, and
11  they spoke. If you wish to discuss the inquiry, please
12  contact blah-blah-blah. It could have been just the --
13  they could have just had a conversation.
14  Q. Okay.
15  A. But I do remember -- after Adam showed this
16  to me the other day, I do remember compliance asking me
17  about it, and then preparing something with the firm's
18  -- of attorneys prepared it.
19  Q. Okay. And do you recall whether they were
20  satisfied with your response? Did they have any --
21  A. I --
22  Q. -- follow-up happened, if anything?
23  A. I don't recall any follow-up.
24  Q. Okay. Do you recall like -- do you recall

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 145

1  the answers to these questions?  Like, let's discuss the
2  questions I had one by one, and tell me what you said.
3      A.  Well, this was when they came in from what I
4  can remember, the firm's attorney drafted the response.
5  So therefore, you know, I just -- I didn't use it myself.
6      Q.  Who was that attorney?
7      A.  The firm was using two attorneys at that
8  time.  One of them was Ogele something.
9      Q.  Okay.  I think I have that.
10     A.  And the other one, I don't remember.
11     Q.  Was it Adam Ford; no?
12     A.  No.
13         MR. FORD: He remembers me.
14         MS. TAUBER: So I think I have the Ogele; so
15  this is Exhibit 12.  This is actually one
16  document.
17
18         (Plaintiff's Exhibit 12,
19  OGELE LETTER TO G. GENTILE DATED AUGUST 15, 2018,
20  was marked for identification.)
21
22         MR. FORD: Miriam, where is this from?
23         MS. TAUBER: It's an Interactive production.
24         MR. FORD: From us.

Page 146

1         MS. TAUBER: Yeah.
2      A.  So that could have been the reply, by the
3  way.
4      Q.  That's what I was going to ask you.  Is this
5  the reply to this?
6      A.  Yeah.  I didn't read it, but I'm thinking
7  that this is the reply.
8         MR. FORD: This says -- there's a big DR on
9  here.
10        MS. TAUBER: I know.  That's weird that they
11  had it though.
12        THE WITNESS: Maybe draft.
13        MR. FORD: That's what I'm trying to -- this
14  was in the Interactive.
15        MS. McLAUGHLIN: What's the Bates number.
16        MS. TAUBER: It doesn't -- I don't know.  It
17  didn't have a Bates number.  So it didn't have --
18  I can direct you to the folder.
19        MS. McLAUGHLIN: Can you direct me to it,
20  please.
21        MS. TAUBER: Right now.
22        MS. McLAUGHLIN: Yeah.
23
24         (An off-the-record discussion was held.)

Page 147

1         MS. TAUBER: Back on the record.
2      Q.  Okay.  So this -- this is in response, I
3  believe, to the question about the potential takeover of
4  Avalon that you had announced; right?
5      A.  This -- this, I believe, was the response to
6  Interactive Brokers, because it was five days after
7  Interactive Brokers sent the request.
8      Q.  So this, if you look at the Interactive
9  email, one of the things it says is it appears that you
10  indicated that you acquired a large position in AWS, a
11  part of an attempt to take over.  Please provide details
12  about this proposed takeover, and then the letter
13  address -- sort of addresses that; right?
14     A.  I believe so.
15     Q.  So my question was:  Are there any other
16  records you have relating to the proposed takeover?
17  Like any other documents that reflect your preparations
18  for the takeover, financing that you would have
19  obtained, or any other kind of steps you would have
20  taken.
21     A.  That would have been just discussions with
22  the attorney.
23     Q.  With this Ogele?

Page 148

1      A.  Right.
2      Q.  Okay.
3      A.  And later, a different attorney, as well, but
4  I don't remember the name right now.
5      Q.  Okay.  Did you get any financing or try to
6  get any financing in place for a proposed takeover?
7      A.  No.
8      Q.  Okay.  What type of due diligence did you do,
9  besides meeting with the attorney in terms of
10  researching Avalon?
11     A.  I went through all of their SEC filings to
12  the best of my ability.
13     Q.  Okay.  Any other thing I haven't asked about
14  that you did in connection with that?
15     A.  Well, it was just standard research.
16     Q.  Okay.  Have you ever tried to take over a
17  company before?
18     A.  Well, there was GBR before this; right?
19     Q.  Okay.  So you were trying to take over GBR,
20  as well?
21     A.  Yeah.  I mean, not to -- for the same
22  purpose, not for the same purpose as this one.
23     Q.  What was the purpose of this one, of Avalon?
24     A.  Well, with Avalon, I noticed that they had

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 149

1 significant revenue, and that it just appeared that the
2 insiders were just milking the company for whatever
3 profits it had. And I thought maybe if I can take it
4 over, that 50 million might be able to turn into 5- or
5 $10 million worth of profits versus what these guys are
6 doing, which is just billing it out in salaries and who
7 knows what else.
8    Q. Okay. And what about GBR was the purpose of
9 that?
10    A. GBR -- look. That's, again, something I had
11 discussed with my attorney. So I think my discussions
12 with him as far as why that was a potential company is
13 privileged, because it was something that I only
14 discussed with my attorney.
15    Q. Okay. You didn't announce that publicly;
16 that you were trying to take it over?
17    A. (Indicating no.)
18    MS. TAUBER: Okay. I want to do another
19 document, mark Exhibit 12. This one. 13.
20
21    (Plaintiff's Exhibit 13,
22    SURVEILLANCE INTERACTIVE TO G. GENTILE & G. NOVAK,
23    was marked for identification.)
24

Page 150

1    Q. So Exhibit 13 is another email from
2 SurveillanceInteractiveBrokers.com to you and G. Novak.
3 Do you know who G. Novac is, by the way?
4    A. What date is this?
5    Q. This is October 31st, 2019.
6    A. I don't know, specifically, who G. Novac is.
7 There's no name. There should be a name.
8    Q. Right. Did you have, like, an account
9 manager, or somebody that you communicated with at
10 Interactive?
11    A. When I first opened the account, I did, but
12 he had retired like two years ago.
13    Q. Who was that?
14    A. I don't remember his name, but he had
15 retired, and I don't know exactly what G. Novac's
16 position is there.
17    Q. G. Novac is, I think, Greg Novak; is that
18 consistent with what you recall?
19    A. Right. I think that Greg was the original
20 person that opened the account.
21    Q. Right.
22    A. But I don't remember seeing him -- I believe
23 he's retired.
24    Q. Okay. So this is an account that says that

