UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

AVALON HOLDINGS CORPORATION,

                    *Plaintiff*,

                                          Case No.: 1:18-cv-7291-VSB-RWL

        – against –

GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.,

                    *Defendants*

------------------------------------------------------------------------x

### DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO AVALON HOLDINGS CORPORATION'S MOTION FOR SUMMARY JUDGMENT

FORD O'BRIEN LLP

Adam Ford
Robert S. Landy
Danielle M. McLaughlin
575 Fifth Avenue
17th Floor
New York, New York 10017
aford@fordobrien.com
rlandy@fordobrien.com
dmclaughlin@fordobrien.com
(212) 265-1047

*Attorneys for Defendants Guy Gentile
and Mintbroker International, Ltd.*

September 23, 2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii-iii

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND .......................................................................................... 4

LEGAL STANDARD ...................................................................................................... 9

ARGUMENT ................................................................................................................... 10

    I.    Liability Is A Contested Fact ............................................................................. 10

          a.    Plaintiff Did Not Establish Defendants Had Voting Power in Avalon Stock ......... 11

          b.    Disputes of Material Fact Exist as to Defendants' Trading Activity and Whether Defendants were Trading in Avalon "Securities" .................................................. 11

                  i.    Defendants' Alleged Trading Activity as a Proxy for "Beneficial Ownership" is a Factual Impossibility ................................................. 12

                  ii.    Plaintiff Has Not Established Which of Defendants' Trading Activity Settled ................................................................................................. 13

    II.    Plaintiff's Damages Calculations are Contested ............................................... 16

    III.    Section 16(b) Does Not Apply In These Circumstances .................................... 17

CONCLUSION ................................................................................................................ 18

# TABLE OF AUTHORITIES

*Am. Cas. Co. v. Nordic Leasing, Inc.*,
  42 F.3d 725 (2d Cir. 1994) .............................................................................................9, 17

*Blau v. Lamb*,
  363 F.3d 507 (2d. Cir. 1966) ...............................................................................................18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................................11

*Cruden v. Bank of New York*,
  957 F.2d 961 (2d Cir.1992) ...................................................................................................9

*Gallo v. Prudential Residential Servs. Ltd. P'ship*,
  22 F.3d 1219 (2d Cir. 1994) ..................................................................................................9

*In re Adler, Coleman Clearing Corp.*,
  247 B.R. 51 (Bankr. S.D.N.Y. 1999).................................................................................14

*JSC Foreign Econ. Ass'n v. Int'l Dev. & Trade Servs., Inc.*,
  386 F. Supp. 2d 461 (S.D.N.Y. 2005) ..................................................................................9

*Katz v. Adecco USA, Inc.*,
  845 F. Supp. 2d 539 (S.D.N.Y. 2012) ................................................................................16

*Morales v. Freund*,
  163 F.3d 763 (2d Cir. 1999) ................................................................................................10

*Morales v. New Valley Corp.*,
  999 F. Supp. 470 (S.D.N.Y. 1998) .....................................................................................10

*Olin Corp. v. Lamorak Ins. Co.*,
  332 F. Supp. 3d 818 (S.D.N.Y. 2018) ................................................................................10

*Portnoy v. Seligman & Latz. Inc.*,
  516 F. Supp. 1188 (S.D.N.Y. 1981) ...................................................................................18

*Taggart v. Time Inc.*,
  924 F.2d 43 (2d Cir.1991) .....................................................................................................9

*Thornton v. Syracuse Savings Bank*,
  961 F.2d 1042 (2d Cir.1992) ...............................................................................................11

*U.S. Bancorp Oliver-Allen Tech. Leasing v. Hall, Dickler, Kent, Goldstein & Wood, LLP*,
 No. 04 CIV. 4986, 2005 WL 1875459, at *3-6 (S.D.N.Y. Aug. 8, 2005)................................16

*V.S. Int'l, S.A. v. Boyden World Corp.*,
 No. 90 CIV. 4091, 1993 WL 59399 (S.D.N.Y. Mar. 4, 1993) ....................................................9

<u>Statutes:</u>

15 U.S.C. § 78a *et seq* ...........................................................................................................4

Fed. R. Civ. P. 56(a) .............................................................................................................9

Section 13(d), 17 CFR 240.13d-3(a) ...................................................................................10

17 C.F.R. § 240.15c6-1 .........................................................................................................14

17 C.F.R. § 242.200 *et. seq* ..................................................................................................14

15 U.S.C.A. § 78p.................................................................................................................18

Peter Romeo & Alan Dye, *Section 16 Deskbook* at 365-68 (Summer 2019)................17

15 U.S.C.A. § 78p.................................................................................................................17

Pursuant to Fed. R. Civ. P. 56 and the Local Rules of the United States District Court for

the Southern District of New York, Defendants Guy Gentile and Mintbroker International, Ltd.

