UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

AVALON HOLDINGS CORPORATION,

                                   *Plaintiff*,

                   – against –

GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.,

                                   *Defendants*

Case No.: 1:18-cv-7291-VSB-RWL

------------------------------------------------------------------------x

**DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT IN SUPPORT OF
THEIR MEMORANDUM OF LAW IN OPPOSITION TO
AVALON HOLDINGS CORPORATION'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**

Defendants Guy Gentile and Mintbroker International, Ltd. hereby submit this Local Civil Rule 56.1 Statement in Support of their Memorandum of Law in Opposition to Plaintiff Avalon Holdings Corporation's Motion for Summary Judgment to set forth the material facts to which it contends there is a genuine issue to be tried.

1. Undisputed.

2. Disputed. According to Avalon Holdings Corporation's ("Avalon") transfer agent, the number of Avalon shares outstanding during the alleged short swing window was 3,263,585. Declaration of Danielle McLaughlin in Support of Defendants' Motion for Summary Judgment (ECF Doc. No. 74) Exhibit 8, p. 8.

3. Undisputed.

4. Undisputed.

5. Undisputed.

1

6. Undisputed.

7. Disputed. "Beneficial ownership" is a legal conclusion based upon a disputed factual analysis regarding whether "shares" existed to support the trading activity listed. As set forth in Defendants' Rule 56.1(a) Statement (ECF Doc No. 73 at ¶¶ 18-52, 67-72), there is no clear evidence that the trades at issue reflected actual shares that could have been purchased or sold. Statement 7 here wrongly presumes the existence and availability of such shares. Additionally, this paragraph does not comply with Local Civil Rule 56.1(d).

8. Disputed. "Beneficial authority" and "beneficial ownership" are legal conclusions based upon a disputed factual analysis regarding whether "shares" existed to support the trading activity. As set forth in Defendants' Rule 56.1(a) Statement (ECF Doc No. 73 at ¶¶ 18-52, 67-72), there is no clear evidence that the trades at issue reflected actual shares that could have been purchased or sold. Statement 8 here wrongly presumes the existence and availability of such shares. Additionally, this paragraph does not comply with Local Civil Rule 56.1(d).

9.

| Date | 7/24 | 7/25 | 7/26 | 7/27 | 7/30 | 7/31 | 8/1 |
|---|---|---|---|---|---|---|---|
| MintBroker Buys (Ex. H) | 624,073 | 703,602 | 690,184 | 327,406 | | | |
| | | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | | | |
| MintBroker Sells (Ex. H) | 99,086 | 118,277 | 215,677 | 192,340 | 719,885 | 799,720 | 200,280 |
| | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not relevant or material as outside short swing window* |
| MB position (end of day) | 524,987 (16.45%) | 1,110,312 (34.79%) | 1,584,819 (49.66%) | 1,719,885 (53.9%) | 1,000,000 (31.34%) | 200,280 (20.03%) | 0 |

2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| (% of AWX) | | | | | | | |
| | *Disputed* *Percentage of AWX disputed* | *Disputed* *Percentage of AWX disputed* | *Disputed* *Percentage of AWX disputed* | *Disputed* *Percentage of AWX disputed* | *Disputed* *Percentage of AWX disputed* | *Disputed* *Percentage of AWX disputed* | *Not relevant or material as outside short swing window* |
| AWX Trading Vol. (Ex. I) | 2,486,200 | 10,660,300 | 10,306,900 | 12,799,500 | 5,707,000 | 3,976,900 | *2,863,200* |
| | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not relevant or material as outside short swing window* |
| Fails to Deliver (Ex. J) | | | 119,078 | 298,858 | 95,656 | 187,010 | *300,949* |
| | | | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not relevant or material as outside short swing window* |

Disputed as to the term "beneficial ownership" as set out in statement 8, *infra*. Disputed as set out in red font the table above, in footnotes 1 and 2, and in Paragraphs 25, 26, and 31-35 *supra*. Moreover, other than the trades that resulted in failures to deliver, as set forth in in Plaintiff's Exhibit J, there is no clear evidence that the trades at issue reflected actual shares that could have been purchased or sold. Statement 9 here wrongly presumes the existence and availability of such shares.

