UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVALON HOLDINGS CORP., <br><br> Plaintiff, <br><br> v. <br><br> GUY GENTILE and <br> MINTBROKER INTERNATIONAL, LTD., <br><br> Defendants. | No. 18-cv-7291 (VSB) (RJL) <br><br> ECF Case |

Related to:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC. <br><br> Plaintiff, <br><br> v. <br><br> GUY GENTILE and <br> MINTBROKER INTERNATIONAL, LTD., <br><br> Defendants. | No. 18-cv-8896 (VSB) (RJL) <br><br> ECF Case |

**AVALON HOLDINGS CORP.'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
<u>AND IN FURTHER SUPPORT TO ITS MOTION FOR SUMMARY JUDGMENT</u>**

Miriam Tauber (MT1-1979)
MIRIAM TAUBER LAW PLLC
885 Park Ave. 2A
New York NY 10075
(323) 790-4881
MiriamTauberLaw@gmail.com

David Lopez (DL-6779)
LAW OFFICES OF DAVID LOPEZ
PO Box 323 | 171 Edge of Woods Rd.
Southampton NY 11968
(631) 287-5520
DavidLopezEsq@aol.com

*Attorneys for Plaintiff Avalon Holdings Corp.*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i
TABLE OF AUTHORITIES ........................................................................................... ii

OVERVIEW .................................................................................................................... 1

FACTS ............................................................................................................................. 3

1. THE MARKET PRICE OF PLAINTIFF'S STOCK BEFORE OR AFTER
   DEFENDANTS TRADED THE SHARES ........................................................... 3

2. RECORD OWNERSHIP OR OWNERSHIP IN
   "STREET NAME" (CEDE & CO.) ........................................................................ 4

3. PLAINTIFF'S COUNSEL'S SECTION 16
   LITIGATION EXPERIENCE ............................................................................... 5

ARGUMENT ................................................................................................................... 5

POINT I.
THE APPLICABILITY OF § 16(B) IS INESCAPABLE ............................................... 5

POINT II.
DEFENDANTS WERE INCONTESTABLY
10% "BENEFICIAL OWNERS" AND INSIDERS OF
AVALON DURING THE SHORT SWING PERIOD
IN WHICH THEY TRADED AVALON STOCK ......................................................... 8

POINT III.
THE DEFENDANTS ARE NOT EXCULPATED
BY THEIR CLAIMED LACK OF ACCESS TO INSIDE INFORMATION ............... 11

CONCLUSION .............................................................................................................. 14

# TABLE OF AUTHORITIES

**CASES**

*Blau v. Ogsbury,*
  210 F.2d 426 (2d Cir. 1954) ---------------------------------------------------------------- 10

*Donoghue v. Bulldog Investors, G.P.*,
  696 F. 3d 170 (2d Cir. 2012). ---------------------------------------------------------------- 3

*Donoghue v. Patterson Cos. Inc.*,
  990 F. Supp. 2d 421 (S.D.N.Y. 2013) ---------------------------------------------------- 8, 10

*Epstein v. Schinler,*
  200 F. Supp. 836 (S.D.N.Y. 1961) ---------------------------------------------------------- 3

*Heit v. Katz,*
  Fed. Sec. L. Rep. (CCH) ¶ 96,405 (S.D.N.Y. 1978). ------------------------------------- 11

*IBS Financial Corp. v. Seidman & Associates L.L.C.*,
  136 F. 3d 940, 947 (3d Cir. 1998). ----------------------------------------------------------- 7

*Kern County Land Co. v. Occidental Petroleum Corp.,*
  411 U.S. 582 (1973) ---------------------------------------------------------------------------- 13

*Avalon Holdings Corp. v. MintBroker International, Ltd.*,
  No. 18-CV-7291-VSB, 2019 WL 4640206 (S.D.N.Y. Sept. 24, 2019) -------------------- 11

*Plumber's Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
  753 F. Supp. 2d 166 (S.D.N.Y. 2010) ------------------------------------------------------- 8

*Popkin v. Dingman*,
  366 F. Supp. 534 (S.D.N.Y. 1973); ---------------------------------------------------------- 11

*Prager v. Syvestri,*
  449 F. Supp. 2d 421 (S.D.N.Y 1975); -------------------------------------------------------- 8

