**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AVALON HOLDINGS CORP., <br><br>               Plaintiff, <br><br>               v. <br><br> GUY GENTILE and <br> MINTBROKER INTERNATIONAL, LTD., <br><br>               Defendants. | No. 18-cv-7291 (VSB) (RJL) <br><br> ECF Case |

Related to:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC. <br><br>               Plaintiff, <br><br>               v. <br><br> GUY GENTILE and <br> MINTBROKER INTERNATIONAL, LTD., <br><br>               Defendants. | No. 18-cv-8896 (VSB) (RJL) <br><br> ECF Case |

**PLAINTIFF'S RESPONSES TO**
**DEFENDANTS' L.R. 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

        Pursuant to Rule 4.F. of the Hon. Broderick's Individual Rules of Practice, Plaintiff submits these responses to Defendants' L.R. 56.1 Statement of Undisputed Material Facts. Defendants' numbered Statements are reproduced

    1.    Avalon Holdings Corporation ("Avalon") is a Warren, Ohio-based provider of waste management services to industrial, commercial, municipal and governmental customers in selected northeastern and midwestern U.S. markets. Avalon also owns the Avalon Golf and Country Club, which operates golf courses and related facilities. McLaughlin Declaration ("McLaughlin Decl.") Exhibit 1.

**Response:**    Not disputed.

2.      For approximately the first seven months of 2018, up until July 24, 2018, Avalon's closing share price ranged from approximately $2.00 to $2.40. McLaughlin Decl. Exhibit 2.

**Response:**      Not disputed.

3.      On June 15, 2018, Mintbroker, through Interactive Brokers, opened a position on Avalon securities with the purchase of 200 shares. McLaughlin Decl. Exhibit 3.

**Response:**

MintBroker's Interactive Account Statements, which were stipulated as accurate for the purposes of these Motions for Summary Judgment, and which were authenticated by Interactive's R.30(b)(6) witness, are attached to Plaintiff's Motion as Ex. D and E. The transactions reflected on the Interactive statements for MintBroker's two trading "subaccounts" (UL#104381 and US#104382) are aggregated and sorted in chronological order at Ex. to Plaintiff's Motion. The Account Statements reflect that MintBroker's first trade was a purchase of 1,000 shares at a price of $2.20 per share, on June 15, 2018, at 10:27:16 AM (*see* Pl. Ex. H, *see also* Pl. Ex. D & Pl. Ex. E). The document attached at Defendants' Ex. 3 and referenced in this Paragraph appears to be an excerpt from Interactive Dep. Ex. #22. As Interactive's witness testified, this exhibit includes shares traded by all Interactive customers (not just the Defendants). With respect to the Defendants' trades, Defendants' Ex. 3 represents the "individual executions that made up [an] aggregate transaction" indicated on the Account Statements (Interactive Dep. at 45:10-12). For example, on June 15, 2018, MintBroker's purchase of 1,000 shares was in fact made up of several "partial fills" adding up to 1,000 shares, and MintBroker was given a "weighted average" price for the 1,000 shares purchased.

4.      On August 2, 2018, Mintbroker netted its position in Avalon securities to zero with the purchase of 1,000 Avalon securities. McLaughlin Decl. Exhibit 4.

**Response**:

The Account Statements referenced in the Stipulation (Pl. Ex D and Pl. Ex. E), as organized at Pl. Ex. H, reflect that MintBroker "netted its position in Avalon securities to zero with purchase of" 1,251 shares at a price of $3.276035 per share on August 2, 2018, at 12:57:03 PM. (*See* Pl. Ex. H, at p.37, row 1,925). MintBroker continued to trade AWX shares (at least) until November 12, 2018, but according to the Account Statements, MintBroker did not cross over the 10% "beneficial ownership" threshold between August 1, 2018 and the end of 2018. Defendants' Ex. 4, like Defendants' Ex. 3, is an excerpt from the same "trade blotter" document introduced as Interactive Deposition Ex. #22. Plaintiff refers to the discussion of this document in Response to Defendants' Paragraph 3.

5.  For approximately the last five months of 2018, after July 31, 2018, Avalon's closing share price ranged from approximately $2.65 to $4.80. McLaughlin Decl. Exhibit 2 and, Yahoo Finance Avalon Share Price Chart, January 1, 2018 to December 31, 2018.

**Response**:     Not disputed.

6.  The highest closing share price of $4.80 in the second half of 2018 represents a 100% increase over the highest closing share price of $2.40 in the first half of 2018, and the lowest closing share price of $2.65 in the second half of 2018 represents a 32.5% increase over the lowest closing price of $2.00 in the first half of 2018. McLaughlin Decl. Exhibit 2 and ¶ 4.

**Response**:     Not disputed.

7.  Between its opening and closing positions, Mintbroker undertook some 18,460 trades in purported Avalon securities. McLaughlin Decl. ¶ 6.

**Response**:

As indicated in the above Response to Paragraph 4, the Account Statements aggregated at Pl. Ex. H reflect that MintBroker executed 1,922 transactions between the "opening" trade on June 15, 2018 (Pl. Ex. H, at row 3) and the trade on August 2, 2018

referenced at Paragraph 4 (which "netted MintBroker's position to zero" for the second time that day; *see* Pl. Ex. H, at row 1,925).

