UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

AVALON HOLDINGS CORPORATION,

                *Plaintiff*,

– against –

GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.,

                *Defendants*

-----------------------------------------------------------------------x

Case No.: 1:18-cv-7291-VSB-RWL

# DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

FORD O'BRIEN LLP

Adam C. Ford
Robert S. Landy
Danielle M. McLaughlin
575 Fifth Avenue
17th Floor
New York, New York 10017
aford@fordobrien.com
rlandy@fordobrien.com
dmclaughlin@fordobrien.com
(212) 265-1047

*Attorneys for Defendants Guy Gentile and Mintbroker International, Ltd.*

October 5, 2020

Pursuant to Fed. R. Civ. P. 56 and the Local Rules of the United States District Court for the Southern District of New York, Defendants Guy Gentile and Mintbroker International, Ltd. ("Mintbroker"), by their undersigned counsel, submit this Reply Brief in Support of their Motion for Summary Judgment (ECF Doc. No. 71).

## INTRODUCTION

The opposition papers of Plaintiff Avalon Holdings Corp ("Avalon") prove that Plaintiff cannot refute the unique facts of this case which remove it from Section 16(b)'s ambit.  First, the massive trading volume representing many multiples of the available shares.  Second, the Securities and Exchange Commission's mandated settlement period which is not accounted for in the Interactive Brokers activity statements upon which Plaintiff relies.  Third, the impact of naked short on Defendants' (and others') ability to actually purchase "Avalon securities."  Fourth and most importantly, the fact that the number of Avalon securities actually available for purchase during  relevant period were *less than Plaintiff claims Defendants "beneficially owned*."  Instead, Plaintiff argues past Defendants in a rote recitation of its arguments in the companion *New Concept Energy* case (with the sole exception of alleged damages), urging the Court in its Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Further Support to its Motion for Summary Judgment, ECF Doc. No. 86 ("Pl. Opp.") that what happened here meets all definitional standards of the statutory and regulatory scheme of the 1934 Securities Exchange Act, and strict liability must therefore apply.  The evidence, which includes statements from Avalon's own executives, proves otherwise.

Even if this Court does not entirely dispose of this case on Defendants' motion for summary judgment—as it should—at the very least it should deny Plaintiff's motion for summary judgment because Plaintiff has not even addressed these glaring disputes of material fact.  Finally, while Plaintiff (tellingly) urges this court not to consider policy when making a

determination on summary judgment even as it tries to expand Section 16(b) liability, policy counsels that the trading activity here is not the speculative abuse, born of inside knowledge, that Section 16(b) was designed to deter and punish, and as such it falls outside Section 16(b)'s necessarily narrow construction.

## ARGUMENT

I. Section 16(b) Of The 1934 Securities Exchange Act Does Not Apply Here

    A. Defendants Did Not Purchase, Or Sell, "Securities"

As the Court is well aware, SEC Rule 16a–1(a) provides that, in determining whether an individual is a "beneficial owner" under § 16(b) of the Act, courts should look to Section 13(d), 17 CFR 240.13d-3(a), which states that a beneficial ownership can be established by "voting power," or by "investment power," which "includes the power to dispose, or to direct the disposition of, *such security*." (Emphasis added). Plaintiff has presented no facts demonstrating that Defendants possessed voting power in Avalon securities, and so have abandoned this prong of the test, arguing solely that they have established "the more easily identified possession of 'dispositive' power, i.e., Defendants' authority to sell the shares accumulated in their brokerage accounts." Pl. Opp. at 8. Plaintiff has done no such thing. Defendants never possessed voting power because they were not trading in Avalon securities. As such, they did not possess "dispositive power" either.

        1. The "Available Float" and Market Volume Proves That Trading Was In Book Entries

The clearest dispute of material fact in this case—and the one that brings Plaintiff's untenable position on "beneficial ownership" into sharpest relief—is Plaintiff's allegation that Defendants possessed more than the number of Avalon shares actually available for purchase for

several days during the alleged short swing period. Plaintiff has not offered a single fact in its' opposition papers to dispute this gaping hole in its argument on summary judgment.

Specifically, according to Plaintiff's own motion for summary judgment, there is no dispute of material fact as to their assertion that Defendants "beneficially owned" each and every Avalon share as set out in the trades in its Exhibit H, which is based on the Interactive Brokers activity statements. Plaintiff's Memorandum of Law in Support of Summary Judgment (ECF Doc. No. 76) ("Pl. Br"). at 9-11. Plaintiff also asserts there is no issue of material fact as to whether Defendants owned 53% of Avalon stock at the end of the trading day on July 27, 2018. Plaintiff's Rule 56.1 Statement (ECF Doc. No. 77) ¶ 9. There is more than a dispute of material fact as to these assertions. They cannot possibly be true.

