UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVALON HOLDINGS CORP., <br><br> Plaintiff, <br><br> v. <br><br> GUY GENTILE and <br> MINTBROKER INTERNATIONAL, LTD., <br><br> Defendants. | No. 18-cv-7291 (VSB) (RJL) <br><br> ECF Case |

Related to:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC. <br><br> Plaintiff, <br><br> v. <br><br> GUY GENTILE and <br> MINTBROKER INTERNATIONAL, LTD., <br><br> Defendants. | No. 18-cv-8896 (VSB) (RJL) <br><br> ECF Case |

**AVALON HOLDINGS CORP.'S REPLY MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Miriam Tauber (MT-1979)
MIRIAM TAUBER LAW PLLC
885 Park Ave. 2A
New York NY 10075
Tel: (323) 790-4881
MiriamTauberLaw@gmail.com

David Lopez (DL-6779)
LAW OFFICES OF DAVID LOPEZ
PO Box 323 | 171 Edge of Woods Rd.
Southampton NY 11968
Tel: (631) 287-5520
Fax: (631) 283-4735
DavidLopezEsq@aol.com

*Attorneys for Plaintiff Avalon Holdings Corp.*

**OVERVIEW**

The defense continues to cling to magical thinking. Eighty-six years of legislative history, of the promulgation of administrative rules and of the development of a vast body of judicial interpretation, are of no moment.

In their responses to Plaintiffs' Motions for Summary Judgment, the Defendants repeat their wishful alternative view that purchases and sales are not as defined by the statute. Instead, they are what the Defendants want them to be. Trades must settle before they are trades, even though they can be traded against instantly. Record ownership is of the essence, even though the decisions make it irrelevant. Buying from a naked short seller is not buying even though the shares bought can be resold immediately. Trading through a broker involves only "book entries" or "derivatives" ignoring that both are indisputably purchases or sales of referenced securities.

In the Plaintiffs' Response Briefs filed September 24, 2020, the real-world state of applicable law is discussed. We continue our discussion here, tethered to the law.

**POINT I.**

**THE NAKED SHORT-SELLING OF COMMON STOCK IS ANALAGOUS TO FRACTIONAL RESERVE BANKING. SHARES CAN BE CREATED.**

The defense response brief rehearsed at length the extent to which daily trading in the Plaintiff's shares exceeded its float. Plaintiff does not dispute the data. Arithmetic is arithmetic. There is much massaging of the numbers to show the incongruity between shares traded on key dates and the issuer's purported float, but no discussion of authority that sheds light on their implications under Section 16(b). The argument seems to run that unless every purchase by the Defendants were from a holder in possession of adequate numbers of physical shares the fact that the defendants were reaping real-world profits would make no difference to their liability.

The argument is meritless. We draw an analogy to fractional reserve banking. The following is a summary of select balance sheet items from five of the leading domestic bank holding companies at year-end 2019:[1]

|  | **JP Morgan Chase** | **Citigroup** | **Bank of America** | **Morgan Stanley** | **Wells Fargo** |
|---|---|---|---|---|---|
| Shareholder Capital | $261,330,000 | $193,242,000 | $264,810,000 | $81,549,000 | $187,146,000 |
| Deposits | $1,562,431,000 | $1,070,590,000 | $1,434,803,000 | $190,356,000 | $1,322,626,000 |
| Loans Outstanding | $959,769,000 | $686,700,000 | $983,426,000 | $130,637,000 | $962,265,000 |
| Derivatives Outstanding | $1,722,283,000 | $2,279,242,000 | $1,536,870,000 | $1,809,794,000 | $276,864,000 |

Looking to JPMorgan Chase & Co. as an example, at y/e 2019, it reported equity of $261,330,000; loans of $959,769,000; and derivative securities of $1,722,283,000. We may safely assume that with 10X leverage the bank lacked sufficient dollar bills sitting in its vaults to back with physical certificates every dollar of its loans and equity derivatives, not to mention its roughly $50,000,000,0000 in Interest Rate Swaps and ForEx and Commodity Contracts.

