UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                   :

AVALON HOLDINGS CORPORATION,   :
                                                  :

                           Plaintiff,   :

                                                      :           18-CV-7291 (VSB)

                  - against -         :

                                                        :

GUY GENTILE and MINTBROKER    :           18-CV-8896 (VSB)
INTERNATIONAL, LTD.,                  :

                                                       :

                           Defendants.  :

--------------------------------------------------------:          **OPINION & ORDER**

                                                       :

NEW CONCEPT ENERGY, INC.,      :

                                                       :

                           Plaintiff,   :

                                                       :

                  - against -         :

                                                        :

GUY GENTILE and MINTBROKER    :
INTERNATIONAL, LTD.,                  :

                                                      :

                           Defendants.  :

                                                       :

--------------------------------------------------------X

Appearances:

David Lopez
Law Office of David Lopez
Southampton, New York

Miriam Deborah Tauber
Miriam Tauber Law
New York, New York
*Counsels for Plaintiffs*

Danielle M. McLaughlin
Adam C. Ford
Robert Seabrook Landy
Ford O'Brien Landy LLP
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

Before me are (1) the motions for summary judgment filed by Avalon Holdings Corporation ("Avalon") and New Concept Energy, Inc. ("New Concept") (together, "Plaintiffs") in the two related cases, both filed against Guy Gentile and MintBroker International, Ltd. (together, "Defendants"), (No. 18-cv-7291 ("Avalon Action") Doc. 75 and No. 18-cv-8896 ("New Concept Action") Doc. 68); and (2) the cross-motions for summary judgment filed by Defendants, (Avalon Action, Doc. 71 and New Concept Action, Doc. 64).  For the reasons below, Plaintiffs' motions for summary judgment are GRANTED and Defendants' cross-motions for summary judgment are DENIED.

## I.  Factual Background[1]

### A.  *Avalon Action*

Avalon is an Ohio-based provider of waste management services.  (Defs. 56.1 I ¶ 1.)[2] The shares of Class A Common Stock issued by Avalon were registered pursuant to § 12(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and were listed on the New York Stock Exchange ("NYSE").  (Pl. 56.1 I ¶ 1.)[3]  Avalon shares, as with the majority of the publicly traded shares in the United States, were held in "street name," i.e., they were registered in the name of Cede & Co., the nominee of the Depository Trust Company ("DTC"), instead of in the names of the individual investors who bought the shares.  (Defs. 56.1 I ¶¶ 15, 17.)  Transactions of street name shares are conducted through DTC's electronic "book-entry" system, where the

---

[1] The statements of fact set forth in this section are undisputed unless noted otherwise.

[2] "Defs. 56.1 I" refers to Defendants' Rule 56.1 Statement of Undisputed Material Facts in support of their motion for summary judgment against Avalon.  (Avalon Action, Doc. 73.)

[3] "Pl. 56.1 I" refers to Plaintiff Avalon's Rule 56.1 Statement of Undisputed Material Facts in support of its motion for summary judgment.  (Avalon Action, Doc. 77.)

investors' DTC accounts are debited or credited in accordance with the purchase or sale they make.  (*Id*. ¶ 16.)  In other words, DTC stock trades are all in the form of book-entries; there is no movement of actual physical stock certificates, which are typically stored in DTC's vault. (*Id*.)

Defendant MintBroker International, Ltd. (a/k/a Swiss America Securities Ltd.) ("MintBroker") was a Bahamian entity and broker-dealer registered under the Bahamas securities laws.  (Pl. 56.1 I ¶ 3.)  On June 15, 2018, MintBroker, through its broker, Interactive Brokers, Inc. ("Interactive Brokers"), opened a position in Avalon securities.  (Defs. 56.1 I ¶ 3; Pl. 56.1 I ¶ 4.)  On July 27, 2018, MintBroker filed with the Securities and Exchange Commission ("SEC") its "Initial Statement of Beneficial Ownership" (SEC Form 3),[4] the form that stockholders are required to file under § 16(a) of the Exchange Act when they become the beneficial owner of more than 10% of the equity shares of the issuer company ("more-than 10% beneficial owners").  (Defs. 56.1 I ¶ 8.)  The SEC Form 3 shows that MintBroker had taken a position of 1,922,095 shares in Avalon.  (McLaughlin Decl. I Ex. 5.)[5]  On August 2, 2018, MintBroker netted its position in Avalon shares to zero.  (Defs. 56.1 I ¶ 4.)  The following is MintBroker's trading activities in Avalon shares from July 24, 2018 to August 1, 2018:

| Date | 7/24 | 7/25 | 7/26 | 7/27 | 7/30 | 7/31 | 8/1 |
|---|---|---|---|---|---|---|---|
| Buy Position | 624,073 | 703,602 | 690,184 | 327,406 | | | |
| Sell Position | 99,086 | 118,277 | 215,677 | 192,340 | 719,885 | 799,720 | 200,280 |
| Net Position (end of day)[6] | 524,987 | 1,110,312 | 1,584,819 | 1,719,885 | 1,000,000 | 200,280 | 0 |

---

[4] In the memorandum of law in support of their motion for summary judgment, Defendants wrote that MintBroker filed the SEC Form 3 on July 7, 2018.  (Avalon Action, Doc. 72, at 4; *see also* Defs. 56.1 I ¶ 8.)  This appears to be a typographic error, since the SEC Form 3 submitted by Defendants was dated July 27, 2018.  (Avalon Action, Doc. 74 Ex. 5.)  Accordingly, I take this fact as undisputed.

[5] "Mclaughlin Decl. I" refers to the Declaration of Danielle McLaughlin in support of Defendants' motion for summary judgment against Avalon.  (Avalon Action, Doc. 74.)

