## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVALON HOLDINGS CORP., <br><br> Plaintiff, <br><br> v. <br><br> GUY GENTILE and <br> MINTBROKER INTERNATIONAL, LTD., <br><br> Defendants. | No. 18-cv-7291 (VSB) (RJL) <br><br> ECF Case |

Related to:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC. <br><br> Plaintiff, <br><br> v. <br><br> GUY GENTILE and <br> MINTBROKER INTERNATIONAL, LTD., <br><br> Defendants. | No. 18-cv-8896 (VSB) (RJL) <br><br> ECF Case |

### PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE DEFENDANTS' POST-DISCOVERY PRODUCTION, EXPERT TESTIMONY AND REPORTS

David Lopez (DL-6779)  
LAW OFFICES OF DAVID LOPEZ  
171 Edge of Woods Road | P.O. Box 323  
Southampton NY 11969-0323  
(631) 287-5520 | DavidLopezEsq@aol.com  

Miriam Tauber (MT-1979)  
MIRIAM TAUBER LAW PLLC  
885 Park Ave. # 2A  
New York NY 10075  
(323) 790-4881| MiriamTauberLaw@gmail.com  

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Table of Authorities** …………………………………………………………………………………..ii

**Overview** ……………………………………………………………………………………………1

**Background** ……………………………………………………………………………….………...3

**ARGUMENT**……………………………………………………………………………………….5

1. The Post-Discovery Records Should Be Excluded Under F.R.C.P. 37
   as Unreasonably Withheld During Discovery and Irredeemably Prejudicial to Plaintiffs…….. 5

   A. The Post-Discovery Records Were Available to Gentile at All Times ……………….5

   B. During Discovery, Defendants Repeatedly and Emphatically Represented,
      Confirmed, and Stipulated That There Was No Trading
      in Customer Accounts…………………………………………………………………. 7

   C. Exclusion Is Warranted Under F.R.C.P. 37
      as a Further Continuance Would Be Unproductive ……………………………………9

2. The Post-Discovery Records Are Unreliable …………………………………………….……11

3. The Expert Reports Are Unreliable and Fail to Meet Accepted Standards ……………..……...13

   **CONCLUSION** …………………………………………………………………………….16

# TABLE OF AUTHORITIES

**CASES**

*Daubert v. Merrell Dow Pharmaceuticals., Inc.*,
 509 U.S. 579 (1993) ...........................................................................................................2, 15

*EMA Financial v. Joey N.Y., Inc.*,
 No. 17-CV-9706, 2021 WL 2822565 (S.D.N.Y. June 9, 2021) .................................................9

*Metropolitan Opera Assn. v. Local 100*,
 212 F.R.D. 178 (S.D.N.Y. 2003) ............................................................................................11

*Owens v Auxilium Pharmaceuticals, Inc.*,
 895 F.3d 971 (7th Cir. 2018) ..................................................................................................15

*Rubenstein v. International Value Advisors, LLC*,
 363 F. Supp. 3d 379 (S.D.N.Y. 2019) .....................................................................................16

**OTHER AUTHORITIES**

Peter J. Romeo & Alan L. Dye,
 *Section16 Deskbook* § II.F(C)(e) ...........................................................................................16

**RULES**

17 C.F.R. § 240.13d-3 ....................................................................................................................15

17 C.F.R. § 240.16a-1 ....................................................................................................................16

F.R.C.P. 37 ......................................................................................................................................1

F.R.E. 401-403 .......................................................................................................................1, 2, 12

F.R.E. 702 .......................................................................................................................................2

# **OVERVIEW**

Plaintiffs move to exclude the files produced by the Defendants more than two years following the close of discovery (the "Post-Discovery Records"), and two months after the Court granted summary judgment for the Plaintiffs, pursuant to F.R.C.P. 37 and F.R.E. 401-403.