Page 151

1 they are closing. They're terminating their customer
2 relationship with you and advising you to close the
3 accounts. Do you see that?
4    A. Yes.
5    Q. Did they tell you why they were closing your
6 account?
7    A. Says it right on here.
8    Q. Where does it say that?
9    A. Based on the information that's come to the
10 attention of the compliance.
11    Q. Right, but -- I mean, what did they tell you
12 what the information was?
13    A. They did not tell me.
14    Q. Did you ask them?
15    A. I may have asked them, and I don't believe
16 they gave me an answer.
17    Q. Okay. Do you remember who you discussed that
18 with?
19    A. I don't remember if it was an email, or if I
20 called and spoke to them. I don't -- I don't -- I don't
21 remember. It was one of those two. It was either I
22 emailed them, or asked them what's going on, or I think
23 -- or I could have called them and asked. And I believe
24 the response was by email or phone is that their

Page 152

1 decision was final, and that they weren't providing any
2 more information.
3    Q. Do you know if it had to do with their
4 inquiry about the Avalon and GBR Trading that we just
5 looked at?
6    A. I don't think it had anything to do with
7 that.
8    Q. Okay. Why not?
9    A. Well, that was a year and a half prior.
10    Q. Took them a long time? Is there any other
11 thing that you think it had to do with besides that, or
12 any other inquiries you received that was for the
13 blacklist loan that may -- that, I mean --
14    A. I don't believe it's related to GBR or
15 Avalon.
16    Q. Okay. But you -- that's your belief, or do
17 you have any reason to think it's unrelated?
18    MR. FORD: Well, they didn't tell you the
19 reason.
20    A. They didn't tell me the reason. I don't
21 know.
22    Q. Right. Okay. And then this email that's
23 directing you to liquidate your positions and transfer
24 funds.

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 153

1    **A.  Does this coincide with the time that you**
2    **guys sent them a document request?**
3    Q.  That we sent them a document request?
4    **A.  Yeah.**
5    Q.  Hold on.  Did you request that this account
6    be closed?
7    **A.  No.  I'm asking you.  Well, I don't get to**
8    **ask questions but --**
9    Q.  I like that.
10   **A.  If -- if -- if it was --**
11   Q.  Well, that had occurred to me.  So --
12   **A.  It was closed during that time, because if**
13   **that's the case, then you guys caused my account to be**
14   **closed.**
15   Q.  Uh-huh.  But you think -- so you're
16   suggesting they closed the account for that -- in
17   response to document requests?
18   **A.  I'm not suggesting anything.**
19   **MR. FORD:  We don't know why that --**
20   **A.  Just conclusions, but I don't think it had**
21   **anything to do with it.**
22   Q.  Okay.
23   **A.  Could just be their business appetites**
24   **changing.  It's just changing, a lot of things changing.**

Page 154

1    Q.  And so -- back -- directing you to the gray
2    positions and withdraw your funds -- so this email is
3    directing you to liquidate your positions and move your
4    funds.
5        Do you recall what bank you moved the funds
6    to?
7    **A.  Well, that is not relevant.**
8    **MR. FORD:  Yeah.  I'm going to -- I would**
9    have stopped that.  The whole closing of the IB
10   account was, sort of, off the path.  But now,
11   we're really --
12   **MS. TAUBER:** Well, I assumed it was related,
13   to be honest, because I thought it was related to
14   this inquiry, the inquiry about AWX and GBR.
15   **MR. FORD:** Oh, I understand.  Well, that's
16   fine.  That's why I let that go, but now, we're
17   not going into --
18   **MS. TAUBER:** Okay.
19
20   (Plaintiff's Exhibit 14,
21   CIM TICKET SEARCH, was marked for
22   identification.)
23
24   Q.  So this is -- it's very small.  You want to

Page 155

1    use a magnifying glass?  It's a communication with you,
2    and it looks like tech support or customer service
3    people at Interactive about the closing of your account.
4    **A.  Okay.**
5    Q.  Is that right?
6    **A.  Well, I mean, that's what I'm seeing here.**
7    **This is -- this is what you just asked -- well,**
8    **actually, for example, this should not have been**
9    **provided by Interactive Brokers, because this has**
10   **nothing to do with MintBroker International, and this**
11   **should be stricken off the record.**
12   Q.  Well, so we asked for things that had to do
13   with either -- there's two defendants.  There's you
14   also.  So --
15   **A.  But that's not me.  That's a company, a**
16   **separate company.**
17   Q.  Well, it's a communication with you.
18   **A.  It's still unrelated to MintBroker**
19   **International --**
20   Q.  So --
21   **A.  -- Funds LLC; it's not a plaintiff.**
22   Q.  We broadly defined defendants as including
23   affiliates and --
24   **MR. FORD:** No, you don't.  No, you don't.

Page 156

1    **MS. TAUBER:** In our document requests.
2    **MR. FORD:** Well -- but that's -- all right.
3    This is a first -- this was also --
4    **MS. TAUBER:** Yeah.
5    **MR. FORD:** -- Interactive Brokers, which just
6    came in.
7    **THE WITNESS:** That account did not even
8    exist, because Interactive Brokers, when they --
9    had been provided.
10   **MS. TAUBER:** Well, I was going to actually
11   ask about that.  It says "Mint Funds," and if that
12   was a separate account and --
13   **MR. FORD:** Okay.  So we're not -- we'll deal
14   with -- for the record:  The IB production came
15   late Friday night, and we had done our best to see
16   as much of it as possible.  Obviously, you've done
17   a better job at that.
18   **MS. TAUBER:** Oh, thank you.
19   **MR. FORD:** But we're not going to get into
20   stuff that's completely irrelevant and should not
21   have been --
22   Q.  Okay.  So this -- to me, I thought this is
23   the same incident as this other closing of this account
24   we just looked at, Document 13, the same date or same --

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 157

1 around the same time, November/October 2018. So you're
2 saying it's not related; is that right?
3    **A. They're not affiliated.**
4    Q. But meaning this, the closure being discussed
5 in this document, is not the same thing as the closure
6 being discussed in Document 13?
7    **A. Well, you can look at it yourself.**
8 **Interactive Brokers will not provide a reason as to**
9 **whether they're related or not.**
10    Q. Are these two different accounts; is that
11 what you're saying?
12    **A. They're two separate companies.**
13    Q. But they don't have the same account? I'm
14 asking -- I mean --
15    **A. Correct, two separate companies, two separate**
16 **accounts, unrelated.**
17    Q. Okay. I did think I saw this was -- this
18 says Account Number U2XXX515. And this one --
19    **A. It's definitely different.**
20    Q. Okay. 365. Okay. So --
21    **MR. LOPEZ:** Which exhibits are we looking at?
22    **MS. TAUBER:** 13 and 14.
23    Q. Okay. So these relate to two different
24 accounts is what you're talking -- is what