("Mintbroker") by and through their undersigned attorneys, hereby submit their Opposition to

Plaintiff Avalon Holdings Corporation's ("Avalon") Motion for Summary Judgment (ECF Doc.

No. 75).

## INTRODUCTION

Given the strict liability nature of Section 16(b), Plaintiff suggests this case is open and

shut. In two virtually identical, boilerplate briefs in this and the related New Concept case, and

without regard to the considerable factual differences between the cases or the broader trading

activity occurring in the market during the relevant time, Plaintiff seeks summary judgment by

presenting liability as a *fait accompli*, and damages as an issue that can be handed off to a special

master to determine. This lackadaisical and entitled attitude, perhaps honed over counsels'

hundreds of 16(b) cases, is reflected in its moving papers, which also lack even the most basic

citations to material facts and whose supporting materials do not adhere to Local Rule 56.1.

This case involves trading activity over six days in July 2018 in which market

participants, including Defendants, sold and purchased, and purchased and sold, more than

fifteen times the number of Avalon shares purportedly outstanding and more than thirty times the

number of Avalon shares actually available to purchase at the time of the purchase and sale. The

sheer volume of this trading activity makes it clear that only naked short selling (i.e., someone

selling a security they did not have possession of) could have permitted the transactions to occur.

In addition, the statements of *Avalon's own executives* relating to the number of shares actually

available for purchase undermine Plaintiff's assertion that there is no dispute of material fact as

to Defendants' "beneficial ownership" in Avalon. Specifically, these executives stated

1

contemporaneously with the alleged short swing trading window that only half of Avalon's outstanding stock was available for purchase.  This flies in the face of Avalon's assertion in this case that for multiple trading days, Defendants "beneficially owned" more than half of Avalon's stock.

At its core, and as with the companion New Concept case, Plaintiff seeks to create new law in the arena of 16(b), which would allow for liability against investors who never entered a transaction that could ever result in their acquisition of the plaintiff-issuer's stock.  In fact, policy counsels against this expansion of the law given the stark differences between the facts here and the harms that Congress intended and designed 16(b) to prevent against.  Under Plaintiff's theory, in its simplest form, a market maker could short sell shares it did not have to an investor (which market makers are permitted to do), and were that investor to sell the "shares" back to the market maker at a profit before the trades failed because the market make was unable to cover, the investor could be held liable to the issuer as a "statutory insider," even though neither the seller, nor the buyer, ever possessed a single of the issuer-plaintiff's shares and never could have.  That is what occurred here.

Plaintiff here seeks a rule that once a trade is entered, the Court must disregard whether that trade could ever have resulted in the transfer of actual shares, and impose liability regardless.  Plaintiff seeks this new rule because without it, summary judgment would require it to make the impossible showing that Defendants' counterparties were not market makers selling short, and that had Defendants not promptly entered trades to sell back whatever it was that they bought, actual shares of the issuer plaintiff were available and would have been delivered (because the "shares" actually existed and were available to trade).  Not only would such a showing be impossible in the context of summary judgement, it is not possible to show at trial.

The sheer volumes in excess of the "float" and the "available float" at issue in this case foreclose any such showing.  As such, Plaintiff does not attempt to explain how (given the realities of modern trading and the volume at issue here) Defendants could have ever actually possessed all of the securities that Plaintiff alleges they purchased.  Nor does Plaintiff attempt to explain which trades cleared and which trades did not clear, even after introducing its own "failure to clear" evidence.

Finally, an objective review of the facts and circumstances of this case makes it impossible to conclude that Congress drafted Section 16(b) in 1934 in order to direct a windfall here to Plaintiff (and, frankly, its counsel).  Nowhere did Congress mandate (and no court has found) that a person trading in a certain "stock," possessing no insider information in that stock, and trading in book entries or "positions" in the that stock may be held liable under Section 16(b) as a beneficial owner where it was a factual impossibility for that person to ever actually possess any of the securities that Plaintiff alleges they purchased, disposed of, and profited from.  This trading activity is not the inside abuse that Congress intended Section 16(b) to guard against, and to apply its aged strictures to the modern reality of high-frequency, retail trading would distort the statute's original intent beyond all recognition.