10. Disputed. "Pecuniary interest" is a legal conclusion based upon a disputed factual analysis regarding whether "shares" existed to support the trading activity listed. As set forth in Defendants' Rule 56.1(a) Statement (ECF Doc No. 73 at ¶¶ 18-52, 67-72), there is no clear evidence that the trades at issue reflected actual shares that could have been purchased or sold. Statement 10 here wrongly presumes the existence and availability of such shares. Additionally, this paragraph does not comply with Local Civil Rule 56.1(d).

11. Undisputed.

12. Disputed.  The existence of "joint and several liability" is a legal conclusion not suitable for inclusion in a Local Civil Rule 56.1 Statement of Facts.  Moreover, the unknown substantive arguments contained in certain unknown "further submissions by the parties" are not undisputed material facts and are therefore not suitable for inclusion in a Local Civil Rule 56.1 Statement of Facts.  Finally, this paragraph does not comply with Local Civil Rule 56.1(d).

13. Disputed.  The computation utilized to calculate short swing profits is a legal conclusion not suitable for inclusion in a Rule 56.1 Statement of Facts.  Additionally, this paragraph does not comply with Local Civil Rule 56.1(d).

14. Disputed.  What Plaintiff seeks by its motion (a referral of the issues of damages to a special master) is not an undisputed material fact suitable for inclusion in a Rule 56.1 Statement of Facts.  Additionally, this calculation of damages is disputed because Defendants dispute Plaintiff's assertions related to trading and settlement activity, *see* Paragraphs 35-56 *supra*.

**ADDITIONAL MATERIAL FACTS**

15. On June 15, 2018, Mintbroker, through Interactive Brokers, opened a position on Avalon securities with the purchase of 200 shares.  Defendant's Local Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, ECF Doc. No. 73 ("R-56.1") ¶ 3; Declaration of Danielle M. McLaughlin in Support of Defendants' Motion for Summary Judgment, ECF Doc. No. 74 ("McLaughlin Decl."), Exhibit 3.

16. On August 2, 2018, Mintbroker netted its position in Avalon securities to zero with the purchase of 1,000 Avalon securities.  R-56.1 ¶ 4; McLaughlin Decl. Exhibit 4.

17. For approximately the last five months of 2018, after July 31, 2018, Avalon's closing share price ranged from approximately $2.65 to $4.80. R-56.1 at ¶ 5; McLaughlin Decl. Exhibit 2.

18. The highest closing share price of $4.80 in the second half of 2018 represents a 100% increase over the highest closing share price of $2.40 in the first half of 2018, and the lowest closing share price of $2.65 in the second half of 2018 represents a 32.5% increase over the lowest closing price of $2.00 in the first half of 2018. R-56.1 ¶ 6; McLaughlin Decl. Exhibit 2 and ¶ 4.

19. Between its opening and closing positions, Mintbroker undertook some 18,460 trades in purported Avalon securities. R-56.1 ¶ 7; McLaughlin Decl. ¶ 6.

20. On July 7, 2018, Mintbroker filed a SEC Form 3 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating that it had taken a position in 1,922,095 shares of Avalon. R-56.1 ¶ 8; McLaughlin Declaration ("McLaughlin Decl.") Exhibit 5.

21. On August 1, 2018, Mintbroker filed a SEC Form 4 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating it had decreased its position in Avalon securities by 202,642 shares. R-56.1 ¶ 9; McLaughlin Decl. Exhibit 6.

22. On August 22, 2018, Mintbroker filed a SEC Form13-D pursuant to Section 16(a) of the Securities Exchange Act of 1934, to which it attached all of its trading records reflecting positions in Avalon stock effected during the prior sixty days by Mintbroker. Gentile, by virtue of his relationship to MintBroker, noted in this form that he "may be deemed to indirectly beneficially own (as that term is defined in Rule 13d-3 under the Exchange Act of 1934, as amended) those Shares which MintBroker had owned" and that he

"disclaim[ed] beneficial ownership of all such Shares for all other purposes." R-56.1 ¶ 10; McLaughlin Decl. Exhibit 7.