*Rubenstein v. Cosmos Holdings, Inc.*,
  No. 19 Civ. 6970 (KPF), 2020 WL 3893347 (S.DN.Y. July 10, 2020) -------------------- 8

*SEC v, Wily*,
  117 F. Supp. 3d. 381 (S.D.N.Y. 2016) ------------------------------------------------------- 7

*Smolowe v. Delendo Corp.*,
  136 F. 2d 231 (2d Cir. 1943) ----------------------------------------------------------------- 11

**STATUTES**

15 U.S.C. § 78p(b) ------------------------------------------------------------------------------- 11

**OTHER AUTHORITIES**

SEC C&D Q.103.10 (Nov. 16, 2009) -------------------------------------------------------- 8

SEC Release No. 33768,
  1994 WL 83914 (Mar. 16, 1994) ------------------------------------------------------------- 4

**RULES**

F.R.E. 1006 ---------------------------------------------------------------------------------------------- 10
SEC Rule 13d-3, 17 C.F.R. § 240.13d-3 ---------------------------------------------------------- 7
SEC Rule 16a-1, 17 C.F.R. § 240.16a-1 ---------------------------------------------------------- 8
SEC Rule 16b-6, 17 C.F.R § 240.16b-6. ---------------------------------------------------------- 6

**TREATISES**

Peter J. Romeo & Alan L. Dye,
    *Section 16 Treatise & Reporting Guide* (2020 ed.) ------------------------------------------ 7, 9

**OVERVIEW**

Defendants' Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment makes three principle arguments:

1. <u>"Section 16(b) of the 1934 Securities Act does not apply here</u>." With this point we agree. The suit is brought under Section 16(b) of the Securities *Exchange* Act of 1934. There is no "1934 Securities Act".

The Amended Complaint alleges, and the indisputable evidence presented on Plaintiff's Rule 56 Motion demonstrates: a) Defendants' insider status as more-than-10% beneficial owners; and b) their purchases and sales within periods of less than six months, some of the purchases at lower prices than some of the sales. Defendants' trading activity, which establishes their Section 16(b) liability under a straightforward application of the statute, is evidenced by:

    a) Defendant's own Schedule 13D filing (constituting admissions filed under penalty of perjury) (Pl. Ex. F);[1]

    b) Defendant;s trading records (Pl. Ex. G), and the account statements produced by Defendants' broker (Pl. Ex. D & E), which Defendants have stipulated accurately represent their trading of Plaintiff's stock (as organized at Pl. Ex. H);

    c) Publicly available trading data (*see,* e.g., Pl. Ex. I).

Plaintiff has calculated Defendants' Section 16 liability of $6,235,908 by matching Defendants' executed transactions according to the "lowest-in, highest-out" methodology prescribed under the statute, as reflected in the computations attached to Plaintiff's Motion (Pl. Ex. M). If the exact amount of such damages is disputed, the existence of *some* quantum of damages

---

[1] Citations to "Pl. Ex. __" refer to the Exhibits annexed to the Affidavit of Miriam Tauber filed in support of Plaintiff's Motion for Summary Judgment (Dkt # 78).

1

is sufficient to support a finding of liability with accounting matters reserved for further proceedings. The prayer for relief explicitly seeks an accounting.

2. <u>"Defendants were never 'beneficial owners' of the shares and are therefore not subject to Section 16(b)'s disgorgement rules."</u>

The Defendants argue that they were never shareholders of record, nor held stock certificates for the shares they are charged with owning, nor engaged in anything more than "book entry" transactions; that their trading was so rapid that Section 16(b) could not have applied because they could not and did not gain access to inside information.

These arguments have the luxury of ignoring all applicable Exchange Act definitions as to what constitutes a "purchase" or "sale;" and the considerable body of law that makes actual access or use of inside information irrelevant to a finding of Section 16(b) liability—as expressly stated in the statute—where ordinary cash-for-stock transactions are at issue.