8.  On July 7, 2018, Mintbroker filed a SEC Form 3 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating that it had taken a position in 1,922,095 shares of Avalon. McLaughlin Declaration ("McLaughlin Decl.") Exhibit 5.

**Response**:

MintBroker's "Initial Statement of Beneficial Ownership" (SEC Form 3), required under Section 16(a) of the Act, was filed on July 27, 2018 (not on July 7). MintBroker's Form 3 reported MintBroker's "beneficial ownership," as defined for purposes of Section 16 of 1,922,095 shares of AWX common stock.

9.  On August 1, 2018, Mintbroker filed a SEC Form 4 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating it had decreased its position in Avalon securities by 202,642 shares. McLaughlin Decl. Exhibit 6.

**Response**:

MintBroker filed SEC Form 4 "Statement of Changes in Beneficial Ownership" reports, which are required by Section 16(a) of the Act, on the following dates: (a) July 30, 2018 (reporting a sale of 192,340 shares of AWX common stock, on July 27, 2018); (b) July 31, 2018 (reporting a sale of 719,885 shares on July 30, 2018); (c) August 1, 2018 (reporting a sale of 799,720 shares of AWX common stock on July 31, 2018); (d) August 1, 2018 (reporting a sale of 202,642 shares of AWX common stock on August 1, 2018); this August 1 filing appears to be the filing referenced in the above Paragraph 9. Additionally, MintBroker filed an amended "Statement of Changes in Beneficial Ownership" (SEC Form 4/A), on August 1, 2018, which again reported the sale of 192,340 shares of AWX common stock on July 27, 2018 (as reported in the original Form 4, filed on July 30, 2018).

10. On August 22, 2018, Mintbroker filed a SEC Form13-D pursuant to Section 16(a) of the Securities Exchange Act of 1934, to which it attached all of its trading records reflecting positions in Avalon stock effected during the prior sixty days by Mintbroker. Gentile, by virtue of his relationship to MintBroker, noted in this form that he "may be deemed to indirectly beneficially own (as that term is defined in Rule 13d-3 under the Exchange Act of 1934, as amended) those Shares which MintBroker had owned" and that he "disclaim[ed] beneficial ownership of all such Shares for all other purposes." McLaughlin Decl. Exhibit 7.

**Response:**

MintBroker's Schedule 13D, which is the "beneficial ownership" report required under Section 13(d) of the Act, was filed with respect to Avalon on August 22, 2018. The Schedule 13D was authenticated when introduced as Ex. 2 at Defendant Gentile's deposition, and is attached to Plaintiff's Motion as Ex. F. While the text of the Schedule 13D speaks for itself, Plaintiff notes that Defendants' statement of their interpretation of the law does not establish the accuracy of that interpretation, and facts asserted in Defendants' Schedule 13D constitute hearsay unless otherwise established. Gentile testified that he believed the trading activity reported on his Schedule 13D was compiled from the trading records produced by the Defendants in discovery and attached as Ex. G to Plaintiff's Motion. Gentile also testified, and the parties have stipulated, that these trading records reflect or otherwise correspond to AWX trades executed through Defendants' Interactive trading accounts, as reflected on the Account Statements attached as Pl. Ex. D & E, and as further discussed in the Responses to Paragraphs 3 and 4, above.

11. The periods during which Defendants purported to hold a greater than 10% of the outstanding common stock of Avalon based on the Interactive Brokers' trade blotter (which does not account for T+2 settlement) are July 24, 2018 for eleven seconds between 2:46:41 p.m. and 2:46:52 p.m. and July 24, 2018 for less than four minutes between 2:54:21 p.m. and 2:58:08 p.m. At 3:06 p.m. on July 24, 2018, Mintbroker entered a greater than 10% position in AWX, which it exited on July 31, 2018 at 12:02 p.m.

(the "Alleged Short Swing Period"). McLaughlin Decl. ¶ 11.

**Response**:

Based on the Interactive Account Statements as summarized on Pl. Ex. H, MintBroker was a more-than 10% "beneficial owner" of AWX common stock at all times from July 24, 2018 at 2:46:01 PM through July 24, 2018 at 2:46:53 PM; from July 24, 2018 at 2:54:21 PM through July 24, 2018 at 3:03:50 PM; and from July 24, 2018 at 3:06:02 PM through July 31, 2018 at 11:46:00 AM. (Pl. Ex. H rows 204-211; 217-222; and 225-1904).

12.    Defendants made 15,511 trades during the Alleged Short Swing Period. McLaughlin Decl. ¶ 12.

**Response:**

There are 1,691 total transactions (i.e., total number of rows of Pl. Ex. H) reflected on the Account Statements as executed by MintBroker while a beneficial owner of more than 10% of outstanding AWX common stock (i.e., during the time periods identified in the Response to Paragraph 11). The transactions reflected on the Interactive Account Statements may have been executed by Interactive in one or more transactions or "partial fills," as discussed in the Response to Paragraph 3.