On July 27, 2018, (and throughout the alleged short swing window), according to Avalon executives, the number of actual Avalon shares (ticker symbol AWX) any market participant could feasibly possess was 1.7 million shares (the "Available Float") because certain known and identified insiders did not sell their shares during the short swing period. R-56.1 ¶ 19. The Available Float represents 52% of Avalon's outstanding shares. *Id.* Despite this, Plaintiff suggests that there is no genuine dispute of material fact as to their assertion that at the end of the day on July 27, Defendants "beneficially owned" 1,719,885 Avalon shares. This is *more than the number of shares that Avalon executives themselves admit existed to purchase*. In addition to this being a factual impossibility with respect to Mintbroker's own trading, this "material fact," around which Plaintiff alleges there is no genuine dispute, is impossible to square with the undisputed material fact that the volume of AWX traded on the entire market on July 27 was 12,799,500 shares. R-56.1 ¶ 32. Not only did Defendants not actually own—nor could they ever own—actual shares unpinning their positions, neither did over 90% of market participants on

3

that day.  The positions in traders' accounts are simply divorced from the reality of the actual number of Avalon shares in existence.

Plaintiff's Exhibit H to its Motion for Summary Judgment ("Plaintiff's Exhibit H") (ECF Doc. No. 78-8) sets forth that Mintbroker "beneficially owned" (under Plaintiff's interpretation of these facts) greater than 48% of Avalon stock for three trading days during the short swing period—from July 26 at 10:15:10 a.m. until July 30 at 12:49:38 p.m.  *See* Plaintiff's Exhibit H at pp. 21-30.  If Plaintiff's theory of beneficial ownership is correct and there is no material dispute here, there could be *no other trading* in Avalon stock during that period, because Plaintiff "beneficially owned" all of the Available Float (and, impossibly, more shares than were available to purchase).  The facts prove Plaintiff's theory wrong, removing this case from Section 16(b)'s ambit entirely, because the undisputed trading volume for all market participants in Avalon stock on July 26 was 10,306,500, on July 27 was 12,799,500, and on July 30 was 5,707,000.  R-56.1 ¶¶ 28, 32, 36.  Plaintiff argues that "[s]o long as purchases or sales were placed by the Defendants and confirmed by their broker, the Defendants bought or sold by entering into contracts to buy or to sell."  But what, exactly, did they buy and sell?  The evidence establishes that it was not Avalon "securities."

        2.     <u>Defendants Could Never Have Purchased "Securities" From Naked Short Sellers Who Did Not Ever Own Such "Securities"</u>

The impossibility of Plaintiff's position is set out in the contradictory positions it takes in its own brief.  Plaintiff argues that "Defendants do not and cannot deny that they had the right to sell all of the shares purchased in their Interactive Brokers' accounts when their purchases were executed, before delivery of the shares was due to the Defendants on the T+2 settlement date . . . ."  Pl. Opp. at 9.  And yet, just three pages later, Plaintiff appears to admit that it is not "difficult to hypothesize a situation . . . closer to the record in this case, [where] large numbers of short

sales by market makers ha[d] no relation, at the moment of sale, to available shares." Pl. Opp. at 12. Plaintiff hereby admits that the "purchases" it alleges Mintbroker made had "no relation …to available shares," which is the position of Defendants in this case (borne out by the analysis in point 1 above), and which squares with the testimony of Interactive Brokers' Brad Klauseger—a witness that Plaintiff called for deposition—who stated in response to a hypothetical question about short selling that the "pot" of available shares might be one million, but two brokers can (and do) each take a short position in those million shares, meaning there would be short sales of two million shares, when only one million actual shares were available to cover the short positions. R-56.1 ¶ 69. Obviously, *such an event does not double the amount of actual shares available to sell and obviously the purchasers from short sellers to not end up owning two million shares.* Rather, it means that many of the short sales could never settle because the sales did not represent actual and deliverable securities.

Inexplicably, having adopted Defendants' theory of the case, Plaintiff then urges the court to adopt the opposite position, that "Defendants bought 'actual and deliverable stock'" even if they bought from short sellers "who did not have the stock available to sell." Not only does this premise not make any sense, the case law cited by Plaintiff does not support it.