It follows from the Defendants' logic that anyone indebted to JPMorgan Chase through a loan would not be liable for repayment unless the bank could prove that the physical dollar bills backing it were sitting in its vault at the time of its making. Never mind that the full loan amount was paid to and accepted by the borrower. This, of course, is nonsense. Banks can create money to lend as long as regulatory reserve requirements are met. An account for the borrower is funded with a keystroke. The loan is made.

Nor does JPMorgan Chase need to hold physical shares matching all shares underlying its derivative securities positions. So long as regulatory reserve requirements are met,

---

[1] Information provided in the table is compiled from 10K reports available at sec.gov. *See also*: https://:www.idbanknet.com/scripts/callreports/filist.aspx?type=derivatives.

2

it can undertake hugely leveraged positions in referenc securities without physical ownership of the underlying shares. Credit worthiness is a substitute -- yet under Section 16(b) the creation of each such derivative is a purchase or a sale of shares.

The selling by securities market-makers of naked-shorts is similarly perfectly legal and enforceable by all parties so long as settlement requirements are met under the SEC's Regulation SHO. *See* Pl. Ex. O (text of Reg. SHO); Pl. Ex P (SEC's plain English explanation). For broker-dealers and for most market participants, sales of naked-shorts must be settled through delivery of shares on T+2 (trade day plus 2 settlement days). If the customer fails to deliver, the broker is obligated to buy-in covering shares on T+3, at whatever price the market demands.

Different rules apply to market makers in the ordinary course who may need to "create" shares to provide immediate liquidity. For them, various more lenient rules apply that may allow them T+ 4, T+6 and circumstances permitting, up to T+13. *See* Pl. Ex. O; Ex. P at § III.  The purchase of nakedly-shorted shares confers immediate powers of alienage making the seller a midwife delivering newly created shares beyond the issuer's physical float. *See* Pl. Ex. P §§ I–III.

No purchase or sale on which the Plaintiff relies for Section 16(b) profits matching has been identified or claimed by the defense not to have been paid for or not to have paid out. There is no issue.

## POINT II.

### THE DEFENDANTS ENGAGED IN HIGH FREQUENCY DAY TRADING AS PART OF A PUMP AND DUMP SCHEME IN AID OF A SHORT-SQUEEZE.

**A.  Defendants' Day Trading Algorithm Generated Short-Swing Profits**

Defendants accuse Plaintiffs of filing "boilerplate briefs" in these cases. We are accused of disregarding supposed differences in the "market activity" in these stocks. (Def. Opp. Br. at 5). Defendants are largely responsible for most of that "market activity" during the short-

3

swing period. The sheer volume and frequency of Defendants' trades of Plaintiffs' stocks confirm they were placed by an algorithm implementing a trading strategy of defendants' design. Market data for each stock provided different "input" data for the formula, but the algorithmic trading strategies were the same in each case. They were to "pump and dump" the stock causing a "short-squeeze."

The academic study accompanying Plaintiff's Motion identifies the key features of Defendants' trading algorithm. *See* Pl. Ex. J (R. Ricco paper); Pl. Ex. F (Def. Sched. 13D):

1. Defendants placed **"market buy" orders** (orders to buy shares at the "asking price") until a large portion of the available shares were scooped up (up to 58.83% of outstanding AWX shares, *see* Pl. 56.1 Opp. ¶ 13)—*the "Accumulation" phase of the scheme.*

2. *To confuse the market* and *re-enforce their informational advantage*, Defendants **interspersed sales among the buy orders** on "pump" days (i.e., days when Defendants were net buying); **and buys among the sell orders** on days leading up to and when Defendants were "dumping" (i.e., net selling) under Regulation SHO.

3. Once Defendants' accumulated positions sizeable enough to be loaded with short sales, Defendants placed **"limit sell" orders** (orders where they set the "asking price"). When settlement requirements were triggered (e.g., on and after T+2)—*the "dump" portion of the scheme* came into play.