[6] Although Defendants do not dispute the calculation of the numbers in this row, they dispute the numbers to the extent Avalon presents them as shares that MintBroker actually owned.  (Doc. 84 ¶¶ 8–9, 35 n.3.)  Specifically,

(Pl. 56.1 I ¶ 9.)  Between its opening and closing positions, MintBroker made thousands of trades in Avalon shares.  (Defs. 56.1 I ¶ 7.)  During this period, there were roughly 3,000,000 Avalon shares outstanding,[7] (*Id*. ¶ 14; Pl. 56.1 I ¶ 2), and only around 1.7 million of them were available for public trading,[8] (Defs. 56.1 I ¶ 19).  MintBroker's trading was part of the significant trading activities that Avalon stock experienced from late July to early August 2018, during which time the price of the stock skyrocketed.  (Tauber Aff. I Ex. I, at 3).[9]  For the first seven months of 2018, up until July 24, Avalon's closing share price ranged from approximately $2.00 to $2.40.  (Defs. 56.1 I ¶ 2.)  However, on July 27, 2018, Avalon's closing share price was $10.25; during its peak trading on July 30, Avalon shares were traded at $20.20.  (Tauber Aff. I Ex. I, at 1.)

Avalon now brings this action against MintBroker and Guy Gentiles, the sole owner of MintBroker and the person who directed MintBroker's trading activities.  (Pl. 56.1 I ¶3).  Avalon alleges that from July 24, 2018, when MintBroker became a more-than 10% beneficial owner of Avalon, up until July 31, 2018, when MintBroker's ownership of Avalon shares dropped below 10% (Short-Swing Period I),[10] MintBroker made huge profits through trading Avalon shares. (Avalon Action, Doc. 19 ¶¶ 6–8.)  Avalon seeks disgorgement of these profits under § 16(b) of the Exchange Act as profits obtained by corporate insiders during a short-swing trade.  (*Id*. ¶ 40.)

---

Defendants argue that these numbers do not include shares MintBroker owned prior to July 24, 2018.  (*Id*.)

[7] The parties dispute the exact number of Avalon shares outstanding at the time.  (*See* Avalon Action, Doc. 84 ¶ 2.)

[8] This number was calculated by subtracting from the entire outstanding shares those shares held by several of the largest shareholders of Avalon who allegedly did not trade at the time.  (Defs. 56.1 I ¶ 19.)

[9] "Tauber Aff. I" refers to the Affidavit of Miriam Tauber in support of Avalon's motion for summary judgment. (Avalon Action, Doc. 78.)

[10] The parties dispute the exact minutes when MintBroker's position shortly dipped below 10% during the Short Swing Period I.  (Avalon Action, Doc. 87, at 5–6.)

### B. *New Concept Action*

The New Concept Action involves a similar fact pattern.  New Concept is a Texas-based oil and gas drilling and exploration company.  (Defs. 56.1 II ¶ 1.)[11]  The shares of Common Stock issued by New Concept were registered pursuant to § 12(b) of the Exchange Act and were listed on the NYSE.  (Pl. 56.1 II ¶ 1.)[12]  Like the Avalon shares, the New Concept shares were also held in street name and traded through DTC's book-entry system.  (Defs. 56.1 II ¶¶ 16–18.)

On May 24, 2018, MintBroker, through Interactive Brokers, opened a position in New Concept securities.  (*Id.* ¶ 3.)  On June 29, 2018, MintBroker filed an SEC Form 3, which shows that it had taken a position of 1,073,713 shares in New Concept.  (*Id.* ¶ 8.)  On September 25, 2018, MintBroker closed its position in New Concept.  (*Id.* ¶ 4.)  The following is MintBroker's trading activities in New Concept on June 29, July 2, and July 3, 2018 (excluding June 30 and July 1, which was a weekend):

| Date | 6/29 | 7/2 | 7/3[13] |
|---|---|---|---|
| **Buys** | 1,804,833 | 0 | 0 |
| **Sells** | 780,348 | 113,576 | 960,137 |
| **Net Position (end of day)[14]** | 22,848 | 57,631 | 0 |

(Pl. 56.1 II ¶ 9.)  Between its opening and closing positions, MintBroker engaged in thousands of trades in New Concept shares.  (Defs. 56.1 II ¶ 7.)  During this period, there were roughly 2.1

---

[11] "Defs. 56.1 II" refers to Defendants' Rule 56.1 Statement of Undisputed Material Facts in support of their motion for summary judgment against New Concept.  (New Concept Action, Doc. 66.)

[12] "Pl. 56.1 II" refers to Plaintiff New Concept's Rule 56.1 Statement of Undisputed Material Facts in support of its motion for summary judgment.  (New Concept Action, Doc. 70.)

[13] The parties dispute the number of buy and sell positions on July 3, 2018.  New Concept presents data showing that MintBroker sold 960,137 shares that day and bought zero shares.  (Pl. 56.1 II ¶9.)  Defendants present data showing that MintBroker bought 37,106 shares and sold 997,243 shares on that day.  (New Concept Action, Doc. 77 ¶ 35.)  In either case, the parties seem to agree that MintBroker's net sell position on July 3 was 960,137.

[14] Although Defendants do not dispute the calculation of this row, they dispute the numbers to the extent that Avalon represents them as MintBroker's actual share accumulation.  (Doc. 77 ¶ 32 n.2); *see also infra* n.6.

million New Concept shares outstanding and available for public trading.  (*Id*. ¶¶ 15, 20; Pl. 56.1 II ¶ 2.)  The New Concept stock experienced significant trading activities from late June to early July 2018, (Tauber Aff. II Ex. I, at 3),[15] and its share price surged.  For the first six months of 2018, up until June 29, New Concept's closing share price ranged from approximately $1.26. to $1.89.  (Defs. 56.1 II ¶ 2.)  However, on June 29, 2018, New Concept's closing share price was $4.22; during its peak trading on July 2, New Concept shares were traded at $12.75.  (Tauber Aff. II Ex. I, at 1–2.)