The Post-Discovery Records consist of 2 data files, each of which is over 700 pages long and includes over 55,000 entries purporting to correspond to trading of Plaintiffs' stocks by Mintbroker and in Mintbroker customer accounts. These files were first identified and produced to Plaintiffs as Exhibits A (relating to AWX) and Exhibit B (relating to GBR) to an affidavit of Stephen Darville dated May 20, 2022. These files were willfully withheld from the Plaintiffs during discovery, and their existence and relevance affirmatively and repeatedly denied by Defendants and their counsel, who chose to submit this case to Summary Judgment based on a Stipulation affirmatively representing that the trading at issue in this case *did not involve any trading in customer managed accounts*.

The Court previously ordered a continuance and a period of discovery to investigate the sudden appearance of these Post Discovery Records, which has now been stretched out for six months. During this extended post-discovery discovery period, Gentile again admitted that he always knew these documents existed and were in custody of his attorneys but declined to produce them or to raise any objection to their production. He has offered no legitimate excuse for failing to identify these files during discovery in response to Plaintiffs' multiple discovery requests directly inquiring about "customer managed accounts," or for affirmatively and repeatedly representing, both directly and through counsel, that there was no "client trading" at issue in this case. Plaintiffs now renew their motion to preclude this evidence under F.R.C.P. 37.

1

Moreover, the Post Discovery Records cannot be competently authenticated or explained by Stephen Darville—the only one of Defendants' witnesses who claims to have directly accessed and "maintained" these records. Darville signed two separate affidavits attesting to his direct knowledge of the Post Discovery Records, the various types of Mintbroker accounts and how trading in those accounts were reflected on these data files. At his deposition, however, Darville professed to know nothing about "how the trading worked," and was unable to explain how the Post Discovery Records were generated, or how to interpret any of the entries on these files. Any supposed relevance of the Post Discovery Records are outweighed by their unreliability and the risk of confusing the issues and causing (further) undue delay and should therefore be precluded under F.R.E. 401-402.

Plaintiffs also move to exclude the "expert reports" and testimony that Defendants propose to introduce. Both so-called experts admit that they did absolutely nothing to confirm or corroborate any of the supposed trading reflected on these Post Discovery Records. Both experts readily acknowledged that their analysis would not satisfy audit standards, accounting standards, or any other standards, and that their conclusions depended entirely on self-serving explanations provided Gentile, which they accepted at face value and without even a hint of the professional skepticism demanded of them. Their reports and proposed testimony should be excluded for failing to meet basic standards mandated by F.R.E. 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579, 591-92 (1993).

**BACKGROUND**

Mintbroker, a Bahamian entity, conducted its securities brokerage business offshore on a model that would be prohibited in the United States. That model triggered an investigation by the Securities & Exchange Commission of the Bahamas ("the Bahamas Commission") to which

2

Gentile responded by attempting a "voluntary dissolution" of Mintbroker in late December 2019. Ultimately, Mintbroker's forced liquidation was initiated by the Supreme Court of the Bahamas at the instance of the Securities Commission of the Bahamas ("the Commission") "for the protection of SASL's [a/k/a Mintbroker's] clients, investors and/or creditors" and "the public interest." (*See* Bahamas SEC Petition, Gentile Post-Discovery Dep. Ex. 2 p.14) (attached as App. 1.)

Mintbroker's method of operation involved no actual buying or selling of securities in the public U.S. markets on behalf of its customers. Rather, Mintbroker acted as a principal, taking the other side of any customer orders. When, for example, a customer placed an order to buy 100 shares of XYZ corporation, a U.S. exchange listed security, Mintbroker would create a long position in the customer's account for those shares at the public market price, more or less, without actually buying corresponding shares for the customer. In essence, Mintbroker would book the customer's wager on the stock. On occasion, it might hedge its exposure by buying actual shares for Mintbroker's omnibus account and its own risk. On other occasions, Mintbroker might coincidentally have corresponding shares in its inventory. But in either case, there was no segregation of marketable shares for the customer's benefit.