Page 158

1    **A. Two separate accounts, two separate entities.**
2    Q. Okay. Okay. The other reason that this
3 document is relevant to me is that this talks about the
4 closing of MintBroker. I understood that at least. Is
5 this not what it's talking about? That you say this
6 puts me -- puts my firm practically out of business, and
7 this was around the time that I understood that
8 MintBroker had closed; so is that what you are referring
9 to in that?
10    **A. Well, I mean, this is an email to Mint Funds.**
11 **I could have been talking about -- puts Mint Funds out**
12 **of business. I don't remember exactly. But like I**
13 **said, either way, this email should not have been**
14 **provided to you since --**
15    Q. That's a matter of debate but --
16    **A. -- it's not relevant. It's not your**
17 **plaintiff.**
18    **MR. FORD:** Mint Fund had nothing to do with
19 the case that we're talking about. Nothing about
20 it, whether it's opened or closed to -- it had
21 nothing to do with this case.
22    **MS. TAUBER:** Okay. All right. Well, maybe,
23 maybe not, discovery, you know, appears it does
24 have to do with it. So -- but --

Page 159

1    **MR. FORD:** Fair enough, and it then appeared,
2 and then you asked, and Mr. Gentile explained that
3 it does not.
4    **MS. TAUBER:** Okay.
5    Q. So like I said -- asked: Why did MintBroker
6 close down when it closed down?
7    **A. It was a business decision.**
8    Q. Did it have to do with Interactive's closing
9 of your account?
10    **A. It was a business decision.**
11    Q. Okay. Based on what?
12    **A. Well, that was based on a board resolution**
13 **between the board of directors, and it's not relevant to**
14 **your case as to why it closed.**
15    Q. Okay. What happened to all of the stock that
16 MintBroker held when it closed?
17    **MR. FORD:** Stop. We're -- it has nothing to
18 do --
19    Q. Or like the records, records of stock,
20 records of customers, like all of the records that
21 MintBroker had when it closed, what happened to those
22 records? Like where -- let's just start with customer
23 records. Like, did MintBroker have customers when it
24 closed?

Page 160

1    **A. I mean, it didn't have customers any more**
2 **when it closed. All the customers were --**
3    Q. But the months before closing?
4    **A. Yeah, it had. It had it, and the company**
5 **closed, and whatever records are required to be kept**
6 **were sent to the firm's attorneys.**
7    Q. To MintBroker's attorneys?
8    **A. In the Bahamas.**
9    Q. Ogele or somebody else?
10    **A. Someone else.**
11    Q. Okay. Did that include customer accounts?
12    **A. Yes.**
13    Q. Okay. Customer statements, you're talking
14 about, or what other documents?
15    **A. Well, it's works similar to Interactive**
16 **Brokers. There's no statement. It's just -- it's just**
17 **their trade records and history. It's not specifically**
18 **statement.**
19    Q. So did you send it to the firm by email or by
20 mail?
21    **A. Thumb drive, I believe. I didn't do it**
22 **myself. This was something I was -- I wasn't -- I**
23 **hadn't been to the Bahamas since October, I believe --**
24 **November -- October or November, I haven't been there**

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 161

1　since then. I wasn't involved in the closing procedures
2　and exactly how everything was done.
3　　Q. Okay. But it's your understanding that
4　someone downloaded MintBroker's database or how --
5　　A. Yeah, whatever were required records, I
6　believe that was something that was handled between
7　compliance and IT, and from my understanding, was
8　delivered to the firm's law firm in the Bahamas.
9　　Q. Do you have any sense of, like, the volume
10　of --
11　　A. I don't.
12　　Q. -- the documents on the thumb drive or in
13　what --
14　　A. I haven't seen the thumb drive. I don't have
15　the thumb drive. I don't have a copy of it.
16　　Q. Okay.
17　　A. I'm not -- I'm not going to take those
18　documents out of the Bahamas. Bahamas has strict laws
19　on where those records have to be.
20　　Q. And what about, like, any hard copies of any
21　documents that were in your office when it closed, like,
22　physically in your office?
23　　A. So the most -- I don't know what happened to
24　any hard copies. The offices are closed also, but I

Page 162

1　know that three or four years ago, the firm went full
2　electronic; so everything should be electronically
3　stored.
4　　Q. So everything that ever happened had been on
5　this thumb drive that was sent to the attorneys?
6　　A. Yeah.
7　　Q. Okay. And, like, is there backup? When
8　MintBroker was in business, what was, like, the system;
9　was there a backup system for documents?
10　　A. Well, it was on cloud. So the cloud doesn't
11　require a backup, because the cloud, by itself, is a
12　backup.
13　　Q. So what like -- what cloud system did you
14　use?
15　　A. It was a cloud in the Bahamas, a local cloud
16　company in the Bahamas.
17　　Q. Do you know what the name if the company is?
18　　A. This was something that IT set up. I don't
19　remember the name.
20　　Q. Okay. Who was your IT manager -- or was your
21　IT manager; who set it up?
22　　A. There was two people: One of them resigned,
23　and then there was one person left. I believe his name
24　is Steven. I don't remember his last name.

Page 163

1　　Q. Steven something, okay.
2　　A. Also Bahamian, someone in the Bahamas. I
3　don't believe he's a U.S. citizen.
4　　Q. He's the person that would have been
5　responsible for downloading the documents to the thumb
6　drive?
7　　A. I don't know who, in compliance, may do it,
8　but most likely, it would have been him. I'm not the
9　one who ordered him to do it. It would have been
10　something that compliance would have handled. It's a
11　compliance function.
12　　Q. The backup that you're talking about, this
13　company, did you know if you had a log-in for that?
14　Like did you log-in and see your backups?
15　　A. I never had access to the servers myself.
16　　Q. And do you know where the servers are
17　physically located?
18　　A. In the Bahamas. It's a requirement by
19　Bahamian law that all the records are kept there.
20　　Q. Okay. And so -- but someone in your firm
21　would have had a log-in to access the backup in case
22　those computers crashed or something in the office?
23　　A. Well, like I said, I don't believe that there
24　was a backup, because a cloud, in itself, is self-backed

Page 164

1　up. I don't know if you know how -- cloud computing is
2　basically 20 computers or 30 computers that work as one.
3　So if one dies, that information is still in one of the
4　others so it doesn't -- I don't know if they have
5　backups or not basically, but my understanding is that
6　they were using a cloud service provider, and that's
7　where the data was kept until they closed. And then
8　they pulled it down, and they delivered it to the
9　attorneys.
10　　Q. And that would have included your --
11　MintBroker's principal account trading history too;
12　right.
13　　A. I don't know if it would have included that.
14　That would have been the customers; information.
15　　Q. Okay.
16　　A. Like I said, the firm's street-side trades
17　are going to be in Interactive Brokers.
18　　Q. Okay. And what about, like, DAS Trader
19　independently, did they have any backup, that you know
20　of, of trades that MintBroker would have done?
21　　A. I have no idea what DAS would have done.
22　They're not required to maintain records. They're not a
23　licensed firm. They're just providing a front end. So
24　the firms that are required to maintain records are