If the Court determines that it will not grant Defendants' motion for summary judgment (ECF Doc. No. 71), Defendants argue in the alternative that this Court deny Plaintiff's motion for summary judgment in its entirety and that this case proceed to trial where Plaintiff must meet its burden to establish how Defendants could possibly beneficially own more shares than could be purchased on the market, and also that each and every "purchase" that allegedly bestowed "beneficial ownership" reflected shares that, had no matching sale been executed, would have been delivered.  If in so attempting, Plaintiff fails to show that the purchase transactions would

have ultimately resulted in the actual delivery of more than 10% of the plaintiff-issuer's outstanding shares, no liability can attach.  Put simply, to be considered the owner of 10% of a company, even for a moment, one must enter a transaction or series of transactions that actually confer such ownership.  While the record here shows trading, and profits and losses, it does not show that Defendants ever owned 10% of Plaintiff Avalon, not even for a moment.

## FACTUAL BACKGROUND

As with the companion New Concept case, the facts of this case are well known to this Court.  They concern certain day trading activity in Plaintiff's stock during the summer of 2018 conducted by Mr. Gentile in the Mintbroker proprietary trading account.  Defendants' Local Civil Rule 56.1 Statement in Support of their Memorandum of Law in Opposition to Avalon Holdings Corporation's Motion for Summary Judgment ("Opp. R-56.1") ¶¶ 15-19; 23-26.  Just weeks after Mintbroker filed the requisite U.S. Securities and Exchange Commission ("SEC") Form 3, Form 4, and Form 13D, and while it was enjoying the increased trading price of its securities after Defendants' alleged short swing trading, Opp. R-56.1 ¶¶ 17-18; 20-22, Plaintiff filed suit under Sections 16(a) and 16(b) of the 1934 Securities Exchange Act, as amended, 15 U.S.C. § 78a *et seq*.  In its complaint, it alleged Defendants had engaged in so-called "short swing" trading and demanded that Defendants disgorge any and all profits realized through their purchases and sales in Plaintiff's stock during the short swing trading period.  Amended Complaint, ECF Doc. No. 19.

The amount of outstanding Avalon stock (symbol: AWX) during the alleged short swing period was 3,263,585 shares.  Opp. R-56.1 ¶ 26.  The number of street-side securities actually available for trading by market participants, including Defendants, was 3,250,012 shares (the "Float).  Opp. R-56.1 ¶ 30.  Based upon Avalon's own analysis of its shareholders, as of July 24,

2018 there were only approximately "1.7 million shares" left to publicly trade when backing out the greater than 5% shareholders who had not traded their shares during the relevant period, identified as Ron Klingle, Anil Nalluri, Dimension Fund Advisors LP, and Comprehensive Financial Planning (the "Available Float"). The Available Float equates to 52% of Avalon's entire number of outstanding shares.  Opp. R-56.1 ¶ 31.

Defendants are not alleged to have ever possessed any inside information.  During the relevant period, Avalon executives did not have any knowledge of either Defendant as a greater than 5% (or 10% owner); in fact, Avalon specifically identified its greater than 5% owners in a complaint made to the New York Stock Exchange on July 24, 2018 and this list did not include Defendants.  Opp. R-56.1 ¶ 63.  During the relevant period, internal emails also established that "no members of management have bought or sold any shares of stock" and that "no current or potential investor" had contacted Avalon regarding the trading activity described herein.  Opp. R-56.1 ¶ 64.  In short, Plaintiff had no contact with Defendants, did not know of their existence and did not believe they owned more than 5% of company shares.

Trading by Mintbroker, the customers of its broker, Interactive Brokers, and all market participants during the relevant period are set out below.

Table A sets out the number of Avalon "shares" purportedly traded during the Alleged Short Swing Period by all market participants, and those trades as a percentage of the Float and the Available Float:

| Table A: Market Participants | | | |
|---|---|---|---|
| Date | All market trades (purchases and sales) | Trades as % of Float | **Trades as % of Available Float** |
| 7/24/18 | 2,486,200 | 76.49% | **146.25%** |
| 7/25/18 | 10,660,300 | 328% | **627.08%** |

| | | | |
|---|---|---|---|
| 7/26/18 | 10,306,900 | 317.13% | **606.29%** |
| 7/27/18 | 12,799,500 | 393.83% | **752.91%** |
| 7/30/18 | 5,707,000 | 175.60% | **335.94%** |
| 7/31/18 | 3,976,900 | 122.37% | **233.94%** |
| TOTAL | 45,936,800 | 1413.43% | **2,702.16%** |

Opp. R-56.1 ¶ 32.