23. The periods during which Defendants purported to hold a greater than 10% of the outstanding common stock of Avalon based on the Interactive Brokers' trade blotter (which does not account for T+2 settlement) are July 24, 2018 for eleven seconds between 2:46:41 p.m. and 2:46:52 p.m. and July 24, 2018 for less than four minutes between 2:54:21 p.m. and 2:58:08 p.m.  At 3:06 p.m. on July 24, 2018, Mintbroker entered a greater than 10% position in AWX, which it exited on July 31, 2018 at 12:02 p.m. (the "Alleged Short Swing Period").  R-56.1 ¶ 11; McLaughlin Decl. ¶ 11.

24. Defendants made 15,511 trades during the Alleged Short Swing Period.  R-56.1 ¶ 12; McLaughlin Decl. ¶ 12.

25. Based upon the trade blotter produced by Interactive Brokers (which does not account for T+2 settlement), Defendants' maximum position was 57.5 % of the Avalon outstanding stock on July 27, 2018 at 1:56 p.m.  R-56.1 ¶ 13; McLaughlin Decl. ¶ 13.

26. The number of Avalon shares outstanding during the Short Swing Window was 3,263,585.  R-56.1 ¶ 14; McLaughlin Decl. Exhibit 8, ¶ 15.

27. A company's share register sets forth the legal owners of that company's stock.  R-56.1 ¶ 15; McLaughlin Decl. Exhibit 9, at 12-5. These "registered owners" or "record owners" (the "record date" is the date upon which they legally own the shares) generally possess share certificates that "represent their ownership in the company." *Id.*  The vast majority of publicly traded shares in the United States are registered in the name of Cede & Co., the nominee of The Depository Trust Company ("DTC"). *Id.* at 12-3. DTC is the largest "legal" owner of most public companies' stock. *Id.* at 12-5.  "Shares registered in this

manner are commonly referred to as being held in "street name*.*"  *Id.*  "The street name registration system was created to facilitate securities trading, eliminate paperwork and preserve the confidentiality of beneficial owners' identities." *Id.*  "Beneficial owners are divested of the rights incident to legal ownership when they hold their shares in street name." *Id.*

28. Transactions involving street name shares are conducted using DTC's electronic "book-entry" system of accounting for share transfers.  R-56.1 ¶ 16; McLaughlin Decl. Exhibit 9 at 12-6.  Whcn one participant's client sells shares in a particular company, that participant's DTC account is debited and the purchasing participant's account is credited by the same amount. *Id.* DTC's "book-entry" system negates the need to keep a large inventory of physical stock certificates. The shares of each company held by DTC are typically represented by only one or more immobilized jumbo stock certificates held in DTC's vault. *Id.*

29. Avalon shares are DTC eligible securities, as evidenced by the DTC settlement data produced in this litigation.  R-56.1 ¶ 17; McLaughlin Decl. Exhibit. 10.

30. The number of Avalon shares possessed by "Cede & Co" during the Short Swing Window is 3,250,012 (the "Float").  R-56.1 ¶ 18; McLaughlin Decl. Exhibit 8, ¶ 16.

31. Based upon Avalon's own analysis of its shareholders, as of July 24, 2018 there were only approximately "1.7 million shares" left to publicly trade when backing out the greater than 5% shareholders who had not traded their shares during the relevant period, identified as Ron Klingle, Anil Nalluri, Dimension Fund Advisors LP, and Comprehensive Financial Planning (the "Available Float"). The Available Float equates

to 52% of Avalon's outstanding shares. R-56.1 ¶ 19; McLaughlin Decl. Exhibit 27 at NYSE000076, McLaughlin Decl. Exhibit 28, and McLaughlin Decl. ¶ 54.