The Defendants, whose trading of the Plaintiff's stock was an apparent "pump and dump" scheme engineered to spring a short squeeze trap, describe the consequences and mechanics of short selling in terms contrary to SEC Regulation SHO, and misrepresent the essential mechanism by which they fleeced their short-selling counterparties. Regulation SHO requires the broker of any naked-short seller who cannot deliver shares on settlement date, T+2, to go into the open market and buy covering shares at the customer's expense. (Pl. Ex. J). This is the point at which the short-squeeze artist, having largely cornered the market for available shares, sells to his victims through their brokers at whatever prices the market will bear, the shares and claims to shares he has previously acquired from them through their short-sales. A "fail to deliver" is the opportunity to gaff the short seller, the short-squeeze payday. (Pl. Ex. J). Only in the Defendants' never-never-

2

land does it make the transaction magically go away as though it had never been.  Nor does it exculpate the insider party from short-swing profits liability.

## FACTS

Plaintiff's Response to Defendants' R.56.1 Statement is submitted along with this Brief and incorporated by reference. Plaintiff has responded to each enumerated fact included in Defendants' Statement, as required by the Rules of this Court. Plaintiff notes that certain categories of facts introduced by the Defendants and highlighted in the "Facts" section of their Brief are entirely irrelevant to Plaintiff's Section 16(b) claim as matters of law.  Physical possession of shares through settlement or record ownership or delivery of share certificates has no relation to beneficial ownership for Section 16 purposes.

1. **The market price of Plaintiff's stock before or after Defendants traded the shares.**

Defendants invite the Court to take judicial notice that the average market price of AWX stock in the period after Defendants traded the stock was higher than the average price in the period before Defendants' trading activity. Defendants suggest that the increase in stock price demonstrates that Plaintiff was not harmed by the Defendants' short swing trading. This is a red herring, actual damage being irrelevant to enforcement.  Injury-in-fact through invasion of a statutory right and Article III standing of Section 16(b) plaintiffs are settled law in the Second Circuit.  *Donoghue v. Bulldog Investors, G.P.*, 696 F. 3d 170 (2nd Cir. 2012).

Section 16(b) reflects the policy determination that short swing trading by company insiders, including 10% beneficial owners, is an abhorrent practice that is inherently harmful to the company by undermining shareholder confidence in a fair market for the Plaintiff's stock. *See, e.g., Epstein v. Schinler,* 200 F. Supp. 836, 837 (S.D.N.Y. 1961) (Section 16(b) aims to protect the interests of the "general body of [the company's] stockholders" and does not require the company

3

to allege financial harm or prohibit 'windfall' recoveries). Although Defendants' manipulation of Plaintiff's stock was intended to have caused a short term increase in the stock price (inflating the price of shares *is* the point of a short-squeeze manipulation), that is not inconsistent with, and does not negate, the long-term damage to the market for the company's stock that Section 16(b) aims to prevent.

2. **Record ownership or ownership in "street name" (Cede & Co.)**

Defendants devote several enumerated Paragraphs of their R.56.1 statement to a discussion of "record ownership." Brokerage customers are generally not identified as "record owners" on records maintained by company transfer agents. Shares for brokerage customers are held in the name of Cede & Co (referred to as held in "street name").

Defendants incorrectly suggest that they would only be able to exercise voting rights over shares purchased in their Interactive accounts to the extent provided by their agreement with Interactive. (*See* Avalon Br. p. __.) Brokerage customers are the "ultimate beneficial owners" of shares purchased for their accounts, and the customers have the voting rights associated with their shares. Under regulations governing the "proxy system" of shareholder voting, brokers that hold shares in "street name" for their customers (as provided by agreement with their customers) are required to provide sufficient notice to their customers to exercise their voting rights. *See* SEC Release No. 33768, 1994 WL 83914 (Mar. 16, 1994) (describing proxy solicitation requirements). (*See also* Interactive Dep., Ex. C. at p.142.)

Defendants also incorrectly imply that the absence of any reference to Defendants as "record owners" of the stock supports their assertion that Defendants' transactions were not "completed" or did not "settle." Record ownership, meaning entry of a transfer on the stock ledger of the issuer, has nothing whatsoever to do with "settlement" and has no bearing on whether a

4

trade was executed or otherwise completed. Transactions executed in customer brokerage accounts do not typically result in a transfer or change of "record ownership" at settlement, or at any time, a fact of which the court may take judicial notice.