13.    Based upon the trade blotter produced by Interactive Brokers (which does not account for T+2 settlement), Defendants' maximum position was 57.5 % of the Avalon outstanding stock on July 27, 2018 at 1:56 p.m. McLaughlin Decl. ¶ 13.

**Response:**

Based on the trades reflected on the Account Statements and summarized at Plaintiff's Ex. H, MintBroker's highest level of beneficial ownership was 58.83% on July 27, 2018, at 1:56:16 PM (Pl. Ex. H, row 1,461).

6

14.     The number of Avalon shares outstanding during the Short Swing Window was 3,263,585. McLaughlin Decl. Exhibit 8, ¶ 15.

**Response:**

At all relevant times, there were 3,191,100 shares of AWX outstanding. (*See* Avalon R. 56.1 Statement ¶ 2, citing Avalon 10Q reports filed May 10, Aug. 9, and Nov. 8, 2018.) While the "share registrar" document referenced at Def. Ex. 8 has not been authenticated, Plaintiff notes that the registrar may include an additional number of shares issued but not outstanding.

15.     A company's share register sets forth the legal owners of that company's stock. McLaughlin Decl. Exhibit 9, at 12-5. These "registered owners" or "record owners" (the "record date" is the date upon which they legally own the shares) generally possess share certificates that "represent their ownership in the company." *Id.* The vast majority of publicly traded shares in the United States are registered in the name of Cede & Co., the nominee of The Depository Trust Company ("DTC"). *Id.* at 12-3. DTC is the largest "legal" owner of most public companies' stock. *Id.* at 12-5. "Shares registered in this manner are commonly referred to as being held in "street name." *Id.* "The street name registration system was created to facilitate securities trading, eliminate paperwork and preserve the confidentiality of beneficial owners' identities." *Id.* "Beneficial owners are divested of the rights incident to legal ownership when they hold their shares in street name." *Id.*

**Response:**

The registrar identifies the "record owners" of the Company's common stock. Brokerage customers are the "beneficial owners" of shares held in their brokerage accounts for all purposes relevant to Section 16. Plaintiff does not dispute that shares held in brokerage accounts are typically registered in the name of Cede & Co., which is commonly referred to as held in "street name." Customers holding their shares in "street name" are not "divested" of any rights of beneficial ownership, including the right to vote their shares, which is governed by SEC regulations governing proxy voting.

16.     Transactions involving street name shares are conducted using DTC's electronic "book-entry" system of accounting for share transfers. McLaughlin Decl. Exhibit 9 at 12-6. Whcn one participant's client sells

shares in a particular company, that participant's DTC account is debited and the purchasing participant's account is credited by the same amount. Id. DTC's "book-entry" system negates the need to keep a large inventory of physical stock certificates. The shares of each company held by DTC are typically represented by only one or more immobilized jumbo stock certificates held in DTC's vault. *Id.*

**Response:**

Plaintiff does not dispute the generalized description of the DTC "book entry" system in the referenced Defendants' Ex. 9.

17.     Avalon shares are DTC eligible securities, as evidenced by the DTC settlement data produced in this litigation. McLaughlin Decl. Exhibit. 10.

**Response:**

Plaintiff does not dispute the DTC data with respect to Avalon trading introduced at Defendants' Ex. 10.

18.     The number of Avalon shares possessed by "Cede & Co" during the Short Swing Window is 3,250,012 (the "Float"). McLaughlin Decl. Exhibit 8, ¶ 16.

**Response:**

Plaintiff does not dispute that the registrar document attached at Def. Ex. 8 purports to indicate 3,250,012 shares registered  in the name of "Cede & Co."

19.     Based upon Avalon's own analysis of its shareholders, as of July 24, 2018 there were only approximately "1.7 million shares" left to publicly trade when backing out the greater than 5% shareholders who had not traded their shares during the relevant period, identified as Ron Klingle, Anil Nalluri, Dimension Fund Advisors LP, and Comprehensive Financial Planning (the "Available Float"). The Available Float equates to 52% of Avalon's outstanding shares. McLaughlin Decl. Exhibit 27 at NYSE000076, Exhibit 28, and ¶ 54.

**Response:**

Plaintiff does not dispute that the correspondence referenced at Def. Ex. 27 & 28 describe significant AWX trading activity during the relevant time period.

20.    On July 24, 2018, **2,486,200** Avalon shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

**Response:**    Not disputed.

21.    The July 24, 2018 trading by all market participants in Avalon shares represented **76.49%** of the Float and **146.25%** of the Available Float. McLaughlin Decl. ¶ 22.

**Response:**

The July 24, 2018 trading volume represented 77.91% of the number of

outstanding Avalon shares (3,191,100).

22.    On July 24, 2018, **763,945** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of **1,527,890** trades. McLaughlin Decl. Exhibit. 10.

**Response:**    Not disputed.

23.    The July 24, 2018 trading by Interactive Brokers' customers represented **47.01%** of the Float and **89.88%** of the Available Float. McLaughlin Decl., ¶ 29.

**Response:**

The July 24, 2018 trading volume stated in Paragraph 23 represents 47.788% of

the number of outstanding Avalon shares (3,191,100).