First, *IBS Financial Corp. v. Seidman & Associates L.L.C.*, 136 F. 3d 940 (3d Cir. 1998) is a Third Circuit Court of Appeals case which is not controlling and is entirely irrelevant. It is offered in support of Plaintiff's argument that "possession of the [investment] power is sufficient, its exercise unnecessary for its holder to be a beneficial owner." Pl. Opp. at 7. But *IBS Financial Corp.* concerns the definition of "control" pursuant to Section 13 of the Act. 136 F. 3d at 947. There, the court determined that the defendant could be a "controlling" person

5

because he had the power to direct the "management and policies" of a company, whether he exercised it or not. *Id.* In short, this case is not about beneficial ownership at all.

The rest of the cases cited in support of Plaintiff's argument that Section 16(b) applies to the trading activity here (Pl. Opp. 5-8) concern the definition of the terms "purchase" and sale" as they appear in Section 16(b), and most importantly (unlike in this case), concern securities, that actually existed, were owned by a long seller, and were purchased or sold.

Plaintiff argues that "so long as purchases or sales were placed by the Defendants and confirmed by their broker, the Defendants bought or sold by entering into contracts to buy or to sell," citing *Rubenstein v. Cosmos Holdings, Inc.,* No. 19 Civ. 6970 (KPF), 2020 WL 3893347, at *6 ) (S.D.N.Y. July 10, 2020). This particular Mark Rubenstein case (a decision on a motion to dismiss which requires only a "plausible claim for relief"), concerned the purchase and sale of 100,000 actual shares of company stock, the existence of which no party disputed. *Id.* at *1. Plaintiff's next case, *Plumber's Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, examined the definition of the term "purchaser," and concerned the purchase of actual "shares of Swiss Re's common stock," the existence of which no party disputed. 753 F. Supp. 2d 166, 172 (S.D.N.Y. 2010). Plaintiff also cites *Donoghue v. Patterson Cos. Inc.*, a case about a prepaid variable forward contract for the sale of 200,000 shares. 990 F. Supp 2d 421, 423 (S.D.N.Y. 2013). First and foremost, the case involved actual shares, the existence of which no party disputed. *Id.* Second, the proposition for which the case is offered – that the date of a contract to settle this specific type of transaction in cash is the "purchase date" – is not only irrelevant here, it was a rejection of Plaintiff's (and counsel here's) argument that an option to settle in cash is a "purchase" even if the option was not exercised. *Id.* at 427. Notably, this case is one of at least three cases where serial plaintiff Deborah Donoghue and her counsel (some 150 Section 16(b)

6

cases since 2001, R-56.1 ¶¶ 83, 85) argued to expand the meanings of the terms "purchase" and "sale" as a means of expanding liability under Section 16(b). This argument was rejected in all three cases on a motion to dismiss. *See also Donoghue v. Murdock*, No 13 Civ. 1224, 2013 WL 4007565 (S.D.N.Y. Aug. 6, 2013) and *Donoghue v. Centillium Communications, Inc.*, No. 05 Civ. 4082, 2006 WL 775122 (S.D.N.Y. Mar. 28, 2006).

      B.      Defendants' Open Positions Did Not All Clear Before Defendants Exited Positions in Avalon Stock

The data on clearing in this case comes directly from the Depository Trust & Clearing Corporation ("DTCC") and its subsidiaries the Depository Trust Company ("DTC") and the National Securities Clearing Corporation ("NSCC"). DTC is "the central securities depository for equity securities . . . where all securities positions are held in the U.S.[1] DTCC itself describes settlement as follows: "[i]n the financial industry, settlement is generally the term applied to the exchange of payment to the seller and the transfer of securities to the buyer of a trade. It's the final step in the lifecycle of a securities transaction."[2] DTC data proves that Mintbroker's 7/24 AWX trades did not settle until 7/26; Mintbroker's 7/25 AWX trades did not settle until 7/27; Mintbroker's 7/26 AWX trades did not settle until 7/30; Mintbroker's 7/27 AWX trades did not settle until 7/31; Mintbroker's 7/30 AWX trades did not settle until 8/1; and Mintbroker's 7/31AWX trades did not settle until 8/2. *See generally* Exhibit 10 to Defendants'Motion for Summary Judgment, ECF Doc. No. 74-11. The Interactive Brokers activity statements relied upon by Plaintiff in this case do not account for the settlement period, and Plaintiff's analysis simply ignores it. *See generally* Plaintiff's Exhibit H.