Due to the size of their positions the Defendants, had to know that some of their counterparties could not be other than short sellers. "Short selling" data is publicly available and interpretable by experienced market operators. And they had to know that the short-selling counterparties would be compelled to buy covering shares byT+2, or have is done for them at T+3.

The strategy employed by the Defendants, once their holdings passed the threshold of 10% beneficial ownership, systematically (algorithmically) had to implicate Section 16(b)—and would be so if applied to any stock, regardless of the "market activity" in that stock. Section 16(b) was and is intended to take all profits out of such activity for insiders.

4

Defendants assert that Section 16(b) is ill-suited to "modern realities" of trading, like their computer-driven trading, that Defendants could not obtain any "insider" information. Day trading is a reality of the markets and is subject to SEC Regulations; *see, e.g.,* FINRA Rule 4210 (providing "margin" requirements for "pattern day traders"). Day traders are required to comply with all provisions and restrictions of the securities laws, including Regulation SHO, anti-market manipulation rules, and insider trading prohibitions—including Section 16(b).

Although motivated by concerns prominent in the wake of the great crash of 1929 -- the misuse of inside information contributing to deteriorating confidence in public markets -- the rule against short swing-trading was drafted with much supporting testimony before the Pecora Commission of the workings of pools and pool operators. *See generally* H.R. Rep. No. 1383 & S. Rep. No. 1455, 73rd Cong., 2d. Sess. (1934) (with special attention to § 7: "Manipulative Devices"). The "flat" rule established by Section 16(b) is designed to require "mechanical" compliance, *see, e.g.*, *Reliance Elec. Co. v. Emerson Co.*, 404 U.S. 418, 422 & 425-26 (1972); surely even a computer program can be made to comply. This Court's decision on Defendants' Motion to Dismiss [Dkt #35] serves as a warning that "high speed" day traders must build Section 16(b) compliance into their algorithms by not blundering over the 10% threshold of insider status.

**B.    Defendants' Purchases from Short Sellers,
         and Sales to Short Sellers, Are Subject to Sec. 16(b)**

Defendants deny that Plaintiffs are entitled to summary judgment because the Plaintiffs have not demonstrated that any (or which) of the Defendants' trading counterparties were not short sellers. Defendants argue that their purchases from short sellers would not give to Section 16(b) liability because the short sellers did not have, and could not have transferred, "possession" of the shares, and/or voting rights with respect to the shares, to the Defendants at the time their purchase orders were executed and filled. Defendants also suggest that their sales of shares back

5

to short sellers would not give rise to Section 16(b) liability because the sale would "cancel" the original short sellers' obligation to deliver these shares to the Defendants. For all of this there is no citation to authority. There is none. There is no issue.

While the Defendants, not the Plaintiffs, must prove the existence of facts asserted in their defense, *see Rosen v. Brookhaven Capital Mgmt. Co., Ltd.*, 194 F. Supp. 2d 224, 227 (S.D.N.Y. 2002) (plaintiffs are not required to plead facts in anticipation of potential § 16(b) defenses), the academic analysis submitted as Pl. Ex. J identifies the segment of Defendants' trading counterparties that were short sellers. Trades with short counterparties are treated no differently than any other trades under Section 16(b). The trade date controls. The settlement date is irrelevant. *See Romeo & Dye,* Sec. 16 Treatise & Reporting Guide (2020 ed.) at 484; *cf.* In re Form 8-K Disclosure of Certain Management Transactions, SEC Release No. 8090, 2002 WL 538909, at *5 (April 12, 2002) ("The date of a reportable event would be the date on which the parties enter into an agreement. … In the case of an open market securities transaction, the date would be the trade date and not the settlement date"). There is no issue.