New Concept brings this action against Defendants, alleging that from June 29, 2018, when MintBroker became a more-than 10% beneficial owner of New Concept, up until July 3, 2018, when MintBroker's shares dropped below 10% (Short-Swing Period II, together with Short-Swing Period I, "Short-Swing Periods"), MintBroker made huge profits through trading New Concept shares, and such profits should be disgorged under § 16(b) as profits obtained by corporate insiders during a short-swing trade.  (New Concept Action, Doc. 7. ¶¶ 12–29.)

## C. *Trade Settlement and "Naked" Short Selling*

Under SEC Rule 15c6-1(a), as amended by the SEC on May 22, 2017, the standard settlement cycle for broker-dealer securities transactions is "trade date plus two business days," also referred to as the "T+2" schedule.  (Defs. 56.1 I ¶ 57.)  This means that when an investor buys or sells a security, the brokerage firm must receive payment or delivery of the security (i.e. "settle") no later than two business days after the trade is executed.  (*Id*. ¶ 58.)  All of MintBroker's transactions on Interactive Brokers occurred under the T+2 schedule.  (*Id*. ¶¶ 59–60; *see also* Defs. 56.1 II ¶¶ 44–55.)

---

[15] "Tauber Aff. II" refers to the Affidavit of Miriam Tauber in support of New Concept's motion for summary judgment.  (New Concept Action, Doc. 69.)

When a customer places an order for shares, Interactive Brokers routes the order to an exchange, where the order will be filled by a counterparty.  (Defs. 56.1 I ¶ 70.)  There are certain situations, however, where a trade is executed, but the shares are not readily available by the settlement day.  (*See* SEC Key Points 2 (explaining reasons for the seller's failure "to deliver securities to the buyer when delivery is due").)[16]  One of these situations is created by a type of trading activity called "naked short selling," where investors short the shares without first locating the shares available for borrowing.[17]  (Defs. Mem. I 18; *see also* SEC Key Points 2.)[18] In other words, there can be multiple brokers shorting the same "pot" of shares over and over again, which will result in the number of shares shorted exceeding the number of shares available.  (*See* Defs. Mem. I 18; Defs. 56.1 I ¶¶ 68–69.)  Therefore, when an investor purchases shares from a "naked short seller," those shares may not be deliverable within two days after the trade date, and the trade will "fail to settle" under the T+2 schedule.  (SEC Key Points 2.)

Interactive Brokers does not place any securities into the customer's account until the trade is settled.  (Defs. 56.1 I ¶ 72.)  Moreover, it does not know, when the order is filled by a counterparty, whether the counterparty actually has the shares it purports to be selling, i.e., it does not know whether the counterparty is a "naked short seller."  (*Id*. ¶ 71.)

On motion for summary judgment, Defendants mainly argue that the T+2 schedule, in combination with the naked short sellers in the market during the Short-Swing Periods, renders

---

[16] "SEC Key Points" refers to the publication issued by the SEC titled "Key Points About Regulation SHO," submitted by Plaintiffs.  (Tauber Aff.  I&II Ex. P.)

[17] Short selling occurs when an investor borrows a security and sells it on the open market, planning to buy it back later for less money.  (SEC Key Points 1.)  While naked short selling does not necessarily violate the federal securities laws, "abusive" naked short selling "effected to manipulate the price of a stock" is illegal and prohibited. (*Id*. 2.)

[18] "Defs. Mem. I" refers to Defendants' memorandum of law in support of their motion for summary judgment against Avalon.  (Avalon Action, Doc. 72.)

the trading records that Plaintiffs rely on insufficient to prove MintBroker's actual possession of any Avalon or New Concept shares purportedly traded.  (Defs. Mem. I 15–18; Defs. Mem. II 15–19.)[19]

## II.   **Procedural History**

Plaintiff Avalon filed its complaint on August 13, 2018, against MintBroker, Gentile, and "John Does 1 through 10."  (Avalon Action, Doc. 1.)  Avalon later dismissed its claims against "John Does 1 through 10," leaving MintBroker and Gentile as the only defendants.  (Avalon Action, Docs. 12–14.)  On November 28, 2018, Avalon filed its amended complaint.  (Avalon Action, Doc. 19.)  Plaintiff New Concept filed its complaint against Defendants on October 1, 2018.  (New Concept Action, Doc. 7.)  On October 6, 2018, the New Concept Action was assigned to me as related to the Avalon Action.

On January 2, 2019, Defendants filed motions for discovery limited to venue issues in both actions.  (Avalon Action, Doc. 24; New Concept Action, Doc. 17.)  I denied the motions, noting that I would rule on Defendants' motion to dismiss based on the parties' papers.  (*See* Avalon Action, Doc. 26; New Concept Action, Doc. 19.)  On January 22, 2019, Defendants filed motions to dismiss the amended complaint in both actions.  (Avalon Action, Doc. 27; New Concept Action, Doc. 20.)  On September 24, 2019, I denied Defendants' motions to dismiss. (Avalon Action, Doc. 35; New Concept Action, Doc. 28.)  On October 15, 2019, Defendants filed their answers to the amended complaint in both actions.  (Avalon Action, Doc. 37; New Concept Action, Doc. 29.)  On November 11, 2019, Defendants filed their amended answer to Avalon's amended complaint.  (Avalon Action, Doc. 39.)  Both actions were then referred to

---

[19] "Defs. Mem. II" refers to Defendants' memorandum of law in support of their motion for summary judgment against New Concept.  (New Concept Action, Doc. 65.)