Mintbroker took on the obligation to the customer to pretend that it was the market and advised customers that they had the right to look to Mintbroker to make good on their account by mirroring a security's open market performance. Mintbroker's customers did not acquire ownership, title or possession to any shares, or the right to vote the make-believe shares. Any open market trading by Mintbroker was for Mintbroker's own account, benefit, and risk—and not for any customers.

What the customer received was Mintbroker's naked promise to mimic the market performance, more or less, of the illusory shares credited to the customer's account and to report

3

that performance to the customer as though the customer actually owned the make-believe shares. If customers wanted to transfer these so-called shares to a new brokerage (e.g., Fidelity, Merrill Lynch, Interactive Brokers) they could not because they did not, in fact, own any transferrable shares. Instead, Gentile testified, customers would need to "sell" their paper positions back to Mintbroker, withdraw the funds the sale generated, and instruct their new broker go into the public market to buy actual shares on their behalf.

Mintbroker informed customers of this business model in the following statement appearing prominently on its website: "All trades are executed in a principal capacity, our clients do not have direct market access. All transactions are executed against MintBroker International, Ltd. … " (Gentile Dep. Ex. #7) (attached as App. 2.)

In September 12, 2019, Christina Rolle, the Executive Director of the Commission asked Gentile to appear for a meeting with regulators at the Commission's offices. The purpose of the meeting was to have Gentile explain the *modus operandi* of Mintroker. He testified at his deposition that he did so at length. On September 18, 2019, Rolle caused a letter addressed to Gentile to be hand delivered to Mintbroker informing him that Mintbroker's brokerage practices appeared to be "akin to a Ponzi scheme" and that its brokerage license was suspended for five days to allow the Commission time to investigate further. (*See* Gentile Dep. Ex. #1, attached as App. 3.)

Gentile initiated court proceedings to challenge these actions and, with ups and downs, the involuntary liquidation of Mintbroker was eventually ordered. It continues to this day.

During the course of these proceedings Mr. Gentile broached to the Commission the possibility of his voluntarily liquidating Mintbroker and surrendering its brokerage license. The Commission instructed him in writing that a voluntary liquidation would need to be preceded

by his filing with the Commission: (i) Audited financial statements for two delinquent prior years and, presumably, for the current year; and (ii) A reconciliation of all client accounts.

Instead, Gentile promptly declared Mintbroker liquidated without regulatory permission or supervision, terminated all employees, turned the key in the doorlock and left the jurisdiction of the Bahamas. The Commission caused the Supreme Court of the Bahamas to appoint temporary (later permanent) liquidators for Mintbroker, and then to initiate formal liquidation proceedings "in the public interest" and "to ensure the protection of Mintbroker's clients, investors and/or creditors."

**ARGUMENT**

1. **The Post-Discovery Records Should Be Excluded Under F.R.C.P. 37 as Unreasonably Withheld During Discovery and Irredeemably Prejudicial to Plaintiffs**

    A. **The Post-Discovery Records Were Available to Gentile at All Times**

    Plaintiffs' original discovery requests were served on Defendants in October 2019. In December 2019, Gentile attempted to voluntarily dissolve Mintbroker in response to the investigation and proceedings initiated by the Commission. Of course, nothing prevented Gentile from producing the Post Discovery Records in response to Plaintiffs' outstanding discovery requests, prior to voluntarily closing Mintbroker's business in December 2019. And, as Gentile testified at his deposition during discovery and again confirmed at his post-discovery deposition, nothing prevented Gentile from accessing these records at any time since.

    At his deposition during discovery in February 2020, Gentile testified that copies of a disk containing Mintbroker's complete records were delivered to Mintbroker's lawyers and to Gentile's personal lawyers in the Bahamas. Darville's affidavit and deposition testimony confirms that these are the disks that he personally delivered to these law firms and copied. He states that he was instructed to retrieve the Post-Discovery Records from his personal copy of these disks for

5

production in this case in April 2022—after the Court granted Plaintiffs' Motion for Summary Judgment. Darville confirmed that he could have accessed and produced the Post Discovery Records at any time since, if only Gentile had asked.