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 165

1  Interactive Brokers and the firm in the Bahamas, which
2  is required to keep those records in the Bahamas, the
3  client records.
4       Q.  Okay.  How about emails?  Like do you still
5  have access to your MintBroker --
6       A.  I don't.
7       Q.  -- Swiss America, your email address?
8       A.  I don't have access to those anymore.
9       Q.  Does -- like do they have access to their old
10  emails?
11      A.  I don't know what they would have access to,
12  because I haven't been there; so I don't even know what
13  happened to the actual individual computers.  I don't
14  know if it was a free-for-all or everyone just took it.
15  I have no idea.
16      Q.  What about a system for, like, customer
17  communications if there were any like, you know,
18  complaints or issues or questions about these stocks or
19  these trades?
20      A.  Well, that -- that --
21      Q.  Is there a system for keeping track of that?
22      A.  That, again, would be part of the same
23  recordkeeping requirements that would have been in the
24  Bahamas.

Page 166

1       Q.  Okay.
2       A.  Email servers, communications, all that stuff
3  would have to be in the Bahamas, per Bahamian law, as
4  far as I understand it.  And, you know, the firm doesn't
5  -- doesn't exist anymore; so there's no one paying for
6  maintaining any of these services, so that cloud
7  services no longer in existence, and I believe
8  everything should have been moved down to a -- either a
9  hard drive or a thumb drive.  I don't know if it was too
10  big to put on a thumb drive and, maybe, they put it in a
11  bigger hard drive.  I don't know.  I didn't ask.
12      Q.  Okay.  What about when customers would
13  communicate with people issues with their account; is
14  there a different platform they use, like, you know, a
15  chat platform or customer service platform?
16      A.  I don't know the name of what platform they
17  would use.
18      Q.  But the email you directly -- that was my
19  question.
20      A.  Customers do not communicate with me like
21  that.
22      Q.  Not you, but somebody.  Like did they send an
23  email to somebody at MintBroker, or did they use like a
24  platform to, like, enter your question here and then

Page 167

1  respond, you know, a third-party?
2       A.  How is that relevant?  I want my customers --
3       Q.  What do you mean?  You're saying you have no
4  documents.
5           MR. FORD:  I was just going to say that, as
6  well.
7           THE WITNESS:  Customer communication.
8           MR. FORD:  We're ten minutes into questions
9  now about customer complaint.  This case has
10  nothing to do with customer complaints.
11          MS. TAUBER:  Hold on.  So we -- if you guys
12  were still in business, and you had documents,
13  like, business records, we would request all
14  communications related to these trades, right?
15  Presumably, that would include, if there were
16  customer complaints about this --
17          MR. FORD:  You --
18          MS. TAUBER:  -- that would include that;
19  right?  You would respond and say, Customer said,
20  like, Hey, why are you trading all the -- whatever
21  it is.
22          MR. FORD:  You did request those documents.
23          MS. TAUBER:  Right.  You said you didn't have
24  them, because the offices closed.

Page 168

1           MR. FORD:  No.  What we said was that they
2  don't -- that there's no responsive documents.
3           MS. TAUBER:  Within your possession.
4           MR. FORD:  Custody or control.
5           MS. TAUBER:  Then we had a debate about what
6  "in your possession" means, and if that means a
7  third-party that you have access to; right.
8           MR. FORD:  No, no.  What -- there -- are you
9  asking for whether a customer complained about
10  Avalon and New Concept's trades in the proprietary
11  account.
12          MS. TAUBER:  Yeah.  I'm asking about that.
13  Maybe the answer is no, but like I'm trying to
14  understand -- I asked you for documents like --
15  right.  You said all communications while he's
16  trading in these securities.  Right.  Presumably,
17  if a customer would have complained, that would be
18  included; right?  I'm not saying a customer
19  complained or not.  I'm just wanting to know,
20  like, what you could have searched.  But now,
21  you're telling me you can't search, because the
22  office is closed.
23          MR. FORD:  What -- we're -- we're just --
24  we're going around in circles on something that

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 169

1 has nothing to do with anything.
2    **MS. TAUBER:** Well, it does.
3    **MR. FORD:** Even if a customer complained,
4 that has nothing to do with the question of
5 whether there was a legal short-swing profit on
6 these trades, the only thing at issue.
7    **MS. TAUBER:** It has to do with the fact that
8 whether or not there's been, like, document
9 retention appropriately or not. Like whether we
10 have documents that you might have access to that
11 we don't have.
12    **MR. FORD:** They're not -- we don't have
13 access to anything, and they're not -- they would
14 not be relevant. If a customer complained --
15    **MS. TAUBER:** Yeah.
16    **MR. FORD:** -- about proprietary trading in
17 Avalon, which --
18    **MS. TAUBER:** Well, because some of these
19 trades were against customers; right? We've
20 established that. Some of MintBroker's
21 proprietary trades were riskless or -- not
22 riskless -- trades against customers.
23    **MR. FORD:** I don't think that's been
24 established.

Page 170

1    **MS. TAUBER:** I think it has.
2    **THE WITNESS:** I wouldn't know anyway. This
3 is something that compliance would have dealt
4 with. It wouldn't even have even called me about
5 that.
6    **MS. TAUBER:** I mean, I'm not trying to get
7 into the substance of the customer complaints,
8 obviously, like there would be other problems,
9 hearsay, whatever; right.
10    **MR. FORD:** I guess, maybe that's the issues
11 that were a little too broad.
12    **MS. TAUBER:** So I'm just trying to
13 understand, like, what -- this is a business that
14 existed that did a lot of trading, and now, that
15 it closed. I get that. But now, there's like,
16 Oh, there's zero documents that they have, except
17 for this, like, printout from Interactive. So I'm
18 trying to understand how that's possible.
19    **THE WITNESS:** That's where the street-side
20 trades happen, so what other documents would you
21 possibly need.
22    **MS. TAUBER:** Well, usually, when you're a
23 brokerage firm, you'd have other documents, but
24 there's not just, you know, printout from your

Page 171

1 account, you know. There's other business records
2 that are created in the course of business.
3    **MR. FORD:** If there are any relevant
4 documents -- and I thought we've been through
5 this. But if there are categories of relevant
6 documents that you believe have been requested and
7 exist or may exist or not and produced, please let
8 us know. I thought we were past that. This is a
9 case about what trades were placed.
10    **MS. TAUBER:** No. This whole deposition is
11 what I'm concerned is about this. About like why
12 there are no -- why MintBroker had said that there
13 is no documents that they can produce to us,
14 except this one printout; right.
15    **MR. FORD:** We produced to you all of the
16 relevant documents that they had. These other
17 documents that you're pointing out about different
18 funds or the closing of IB -- the closing of
19 MintBroker, they have nothing to do with this.
20 They wouldn't be relevant. They wouldn't be
21 responsive to requests.
22    **MS. TAUBER:** The document from IB saying,
23 like, I'm surveilling your account because of this
24 exact trading is not responsive to our request?