Tables B and C set out the number of Avalon securities purportedly traded during the Alleged Short Swing Period by all Interactive Brokers' customers, and those trades as a percentage of the Float and the Available Float:

| Table B: Interactive Brokers' Customers/Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | IB purchases | % of Float | IB sales* | % of Float | All IB trades (purchases + sales) | Trades as % of Float |
| 7/24/18 | 763,945.00 | 23.51% | 763,945.00 | 23.51% | 1,527,890 | 47.01% |
| 7/25/18 | 1,083,950 | 33.35% | 1,083,950 | 33.35% | 2,167,900 | 66.71% |
| 7/26/18 | 1,082,250 | 33.3% | 1,082,250 | 33.3% | 2,164,500 | 66.6% |
| 7/27/18 | 886,938 | 27.29 | 886,938 | 27.29% | 1,773,876 | 54.6% |
| 7/30/18 | 884,610 | 27.22% | 884,610 | 27.22% | 1,769,220 | 54.4% |
| 7/31/18 | 990,140 | 30.47% | 990,140 | 30.47% | 1,980,280 | 60.9% |
| TOTAL | 5,691,833 | 175.14% | 5,691,833 | 175.14% | 11,383,666 | 350.3% |

| Table C: Interactive Brokers' Customers/Available Float |
|---|

| Date | IB purchases | **% of Available Float** | IB sales | **% of Available Float** | All IB trades (purchases + sales) | **Trades as % of Available Float** |
|---|---|---|---|---|---|---|
| 7/24/18 | 763,945.00 | **44.94%** | 763,945.00 | **44.94%** | 1,527,890 | **89.88%** |
| 7/25/18 | 1,083,950 | **63.76** | 1,083,950 | **63.76** | 2,167,900 | **127.53%** |
| 7/26/18 | 1,082,250 | **63.66%** | 1,082,250 | **63.66%** | 2,164,500 | **127.32%** |
| 7/27/18 | 886,938 | **52.17%** | 886,938 | **52.17%** | 1,773,876 | **104.35%** |
| 7/30/18 | 884,610 | **52.04%** | 884,610 | **52.04%** | 1,769,220 | **104.07%** |
| 7/31/18 | 990,140 | **58.24%** | 990,140 | **58.24%** | 1,980,280 | **116.49%** |
| TOTAL | 5,691,833 | **334.81%** | 691,833 | **334.81%** | 11,383,666 | **669.63%** |

Opp. R-56.1 ¶ 33.

Tables D and E set out the number of Avalon securities purportedly traded during the Alleged Short Swing Period by Mintbroker, and those trades as a percentage of the Float and the Available Float:[1]

| Table D: Mintbroker/Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | Mintbroker purchases | % of Float | Mintbroker sales* | % of Float | Mintbroker total trades | Trades as % of Float |
| 7/24/18 | 624,073 | 19.2% | 99,086 | 3.05% | 723,159 | 22.25% |
| 7/25/18 | 703,602 | 21.65% | 118,277 | 3.64% | 821,879 | 25.29% |
| 7/26/18 | 690,184 | 21.24% | 215,677 | 6.64% | 905,861 | 27.87% |
| 7/27/18 | 327,406 | 10.07% | 192,340 | 5.92% | 519,746 | 15.99% |
| 7/30/18 | 0 | 0% | 719,885 | 22.15% | 719,855 | 22.15% |
| 7/3118 | 0 | 0% | 799,720 | 24.61% | 799,720 | 24.61% |

---

[1] There is no dispute of material issue of fact as to the "purchase" and "sales" figures set forth in Plaintiff's motion for summary judgment (although there is dispute as to their application to "beneficial ownership"); but there is a material dispute of fact as to the number of outstanding shares in AWX at the relevant time, and therefore the percentage value of Defendants' position in AWX during the relevant period.  See Opp. R-56.1 ¶ 35.

| | | | | | | |
|---|---|---|---|---|---|---|
| TOTAL | 2,345,265 | 77.16 | 2,144,985 | 66.00 | 4,490,250 | 138.16% |

*including "short sales"

| Table E: Mintbroker/Available Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | Mintbroker purchases | % of Available Float | Mintbroker sales* | % of Available Float | Mintbroker total trades | Trades as % of Available Float |
| 7/24/18 | 624,073 | **36.71%** | 99,086 | **5.83%** | 723,159 | **42.54%** |
| 7/25/18 | 703,602 | **41.39%** | 118,277 | **6.95%** | 821,879 | **48.34%** |
| 7/26/18 | 690,184 | **40.60%** | 215,677 | **12.69%** | 905,861 | **53.29%** |
| 7/27/18 | 327,406 | **19.26%** | 192,340 | **11.31%** | 519,746 | **30.57%** |
| 7/30/18 | 0 | **0%** | 719,885 | **42.35%** | 719,855 | **42.35%** |
| 7/3118 | 0 | **0%** | 799,720 | **47.04%** | 799,720 | **47.04%** |
| TOTAL | 2,345,265 | **137.96** | 2,144,985 | **126.18%** | 4,490,250 | **264.13%** |

*including "short sales"

Opp. R-56.1 ¶ 34.