32. Table A sets out the number of Avalon "shares" purportedly traded during the Alleged Short Swing period by all market participants, and those trades as a percentage of the Float and the Available Float:

| Table A: Market Participants | | | |
|---|---|---|---|
| Date | All market trades (purchases and sales) | Trades as % of Float | **Trades as % of Available Float** |
| 7/24/18 | 2,486,200 | 76.49% | **146.25%** |
| 7/25/18 | 10,660,300 | 328% | **627.08%** |
| 7/26/18 | 10,306,900 | 317.13% | **606.29%** |
| 7/27/18 | 12,799,500 | 393.83% | **752.91%** |
| 7/30/18 | 5,707,000 | 175.60% | **335.94%** |
| 7/31/18 | 3,976,900 | 122.37% | **233.94%** |
| TOTAL | 45,936,800 | 1413.43% | **2,702.16%** |

McLaughlin Decl. Exhibit 11.

33. Tables B and C set out the number of Avalon securities purportedly traded during the Alleged Short Swing Period by all Interactive Brokers' customers, and those trades as a percentage of the Float and the Available Float:

| Table B: Interactive Brokers' Customers/Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | IB purchases | % of Float | IB sales* | % of Float | All IB trades (purchases + sales) | Trades as % of Float |
| 7/24/18 | 763,945.00 | 23.51% | 763,945.00 | 23.51% | 1,527,890 | 47.01% |
| 7/25/18 | 1,083,950 | 33.35% | 1,083,950 | 33.35% | 2,167,900 | 66.71% |
| 7/26/18 | 1,082,250 | 33.3% | 1,082,250 | 33.3% | 2,164,500 | 66.6% |

8

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 7/27/18 | 886,938 | 27.29 | 886,938 | 27.29% | 1,773,876 | 54.6% |
| 7/30/18 | 884,610 | 27.22% | 884,610 | 27.22% | 1,769,220 | 54.4% |
| 7/31/18 | 990,140 | 30.47% | 990,140 | 30.47% | 1,980,280 | 60.9% |
| TOTAL | 5,691,833 | 175.14% | 5,691,833 | 175.14% | 11,383,666 | 350.3% |

R-56.1 ¶¶ 20, 21, 24, 25, 28, 29, 32, 33, 36, 37, 40, 41, 44.

| Table C: Interactive Brokers' Customers/Available Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | IB purchases | % of Available Float | IB sales | % of Available Float | All IB trades (purchases + sales) | Trades as % of Available Float |
| 7/24/18 | 763,945.00 | **44.94%** | 763,945.00 | **44.94%** | 1,527,890 | **89.88%** |
| 7/25/18 | 1,083,950 | **63.76** | 1,083,950 | **63.76** | 2,167,900 | **127.53%** |
| 7/26/18 | 1,082,250 | **63.66%** | 1,082,250 | **63.66%** | 2,164,500 | **127.32%** |
| 7/27/18 | 886,938 | **52.17%** | 886,938 | **52.17%** | 1,773,876 | **104.35%** |
| 7/30/18 | 884,610 | **52.04%** | 884,610 | **52.04%** | 1,769,220 | **104.07%** |
| 7/31/18 | 990,140 | **58.24%** | 990,140 | **58.24%** | 1,980,280 | **116.49%** |
| TOTAL | 5,691,833 | **334.81%** | 691,833 | **334.81%** | 11,383,666 | **669.63%** |

R-56.1 ¶¶ 22, 23, 26, 27, 30, 31, 34, 35, 38, 39, 42, 43, 45.

34. Tables D and E set out the number of Avalon securities purportedly traded during the Alleged Short Swing Period by Mintbroker, and those trades as a percentage of the Float and the Available Float:

| Table D: Mintbroker/Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | Mintbroker purchases | % of Float | Mintbroker sales* | % of Float | Mintbroker total trades | Trades as % of Float |
| 7/24/18 | 624,073 | 19.2% | 99,086 | 3.05% | 723,159 | 22.25% |
| 7/25/18 | 703,602 | 21.65% | 118,277 | 3.64% | 821,879 | 25.29% |

9

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/26/18 | 690,184 | 21.24% | 215,677 | 6.64% | 905,861 | 27.87% |
| 7/27/18 | 327,406 | 10.07% | 192,340 | 5.92% | 519,746 | 15.99% |
| 7/30/18 | 0 | 0% | 719,885 | 22.15% | 719,855 | 22.15% |
| 7/3118 | 0 | 0% | 799,720 | 24.61% | 799,720 | 24.61% |
| TOTAL | 2,345,265 | 77.16 | 2,144,985 | 66.00 | 4,490,250 | 138.16% |