### 3. **Plaintiff's counsel's Section 16 litigation experience.**

Plaintiff's counsel are specialists in this field. Plaintiff's counsel David Lopez has been a pre-eminent Section 16 litigator for over 50 years. Defendants' attempt to unearth personal information about Plaintiff's other clients and their presentation (or misrepresentation) of details from some of the many Section 16 cases that Plaintiff's counsel have handled (and some they have never heard of), none of which are in any way related to the cases against the Defendants, is unprofessional and undeserving of the Court's attention. Defendants similarly tried to distract the Court in moving to dismiss this action. *See* Dkt. #32-1).  This time, Defendants focus their efforts on attempting to malign Plaintiff's counsel's settlement of various unrelate and long-resolved matters.  We note that despite their best efforts they have been unable to point to a single settlement that did not meet with court approval or generate a tangible recovery for the issuer.

## ARGUMENT

### POINT I.   THE APPLICABILITY OF § 16(b) IS INESCAPABLE

The Defendants contend that they traded at speeds too fast to be captured by Section 16(b) of the Securities Exchange Act, or indeed to fall within the securities laws at all.  We are told we are in a new era. The Defendants contend that they purchased and sold shares so quickly that they did not actually own any shares or engage in any trading recognized by Section 16.  They only raked in profits from "book entries.

5

Their digression into musings about whether a purchase or sale, without defining either term, can be shown to have taken place without the plaintiff proving settlement of each transaction is pure frivolousness. We deal with statutorily defined terms and concepts:

- "***Purchase***" is defined by Section 3(a)(13) of the Exchange Act, 15 U.S.C. § 3(a)(13), to include "any contract to buy."

- "***Sale***" is defined in Section 3(a)(14) of the Exchange Act, 15 U.S.C. § 3(a)(14), to include "any contract to sell."

- "***Equity Security***" is defined in Section 3(a)(11) as "any stock or similar security."

When the Defendants placed an order to buy with their broker and their broker confirmed, it was a contract and they bought. When the Defendants placed an order to sell with their broker and their broker confirmed, it was a contract and a sale. And when those buys and sells were of common stock of the Plaintiff, they were of equity securities.

The Defendants also try to characterize their transactions as involving "derivatives," apparently being unaware that the SEC has created a highly developed regimen for the regulation of derivatives. *See* SEC Rule 16b-6, 17 C.F.R, Sec/ 240.16b-6. A derivative is a security that derives its value from an underlying or reference security. *See* Rule 16a-1(b)-(d), (h), 17 C.F.R. Sec. 240.16a-1. A derivative that entitles its holder to acquire shares – a "call equivalent position" - is deemed a purchase of the underlying shares at the moment of acquisition of the derivative. Likewise, a derivative that entitles its holder to dispose of shares – a "put equivalent position" – is deemed a sale of the underlying shares at the moment of acquisition of the derivative *See* SEC Rule 16a-1(b) & (h); SEC Rule 16b-6(a), 17 C.F.R. Sec. 240 16b-6. So, call them derivatives, if you like but that makes them self-confessed purchases and sales of the referenced or underlying equity securities without the need for settlement. The buys and the sells are deemed instantaneous.

6

The Defendants avoid citing or discussing controlling statutory or regulatory provisions. "Beneficial ownership". Rule 16a-1(a)(1), adopted in Release No. 34-28869 (1991) imports into Section 16 the definitional standards of Section 13(d). Rule 13d-3 defines, for purposes of determining who is a more-than-10% beneficial owner, anyone having (i) voting power, including the power to direct the voting of the security; or (ii) investment power (including a power to dispose or to direct the disposition of, the security). Rule 13d-3(a) states that beneficial ownership may exist by virtue of a contract, arrangement, understanding, relationship, or otherwise. *See SEC v, Wily*, 117 F. Supp. 3d. 381 (S.D.N.Y. 2016). The mere possession of the power is sufficient, its exercise unnecessary for its holder to be a beneficial owner. *See IBS Financial Corp. v. Seidman & Associates L.L.C.*, 136 F. 3d 940, 947 (3d Cir. 1998). In addition, and of controlling relevance here, SEC Rule 13d-3(d)(1), 17 C.F.R. § 13d-3, provides that a person will be deemed the beneficial owner of any securities the person has a right to acquire at any time within 60 days. How can a confirmed purchase in the Defendants' brokerage account not fit the bill?