24.    On July 25, 2018, **10,660,300** Avalon shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

**Response:**    Not disputed.

25.    The July 25, 2018 trading in Avalon shares by all market participants represented **328%** of the Float and **627.08%** of the Available Float. McLaughlin Decl. ¶ 23.

**Response:**

The July 25, 2018 trading volume stated in Paragraph 25 represents 3.34 times the

number of outstanding Avalon shares (3,191,100).

26.     On July 25, 2018, **1,083,950** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of 1,167,900 trades. McLaughlin Decl. Exhibit 10.

**Response:**     Not disputed.

27.     The July 25, 2018 trading by Interactive Brokers' customers represented **66.71%** of the Float and **127.53%** of the Available Float. McLaughlin Decl. Exhibit 10, ¶ 30.

**Response:**

The July 25, 2018 trading volume stated in Paragraph 26 represents about 1/3 of

the number of outstanding Avalon shares (3,191,100).

28.     On July 26, 2018, **10,306,900** Avalon shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

**Response:**     Not disputed.

29.     The July 26, 2018 trading in Avalon shares by all market participants represented **317.13%** of the Float and **606.29%** of the Available Float. McLaughlin Decl. ¶ 24.

**Response:**

The July 26, 2018 trading volume stated in Paragraph 28 represents 3.34 times the

number of outstanding Avalon shares (3,191,100).

30.     On July 26, 2018, **1,082,250** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of **2,164,500** trades. McLaughlin Decl. Exhibit 10.

**Response:**     Not disputed.

31.     The July 26, 2018 trading by Interactive Brokers' customers represented **66.6%** of the Float and **127.32%** of the Available Float. McLaughlin Decl. Exhibit 10, ¶ 31.

**Response:**

The total number of trades stated in Paragraph 30 represents 67.82% of the

number of outstanding Avalon shares (3,191,100).

32.     On July 27, 2018, **12,799,500** Avalon shares were traded by all market participants. McLaughlin Decl. 11.

**Response:**     Not disputed.

33.     The July 27, 2018 trading in Avalon shares by all market participants represented **393.83%** of the Float and **752.91%** of the Available Float. McLaughlin Decl. ¶ 25.

**Response:**

As indicated in the above Responses, the number of shares defined as the

"Available Float" is irrelevant. The number of outstanding shares (3,191,100) is a more relevant

benchmark.

34.     On July 27, 2018, **886,938** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of **1,773,867** trades. McLaughlin Decl. Exhibit 10.

**Response:**     Not disputed.

35.     The July 27, 2018 trading by Interactive Brokers' customers represented **54.6%** of the Float and **104.35%** of the Available Float. McLaughlin Decl. Exhibit 10, ¶ 32.

**Response:**

As indicated in the above Responses, the number of shares defined as the

"Available Float" is irrelevant. The number of outstanding shares (3,191,100) is a more relevant

benchmark. Plaintiff has not further checked Defendants' math.

36.     On July 30, 2018, **5,707,000** Avalon shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

**Response:**     Not disputed.

37.     The July 30, 2018 trading in Avalon shares by all market participants represented **175.60%** of the Float and **335.94%** of the Available Float. McLaughlin Decl. ¶ 26.

**<u>Response</u>:**

As indicated in the above Responses, the number of shares defined as the "Available Float" is irrelevant. The number of outstanding shares (3,191,100) is a more relevant benchmark. Plaintiff has not further checked Defendants' math.

38.     On July 30, 2018, **884,610** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of **1,769,220** trades. McLaughlin Decl. Exhibit 10.

**<u>Response</u>:**     Not disputed.

39.     The July 30, 2018 trading by Interactive Brokers' customers represented **54.4%** of the Float and **104.07%** of the Available Float. McLaughlin Decl. Exhibit 10, ¶ 33.

**<u>Response</u>:**

As indicated in the above Responses, the number of shares defined as the "Available Float" is irrelevant. The number of outstanding shares (3,191,100) is a more relevant benchmark. Plaintiff has not further checked Defendants' math.

40.     On July 31, 2018, **3,976,900** Avalon shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

**<u>Response</u>:**     Not disputed.

41.     The July 31, 2018 trading in Avalon shares by all market participants represented **122.37%** of the Float and **233.37%** of the Available Float. McLaughlin Decl. ¶ 27.

**<u>Response</u>:**

As indicated in the above Responses, the number of shares defined as the "Available Float" is irrelevant. The number of outstanding shares (3,191,100) is a more relevant benchmark. Plaintiff has not further checked Defendants' math.

42.     On July 31, 2018, **990,140** Avalon shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of 1,980,280 trades. McLaughlin Decl. Exhibit 10.

**Response:**     Not disputed.

43.     The July 31, 2018 trading by Interactive Brokers customers represented **60.9%** of the Float and **127.76%** of the Available Float. McLaughlin Decl. Exhibit 10, ¶ 34.

**Response:**

As indicated in the above Responses, the number of shares defined as the "Available Float" is irrelevant. The number of outstanding shares (3,191,100) is a more relevant benchmark. Plaintiff has not further checked Defendants' math.

44.     The combined trading in Avalon shares by all market participants during the alleged Short Swing Period was **45,936,800** shares, constituting **1413.43%** of the Float and **2,702.16%** of the Available Float. McLaughlin Decl. ¶¶ 21, 28.