---

[1] DTCC, Understanding the Settlement Process, https://www.dtcc.com/understanding-settlement/index.html (last visited Sept. 29, 2020).
[2] *Id.*

Finally, Plaintiff argues (referencing Exhibit J attached to its own Motion to Dismiss, ECF Doc. No. 78-10) that "it is possible to cross-reference [the publicly available] short selling data with Defendants' reported trades to determine the portion of Defendants' counterparties who were short sellers. This statement is simply false. Indeed, if one could cross-reference short selling data to make this determination, Plaintiff would certainly have done so and highlighted the results (if they were favorable). But despite Plaintiff saying such an analysis is possible, it has not performed this analysis in order to present to the court proof of all Defendants' purchases from long sellers (who actually possessed Avalon securities to sell). This is obviously because such an analysis cannot be done. Without dispute, the SEC "fail to deliver" data referenced in Plaintiff's Exhibit J identifies only the settlement date, security, quantity, and price of a failed trade. Defendants' Local Civil Rule 56.1 Statement in Support of their Memorandum of Law in Opposition to Avalon Holdings Corp.'s Motion for Summary Judgment (ECF Doc. No. 84) ("Opp. R-56.1") ¶ 48. It does not state whether it is a purchase or sale, or the time of the transaction, and it does not identify the trade date, or the purported purchaser, seller, or broker. *Id.* The limitations of this data are inherent in the SEC's long-winded description of it – "[t]he values of total fails-to-deliver shares represent the *aggregate net balance* of shares that failed to be delivered as of a particular settlement date . . . . Fails to deliver on a given day are a cumulative number of all fails outstanding until that day, plus new fails that occur that day, less fails that settle that day. The figure *is not a daily amount of fails*, but a combined figure that includes both new fails on the reporting day as well as existing fails. In other words, these numbers reflect aggregate fails as of a specific point in time, and may have little or no relationship to yesterday's aggregate fails. Thus, it is important to note that the age of fails cannot be determined by looking at these numbers." Opp. R-56.1 ¶ 49 (emphasis added).

### C. This Trading Activity Is Not The Insider Abuse Congress Designed Section 16(b) To Remedy

Congress recognized in enacting Section 16(b) "that that insiders may have access to information about their corporations not available to the rest of the investing public. By trading on this information, these persons could reap profits at the expense of less well informed investors." *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 243 (1976) (internal citations omitted). *See also Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 173-74 (2d Cir. 2012) (Section 16(b), "a vital component of the Exchange Act, [ ] was designed to prevent an issuer's directors, officers, and principal stockholders from engaging in speculative transactions *on the basis of information not available to others*.") (internal quotation marks omitted) (emphasis added).  Importantly, because of its strict liability nature, "where alternative constructions of the terms of S[ection] 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders." *Foremost-McKesson, Inc.*, 423 U.S. at 244.  *See also Donoghue*, 990 F. Supp. 2d at 424 (*citing Levy v. Southbrook Int'l Invs. Ltd.,* 263 F.3d 10, 16 (2d Cir. 2001)) ("[f]inancial instruments that do not fall squarely into [the 16(b)] framework are to be construed narrowly to favor the insider because of the strict-liability nature of Section 16(b)").  This case involves high-speed computer trading by non-insiders who opened positions in shares that could not possibly exist, and who are accused of "beneficially owning" more shares than could possibly have been purchased during three of the six trading days in the short swing window. Defendants did not purchase or sell "securities."  This is simply not a Section 16(b) case.  And this court should resist Plaintiff's dogged attempt to expand it.

9

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Court grant their motion for summary judgment, or in the alternative, issue a ruling requiring Plaintiff to establish at trial that every "security" it alleges Defendants purchased or sold: (i) actually existed; and, (ii) came into Defendants' possession such that Defendants had "investment power" pursuant to 17 CFR 240.13d-3(a).

FORD O'BRIEN LLP


  /s/ Danielle M. McLaughlin
Adam C. Ford
Robert S. Landy
Danielle M. McLaughlin
575 5th Avenue, 17th Floor
New York, NY 10017
aford@fordobrien.com
rlandy@fordobrien.com
dmclaughlin@fordobrien.com
*Attorneys for Defendants Guy Gentile and Mintbroker International, Ltd.*

Dated: New York, New York
         October 5, 2020

10