Defendants assert that, according to Interactive's witness, Defendants may not have had exercisable voting rights with respect to any shares sold from the account designated for "short" positions taken by the Defendants.[2] The extent and nature of voting rights over shares in a brokerage account is governed by the proxy rules of the SEC, not by the speculations or

---

[2] Defendants baselessly assert that Plaintiffs supposedly abandoned the opportunity to take further discovery on this point. In fact, Plaintiffs established that the Defendants had the right to vote shares held in their Interactive brokerage accounts as a general matter, as required by SEC Regulations. As Defendants are also aware, Plaintiffs specifically followed up on Interactive's deponent's suggestion that additional documents or restrictions may exist with respect to Defendant's voting rights pertaining to these individual stocks, or applicable to Defendants' "short" account. Following Interactive's R. 30(b)(6) deposition on May 27, 2020 (Pl. Ex. C), Plaintiffs sent a supplemental Document Request relating to "voting rights" information on June 17. On July 17, Interactive responded that no additional documents existed.

ruminations of a brokerage employee. But since the Plaintiff has sidestepped the voting rights issue entirely by relying on dispositive power as the basis of beneficial ownership. There is no issue.

Defendants claim that any shares sold to short sellers to cover their short sales "canceled" the short sellers' delivery obligations. Thus, these trades should be considered to have "failed to clear" or "failed to settle." But as Defendants are forced to acknowledge, none of their trades resulted in delivery failures. (*See* Def. Opp. Br. at 16: "failures to deliver by their very nature exclude the types of round-trip transactions that occurred frequently here …"). There is no issue.

Defendants argue that where the same parties are involved in the short sale and the covering transaction (where the short seller buys the shares back from the Defendants in order to cover), the sale and covering purchase effectively "cancel" each other without liability. The defense presents no evidence that such ever happened nor authority for the consequences. There is no issue.

Defendants suggest they bought shares from short sellers and sold shares "back" to the same short sellers. Defendants do not (and cannot) know whether their purchases and sales were executed against the same short sellers. No evidence is presented of any such event. There is no issue.

Although Regulation SHO permits the Defendants to buy shares from short sellers in order to sell the shares back to the short sellers at a profit, Section 16(b) requires forfeiture of any pofits to an insider from doing so "... within any period of less than six months." Regulation SHO gives effect to Defendants' transactions with short sellers, notwithstanding that the shares sold by short sellers may also "belong" to other shareholders (e.g., shareholders who loaned the shares to be sold short, in compliance with the "borrow" or "locate" requirement). Section 16(b) likewise requires the Defendants to include any shares traded with short sellers within their

7

"beneficial ownership" for purposes of compliance with the short swing trading proscription, notwithstanding that the shares may also be beneficially owned by other shareholders (e.g., lenders to the short sellers, who may have restricted their right to sell the shares under the terms of the loan, but who may retain some voting rights in the shares loaned and sold short). There is no issue.

Defendants' "short squeeze" trading scheme exemplifies the type of abuse that Section 16(b) aims to prevent—speculative trading by significant shareholders with access to market information not visible to their counterparties. Defendants argue that the policy of Section 16(b) does not extend to them because they were insiders as a purely technical matter, and not because of their relationship with the Plaintiffs. But Section 16(b) is deliberately designed to be technical, *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320-21 (2d Cir. 1998). The statute is famously both "under-" and "over-" inclusive, *by design*. Section 16(b) prohibits all short swing trading by statutory insiders, *Donoghue v. Bulldog Investors*, *G.P.*, 696 F.3d 170 (2d Cir. 2012), whether they are *ex officio* or statutorily created insiders; but does not apply to any trading by actual "insiders" who are not officers, directors, or 10% "beneficial owners," or to any insider trading over the course of periods longer than six months.