8

Magistrate Judge Robert W. Lehrburger for general pretrial purposes.  (Avalon Action, Doc. 46; New Concept Action, Doc. 38.)  Discovery in both cases was completed around June 29, 2020. (Avalon Action, Doc. 64; New Concept Action, Doc. 57.)

On August 10, 2020, Defendants filed their motions for summary judgment in both actions, with supporting memoranda of law, Rule 56.1 statements, and declarations of Danielle McLaughlin.  (Avalon Action, Docs. 71–74; New Concept Action, Docs. 64–67.)  On August 11, 2020, both Plaintiffs filed their cross-motion for summary judgment, with supporting memoranda of law, Rule 56.1 statements, and affidavits of Miriam Tauber.  (Avalon Action, Docs. 75–78; New Concept Action, Docs. 68–71.)  On September 23, 2020, Defendants filed their oppositions to Plaintiffs' motions for summary judgment with supporting documents. (Avalon Action, Docs. 83–85; New Concept Action, Docs. 76–78.)  On September 24, 2020, both Plaintiffs filed their opposition to Defendants' motions for summary judgment.  (Avalon Action, Doc. 86; New Concept Action, Doc. 79.)  Defendants filed their replies to Plaintiffs' oppositions on October 5, 2020, (Avalon Action, Doc. 90; New Concept Action, Doc. 83); Plaintiffs filed their replies to Defendants' oppositions on the same day, (Avalon Action, Doc. 91; New Concept Action, Doc. 84).

### III.  **Legal Standard**

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id*.

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists; if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id*. at 256, and to present such evidence that would allow a reasonable jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). If "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3). Finally, in considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks and citation omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the

non-moving party," summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310

F.3d 280, 286 (2d Cir. 2002).

### IV.  Discussion

 Section 16(b) of the Exchange Act "requires statutorily defined corporate insiders to

disgorge short-swing profits obtained by trading in the securities of the [issuer]."  *See Olagues v.*

*Perceptive Advisors LLC*, 902 F.3d 121, 125 (2d Cir. 2018) (citing 15 U.S.C. § 78p(b)).  Section

16(b) is part of the statutory scheme under the Exchange Act directed to prevent corporate

insiders "from engaging in speculative transactions on the basis of information not available to

others."  *Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 173–74 (2d Cir. 2012) (internal

quotation marks omitted).  Specifically, it provides that

> [f]or the purpose of preventing the unfair use of information which may have been
> obtained by such beneficial owner, director, or officer by reason of his relationship
> to the issuer, any profit realized by him from any purchase and sale, or any sale and
> purchase, of any equity security of such issuer . . . within any period of less than
> six months . . . shall inure to and be recoverable by the issuer . . . .

15 U.S.C. § 78p(b).  The statute authorizes an issuer whose securities are traded in violation of §

16(b) to bring a claim to recover the short-swing profits, or shareholders of the issuer may bring

a derivative suit if the issuer refuses to bring the claim itself.  *See Bulldog Inv'rs*, 696 F.3d at

174; *see also* 15 U.S.C. § 78p(b).  In either case, to recover under § 16(b), a plaintiff must

establish that "there was (1) a purchase and (2) a sale of securities (3) by an officer or director of

the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's

securities (4) within a six-month period."  *Feder v. Frost*, 220 F.3d 29, 32 (2d Cir. 2000)

(internal quotation marks omitted).

 Section 16(b) imposes strict liability.  If the defined short-swing transaction occurred

within a six-month period, the insider must disgorge their profits "irrespective of any intention"

to abuse insider information.  15 U.S.C. § 78p(b); *see also Roth v. Jennings*, 489 F.3d 499, 507 (2d Cir. 2007) (explaining that § 16(b) requires disgorgement "without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information" (internal quotation marks omitted)).  In other words, although it would be difficult to present actual proof that the trading was for speculative purposes based on insider information, Congress has determined that "two trades by an insider within six months of each other" creates a "conclusive presumption" that such trades "were speculative and based on inside information." *Prager v. Sylvestri*, 449 F. Supp. 425, 431 (S.D.N.Y. 1978) (noting that the proof of the insider's motive for trading would be "hard to come by").

Therefore, § 16(b) has been noted as a "strong medicine for the ill Congress sought to address." *Olagues*, 902 F.3d at 125; *see also Bulldog Inv'rs*, 696 F.3d at 174 (describing § 16(b) as a "blunt instrument" to curb insider trading).  Courts are usually "reluctant to exceed a literal, mechanical application of the statutory text in determining who may be subject to liability," *Olagues*, 902 F.3d at 126 (internal quotation marks omitted), and have advised that "[t]he strict liability remedy should be employed cautiously to avoid unfair application," *id.*; *see also Foremost-McKesson, Inc. v. Provident Securities Co*., 423 U.S. 232, 251 (1976) (noting that § 16(b) "imposes liability without fault within its narrowly drawn limits").  Nevertheless, "the growing complexities of financial transactions have generated numerous issues of statutory interpretation that admit of no clear resolution." *Olagues*, 902 F.3d at 126 (quoting *Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865, 869 (2d Cir. 2014)).  When faced with a transaction that "does not fall within the literal terms of Section 16(b)," the court must interpret the statute in a way that is "consistent with its legislative purpose." *Donoghue v. Centillium Communs. Inc.*, No. 05 Civ.4082 (WHP), 2006 WL 775122, at * 5 (S.D.N.Y. Mar. 28, 2006) (citing *Steel*

*Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 124 (2d Cir. 2002)).