Gentile testified that the reason he did not ask Darville – or his own lawyers – to produce these records was because it was his understanding that "without a court order they could not be released" and that the Bahamian attorneys "declined" to give these records to Gentile when he now says he asked for them in 2020. (*See* Gentile Post Discovery Dep. Tr. pp. 94-97) (attached as App. 4.) But at the same time, Warren Gluck, New York counsel for Mintbroker's appointed liquidators, also describes Gentile's (and his Bahamian counsel's) characteristic non-cooperation in producing these records to *them* during the liquidation proceedings; and further rebukes Gentile and his counsel in this case for failing to inform the liquidators of these lawsuits or Plaintiffs' discovery requests. (*See* Holland & Knight Letter, filed at New Concept Dkt #135.)

Gentile has always known that these Post-Discovery Records existed and were stored on disks in the possession of his Bahamian counsel—the very disks that Plaintiffs repeatedly sought to compel him to produce. And yet Gentile did not produce these Records or even identify these Records for the purpose of objecting to their production during discovery. Instead, Gentile authorized his counsel to affirmatively represent to the Plaintiffs and to the Court that there were no records reflecting client trading of these securities *in existence* because there was no trading of these stocks in Mintbroker's customer accounts.

B. **During Discovery, Defendants Repeatedly and Emphatically Represented, Confirmed, and Stipulated That There Was No Trading in Customer Accounts**

Notwithstanding Gentile's admitted knowledge throughout this litigation of the existence of the Post-Discovery Records, which purportedly reflect extensive trading by

6

Mintbroker's (unidentified) customers, Gentile and his counsel affirmatively told the Court that none of the trading at issue in these cases included any trading for customer managed accounts.

<u>Some examples of their affirmative representations are summarized below:</u>

- **At the conference held in Court on January 22, 2020,** to discuss Plaintiffs' motion to compel the production of any relevant customer trading records, Gentile's counsel told the Court that these documents "do not exist," and "never existed," and that this case solely involved Gentile "sitting at a computer day trading" Mintbroker's account at his discretion.

    Gentile's counsel advised Plaintiffs that all of the underlying trading records (e.g., order tickets, trade confirmations, and deposits and withdrawals of cash or stock) could be obtained from Mintbroker's third-party brokers (i.e., Interactive Brokers, where Mintbroker held an omnibus trading account), and that Mintbroker had did not have any further information. (*See* 1/22/2020 Conf. Tr., Avalon Dkt #104-1, NC Dkt #93-1.)

    Plaintiffs note this conference was held only weeks after Gentile attempted to voluntarily dissolve Mintbroker and Darville states that he delivered the disk containing the Post Discovery Records to Gentile's and Mintbroker's Bahamian law firms.

- **At his deposition during discovery on February 22, 2020**, Gentile acknowledged his awareness – and indeed informed Plaintiffs' counsel for the first time – of the existence of the disks in the possession of his and Mintbroker's Bahamian lawyers. Plaintiffs reiterated their request for production of any relevant information on these disks. At multiple times during this deposition, Gentile and his counsel clarified that the trading at issue – i.e., the trading reported on Gentile's 13D, and reflected on Gentile's original production and on Mintbroker's Interactive Brokers statements – only included Gentile's discretionary trading of Mintbroker's proprietary account and did not include "whatever the clients traded." (*See* Gentile Dep. Tr., Pl. Damages Reply Ex. 1.)

    **Plaintiffs' First Interrogatories** were served on October 16, 2019. Interrogatory #6 asked Gentile to "Identify all Managed Accounts that held, traded, or voted AVALON securities (including at GENTILE's and/or MINTBROKER's direction); and identify the owners of any such Managed Accounts or AVALON securities; and all persons with knowledge of the ownership of such Managed Accounts or AVALON securities."