Page 172

1 How is that possible? I mean, that's directly
2 responsive to our request; right? So but -- that
3 we have it anyway. I'm just trying to understand
4 what else --
5    **MR. FORD:** Well, you have -- exactly, you
6 have it. You have all the IB communications.
7    **MS. TAUBER:** Right. So -- right. So -- but
8 I'm trying to establish what has existed that
9 would also -- may be -- potentially, have been
10 destroyed or exist somewhere else now --
11    **MR. FORD:** Nothing has been des --
12    **MS. TAUBER:** -- or was moved, on a cloud, in
13 a log-in, in a platform that's a third-party
14 provider. You know, I mean --
15    **MR. FORD:** He has been clear that all of the
16 documents that are required to be retained, which
17 are anything that could possibly be relevant were
18 on the cloud, and they're either still in the
19 cloud, or they've been moved to a server into the
20 law firm. That's what he testified to; correct?
21    **THE WITNESS:** I don't believe anything is on
22 the cloud anymore.
23    **MR. FORD:** Okay. So they have been moved to
24 the server and delivered to the law firm; is that

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

**Page 173**

1 correct?
2     THE WITNESS: Moved -- yeah.  Moved onto a
3 hard drive and delivered to the law firm.
4     MR. LOPEZ: What is the name of the law firm.
5     THE WITNESS: Let me -- let me check for you.
6 King -- King something.
7     MR. FORD: And I'm sorry.  To answer your
8 question, Miriam, about whether that document is
9 relevant, I would say that it's not.  But I
10 understand we disagree on that, the document,
11 meaning the Interactive Brokers.
12     THE WITNESS: Kensington Law.
13     MR. LOPEZ: In what town, city.
14     THE WITNESS: Nassau, Bahamas.
15 BY MS. TAUBER:
16     Q.  Okay.  I want to go back to the affirmative
17 defense that we were talking about, the clearing
18 defense, for a second, and just read the rest of that
19 sentence.  Let me see if I have the marked exhibit in
20 here.  It should be one of these.  Oh, 9, Plaintiff's
21 Exhibit 9.  That says, They failed to clear or related
22 to shares that do not exist, because the trades were
23 naked short sales made by market makers that had not
24 borrowed shares, and had failed to obtain or locate

**Page 174**

1 before the short, as required by SEC regulations.
2     Okay.  The market makers that you're
3 referring to, do you have any market makers, in mind,
4 that you are referring to?
5     A.  I don't know the specific market makers that
6 would have done it.
7     Q.  Okay.  Do you have any -- like, are you -- so
8 it sounds to me, and correct me if I'm wrong, but you're
9 accusing these market makers of doing something illegal.
10     A.  Well, I'm not saying that it's just the
11 market makers per se.  I'm saying just, pretty much,
12 anyone who shorted naked, I think that market makers
13 should be changed by just other traders, short sales by
14 other traders.
15     Q.  Okay.
16     A.  Not specifically market makers.
17     Q.  Okay.
18     A.  Although market makers, you know, they're
19 able to short, you know, naked, but they still
20 have to deliver by settlement, but regular traders have
21 to do locate.  I mean, they -- actually, market makers
22 should not be going naked anyway, but they have a little
23 more leeway.  It's my understanding.  I'm not a hundred
24 percent on that.  But it's my understanding they have a

**Page 175**

1 little more leeway than an individual or even an
2 institutional or a corporate account, but they have to
3 get an actual locate.  They need to borrow shares where
4 a market maker, if he's making a bona fide market in the
5 stock, then they have a little more leeway.
6     Q.  Okay.  So you -- but either way, you're --
7 are you suggesting that the market makers in these -- in
8 these stocks did something either illegal or --
9     A.  I'm suggesting that traders --
10     Q.  -- unadvisable?
11     A.  -- or short locate systems, because, you
12 know, you may not know, there's third-party systems out
13 there that allow traders to locate shares.  And they're
14 currently under scrutiny by the SEC, because they were
15 doing what I said earlier.  For example, they locate a
16 thousand shares, and then they'd locate that same
17 thousand shares.  They tell 50 traders, yeah, we have
18 it.  We have it.  They give each trader a thousand
19 shares.  They're all shorting, and guess what, the first
20 one was fine, but the other 50 are all naked.  And what
21 the SEC's recently saying now is that they can only
22 short that thousand shares one time.  If they buy it
23 back, they have to do a second locate.  They cannot
24 reuse it.  And I believe that, number one, they were

**Page 176**

1 reusing it, and that they were also over-allocating the
2 locates that they had.
3     Q.  So did you attempt to tell anybody, at this
4 time, that you thought they were doing this -- like
5 market makers or other traders, did you attempt to,
6 like, say to anybody, Hey, something's wrong here?
7     A.  I spoke to my attorney about it.
8     Q.  At the time?
9     A.  Uh-hum.
10     Q.  Okay.  And that would be Kensington or --
11     A.  It would have been Ogele.
12     Q.  Ogele.  Okay.  Do you know if any effort was
13 made to inform anybody that you thought this was going
14 on?
15     A.  Inform who?
16     Q.  SEC or anybody, regulators, market makers,
17 anybody like, Hey, there's a concern here that this is
18 happening?
19     A.  I don't recall.  I don't recall.
20     Q.  Okay.  Let's move to the second affirmative
21 defense.  It says, "Plaintiff's claims are barred in
22 whole or part by the doctrine of unclean hands"; do you
23 what "unclean hands" means?
24     A.  No.  Explain it to me.