The trading by Mintbroker during the relevant period was high-speed day trading, with the average time between trades in the milliseconds. Plaintiff's Exhibit J at 20-21. Mintbroker did not know in real time which of its "purchases" involved a side that was short selling. Plaintiff's Exhibit J at 37. Plaintiff did not establish in discovery (and no evidence suggests) that Defendants had any voting rights in Avalon stock during the relevant period. Opp. R-56.1 ¶¶ 57-62. None of the net "purchase" or sale" data produced by Interactive Brokers in its trade blotter and set forth in Table D and E accounts for the T+2 or T+3 settlement periods for long and short sales. Opp. R-56.1 ¶ 25. Based upon the trade blotter produced by Interactive Brokers, Defendants' maximum position was an impossible 57.5 % of the Avalon outstanding stock on July 27, 2018 at 1:56 p.m. *Id.*

## LEGAL STANDARD

In determining whether to grant summary judgment, "all inferences drawn from the materials submitted to the trial court are viewed in a light most favorable to the party opposing the motion.  The nonmovant's allegations are taken as true and it receives the benefit of the doubt when its assertions conflict with those of the movant."  *V.S. Int'l, S.A. v. Boyden World Corp.*, No. 90 CIV. 4091 (PKL), 1993 WL 59399, at *2 (S.D.N.Y. Mar. 4, 1993) *citing Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992).  It is "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."  *Id.; accord Taggart v. Time Inc.,* 924 F.2d 43, 46 (2d Cir.1991).

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  In its issue-finding role, the district court must assess the evidence in "the light most favorable to the non-moving party," and resolve all ambiguities and "draw all reasonable inferences" in the non-moving party's favor.  *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994) (citations omitted).  Thus, once the non-moving party points to conflicting, non-conclusory evidence concerning "any material fact," Fed. R. Civ. P. 56(a), summary judgment cannot be granted.  *See, e.g.*, *JSC Foreign Econ. Ass'n v. Int'l Dev. & Trade Servs.*, Inc., 386 F. Supp. 2d 461, 463 (S.D.N.Y. 2005) ("Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.") (emphasis added).

Whether a defendant is a "beneficial owner" and therefore liable under Rule 16(b) is an issue of material fact. *Morales v. New Valley Corp.*, 999 F. Supp. 470, 472 (S.D.N.Y. 1998), *aff'd sub nom. Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999). Even where liability has been established, a "material fact" may include the amount of damages at issue in the litigation. *Olin Corp. v. Lamorak Ins. Co.,* 332 F. Supp. 3d 818, 858 (S.D.N.Y. 2018), *reconsideration denied,* No. 84-CV-1968 (JSR), 2018 WL 4360775 (S.D.N.Y. Aug. 17, 2018).

## ARGUMENT

### I.      Liability Is A Contested Fact

A beneficial owner of securities is defined as "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

(1) Voting power which includes the power to vote, or to direct the voting of, *such security*; and/or,

(2) Investment power which includes the power to dispose, or to direct the disposition of, *such security*. Section 13(d), 17 CFR 240.13d-3(a) (Emphasis added).

Once status as a greater-than-ten percent beneficial owner of actual shares is established, "the reporting and short-swing profit provisions of section 16 apply only to those securities in which the insider has a pecuniary interest." *Id.* Pecuniary interest is defined as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the *subject securities*." 17 C.F.R. § 240.16a–1(a)(2)(i) (emphasis added). All of these factors share a common requirement: that there be an actual security of the issuer over which the investor obtains the required dominion. Because there are genuine issues of material fact as to Defendants' voting power, ability to dispose of *actual* AWX securities, and pecuniary interest in profits from trading in *actual* AWX securities, all of which are "essential element[s]" of its case

which Plaintiff bears the burden of establishing at trial, *Thornton v. Syracuse Savings Bank*, 961

F.2d 1042, 1046 (2d Cir.1992) (*quoting Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)),

summary judgment cannot be granted in Plaintiff's favor.

### a.   Plaintiff Did Not Establish Defendants Had Voting Power in Avalon Stock

Beneficial ownership can be established by voting power, Section 13(d), 17 CFR

240.13d-3(a).  However, Plaintiff did not establish at summary judgment (and Defendants deny)

that Defendants had voting rights in Avalon stock.  Interactive Brokers' 30b(6) deponent Brad

Klauseger testified that "generally speaking," a customer "may" have voting power in securities

in which they have a long position, but could not say that Defendants definitively did.  Opp. R-

56.1 ¶ 59.  No document or testimony established that the contract between Interactive Brokers

and Mintbroker gave Mintbroker the right to provide voting instructions to Interactive Brokers,

or that such instructions were ever given.  *Id.* at ¶ 62.  Moreover, and crucially here, Mr.