*including "short sales"

| Table E: Mintbroker/Available Float | | | | | | |
|---|---|---|---|---|---|---|
| Date | Mintbroker purchases | % of Available Float | Mintbroker sales* | % of Available Float | Mintbroker total trades | Trades as % of Available Float |
| 7/24/18 | 624,073 | **36.71%** | 99,086 | **5.83%** | 723,159 | **42.54%** |
| 7/25/18 | 703,602 | **41.39%** | 118,277 | **6.95%** | 821,879 | **48.34%** |
| 7/26/18 | 690,184 | **40.60%** | 215,677 | **12.69%** | 905,861 | **53.29%** |
| 7/27/18 | 327,406 | **19.26%** | 192,340 | **11.31%** | 519,746 | **30.57%** |
| 7/30/18 | 0 | **0%** | 719,885 | **42.35%** | 719,855 | **42.35%** |
| 7/3118 | 0 | **0%** | 799,720 | **47.04%** | 799,720 | **47.04%** |
| TOTAL | 2,345,265 | **137.96** | 2,144,985 | **126.18%** | 4,490,250 | **264.13%** |

*including "short sales"

R-56.1 ¶¶ 46-51.

35. Table F sets out Plaintiff's assertions as to Defendants' trading activity set forth in its Rule 56.1 Statement of Facts (ECF Doc. No. 77), duplicated here with Defendants' responses (shaded rows B, D, F, H, J) as to which of the material facts are disputed (in red font). All of Defendants' figures are excerpted from McLaughlin Decl. Exhibit 12 (ECF Doc. No. 74-13) as corrected by Exhibit 2 to the Declaration of Danielle M. McLaughlin in Support of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("McLaughlin Opp. Decl.").

10

|   |   | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
|   | Date | 7/24 | 7/25 | 7/26 | 7/27 | 7/30 | 7/31 | 8/1 |
| A | MintBroker Buys (Ex. H) | 624,073 | 703,602 | 690,184 | 327,406 |   |   |   |
| B | Mintbroker Open positions | 624,073 | 703,602 | 690,184 | 327,406 |   |   |   |
| C | MintBroker Sells (Ex. H) | 99,086 | 118,277 | 215,677 | 192,340 | 719,885 | 799,720 | 200,280 |
| D | Mintbroker closed positions | 99,086 | 118,277 | 215,677 | 192,340 | 719,885 | 799,720 | Not relevant or material as outside short swing window |
| E | MB position (end of day) (% of AWX) | 524,987 (16.45%)[1] | 1,110,312 (34.79%) | 1,584,819 (49.66%) | 1,719,885 (53.9%) | 1,000,000 (31.34%) | 200,280 (20.03%)[2] | 0 |
| F | MB position (end of day) | 524,987[3] | 1,110,312 *34.02%* | 1,584,819 *48.56%* | 1,719,885 *52.70%* | 1,000,000 *30.64%* | 200,280 *6.13%* | *Not relevant or material as outside short swing window* |

---

[1] Here, Plaintiff uses a denominator of 3,191,100 whereas Defendants use a denominator of 3,263,585. See paragraph 2, *infra*.

[2] Plaintiff's calculation in Cell E6 is incorrect. Its own Exhibit H states that Mintbroker exited a 10% position on 7/31 at 11:46:00. See Plaintiff's Exhibit H at page 37.

[3] While these numbers are not disputed as to the way plaintiffs have calculated them (in other words, the arithmetic is correct), they are disputed because they are presented as a "net position", but do not reflect the actual net "position" of Mintbroker on any given trading day because they do not account for AWX share accumulation prior to 7/24. The Plaintiffs have calculated the MB position at the end of the day by adding the net "purchase minus sales" number to the prior day's end of day position. They have incorrectly assumed that Mintbroker started with zero Mintbroker shares on 7/24 when in fact Mintbroker started accumulating a small number of AWX shares on 6/15/18. McLaughlin Decl. Exhibit 3. Moreover, and more importantly, while Defendants have undertaken the same calculation in its own Exhibits (McLaughlin Decl. Exhibit 12 as corrected by McLaughlin Opp. Decl. Exhibit 2), it does so not to provide for the court a net "position" in AWX shares, but rather to measure the purported purchases and sales against the Float and Available Float and also to compare Mintbroker's purported purchases with those of all Interactive Brokers and with all market participants writ large in order to have an "apples to apples" comparison with all trading data relevant to this litigation.