The Defendants assert that all they were doing was "dealing in book entries." Okay, but what did those book entries by their broker denote if not contracts to buy or sell?

Settlement of trades has nothing to do with the definitional or regulatory scheme. The receipt of stock certificates has nothing to do with the definitional or regulatory scheme. Record ownership has nothing to do with the definitional or regulatory scheme. *See* Romeo & Dye, *Section 16 Treatise* § 2.03 at p. 142 ("It is clear that beneficial ownership means something more than record ownership"); *see also* id. § 1.02 at pp 33-34 & n. 54 (discussing legislative history of Section 16 as initially proposed to apply to all record owners *or* beneficial owners, and later revised to include only beneficial owners). So long as purchases or sales were placed by the Defendants

and confirmed by their broker, the Defendants bought or sold by entering into contracts to buy or to sell. *See, e.g. Rubenstein v. Cosmos Holdings, Inc.,* No. 19 Civ. 6970 (KPF), 2020 WL 3893347, at *6 ) (S.DN.Y. July 10, 2020) (holding that purchase occurred for purposes of Sec. 16 when the parties agreed on the purchase price, notwithstanding the seller's failure to deliver the shares); *see also Plumber's Union Locl No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 177 (S.D.N.Y. 2010) (citing *Blau v. Ogsbury,* 210 F. 2d 426, 427 (2d Cir. 1954) (Section 16 purchase occurs when the purchaser "incur[s] an irrevocable obligation to take and pay for the stock"); *accord, Prager v. Syvestri,* 449 F. Supp. 2d 421, 427 (S.D.N.Y 1975); *see also Donoghue v. Patterson Cos. Inc.,* 990 F. Supp 2d 421, 427 (S.D.N.Y. 2013) (holding that whether option settles in stock or cash is irrelevant; "the date the option to settle in cash is purchased – the date of the contract execution – is the date any security was purchased" for purposes of Section 16).

### POINT II.  DEFENDANTS WERE INCONTESTABLY 10% "BENEFICIAL OWNERS" AND INSIDERS OF AVALON DURING THE SHORT SWING PERIOD IN WHICH THEY TRADED AVALON STOCK

The Defendants claim they were not 10% beneficial owners at any time because of their frivolous arguments addressed at Point I. The Amended Complaint relies on the Defendants' Schedule 13D and Form 4 admissions, and their trading records and brokerage statements, to establish their entry into and exit points from 10% beneficial ownership.

The Defendants would lead Plaintiffs and the Court into a morass of voting rights analysis. While we would gladly go down that garden path were it necessary, beneficial ownership for purposes of determining who is a 10% beneficial owner is conferred, as well (and as the Defendants correctly recite) by the more easily identified possession of "dispositive" power, i.e., Defendants' authority to sell the shares accumulated in their brokerage accounts. *See* SEC Rule 16a-1, 17 C.F.R. § 240.16a-1. (Def. Br. 15.) *See* SEC C&D Q.103.10 (Nov. 16, 2009) (Section

8

13(d) disclosure requirements are determined based on the trade date, not the settlement date, because "an investor may, at a minimum, exercise investment power over the securities that were acquired through the trade as of the trade date"). *See also Romeo & Dye, Sec. 16 Treatise* at 484 (A brokerage transaction … becomes a reportable event under Section 16(a), and is deemed to involve a purchase or sale under Section 16(b), on the trade date, not the settlement date." (collecting cases).

The Schedule 13D filed by the Defendants (Pl. Ex F), their trading records and brokerage account statements (Pl. Ex G, D, E), the deposition testimony of Mr. Gentile (Pl. Ex. A) and of Interactive Broker's R.30(b)(6) representative (Pl. Ex C) establish beyond dispute that the Defendants had the power to acquire and dispose of shares. And they did so thousands of times in very short order once the short-squeeze payday arrived.

Defendants do not and cannot deny that they had the right to sell all of the shares purchased in their Interactive accounts when their purchases were executed, before delivery of the shares was due to the Defendants on the T+2 settlement date, and regardless of whether Defendants were "record owners" or had "possession" of the share certificates. The very reason that the Defendants claim not to have taken delivery or "possession" of the shares is because they admit that they sold the shares to other purchasers before the Defendants' own purchases settled.