**Response:**

Plaintiff refers to the above responses regarding daily trading volumes. Plaintiff has not further checked Defendants' math.

45.     The combined trading in Avalon shares by Interactive Brokers' customers during the alleged Short Swing Period was **11,383,666** shares, representing **350.3%** of the Float and **669.63%** of the Available Float. McLaughlin Decl. ¶ 34.

**Response:**

Plaintiff refers to the above responses regarding trading by all Interactive customers. Plaintiff has not further checked Defendants' math.

46.     On July 24, Mintbroker opened a position in **624,073** shares representing **19.2%** of the Float and **36.71%** of the Available Float and closed a position in **99,086** shares representing **3.05%** of the Float and **5.83%** of the Available Float; its total trades were **723,159** "shares" representing **22.25%** of the Float and **42.54%** of the Available Float. McLaughlin Decl. Exhibit 12.

**Response:**

Plaintiff refers to Plaintiff's R. 56.1 Statement ¶ 9. Plaintiff does not dispute that MintBroker purchased 624,073 AWX shares and sold a total of 99,086 AWX shares on July 24, 2018, as further reflected on their Account Statements (Pl. Ex. D & E; as aggregated at Pl. Ex. H).

47.     On July 25, Mintbroker opened a position in **703,602** shares representing **21.65%** of the Float and **41.39%** of the Available Float and closed a position in **118,277** shares representing **3.64%** of the Float and **6.95%** of the Available Float; its total trades were **821,879** "shares" representing **25.29%** of the Float and **48.34%** of the Available Float. McLaughlin Decl. Exhibit 12.

**Response:**

Plaintiff refers to Plaintiff's R. 56.1 Statement ¶ 9. Plaintiff does not dispute that MintBroker purchased 703,602 AWX shares and sold a total of 118,277 AWX shares on July 25, 2018, as further reflected on their Account Statements (Pl. Ex. D & E; as aggregated at Pl. Ex. H).

48.     On July 26, Mintbroker opened a position in **690,184** shares representing **21.24%** of the Float and **40.60%** of the Available Float and closed a position in **215,677** shares representing **6.64%** of the Float and **12.69%** of the Available Float; its total trades were **905,861** "shares" representing **27.87%** of the Float and **53.29%** of the Available Float. McLaughlin Decl. Exhibit 12.

**Response:**

Plaintiff refers to Plaintiff's R. 56.1 Statement ¶ 9. Plaintiff does not dispute that MintBroker purchased 690,184 AWX shares and sold a total of 215,677 AWX shares on July 26, 2018, as further reflected on their Account Statements (Pl. Ex. D & E; as aggregated at Pl. Ex. H).

49.     On July 27, Mintbroker opened a position in **327,406** shares representing **10.07%** of the Float and **19.26%** of the Available Float and closed a position in **192,340** shares representing **5.92%** of the Float and **11.31%** of the Available Float; its total trades were **519,746** "shares" representing **15.99%** of the Float and **30.57%** of the Available Float. McLaughlin Decl. Exhibit 12.

**Response**:

Plaintiff refers to Plaintiff's R. 56.1 Statement ¶ 9. Plaintiff does not dispute that MintBroker purchased 327,406 AWX shares and sold a total of 192,340 AWX shares on July 27, 2018, as further reflected on their Account Statements (Pl. Ex. D & E; as aggregated at Pl. Ex. H).

50.     On July 30, Mintbroker closed a position in **719,885** shares representing **22.15%** of the Float and **42.35%** of the Available Float. McLaughlin Decl. Exhibit 12.

**Response**:

Plaintiff refers to Plaintiff's R. 56.1 Statement ¶ 9. Plaintiff does not dispute that MintBroker sold a total of 719,885 AWX shares on July 30, 2018, as further reflected on their Account Statements (Pl. Ex. D & E; as aggregated at Pl. Ex. H).

51.     On July 31, Mintbroker closed a position in **799,720** shares representing **24.61%** of the Float and **47.04%** of the Available Float. McLaughlin Decl. Exhibit 12.

**Response**:

Plaintiff refers to Plaintiff's R. 56.1 Statement ¶ 9. Plaintiff does not dispute that MintBroker sold a total of 799,720 AWX shares on July 31, 2018, as further reflected on their Account Statements (Pl. Ex. D & E; as aggregated at Pl. Ex. H).

52.     The combined trading in Avalon shares by Mintbroker during the Alleged Short Swing Period was **4,490,250** "shares", representing **138.16%** of the Float and 264.**13%** of the Available Float. Mintbroker's positive book entry position during the Alleged Short Swing Period was **2,345,265** "shares" and its negative book-entry position during the Alleged Short

Swing Period representing sales and short sales was **2,144,985** "shares." McLaughlin Decl. Exhibit 12.

**Response**:

Plaintiff refers to the above responses regarding Defendants' daily trading activity. Plaintiff also refers to the responses above, regarding the number of outstanding AWX shares as a more appropriate benchmark than what the Defendants define as the "Available Float." Plaintiff has not further checked Defendants' math.