This is fully in keeping with the statutory purpose, which is not (as Defendants incorrectly state) to prohibit the misuse of information. Rather it is to *prevent* the misuse of information. The disgorgement remedy is strictly imposed by the statute not to correct wrongdoing, but to deter the Defendants from engaging in this type of trading at all. *Id.*

## POINT III.

### THE DEFENSE HAS FAILED TO MEET ITS BURDEN OF PROOF BY FAILING TO OFFER COMPUTATIONS OF DAMAGES IN MITIGATION OF THOSE PRESENTED BY PLAINTIFF

8

Plaintiff bears the initial burden of proof for the existence and amount of damages. In discharge Plaintiff has presented nearly two thousand computations in each case using transaction amounts and prices stipulated as correct. (Pl. Ex. M); *Stella v. Graham Paige Motors Corp.,* 232 F.2d 299, 302 (2d Cir.), *cert. denied*, 352 U.S. 831 (1956).

Our computations utilize the "lowest-price-in, highest-price-out" method devised by the Second Circuit in *Smolowe v. Delendo Corp.,* 136 F. 2d 219 (2d Cir. 1943), "which rejected all other methods of calculating profits, including first-in, first-out, tracing of shares and price averaging. *See also Gratz v. Claughton*, 187 F. 2d 46 (2d. Cir.), *cert denied*, 3541 U.S. 9020 (1951); *Whittaker v. Whittaker Corp.,* 639 F. 2d 516*,* 532-33 (9th Cir*.) cert. denied*, 453 U.S. 1031 (1981); *Newmark v. RKO General, Inc.,* 305 F. Supp. 310, 317 (S.D.N.Y. 1969), *aff'd* 425 F 2d. 348 (2d Cir. 1970), *cert. denied*, 400 U.S. 854 (1970).

This has been deemed "[t]he only rule whereby all possible profits can be surely recovered …" *Smolowe,* 136 F. 2d at 239. The lowest-in, highest-out method operates in this manner:

> "Profit is computed by matching the highest share price with the lowest purchase price within six months, the next highest sale price with the next lowest purchase price within six months, and so on, until all shares have been included in the computation." *Interpretive Release on Rules Applicable to Insider Reporting & Trading,* SEC Release No. 34-18114, 1981 WL 31301, at *28 & n.102 (Sept. 24, 1981).

And it has been universally adopted by all circuits and by the Supreme Court.

This is *prima facie* proof of a maximum amount of damages. *See Stella,* 232 F.2d 299. "Upon a showing of such proof, the burden then shifts to the defendant to establish the extent to which the profits were less that the maximum alleged." Romeo & Dye, *Section 16 DeskBook* (summer 2019 ed.) at 487; *accord Mueller v. Korholz,* 449 F.2d 82, 85-86 (7th Cir. 1971), *cert. denied*, 405 U.S. 922 (1972).

9

The defense has utterly failed to carry, let alone address, its burden of mitigation of Plaintiff's *prima facie* showing. The most it has to say is that damages should be relegated "to the jury." This is a Motion for Summary Judgment. There is no jury on summary judgment. Plaintiff's prayer for relief seeks an "accounting," an equitable remedy. There is no jury in equity.

Judgment should enter in favor of the Plaintiff and against the Defendants, jointly and severally, in the demonstrated *prima facie* amount of $6,235,908, together with pre-judgment interest, *Morales v. Freund,* 163 F.3d 763, 767 (2d Cir. 1999) ("[p]rejudgment interest is generally awarded as part of Sec. 16(b) recoveries"). The award of pre-judgment interest, of course, remains within the sound discretion of the Court and if further briefing on the point is thought indicated Plaintiff stands ready to provide it. But a market manipulation that has boomeranged on its creators is hardly a sympathetic setting for dispensing with "generally awarded" pre-judgment interest.

## CONCLUSION

Judgment of liability should enter. Damages may be computed from the record and should include pre-judgment interest. If the Court believes further proceedings are needed for damages to be determined, the matter should be referred to the assigned Magistrate Judge or another officer of the Court acting as a special master.

Dated:  Southampton, New York
        October 5, 2020

                                        *s/ David Lopez*

                                        David Lopez (DL-6779)
                                        Miriam Tauber (MT-1979)

                                        *Attorneys for Plaintiff*

10