Defendants argue that Section 16(b) does not apply to them, because Plaintiffs fail to establish that (1) Defendants ever "purchased or sold" the securities, and therefore also fail to establish that (2) Defendants were ever more-than 10% beneficial owners of the companies; Defendants further argue that (3) they were not the insiders whose trading Section 16(b) intends to monitor.  (Defs. Mem. I 14, 19; Defs. Mem. II 13, 19.)  As explained below, each of these arguments is flawed.

As an initial matter, there is an implicit disagreement between the parties as to the nature of Defendants' defense that they did not actually purchase or sell the shares and were not more-than 10% beneficial owners.  Defendants labeled it as an "affirmative defense" in their answers to the complaints.  (Avalon Action, Doc. 39 at 7–8; New Concept Action, Doc. 29 at 6.)  However, Defendants now treat the defense as negation to certain elements of Plaintiffs' claims.  (Defs. Mem. I&II 15.)  On the other hand, Plaintiffs argue that it is an affirmative defense which Defendants bear the burden to prove.  (*See* Pl. Mem. I 12; Pl. Mem. II 11.)

"An affirmative defense is defined as 'a defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true.'"  *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (quoting Black's Law Dictionary 430 (7th ed. 1999)).  "If an argument can at most negate an element of the plaintiff's claim, it is not appropriately considered an affirmative defense."  *Sesto v. Slaine*, 171 F. Supp. 3d 194, 206 (S.D.N.Y. 2016) (internal quotation marks omitted).  Here, whether Defendants actually purchased or sold the shares, or ever were more-than 10% beneficial owners, are elements of Plaintiffs' claims, *Feder*, 220 F.3d at 32, and the defense negates these elements.  Therefore, Defendants' "defense" is not an affirmative defense, but simply a partial

denial of Plaintiffs' claims; Plaintiffs bear the ultimate burden of proof at trial that Defendants actually "purchased" or "sold" the shares, or were ever more-than 10% beneficial owners of the companies.

Bearing in mind this burden of proof, and, after reviewing all the evidence submitted by the parties, I find that Plaintiffs have met their burden of establishing that no genuine factual dispute exists and that no reasonable jury could find for Defendants.  Therefore, Plaintiffs in both actions are entitled to judgment as a matter of law.

### A.  *Purchase and sale*

#### 1.  **Applicable Laws**

Section 16(b) contains no definition of "purchase" or "sale;" instead, the two terms are broadly defined under Section 3 of the Exchange Act to include "any contract to buy, purchase, or otherwise acquire" and "any contract to sell or otherwise dispose of" a security.  15 U.S.C. § 78c(a)(13), (14).  Courts have consistently ruled that for purposes of § 16(b), a "purchase" occurs when an investor's rights and obligations under the transaction become "fixed and irrevocable." *Centillium Communs.,* 2006 WL 775122 at * 5; *see also T-Bar, Inc. v. Chatterjee*, 693 F. Supp. 1, 5 (S.D.N.Y. 1988) ("For purposes of § 16(b) liability, a purchase only occurs when the purchaser has incurred an irrevocable liability to take and pay for the stock and his rights and obligations have become fixed." (internal quotation marks omitted)); *Prager*, 449 F. Supp. at 432–33 (ruling that a stock is "purchased" when "the investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction in any way that could be turned to speculative advantage").  As *Prager* explains, the rationale behind this approach is that § 16(b) is primarily concerned with "speculative" plans that are "formulated prior to or simultaneously with the first of two trades."  449 F. Supp. at 432.  The moment when the

investor becomes irrevocably committed to the transaction, "the power to manipulate the transaction is lost" to them, and they are no longer able to speculate. *Id.* at 433. Therefore, it is the moment the trading decision is made, instead of the "technicalities of stock transfers, such as the passing of title or the exchange of the shares," that governs the construction of § 16(b). *Id.*; s*ee also Foremost-McKesson*, 423 U.S. at 254 n.28 ("[T]he crucial point in the acquisition of securities is not the technical 'purchase' but rather the decision to make an acquisition.")

In a number of § 16(b) cases, courts have found that the time when an investor's rights become fixed and irrevocable is when they enter into the contract and "no longer ha[ve] control over the transaction in any way that could be turned to speculative advantage." *Prager*, 449 F. Supp. at 432–33. In such cases, it is irrelevant when the transaction settles. *See e.g. Chechele v. Sperling*, No. 11 Civ. 0146(PAC), 2012 WL 1038653 at *5 (S.D.N.Y. Mar. 29, 2012), *aff'd*, 758 F.3d 463 (finding that the investors' rights "'became fixed and irrevocable' at the time they entered into the [contracts]," not at the time when the stock transactions settled, because the investors "had no opportunity to speculate on the basis of their inside information at the time of the settlements"); *DiLorenzo v. Murphy*, 322 F. Supp. 2d 479, 482 (S.D.N.Y. 2004) *aff'd*, 443 F.3d 224 (finding that the stock purchase occurred not when the stock was transferred, but when the acquisition agreement was executed, because "[w]hile the ultimate number of shares to be transferred was not then known, that number was dictated by financial formulae and criteria" that were beyond the investors' control); *see also Donoghue v. Murdock*, No. 13 Civ. 1224(PAE), 2013 WL 4007565, at *8 (S.D.N.Y. Aug. 6, 2013) (concluding that it "accords with the purpose of § 16(b) to treat the date of acquisition as the relevant date where the insider's obligations are fixed and irrevocable from the date of acquisition," but to "treat the settlement date as the relevant date" only where "the insider [still] has the discretion" to speculate based on the

15

fluctuation of stock prices).