    Gentile responded on December 2, 2019, prior to Gentile's attempted voluntary dissolution of Mintbroker, when he was indisputably in custody and control of all Mintbroker files. His response to Interrogatory #6 stated simply: "None." (*See* Pl. 1st Interrogatories & Responses) (attached as App. 5 & 6).

- **Plaintiffs' Second ("Contention") Interrogatories** were served on December 6, 2019 – still prior to Gentile's attempted voluntary dissolution.

7

Interrogatory #4 asked Defendants to identify any "arrangements or agreements governing or pertaining to GENTILE's and/or MINTBROKER's trading of AVALON [or New Concept] securities in any Managed Account."

"Managed Accounts" were defined for the Defendants as including" any investment account managed by the Defendants, whether for their own benefit or on behalf of one or more clients or customers (including, but not limited to, affiliates of the Defendants), and in which the Defendants directed, executed, placed, received, cleared, handled, or in any way reviewed or processed orders with respect to the purchase or sale of AVALON or NEW CONCEPT Securities." (*See* 2d Interrogatories, Definitions p.2 at (d) (attached as App. 7.)

In their Responses, sent to Plaintiffs more than six months later on June 29, 2022, Defendants stated unequivocally: "None. There are no managed accounts." (2d Interrogatory Responses) (attached as App. 8.)

Interrogatory #5 asked Defendants to "Identify all Managed Accounts that held, traded, or voted AVALON securities (including at GENTILE's and/or MINTBROKER's direction); and identify the owners of any such Managed Accounts or AVALON securities; and all persons with knowledge of the ownership of such Managed Accounts or AVALON securities."

Defendants again responded unequivocally: "None."

- **Another discovery conference was held in Court on April 23, 2020**, at Plaintiffs' request to address Gentile's continued failure to produce any financial records reflecting the deposit or withdrawal of funds or trading proceeds in connection with the trading reflected on Mintbroker's Interactive Brokers statements. When the Court suggested that these documents appeared relevant to Plaintiffs' claims, Defendants suggested that they provide a Stipulation to confirm that there "was no relevant information of the type that Plaintiffs are seeking." (*See* 4/23/2020 Conf. Tr., Pl. Damages Reply Ex. 2.)

  The result of this conference was the execution of the **Stipulation of Fact for Purposes of Summary Judgment**, in which the Defendants represented that all of the trading at issue was trading executed in Mintbroker's proprietary account. Defendants stated that their suggested term "proprietary account" was intended to "avoid any need for discussion of client accounts." (*See* Stipulation, Pl. MSJ Ex. B; Stipulation Correspondence, Pl. Damages Reply Br. Ex. 4.)

- Plaintiffs' **Requests for Admission**, sent in March 2020 asked Defendants to admit that they had not produced any documents reflecting trading in client managed accounts.

  Defendants again unequivocally (and belatedly) responded at the close of discovery in June 2020, that "as Mr. Gentile asserted in his Responses and Objections to Plaintiffs' First Set of Interrogatories served on December 2, 2019, no trades reported in the Avalon Schedule 13D were executed in or on behalf of Managed Accounts held for the benefit of

8

third-party customers or clients of MintBroker." (*See* RFA Responses, Pl. Damages Reply Ex. 5.)

At no time prior to or since Gentile's attempted voluntary dissolution of Mintbroker did he seek to correct or modify his discovery responses. At no time did he suggest that further relevant information might be found on the disk delivered to his Bahamian lawyers – which Plaintiffs sought to compel him to produce. He intentionally shut down Plaintiffs' request to review these very same files – and deprived Plaintiffs of the opportunity to seek any follow-up discovery from third parties to corroborate or disprove their contents – by stipulating to the non-existence of any relevant customer account records. By lying to Plaintiffs and instructing his counsel to lie to the Court on his behalf, Gentile has waived any defense to liability based on "customer account" trading. The Court should not permit him to change his story and relitigate this case in hopes of obtaining a more favorable decision on different (i.e., made up) facts.