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 177

1      MR. FORD: You shouldn't ask questions but,
2  again, it's a legal defense.
3      MS. TAUBER: Yeah.
4      MR. FORD: You asked if he knew what it
5  meant.  He said no.  You can ask another question.
6      Q.  Usually, unclean hands refers to some kind of
7  bad faith on the part of the person being accused of
8  unclean hands.  Do you have any reason to think that
9  either of these companies acted in bad faith?
10     A.  The companies.
11     Q.  Avalon, my clients, Avalon or New Concept.
12     A.  Do I have reason to believe that they acted
13  in bad faith for what, for what specifically?
14     Q.  Well, you tell me.  I mean -- so I'm trying
15  to understand the factual basis for this defense which,
16  to me, is suggesting, kind of, bad-faith allegation.
17     MR. FORD: This is -- it's an affirmative
18  defense.
19     MS. TAUBER: Uh-huh.
20     MR. FORD: The information that supports it
21  will be based on the discovery that's currently
22  being taken; so he doesn't have to give a full
23  explanation of what our affirmative defenses are.
24

Page 178

1  BY MS. TAUBER:
2  Q.  But to your knowledge, like your personal
3  knowledge, do you have any indication or belief that
4  either of these companies, New Concept or Avalon, acted
5  in bad faith?  Meaning, they had bad intentions on
6  someone.
7     A.  Well, that will be determined when we have
8  them on deposition.
9     Q.  Okay.  But do you -- what kind of questions
10  would you ask?  In other words, what's your basis for --
11     MR. FORD: No.  That one's not being asked.
12  That one's not being asked.
13     MS. TAUBER: Okay.
14     Q.  All right.  So there's no -- is there any --
15  are there any circumstances that would lead you to think
16  that there was bad faith on the part of these companies?
17     A.  Well, I think we talked about this earlier
18  when I told you I went through Avalon's financials and
19  things that didn't make sense.
20     Q.  Okay.  So you're talking about mismanagement,
21  generally?
22     A.  I mean, that's just part of it.
23     Q.  Okay.
24     A.  Just things that didn't make sense to me.

Page 179

1     Q.  Okay.  Other than, like, mismanagement
2  claims, is there any other bad faith that you think was
3  directed towards you or your clients?
4     A.  Me or my clients?  Which clients, my --
5     Q.  MintBroker's customers.
6     A.  -- International clients?
7     Q.  Sure.
8     A.  I mean there could have been some stuff.
9  But, you know, for example, his press release that he
10  put out.  I think that was -- that was done in bad
11  faith.
12     MR. LOPEZ: Which press release?
13     THE WITNESS: He put out a press release
14  saying that he owns 66 percent of the company, has
15  no intention of selling his shares, and that he
16  had no idea who MintBroker International was.  So,
17  you know, that's -- that's -- you know, why was he
18  saying that?  If -- if -- if I'm filing that I own
19  over ten percent of the company, he shouldn't say
20  that he has no idea who MintBroker International
21  is, because he knows exactly who MintBroker
22  International is.  It was, potentially, someone
23  that owns 66 percent of his company.  But he
24  wanted investors to believe that it was a lie, but

Page 180

1  it wasn't.  Well, we'll figure that part out, but
2  I think that that was done in bad faith.
3     MR. LOPEZ: When you say he had your filings
4  showing more than ten percent, are you referring
5  to the 13D?
6     THE WITNESS: I'm referring to the Form 4
7  filings that were made, and he put a press release
8  out saying that he owned 66 percent of the
9  company, and that he had no idea who MintBroker
10  International was.  And I think that that is not a
11  true statement, because he should have known,
12  based on the Form 4, who MintBroker International
13  is.  And that I was potentially an investigator in
14  his company, but he made it seem as if it wasn't.
15  So you can't have it both ways; it's either I am,
16  or I'm not.  He said I'm not; so I don't know why
17  we're here.
18     MR. LOPEZ: Did you and he ever speak --
19     THE WITNESS: No.
20     MR. LOPEZ: -- to one another?
21     THE WITNESS: No.
22     MR. LOPEZ: You never met?
23     THE WITNESS: No.
24     MR. LOPEZ: Okay.

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 181

BY MS. TAUBER:

1 BY MS. TAUBER:
2     Did -- but also, is there any other reason,
3 besides the Form 4, that you think he should have known
4 who you were, or who the main broker was?
5     A.  I mean, that's the only way I think he would
6 have known.
7     Q.  Okay.  The third affirmative defense is --
8 back in Exhibit 9 -- is waiver.  Do you have any basis,
9 factual basis, that you can think of for that defense.
10    A.  I don't know.
11        MR. FORD: It's not clear.  Do you know what
12 a legal doctrine means?
13        THE WITNESS: No.  I need another water
14 actually.  Thanks.  Coming from a tropical
15 weather, and it's so dry here that --
16        (Pause.)
17    Q.  Waiver usually means you relinquished your
18 claim in some way.  Do you have any reason to think
19 either of my clients have relinquished their claim?
20    A.  I have no idea what --
21        MR. FORD: These are legal issues.  It's not
22 for him to explain them.  They're legal positions.
23        MS. TAUBER: You understand there are some
24 facts we never got to that you were contending

Page 182

1 supported these defenses.  This is the time we
2 have to inquire about those facts; so we're not
3 surprised by allegations --
4        MR. FORD: Understand -- if he understands
5 what our legal argument based on legal waiver
6 means, he can explain that.
7        MS. TAUBER: But also facts you're intending
8 to produce in support of these questions.
9        MR. FORD: The issue, this whole line of
10 questions, he doesn't understand the legal
11 concept.  So he doesn't understand what facts
12 would be supportive of that.  That's something the
13 lawyers know, and you know this.
14        MS. TAUBER: Right.  That's why I'm
15 describing the concept and saying what facts do
16 you know of that might fit into these --
17        MR. FORD: He has no idea what we could
18 possibly put in a legal brief.
19        MS. TAUBER: How do you suggest I prevent
20 unfair surprise in this case about facts we never
21 proved in this case in support of defenses?
22        MR. FORD: I assure you, any legal argument
23 we make will be based on the record developed in
24 discovery.

Page 183

1        MS. TAUBER: Okay.
2        MR. FORD: Is that fair?
3        MS. TAUBER: Sure.  That's fair enough.
4 Okay.
5        (Pause.)
6        MS. TAUBER: Moving on.  I think we're almost
7 done.
8        MR. LOPEZ: I'd like to edit it.
9        MS. TAUBER: You can also take it over.
10       (Recess taken.)
11 EXAMINATION
12 BY MR. LOPEZ:
13    Q.  Who were the directors of MintBroker?
14    A.  At the relevant time?
15    Q.  Yes.
16    A.  The directors of MintBroker International
17 Bahamas; there was myself and Antonio Collie.
18    Q.  Are you obliged to file taxes in the U.S.?
19    A.  A tax return, no.  I'm not obliged to file a
20 tax return.  Like a 1040?
21    Q.  Yeah.
22    A.  Well, personally, I file a 1040, but the
23 entity does not have to file a 1040.
24    Q.  Who is your personal accountant?