Klauseger did not know if a customer could vote shares after an order had been placed but before

the shares were placed into the customer's account*. Id.* at ¶ 61.  Knowing it was its burden to

establish that Gentile had voting power over these "shares," Plaintiff had an opportunity to take

additional discovery to prove this material fact.  But Plaintiff declined to seek additional

discovery on this question.  As it stands, there is no evidence in the record that Defendants had

voting power, nor could such evidence be introduced at trial.  Because Plaintiff did not establish

that Defendants had voting power, it can only establish beneficial ownership on summary

judgment by showing no issue of material fact as to whether Defendants had the power to

dispose of actual Avalon "securities."  As set out below, this it cannot do.

**b. Disputes of Material Fact Exist as to Defendants' Trading Activity and Whether Defendants were Trading in Avalon "Securities"**

i.   Defendants' Alleged Trading Activity as a Proxy for "Beneficial Ownership" is a Factual Impossibility.

Unlike in the companion New Concept case, there is general agreement as to the net end of day "positions" that Defendants held in Avalon securities.  Opp. R-56.1 ¶ 35.  There is not agreement, however, as to the number of Avalon outstanding shares during the relevant period. This is a material fact because without an uncontroverted determination as to the number of outstanding AWX shares, determining Defendants' position in AWX is impossible.  *Id.*

According to Plaintiff, there is no dispute of material fact as to their assertion that Defendants "beneficially owned" each and every Avalon share as set out in the trades in its Exhibit H, which is based on the Interactive Brokers Trading Statements.  Plaintiff's Memorandum of Law in Support of Summary Judgment (ECF Doc. No. 76) ("Pl. Br"). at 9-11. Plaintiff also asserts there is no issue of material fact as to whether Defendants owned 53% of Avalon stock at the end of the trading day on July 27, 2018.  Plaintiff's Rule 56.1 Statement (ECF Doc. No. 77) ¶ 9.  There is more than a dispute of material fact as to these assertions.  They cannot possibly be true.

On July 27, 2018, (and throughout the alleged short swing window), according to Avalon executives, the number of actual Avalon shares a market participant could feasibly possess was 1.7 million shares (the "Available Float") because certain insiders did not sell their shares during the short swing period.  Opp. R-56.1 ¶ 31.  The Available Float represents 52% of Avalon's outstanding shares.  *Id.*  Despite this, Plaintiff suggests that there is no genuine dispute of material fact as to their assertion that at the end of the day on July 27, Defendants "beneficially owned" 1,719,885 Avalon shares – more than the number of shares that Avalon executives

themselves admit existed to purchase.  In addition to being a factual impossibility with respect to

Mintbroker's own trading, this "material fact," around which Plaintiff alleges there is no genuine

dispute, is impossible to square with the undisputed material fact that the volume of AWX traded

on the entire market on 7/27 was 12,799,500 shares (Table A, *infra*).  Not only did Defendants

not actually own—nor could they ever own—actual shares unpinning their positions, neither did

over 90% of market participants.  The positions in traders' accounts are simply divorced from the

reality of actual shares in existence.

Plaintiff's own Exhibit H sets forth that Mintbroker "beneficially owned" (under

Plaintiff's interpretation of these facts) greater than 48% of Avalon stock for three trading days

during the short swing period -- from July 26 at 10:15:10 a.m. until July 30 at 12:49:38 p.m.  *See*

Plaintiff's Exhibit H at pp. 21-30.  If Plaintiff's theory of beneficial ownership is correct and

there is no material dispute here, there could be *no other trading* in Avalon stock during that

period, because Plaintiff "beneficially owned" all of the Available Float (and, impossibly, more

shares than were available to purchase).  Plaintiff seeks a finding on summary judgment that the

only person in the world who beneficially owned Avalon stock during these days were

Defendants.  The facts show otherwise.  The undisputed trading volume for all market

participants in AWX stock on July 26 was 10,306,500, on July 27 was 12,799,500, and on July

30 was 5,707,000.  *See* Table A, *infra*.  This renders Plaintiff's theory of beneficial ownership

untenable and presents an issue of material fact as to liability meaning summary judgment cannot

be granted in Plaintiff's favor.

ii.    <u>Plaintiff Has Not Established Which of Defendants' Trading Activity Settled</u>

While the Interactive Brokers trading records show book entries for a greater than 10%

position in Avalon stock on July 24, 2018, and additional book entries exiting a greater than 10%

position in Avalon stock on July 31, 2019, Opp. R-56.1 ¶ 23, these entries do not reflect the possession of actual shares, and nor can they – first and foremost because they do not account for the T+2 settlement period for long sales pursuant to 17 C.F.R. § 240.15c6-1 or the T+3 settlement period for short sales pursuant to 17 C.F.R. § 242.200 *et. seq.* The Interactive Brokers activity statements reflect this reality, with lines for "cash" and "settled cash." Opp. R-56.1 ¶¶ 45-47.