|   |   |   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|---|---|
|   |   | *16.1%[4]* |   |   |   |   |   |   |
| G | AWX Trading Vol. (Ex. I) | 2,486,200 | 10,660,300 | 10,306,900 | 12,799,500 | 5,707,000 | 3,976,900 | 2,863,200 |
| H |   | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not relevant or material as outside short swing window* |
| I | Fails to Deliver (Ex. J) |   |   | 119,078 | 298,858 | 95,656 | 187,010 | *300,949* |
| J |   |   |   | *Not disputed* | *Not disputed* | *Not disputed* | *Not disputed* | *Not relevant or material as outside short swing window* |

36. On July 24, Mintbroker opened a position in 624,073 shares representing 19.2% of the Float and 36.71% of the Available Float and closed a position in 99,086 shares representing 3.05% of the Float and 5.83% of the Available Float; its total trades were 723,159 "shares" representing 22.25% of the Float and 42.54% of the Available Float. R-56.1 ¶ 46; McLaughlin Decl. Exhibit 12. These trades did not clear until July 26. McLaughlin Decl. Exhibit 10.

37. On July 25, Mintbroker opened a position in 703,602 shares representing 21.65% of the Float and 41.39% of the Available Float and closed a position in 118,277 shares representing 3.64% of the Float and 6.95% of the Available Float; its total trades were 821,879 "shares" representing 25.29% of the Float and 48.34% of the Available Float. R-56.1 ¶ 47; McLaughlin Decl. Exhibit 12. These trades did not clear until July 27. McLaughlin Decl. Exhibit 10.

38. On July 26, Mintbroker opened a position in 690,184 shares representing 21.24% of the Float and 40.60% of the Available Float and closed a position in 215,677 shares

---

[4] These numbers are disputed because there is a disagreement of material fact as to the number of AWX shares actually outstanding during the relevant period, this number being the denominator in these percentage calculations. *See* statement 2, *supra*.

representing 6.64% of the Float and 12.69% of the Available Float; its total trades were 905,861 "shares" representing 27.87% of the Float and 53.29% of the Available Float. R-56.1 ¶ 48; McLaughlin Decl. Exhibit 12. These trades did not clear until July 30. McLaughlin Decl. Exhibit 10.

39. On July 27, Mintbroker opened a position in 327,406 shares representing 10.07% of the Float and 19.26% of the Available Float and closed a position in 192,340 shares representing 5.92% of the Float and 11.31% of the Available Float; its total trades were 519,746 "shares" representing 15.99% of the Float and 30.57% of the Available Float. R-56.1 ¶ 49; McLaughlin Decl. Exhibit 12. These trades did not clear until July 31. McLaughlin Decl. Exhibit 10.

40. On July 30, Mintbroker closed a position in 719,885 shares representing 22.15% of the Float and 42.35% of the Available Float.  R-56.1 ¶ 50; McLaughlin Decl. Exhibit 12. These trades did not clear until August 1.  McLaughlin Decl. Exhibit 10.

41. On July 31, Mintbroker closed a position in 799,720 shares representing 24.61% of the Float and 47.04% of the Available Float.  R-56.1 ¶ 51; McLaughlin Decl. Exhibit 12. These trades did not clear until August 2.  McLaughlin Decl. Exhibit 10.

42. The combined trading in Avalon shares by Mintbroker during the Alleged Short Swing Period was 4,490,250 "shares", representing 138.16% of the Float and 264.13% of the Available Float.  Mintbroker's positive book entry position during the Alleged Short Swing Period was 2,345,265 "shares" and its negative book-entry position during the Alleged Short Swing Period representing sales and short sales was 2,144,985 "shares." R-56.1 ¶ 52; McLaughlin Decl. Exhibit 12.