We decline to follow the various red herrings the defense has sought to drag across our path. Section 16(b) is incontestably applicable. Because the Defendants had the right to sell (i.e., "dispositive power" over) shares purchased and due to be delivered in their Interactive accounts, those shares counted towards their 10% "beneficial ownership" threshold for purposes of Section 16. Likewise, Defendants' sales reduced their "beneficial ownership" because Defendants owed the sold shares to subsequent purchasers.

At any given time, Defendants' "beneficial ownership" can be calculated by aggregating all AWX shares purchased, and subtracting any AWX shares sold, in transactions executed up until that time. As indicated in the table compiled at Ex. H to Avalon's Motion for Summary Judgment,[2] Defendants were "beneficial owners" of more than 10% of outstanding AWX common stock between July 24, 2018, and July 31, 2018 (at all times following the execution of purchases by which the Defendants crossed over the 10% threshold, and until their execution of sales by which they crossed under the threshold) (Pl. Ex H, at pp. 4-37) During these time periods, Defendants realized short swing trading profits upon execution of their AWX trades, when their purchase and sale prices were established, regardless of when payment was due (or later appeared as "settled cash" on their statements) and even if the transactions were "cash-settled" without requiring delivery of any "actual" shares. *Patterson*, 990 F. Supp. 2d at 427 (S.D.N.Y. 2013) ("cash settled" options are subject to Sec. 16 when the options are traded, the "cash settlement" is a non-event for purposes of the statute); *see also Blau v. Ogsbury*, 210 F.2d 426, 427 (2d Cir. 1954) ("[i]t matters not to the speculator who has title or possession or who can vote the stock or receive dividends. What he needs is firm assurance that a fixed quantity can be acquired or disposed of at a fixed price").

Defendants were statutory "insiders" of Avalon and subject to the strict proscription against profiting from short swing trading AWX stock. Defendants brazenly violated the statute through their retention of profits and are required to disgorge them to Avalon.

---

[2] Under F.R.E. 1006, The Court may take judicial notice of Pl. Ex. H, which summarizes the voluminous data appearing in MintBroker's Interactive brokerage records, as the originals are also available to the Court (*see* original statement pages appended at Pl. MSJ Ex. D & Ex. E).

### POINT III.  THE DEFENDANTS ARE NOT EXCULPATED
### BY THEIR CLAIMED LACK OF ACCESS TO INSIDE INFORMATION

Defendants assert that they are not the type of "insiders" targeted by Section 16(b) because they traded too quickly to have the opportunity to access non-public information about the Plaintiff. (Def. Br. at 19.)  Section 16(b) is a strict liability statute which expressly applies to short swing trading by 10% "beneficial owners" to the same extent as *ex officio* insiders (i.e., officers and directors), and precludes considerations of their actual knowledge or lack of knowlege of "insider" information, or of their intent to violate the short swing trading restriction. *See* 15 U.S.C. § 78p(b) (the statute applies "irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction" giving rise to short swing trading profits). As this Court held, even "briefly-tenured" 10% shareholders are required to comply with Section 16 while they are statutory insiders. *Avalon Holdings Corp. v. MintBroker Internat'l, Ltd.*, No. 18-CV-7291-VSB, 2019 WL 4640206, at *7 (S.D.N.Y. Sept. 24, 2019) (Dkt #35).  That is the law of the case. *See also Smolowe v. Delendo Corp.*, 136 F. 2d 231 (2d Cir.), *cert. denied,* 320 U.S. 751 (1943); *Popkin v. Dingman*, 366 F. Supp. 534, 537 (S.D.N.Y. 1973); *Heit v. Katz,* Fed. Sec. L. Rep. (CCH) ¶ 96,405, at 93,447 (S.D.N.Y. 1978).

To avoid the strict liability consequences of the statute, the Defendants attempt to persuade the Court that the trading they reported in their SEC filings, which is corroborated by their brokerage records and by all publicly available data sources, did not happen at all. They claim their high-speed trades are like "derivatives," or were "mere book entries," because it is "mathematically and logically impossible" for the Defendants, other Interactive clients, and/or "all market participants" to have traded more than the number of AWX shares outstanding on any trading day during the relevant period. (*See* Def. Br. at 21: "there simply weren't enough actual

11

shares in the Float to enable every purchaser to take possession of every share they purported to purchase and then sell").