53. Account #I1043365 was a proprietary trading account held by MintBroker at Interactive Brokers ("Interactive") and it served as the "Master Account" for two proprietary sub- accounts: (i) Account #UL1043811; and (ii) Account #US1043812 (the "Trading Accounts"). McLaughlin Decl. Exhibit 13.

**Response**:     Not disputed.

54. The "Activity Statements" produced by Interactive for each of the Trading Accounts accurately reflect the Avalon (AWX) and New Concept (GBR) trades executed in those Trading Accounts by Gentile, as the sole owner of MintBroker. (See #UL1043811 "Activity Statement" (filename: Annual Statements/MINT 2018 UL.pdf), AWX trades at pp.933 –1000; GBR trades at pp.1150 –1202; see also #US1043812 "Activity Statement" (filename: Annual Statements/MINT 2018 US.pdf), AWX trades at pp.203-206; GBR trades at pp. 431-433). McLaughlin Decl. Exhibit 13.

**Response**:     Not disputed.

55. The trades reflected in the Activity Statements for the Trading Accounts include the Avalon and New Concept trades reflected in the records produced by the Defendants at Bates Numbers MINT-AWX000001-140 and MINT-GBR-000001-159. McLaughlin Decl. Exhibit 13.

**Response**:     Not disputed.

56. Cash was credited or debited to the Trading Accounts, as applicable, in connection with each AWX or GBR trade listed on the "Activity Statements," in the amount of the "Proceeds" indicated on the "Activity Statements" for each such trade. McLaughlin Decl. Exhibit 13.

**Response**:     Not disputed.

57.     On May 22, 2017, the SEC amended Rule 15c6-1(a) to shorten by one business day the standard settlement cycle for broker-dealer securities transactions from trade date plus 3 business days ("T+3") to trade date plus 2 business days, known as T+2. McLaughlin Decl. Exhibit 14.

**Response:**     Not disputed.


58.     "Generally, this change would mean that when an investor buys a security, the brokerage firm must receive payment from the investor no later than two business days after the trade is executed. When an investor sells a security, the investor must deliver to the brokerage firm the investor's security no later than two business days after the sale. For example, if an investor sells shares of a particular stock on Monday, the transaction would settle on Wednesday." McLaughlin Decl. Exhibit 14.

**Response:**     Not disputed.

59.     Interactive Brokers informed its clients that "[e]ffective September 5, 2017, the standard settlement period for securities traded on U.S. and Canadian exchanges will be reduced from 3 business days (T+3) to 2 business days (T+2) and that clients currently utilizing T+2 (which had a higher execution cost) would be amended to T+1. McLaughlin Decl. Exhibit 15, 17.

**Response:**     Not disputed.

60.     "Most stock exchange transactions settle on the trade date plus two business days . . ." McLaughlin Declaration Exhibit 16 at p. 11.

**Response:**     Not disputed.

61.     Mintbroker's Interactive Brokers 2018 Annual Statement features line items for starting cash, ending cash, and ending settled cash." McLaughlin Declaration Exhibit 16 at pp 1-2.

**Response:**     Not disputed.

62.     Mintbroker's Interactive Brokers Long Account Activity Statement, January 1, 2018- December 31, 2018 features line items for starting cash, ending cash, and ending settled cash. McLaughlin Declaration Exhibit 17 at pp. 772-773.

**Response:**     Not disputed.

63.    The Interactive Brokers Activity Statements explain that "Ending settled cash reflects the cash that has actually settled." McLaughlin Declaration Exhibit 17 at p. 5210.

**Response:**    Not disputed.

64.    The Interactive Brokers code "SS" indicates that a customer has "designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market." McLaughlin Declaration Exhibit 17 at p. 5210.

**Response:**    Not disputed.

65.    None of Mintbroker's AWX long trades during the relevant period were designated "SS." McLaughlin Declaration Exhibit 17 at p. 933-1000.

**Response:**    Not disputed.

66.    None of Mintbroker's AWX short trades during the relevant period were designated "SS." McLaughlin Declaration Exhibit 18.

**Response:**    Not disputed.

67.    The number of shares available for a short seller to borrow is necessarily less than the number of shares in the float of a given stock. McLaughlin Decl. Exhibit 19 at 162:2- 15.

**Response:**

Plaintiff refers to the SEC's "Key Points About Regulation SHO," appended as

Pl. Ex. O, for an explanation of "short selling" rules and practices relevant to this case, including

the procedures required in the event of excessive short selling.

68.    For example, if on a given day, market participants are looking to borrow shares to short sell five million shares, but only one million shares exist, only one million shares can be obtained and are available for delivery on that day. McLaughlin Decl. Exhibit 19 at 162:16-25.

**Response:**

Plaintiff refers to the SEC's "Key Points About Regulation SHO," appended as

Pl. Ex. O, for an explanation of "short selling" rules and practices relevant to this case, including

the procedures required in the event of excessive short selling. As described in that guidance, if short sellers are unable to obtain shares for delivery on the required settlement date, they must obtain the shares on the next day, and/or are subject to an ongoing obligation to the deliver the shares as soon as practicable.