### 2. Application

Despite the trading records that display thousands of trades by MintBroker in the Avalon and the New Concept shares during the Short Swing Periods, Defendants still argue that Plaintiffs have failed to produce sufficient evidence to establish that MintBroker actually "purchased" these shares, because those trades were all in the book-entry form and only reflect a position relative to the company's stock—in other words, they do not represent shares MintBroker actually possessed. (Defs. Mem. I&II 16–18.) Defendants provide two bases for this argument: first, the T+2 schedule delayed the settlement; second, due to the naked short-selling in the market at the time, a large portion of shares that MintBroker purportedly purchased "did not represent actual or deliverable stock." (*Id*.) These arguments are fatally flawed and contrary to the law.[20]

### a. Settlement

The first basis of Defendants' argument is that the T+2 schedule delayed settlement, such that any shares MintBroker transacted on a given day would not be settled until two days later. Defendants argue that since Plaintiffs have not produced evidence showing that any actual shares settled or came into Defendants' possession, Defendants cannot be deemed "purchased" any of these shares. (*Id*.)

This argument flies in the face of well-established case law, and makes no sense against the evidence. "Purchase" under § 16(b) looks at whether the investor incurs irrevocable liability, not whether they have actual possession of the shares. *See T-Bar*, 693 F. Supp. at 5. When

---

[20] Defendants do not fully explain why they did not actually "sell" the shares; presumably they are suggesting that since they did not "purchase" these shares, any purported "sale" of the same shares did not actually happen, either. In other words, under Defendants' construction, a plaintiff would need to wait until the transaction settles to demonstrate a purchase or sale. As noted, this is plainly not the law.

MintBroker executed a trade to buy or sell shares, it became irrevocably committed to the transaction by entering into the contract, and therefore lost the "power to manipulate," *Prager*, 449 F. Supp. at 433.  The parties agree that the records establishe thousands of trades made by MintBroker, and there is no evidence suggesting that MintBroker had discretion, after the trade was executed, to alter the transaction in any way or continue to speculate based on the stock prices; all it could do was wait for the settlement.  *C.f. Connell v. Johnson*, 20 Civ. 1864 (LLS), 2020 WL 2748439 at *3 (S.D.N.Y. May 27, 2020) (finding that the investor did not incur an irrevocable liability to pay for the stock by entering into the transaction because he later canceled the transaction).  Therefore, Defendants cannot escape § 16(b) liability by pointing to the mere delay in settlement.

Without citing to cases for support, Defendants urge me to find otherwise—that the time of purchase or sale is determined by the settlement date—by looking at the legislative purpose. (Defs. Mem. I 19.)  They argue that I should consider the legislative purpose because this case "does not fall within the literal terms of Section 16(b)," *Centillium Communs.*, 2006 WL 775122, at *5, as it involves "phantom shares" that are not readily deliverable for settlement.  (Defs. Mem. I 19.)  However, Defendants cannot avoid § 16(b) liability by simply arguing that "they traded at speeds too fast to be captured by" the law.  (Avalon Action Doc. 86, at 5.)  Indeed, the case law is to the contrary.  "Purchase" under § 16(b) includes "contract to buy," 15 U.S.C. § 78c(a)(13), and Defendants' trades were clearly contracts to buy shares, therefore within the literal terms of "purchase" under § 16(b).  Settlement of the contracts, or delivery of the shares, is among those "technicalities . . . [that are] of no import for [Section] 16(b) purposes," *Prager*, 449 F. Supp. at 433.  Moreover, even in those cases where the investors engaged in complex financial transactions that did not fall under the literal terms of § 16(b), courts still looked at

when the investors' rights became fixed and irrevocable, not when the investors had actual possession, to determine the time of the purchase or sale; the settlement date was irrelevant when the investor, like here, no longer had opportunity to speculate. *See e.g. Chechele*, 2012 WL 1038653 at *5 (finding the settlement of shares under the forward sale agreements not a "purchase" under § 16(b) because the defendants' rights "'became fixed and irrevocable' at the time they entered" into the agreements); *Centillium Communs.*, 2006 WL 775122, at *5 (same, in a case involving floating price derivatives).

Not only is Defendants' position unsupported by the law, it also makes no sense. The evidence demonstrates that Defendants were able to complete transactions in the shares of Avalon and New Concept such that it made money. Defendants do not explain how they were able to complete transactions and make money without possessing any shares.

b.  Naked Short Selling

Defendants' next argument—that a large portion of the shares MintBroker purportedly transacted were not deliverable due to "naked short sellers" in the market—also misses the mark. Defendants point out that, based on Avalon's own analysis, there were approximately 1.7 million shares left for public trading during the Short Swing Period I. (Def. 56.1 I ¶ 19.) However, throughout the period, the daily number of Avalon shares traded by market participants reached as much as 3 million, or on some of the days even over 12 million. (*Id*. ¶¶ 20, 24, 28, 32.) In other words, the number of shares traded in the market vastly exceeded the number of shares available, on some of the days by over 600%. (Defs. Mem. I 7.) The glaring discrepancy in numbers, Defendants contend, leads to the "unavoidable conclusion" that a large portion of the "trades" were "naked short trades"—where the market participants shorted the stock without first locating the security available for borrowing. (Defs. Mem. I 18.) With such volume of naked

short selling, the number of actual shares would be insufficient to cover the shares shorted, which would drive up the demand for the shares and make the price skyrocket, as happened during the Short Swing Periods.  (Gentile Dep. Tr. 118:20-119:2.)[21]  Defendants thus argue that a large portion of the shares MintBroker purportedly bought would not have been readily deliverable and the transactions could not have settled.  (Defs. Mem. I 18.)  Defendants make a similar argument in the New Concept Action.  (Defs. Mem. II 17–18.)