## C. Exclusion Is Warranted Under F.R.C.P. 37 as a Further Continuance Would Be Unproductive

Plaintiffs renew their motion to exclude these documents pursuant to F.R.C.P., which governs discovery sanctions and provides grounds for a motion *in limine*. *See, e.g., EMA Fin. v. Joey N.Y., Inc.,* No. 2021 WL 2822565, at *8 (S.D.N.Y. June 9, 2021) ("the same Second Circuit test [for exclusion under Rule 37] requires that I exclude these exhibits" on the plaintiff's motion *in limine*).

As outlined in Plaintiffs' Reply Damages briefing, Rule 37 permits courts broad discretion to order sanctions, including preclusion. In deciding whether to order preclusion or a lesser remedy, courts consider the possibility of ordering a continuance to alleviate any prejudice or "unfair surprise."

9

At the conference held following the submission of briefing on Damages, the Court noted that continuance was often the preferred remedy. The parties have since been engaged in a six-month continuation of discovery. Nonetheless, Defendants have still failed to produce any information corroborating their Post Discovery Records supposedly reflecting trading by thousands of clients. Not a single example of an account statement, trade order, or execution confirmation, and not a single receipt evidencing the withdrawal of cash or stock by any Mintbroker clients have been produced that can be confirmed or reconciled against with the Post Discovery Records.

Plaintiffs note that Defendants' original production consisted of a similar data file supposedly constituting a similarly generated "report" of their trading activity, and Plaintiffs insisted on corroborating this information against account statements and underlying trade confirmations. When Defendants insisted that they did not have those documents, Plaintiffs painstakingly corroborated the trading include in Plaintiffs' damages calculations through extensive third-party discovery.

The Post Discovery Records appears to be nothing more than a ledger created by the Defendants. Again, there is no evidence produced by the Defendants or any third party corroborating any of the entries on the Post-Discovery Records supposedly representing customer transactions. This is consistent with Gentile's testimony and with the conclusion reached by Commission that orders by Mintbroker's clients were not sent to the market but merely recorded "internally" by Mintbroker.

There is no chance that the Defendants will produce corroborating records if given a further continuance. Darville has stated that he did not believe client financial records were

included in the disk he copied and sent to the Bahamian law firms. Only Gentile knows if these records exist – and he has deliberately chosen not to tell.

Defendants are intent on creating a strange loop of discovery. Following them down this path would be pointless. A further continuance would be fruitless and would only serve to further prejudice the Plaintiffs. The appropriate remedy is preclusion. *See, e.g., Met. Opera Assn. v. Local 100*, 212 F.R.D. 178, 220-221 (S.D.N.Y. 2003) ("counsel's repeated representations that all responsive documents had been produced—were made without any real reflection or concern for their obligations under the rules governing discovery and, in the absence of an adequate search for responsive documents, without a reasonable basis," not only warranted preclusion, but justified entry of default judgment as the strongest available sanction under Rule 37).

**2. The Post-Discovery Records Are Unreliable**

As discussed above, the Post-Discovery Records consist of nothing more than a ledger of entries. None of the so-called "client trading" entries can be corroborated or reconciled with any brokerage statements or market trading data.

Moreover, the Post-Discovery Records cannot be competently introduced. Stephen Darville – the only one of the Defendants' witnesses who claims (in his affidavit) to have knowledge of the contents of these Records – testified that he cannot attest to the accuracy of the Records or explain the extent to which the Records reflect any trading by the Defendants or Mintbroker's purported clients.

In his affidavit attempting to introduce the Post Discovery Records, Darville states that the Records are the type of records he managed and maintained for Mintbroker. At his deposition, however, Darville testified that the Post-Discovery Records actually consist of data generated by DAS, Inc., the maker of trading software used by Mintbroker and Mintbroker clients.