Page 184

1    A.  How is that relevant to this?
2    Q.  Because MintBroker is probably a
3 foreign-controlled corporation, and your personal tax
4 return may reflect some of its activities.
5        MR. FORD: Wait.  Wait.  No, but that's
6 not -- I don't understand that.  It's -- what does
7 that have to do with a 16B claim?
8        MR. LOPEZ: Pursuant to -- reconstruct
9 records and the only thing we're interested in is
10 whether there is anything in that tax return that
11 reflects on papers -- on records that we don't
12 have.
13       MR. FORD: That doesn't -- I'm not buying
14 that.  We're not getting into his tax returns.
15       MR. LOPEZ: Okay.  There will be a motion on
16 that one.
17       MR. FORD: Okay.  That sounds good.
18 BY MR. LOPEZ:
19    Q.  When did you become aware of these suits?
20    A.  Which suits?
21    Q.  The ones you testified on today.  Avalon
22 versus -- and --
23    A.  I think -- either -- either my attorney told
24 me about it, or I've read it online.

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 185

1   Q.  Can you place it in time; when?
2       MR. FORD: Do you remember.
3   A.  Probably late summer of -- around the time --
4       MR. FORD: Do you have any recollection of
5   when you first became aware of these lawsuits?
6       THE WITNESS: No.
7   Q.  When you became aware of these lawsuits, did
8   you put a litigation hold on the books and records of
9   MintBroker?
10  A.  Well, there's no requirement for me to do
11  that, because it's automatically required by law in the
12  Bahamas anyway; that all the records are maintained for
13  seven years.  There's nothing extra for me to do.
14  Q.  And what records are you speaking of?
15  A.  Trade records.  Customer, you know,
16  documents, communications with customers.
17  Q.  And those records are now in the custody of
18  Kensington Law?
19  A.  Yes.  That's what I believe.
20  Q.  Who is paying Kensington Law?
21  A.  Well, they were paid already upfront from
22  what my understanding is, but they were paid to hold
23  these records.
24  Q.  By whom?

Page 186

1   A.  By the company, MintBroker International.
2   Q.  MintBroker, of which you are a director and
3   sole shareholder?
4   A.  Yes.
5   Q.  Do you have access to these records?
6   A.  I can ask them to go through records, if need
7   be.
8   Q.  You do have access then?
9   A.  I have access to ask them.  I don't have an
10  online access to log-in somewhere, and access it on my
11  own.
12  Q.  No.  I'm just asking whether you've got
13  access whether as the owner of MintBroker --
14  A.  I can ask them.
15  Q.  -- you can ask them?
16      MR. FORD: He does.
17  Q.  Who is the chief financial officer of
18  MintBroker?
19  A.  Antonio Collie.
20  Q.  Address?
21  A.  It's Nassau, Bahamas.
22  Q.  Who is the compliance officer of MintBroker?
23  A.  Edward Cooper, Nassau, Bahamas.  Again, these
24  are former, during the relevant time, not currently,

Page 187

1   because no business currently.
2   Q.  Do you have custody or control or access to
3   MintBroker's tax returns?
4   A.  MintBroker International, like I said
5   earlier, does not have a 1040 tax return.
6   Q.  Does it file taxes in the Bahamas?
7   A.  No.  There is no tax returns in the Bahamas.
8   Q.  I want to live there.
9       MR. FORD: Keep that in mind.
10      Okay.  Anything further?
11      MS. TAUBER: Yeah.  One more thing.
12  I want to introduce one more document that I
13  forgot to introduce, which is this one, same as
14  this.
15
16      (Plaintiff's Exhibit 15,
17  PORTFOLIO REPORT AS OF 13/03/2018, was marked for
18      identification.)
19
20  EXAMINATION
21  BY MS. TAUBER: (Continued.)
22  Q.  Plaintiff's Exhibit 15, and it is titled
23  "Portfolio Report as of 13/3/2018 for MintBroker
24  International, LTD."

Page 188

1       Do you know how this document was generated;
2   where it comes from?
3   A.  Well, it says on it that it was generated
4   from Deltec Bank and Trust.
5   Q.  Well, it doesn't -- I'm being sure.  So
6   Deltec Bank generated this; is that what you're saying?
7   A.  That's what I believe.
8       MR. FORD: I'm sorry.  You're asking who
9   generated this?
10      MS. TAUBER: Yeah.
11      MR. FORD: This is your document.  Where did
12  you get it from?
13      MS. TAUBER: A document directive.  But it
14  doesn't look like an Interactive document.  It was
15  in their possession, but I don't know where -- who
16  created it.
17      MR. FORD: Oh, I understand.
18  BY MS. TAUBER:
19  Q.  Right.  So Deltec Bank is the one who created
20  this?
21  A.  I believe that they created and generated it.
22  It was not generated by myself or by my company.
23  Q.  Okay.  So portfolio summary is page 1; page 3
24  has, like, performance indices?

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 189

1    **A.   There is a bank account.  It's not a**
2    **brokerage account.**
3    Q.   I understand that.  But -- I understand that,
4    but I'm wondering -- well, it has some bonds and stock
5    in there, in page 3, the third page, second-to-last
6    page.
7    **A.   3 out of 4.  Where does it say bonds?**
8    Q.   Oh, here.  This one, corporate bonds,
9    everything, S and P 500 equity.
10   **A.   Okay.  They may have had like, what's it**
11   **called, a discretionary account.**
12   Q.   So whose -- you mean MintBroker would have a
13   discretionary account at the bank?
14   **A.   With them.  So this would not -- this would**
15   **have just been the bank investing the money, not the**
16   **firm telling them what to invest in, I think.  I'm not**
17   **a-hundred-percent sure.**
18   Q.   So did -- you didn't -- did you hold stocks
19   at this bank, Deltec Bank?
20   **A.   I don't know what they held, but I never**
21   **placed orders with them, if you know what I mean.  Like**
22   **I never said buy this or sell that.  It could have just**
23   **been -- like just a fund that they had, of some sort,**
24   **where it was at their discretion.**

Page 190

1    Q.   Okay.  So when you say "placed orders"
2    though, do you mean like with DAS Trader, like you were
3    describing, like, routing the orders to the different --
4    **A.   I'm saying whether by phone, email, or**
5    **otherwise, that this was, to me, just a bank account.**
6    **They may have had some investments in it, but not**
7    **self-directed investments.**
8    Q.   So this was not -- this link -- this account
9    linked to your DAS account, the same way you described
10   that --
11   **A.   No.  It was basically used as a bank mainly.**
12   Q.   Okay.  So the equity that's listed here, this
13   would not refer to the -- to any of the stocks in this
14   case that we're talking about?
15   **A.   No.**
16   Q.   The Avalon and New Concept stocks?
17   **A.   No.**
18   Q.   Okay.  Did you get statements like this from
19   the bank?
20   **A.   I believe they sent monthly statements.**
21   Q.   It looked quite similar to this?
22   **A.   Uh-hum.**
23   **MS. TAUBER:** I want to introduce this last
24   document; it's the last one.