As set out in more detail in Defendants' Memorandum of Law in Support of Summary Judgment, the trade date of a security reflects a "pending transaction" made on that date, whereas the settlement date of a security is the date that reflects the "actual balance posted to [a] customer account as of [the] settlement date," and is the date upon which "the cash proceeds from the sale of a security are available" to an investor. *See In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 84 (Bankr. S.D.N.Y. 1999), *aff'd* 263 B.R. 406 (S.D.N.Y. 2001). *See also* R 56.1 at ¶¶ 46-48 (Interactive Brokers' annual and activity statements feature line items for "starting cash," "ending cash," and "ending settled cash").

Plaintiff argues that "Defendants, throughout discovery have been unable to identify a single trade that failed to clear." Pl. Br. at 12. However, trade settlement data produced in this litigation by the Depository Trust Company ("DTC"), which oversees the "book entry" system of accounting for share transfers for all DTC-eligible securities in the United States (including Plaintiff's) proves that *none* of the open positions in AWX of any Interactive Brokers customer, *including Defendants*, settled until two days after they were opened. Opp. R-56.1 ¶¶ 36-41. Mintbroker's 7/24 AWX trades did not settle until 7/26; Mintbroker's 7/25 AWX trades did not settle until 7/27; Mintbroker's 7/26 AWX trades did not settle until 7/30; Mintbroker's 7/27

AWX trades did not settle until 7/31; Mintbroker's 7/30 AWX trades did not settle until 8/1; and Mintbroker's 7/31 AWX trades did not settle until 8/2. *Id.*

Finally, after first arguing that whether a trade settled or not is not relevant for purposes of 16(b) liability, Pl. Br. at 15, Plaintiff attaches to its motion for summary judgment an article by an Italian Ph.D. student (Plaintiff's Exhibit J), apparently seeking to establish that all but some modicum of Defendants' AWX trades cleared. *See* Plaintiff's Exhibit J at Table 10. The calculation in Table 10 is based on publicly available SEC "fail to deliver" data. *Id.* However, this SEC "fail to deliver" data identifies only the settlement date, security, quantity, and price of a failed trade. It does not state whether it is a purchase or sale, or the time of the transaction, and it does not identify the trade date, or the purported purchaser, seller, or broker. Opp. R-56.1 ¶ 65. The vagaries and limitations of this data are perhaps best described by the SEC itself: "The values of total fails-to-deliver shares represent the *aggregate net balance* of shares that failed to be delivered as of a particular settlement date . . . . Fails to deliver on a given day are a cumulative number of all fails outstanding until that day, plus new fails that occur that day, less fails that settle that day. The figure *is not a daily amount of fails*, but a combined figure that includes both new fails on the reporting day as well as existing fails. In other words, these numbers reflect aggregate fails as of a specific point in time, and may have little or no relationship to yesterday's aggregate fails. Thus, it is important to note that the age of fails cannot be determined by looking at these numbers. In addition, the underlying source(s) of the fails-to-deliver shares is not necessarily the same as the underlying source(s) of the fails-to-deliver shares reported the day prior or the day after." Opp. R-56.1 ¶ 66 (emphasis added). In short, Plaintiff has not established which of Defendants' trades cleared such that they had the power to dispose of or profit from actual Avalon securities, *see* Section 13(d), 17 CFR 240.13d-

3(a), and their "failure to clear" data is too vague to establish any specific Mintbroker trades that did not clear, leaving an issue of material fact that must be resolved at trial, if Defendants' motion to dismiss is not granted. Finally, failures to deliver, by their nature, exclude the types of round-trip transactions that occurred frequently here, where a market maker sells short (and naked) but rather than trying (and failing) to cover, it purchases the "shares" back from the same investor it sold short to, thus cancelling the liability to deliver.