43. Interactive Brokers informed its clients that "[e]ffective September 5, 2017, the standard settlement period for securities traded on U.S. and Canadian exchanges will be reduced from 3 business days (T+3) to 2 business days (T+2) and that clients currently utilizing T+2 (which had a higher execution cost) would be amended to T+1. R-56.1 ¶ 59; McLaughlin Decl. Exhibit 15, 17.

44. "Most stock exchange transactions settle on the trade date plus two business days . . ." R-56.1 ¶ 60; McLaughlin Declaration Exhibit 16 at p. 11.

45. Mintbroker's Interactive Brokers 2018 Annual Statement features line items for starting cash, ending cash, and ending settled cash." R-56.1 ¶ 61; McLaughlin Declaration Exhibit 16 at pp 1-2.

46. Mintbroker's Interactive Brokers Long Account Activity Statement, January 1, 2018-December 31, 2018 features line items for starting cash, ending cash, and ending settled cash. R-56.1 ¶ 62; McLaughlin Declaration Exhibit 17 at pp. 772-773.

47. The Interactive Brokers Activity Statements explain that "Ending settled cash reflects the cash that has actually settled." R-56.1 ¶ 63; McLaughlin Declaration Exhibit 17 at p. 5210.

48. The Interactive Brokers code "SS" indicates that a customer has "designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market." R-56.1 ¶ 64; McLaughlin Declaration Exhibit 17 at p. 5210.

49. None of Mintbroker's AWX long trades during the relevant period were designated "SS." R-56.1 ¶ 65; McLaughlin Declaration Exhibit 17 at p. 933-1000.

50. None of Mintbroker's AWX short trades during the relevant period were designated "SS." R-56.1 ¶ 66; McLaughlin Declaration Exhibit 18.

51. The number of shares available for a short seller to borrow is necessarily less than the number of shares in the float of a given stock. R-56.1 ¶ 67; McLaughlin Decl. Exhibit 19 at 162:2-15.

52. For example, if on a given day, market participants are looking to borrow shares to short sell five million shares, but only one million shares exist, only one million shares can be obtained and are available for delivery on that day. R-56.1 ¶ 68; McLaughlin Decl. Exhibit 19 at 162:16-25.

53. Multiple brokers can short the same "pot" of shares on any given trading day, meaning there might be one million shares available, but two million shares to be sold short. Over the next two trading days, the "clearing function" means the shorted shares will either be delivered or available to borrow, or the short will be closed out because the shares are unavailable. R-56.1 ¶ 69; McLaughlin Decl. Exhibit 19 at 99:15-100:19

54. When an Interactive Brokers customer puts an order for shares to be filled, Interactive Brokers routes the order to an exchange and then it is filled on the exchange by a counterparty. R-56.1 ¶ 70; McLaughlin Decl. Exhibit 19 at 154:12-155:6.

55. Interactive Brokers does not know whether or not the counterparty, if not also an Interactive Brokers customer, actually owns the shares it purports to be selling. R-56.1 ¶ 71; McLaughlin Decl. Exhibit 19 at 155:4-11.

56. Interactive Brokers does not place any securities into its customer's account until the trade has settled. R-56.1 ¶ 72; McLaughlin Decl. Exhibit 19 at 167:22-168:8.

57. Voting power is a legal incident to share ownership, which is vested in the legal owner of stock, which include registered owners, who appear in the company's share registry, and DTCC, which registers the shares it owns under "Cede & Co." McLaughlin Decl. R-56.1

¶ 73; McLaughlin Decl. Exhibit 9 at p. 12-6.  Only Legal owners can vote shares, while street name holders are not "technically entitled to vote shares or grant proxy authority." *Id*. at p. 12-7.  However, DTC assigns to each market participant (including Interactive Brokers) the voting rights associated with particular shares in that participant's DTC account "as of the record date." *Id.* at p. 12-7.  The "record date" is the date that a shareholder obtains legal ownership. *Id.* at p. 12-5.  Absent special circumstances, proxy authority is never transferred down to the ultimate beneficial owners. *Id.* at pp. 12-7 to 12-8.