Putting aside that derivatives trading also gives rise to Section 16(b) liability, as discussed at Point I, it is neither "impossible" nor uncommon for a company's shares or share equivalents to be purchased and sold numerous times throughout the day—shares can be bought by one purchaser and sold to another; or bought and sold by the same investor trading against different buyers and sellers in rapid succession (as in this case). Gentile is very familiar with this practice of "day trading," as he volunteered at his deposition (*see* Pl. Ex. C at 95:6-9: Q: … "I can buy and sell the same shares all day long if I wanted …" A: You're talking about day trading. … You're talking about someone just trading back and forth"); he is the owner of the website daytraderpro.com, one of several offering to share his tips and expertise with members of the public (*see* Pl. Ex. C at 13:1-6).

Nor is it difficult to hypothesize a situation in which derivatives come into play. There is nothing to prevent the writing of a series of call options far exceeding the actual float of an issuer's shares.  Or the writing of total return pre-paid variable forwards; or cash settled swaps. Or, closer to the record in this case, large numbers of short sales by market makers having no relation, at the moment of sale, to available shares. What the Defendants describe to the Court as unimaginable is well known to them, as Wall Street operators, to be everyday happenings.

As Defendants themselves emphasize, it is not unusual for multiple short sellers to "locate" the same shares for delivery to more than one purchaser. But Defendants misrepresent the consequences of this type of duplicative short selling. Defendants assert that, given their large trading volume, "an unknown, but large portion of the 'trades' were naked short sales" and that

12

"many of the short sales could never settle because the sales did not represent actual and deliverable stock." (Def. Br. at 18).

The portion of market activity attributable to short selling is not "unknown," but a matter of public record. Further, as illustrated by the academic report analyzing Defendants' trading (filed as Pl. Ex. J), it is possible to cross-reference this short selling data with Defendants' reported trades to determine the portion of Defendants' counterparties who were short sellers.

More importantly, the Defendants bought "actual and deliverable stock" even if they bought from short sellers who did not have the stock available to sell. As Defendants know, not only is it not true that "many of these short sales could never settle;" in fact, they were required to settle under Regulation SHO. That is precisely how, as Gentile testified, he was "net building a position"—a net position exceeding over 10% of outstanding Avalon stock—even though he also claims that a "large portion" of Defendants' trades were with naked short sellers. (*See* Pl. Ex. A at pp. 101-109.) As Defendants also know, their short selling counterparties' ongoing obligations to deliver a stock that the Defendants now controlled are precisely what enabled the Defendants to quickly liquidate their position at a tremendous profit.

As the Supreme Court has instructed, policy issues need not be considered where a case involves straightforward cash-for-stock transactions that are clearly within the Section 16 short swing trading proscription. *See Kern Cty. Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582 (1973). Nonetheless, Plaintiff concludes by noting that Defendants' accumulation of a controlling position in Plaintiff's stock to turn a quick profit is exactly the type of abusive and speculative trading that the statute aims to prevent. In that respect, the statute deems 10% "beneficial owners" to be "insiders" with good reason: As summarized in the scholarship cited in the academic paper filed in support of Plaintiff's Motion, controlling shareholders trade against

13

the market in ways similar to informed insiders, because their significant position provide market insights and trading advantages not available to the company's general body of stockholders. That unfair advantage was on full display when Defendants locked up control of the Plaintiff's stock to profit at the expense of their trading counterparties.

Defendants' manipulative scheme was not "impossible." It happened and it ran afoul of Section 16(b).

## CONCLUSION

Nothing put forward by the defense in their Summary Judgment Motion puts in doubt their liability under Section 16(b) for their short-swing trading in shares of Avalon. Judgment should enter.

Dated:   Southampton, New York
         September 23, 2020

Respectfully submitted,

*s/ David Lopez*
———————————————
David Lopez (DL-6779)
171 Edge of Woods Rd. P.O.323
Southampton, New York 11968
Tel:  631.287.5520
Fax:  631.283.4735
E-Mail:  DavidLopezEsq@aol.com
*Attorney for Plaintiffs*

On the Brief:

Miriam Tauber (MT-1979)
*Attorney for Plaintiffs*

14