69.     Multiple brokers can short the same "pot" of shares on any given trading day, meaning there might be one million shares available, but two million shares to be sold short. Over the next two trading days, the "clearing function" means the shorted shares will either be delivered or available to borrow, or the short will be closed out because the shares are unavailable. McLaughlin Decl. Exhibit 19 at 99:15-100:19.

**Response:**

Plaintiff refers to the SEC's "Key Points About Regulation SHO," appended as Pl. Ex. O, for an explanation of "short selling" rules and practices relevant to this case, including the procedures required in the event of excessive short selling. As described in that guidance, all short sellers must close out their positions by the day after the required T+2 settlement date. Specifically, short positions must be closed out by buying the shares owed for delivery on the short sale, at the expense of the short seller.

70.     When an Interactive Brokers customer puts an order for shares to be filled, Interactive Brokers routes the order to an exchange and then it is filled on the exchange by a counterparty. McLaughlin Decl. Exhibit 19 at 154:12-155:6.

**Response:**

Plaintiff does not dispute that Interactive routes customer trade orders to one of several possible national securities exchanges for execution. These trades are "filled" by Interactive, as the customer's broker, and executed against an unknown market participant who is the counterparty to the trade.

71.     Interactive Brokers does not know whether or not the counterparty, if not also an Interactive Brokers customer, actually owns the shares it purports to be selling. McLaughlin Decl. Exhibit 19 at 155:4-11.

**<u>Response</u>:**

Plaintiff does not dispute that when Interactive executes a buy order for a customer, Interactive does not know if the selling counterparty is a short seller.

72.     Interactive Brokers does not place any securities into its customer's account until the trade has settled. McLaughlin Decl. Exhibit 19 at 167:22-168:8.

**<u>Response</u>:**

Plaintiff does not dispute that there is generally a delay between trade execution and trade settlement.

73.     Voting power is a legal incident to share ownership, which is vested in the legal owner of stock, which include registered owners, who appear in the company's share registry, and DTCC, which registers the shares it owns under "Cede & Co." McLaughlin Decl. Exhibit 9 at p. 12-6. Only Legal owners can vote shares, while street name holders are not "technically entitled to vote shares or grant proxy authority." *Id*. at p. 12-7. However, DTC assigns to each market participant (including Interactive Brokers) the voting rights associated with particular shares in that participant's DTC account "as of the record date." *Id*. at p. 12-7. The "record date" is the date that a shareholder obtains legal ownership. *Id*. at p. 12-5. Absent special circumstances, proxy authority is never transferred down to the ultimate beneficial owners. *Id*. at pp. 12-7 to 12-8.

**<u>Response</u>:**

Plaintiff refers to the above responses regarding the relevance of "record ownership" as opposed to "beneficial ownership," which is the concept relevant to this case. Brokerage customers are the "beneficial owners" of shares held in their accounts, regardless of whether the shares are held in "street name."

74.     In order to vote shares, the customers of market participants may, by contract with the market participant, have the right to provide voting instructions to their bank or broker, who, in turn, has the legal right to actually vote those shares. *Id*. at pp. 12-7 to 12-8.

**Response**:

Brokerage customers, who are the "beneficial owners" of shares held in their accounts, are entitled to vote their shares. Under the SEC's proxy regulations, brokers holding their customer shares in "street name" are required to provide the customers with the opportunity to vote their shares (including by requesting a transfer of "record ownership").

75.     According to Interactive Brokers, a customer may, "generally speaking," have voting power in securities, but only to the extent they have a long position. McLaughlin Decl. Exhibit 19 at 114:24-125:6.

**Response**:     Not disputed.

76.     A short seller never has any voting rights because it never takes possession of any shares. McLaughlin Decl. Exhibit 9 at pp. 12-18 to 12-20.

**Response**:

Regardless of whether short sellers have voting rights with respect to the shares sold short, the purchasers of shares from short sellers acquire the right to vote—and the right to sell—the shares owed by the short sellers. Additionally, short sellers, like all traders, have a "pecuniary interest" in the shares they trade—including any shares sold short. "Possession" is not an element of "beneficial ownership" relevant to Section 16.

77.     The Interactive Brokers 30b(6) deponent in this matter did not know if a customer could vote shares after an order had been placed but before the shares were placed into the customer's account. McLaughlin Decl. Exhibit 19 at 170:18-117:8.

**Response**:     Not disputed.

78.     This deponent did not establish that the contract between Interactive Brokers and Mintbroker enabled Mintbroker to provide voting instructions to Interactive Brokers, and nor did he establish that Mintbroker exercised

any voting power during the period that it held a position in Avalon securities.

**Response:**

As Interactive's deponent testified, the voting rights provided to brokerage customers are governed by the SEC's proxy voting regulations.

79.     During the relevant period, Avalon executives did not have any knowledge of either Defendant as a greater than 5% (or 10% owner); in fact, Avalon specifically identified its greater than 5% owners in a complaint made to the NYSE on July 24, 2018 and this list did not include Defendants. McLaughlin Decl. Exhibit 27.

**Response:**     Not disputed.

80.     During the relevant period, internal emails also established that "no members of management have bought or sold any shares of stock" and that "no current or potential investor" had contacted Avalon regarding the trading activity described herein. McLaughlin Decl. Exhibit 30 at AV0009-10, AV0026-29.