First of all, Defendants fail to establish that naked short selling actually occurred beyond any genuine dispute.  Defendant Gentile stated that he "believe[s]" that many of the shares he transacted were shorted, and that "had [he] not sold the shares, [] they would have all failed [to settle]."  (Gentile Dep. Tr. 89:20-24.)  However, that begs the question since Gentile did sell all of the shares, and, apart from this speculation, Defendants do not point to any evidence in the record to prove the existence of naked short selling during the Short Swing Periods.  The testimony from Interactive Brokers' agent only confirmed the possibility that if naked short selling did take place, some of the shares might not be deliverable in the next few days, (Klausner Dep. Tr. 99:23-100:19);[22] however, Interactive Brokers provides no testimony demonstrating that naked short selling actually occurred during the Short Swing Periods.  To be sure, Defendants' speculation of naked short selling is consistent with the numbers and provides a possible explanation for the discrepancy between the shares available for trading and the shares actually traded.  Nevertheless, the evidence they have produced is far from establishing that naked short selling is the "unavoidable conclusion" that can be drawn from the numbers.  (Defs.

---

[21] "Gentile Dep. Tr." refers to the transcript of Defendant Gentile's deposition.  (Avalon Action, Doc. 78 Ex. A; New Concept Action, Doc. 69 Ex. A.)

[22] "Klausner Dep. Tr." refers to the transcript of the deposition of Brad Klausner, a non-party witness on behalf of Interactive Brokers.  (Avalon Action, Doc. 78 Ex. C; New Concept Action, Doc. 69 Ex. C.)

Mem. I&II.)  A genuine dispute remains as to the existence of naked short selling during the relevant time periods.

Even if naked short selling were established, Defendants still would not be entitled to judgment as a matter of law.  To prevail on their motions, Defendants must demonstrate not only the existence of naked short selling, but also that the naked short selling occurred in such a significant volume that it had a more than de minimis impact on MintBroker's trades at the time. Defendants failed to produce sufficient evidence to create a genuine dispute that their trades were in fact affected by the naked short sales in any meaningful way.  Although the records suggest that a fraction of the trades conducted by all market participants in Avalon and New Concept shares failed to be delivered during the period, (Pl. 56.1 I&II ¶ 9), Defendants have not pointed to one single trade where their shares failed to settle due to naked short selling—indeed any trade where their shares failed to settle at all.[23]  Defendants seem to suggest that because MintBroker sold the shares before the shares were settled into its account, there is no way to know whether the transactions would have settled had they not sold them.  (Gentile Dep. Tr. 132:4-135:12.) However, the trading records contain no indication that MintBroker did not successfully sell the shares it bought.  In fact, it seems that MintBroker was paid the full proceeds from the sale of shares that it bought at a much lower price.  As Plaintiffs also point out, Interactive Brokers testified that a purchase that failed to clear, i.e., had no shares to deliver, will result in a "liquidation" of the position, and the transaction will be designated with code "L" on the long account.  None of the transactions in MintBroker's long account have an "L" designation, (Pl. Mem. I&II 16), which shows that in all of MintBroker's transactions, the shares were ultimately

---

[23] Moreover, the failure to deliver as shown by the records may be caused by various reasons, including legitimate reasons, (SEC Key Points 2); there is no evidence that they were caused by naked short selling.

delivered.

Therefore, although it is the Plaintiffs' ultimate burden to establish that the transactions actually went through, Plaintiffs have provided undisputed evidence that none of the transactions failed; all Defendants can point to is some "metaphysical doubt" as to whether they would have settled, which is not sufficient to defeat a motion for summary judgment. *See Matsushita*, 475 U.S. at 586. No reasonable jury would find that MintBroker never actually purchased those shares when it has sold them all and taken full advantage between the purchase price and the sale price.[24]

### B. *Beneficial Owners*

#### 1. Applicable Laws

Section 16 does not define "beneficial owner." Instead, the SEC promulgated Rule 16a-1, which provides that:

> Solely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities . . . the term "beneficial owner" shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the Act.

17 C.F.R. § 240.16a-1(a)(1). Rule 13d-3, promulgated under Section 13(d) of the Act, provides that:

> (a) For purposes of section 13(d) . . . of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
>
> (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or

---

[24] Plaintiffs also argue that even if any shares fail to deliver, Regulation SHO requires the broker to close out the fail to deliver position by purchasing securities of like kind and quantity in the market. *See* 17 C.F.R. § 242.203(b)(1); *see also Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 135–36 (2d Cir. 2009). Defendants have completely failed to address this argument. However, because Plaintiffs have not sufficiently explained why Regulation SHO applies to Interactive Brokers in the first place, I do not address the application of Regulation SHO in this opinion.

> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a).  Rule 13d-3 further provides that a person is deemed to be a beneficial

owner of a security "if that person has the right to acquire beneficial ownership of such security .

. . within sixty days."  *Id.* § 240.13d-3(d)(1)(i); *see also Packer v. Raging Capital Mgmt., LLC*,

981 F.3d 148, 152 (2d Cir. 2020).

Rule 16a-1(a)(1) only determines whether a person is a more-than 10% beneficial owner

at all under § 16.  Once a person meets this criterion and becomes liable under § 16(b), the extent

of their liability, i.e., how much short-swing profits they have to disgorge, is governed by another

definition of "beneficial owner" as provided under Rule 16a-1(a)(2):

> Other than for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities . . . the term beneficial owner shall mean any person who, directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the equity securities . . . The term pecuniary interest . . . shall mean the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities.

17 C.F.R. 240.16a-1(a)(2); *see also Huppe v. Special Situations Fund III QP, L.P.*, 565 F. Supp.

2d 495, 499 (S.D.N.Y. 2008).

## 2. Application

Defendants argue that they are entitled to summary judgment because the evidence is not

sufficient to prove that they were ever "beneficial owners" of Avalon or New Concept.

Specifically, they argue that the evidence does not establish that Defendant (1) had any voting

power in the shares MintBroker took position on, (2) actually owned these shares, or (3) had any

pecuniary interest in these shares.  (Defs. Mem. I&II 14.)