Darville clarified that "by maintaining" these Records, he meant "managing access to the DAS database by authorized Mintbroker employees," and that he had no idea how these records were generated. He also testified that any MIntbroker employee with authorized access could have attempted changed the records without his knowledge. More critically, Darville had no knowledge of what these records reflect – and whether they are, in fact, customer trading records at all.

For example:

- Darville's affidavit states that the account numbers beginning with letters represent customer accounts. His deposition clarified that this system of designating client accounts by letter numbers was a devised and implemented by DAS, Inc., and he did not know the process for confirming that accounts were properly designated, or if and how clients were prevented from opening more than one account.

- Darville's affidavit attests that account numbers containing numerals only were Mintbroker's "proprietary, internal booking, or error accounts." But at his deposition, he testified that he did not know the difference between these types of accounts and did not know which account numbers appearing on the Post-Discovery Records pertained to which type of account.

- Darville testified that he did not know which – or whether – any of the entries on the records represented actual trading in any account.

- Darville testified that he did not know whether these records included all trades executed by Mintbroker or Gentile through other platforms or brokers.

(*See* Darville Dep. Tr. pp. 58-65; 82-85) (attached as App. 9.)

Plaintiffs submit that the Post Discovery Records should be excluded under F.R.E. 403, which permits the preclusion of even relevant evidence if outweighed by the risk of "prejudice, confusion, wasting time, or other reasons." Any relevance of the Post Discovery Records is overshadowed not only by the substantial ongoing prejudice to Plaintiffs caused by their delayed production, but also by the confusion they generate and the time that will be wasted by the Court and the parties in attempting to parse the unverified (and unverifiable) information that the Defendants claim these Records contain.

12

### 3. The Expert Reports Are Unreliable and Fail to Meet Accepted Standards

Gentile proposes to offer two expert witnesses to present their reports. Each report follows a similar pattern. Each expert was presented with the Post-Discovery Records. Each expert then performs the following exercise:

(i) They eliminate the entries for accounts beginning with letters, based solely on Gentile and his delegate Darville's representation that these are "customer accounts" from inclusion in calculating Defendants' "beneficial ownership" and short swing profits; and

(ii) They further eliminate any entries for numerical-only accounts designated as Mintbroker accounts that can be "netted" against another entry by any other account at the same time, on the assumption that any entries that can be "netted" in this manner are for "record keeping" purposes and do not represent separate transactions.

The Beresford report and deposition indicate that Beresford made no independent inquiry into the derivation of the numbers he was asked to analyze. Beresford states that he relied solely on Christian's inquiries. (*See* Beresford Dep. Tr. pp. 58-61) (attached as App. 10.)

Christian testified that he did not attempt to corroborate any of the factual representations supplied by Gentile through Darville. As discussed above, Darville has no personal knowledge of how these records were generated, what they signify, whether they are complete or unaltered, and he was wholly uninformed as to how Mintbroker's trading worked. The expert reports are no more relevant reliable than the information fed to them by Defendants' incompetent witness.

Neither expert reviewed any of the extensive third-party discovery materials produced in this case, including Mintbroker's Interactive Brokers statements, to confirm whether entries assumed to constitute "record keeping" in fact corresponded to trades executed in the market through Mintbroker's omnibus account. He did not consider whether entries occurring at the same time as another entry could reflect day trading or coordinated activity that should not simply be disregarded from the analysis.

13

The experts did not attempt to verify whether any stock designated as bought or sold for client was in fact credited to any client accounts, or in fact whether any segregated client accounts existed at all.

Both experts acknowledged that they did not inquire as to whether any purported customer accounts were in fact owned by one of Gentile's many affiliated entities, or whether any customers were the owners of more than one account. Most notably, neither of the experts noticed that a single "customer" account (#MBS010067) accounted for more than half of the total purported "customer account" entries or that this particular account also appeared to have traded more than double the amount of outstanding New Concept common stock. (*See, e.g.*, Beresford Dep. Tr. pp. 26-29) (App. 10.)