Page 191

1
2         (Plaintiff's Exhibit 16,
3    NYSE PRINTOUT, was marked for
4    identification.)
5
6    Q.   So do you have this -- you guys have this
7    document?
8         **MR. FORD:** This is a New York Stock Exchange
9    document?
10        **MS. TAUBER:** Yes.
11        **MR. FORD:** No.  We don't have documents from
12   the New York Stock Exchange.
13        **MS. TAUBER:** The last document produced was
14   an email to you.
15        **MS. McLAUGHLIN:** Saying --
16        **MS. TAUBER:** Off the record.  I can send you
17   what they have.
18        **MR. FORD:** Who did this document come from?
19        **MS. TAUBER:** The New York Stock Exchange.
20   I'm on it too, at the end.  Funny, I make a guest
21   appearance.
22   **A.   I haven't seen it before, and there's not**
23   **enough time for me to -- unless you want me to spend a**
24   **half-an-hour reading this.**

Page 192

1    Q.   That's okay.  Not that long, but I just want
2    to know if you knew about this document, which, I guess,
3    the answer's no.
4    **A.   No.**
5    Q.   But also, if you were aware of any of these
6    communications reflected in there that are complaining
7    about you?
8    **A.   I wouldn't know who this is for.**
9         **MR. FORD:** These are -- to be clear:  You've
10   seen the document.  I haven't.  But are these
11   complaints that --
12        **MS. TAUBER:** The stock exchange received --
13        **MR. FORD:** But from who, from customers
14   and --
15        **MS. TAUBER:** They were redacted; so I was
16   going to ask you about them.  But --
17        **MR. FORD:** So someone in the world complained
18   to the New York Stock Exchange about Mr. Gentile?
19        **MS. TAUBER:** I guess so.
20        **MR. FORD:** And we don't know who that person
21   is?
22        **MS. TAUBER:** Correct.  Well, there's my name
23   and there's Brian Saksa, the CFO of Avalon.
24        **THE WITNESS:** Can you say that again.

AVALON HOLDINGS CORPORATION v.
GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.

GUY GENTILE
February 24, 2020

Page 193

1        MR. FORD: The CFO of Avalon.
2        MS. TAUBER: Well, they called to -- I think
3    we sent you those documents too.  Like the --
4        MS. McLAUGHLIN: Yes.
5        MS. TAUBER: So that's related to that.
6        MR. FORD: Oh, that's the Bryan Saksa.  Do we
7    have his -- the complaint he filed with the New
8    York Stock Exchange?
9        MS. McLAUGHLIN: I don't think --  Assuming
10   we don't have these documents.
11       MS. TAUBER: Bryan Saksa is attached to one
12   of the emails or, again -- yeah.  There's
13   communication with him and NYSE.
14       MS. McLAUGHLIN: When did you get these
15   documents from the stock exchange?
16       MS. TAUBER: I got these -- maybe Thursday or
17   something.
18       MR. FORD: Okay.  So they were complaints
19   made to the New York Stock Exchange by Bryan
20   Saksa, an unknown individual.
21       MS. TAUBER: And me at the end.
22       MR. FORD: And you at the end.
23       We're on the record; yes?
24       MS. TAUBER: Yeah.

Page 194

1    BY MS. TAUBER:
2        Q.  So, I guess, you have no idea what this
3    document is or refers to?
4        A.  No.
5        Q.  But at least one of -- if you look at page --
6    the third page, whoever this person saying, I lost a
7    total of $15,000.
8        A.  Which one?
9        Q.  The third page.
10       A.  I lost a total of 15,000.
11       Q.  Yeah.  And then somebody else -- well this is
12   -- it looks like the same guy actually, just put it in
13   twice, the next page after that, same $15,000.  And
14   then --
15       A.  So how do you lose $15,000?
16       Q.  I don't know.  I was going to ask you what --
17   if you knew what he was talking about.
18       MR. FORD: He doesn't know who he is.  He has
19   no idea know what this document is.
20       Q.  I was going to ask you:  Are you aware of any
21   losses in connection with this trading that was raised
22   with you?  Like, in other words -- was --
23       MR. FORD: Did any customer of MintBroker
24   complain to you that they lost a total of $15,128?

Page 195

1        MS. TAUBER: Or any amount of money.
2        A.  Not to my recollection.
3        Q.  Okay.  Okay.  So were you -- are you aware of
4    -- were you aware of any other losses that were being
5    discussed at the time of these trades?
6        A.  Am I aware of any -- I don't have access
7    to --
8        Q.  Did customers, people -- colleagues of yours,
9    talk to you and say, Hey, they lost a ton of money on
10   this stock; do you know anything about this?
11       A.  I mean, I don't think anyone came to me and
12   said, Hey, I lost money on AWX.  I don't recall.
13       Q.  Okay.  Or GBR?
14       A.  I mean, I don't remember, specifically,
15   someone coming to me and saying that.  I mean,
16   obviously, people make money and people lose money all
17   the time in any security that's volatile or not
18   volatile; right?  It's moving up or down.  But this is
19   -- specifically, AWX is what this person's talking
20   about.
21       Q.  Right.
22       A.  I don't know who this person is, or how they
23   would have lost money.
24       Q.  Okay.

Page 196

1        MR. FORD: Or how it would have anything to
2    do with the short-swing case.
3        MS. TAUBER: It's about the trading that
4    we're talking about.
5        But okay.  All right.  I think that's -- that's
6    it, I think.  That's all I have.  I just wanted to
7    make sure I entered everything I wanted to enter.
8    I think I did.  Do you mind if we take a
9    five-minute break.
10       MR. FORD: Sure.
11       MS. TAUBER: I'll check, and then we'll end.
12
13       (Plaintiff's Exhibit 17,
14   EMAIL FROM DRAMEKO, was marked for
15   identification.)
16
17   BY MS. TAUBER:
18       Q.  So this is just a question about, like, if
19   you look at the bottom of this page.  Exhibit 17 is an
20   email between Drameko at SureTrader and --
21       A.  Who?
22       Q.  Drameko, sorry, and atenerelli@interactive,
23   and some other people, Guy Gentile, Proserve,
24   Professional Services.  So the bottom, it asks about the