## II.    Plaintiff's Damages Calculations are Contested

Plaintiff glibly asserts that Defendants may not raise a conflict over the amount of damages at issue to defeat summary judgment, arguing it "would be child's play to raise an objection to any one of those [lowest-in, highest out] matches, making damages an unsuitable subject for determination under the Rule 56 decisional standard." Pl. Br. at 4. First and foremost, the existence and extent of damages are material facts that a moving party must demonstrate no issue as to in order to obtain summary judgment. *See Katz v. Adecco USA, Inc.*, 845 F. Supp. 2d 539, 546 (S.D.N.Y. 2012) (denying summary judgment because of genuine issue of material fact as to whether Plaintiff suffered damages at all); *U.S. Bancorp Oliver-Allen Tech. Leasing v. Hall, Dickler, Kent, Goldstein & Wood, LLP*, No. 04 CIV. 4986, 2005 WL 1875459, at *3-6 (S.D.N.Y. Aug. 8, 2005) (summary judgment denied because genuine issues of material fact existed as to the amount of damages at issue in the case).

Moreover, and as set forth above, there are genuine (and considerable) disputes of material fact as to whether Defendants "beneficially owned" the shares set forth in Plaintiff's Exhibit H, particularly as to the "impossible" ownership position of greater than of 48% of Avalon stock, but equally as to which of Defendants' trades involved Avalon "securities" and actually settled. All of these disputes of material fact correlate directly to the existence, and

extent, of damages. All of these elements are Plaintiff's burden to establish at trial, making summary judgment here improper.

### III.    Section 16(b) Does Not Apply In These Circumstances

Defendants never took possession of any of Plaintiff's shares during the alleged short swing period because the "trades" at issue here were done rapidly and on an exchange where "trades" are not completed by the exchange of actual shares, but rather by "book entries" that are tied to the published share value.  This is the reality of securities trading today: online high frequency trading is responsible for 50-60% of all trading activity, R-56.1 Opp. ¶ 55; a far cry from the in-person trading, ticker tape, and paper trading slips necessary when the 1934 Act became law, and when Rule 16(b) was promulgated.

These book entries (certain of which as set out above are literally impossible to square with Defendants' allegations of "beneficial ownership") did not grant voting or dividend rights, and, due to the speed at which the book entry positions were unwound, they never bestowed upon plaintiff any of the rights of a shareholder.  And while the motion before this Court must be determined on the existence of material issues of fact, the district court must also resolve all ambiguities and "draw all reasonable inferences" in the non-moving party's favor.  *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994) (citations omitted).

Defendants suggest that the Court's consideration of these "reasonable inferences" should include whether Section 16(b) applies here at all.  Even the leading treatise on Section 16(b) explains that Section 16(b) is both over- and under-inclusive, imposing liability under circumstances that do not further its policy objectives (including trading on the basis of incorrect legal advice and mistakes as to the calculation of the six month period), while not imposing liability under circumstances that do (no application to tippers or tippees, or actual insider

17

trading that occurred just outside the six month window). *See* Peter Romeo & Alan Dye, *Section 16 Deskbook* at 365-68 (Summer 2019). Moreover, Section 10(b) and Rule 10b-5 now constitute strong weapons against insider trading.

Defendants therefore request that the Court consider the extent to which the statutory intent counsels against expanding Section 16(b) into this type of trading, if it is "uncomfortable with the rule's rigid terms and with its underlying assumptions." *Portnoy v. Seligman & Latz. Inc.*, 516 F. Supp. 1188, 1192 (S.D.N.Y. 1981).

The Second Circuit held in *Blau v. Lamb* that "in order to avoid 'purposeless harshness', before finding a 16(b) violation a court should first inquire considering all relevant facts whether a given transaction could possibly tend to accomplish the practices Section 16(b) was designed to prevent." 363 F.3d 507, 515 (2d. Cir. 1966). *The Portnoy* court also noted that courts now look "as a matter of course" to the preamble to section 16(b) to "resolve ambiguities." 516 F. Supp. at 1192. The preamble, of course, focuses entirely on abuse of actual insider information, which is not alleged here: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer . . . ." 15 U.S.C.A. § 78p.

## CONCLUSION

Plaintiff here is seeking to use Rule 16(b) in a manner that is entirely inconsistent with Congressional intent, and most significantly, in a manner that that has no net positive societal value. Plaintiff and their counsel should not be granted a windfall here. For all the reasons set forth herein, Defendants respectfully requests that this honorable court deny Plaintiff's motion for summary judgment.

FORD O'BRIEN LLP


  /s/Danielle M. McLaughlin
Adam Ford
Robert Landy
Danielle McLaughlin
575 5th Avenue, 17th Floor
New York, NY 10017
aford@fordobrien.com
rlandy@fordobrien.com
dmclaughlin@fordobrien.com
*Attorneys for Defendants Guy Gentile and
Mintbroker International, Ltd.*

Dated: New York, New York
        September 23, 2020