58. In order to vote shares, the customers of market participants may, by contract with the market participant, have the right to provide voting instructions to their bank or broker, who, in turn, has the legal right to actually vote those shares.  R-56.1 ¶ 74; McLaughlin Decl. Exhibit 9 at pp. 12-7 to 12-8.

59. According to Interactive Brokers, a customer may, "generally speaking," have voting power in securities, but only to the extent they have a long position.  R-56.1 ¶ 75; McLaughlin Decl. Exhibit 19 at 114:24-125:6.

60. A short seller never has any voting rights because it never takes possession of any shares.  R-56.1 ¶ 76; McLaughlin Decl. Exhibit 9 at pp. 12-18 to 12-20.

61. The Interactive Brokers 30b(6) deponent in this matter did not know if a customer could vote shares after an order had been placed but before the shares were placed into the customer's account.  R-56.1 ¶ 77; McLaughlin Decl. Exhibit 19 at 170:18-117:8.

62. This deponent did not establish that the contract between Interactive Brokers and Mintbroker enabled Mintbroker to provide voting instructions to Interactive Brokers, and

nor did he establish that Mintbroker exercised any voting power during the period that it held a position in Avalon securities. R-56.1 ¶ 78.

63. During the relevant period, Avalon executives did not have any knowledge of either Defendant as a greater than 5% (or 10% owner); in fact, Avalon specifically identified its greater than 5% owners in a complaint made to the NYSE on July 24, 2018 and this list did not include Defendants. R-56.1 ¶ 79; McLaughlin Decl. Exhibit 27.

64. During the relevant period, internal emails also established that "no members of management have bought or sold any shares of stock" and that "no current or potential investor" had contacted Avalon regarding the trading activity described herein. R-56.1 ¶ 80; McLaughlin Decl. Exhibit 30 at AV0009-10, AV0026-29.

65. Publicly Available SEC "fail to deliver" data identifies only the settlement date, security, quantity, and price of a failed trade. It does not state whether it is a purchase or sale, or the time of the transaction, and it does not identify the trade date, or the purported purchaser, seller, or broker. Declaration of Danielle M. McLaughlin in Support of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("McLaughlin Opp. Decl.") Exhibit 1-b.

66. "The values of total fails-to-deliver shares represent the aggregate net balance of shares that failed to be delivered as of a particular settlement date . . . . Fails to deliver on a given day are a cumulative number of all fails outstanding until that day, plus new fails that occur that day, less fails that settle that day. The figure is not a daily amount of fails, but a combined figure that includes both new fails on the reporting day as well as existing fails. In other words, these numbers reflect aggregate fails as of a specific point in time, and may have little or no relationship to yesterday's aggregate fails. Thus, it is important

to note that the age of fails cannot be determined by looking at these numbers. In addition, the underlying source(s) of the fails-to-deliver shares is not necessarily the same as the underlying source(s) of the fails-to-deliver shares reported the day prior or the day after". McLaughlin Opp. Decl. Exhibit 1-a at p. 1.

67. "Fifty years ago investing was a distinctly human affair. "People would have to take each other out, and dealers would entertain fund managers, and no one would know what the prices were," says Ray Dalio, who worked on the trading floor of the New York Stock Exchange (NYSE) in the early 1970s before founding Bridgewater Associates, now the world's largest hedge fund. Technology was basic. Kenneth Jacobs, the boss of Lazard, an investment bank, remembers using a pocket calculator to analyze figures gleaned from company reports. His older colleagues used slide rules. Even by the 1980s "reading the *Wall Street Journal* on your way into work, a television on the trading floor and a ticker tape" offered a significant information advantage, recalls one investor." McLaughlin Opp. Decl. Exhibit 1-c at p. 1.

68. "Each day around 7bn shares worth $320bn change hands on America's stock market. Much of that volume is high-frequency trading, in which stocks are flipped at speed in order to capture fleeting gains. High-frequency traders, acting as middlemen, are involved in half of the daily trading volumes. Even excluding traders, though, and looking just at investors, rules-based investors now make the majority of trades." McLaughlin Opp. Decl. Exhibit 1-c at p. 1.

Dated: September 23, 2020
New York, NY