**Response:**     Not disputed.

81.     Counsel for Avalon, David Lopez, has brought at least 325 Section 16(b)-related cases in the Southern District of New York since 1973. McLaughlin Decl. Exhibit 20, PACER Search results for "attorney" Firstname "David" Lastname "Lopez.

**Response:**

Not disputed. Plaintiff refers the Court to the supplement filed in connection with Plaintiff's opposition to Defendants' Motion to Dismiss (Dkt #32-1) regarding Defendants' unprofessional (and baseless) accusations and attempts to denigrate the value of Plaintiff's counsel's Section 16 enforcement efforts.

82.     Counsel for Avalon, Miriam Tauber, has brought some 45 Section 16(b)-related cases in the Southern District of New York since 2014. McLaughlin Decl. Exhibit 21.

**Response:**     See Response to above Paragraph 81.

83. Lopez and/or Tauber have represented Plaintiff Deborah Donoghue in at least 146 16(b)-related demand action 146 times since 2001. McLaughlin Decl. Exhibit 22.

**Response:**     See Response to above Paragraph 81.

84. Lopez represented Plaintiff Richard Morales in approximately 88 16(b)-related demand action 146 times prior to 2001. McLaughlin Decl. Exhibit 23.

85. Plaintiff Deborah Donoghue was substituted for Plaintiff Richard Morales or designated as plaintiff/executrix of Richard Morales in eight cases in 2001 after he died:

   a) *Donoghue, et al v. Flightserv.Com, et al.*, No. 1:00-cv-03987-JSM
   b) *Donoghue, et al v. Miracor Diagnostics, et al.*, No. 1:00-cv-06696-JGK
   c) *Morales, et al v. Natural Microsystems, et al.*, No. 1:01-cv-00708-RWS
   d) *Morales, et al v. CT Holdings Inc., et al.*, No. 1:01-cv-01303-KMW-KNF
   e) *Donoguhe v. Integrated Business, et al.*, No. 1:01-cv-02407-KMW
   f) *Donoghue v. Opti, Inc., et al.*, No. 1:01-cv-02447-MP
   g) *Donoghue v. Equitex, Inc., et al.*, No. 1:01-cv-06132-WK
   h) *Donoghue v. Spatializer Audio, et al.*, No. 1:01-cv-07286-AKH

   McLaughlin Decl. Exhibit 22.

**Response:**     See Response to above Paragraph 81.

86. Lopez has represented Plaintiff C.R.A. Realty Corp. in approximately 50 16(b)- related cases. McLaughlin Decl. Exhibit 24.

**Response:**     See Response to above Paragraph 81.

87. Lopez and/or Tauber have represented Plaintiff Aaron Rubenstein in approximately 24 16(b)-related demand actions since 2015. McLaughlin Decl. Exhibit 25.

**Response:**     See Response to above Paragraph 81.

88. Lopez and/or Tauber have represented Plaintiff Mark Rubenstein in approximately 10 16(b)-related demand actions since 2015. McLaughlin Decl. Exhibit 26.

**Response:**     See Response to above Paragraph 81.

89.     A great number of this cohort's 16(b) cases are dismissed within months of being brought, including, for example, as to Richard Morales, the following cases: *Morales v. Underwriters Group, et al.*, No 1:93-cv-06228-LAP (filed 9/7/1993, closed 11/17/1993); *Morales v. IEC Electronics, et al.*, No 1:00-cv-017553-BSJ, (filed 3/7/00, closed 7/29/00; *Morales v. Coleman Co. In., et al.*, No. 1:00-cv-02482-VM (filed 3/31/11, closed 5/1/00); *Morales v. Memberworks Inc., et al.*, No. 1:00-c- 03122-JSM (filed 4/24/00, closed 8/28/00); *Morales v. Zale Corporation, et al.*, No. 1:95:cv-01653 (filed 3/10/95, closed 4/19/95). McLaughlin Decl. Exhibit 23.

**Response:**     See Response to above Paragraph 81.

90.     Following the filing of *Huppe v. Special Solutions Fund III QP, L.P.* in 2006 and six years of litigation thereafter, Ayro informed shareholders in its 2013 Annual Report that a settlement reached against alleged short-swing shareholders in the case constituted $529,280 in disgorgement of short-swing profits, less the fees and expenses agreed upon by the plaintiffs of $272,539, leaving a remainder of $254,361 for Ayro which would be "recorded as additional paid-in capital." McLaughlin Decl. Exhibit 29.

**Response:**     See Response to above Paragraph 81.

Dated: September 23, 2020
       New York, NY

s/ Miriam Tauber                                   *s/ David Lopez*

_____        _____
Miriam Tauber (MT-1979)                     David Lopez (DL-6779)
MIRIAM TAUBER LAW PLLC                  LAW OFFICES OF DAVID LOPEZ
885 Park Ave. 2A                                  PO Box 323 | 171 Edge of Woods Rd.
New York NY 10075                              Southampton NY 11969
323-790-4881                                       (631) 287-5520
MiriamTauberLaw@gmail.com

*Attorneys for Plaintiff Avalon Holdinfgs Corp.*