Defendants argue that they never "owned" the shares MintBroker purportedly transacted

because MintBroker never actually purchased or possessed these shares.  As I have explained

above, this argument is meritless.  Moreover, "beneficial ownership" under § 16(b) does not look at the shares the investors actually purchased or possessed; rather, it looks at whether the investor has investment power and/or voting power in those shares.  17 C.F.R. § 240.13d-3(a).  Here, Defendants had "investment power" over these shares—even before the transactions were settled—because they had the power to dispose them, as admitted by Gentile himself, (Gentile Dep. Tr. 105:16-106:9), and shown by the fact that they successfully sold these shares on the market.  Since I find that Defendants had investment power over the shares, I need not address whether they also had voting power over them.

Defendants suggest that such a finding will create a seemingly impossible situation where the total ownership of all the "beneficial owners" of the issuer exceeds 100%.  (Defs. Mem. I 16; Defs. Mem. II 17.)  However, that is not a concern under § 16(b), which obviously contemplates situations where the same shares might be deemed "beneficially owned" by more than one investor, with the total beneficial ownership over 100%.  For example, the regulation specified that an investor will be deemed the beneficial owner of the shares if they have the right to acquire them within 60 days.  In other words, in such a situation, these shares will have at least two "beneficial owners:" the current owner, and the person who have the right to acquire them within 60 days.  *See Schaffer v. Dickstein & Co., L.P.,* No. 95 CIV. 7934 (BSJ), 1996 WL 148335, at *5 (S.D.N.Y. Apr. 2, 1996) (recognizing that § 16(b) is "a crude rule of thumb" and may lead to "anomalous results").

Further, I disagree with Defendants' argument that Plaintiffs have failed to prove that Defendants have a pecuniary interest in these shares.  Defendants had pecuniary interests in these shares because they had the opportunity to and did profit from them.  As I explained, the trading records demonstrate that Plaintiffs successfully sold thousands of shares that they bought at a

much lower price, and Defendants have failed to create a genuine dispute that they have not

reaped the profits between the purchase price and the sale price.

### C. *Lack of Insider Information*

Defendants' final argument is that they are not the type of insiders § 16(b) intends to

cover.  Specifically, Defendants claim that even if they were ever more-than 10% beneficial

owners, the time they were actually beneficial owners was too short to allow them to gain access

to insider information.  (Defs. Mem. I 19; Defs. Mem. II 20.)  They also cite to documents from

Avalon, which purportedly show that Defendants were never deemed corporate insiders by the

company.  (Defs. R56.1 I ¶ 79.)  Ultimately, Defendants try to argue that because this case does

not fall within the literal terms of the statute, I should consider the statute in light of the

legislative purpose.  (Defs. Mem. I 19.)   I have rejected this argument above, as well as a similar

argument in my Opinion & Order denying Defendants' motion to dismiss.  *See Avalon Holdings*

*Corp. v. Gentile*, No. 18-CV-7291 (VSB), 2019 WL 4640206, at *7 (S.D.N.Y. Sept. 24, 2019)

(rejecting Defendants' argument that "Section 16(b) was clearly not designed to recover profits

made from high-frequency trading positions by briefly-tenured shareholders with no connection

to an issuer and no conceivable opportunity to obtain inside information" and noting that they

"fail[ed] to cite to case law that directly supports this proposition").  Again here, Defendants

cannot point to any case law supporting their position that a case does not fall within the literal

scope of § 16(b) simply because certain shares could not be delivered; in any case, they have

failed to establish that any of the shares they transacted were not delivered, *see infra*.  As I have

explained, under "a literal, mechanical application of the statutory text," *Olagues*, 902 F.3d at

126 (internal quotation marks omitted), the evidence demonstrates that Defendants purchased

and sold shares within a six-month period while being a more-than 10% beneficial owner of

Avalon and New Concept.  Congress has concluded that this constitutes conclusive evidence that such trades were based on insider information.  *See Prager*, 449 F. Supp. at 431.  The profits Defendants made shall be disgorged "irrespective of any intention" to abuse insider information. 15 U.S.C. § 78p(b).  Defendants' demand for evidence of their access to insider information would simply defeat the purpose of the statute.

In an apparent bid to deflect from clear facts demonstrating their own liability, Defendants attack Plaintiffs' counsel for allegedly filing hundreds of § 16(b) cases using the same pool of plaintiffs.  (Defs. Mem. I 21; Defs. Mem. II 22.)  Such facts are completely irrelevant to the merits of the case, and Defendants do not explain otherwise.  Defendants also argue that § 16(b) creates "perverse incentives" that result in "unjust windfalls for companies and their lawyers."  (*Id.*)  As mentioned, the courts are not unaware of the harshness of § 16(b), *see Olagues*, 902 F.3d at 125–26; *Bulldog Inv'rs*, 696 F.3d at 174, but the possibility of harsh results does not mean that I can simply ignore the plain language of the statute and second guess Congress' policy considerations.

Therefore, Defendants are strictly liable under § 16(b).  As the parties still dispute the amount of profits Defendants earned, including the exact period of time that Defendants were more-than-10% beneficial owners, as well as the calculation of damages, I will refer this case to Judge Lehrburger for an inquest on damages.

## V.   <u>Conclusion</u>

For reasons above, Plaintiff Avalon's motion for summary judgment is hereby GRANTED.  Plaintiff New Concept's motion for summary judgment is also GRANTED. Defendants' cross-motions for summary judgment are DENIED.  The Clerk of Court is respectfully direct to close all open motions in the two cases.

SO ORDERED.

Dated: April 8, 2022
      New York, New York

                                     Vernon S. Broderick
                                     United States District Judge