Nor did the experts inquire into the identity of that account owner, as mandated by guidelines applicable to audits of omnibus trading accounts, which are known to facilitate money laundering by disguising their ultimate beneficial owners. (See Staff Bulletin, Christian Dep. Ex. 21) (attached as App. 13.) The experts testified that such a review was "outside the scope of their engagement," which was limited to analyzing the Post Discovery Records, without verifying their accuracy or completeness. (*See, e.g.,* Christian Dep. Tr., App. 11 at pp. 39-47; Christian Supp. Dep. Tr. pp. 10-15, attached as App. 12.)

Both experts also repeatedly admitted that their analysis did not comport with any accepted audit or accounting standards. The experts failed to apply any reasonable methodology of verifying Defendants' self-serving representations, which they were told to accept as the "parameters of their engagement." Their reports and testimony serve only to cloak Gentile's lies in distracting pseudo-science. These reports fail to meet any acceptable standards and are subject

to exclusion under F.R.E. 702. *See Daubert*, 509 U.S. at 589-90 (expert evidence must be ground[ed] in the methods and procedures of science" and "supported by appropriate validation").

If either Christian or Beresford had applied accepted audit standards or even attempted to reconcile the Post Discovery Records with any of the discovery produced in this case, they might have reached the same conclusion as the Commission's investigators: That customer "transactions" were not, in fact, transactions executed on the public market, but private agreements with Mintbroker as counterparty. As such, none of Mintbroker's so-called "customer transactions" effected Mintbroker's ownership of actual shares that were purchased by Mintbroker for its own benefit. Mintbroker's obligation to credit customers with the market value of shares did not alter Mintbroker's long or short positions in these stocks on the public market. If Mintbroker owned 100 actual shares and pretended to "sell" the shares to a customer by crediting the customer's account, Mintbroker nonetheless continued to be the beneficial owner of the shares purportedly "sold" in this manner.

The experts lack an understanding of the nature of Mintbroker's business, which provides the necessary context for interpreting the Post Discovery Reports. Their reports and analysis are of no value to the trier of fact. *Owens v Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) (to be relevant, expert's testimony must "fit the issue to which the expert is testifying and be tied to the facts of the case"). Expert testimony that is not relevant is not helpful. *See, e.g. Daubert*, 509 U.S. at 591 (citing Weinstein's Federal Evidence; helpfulness condition of Rule 702 goes primarily to relevance.)

The experts also lack an understanding of the applicable law. For purposes of determining *10% beneficial ownership*, SEC Rule 13d-3(a), 17 C.F.R. § 240.13d-3, defines the term to mean, *inter alia*, any person who has or shares voting power (including the power to vote

or to direct the voting of) the security. SEC Rule 16a-1(a)(1) imports the definition of Section 13(d) into matters involving Section 16. 17 C.F.R. § 240.16a-1. *See, e.g.*, *Rubenstein v. International Value Advisors, LLC*, 363 F. Supp. 3d 379, 391 (S.D.N.Y. 2019); Romeo & Dye, *Section16 Deskbook* § II.F(C)(e).

No customer of Mintbroker actually owned any securities tradeable on the public market, and no customer had any voting power over the "shares" in their accounts. All shares purchased by Mintbroker were owned by Mintbroker, were within Mintbroker's voting power, and could be sold on the market at Mintbroker's discretion. Consequently, for purposes of determining 10% beneficial ownership and Section 16(b) liability, Mintbroker was the beneficial owner of these shares, regardless of whatever else the newly "discovered" records have to say.

The proposed expert testimony is a red herring by which Defendants hope to lead the Court to stray into green-eyeshade bookkeeping squabbles. The expert reports and testimony should be precluded as irrelevant to resolving any issue before the Court.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion *in limine* should be granted, and the Post-Discovery Records and expert reports excluded from further consideration.

Respectfully submitted,

*/s/ Miriam Tauber*  */s/ David Lopez*

Miriam Tauber  David Lopez

*Attorneys for Plaintiffs*