Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    --------------------------- X
     AVALON HOLDINGS CORP.,
4              Plaintiff,
5         vs.                        No.
                                     18-cv-7291
6                                    (VSB)(RJL)
7    GUY GENTILE and MINTBROKER
     INTERNATIONAL, LTD.,
8              Defendants.
     --------------------------- X
9    Related to:
     --------------------------- X
10   NEW CONCEPT ENERGY, INC.,
               Plaintiff,
11
          vs.                        No.
12                                   18-cv-8896
                                     (VSB)(RJL)
13
     GUY GENTILE and MINTBROKER
14   INTERNATIONAL, LTD.,
               Defendants.
15   --------------------------- X
16                   October 26, 2022
17                   11:39 a.m.
18        Deposition of GUY GENTILE, held
19   via Zoom at 860 Ashford Avenue, San Juan,
20   Puerto Rico, pursuant to Court Order,
21   before Theresa Tramondo, AOS, CLR, a
22   Notary Public of the State of New York.
23   Reported by:
24   THERESA TRAMONDO, AOS, CLR
25   JOB NO. NY5527762

Page 2

1
2  APPEARANCE OF COUNSEL:
3
4  FOR PLAINTIFFS IN BOTH ACTIONS:
5    THE LAW OFFICES OF DAVID LOPEZ
6    171 Edge of Woods Road, P.O. Box 323
7    Southampton, New York  11968
8    BY: DAVID LOPEZ, ESQ.
9    Davidlopezesq@aol.com
10   631-287-5520
11
12
13  COCOUNSEL FOR PLAINTIFFS IN BOTH ACTIONS:
14   MIRIAM TAUBER LAW FIRM
15   885 Park Avenue, 2A
16   New York, New York  10075
17   BY:  MIRIAM TAUBER, ESQ.
18   Miriamtauberlaw@gmail.com
19   323-790-4881
20
21
22
23
24
25

Page 3

1
2  APPEARANCE OF COUNSEL (CONT'D):
3
4  FOR DEFENDANTS IN BOTH ACTIONS:
5    FORD O'BRIEN LANDY LLP
6    275 Madison Avenue, 24th Floor
7    New York, New York  10016
8    BY:  MATTHEW A. FORD, ESQ.
9      CARA J. FILIPPELLI, ESQ.
10   Mford@fordobrien.com
11   Cfilippelli@fordobrien.com
12   212-858-0040
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2        THE REPORTER:  All parties agree
3    that the court reporter can
4    swear/affirm the witness in virtually
5    via Zoom as if the witness was in the
6    same room as the court reporter.
7    Unless there are any objections by any
8    party, say it's so stipulated.
9        MR. LOPEZ:  Yes.
10       MR. FORD:  So stipulated.
11 G U Y   G E N T I L E, called as a
12 witness, having been duly sworn via Zoom
13 by a Notary Public, was examined and
14 testified as follows:
15 BY THE REPORTER:
16   Q.    State your name for the record,
17 please.
18   A.    Guy Gentile, G-E-N-T-I-L-E.
19   Q.    What is your address?
20   A.    I'm home, 860 Ashford Avenue,
21 San Juan, Puerto Rico 00907.
22 EXAMINATION BY
23 MR. LOPEZ:
24   Q.    Mr. Gentile, Judge Lehrburger
25 had some confusion as to how to pronounce

Page 5

1        Gentile
2  your name, Gentle, Gentile, Gentilli
3  (phonetic).  What is your preference?
4    A.    I don't have one.  You can
5  choose whichever one you would like.
6    Q.    It's the Judge who's asking.
7    A.    I don't see him here asking me.
8    Q.    Through me.
9    A.    He can call me any way-- any way
10 he likes.  That's fine.
11   Q.    Okay.  State your name.
12   A.    Guy Gentile.
13   Q.    And where do you reside?
14   A.    In San Juan Puerto Rico.
15   Q.    The address?
16   A.    860 Ashford Avenue.
17   Q.    Did you recently reside at
18 Gallery Plaza, One De Diego, South Tower,
19 Apartment 2022, San Juan?
20   A.    Not -- I mean, last year I did,
21 yes.
22   Q.    And prior to that, prior to the
23 One De Diego address, did you reside in
24 Nassau, Bahamas?
25   A.    Part-time.  I was never

2 (Pages 2 - 5)

Page 6

Gentile

1
2 full-time living there.
3    Q.   Were you a domiciliary of the
4 Bahamas?
5    A.   I don't know what that means.  I
6 had -- when you say domicile, do you mean
7 like for tax purposes domicile or what do
8 you mean?
9    Q.   That would be one way of
10 describing it, yes.
11    A.   No, no, it was not my tax
12 residency.
13    Q.   When did you first make Puerto
14 Rico your domicile?
15    A.   I believe in 2016 or 2017,
16 something like that.
17    Q.   At the times that concern us in
18 these cases, June 29, 2018 through August 3,
19 2018, what offices and positions, if any,
20 did you hold with Swiss America Securities?
21    A.   From what?  From what year?
22    Q.   June 29, 2018 'til August 3,
23 2018.
24    A.   I was -- until August of 2018, I
25 was the CEO and director.

Page 7

Gentile

1
2    Q.   And were you the sole owner?
3    A.   I had 99 percent of the shares
4 with one share being held by an attorney.
5    Q.   What attorney?
6    A.   Michael Miller from the Bahamas.
7    Q.   Did there come a time when Swiss
8 America Securities changed its name to
9 MintBroker?
10    A.   Yes.
11    Q.   Did it also have a trade name of
12 SureTrader?
13    A.   It had a website that it
14 operated called SureTrader, yes.
15    Q.   When I use the term
16 "MintBroker," would you understand it to
17 mean "Swiss America Securities and
18 MintBroker"?
19    A.   Yes, that's fine, I could
20 understand that.
21    Q.   Okay.  What was the business of
22 MintBroker?
23    A.   It was an online trading firm.
24    Q.   Any other activities?
25    A.   I mean, that's -- whatever it

Page 8

Gentile

1
2 was licensed to do with the exception of
3 advising.  It was licensed to do advising,
4 but it didn't do advising.
5    Q.   Was MintBroker/Swiss America
6 subject to the regulatory authority of the
7 Securities Commission of the Bahamas?
8    A.   Yes.
9    Q.   Under what names?
10    A.   Both of those names.  Swiss
11 America Securities, Ltd is what we initially
12 registered as, and I don't remember the
13 dates, but it was later changed to
14 MintBroker International, Ltd.
15    Q.   Did you notify the Securities
16 Commission of the Bahamas prior to the name
17 change?
18    A.   I don't remember.
19    Q.   Do you recall whether you
20 received permission for a name change?
21    A.   We discussed it with the firm's
22 attorney and the firm's attorney is who
23 advised us on that and the board issued a
24 resolution for name change.  That's how I
25 recall it happening.  I don't remember

Page 9

Gentile

1
2 exactly what the details were with the
3 Securities Commission because it was not
4 something that I would have handled.  That
5 would have been something that the
6 compliance officer would have handled.
7        THE REPORTER:  Somebody has a
8    tone chiming.  Could you turn that
9    off, please.
10    Q.   Did you obtain prior permission
11 for a name change from the Commission?
12    A.   I really don't see how this is
13 relevant to a damages inquest.  What is the
14 relevancy of these questions?
15    Q.   Is it not a fact that the
16 suspension of MintBroker license to conduct
17 a brokerage business included a charge that
18 you had not required -- obtained prior
19 permission for the name change?
20    A.   I don't remember exactly what
21 was in a document that you're -- you know,
22 this company has been closed for three years
23 now.  I do remember that there was some back
24 and forth with the Commission about the name
25 change, but I don't remember the specific

3 (Pages 6 - 9)

Gentile

1 details of it. I do know that -- I do
2 remember, not that I know, I remember that
3 the compliance officer had notified them
4 that a name change had happened, I know
5 there was some back and forth with it, but
6 at the end of the day, the firm relied on
7 its counsel to do what it did.
8     Q.    As a broker-dealer, what
9 services did MintBroker offer to retail
10 customers?
11    A.    Online trading services.
12    Q.    Can that mean that it gave
13 customers access to American markets?
14    A.    I mean, that's what we primarily
15 traded in, yes. I mean, it's the only
16 market we traded in actually, yes.
17    Q.    In addition to executing trades
18 on American exchanges, U.S. exchanges for
19 customers, did it also sell shares to
20 customers from its own inventory?
21    A.    Not always, but from time to
22 time if it had inventory, it would sell from
23 inventory.
24    Q.    Who was the custodian for

*(Note: line numbers 1-25 in original)*

Gentile

1 MintBroker's inventory of shares?
2    A.    So you -- I think you mean like
3 clearing firm, right. So it had several
4 clearing firms throughout the year.
5 Interactive Brokers was one of them. ETC
6 Clearing was another one. It also had a
7 few -- at least two others. I think
8 Oppenheimer may have been one. And I don't
9 remember the name of the last one.
10    Q.    And who was the custodian of
11 Swiss America/MintBroker's customers'
12 shares?
13    A.    So if you had an account at
14 Swiss America, Swiss America would be your
15 custodian.
16    Q.    It was a self-custodian?
17    A.    Yes.
18    Q.    Did there come a time when the
19 Securities Commission of the Bahamas
20 temporarily suspended the registration or
21 license of Swiss America/MintBroker to
22 conduct its business as you had described
23 it?
24    A.    I mean, it did suspend the

Gentile

1 firm's business activities for five days in
2 September of 2019.
3    Q.    Did that temporary suspension
4 eventually become a permanent suspension?
5    A.    No.
6    Q.    Are you testifying that Swiss
7 America was not permanently disbarred from
8 conducting a brokerage business in the
9 Bahamas?
10    A.    Well, the timeline of the way
11 you're saying it is not the way it went
12 down. Initially it was suspended for five
13 days and then there was -- our attorneys
14 filed some documents in court and had gotten
15 some type of injunction that removed that
16 suspension, and I do believe at some point
17 that the Securities Commission suspended the
18 license permanently, like you're saying, but
19 it was several months later. I don't
20 remember exactly when.
21    Q.    In connection with the first,
22 the initial suspension, did you receive an
23 explanation from the Commission of the
24 Bahamas of reasons for the suspension?

Gentile

1    A.    Yes, they wrote a letter.
2    Q.    Would that be a letter from a
3 Miss Christina Rolle, R-O-L-L-E, Executive
4 Director of the Commission?
5    A.    I mean, I would have to see the
6 letter, who wrote it, but I don't remember
7 if it was her or someone else in her office,
8 but there was a letter.
9    Q.    All right. It's dated
10 September 18th, 2019. Does that refresh
11 your recollection?
12    A.    Yeah, I remember a letter in
13 September. That's when the suspension
14 suspense happened in.
15       THE REPORTER: In September?
16 Could you repeat the ending?
17    A.    As I stated before that the
18 suspension happened in September. I don't
19 remember the exact date. So the letter that
20 you're having in your hands, if you could
21 show it to me, I guess I can --
22       MS. TAUBER: I'll introduce it.
23 Do you want me to do that right now?
24       THE WITNESS: Say it again.

4 (Pages 10 - 13)

Gentile

1
2       MS. TAUBER:  I'm going to
3   introduce it in a moment, so you'll be
4   able to see.  Just give me one second.
5       THE WITNESS:  Okay.
6       MS. TAUBER:  Let me know when it
7   has gone through.
8       Q.   For further identification, it
9   is document number 112-6 in case number 18
10  civil 7291 and it was filed by USR.
11      MS. TAUBER:  I think we filed it
12  actually, but everyone should be able
13  to see it now.
14      (Exhibit 1, four-page document,
15      cover pages titled "Exhibit 6,"
16      three-page letter from Christina Rolle
17      dated September 18, 2019, marked for
18      identification, as of this date.)
19      MS. TAUBER:  Off the record.
20      (Discussion off the record.)
21      Q.   I would like to begin by reading
22  into the record numbered paragraph 1 on page
23  one.  I'm beginning now.  "SASL's online
24  'day trading' facilities."  Parenthetically
25  "SASL" is term that the Commission is using

Gentile

1
2   in its correspondence for Swiss America
3   Securities.  I am beginning now.  "SASL's
4   online 'day trading' facilities do not
5   enable clients to trade directly with the
6   market, or against the market held position,
7   as is the premise for trading facilities
8   generally.  Instead, SASL's clients' orders
9   are placed via an online platform called
10  'Das Trader,'" D-A-S, "and routed to a
11  purported 'trading desk'/back office of SASL
12  in the Bahamas.  Clients' orders are not
13  filled in the market but instead are
14  recorded as orders by SASL with no
15  transaction having been entered in the
16  market.  As such, clients' positions do not
17  exist in the market as would be expected,
18  but, rely on SASL's ability to cover gains
19  and withdrawals in a manner that is akin to
20  a 'Ponzi' scheme.  This practice is wholly
21  unacceptable to the Commission and must
22  cease immediately."
23      Do you agree with the
24  description of MintBroker's activities as
25  related by Ms. Rolle?

Gentile

1
2       A.   No.  I never told her that.  She
3   made this entire sentence up.  And I've
4   argued this point before, and my response to
5   her in this letter was that she was wrong
6   and she doesn't understand how online
7   trading firms work and that she needs to,
8   you know, maybe take a class on it.  I don't
9   remember exactly what I said.  But she was
10  completely wrong about this, which is why we
11  were successfully able to get an injunction
12  to get the suspension removed.
13      Q.   That was a preliminary
14  injunction, wasn't it?
15      A.   I mean, I don't know exactly
16  what it was, but we had gotten it removed.
17  But I definitely disagree with the way she
18  described the trading activity 'cause it
19  wasn't the way it worked.
20      Q.   And the Commission after the
21  preliminary injunction expired continued
22  with its efforts to have MintBroker cease
23  and desist from this practice; is that not
24  true?
25      A.   By the time that happened the

Gentile

1
2   company was closed for probably a year.  By
3   the time the preliminary injunction -- if
4   that's what it was, I don't remember exactly
5   what it was called -- it was closed for over
6   a year -- or almost a year.  The firm was
7   already closed.  So it would have been
8   meaningless another suspension 'cause we had
9   already surrendered the license anyway.
10      Q.   I'll get back to that in a
11  moment.
12      Let me read the second paragraph
13  of this letter.  "SASL has established a
14  purported 'subsidiary,'" in quotes
15  "subsidiary," "in Canada for the purpose of
16  receiving clients' funds on behalf of SASL.
17  This Canadian entity is not regulated either
18  in the Bahamas or in Canada.  Moreover,
19  SASL's clients are not aware that they are
20  not sending funds directly to SASL and the
21  Commission has received no satisfactory
22  explanation for this operational structure.
23  SASL's inability to obtain a bank account in
24  its own name is an unsatisfactory
25  explanation for the diverting of clients'

Gentile

1
2  funds to an unregulated entity."
3        Do you disagree with that?
4    A.   Yes.
5    Q.   In what way?
6    A.   Because she knew about this
7  before we did it because we told her that we
8  were doing this.
9    Q.   Continuing that paragraph,
10  "demonstrates at the very least, gross
11  deficiencies in SASL's operation capacity.
12  This practice, as described, is wholly
13  unacceptable to the Commission and must
14  cease immediately."
15        Did MintBroker cease immediately
16  from shipping client funds to Canada?
17    A.   Well, it was suspended at this
18  point, so it wasn't shipping client funds
19  anywhere, but it was suspended at this
20  point. I don't remember, you know, from the
21  time the suspension was lifted how it was
22  operating at that point 'cause I had left
23  the Bahamas at that point. But the
24  Commission was well aware that the firm had
25  subsidiaries for transacting banking -- for

Gentile

1
2  banking purposes because it was in, you
3  know, the audited financial statements that
4  were submitted to the Commission to begin
5  with you; for sure the last one they
6  received, but in addition to that, they knew
7  about it for years because they came in and
8  raided the office in 2016, and we showed
9  them everything and they didn't have any
10  issues with anything at that -- at least
11  none of this came up, but obviously they
12  knew about it.
13    Q.   Is it not a fact that at 18
14  September, 2019 audited financial statements
15  were delinquent for calendar years 2017 and
16  2018?
17    A.   Yes. But through no fault of
18  the company. We're always waiting for BDO
19  to complete it.
20    Q.   But you are referring to
21  nonexistent audited financials as evidence
22  that the Commission knew about this?
23    A.   No, because in 20 -- the 2016
24  financial statement would have also shown
25  that. The company had subsidiaries from

Gentile

1
2  pretty much -- probably from 2014 had
3  subsidiaries. So they would have had a 2014
4  audited financial statement showing that it
5  had other entities to facilitate banking. I
6  know that I've met with the Commission
7  several times and explained to them the
8  structure and why we were doing it that way.
9  They didn't have a problem with it. So I
10  mean this -- this letter to me -- you know,
11  this letter to me was just an excuse for
12  the Commission was trying to come up with to
13  find a way to shut the firm down, and it's
14  basically a fabrication of the truth.
15    Q.   Are you saying that the
16  Commission had condoned your directing
17  client monies to Canada without notifying
18  the customers --
19    A.   Well, how would -- first of all,
20  you're mischaracterizing what happened.
21  Clients did not know they were sending money
22  to Canada. They were the ones sending it to
23  Canada. It wasn't us sending money to
24  Canada. It was the client sending money to
25  Canada. So obviously the clients know.

Gentile

1
2  This is why this letter is a lie. So
3  clearly the clients know if they're sending
4  money to Canada. So that -- that's just not
5  true.
6        Secondly, I'm not -- I didn't
7  say that the Commission condoned it. I'm
8  saying that the Commission was well aware of
9  it from -- as early, for sure, as 2016 and
10  did not have a problem with it until
11  September of 2019, three years later after
12  three audits, a forensic audit, you know, us
13  meeting with them several times, telling
14  you, you know, how the business operated,
15  but all of the sudden after eight years of
16  operating a specific way, which they knew
17  how it was, and it's not the way they're
18  characterizing at all, it's a problem now.
19  And I told you that's because I believe that
20  they were just looking for an excuse to shut
21  the firm down.
22        If you go back and ask the
23  Securities Commission to give you a
24  transcript of my meeting with them right
25  before they sent this letter, it's a

Page 22

Gentile

1    complete opposite of what this letter says.
2    And they never would provide it.  I wonder
3    why?  Because it would contradict everything
4    that they said.
5        Q.   Did you ever request a
6    transcript?
7        A.   Of course I did.  Of course I
8    did.  My attorneys did.
9        Q.   Did you receive one?
10       A.   No.
11       Q.   Was this arrangement not one of
12   the factors cited in the eventual
13   liquidation order entered by the Supreme
14   Court of the Bahamas?
15       A.   I would have to see that exhibit
16   to see what they put in there.  I don't -- I
17   can't remember what they put in.
18           MS. TAUBER:  I'm going to
19       produce and send you a copy in a
20       moment, okay.  I'm sorry, I'll screen
21       share it.
22           (Exhibit 2, 156-page document,
23       first page Advertisement of Winding Up
24       Petition with other documents, marked

Page 23

Gentile

1    for identification, as of this date.)
2            THE WITNESS:  What are you doing
3        right now?  I don't see anything and I
4        don't hear you either.  You're muted.
5            MS. TAUBER:  Sorry, one second.
6        Give me one moment.
7            THE WITNESS:  Oh, you're
8        reading.  I thought --
9            MS. TAUBER:  I guess you don't
10       have access to it, but it will appear
11       in your attorney's folder and then
12       I'll screen share it with you.
13           THE WITNESS:  Okay, got it.
14           MS. TAUBER:  Does everybody have
15       it?
16           THE WITNESS:  I see the first
17       few points.  You're going to scroll
18       down, I guess.
19           MS. TAUBER:  Do you see it's the
20       affidavit of Christina Rolle, that's
21       the document?
22           THE WITNESS:  Yes.
23       Q.   Did you take exception to
24   Ms. Rolle's describing your activities as a

Page 24

Gentile

1    Ponzi scheme?
2        A.   Did I take what?
3        Q.   Exception.
4        A.   "Exception" meaning did I accept
5    it?
6        Q.   Did you disagree with?
7        A.   Of course.  Of course it's a
8    disagreement.  How could it be a Ponzi
9    scheme if everybody got their money back?
10       Q.   How do we know that everybody
11   got their money back?
12       A.   Well, where are the complaints
13   of people who didn't get their money back?
14   I haven't seen any.  If 4,000 people didn't
15   get their money back, I think there would be
16   a lot of complaints.  I haven't seen any.
17       Q.   Is it a fact that there was a
18   complaint discovered by the Commission
19   accusing MintBroker of engaging in a
20   pump-and-dump scheme involving my client
21   Avalon?
22       A.   I don't know.  I don't remember
23   seeing anything like that.  Maybe you could
24   show me.

Page 25

Gentile

1        Q.   (**RQ)It appears in one of the
2    inspection reports, and I will be happy to
3    supply it to your counsel afterwards.  I
4    don't have it on my fingertips.
5        A.   Okay.
6            What was the question on this
7    affidavit, though?
8        Q.   Whether you took exception to
9    being described as running a Ponzi scheme.
10       A.   It definitely was not a Ponzi
11   scheme.  That doesn't even make any sense
12   how -- that's why I say that she doesn't
13   know what she's talking about.
14       Q.   All right.  You've engaged two
15   CPAs, have you not, to provide expert
16   testimony on calculating damages?
17       A.   Yes.
18       Q.   One is a Mr. Christian and the
19   other a Mr. Beresford; is that correct?
20       A.   Yes.
21       Q.   Did you inform either of them
22   that MintBroker's licenses to conduct
23   business in the Bahamas had been temporarily
24   suspended in 2019?

7 (Pages 22 - 25)

Page 26

Gentile

1
2    A.    I don't recall if I said that to
3  them.
4    Q.    Did you inform your experts of
5  the final order of the Supreme Court of the
6  Bahamas requiring liquidation under Court
7  supervision of MintBroker?
8    A.    I don't remember discussing that
9  with them, but it's possible.
10    Q.    Had you met with both of them or
11  one of them; had you met with any of them?
12    A.    I've spoken to them the way I'm
13  speaking to you right now over a Zoom
14  conference and the phone.
15    Q.    All right.  To repeat:  Did you
16  inform either of your experts that
17  liquidation of MintBroker under Court
18  supervision had been ordered?
19    A.    I don't remember if I did or did
20  not.
21    Q.    Do you recall whether you might
22  have discussed with them the reasons why
23  liquidation had been ordered?
24    A.    I don't remember talking about
25  the liquidation with them.

Page 27

Gentile

1
2    Q.    So you did not tell them, as far
3  as you can recall, that the liquidation was
4  ordered, and I quote, "for the protection of
5  customers and the general public"?
6    A.    I don't remember saying that to
7  them.
8    Q.    Did you inform either of your
9  experts that you had previously been tried
10  and convicted in the Federal District Court
11  for the District of New Jersey on charges of
12  manipulation of the shares of two penny
13  stock?
14    A.    Why would I tell him that if
15  that's not a true statement.  That's
16  defamation right there.  I've never been
17  convicted of anything.
18    Q.    You were not convicted?
19    A.    I've never been convicted of
20  anything.  That's defamation.
21    Q.    Isn't it true that your
22  conviction had been vacated on grounds that
23  the statute of limitations had expired?
24    A.    My conviction?  I never had a
25  conviction.  How could I have a conviction

Page 28

Gentile

1
2  vacated if I've never been convicted of
3  anything?
4        MR. FORD:  David, I'm not loving
5    this line of questioning where you're
6    stating things that we all know to be
7    false and trying to trick the client.
8    So I can't see where this is going
9    other than harassment.
10    Q.    Mr. Gentile, did you or did you
11  not have a court proceeding in the District
12  of New Jersey accusing you of manipulating
13  penny stocks?
14    A.    So I think they accused me of --
15  of some type of stock market promotion of
16  some sort or being part of a conspiracy to
17  do so, but it's simply not true.
18    Q.    Was there a Court decision on
19  that proceeding?
20    A.    Yes.
21    Q.    And what was that decision at
22  the trial court level?
23    A.    It never went to trial.  It was
24  dismissed on a motion to dismiss.
25    Q.    Based on statute of limitations?

Page 29

Gentile

1
2    A.    I mean, we made civil arguments,
3  but statute of limitations is what the Judge
4  used to dismiss it, but he could have
5  dismissed it for a number of reasons; one is
6  no evidence of anything because it did
7  not happen.
8    Q.    That's purely speculative; he
9  dismissed it because of an expired statute
10  of limitations; is that correct?
11    A.    That's correct.  And the DOJ
12  never appealed it, which they could have
13  done if they had evidence, which they did
14  not.
15    Q.    Is the Securities and Exchange
16  Commission currently suing you in the
17  District of Florida?
18    A.    Yes.
19    Q.    The Southern District of Florida
20  to be exact.
21        And what charges do they lodge
22  there?
23    A.    You mean complaints, right?  I
24  don't know the exact wording that they use
25  for their complaints or what the rule that

8 (Pages 26 - 29)

Gentile

1    Gentile
2  they are charging me with, but it's
3  essentially they are accusing the firm,
4  meaning Swiss America/MintBroker, of
5  soliciting U.S. customers without being
6  registered with the Securities Commission in
7  the United States.
8      Q.   And did you inform either of
9  your experts of that fact?
10     A.   You know, I just don't remember
11  if I did.  I might have.  I mean, it's
12  public knowledge.  If you just Google the
13  company which they're working for or me,
14  you'd see it on the first page, right.  So
15  it's not something I could have -- it's not
16  something I would hide from them, but I just
17  don't remember a conversation that I had
18  with someone from -- I don't know how many
19  months ago it was now -- five, six months
20  ago.  I just don't remember exactly what we
21  discussed because the purpose of their
22  duties was to just calculate numbers, right.
23  It wasn't to do anything else other than to
24  calculate numbers.
25     Q.   Is it not a fact that the

Gentile

1    Gentile
2  reports of each of the experts expressly
3  states that they have not verified
4  representations made to them by you or by
5  Mr. Darville?
6      A.   I don't know.  You could show me
7  the document and I can tell you what it
8  says, if you show it to me.
9      Q.   It's your own filing on this
10  motion?
11     A.   Okay.  But I didn't write the
12  document.  I don't remember what's on this
13  document.  If you pull it up, then I can
14  tell you what it says.
15         MR. LOPEZ:  Miriam, can you hear
16     me?
17         THE WITNESS:  I think her screen
18     is frozen.
19         MS. TAUBER:  Okay, I'm --
20         THE REPORTER:  You should go off
21     and pop back in, Ms. Tauber.
22         (Recess.)
23         MS. TAUBER:  I'm back.  I'm
24     going to share one of the reports with
25     you from the expert.  I'll share the

Gentile

1    Gentile
2  screen.  Give me one second.
3         (Exhibit 3, 30-page document,
4     first page titled "Exhibit G,"
5     Beresford Report, marked for
6     identification, as of this date.)
7         MS. TAUBER:  Here is one of the
8     reports.
9      Q.   Beginning with Beresford Roman
10  numeral II, "Scope of Work," last sentence,
11  "I was not engaged to and did not verify the
12  accuracy or completeness of information
13  provided to me in these reports."
14         Is it not a fact that either you
15  or Mr. Darville provided Mr. Beresford with
16  instructions on how to determine what was
17  and was not an account for the benefit of
18  MintBroker?
19     A.   Say that again one more time.
20  I'm sorry.
21         MR. LOPEZ:  Please read it back.
22         MR. FORD:  I'm objecting to form
23     on it.  I think rather than reading it
24     back, maybe you could just clean it up
25     so he could answer it.

Gentile

1    Gentile
2      Q.   Mr. Beresford states in the
3  last -- the last line of Section II, Scope
4  of Work, quotes, "I was not engaged to and
5  did not verify the accuracy or completeness
6  of information provided to me in these
7  reports."
8         Did you provide the information
9  to which he refers?
10     A.   I believe Stephen Darville
11  provided the information.  That's what it
12  says.  It says right on there the "data
13  provided to me by Stephen Darville."  It
14  doesn't say by Guy Gentile.
15     Q.   Are you aware of what that
16  information was?
17     A.   Well, I saw their -- the final
18  reports.
19     Q.   Did Mr. Darville provide him
20  with instructions on how to determine what
21  trades were and were not MintBroker's for
22  its own benefit?
23     A.   I don't know what Darville
24  provided him.  I did have conversations with
25  Mr. Beresford myself.  I don't remember

Gentile

1
2  exactly what those conversations were exact,
3  but I told him to the best of my
4  recollection, and I believe it's in my
5  affidavit as well, of what account numbers
6  were firm account numbers versus what
7  account numbers were client account numbers.
8  I believe that Darville, you know, would
9  have provided that information as well, but
10 I don't know for a fact, so I'm not going to
11 speculate on what he provided them.  But I
12 believe it's in Darville's affidavit, my
13 affidavit and their affidavits as well.
14     Q.   Turn to Mr. Christian's report,
15 page 2, second paragraph.
16     A.   Can you pull it?
17     MS. TAUBER:  Let me do that, one
18 second.
19     (Exhibit 4, 214-page document,
20 first page titled "Exhibit F,"
21 Christian Report, marked for
22 identification, as of this date.)
23     MR. FORD:  While Ms. Tauber is
24 doing that, we have been at it for
25 50 minutes.  I'm not sure, Theresa, if

Gentile

1
2  you need a break or if anybody needs a
3  break, how we want to do that.  I just
4  want to raise it while we have this
5  pause.
6     MR. LOPEZ:  I'm sorry, my sound
7  is not very good.  Are you asking for
8  a break?
9     MR. FORD:  I don't need a break.
10 It's really up to the witness and the
11 court reporter.  I was just pointing
12 out that we've been at it for
13 50 minutes now.
14     MS. TAUBER:  So I'll share the
15 screen again, okay.
16     A.   What is the question?
17     (Record read.)
18     MS. TAUBER:  Okay, here we go.
19 The document says page 3, but I think
20 it's actually page 2.
21     Q.   Paragraph 2, numbered
22 subparagraph 1, "Identified which accounts
23 with activity were corporate accounts
24 (versus client accounts) via inspection of
25 the master file connected with account

Gentile

1
2  numbers directly within the iBroker system."
3     Did you indicate what numbers
4  would filter out client accounts?
5     A.   Yes.  I -- I believe I did.
6     Q.   So Mr. Christian is relying on
7  your direction on how to choose accounts to
8  be looked at?
9     A.   No, that's not true, because he
10 was able to -- if you read the rest of his
11 affidavit, he had access himself to be able
12 to see it.
13     Q.   I see in the first paragraph
14 that he said that he had "direct access to
15 the Company's iBroker trading platform."
16     Did you have access to iBroker's
17 trading platform?
18     A.   No.
19     Q.   You could not have sat down at a
20 computer and accessed it?
21     A.   I did not have access to it.
22     Q.   How did Mr. Darville learn to
23 have access?
24     A.   How did he learn to have access?
25     Q.   How did he know that he could

Gentile

1
2  access it at any time?
3     A.   Well, if you look through all of
4  the correspondence and affidavits, he
5  already explained how he had it.  From what
6  I remember, he was told by the chief
7  compliance officer to maintain a copy of
8  those records when the firm closed.
9     Q.   But Mr. Christian is not saying
10 that he looked to company records.  He had
11 "direct access to the Company's iBroker
12 trading platform."  Isn't that something
13 different?
14     A.   Well, it's -- I believe if you
15 look at his affidavit and Darville's
16 affidavit, that's explained.  You're asking
17 me, and, you know, I was not in the -- I did
18 not have the access myself, number one.  So
19 I don't know exactly what Darville did other
20 than what is in his -- what he said that he
21 did.  If you want me to tell you what I
22 believe, you know, now you're asking me to
23 speculate.  But if you pull up his
24 affidavit, we can look and see exactly what
25 he did and how he obtained it.  I believe it

Page 38

Gentile

1      Gentile
2  was quite clear.  If you pull it up, you'll
3  see that.  And also
4  Mr. Christian's affidavit as well should say
5  how he gained access to it.
6      Q.    And could you not have asked
7  Mr. Darville to give you access?
8      A.    I didn't want you anything touching,
9  you know -- my hands touching anything, you
10  know, because of the issues with the Bahamas
11  that I have been having over the number of
12  years, where I have a regulator that's just
13  looking to come after me.  I didn't need to
14  have access to the records.  The only person
15  that needed access was the accountants.
16      Q.    You said you didn't need to have
17  access.  Didn't you have an obligation to
18  the United States District Court for the
19  Southern District of New York to respond to
20  legitimate discovery requests?
21      A.    You mean the company, the
22  company?
23      Q.    You as well.
24      A.    Well, I could only provide
25  records that I had in my possession, which I

Page 39

1      Gentile
2  did.
3      Q.    Custody or control?
4      A.    Yes.  But I did not have custody
5  or control.  And the best way for me to
6  explain that to you is that, you know, you
7  have the Securities Commission coming in,
8  accusing the firm of being a Ponzi scheme,
9  number one.  Suspending the firm's license.
10  Obviously the firm's attorneys are involved.
11  Compliance is heightened at that point.  You
12  know, there are rules in the Bahamas where
13  you cannot just hand over records without a
14  court order.  I was not the control person
15  of the -- you know, that was not my
16  responsibility in the firm to be managing
17  records.  That would have been something
18  that compliance would have dealt with and
19  they would have dealt with legal to deal
20  with that.  And from -- I know that I asked
21  the law firm, back then Davis & Co --
22      Q.    Which law firm?
23      A.    Davis & Co, to provide these
24  records, and they said absolutely not
25  without a court order.  So the firm was

Page 40

Gentile

1      Gentile
2  instructed by its counsel not to provide
3  records without a court order.  So I could
4  not have then override compliance to just
5  say do this.
6      And this has actually happened
7  before, where the SEC had sent me a subpoena
8  asking for the firm's records, and I went to
9  compliance and I said, hey, please provide
10  these records, and they said, no, that
11  they're not doing it without a court order.
12      So I was not the only director
13  of this firm.  The firm had two directors.
14  So I did not solely control that company.
15  And that's basically what happened in that
16  situation.
17      And also at the same time, you
18  know, the firm was wounding down.  By the
19  end of October or mid-November the firm was
20  closed with no employees and no office,
21  right.  And the counsel for the firm saying
22  without a court order they're not releasing
23  records.
24      Q.    Did you receive or did you apply
25  to the Supreme Court of the Bahamas for

Page 41

1      Gentile
2  permission to discharge your obligation to
3  the United States District Court for the
4  Southern District of New York?
5      MR. FORD:  Objection, form.
6      Q.    Please answer.
7      A.    Say that again.
8      Q.    Please answer.
9      A.    No, the question, what was the
10  question?  Did I apply?
11      Q.    Did you apply to the Supreme
12  Court of the Bahamas for permission to
13  discharge your obligations to the United
14  States District Court for the Southern
15  District of New York in these cases?
16      A.    So you want did I go to the
17  Supreme Court of Bahamas asking for
18  permission to release these records?
19      Q.    To provide these records in
20  response to discovery requests in these
21  cases.
22      A.    No, I did not.  But at a certain
23  point, when the firm is closed, the firm
24  itself doesn't have these records anymore.
25  It goes to the firm's attorney.  And even

11 (Pages 38 - 41)

Page 42

Gentile

1 there, we couldn't -- once the attorney had
2 the records, the attorney would not release
3 them even to the liquidators. He would not
4 release them until the liquidators got a
5 court order to get them released to the
6 liquidators.
7 Q. Didn't the order of the Supreme
8 Court of the Bahamas appointing the
9 liquidators direct them to secure and obtain
10 all company records?
11 A. I believe so.
12 Q. And that was not sufficient for
13 your attorneys to turn over to them records
14 that the Court had already decreed was
15 theirs?
16 MR. FORD: Objection to form.
17 Q. Please answer.
18 A. Repeat the question. I'm sorry,
19 I got distracted with --
20 MR. LOPEZ: Please read back the
21 question.
22 A. I think I remember it now.
23 THE REPORTER: Do you want me to
24 read it back or not?

Page 43

Gentile

1 THE WITNESS: Yes, go ahead.
2 A. I mean, that's -- that's their
3 decision. It wasn't my decision at that
4 point. I had lost control of the company.
5 Q. Had you lost control of your
6 lawyers?
7 A. Well, I guess so. In the sense
8 that they were representing the firm and me,
9 the part of representing the firm, yeah, I
10 can't control them for the firm portion of
11 it because I'm no longer the controller of
12 the firm. I had lost my powers of the
13 company, so I contradict them to do
14 anything.
15 Q. Mr. Davis was your personal
16 barrister, was he not?
17 A. He represented initially the
18 company and then he represented me as well.
19 When we challenged the liquidation, he
20 represented me.
21 Q. But after the liquidation was
22 ordered, was he not solely your lawyer?
23 MR. FORD: Objection form. And
24 I apologize for interjecting,

Page 44

Gentile

1 Mr. Lopez, but I do feel like we
2 should pin down time to assist the
3 witness with answering her
4 questions. Obviously, there was a
5 provisional liquidation order.
6 MR. LOPEZ: No.
7 Q. Subsequent to the final
8 adjudication of liquidation --
9 MR. FORD: Okay.
10 Q. -- was not Mr. Davis your
11 attorney only?
12 A. Before the liquidation, he was
13 the firm's attorney. After the liquidation
14 commenced, you know, I don't think he
15 resigned as the company's attorney or was
16 terminated because I couldn't terminate him
17 anymore. So I don't know the answer to that
18 question on whether he's representing the
19 company or not because I'm not him. I just
20 don't know -- I just don't know the law
21 enough on how that works. But he was
22 representing me once the liquidation had
23 started at least. That -- that I know.
24 Q. Did you ask him to give you the

Page 45

Gentile

1 records?
2 A. Yes.
3 Q. And he said?
4 A. No. He did not give them to me.
5 Q. Who is paying Mr. Davis for his
6 representation of MintBroker?
7 A. Well, MintBroker paid him for
8 the representation of the first legal
9 proceeding. And the second proceeding where
10 I challenged liquidation, I paid him myself.
11 Q. And there was another set of
12 lawyers in the nature of solicitors for the
13 company and for you, were there not?
14 A. Yes.
15 Q. Their names?
16 A. Michael Miller & Company, but I
17 think they changed the name to Kensington
18 Law.
19 Q. Kensington Law, that's the one.
20 And who paid Kensington Law for its
21 representation of MintBroker?
22 A. MintBroker would have paid for
23 that.
24 Q. Did it?

12 (Pages 42 - 45)

Page 46

Gentile

1
2    A.    I believe so.  I don't have
3 records right in front of me, but I believe
4 that it would have paid.  I did not pay them
5 personally for representing the company.
6    Q.    When you sent them a check, did
7 you make clear that you were not paying them
8 for representation of MintBroker?
9        MR. FORD:  Objection form.
10    A.    Once the company was closed,
11 they were not paid from MintBroker for --
12 from me for any services for MintBroker.
13        MR. FORD:  Is everybody okay
14    with doing a five-minute break then?
15        MR. LOPEZ:  Again, I apologize,
16    my sound is not good.  Did you just
17    ask for a five-minute break?
18        MR. FORD:  We're going to take a
19    five-minute break, yes.
20        MR. LOPEZ:  Okay.
21    (Recess.)
22    Q.    Mr. Gentile, is the current SEC
23 proceedings in Florida, were they timely
24 reported by you to the Securities Commission
25 of the Bahamas?

Page 47

Gentile

1
2    A.    The current proceedings?  That's
3 what you're asking?
4    Q.    Beg your pardon?
5    A.    The current proceedings in
6 Miami?
7    Q.    Yes.
8    A.    That were filed two years after
9 the firm closed, you're asking me if I
10 reported it to the Bahamas, a firm that I
11 don't control anymore?
12    Q.    All right.  So the answer is no?
13    A.    No.
14        MR. FORD:  Well, I don't believe
15    the answer was no.  The answer was
16    what he just provided you.
17    Q.    Have you within the past year,
18 year and a half --
19    A.    Actually, actually we did
20 tell -- we did tell the Securities
21 Commission about those proceedings actually,
22 now that I think about it.
23    Q.    In a timely fashion?
24    A.    We told them that the
25 proceeding -- I don't remember the exact

Page 48

Gentile

1
2 date of when they were notified, but they
3 were told that they needed -- that -- that a
4 response was due to the complaint, and
5 obviously I can't file one because I was not
6 in control of the company, and they were the
7 ones I believe working with the liquidators
8 on whether they were going to respond or
9 not.  But it would not have been my
10 obligation to report that to them because I
11 no longer controlled the firm and I was no
12 longer regulated by them personally or
13 through any entity that I owned or
14 controlled.
15    Q.    Did you inform your experts of
16 the existence of the Florida proceedings?
17    A.    You already asked me this
18 question.
19    Q.    Please remind me what your
20 answer was.
21    A.    I don't remember exactly what I
22 told them regarding the Florida proceedings,
23 but I told you that any search of the
24 company or by name would clearly show it
25 immediately, but I just don't recall if I

Page 49

Gentile

1
2 mentioned it to them or not.
3    Q.    Okay.  Did you apply for an
4 international banking license?
5    A.    Yes.
6    Q.    When abouts was that?
7    A.    I don't remember exactly the
8 dates, but --
9    Q.    Approximately?
10    A.    But probably in 2017, it could
11 have been.  Somewhere around that time.
12    Q.    What agency?
13    A.    The Banking Commission of Puerto
14 Rico.
15    Q.    And were you granted that
16 license?
17    A.    No.
18    Q.    And what was the reason stated
19 for your not being granted the license?
20    A.    Well, it was a long letter, so I
21 don't remember everything in that letter.
22 If you have it, you could pull it up.  But I
23 can tell you what I remember was the -- one
24 of the reasons that they gave, I could -- I
25 remember at least one.  Do you want to hear

1           Gentile
2 just the one?
3     Q.   Yes.
4     A.   They claimed that I did not
5 disclose to them the SEC proceeding in
6 New Jersey.
7     Q.   Is it not one of the
8 requirements of the agency that you
9 establish that you are of a good moral
10 character?
11     A.   I don't remember what their
12 requirements were for what you just said,
13 but there was no requirement to disclose
14 civil litigations in the application
15 process.
16          And I did not file the
17 application on my own.  I hired an expert
18 company in Puerto Rico, BDO.  I disclosed to
19 them everything about my litigation with the
20 SEC, and they were the people who filed the
21 application.  So they are the ones who did
22 not -- who did not put that in there.  But I
23 had no objection to that being in there, and
24 I made that clear to them.  But I remember
25 them telling me it wasn't a requirement to

1           Gentile
2 put it in there.  But we did disclose the
3 criminal case that was dismissed, which was
4 obviously a hundred percent related to the
5 SEC case, which was eventually dismissed as
6 well.  So, I mean, the allegations were
7 disclosed, it's just did not have the civil
8 litigation in there, but, again, that was
9 not due to me not telling the entity that
10 was doing the filing.  They knew about it.
11 Clearly they knew about it because I have --
12 I had records back and forth with them
13 regarding it.
14          So I believe that that -- that
15 the SEC themselves played a role in the
16 license not being granted because the SEC
17 sent e-mails back and forth with that
18 agency, you know, directing them to, you
19 know, Bloomberg reports about things that
20 I've -- that they wrote about me.  So I
21 think that they had their hand in that
22 application not going through.
23     Q.   All right, but that's not really
24 responsive to my question.
25          My question was:  Is it not a

1           Gentile
2 fact that your international banking license
3 was refused and that the reason for the
4 refusal included your inability to establish
5 to the agency satisfaction that you were a
6 person of good moral character?
7     A.   I don't remember exactly what
8 they wrote because you're not showing it to
9 me.  I just remember that the SEC -- they
10 claimed I did not disclose the SEC lawsuit.
11 That's what I remember, and I'm saying that
12 it was not a requirement to disclose it
13 based on their application process.
14     Q.   Okay.  Again, you're not
15 addressing my question.
16     A.   I did.  I told you I don't
17 remember.
18     Q.   All right.
19     A.   I don't remember what their
20 application requirement is if you have to be
21 of good moral character.  I don't remember
22 seeing that.  You're not showing me
23 something that says that.  You're asking me
24 something that happened six, seven years
25 ago.  I just don't remember.

1           Gentile
2     Q.   The refusal of your application
3 took place six or seven years ago?
4     A.   We applied for it in 2017.
5 We're almost in 2023, so --
6     Q.   When was it refused?
7     A.   Probably a year afterwards or
8 less.  I don't remember exactly when.
9     Q.   Did you inform your experts of
10 the fact of your being denied a banking
11 license?
12     A.   I don't remember telling them
13 that.
14     Q.   Were you aware that the opinions
15 expressed by your experts were dependent on
16 accepting instructions given to them by
17 Mr. Darville, Stephen Darville?
18     A.   If that's what it says in their
19 reports, I -- I think that they're experts
20 for a reason.  They're forensic auditors,
21 and they should know what they need to do to
22 verify records.  I'm not an expert forensic
23 accountant, so I don't know what they relied
24 on to generate their report.  Obviously,
25 they would have talked to Darville, talked

14 (Pages 50 - 53)

Page 54

Gentile

1
2 to me, looked at the report, looked at the
3 files that they were able to download or
4 receive. But these are questions that you
5 probably will be asking them.
6     Q.   Who is Stephen Darville?
7     A.   Stephen Darville was a former
8 employee of MintBroker and he was in IT,
9 information technology. I don't know what
10 his day-to-day responsibilities were. I'm
11 not the person who hired him, so I don't
12 remember exactly what his exact duties were
13 on a day-to-day basis. But he was the IT --
14 one of the IT staff at the company.
15     Q.   Is it not a fact that
16 Mr. Darville was a technician without a
17 college degree and with two years or less of
18 study in management information systems at
19 Auburn University in Auburn, Alabama?
20     A.   I don't know. I don't have his
21 resume in front of me.
22     Q.   What position did he hold at
23 Swiss America; was he an officer or
24 director?
25     A.   He was not.

Page 55

Gentile

1
2     Q.   Was he the guy that saw to it
3 that the telephones and computer linkages
4 were working?
5     A.   I believe he did manage the
6 phone system. He managed the server in the
7 office that maintained the data and any
8 computers and things of that nature,
9 internet, stuff -- anything related to IT is
10 what he did. But again, I don't know what
11 he did on a day-to-day basis, but that's
12 what his role was, was basically anything to
13 do with -- with technology.
14     Q.   Did Stephen Darville interact
15 with any customers?
16     A.   He may have from time to time if
17 someone had a technical issue, but I don't
18 know for a fact that he did.
19     Q.   Would he know who owned account
20 MBS10067?
21     A.   If he logged into the system and
22 checked who owned it, yeah.
23     Q.   Do you know who owned account
24 MBS10067?
25     A.   I don't remember account numbers

Page 56

Gentile

1
2 off the top of my head. I know account
3 numbers that start with 328 were firm
4 account numbers and MBS and PFS were client
5 account numbers.
6     Q.   Does the name SureView mean
7 anything to you?
8     A.   SureView?
9     Q.   Yes.
10     A.   I don't know. I don't remember
11 it.
12     Q.   Are you aware that SureView
13 purchased and sold 5,762,336 shares of New
14 Concept between June 29th, 2018 and
15 August 3, 2018?
16     A.   I -- I -- you would have to show
17 me a record for me to answer that question.
18 I don't know off the top of my head.
19     Q.   Are you aware that 5,762,336
20 shares is roughly double the total
21 outstanding shares of New Concept?
22     A.   I don't know what New Concept
23 float is off the top of my head or
24 outstanding. If you show me, then -- I just
25 don't remember what it was exactly or how --

Page 57

Gentile

1
2 how it's relevant to -- to what you're
3 saying. You're saying that someone owned
4 5 million shares of a company that only --
5     Q.   No. That there was turnover of
6 5,762,336 shares by SureView in the period
7 of the short-swing trading accusation?
8     A.   I don't remember. I mean, you'd
9 have to show me some records to reflect my
10 memory on that.
11     Q.   Do you know who the principal of
12 SureView is?
13     A.   I don't. You'd have to show me
14 records.
15     Q.   Well, I'm asking if you know the
16 person.
17     A.   No.
18     Q.   Have you ever met with a person
19 controlling SureView?
20     A.   I don't -- I don't know what
21 SureView is. I don't -- I don't know what
22 SureView is.
23     Q.   Did you personally trade the
24 MintBroker account in Avalon?
25     A.   I did some trades, yeah.

15 (Pages 54 - 57)

Gentile

1
2     Q.    Did anyone else on behalf of
3  MintBroker trade Avalon?
4     A.    On behalf of MintBroker the
5  firm?
6     Q.    Yes.
7     A.    No, I don't think so.  No.
8     Q.    So whatever trades are
9  attributable to MintBroker are your trades?
10    A.    Yes.
11    Q.    Did you do MintBroker's trading
12 or New Concept?
13    A.    Did MintBroker do trades for New
14 Concept, yes.
15    Q.    You made those trades?
16    A.    Yeah, I made some of those
17 trades.
18    Q.    Did anyone else do trading in
19 New Concept for MintBroker?
20    A.    No, I don't believe so.
21    Q.    All right.  How do you trade
22 mechanically?
23    A.    With a computer.
24    Q.    And what do you do with the
25 computer?

Gentile

1
2     A.    Well, it -- it depends.  You
3  turn it on, you can pull up a symbol, press
4  buy, press sell.
5     Q.    You turn the computer on and
6  what does it connect to?
7     A.    The internet.
8     Q.    What destination on the
9  internet?
10    A.    Well, it would have been the
11 SureTrader or the firm MintBroker's platform
12 is what would have been on to place those
13 trades.  Some of those trades are
14 electronic, though.  It's not necessarily me
15 placing those trades.  Sometimes it's just
16 based on an algorithm as well.
17    Q.    That is to say it's automatic
18 trading through --
19    A.    Some of it.  Some of it could
20 have been automatic.
21         THE REPORTER:  Please let him
22    finish the question before answering.
23         MR. LOPEZ:  Again, I'm afraid I
24    didn't hear that instruction from the
25    reporter.

Gentile

1
2         THE REPORTER:  I said you have
3    to let Mr. Lopez finish the question
4    fully before you answer it.
5         MR. LOPEZ:  Thank you.
6     Q.    Is it not a fact that your
7  experts made no attempt to verify the owners
8  of so-called customer accounts?
9     A.    I don't know what they did to
10 try to verify that.
11    Q.    Was your trading in Avalon in
12 any way coordinated with any customer
13 trading?
14    A.    No.
15    Q.    Was your trading in New Concept
16 in any way coordinated with customer
17 trading?
18    A.    No.
19    Q.    Where were you physically when
20 you were trading Avalon?
21    A.    I don't remember.  I believe I
22 was in the Bahamas.
23    Q.    Where were you physically when
24 you were trading New Concept?
25    A.    I could have also been in the

Gentile

1
2  Bahamas, but I could have also been in
3  Puerto Rico or New York.  I just don't
4  remember.
5     Q.    Do you know of any customers
6  acting in concert with one another in the
7  trading either of Avalon or New Concept?
8     A.    No.
9     Q.    Who is the owner of account
10 32810?
11    A.    32810, the firm's account.  It
12 is a firm account that was used for managing
13 inventory and also routing orders for
14 customers.  So for -- if you want me to give
15 you an example of how it would work, I
16 could.
17    Q.    Yes.
18    A.    Would you like it?
19    Q.    Please.
20    A.    So if you were a customer of the
21 firm and you wanted to buy 1,000 shares of
22 Apple, you would send an order through the
23 platform, the SureTrader platform, buy 1,000
24 shares of Apple.  Our platform would then
25 receive that order, and based on a logic

16 (Pages 58 - 61)

Gentile

2 that it had within its Smart Order router,
3 it would first check to see if the firm was
4 long a thousand shares of Apple. If it was,
5 then it would just give you its thousand
6 shares of Apple at the market price, right.
7 That's strategy logic number one.
8      Logic number two is if it only
9 had 500 shares of Apple, then it would give
10 you the 500 shares of Apple and then the
11 other 500 would be routed to IB or ETC, one
12 or the other, and it would go buy those
13 shares, and then 32810 would sell them back
14 to you at the same exact -- it's all
15 simultaneously at the same second or
16 nanosecond basically. It's just a
17 pass-through. It goes right back to you.
18     Q. And what about orders that do
19 not -- that do not reach the market and do
20 not reach inventory?
21     A. Well, I just -- those are the
22 only two -- the scenarios I just gave you is
23 how it would do it.
24      Now there is a third scenario.
25 I'll give you this scenario. Customer A

Gentile

2 buys 1,000 shares of Apple, Customer B
3 shorts 1,000 shares of Apple. So you have
4 one customer long a thousand shares, one
5 customer short a thousand shares. At the
6 clearing firm and the inventory count level,
7 there would be no shares, but you have one
8 long and one short because that's just basic
9 accounting, right.
10      So now, let's just say, for
11 example, Customer A, who's long a thousand
12 shares, he wants to sell his thousand
13 shares. Well, when we go to the market and
14 try to sell a thousand shares, the market is
15 like, what are you talking about, you don't
16 have a thousand shares; and if the stock is
17 not shortable, which many stocks are not
18 shortable these days, the firm would then
19 have to itself sell the shares -- sell the
20 client a thousand shares at the market price
21 and go long itself, right.
22      So now the client has zero
23 shares, the firm has 1,000 shares long,
24 which it cannot sell because we have a
25 client that is short 1,000 shares. We have

Gentile

2 to wait until the client that is short 1,000
3 shares to sell it back to the inventory
4 account, so that the inventory account could
5 go back to zero.
6     Q. Is it what you have described
7 what Ms. Rolle identified as a Ponzi scheme?
8     A. No, of course not. She did
9 not -- that's what I described to her, but
10 she mischaracterized it or misunderstood it.
11     Q. So that's the explanation?
12     A. Yes. She did not understand
13 what she was talking about, simple as that.
14     Q. All right.
15     A. How could that be a Ponzi
16 scheme?
17     Q. There's an old ditty, he that
18 sells what isn't his and makes it good or
19 goes to prison.
20      THE REPORTER: Makes it good, go
21 to prison?
22      MR. FORD: I'm sorry, is this a
23 question or are we doing poetry?
24      MR. LOPEZ: We're doing poetry.
25      MR. FORD: If it's a question,

Gentile

2 ask it; otherwise, we can discuss this
3 off the record.
4     Q. Do you know how many New Concept
5 shares Swiss America traded during the
6 short-swing period?
7     A. I don't know. Off the top of my
8 head, I don't know.
9     Q. Do you have a means of
10 determining it?
11     A. Well, through the records that
12 Christian and Beresford have are generated.
13 It's in there. If you pull it up, we will
14 see exactly how much.
15     Q. What about the Schedule 13D that
16 was filed about MintBroker?
17     A. I believe Antonio already filed
18 an affidavit saying that that had client
19 trades in there and it wasn't a complete
20 record. So I don't think that could be
21 relied on.
22     Q. And were Forms 4 files?
23     A. I believe Form 4s were filed.
24     Q. And are they no longer reliable?
25     A. Like I said, I believe those had

17 (Pages 62 - 65)

Page 66

Gentile

1    client trades in there and I think Antonio's
2    affidavit stated that they had client trades
3    in there.  By the time -- I mean they --
4    they had client trades in there.  So I don't
5    know if it's a complete record of all of the
6    trades.  I don't believe that -- that it is,
7    but I don't know for a fact.  We would have
8    to do a comparison now to see the difference
9    between the trade files and what was put
10   there.
11   Q.   Did your compliance officers or
12   anyone else employed by MintBroker flag
13   account number MS010067 (sic), the SureView
14   account, for suspicious activity or unusual
15   volume?
16   A.   I don't know.  I don't know if
17   they did.
18   Q.   Well, I'm asking whether they
19   flagged it to you.
20   A.   No, I don't believe so.  I don't
21   remember that.
22   Q.   Were you aware that SureView was
23   trading shares every tenth of a second?
24   A.   I don't know who SureView is.
25

Page 67

Gentile

1    Q.   Hmm?
2    A.   I don't know who SureView is.  I
3    don't know what -- and the account numbers
4    like this, there are 30,000 account numbers
5    that had went through that firm.  I don't
6    remember account numbers.
7    Q.   Did you observe that the
8    SureView account was trading in lockstep
9    with Swiss America's proprietary account?
10   A.   Well, all accounts are trading
11   through that account in one way or the
12   other.  So I -- I -- I'm not the person that
13   was doing risk management in the firm that
14   was looking at every trade that is going
15   through the firm to see what clients were
16   doing.  There were people's job that were
17   there for that, for those functions.
18   Q.   What records were your experts
19   given access to?
20   A.   I believe the trading records is
21   all Darville would provide.
22   Q.   And those trading records
23   focused on the International (sic) Broker's
24   account?
25

Page 68

Gentile

1    A.   Do you mean Interactive Brokers?
2    Q.   Interactive.  Forgive me.
3    A.   No.  The records that Darville
4    provided were -- were MintBroker's trading
5    records, which would have included
6    Interactive Brokers's trades as well as ETC
7    trades, as well as its internal trades.  It
8    would have been everything.  And the
9    breakdown of who initiated those orders
10   would have been in that file versus the IB
11   file, doesn't break anything down.  It just
12   has a bunch of trades, but I don't know who
13   they belong to, you don't know who the
14   beneficial owners are.
15   Q.   Focusing on the so-called Ponzi
16   trades.
17   MR. FORD:  Objection, form.
18   Q.   Focusing on the alleged Ponzi
19   trades, how would they turn up in the
20   record?  You said it would appear as zero --
21   A.   So --
22   THE REPORTER:  You said they
23   would appear as zero?
24   Q.   -- they would work out to zero?
25

Page 69

Gentile

1    MR. FORD:  Objection, form.
2    A.   I had the answer, but I lost
3    focus.
4    THE REPORTER:  Do you want me to
5    read back?
6    THE WITNESS:  Yes.
7    (Record read.)
8    A.   Well, that was just one example
9    that I was just giving you have one
10   client long and one client short, right,
11   that the clearing firm would have zero,
12   which would just make logical sense how it
13   would be.  But how you would identify the
14   difference between a client-initiated trade
15   versus the firm-initiated trade is quite
16   simple.
17   If you could just look at -- if
18   there is a client that purchased 500 shares
19   at 12:59:09 at 30 cents point 111, right,
20   and you see that same trade in the 32810
21   account, that shows a buy of that and a sell
22   to that for the same exact price and the
23   same exact second, it's clearly a
24   client-initiated trade because you have a

18 (Pages 66 - 69)

Page 70

Gentile
1
2 client trade to offset that to. But if you
3 see a trade in the 32810 account that
4 doesn't have an offsetting sell at the same
5 price or an offsetting client order, meaning
6 an order -- not an order, a trade from an
7 MBS or PFS account for the same price, same
8 shares, then, you know, that's basically how
9 you make the difference, that's how you
10 figure it out.
11    Q.   Figure what out?
12    A.   The difference between a
13 client-initiated order and the firm's order.
14 So I don't know if I answered your question
15 because it's -- we can try one more time, if
16 you want to ask it a different way.
17    Q.   Who is the owner of account
18 32812?
19    A.   32812, so that account is --
20 it's the firm's account, but those
21 transactions that you see in there are just
22 for the purposes of recordkeeping to know
23 for the Smart router purposes where the
24 orders actually went. Those are not
25 separate individual trades.

Page 71

Gentile
1
2       So it's kind of like a -- it's
3 like taking all the trades and throwing it
4 into QuickBooks, right, essentially. So
5 QuickBooks is going to have the trades, but
6 the QuickBooks trades are not -- they're
7 already accounted for, right.
8       So to give you an example --
9 I'll give you an example. If a client says,
10 you know, buy 800 shares of a stock, all
11 right, I mean -- actually, you know what,
12 the best way for me to explain that would be
13 there's a form that you guys filed in court,
14 that Miriam I believe filed or you guys
15 filed in court, that talks about this
16 specifically where you have a trade for 800
17 shares and you guys were confused on that,
18 how that works. If you can pull that up, if
19 you know what I'm talking about, I could --
20    MS. TAUBER: Do you want -- why
21    don't I discuss with David. We could
22    take a five-minute break so I could
23    talk to David about it off the record
24    and then we can continue. Does that
25    work?

Page 72

Gentile
1
2    THE WITNESS: Yes.
3    (Recess.)
4    Q.   Were the records of the trades
5 that Ms. Rolle described "as akin to a Ponzi
6 scheme" made available to your experts?
7    A.   I don't know what trades she's
8 referring to when she's referring to that
9 because there are no trades that are akin to
10 a Ponzi scheme.
11    Q.   Were the account records
12 withheld from the provisional liquidators at
13 the time or immediately following their
14 appointment?
15    A.   I know that a hard drive or I
16 believe, anyway, a hard drive was delivered
17 to the Securities Commission which appointed
18 the liquidators, so they would have had the
19 records through there. There were some
20 additional records that they then received
21 from the firm's attorney Davis & Co once the
22 Court ordered them to do so.
23    Q.   All right. Is it not a fact
24 that the account records were withheld from
25 the liquidators until at the end of

Page 73

Gentile
1
2 fruitless negotiations, they brought a
3 turnover proceeding before the Supreme Court
4 of the Bahamas?
5    THE REPORTER: At the end of
6    fruitless?
7    Q.   At the end of fruitless
8 negotiations, they brought a turnover
9 proceeding before the Supreme Court of the
10 Bahamas?
11    MR. LOPEZ: Hello, can everybody
12    hear me okay?
13    THE REPORTER: I can hear you
14    fine now.
15    MR. FORD: We can hear you. It
16    was just unclear what the question
17    was. If you could rephrase.
18    Q.   The question was: Is it not a
19 fact that the books and records of
20 MintBroker were withheld from the
21 liquidators until the liquidators brought a
22 turnover proceeding in the Supreme Court of
23 the Bahamas?
24    A.   I believe some -- some of the
25 records were initially given to them from

19 (Pages 70 - 73)

Gentile

1
2 the firm itself, and at that point once they
3 were in possession of the attorneys, I
4 remember a court proceeding where the Court
5 ordered the attorneys to turn over the rest
6 of the records they had, which they did.
7      Q.   Were those account records
8 withheld from the provisional liquidators or
9 subsequently from the joint operating
10 liquidators or from your experts with the
11 purpose of concealment from the authorities
12 or from MintBroker's customers who were
13 subjects or victims of a Ponzi scheme?
14          MR. FORD:  Objection, form.
15      Q.   Please answer.
16      A.   Ask me again.
17          MR. LOPEZ:  Please read it back.
18      (Record read.)
19      A.   There are no victims of any
20 Ponzi scheme.  There is no Ponzi scheme that
21 ever existed.
22      Q.   Shortly after these two suits
23 were brought, the plaintiffs' attorneys
24 asked of your attorney that they produce
25 copies of all relevant documents relating to

Gentile

1
2 their claims.  Are you aware of this?
3      A.   You have to say that in a
4 language that --
5      Q.   Shortly after these two suits
6 were brought --
7      A.   Which two suits?  These suits
8 that we're talking about now, Avalon and --
9      Q.   Yeah, the one you're testifying
10 on, Avalon and New Concept.
11      A.   Okay.
12      Q.   Shortly after these two suits
13 were brought, the plaintiffs' attorneys
14 asked of your attorney that they produce
15 copies of all relevant documents relating to
16 their claims.  Are you aware of this?
17      A.   Yes.
18      Q.   And your attorneys responded
19 that you did not have access to the books
20 and records of MintBroker.  Are you aware of
21 this?
22      A.   What are the dates of this that
23 they're saying that?
24      Q.   Late 2018, early 2019.
25      A.   Late 2019 you mean?

Gentile

1
2      Q.   No.  These suits were filed late
3 2018.
4      A.   Right.  They were filed late
5 2018, but I'm not aware of any record
6 requests in 2018.  I don't remember any
7 record requests in 2018.
8      Q.   All right.  Plaintiffs' counsel
9 had pled that you had failed to file with
10 the United States Securities and Exchange
11 Commission a Schedule 13D under Section 13
12 of the Exchange Act reporting all
13 transactions in Avalon and a late filing was
14 made on your behalf enumerating the
15 transactions on which this case has
16 proceeded to a judgment of liability in the
17 Avalon case; is that correct?
18      A.   You're saying that you filed a
19 lawsuit and that after the lawsuit was filed
20 that the firm filed a 13D?
21      Q.   Yes.
22      A.   Or G, I mean?  Yeah, I
23 believe -- yeah, that sounds right.
24      Q.   And having been instructed in
25 the Avalon case of the need for Schedules

Gentile

1
2 13D filings, did you cause such a filing to
3 be made in the New Concept case?
4      A.   I don't believe that I caused
5 it.  I think this was something that Antonio
6 Collie handled.  So he is the one who
7 handled that filing.  It was not me.
8      Q.   Who had custody and control of
9 the trading records of MintBroker at the
10 time of preparation of those Schedules 13D?
11      A.   So I don't know -- I believe
12 Antonio stated in his affidavit how those
13 records were put together.  I don't remember
14 off the top of my head.  I did not handle
15 records at the firm.  That's not a function
16 of what I did.  This would have been
17 something like I believe I said already,
18 that the compliance officer would deal with
19 any type of records requests.  Whether it's
20 from a regulator, a lawsuit, it always would
21 go through compliance, and then compliance
22 would work on that with an attorney to
23 determine what records need to be produced
24 or not produced, but it's not something that
25 I was involved in.

Page 78

Gentile

1
2    Q.   At the time of the 13D filings
3  you had custody or control of MintBroker's
4  books and records; is that not so?
5    A.   MintBroker had control of those
6  things. I'll give you an example of how I
7  don't have control in some cases. There was
8  an instance where the SEC had subpoenaed me
9  for records of MintBroker. I gave it to the
10  compliance officer, at the time his name was
11  Philip Dorsett, and Philip Dorsett wrote me
12  an e-mail back saying that just because
13  there's a subpoena from the U.S., that
14  doesn't -- it's meaningless in the Bahamas,
15  that we have to have a court order in the
16  Bahamas, we have to go through the attorneys
17  and so on.
18      So it's not like I get a request
19  for documents, I could just turn it over
20  because it's a regulated entity and there
21  are laws in Bahamas that prohibit some
22  information from being released without
23  going through the proper channels, which by
24  the way, you know, yourself and Miriam could
25  have done as well, right. You could have

Page 79

Gentile

1
2  subpoenaed the liquidators, you could have
3  gone to the court in the Bahamas to ask for
4  these records, you could have done all these
5  things also.
6    Q.   We could have defended the
7  claims against you.
8      Please explain why the
9  plaintiffs' request for access to those
10  books and records were not complied with in
11  late 2018 or early 2019?
12    A.   I don't remember any record
13  requests during that time.
14      MR. FORD: Objection to form.
15    Do we have anything clarifying the
16    time period of these requests because
17    the witness testified he is confused?
18      MS. TAUBER: Yeah, I will
19    clarify. I believe our first document
20    request was served in October of 2019.
21      MR. FORD: Okay, so maybe we
22    strike that question. You keep asking
23    questions about 2018. I think we need
24    to pinpoint when those were sent and
25    when the responses were required.

Page 80

Gentile

1
2      (**MO)MR. LOPEZ: All right,
3    please strike my prior question.
4    Q.   Please explain why plaintiffs'
5  request for access to the books and records
6  of MintBroker were not complied with in
7  2000 --
8      MR. LOPEZ: Was it --
9      MS. TAUBER: October 2019.
10    Q.   -- November 2019?
11      MS. TAUBER: October, just to
12    make it clear.
13    A.   Well, I do remember my attorney,
14  Adam, at the time, right, Ford, calling me,
15  asking me about producing these records for
16  the firm, and I went through the same
17  channels I would normally go through, which
18  is -- at this time, by the way, moving in
19  real time, the firm is in the process of
20  winding down, people are getting terminated
21  pretty much every day, just two or three
22  people being let go 'cause the firm is
23  winding down, but compliance was still
24  there, the request was made.
25      They spoke to the firm's

Page 81

Gentile

1
2  attorney, I believe I was on one of those
3  calls with them, and they told the
4  compliance officer with me there not to
5  release documents that are in the Bahamas
6  without a court order because of the
7  situation that the firm was in and just to
8  comply with the rules of the Bahamas. There
9  were records that I was able to release that
10  were already in the U.S.; like, for example,
11  the records from Interactive Brokers were
12  already in the U.S., so I wouldn't have been
13  in violation of any laws in the Bahamas.
14      MS. TAUBER: We actually got the
15    Interactive Brokers' records from
16    Interactive Brokers directly.
17    A.   Okay, but I did provide those
18  records to Adam Ford, which I assumed sent
19  them to you.
20    Q.   I think you --
21      MR. FORD: Mr. Gentile, you can
22    if finish your answer.
23      THE WITNESS: I don't remember.
24    I got interrupted, so I kind lost my
25    chain of thought.

21 (Pages 78 - 81)

Page 82

Gentile

2  A.   But like I said, everything was
3 moving in real time.  You have the firm
4 recently getting suspended a month prior to
5 your records request.  Employees are
6 resigning because, you know, they basically
7 couldn't work for those five days.  We tried
8 to get back online.  You know, right after
9 we get back online, Interactive Brokers
10 shuts down our clearing account, which was
11 the last one we had working.  So the firm
12 basically had to completely shut down its
13 operation in October, early November.  And
14 it was a skeleton crew left basically
15 towards the end of the day because they were
16 just focusing on getting all their clients
17 their money back.
18      I had already left the Bahamas
19 in September and I hadn't been back until --
20 maybe I was back a few months ago for a
21 little bit, but I had not stepped foot in
22 that office since September 2019.  That's
23 where the records would have been.  It's --
24 it, you know, would not have been legal for
25 them to just hand me the records, and they

Page 83

Gentile

2 refused to hand me the records on multiple
3 occasions, not just in litigation, but other
4 litigations, without a court order.  So I
5 could did not get to those records, even
6 being the CEO at the time.
7      And then shortly after that the
8 firm was shut down completely.  There's no
9 office.  I don't know what happened to the
10 records other than a copy being delivered to
11 Davis & Co and the Securities Commission.
12      And shortly after that the
13 company was put into provisional
14 liquidation, which I lose access to
15 everything at that point.  So I was just not
16 in a position to be able to get those
17 records, which I wish I would have been able
18 to, we wouldn't be talking right now, but I
19 was not able to get them at that time.
20  Q.   Did you initiate a request for
21 court approval of turning over those
22 records?
23  A.   No.
24  Q.   You recognize that you had an
25 obligation to do so, an obligation imposed

Page 84

Gentile

2 by the United States District Court for the
3 Southern District of New York?
4      MR. FORD:  Objection.
5  A.   How -- I did not have -- I did
6 not see a court order instructing me to go
7 get another court order.
8  Q.   Okay.
9  A.   In my initial deposition with
10 you, which was in February, I told you where
11 the -- where you could find the records, and
12 again you guys did nothing to try to get
13 those records yourself.  You just can't put
14 it all on me.  You guys didn't do your job
15 either.
16  Q.   We obtained those records at
17 International Brokers (sic) under subpoena.
18 It was your obligation to provide them.
19  A.   I did provide those records.  I
20 believe I provided those records through my
21 attorney.  I don't know, maybe if you got
22 them from IB first, but I remember
23 downloading those records and handing them
24 to my attorney, and I believe that they were
25 handed or delivered to you.

Page 85

Gentile

2  Q.   Is it not a fact that in
3 December of 2019 you caused instructions to
4 be given to Steven Darville to maintain the
5 electronic records of Swiss
6 America/MintBroker for the preceding five
7 years?
8  A.   No.
9  Q.   No?
10  A.   No, I never told him to maintain
11 those records.  I didn't speak to him about
12 those records.
13  Q.   Did someone acting on your
14 behalf or as your agent convey those
15 instructions to him?
16  A.   Not based on my instructions.
17 It was based on -- you're talking about an
18 affidavit that the compliance officer
19 submitted where he instructed Darville, but
20 I did not structure Mr. Cooper to tell
21 Darville to do that.  That was on his own.
22 All -- I don't even remember what -- I
23 believe I told them to give a copy to the
24 attorneys, and I think that's -- that's it.
25 That's all I told them.  Maybe the

Gentile

1    Gentile
2  Commission too because I know they had
3  gotten a copy as well.
4        But I never told anyone to
5  maintain a copy because once we -- once the
6  firm is closed, there's no -- there's
7  nothing there to hold those records, so it
8  was best to send it to the attorneys and the
9  Securities Commission, which already had
10 said they were putting in a provisional
11 liquidator.  They said it since September
12 that they were going to do it, of 2019.
13       Q.   Who or what is Cloud Carib?
14       A.   That's a service provider in the
15 Bahamas.
16       Q.   Does the service or did the
17 service they provided include maintenance of
18 copies of books and records?
19       A.   So they provided -- they
20 provided some books and records.  I mean,
21 they didn't provide the books and records --
22 let me take that back.  They hosted, they
23 hosted some records, and I believe the
24 records that they were hosting was the
25 e-mail system, as well as the online account

1    Gentile
2  form system.  I do not --
3        They were not hosting the trade.
4  The trade records were, I believe, hosted in
5  the firm's office on the firm's server, but
6  it could have been just a backup in the
7  firm's office, and maybe Cloud Carib had one
8  too.  I just don't -- I didn't set that part
9  up, so I just know for sure.  But I know
10 that the e-mail was going through their
11 system and the account application system
12 was going through there.
13       Q.   Is it correct that Mr. Darville
14 delivered copies of the books and records to
15 Kensington Law?
16       A.   I believe so.  That's what his
17 affidavit says.
18       Q.   And that he delivered copies to
19 Mr. Gentile's, to your barrister, Davis &
20 Company?
21       A.   The firm attorney at that time.
22 It was the firm's attorney at that time.
23 Yes.
24       Q.   Hadn't Mr. Davis appeared on
25 your behalf in the proceedings before the

1    Gentile
2  Supreme Court of the Bahamas to overturn the
3  suspension?
4        A.   No.  He appeared on the
5  company's behalf to overturn suspension.  He
6  appeared on my behalf to remove the
7  provisional liquidator.
8        Q.   So he was your attorney?
9        A.   For the challenge to the
10 provisional liquidation, yes, yes, but he
11 was the firm's attorney first, and when he
12 received those records, he was the firm's
13 attorney.
14       Q.   Did you request the liquidators'
15 cooperation in making records available to
16 you?
17       A.   We have asked for them to do
18 that.  Not me personally.  This is again
19 through counsel.
20       Q.   When and how?
21       A.   That I don't -- I don't know.  I
22 don't know exactly when or how they did it.
23 I'm assuming either through a -- I know
24 these are fact-finding enough for
25 assumptions, but you're asking me to assume

1    Gentile
2  how my lawyers are talking to other lawyers.
3  I don't know.
4        Q.   When did the Supreme Court of
5  Bahamas rule in the liquidators' favor and
6  order you to do a turnover?
7        A.   What do you mean by "a
8  turnover"?
9        Q.   Turn over the books and records
10 of the company.
11       A.   So those are two different --
12 those are two different things.  They do
13 not -- they do not happen at the same time.
14 The official liquidation, where the Court
15 ordered the official liquidation in December
16 of 2021.  As far as turning over records, as
17 I've told you before, there were records
18 initially turned over to the attorneys of
19 the firm, Davis & Co, Kensington, and the
20 Securities Commission of the Bahamas, and at
21 some point the joint -- the provisional
22 joint liquidator at the time, asked for some
23 additional records that Davis & Co had and
24 Davis & Co provided that to them.  That
25 would have been, I believe, sometime in 2020

Gentile

1 is when they were ordered to do that.
2
3    Q.    Would you spell the name of the
4 person you're referring to?
5    A.    Which?  Which person am I
6 referring to right now?
7    Q.    Phonetically it sounded like
8 Dave Sinco (phonetic)?
9    A.    Oh, that's the name of the
10 company, the law firm, Davis & Co, Davis &
11 Company.
12    Q.    Isn't it a fact that you have
13 now sought Letters Rogatory in the Southern
14 District of New York to access records in
15 the hands of the liquidators that were
16 copies of MintBroker's original books and
17 records to which Mr. Darville had access?
18    A.    Well, I don't know what
19 Mr. Darville had access to specifically
20 other than the trade records that he
21 provided. I don't know what he had access
22 to, but the provisional liquidator, they
23 should have access because it's their
24 responsibility to have it.
25    Q.    And it's your responsibility to

Gentile

1
2 comply with discovery requests in these
3 suits?
4        (**MO)MR. FORD:  Move to strike.
5    Is that a question or statement?
6    Q.    Is that not true?
7        MR. FORD:  Objection, form.
8    Q.    Where were the originals that
9 Mr. Darville says he copied in December of
10 2019 and copies of which he delivered to
11 MintBroker's solicitors Kensington Law on
12 December 30, 2019?
13    A.    What do you mean by that? I
14 want to know what you mean by "original."
15 On an electronic form, the original, for
16 example, if you submitted an application as
17 a customer, you have the original, right.
18 So we never have really an original. We
19 always have a copy, the firm. So I think
20 you want to change that question, right.
21    Q.    Mr. Darville made copies to be
22 turned over on December 30th to your
23 attorneys, to Davis & Co, to Kensington --
24        MR. FORD:  Objection, form.
25        MR. LOPEZ:  I haven't finished.

Gentile

1
2    There will be a question mark there
3    somewhere.
4    Q.    -- to the Commission; is that
5 not true?
6    A.    I mean, there was a big pause
7 there that I lost the question in there.
8        MR. LOPEZ:  Please read the
9    question back.
10        THE REPORTER:  The other
11    question wasn't answered.
12        (Record read.)
13        THE REPORTER:  Is that okay?
14        MR. LOPEZ:  Yes.
15        (Record read.)
16    A.    It's just such a broken up
17 question, that it's confusing. Could you
18 just ask me the question again?
19    Q.    I'd be happy to.
20    A.    All right.  Thank you.
21    Q.    Mr. Darville has testified in
22 his affidavit that late in December of 2019
23 he was instructed to make copies of the
24 books and records of MintBroker.  What was
25 he copied?

Gentile

1
2    A.    You're asking me to make an
3 assumption of what he copied because I did
4 not witness him copying anything.  I was,
5 you know, in Puerto Rico or New York or
6 somewhere else, not the Bahamas.  But I
7 assume which, you know, is not what I want
8 to be doing here, that he copied the trade
9 records and account documents.  I just don't
10 know exactly what he copied because I was
11 not there.  I believe his affidavit says
12 what he copied, and I believe that
13 Mr. Cooper says what he told him to copy.
14 And --
15    Q.    In what form -- in what form
16 were the books and records for him to copy?
17    A.    Electronic.
18    Q.    So if he was able to access the
19 electronic records during the last week of
20 December 2019, why could he not continue to
21 access those records?
22    A.    Well, we don't know -- I don't
23 know when he accessed those records.  It's
24 just -- his affidavit just says when he
25 finally delivered the copy to the Commission

Gentile

1    Gentile
2 and the attorneys.  I don't know when he
3 made those records.  He could have made
4 those records the month prior because the
5 firm was already closed.
6    Q.   Do you believe that the
7 electronic records that he copied were
8 destroyed?
9    A.   They were delivered to the
10 Securities Commission and to the attorneys.
11    Q.   Copies were?
12    A.   Copies were.
13    Q.   I'll go back to my original
14 question.  What happened to the originals
15 that were copied?
16    A.   Well, I don't know because the
17 office I assume was empty when the firm
18 closed.  So he may have taken the server.  I
19 didn't ask him.  He may have the server that
20 the records are on.  You're asking me to
21 come up with conclusions here.  I don't
22 know.  I didn't have this conversation with
23 him.  I just simply asked do you have the
24 trade records, can you please give it to my
25 C -- to my accountants, and he said, okay,

1    Gentile
2 that he would do that, and that's pretty
3 much the end of the conversation.
4    Q.   When the plaintiffs asked for
5 those records, you did not ask him to assist
6 you in producing another copy?
7    A.   At that time, right, which is
8 between October, that you're saying is when
9 you sent the document request, as I've
10 stated before, the firm was going through
11 these issues in the Bahamas, it was
12 liquidating, it was shutting itself down,
13 the request was sent to the compliance
14 officer, all of these people being
15 employees of a regulated entity, and the
16 legal firm, the law firm in the Bahamas,
17 advised them that without a court order that
18 the record could not be released.
19        You know, that's a big
20 difference from 2019 when it's a licensed
21 regulated firm with these people being
22 employees and, you know, three years later
23 when Darville is no longer an employee --
24 the law firm, by the way, I did ask for
25 those records from them and they denied to

1    Gentile
2 give them to me in 2020 -- 2022 and in 2020
3 as well.
4        And it was just -- you know, I
5 was able to get the trade records, but I had
6 to hunt for them because I had to go back to
7 Mr. Cooper and ask him, hey, do you have
8 them because I didn't know if he might have
9 had a copy, and he told me at that point
10 that he asked Darville to maintain a copy.
11        And the purpose from what he had
12 told me then as to why he asked him to
13 maintain a copy was just in case we were
14 successful in beating the provisional
15 liquidator -- well, actually just in case we
16 brought the firm back, I don't think it was
17 in provisional liquidation at the time, but
18 just in case we got the firm back, that we
19 would have the records, that he would have
20 access of those records.
21        But then, like I said, it went
22 into provisional liquidator and then all
23 these employees are no longer the firm's
24 employees.  So that's the reason that those
25 records were not turned over in 2019 is

1    Gentile
2 'cause of the law firm telling compliance
3 not to turn over those records without a
4 court order in the Bahamas.
5    Q.   Which --
6    A.   No one told me that -- that we
7 had to go file for this court order.  I
8 assumed that it would have been the
9 plaintiffs that had to go file for this
10 court order.  And at that point, like I
11 said, the firm closed down.
12    Q.   What event allowed you to begin
13 accessing the books and records of
14 MintBroker late last year or early this
15 year?
16    A.   Well, nothing happened late last
17 year.  You're talking about in May or April
18 of this year.  I never accessed MintBroker's
19 records.  I simply asked the attorneys
20 initially, I said could you please help me
21 with this, I have to do this inquest on
22 damages, could you please give me these
23 records, and they said no.
24        Then I went to the former
25 compliance office and I said, hey, can you

Gentile

1
2 please give me these records. He said he
3 didn't have them, ask Darville. He had
4 asked Darville to hold on to them.
5        I asked Darville, I said,
6 Darville, I need you to give these trades
7 records to my accountants so they could come
8 up with the short-swing profit. I don't
9 remember if I said the short-swing profit
10 part, but something along those lines, and
11 he said, okay.
12        So I gave him the e-mail address
13 to both of the accountants. He provided the
14 records. I don't know if they had dialogue
15 back and forth or not. After they received
16 the records, I had a few phone calls with
17 them. And I don't know how long it took
18 them to make the report, but probably -- I
19 don't remember how long it took them, a few
20 weeks to a month, something like that.
21     Q.   Mr. Darville swears in his
22 affidavit that it was April 20th, 2020 that
23 you first asked him whether you still had
24 access to MintBroker's trading records?
25     A.   2022.

Gentile

1
2     Q.   You say it's 2022?
3     A.   Well, it should be 2022 because
4 that's when I asked him. I didn't ask him
5 in April of 2020.
6     Q.   I believe that -- is it not a
7 fact that you caused to be lodged a copy of
8 the books and records with Mr. Davis, your
9 Bahamian barrister, the law firm that was
10 Swiss America's solicitor, Mr. Darville,
11 your employee -- your former employee, the
12 two liquidators, the liquidators' attorneys,
13 Mr. Gluck and his firm Holland & Knight,
14 your New York attorneys in this suit, the
15 Ford firm? Is there anyone else you let in
16 on it?
17        MR. FORD: Objection, form.
18     A.   I don't know the question, what
19 you're asking me.
20     Q.   Did you lodge a copy of the
21 books and records with anyone other than the
22 inventory of people that I just recited?
23     A.   Did I -- I didn't give a copy of
24 the records to anyone myself. Are you
25 saying did I cause it to happen?

Gentile

1
2     Q.   Yes.
3     A.   It wasn't something that I
4 caused on my own. Remember, this company
5 had two directors, so it was Mr. Collie and
6 myself who decided that the firm needed to
7 be closed and the process on how it was
8 going to be closed and of giving the
9 attorneys and the SEB the records.
10        As far as Darville having the
11 records, I didn't know that Darville still
12 had the records until earlier this year. I
13 don't know of Warren Gluck. I've heard of
14 his name mentioned, but I never spoken to
15 him, I never e-mailed him, I never said
16 anything to him. I don't remember all of
17 the other people that you said. My
18 attorneys in New York, the only records that
19 I -- that the firm had sent them was the IB
20 trade records, and there might have been
21 some other records. I can't remember
22 because this is, again, like three years ago
23 now, or at least two.
24     Q.   Did you not understand that you
25 had an obligation to preserve books and

Gentile

1
2 records that were or might be requested in
3 the prosecution or defense of these suits?
4        MR. FORD: Objection, form.
5     Q.   Please answer the question.
6     A.   My obligation -- I mean, my
7 obligation was to provide records that I
8 have in my possession, custody and control.
9 The company is separate from me, and the
10 company has its own legal counsel, its own
11 compliance officers, and it's outside of the
12 U.S., right, so it has to follow the laws in
13 that jurisdiction. So I -- I did the best
14 that I could do to getting the records that
15 I had in my control.
16        Now, you can't argue just
17 because I own the company, it doesn't mean
18 that I controlled the records. That's just
19 not true when you have a regulated entity.
20     Q.   And as chief operating officer,
21 you had no control over the books and
22 records?
23     A.   I wasn't the chief operating
24 officer.
25     Q.   Chief executive officer?

26 (Pages 98 - 101)

Page 102

Gentile

1            Gentile
2      A.   I cannot override compliance
3  because he is also the chief compliance
4  officer.  He is the head of compliance and
5  documents are their domain, not my domain.
6  If they tell me that it can't be provided
7  and the attorneys say that it can't be
8  provided without a court order, I'm not in a
9  position to where I could override them
10  because a company in Bahamas that is
11  regulated is required to have two directors,
12  and if the other director challenges this,
13  then I can't do it, which is what is the
14  situation here.  I can't just do whatever I
15  want.
16      Q.   All right.  I believe that
17  Ms. Tauber has some questions for you.
18      A.   I need to use the restroom
19  first.  Can we take a five-minute break?
20        MS. TAUBER:  Yeah, a five-minute
21      break is good, and if that's okay with
22      you, I'll go over that chart that I
23      was talking about that I prepared.
24        THE WITNESS:  Okay, sounds good.
25      (Recess.)

Page 103

1            Gentile
2      (Exhibit 6, 24-page document,
3      Reply Brief in Support of Plaintiffs'
4      Calculation of Damages and Motion for
5      Entry of Judgment containing Chart,
6      marked for identification, as of this
7      date.)
8  EXAMINATION BY
9  MS. TAUBER:
10      Q.   So I have the screen shared with
11  you of this chart that I think you're
12  referring to?
13      A.   Yes.
14      Q.   But before I ask you about that,
15  I want to clarify those examples you gave
16  because I think that will help guide our
17  conversation about the chart.
18        So before you had said to David,
19  you had given an example of a client buying
20  a thousand shares of Apple.  Do you remember
21  talking about that and the three scenarios
22  that you had described?
23      A.   Yes.
24      Q.   So you had said, and correct me
25  if I'm wrong, I think you had said that, you

Page 104

1            Gentile
2  know, the client buys a thousand shares of
3  Apple, let's say, first they will check to
4  see in the firm is long 500 shares -- a
5  thousand shares, and if it's only long 500
6  shares, the other 500 would be routed to
7  either Interactive or ETC; that's the first
8  scenario that you gave?
9      A.   Yes, sounds about right.
10      Q.   Okay.  So then in the situation
11  with the first 500 shares that you said --
12        THE REPORTER:  Your audio is not
13      the best.  I am struggling getting you
14      down.
15        MS. TAUBER:  I have a direct
16      line via Ethernet.
17        THE REPORTER:  So you were
18      saying?
19      Q.   In the first situation where the
20  first had 500 shares to sell to clients,
21  when I had first asked you about this in
22  your original deposition in February of
23  2020, you had told me that in one scenario
24  that the trade would not hit the Street, and
25  it wouldn't be reflected in Interactive

Page 105

1            Gentile
2  statements or in the market, like one of the
3  shares listed in the publicly traded volume
4  of shares; is that correct?
5      A.   Yes.
6      Q.   Is that correct?
7      A.   Yes.
8      Q.   So then only the 500 shares that
9  would be routed to Interactive, if the firm
10  didn't have them, would appear in the market
11  and on the Interactive statements, right?
12      A.   Correct.
13      Q.   Okay.  And you also --
14      A.   Or ETC.
15      Q.   Or ETC, right.
16        You also said that -- you gave a
17  scenario where if one client was short and
18  one client was long and the long client
19  sells the stock, in that case the firm would
20  have to purchase the shares for itself in
21  order to keep that position at zero with the
22  clearing company, right?
23      A.   Only if it's not shortable.  If
24  it's shortable, then the firm would just go
25  and short stock in the market.

27 (Pages 102 - 105)

Page 106

Gentile

1
2    Q.   Okay.  In that -- so let's say
3  it's not shortable in this situation which
4  you initially described, which I just
5  repeated, where the firm itself is forced to
6  buy the shares, would you consider that a
7  client-initiated trade?
8    A.   If the client says "buy me a
9  thousand shares," right?
10   Q.   Uh-hum.
11   A.   And -- just repeat it one more
12  time.  Sorry.
13   Q.   This is the scenario where you
14  have a situation --
15   A.   I could explain this scenario
16  that you have on the screen.
17   Q.   No.  I want to get that because
18  I want to first understand what you're
19  saying generally, and then you can walk me
20  through how it's reflected here, if it is.
21       But you had said saying if one
22  client is long and one client is short and
23  the long client sells the shares, so you
24  only have the short client left, that the
25  firm itself would have to buy those shares

Page 107

Gentile

1  in order to have like a cover for the short
2  position?
3    A.   Yup.
4    Q.   Right.  So in that situation,
5  right, would you consider that to be a
6  client-initiated trade, like you had
7  described trades that you said were
8  client-initiated, right?
9    A.   So the client wants to sell his
10  thousand shares?
11   Q.   Correct.
12   A.   Right, which would make us
13  short, we are synthetically basically short
14  at that point, right, until we either go out
15  into the market and buy it.  So the buy
16  order -- so the short would have been a
17  client-initiated trade, but when we go out
18  to the market and actually buy, that's a
19  firm-initiated trade.
20   Q.   Okay.  I just want to make sure
21  we have the terminology correct.
22       So now in the example where the
23  firm is buying the shares in order to
24  fulfill the client order, would you say

Page 108

Gentile

1  that's a client-initiated trade?
2    A.   If the firm is buying shares
3  to -- on behalf of a client, that's a
4  client-initiated trade.
5        In the first instance, let me --
6  I think I know where you're going with this,
7  so I'm just going to try to repeat it.  So
8  when the client says I want to sell my
9  thousand shares and we just automatically --
10  our account goes short a thousand shares at
11  the market price, that's a client-initiated
12  trade because we have an offsetting order
13  from a client that it went to.  But when we
14  have to now go and buy stock in the market
15  so that our inventory account is flat
16  because we don't want to be long -- sorry,
17  we have to go and sell, we have to go and
18  sell the Apple shares, for example, those
19  shares are not a client-initiated trade.
20  That's the firm doing a trade on its own.
21   Q.   Okay.  So in the situation, the
22  first situation we described, where the
23  client is buying a thousand shares of Apple
24  and the firm only has 500, right, and the

Page 109

Gentile

1  firm sells those 500 it has to the client
2  and then goes to, say, Interactive and buys
3  the other 500, okay, right?
4    A.   I lost -- I'm sorry, I lost you.
5    Q.   The scenario in which the client
6  buys a thousand shares?
7    A.   Okay.
8    Q.   And the firm sells that client
9  500 shares that the firm has inventory,
10  right?
11   A.   Yup.
12   Q.   And then it goes and buys the
13  other 500 shares at Interactive, right?
14   A.   Yeah.
15   Q.   Would all of those trades in
16  your view be client-initiated?
17   A.   Yes.  With the -- yes, they
18  would be client-initiated trades.
19   Q.   So now the other 500 that you
20  purchased from Interactive in that example I
21  just gave, what would happen with those 500
22  shares; would you also sell those to the
23  client?
24   A.   So the client wants a thousand

28 (Pages 106 - 109)

Gentile

1
2  shares, we had 500 in our inventory --
3      Q.   Correct.
4      A.   Right?
5      Q.   Uh-hum.
6      A.   -- we give him the 500 from the
7  inventory and we go to the market and buy
8  another 500 for them in the market.  That's
9  all a client-initiated trade.
10     Q.   Okay.  And then do you also sell
11 or would you also see an inventory traded of
12 the other 500 shares that you just bought?
13     A.   No, no, no.
14     Q.   You have to give them to the
15 client, right?
16     A.   It would go through the
17 inventory account, but it's just -- it's
18 just to give it to the client.  It's not for
19 its own benefit.
20     Q.   Okay.  In your initial
21 deposition we also talked about hedging
22 activities.  Do you remember that?
23     A.   Yes.
24     Q.   So you had said that sometimes
25 the firm hedges its trades against the

Gentile

1
2  client?
3      A.   Right.  So like the hedge would
4  be in that initial example where we went
5  long a thousand shares so that the client
6  can sell.  We don't want to be long a
7  thousand shares, so we sell it.  We just
8  hedged out our book.
9      Q.   So which part of that -- which
10 part would be the hedge trade?
11     A.   So the sell of the thousand
12 shares would have been the hedge and that
13 would have been the firm's initiated trade.
14     Q.   So let's -- you mean
15 client-initiated trade, just to be clear?
16     A.   No.  I'm talking about when the
17 firm itself hedges, that's a firm -- that's
18 the firm's taking a position -- you know,
19 taking risk off essentially, but it's not a
20 client initiating the trade.  Like all of
21 these trades here are very easily
22 explainable.
23     Q.   Let's look at the chart now
24 before we get to that.  So on the screen
25 that I have shared with you, we have these

Gentile

1
2  five different charts.  The first one is
3  the -- is from the Interactive statements
4  that we were discussing.  The second is from
5  13D, the Avalon 13D.  The third is from your
6  initial data file you gave us, initial
7  spreadsheet.  And the fourth one is the
8  spreadsheet you recently gave us.  Does that
9  make sense?
10     A.   Yes.
11     Q.   And then the bottom says "ECT,"
12 but I think it's actually "ETC," so I think
13 that's a typo.
14          So in the first one, which is
15 the shares we counted as trades that
16 actually took place in the market now based
17 on your testimony that the internal trade
18 between MintBroker and its client wouldn't
19 have hit the market, so we didn't count any
20 of the trades that were not on the
21 Interactive record, even if they were in
22 your file.  So we counted these 500 shares.
23          Now, what I see here is that
24 those 500 shares, right, that buy order, was
25 -- it looks like to me -- placed in account

Gentile

1
2  number 32812, if you look at the third chart
3  your "New" document?
4      A.   That's just showing you how they
5  were executed.  If you look -- if you look
6  at -- let's call it chart 1, 2, 3 and 4, and
7  5, okay, from top to bottom, just to make it
8  easier.  So the MBS, right, says buy AWX 800
9  shares, right?
10     Q.   Uh-hum.
11     A.   That's the first thing that
12 happens.  Then the second thing that happens
13 is 328 -- well, it's not in order because
14 it's all in the same second, but what
15 happens is the 32812 sends an order to buy
16 800 shares.
17     Q.   Why do you say 812; that one has
18 the highest --
19     A.   I'm sorry, not 2, not 2.  10 I
20 meant, sorry.  10.  So you could see one,
21 two, three four lines down, you will see it
22 buys 800 shares, the 32810.
23     Q.   Isn't that just the next line it
24 says that --
25     A.   Sell.

Gentile

1
2    Q.   Oh, that's sell.
3    A.   That's a sell.
4    Q.   Uh-hum, I see that.
5    A.   So it buys, and how it buys it,
6  we can see the 300 shares went to IB, the
7  line right above it, 200 shares each went to
8  IB as well, that comes up to 500 shares, and
9  then there's what 300 shares left, which I
10  believe is below in the ETC that comes out
11  to 800 shares total.
12    Q.   Uh-hum.
13    A.   And then once it has 800 shares,
14  then the 32810 sells the 800 shares to the
15  MBS account.  It's all simultaneously.
16    Q.   Right.  But that last part of it
17  you were saying didn't actually happen in
18  the market, right?
19    A.   Which part?
20    Q.   The last part where you say then
21  the 32812 sells the shares to the client,
22  right?
23    A.   I mean, it's just a journal
24  entry.  These particular trades are all
25  hitting the Street.

Gentile

1
2    Q.   Which ones?  Because I thought
3  we had just determined the ones that are
4  between MintBroker and its client, which I
5  take to be 32810 trade --
6    A.   Yes.
7    Q.   -- in this example?
8    A.   Right.  It's just the routing --
9  it's just the routing basically.  It's
10  routes.  It gets the order from the client
11  and it goes out and buys 500 shares with IB
12  and 300 shares with ETC and delivers it to
13  the client.
14    Q.   Okay.  But the last part, again,
15  the delivery to the client, the last thing
16  you just said, doesn't actually --
17    A.   It's not a separate trade.  It's
18  all one trade.
19    Q.   Okay.  But so --
20    A.   It wouldn't print to the Street.
21  It's not a separate trade.  It's just a
22  journal entry to say here's your 800 shares.
23    Q.   Okay.  But 500 of those shares
24  at least, putting aside the ETC 300 shares
25  for now, and looking back at Interactive

Gentile

1
2  statement, chart 1, right, 500 of those
3  shares is not a journal entry, those shares
4  were actually purchased in the market?
5    A.   Okay, yeah, exactly.
6    Q.   So in chart 4, right, leaving
7  aside the MBS trade, looking at the 32810
8  and 32812 trades, it looks to me like the
9  32810 trades are journal trades or you're
10  calling them journal entries?
11    A.   Okay.
12    Q.   And so the 32812 trades are
13  actually market trades; is that correct?
14    A.   So the 12, the only purpose of
15  that account is just to show us where it
16  went.  It's not a separate trade.  It's just
17  showing us the breakdown of the order.
18        And I'll give you an example.
19  If you look at chart number 3, IB does the
20  same thing where they show you 500 shares.
21    Q.   Wait, chart number 3 is your
22  chart.  That's not IB's chart, it's yours?
23    A.   Okay, but it came from IB,
24  right, that chart?
25    Q.   No, it didn't.  Number 3 is a

Gentile

1
2  spreadsheet that you had initially given us.
3    A.   Right, but I got it from IB.
4    Q.   I don't know where you got that
5  from, but the top one is the one from IB, so
6  they're not the same.
7    A.   It's the same trade data, but it
8  came --
9    Q.   But it's not because -- I don't
10  know what -- it's obviously not because you
11  have extra trades in there that are not on
12  the IB statement.
13        MR. FORD:  If I could intervene.
14    A.   That's not true.
15        MR. FORD:  I know we're trying
16    to work through this, but we are
17    getting a little bit of your testimony
18    and not questions and then also
19    everybody is talking over each other.
20        MS. TAUBER:  I just want to get
21    it on the record.
22        MR. FORD:  I think, you know,
23    this has gotten very conversational,
24    but we're getting a lot of lawyer
25    commentary appearing like testimony.

30 (Pages 114 - 117)

Page 118

```
        Gentile
 1
 2    So let's stick to the deposition
 3    format and ask questions and let him
 4    answer.
 5         MS. TAUBER:  I'm clarifying for
 6    the record that we're looking at a
 7    chart that I prepared based on
 8    documents that we have from discovery
 9    where the originals came from.  It
10    says right here it came from your
11    production.  I don't know where you
12    have the information.  All I have is
13    this spreadsheet that you initially
14    gave us that was Bates stamped and
15    then also given to us in the native
16    Excel format.  The IB documents that
17    we're referring to, the Interactive
18    documents, are separate documents that
19    we got directly from Interactive.  I'm
20    trying to reconcile those, and I'm
21    hoping this will help do that.  All
22    right.
23    Q.    So it's not helpful if you
24    describe them as the same document when
25    they're two different documents I'm trying
```

Page 119

```
        Gentile
 1
 2    to reconcile.
 3    A.    So basically what I'm trying to
 4    tell you is that your IB document, okay, and
 5    chart number 3, chart number 3 I got from
 6    IB, okay.  And it's -- what IB gave you is a
 7    consolidation, and what I was able to pull
 8    from them was the consolidation plus the
 9    breakdown.  So you see the first 500 and
10    then 100, 300 and 100.  If you take the
11    average price --
12    Q.    I'm sorry, I'm going to
13    introduce the original of the document that
14    you gave us so you can see what we're
15    talking about here.  What you gave us --
16         MR. FORD:  Miriam, he was in the
17    middle of answering a question.
18         MS. TAUBER:  I didn't mean -- I
19    want to hear what you're saying.
20    Continue saying while I introduce the
21    exhibit.
22    A.    Go back to the screen.
23    Q.    Sorry.  Hold on.  Here is the
24    initial chart again.
25    A.    So what I was trying to tell you
```

Page 120

```
        Gentile
 1
 2    is that chart number 3, the first line is
 3    the same line that you have from IB, right?
 4    Q.    Correct.
 5    A.    The numbers are the same.  Below
 6    it, those three numbers below it is just the
 7    breakdown of what IB did with those orders
 8    and how they executed them.  They're
 9    basically saying, hey, 100 went to Amex, 300
10    went to Dark, another 100 went to Amex.
11    Q.    Got it.
12    A.    All happened at the same time.
13    If you take the average price on all that,
14    it all comes out to exactly the same as the
15    500 shares at 2.21838, right.  And if you
16    look at the proceeds, it will be exactly
17    same.  If you calculate the three
18    commissions, it will calculate to the same
19    number as the .089.  So it's really just one
20    order there.
21         And my point to you is if you
22    look down to the new file created, the 32812
23    also shows the breakdown.  So basically my
24    point to you is that the 10 account, 32810
25    account, has the consolidated and the 32812
```

Page 121

```
        Gentile
 1
 2    account just has the breakdown of where they
 3    went, for example, IB.
 4    Q.    Okay.
 5    A.    But they're not separate trades.
 6    It's just the breakdown of them.  That's why
 7    I tell you that -- that you can't rely on
 8    that as the trades.  It's just telling you
 9    how they were executed.
10    Q.    Sure.
11         Which one can we rely on then?
12    Which of these charts is the one that we can
13    rely on?
14    A.    Well, you could rely on the one
15    that is called "New" document chart, number
16    4, but you need to understand what
17    everything means in there first, right.  You
18    have the client saying buy 800 shares, the
19    firm going out and getting 800 shares for
20    the client, and then below that is just the
21    breakdown on how those trades happen.
22         So you have -- you have in one
23    case the firm's account -- I'm just going to
24    say 10 for purposes of shortening it or 10,
25    the 10 account, is going out to the market
```

31 (Pages 118 - 121)

Page 122

Gentile

1  and going out to IB and ETC to get 800
2  shares, it gets the 800 shares and it sells
3  it to the client at the same price at the
4  same time.
5
6      Q.   Okay.  But again, didn't you
7  tell me that the client firm transactions
8  that you just described were not market
9  transactions?
10     A.   Say that again.
11     Q.   You had said that the
12 transactions between the client, the client
13 of the firm, and the firm what you're
14 calling journal entries and not actually
15 market transactions?
16     A.   Yes, that's correct.  The trade
17 from -- the trade that is going from the
18 firm directly to the client account
19 did not go to the -- it didn't go to the
20 market -- I mean, it did go to the market in
21 a sense of it sent the order to the market
22 to get an execution and then deliver it back
23 to the customer.
24         It's no different than the way,
25 you know, take a firm like, you know,

Page 123

Gentile

1
2  Ameritrade, for example, or Interactive
3  Brokers, right, they -- they have some
4  system to keep track of where these orders
5  went.  It doesn't mean that they're separate
6  trades in the market, but they have to have
7  some way for the computer to know who
8  initiated -- to just track who initiated the
9  trade, how it got executed and where it
10 went, and that's what these records are
11 showing, is how -- at the end of the day,
12 it's the MBS who placed the trade.  The rest
13 of it is just noise.
14     Q.   Right.  So MBS placed the trade
15 and has the shares in its Interactive
16 account, right, at least these 500 shares?
17     A.   MBS doesn't have an Interactive
18 account, right.  MBS just has an account --
19     Q.   Oh, sorry.  I thought you meant
20 MintBroker.  I meant MintBroker.
21     A.   Yeah.
22     Q.   So MintBroker is the one that
23 actually brought the shares through the
24 32812 account to --
25     A.   So interactive would never see a

Page 124

Gentile

1
2  32182 account --
3          THE REPORTER:  Hold on.  You
4      broke off the ending of your question.
5          (Record read.)
6      Q.   So I'm asking is MintBroker the
7  one that actually bought the shares in this
8  32812 account and you are saying?
9      A.   So I'll give you a further
10 explanation.  The client doesn't have an
11 account at ETC or IB.  MintBroker has an
12 account there.  That's just how foreign
13 broker-dealers work.  So only MintBroker
14 could go to ETC or IB to buy shares on
15 behalf of the client.  The client is always
16 the beneficial owner of it.
17     Q.   Well, that's a legal term, so I
18 mean, that's debatable, right, we can
19 dispute that.
20         What I'm trying to get at is:
21 The shares that MintBroker buys and what
22 you're describing, which I think what you're
23 describing is an omnibus account, right,
24 that a foreign brokers?
25     A.   Yes.

Page 125

Gentile

1
2      Q.   But then how do those shares get
3  into the client's account?  Now, you're
4  saying -- I could see it right here, right,
5  32810 sells it to the client.  But now I'm
6  saying how do you reconcile that with the
7  fact you told me those were just journal
8  entries and not actual trades?
9      A.   Because if you just -- if you
10 just -- because the trade from the firm to
11 the client didn't happen in the market.
12 It's just a journal entry, right.
13     Q.   Uh-hum.  So --
14     A.   So the trade where you have the
15 buy of 800 in the 10 account, right, in
16 there you can see just the other account,
17 the 12 account just shows you how it was
18 routed to the market, where it was routed
19 to, right.  That's what that's showing.
20     Q.   Right.  So --
21     A.   So it really doesn't even have
22 to be an account number.  It could just be
23 anything.
24     Q.   I got that.
25     A.   It could have a different number

Gentile

1 every single time. That's just how the
2 system was designed. You could have a
3 different number every time, like Bitcoin,
4 right, it has a unique number every time a
5 transaction happens. It could have been the
6 same way. It's just how the system was
7 designed to easily track when a client
8 places an order, how did he get it or where
9 did it go, what happened. These are just
10 the -- like a log file essentially showing
11 how it got executed. The real execution in
12 the market is the one you see in ETC and the
13 one you see in IB. That's the 800 shares,
14 right.
15    Q.   Okay.
16    A.   It's just reflective in the
17 Avalon 13D showing 800 shares, reflected in
18 the client account showing 800 shares and
19 the breakdown of everything comes out to the
20 800 shares.
21    Q.   Okay. So this MBS10010067 (sic)
22 account, that's the client here we're
23 talking about, if I were to look at their
24 account statements, I would then see the 800

Gentile

1 shares in their account statement; is
2 that what you're --
3    A.   That's right, you'd only see the
4 800 shares. You wouldn't see the rest of
5 how it got executions done. It would just
6 show the 800 shares.
7    Q.   Now, this account number
8 specifically is the one we were talking
9 about before where we asked you about
10 SureView. Do you remember that?
11    A.   Yes, I mean, I remember you
12 asking about SureView. I don't remember the
13 account number.
14    Q.   Okay. This is the account
15 number. This is also the account that was
16 reported on your New Concept 13D?
17    A.   Uh-hum.
18    Q.   Okay.
19    A.   But you have to show me the 13D.
20    MR. FORD: If I could interject.
21 How much more time?
22    MS. TAUBER: I'm going to wrap
23 up very quickly, so if it's okay if I
24 could take five more minutes of your

Gentile

1 time.
2    MR. FORD: As I mentioned, Guy
3 has a hard stop at 3.
4    Guy, are you able to do five
5 more minutes?
6    THE WITNESS: My son is actually
7 in the hospital right now. So I'm
8 just trying to wrap this up as quickly
9 as possible.
10    MS. TAUBER: I'm really sorry to
11 hear that. I will be as quick as I
12 can.
13    Q.   So this is the 13D. It's going
14 to take forever to upload because it's
15 really long. I think it's Exhibit 7.
16    (Exhibit 7, 369-page document,
17 New Concept 13D, marked for
18 identification, as of this date.)
19    MS. TAUBER: This is a different
20 one. This is, I think, 11.
21    (Exhibit 11, three-page
22 document, SPY box, marked for
23 identification, as of this date.)
24    MR. FORD: I don't mean to be a

Gentile

1 pest, we had a 3 o'clock stop and
2 we're giving you the extra five
3 minutes. Now we're down to a minute
4 or two.
5    MS. TAUBER: Okay. I'm waiting.
6 That document took a while to upload,
7 but I'm ready now.
8    Q.   I'm going to screen share. So
9 this is a spreadsheet that came from
10 Interactive production. It was actually
11 attached to an e-mail that you had sent.
12 This is Exhibit 11. This is about this
13 account 10067, and do you see where it says
14 "SureView" next to it?
15    A.   Yes.
16    Q.   Do you know what that refers to?
17    A.   I don't.
18    Q.   That was under -- unfortunately
19 I can't show you -- no, wait, I can -- the
20 original file.
21    Let me also share this with you.
22    MR. FORD: Ms. Tauber, is there
23 any wrap-up questions here?
24    Q.   I just wanted to know if you

Gentile

1  could you explain; do you see this screen
2  share file, the spreadsheet, I made a
3  version of that Exhibit 11 I just
4  introduced.  Do you see where it says Trader
5  ID in the heading and it says "SureView"?
6      A.   Yes, I see it.
7      Q.   Does "Trader ID" refer to the
8  customer name in this situation?
9      A.   I mean, I don't know where this
10 file came from, so I don't -- I don't know.
11     Q.   Okay.  I could show you where it
12 came from.
13          MR. FORD:  Is this a Bates
14     stamped document?
15          MS. TAUBER:  Well, you know,
16     Interactive produced this stuff
17     without a Bates number, but I can --
18     after the deposition I could direct
19     you to the file location of this file.
20          THE REPORTER:  Is this a new
21     exhibit?
22          MS. TAUBER:  This spreadsheet
23     will be part of Exhibit 11.
24          THE REPORTER:  Is it an Excel

Gentile

1  file?
2          MS. TAUBER:  Yes.
3          (Exhibit 9, Omnibus account
4     document, marked for identification,
5     as of this date.)
6      Q.   This one, it came from this
7  e-mail, so you can see an e-mail that is
8  written to you at first, okay, and then that
9  person says "provide examples of orders,"
10 and then this spreadsheet was attached to
11 this e-mail that was the example of this
12 problem you were discussing with
13 Interactive.
14          Now, I know this is not related
15 to the stocks in question in this case; this
16 is related to SPY option trades, as you can
17 see.  The only reason I'm introducing this
18 document is to ask you about this account.
19 So this account, which was -- was this file
20 attached to this e-mail is MBS10067, it
21 says "Trader ID," "SureView," it came from
22 MintBroker files and was sent to Interactive
23 according to this e-mail.
24          MR. FORD:  I have to interject

Gentile

1  because I think that now we are coming
2     to ten minutes over.
3      Q.   I'm asking ask if "Trader ID"
4  refers to the customer name?
5          MR. FORD:  I think the question
6     was already answered.
7          MS. TAUBER:  I didn't hear an
8     answer.  Maybe it could be answered
9     again.
10     A.   I don't know where this file
11 came from because this doesn't say it came
12 from us.  It looks like it came from
13 somewhere else.
14     Q.   You don't know where the file
15 came from, but I'm telling you it looks like
16 it came from your files.  Do you know what
17 "Trader ID" refers to?
18     A.   I don't.  It's -- it says
19 "Trader ID," so it's either the customer's
20 name or the trader's ID.  I don't know.
21     Q.   Are those two different things,
22 trader ID and customer name?
23     A.   I don't know.  I don't believe
24 that that file came from our firm.  I don't

Gentile

1  know where it came from.  It doesn't say
2  that it came from our firm.
3      Q.   Well, it was attached to this
4  e-mail, which was sent --
5      A.   That's from some person it says
6  Tom Liu.
7      Q.   At DAS, D-A-S, trader?
8      A.   Not my company.
9      Q.   But you were copied on it,
10 right?
11     A.   It doesn't mean I looked at it.
12 But what year was that in, 2018.  I don't
13 remember.
14     Q.   Okay.
15     A.   That file didn't -- doesn't look
16 like it was generated by us.  It looks like
17 it was generated by either IB itself or from
18 another party.
19     Q.   Okay.  But it's an MBS account
20 number would have been one of your accounts?
21     A.   MBS would have SureTrader or a
22 MintBroker account.  Not one of my accounts,
23 but MintBroker's customer's accounts.
24     Q.   I have one last question, which

Page 134

1                Gentile
2  is:  Is there a difference between MBS and
3  PFS numbers you were describing?
4      A.   No, no, it's the -- it's just
5  they change the sequence at some point of
6  how the letters started, but they're both
7  customer accounts.
8      Q.   Do they stand for something,
9  those letters?
10     A.   I don't remember what PFS stands
11 for, but MBS could -- I believe it's -- it
12 stood for MintBroker.  I don't know what the
13 "S" was for.
14     Q.   Are the accountants we talked
15 about, Mr. Beresford and Mr. Christian, are
16 those your personal accountants?
17     A.   No.
18     Q.   Okay.  So when you say they're
19 the accountants, you mean just for this case
20 or do they also work for you in other
21 capacities?
22     A.   No, they were hired specifically
23 for this.
24     Q.   Okay.
25         MS. TAUBER:  I guess we are out

Page 135

1                Gentile
2  of time.
3         Do you have follow-up, Matt?
4         MR. FORD:  Not at this time.  I
5  don't have any questions.
6         MR. LOPEZ:  Off the record.
7         MR. FORD:  If you can get a
8  rough draft tonight, we will take it,
9  we will order it, and a copy.
10        MS. TAUBER:  Original
11 transcript, rough and delivery
12 expedited on Monday.
13        (Time noted:  3:12 p.m.)
14 _____
15             GUY GENTILE
16 Subscribed and sworn to before me
17 this ___ day of _____, 202_.
18
19 _____
20    Notary Public
21
22
23
24
25

Page 136

1
2      C E R T I F I C A T E
3  STATE OF NEW YORK   )
4               : ss.
5  COUNTY OF NEW YORK   )
6
7      I, THERESA TRAMONDO, a Notary
8  Public within and for the State of New
9  York, do hereby certify:
10     That GUY GENTILE, the witness
11 whose deposition is hereinbefore set
12 forth, was duly sworn by me and that such
13 deposition is a true record of the
14 testimony given by the witness.
15     I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I am
18 in no way interested in the outcome of
19 this matter.
20     IN WITNESS WHEREOF, I have
21 hereunto set my hand this 31st day of
22 October, 2022.
23
24 _____
25         THERESA TRAMONDO

Page 137

1
2  ------------ I N D E X --------------
3  WITNESS   EXAMINATION BY       PAGE
4  GUY GENTILE  MR. LOPEZ        4
5         MS. TAUBER      103
6
7  -------- INFORMATION REQUESTS ---------
8  DIRECTIONS:  (NONE)
9  RULINGS:  (NONE)
10 TO BE FURNISHED: (NONE)
11 REQUESTS:  25
12 MOTIONS:  80, 91
13 CONFIDENTIAL: (NONE)
14 -------------- EXHIBITS ---------------
15 EXHIBIT            FOR ID.
16 Exhibit 1, four-page document,     14
17  cover pages titled "Exhibit 6,"
18  three-page letter from Christina
19  Rolle dated September 18, 2019
20 Exhibit 2, 156-page document,      22
21  first page Advertisement of
22  Winding Up Petition with other
23  documents
24 Exhibit 3, 30-page document, first  32
25  paged titled "Exhibit G,"

35 (Pages 134 - 137)

Page 138

```
1
2   Beresford Report
3   Exhibit 4, 214-page document,      34
4   first page titled "Exhibit F,"
5   Christian Report
6   Exhibit 6, 24-page document, Reply  103
7   Brief in Support of Plaintiffs'
8   Calculation of Damages and Motion
9   for Entry of Judgment containing
10  Chart
11  Exhibit 7, 369-page document, New   128
12  Concept 13D
13  Exhibit 11, three-page document,    128
14  SPY box
15  Exhibit 9, Omnibus account          131
16  document
17
18       (EXHIBITS ATTACHED.)
19       (CERTAIN EXHIBIT NUMBERS
20    SKIPPED.)
21
22
23
24
25
```

Page 139

```
1
2        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS
3         330 OLD COUNTRY ROAD
          MINEOLA, NEW YORK 11501
4         800.727.6396
     NAME OF CASE:  AVALON VS. GUY GENTILE AND
5   MINTBROKER/NEW CONCEPT VS GUY GENTILE AND
     MINTBROKER
6   DATE OF DEPOSITION:  OCTOBER 26TH, 2022
     NAME OF WITNESS:  GUY GENTILE
7   PAGE  LINE    FROM      TO
8   ____|____|_____|_____
9   ____|____|_____|_____
10  ____|____|_____|_____
11  ____|____|_____|_____
12  ____|____|_____|_____
13  ____|____|_____|_____
14  ____|____|_____|_____
15  ____|____|_____|_____
16
17        _____
18            GUY GENTILE
19  Subscribed and sworn to before me
20  this ____ day of _____, 202_.
21
22  _____ _____
23  (Notary Public)  My Commission Expires:
24
25
```

36 (Pages 138 - 139)

[& - 3:12]                                                                 Page 1

**&**

**&**  39:21,23
45:17 72:21
83:11 87:19
89:19,23,24
90:10,10 91:23
99:13

**0**

**00907**  4:21
**089**  120:19

**1**

**1**  14:14,22 35:22
113:6 116:2
137:16
**1,000**  61:21,23
63:2,3,23,25
64:2
**10**  113:19,20
120:24 121:24
121:24,25
125:15
**100**  119:10,10
120:9,10
**10016**  3:7
**10067**  129:14
**10075**  2:16
**103**  137:5 138:6
**11**  128:21,22
129:13 130:4,24
138:13
**111**  69:20
**112-6**  14:9
**11501**  139:3
**11968**  2:7
**11:39**  1:17
**12**  116:14 125:17

**128**  138:11,13
**12:59:09**  69:20
**13**  76:11
**131**  138:15
**13d**  65:15 76:11
76:20 77:2,10
78:2 112:5,5
126:18 127:17
127:20 128:14
128:18 138:12
**14**  137:16
**156**  22:23 137:20
**171**  2:6
**17432**  136:23
**18**  1:5,12 14:9,17
19:13 137:19
**18th**  13:11

**2**

**2**  22:23 34:15
35:20,21 113:6
113:19,19
137:20
**2.21838**  120:15
**20**  19:23
**200**  114:7
**2000**  80:7
**2014**  20:2,3
**2016**  6:15 19:8
19:23 21:9
**2017**  6:15 19:15
49:10 53:4
**2018**  6:18,19,22
6:23,24 19:16
56:14,15 75:24
76:3,5,6,7 79:11
79:23 133:13

**2019**  12:3 13:11
14:17 19:14
21:11 25:25
75:24,25 79:11
79:20 80:9,10
82:22 85:3
86:12 91:10,12
92:22 93:20
95:20 96:25
137:19
**202**  135:17
139:20
**2020**  89:25 96:2
96:2 98:22 99:5
104:23
**2021**  89:16
**2022**  1:16 5:19
96:2 98:25 99:2
99:3 136:22
139:6
**2023**  53:5
**20th**  98:22
**212-858-0040**
3:12
**214**  34:19 138:3
**22**  137:20
**24**  103:2 138:6
**24th**  3:6
**25**  137:11
**26**  1:16
**26th**  139:6
**275**  3:6
**29**  6:18,22
**29th**  56:14
**2a**  2:15

**3**

**3**  6:18,22 32:3
35:19 56:15
113:6 116:19,21
116:25 119:5,5
120:2 128:4
129:2 137:24
**30**  32:3 69:20
91:12 137:24
**30,000**  67:5
**300**  114:6,9
115:12,24
119:10 120:9
**30th**  91:22
**31st**  136:21
**32**  137:24
**32182**  124:2
**323**  2:6
**323-790-4881**
2:19
**328**  56:3 113:13
**32810**  61:10,11
62:13 69:21
70:3 113:22
114:14 115:5
116:7,9 120:24
125:5
**32812**  70:18,19
113:2,15 114:21
116:8,12 120:22
120:25 123:24
124:8
**330**  139:3
**34**  138:3
**369**  128:17
138:11
**3:12**  135:13

**4**

**4**   34:19 65:22
113:6 116:6
121:16 137:4
138:3
**4,000**   24:15
**4s**   65:23

**5**

**5**   57:4 113:7
**5,762,336**   56:13
56:19 57:6
**50**   34:25 35:13
**500**   62:9,10,11
69:19 104:4,5,6
104:11,20 105:8
108:25 109:2,4
109:10,14,20,22
110:2,6,8,12
112:22,24 114:8
115:11,23 116:2
116:20 119:9
120:15 123:16

**6**

**6**   14:15 103:2
137:17 138:6
**631-287-5520**
2:10

**7**

**7**   128:16,17
138:11
**7291**   1:5 14:10

**8**

**80**   137:12
**800**   71:10,16
113:8,16,22
114:11,13,14

115:22 121:18
121:19 122:2,3
125:15 126:14
126:18,19,21,25
127:5,7
**800.727.6396**
139:4
**812**   113:17
**860**   1:19 4:20
5:16
**885**   2:15
**8896**   1:12

**9**

**9**   131:4 138:15
**91**   137:12
**99**   7:3

**a**

**a.m.**   1:17
**ability**   15:18
**able**   14:4,12
16:11 36:10,11
54:3 81:9 83:16
83:17,19 93:18
96:5 119:7
128:5
**abouts**   49:6
**absolutely**   39:24
**accept**   24:5
**accepting**   53:16
**access**   10:14
23:11 36:11,14
36:16,21,23,24
37:2,11,18 38:5
38:7,14,15,17
67:20 75:19
79:9 80:5 83:14
90:14,17,19,21

90:23 93:18,21
96:20 98:24
**accessed**   36:20
93:23 97:18
**accessing**   97:13
**account**   11:14
17:23 32:17
34:5,6,7,7 35:25
55:19,23,25 56:2
56:4,5 57:24
61:9,11,12 64:4
64:4 66:14,15
67:4,5,7,9,10,12
67:25 69:22
70:3,7,17,19,20
72:11,24 74:7
82:10 86:25
87:11 93:9
108:11,16
110:17 112:25
114:15 116:15
120:24,25 121:2
121:23,25
122:18,18
123:16,18,18,24
124:2,8,11,12,23
125:3,15,16,17
125:22 126:19
126:23,25 127:2
127:8,14,15,16
129:14 131:4,19
131:20 133:20
133:23 138:15
**accountant**
53:23
**accountants**
38:15 94:25
98:7,13 134:14

134:16,19
**accounted**   71:7
**accounting**   63:9
**accounts**   35:22
35:23,24 36:4,7
60:8 67:11
133:21,23,24
134:7
**accuracy**   32:12
33:5
**accusation**   57:7
**accused**   28:14
**accusing**   24:20
28:12 30:3 39:8
**act**   76:12
**acting**   61:6
85:13
**action**   136:17
**actions**   2:4,13
3:4
**activities**   7:24
12:2 15:24
23:25 110:22
**activity**   16:18
35:23 66:15
**actual**   125:8
**adam**   80:14
81:18
**addition**   10:18
19:6
**additional**   72:20
89:23
**address**   4:19
5:15,23 98:12
**addressing**
52:15
**adjudication**
44:9

**advertisement**
22:24 137:21
**advised** 8:23
95:17
**advising** 8:3,3,4
**affidavit** 23:21
25:8 34:5,12,13
36:11 37:15,16
37:24 38:4
65:18 66:3
77:12 85:18
87:17 92:22
93:11,24 98:22
**affidavits** 34:13
37:4
**affirm** 4:4
**afraid** 59:23
**agency** 49:12
50:8 51:18 52:5
**agent** 85:14
**ago** 30:19,20
52:25 53:3
82:20 100:22
**agree** 4:2 15:23
**ahead** 43:2
**akin** 15:19 72:5
72:9
**alabama** 54:19
**algorithm** 59:16
**allegations** 51:6
**alleged** 68:19
**allowed** 97:12
**america** 6:20 7:8
7:17 8:5,11
11:12,15,15,22
12:8 15:2 30:4
54:23 65:5 85:6

**america's** 67:10
99:10
**american** 10:14
10:19
**ameritrade**
123:2
**amex** 120:9,10
**answer** 32:25
41:6,8 42:18
44:18 47:12,15
47:15 48:20
56:17 60:4 69:3
74:15 81:22
101:5 118:4
132:9
**answered** 70:14
92:11 132:7,9
**answering** 44:4
59:22 119:17
**antonio** 65:17
77:5,12
**antonio's** 66:2
**anybody** 35:2
**anymore** 41:24
44:18 47:11
**anyway** 17:9
72:16
**aol.com** 2:9
**aos** 1:21,24
**apartment** 5:19
**apologize** 43:25
46:15
**appealed** 29:12
**appear** 23:11
68:21,24 105:10
**appearance** 2:2
3:2

**appeared** 87:24
88:4,6
**appearing**
117:25
**appears** 25:2
**apple** 61:22,24
62:4,6,9,10 63:2
63:3 103:20
104:3 108:19,24
**application**
50:14,17,21
51:22 52:13,20
53:2 87:11
91:16
**applied** 53:4
**apply** 40:24
41:10,11 49:3
**appointed** 72:17
**appointing** 42:9
**appointment**
72:14
**approval** 83:21
**approximately**
49:9
**april** 97:17
98:22 99:5
**argue** 101:16
**argued** 16:4
**arguments** 29:2
**arrangement**
22:12
**ashford** 1:19
4:20 5:16
**aside** 115:24
116:7
**asked** 38:6 39:20
48:17 74:24
75:14 88:17

89:22 94:23
95:4 96:10,12
97:19 98:4,5,23
99:4 104:21
127:10
**asking** 5:6,7 35:7
37:16,22 40:8
41:17 47:3,9
52:23 54:5
57:15 66:19
79:22 80:15
88:25 93:2
94:20 99:19
124:6 127:13
132:4
**assist** 44:3 95:5
**assume** 88:25
93:7 94:17
**assumed** 81:18
97:8
**assuming** 88:23
**assumption** 93:3
**assumptions**
88:25
**attached** 129:12
131:11,21 133:4
138:18
**attempt** 60:7
**attorney** 7:4,5
8:22,22 41:25
42:2,3 44:12,14
44:16 72:21
74:24 75:14
77:22 80:13
81:2 84:21,24
87:21,22 88:8,11
88:13

attorney's  23:12
attorneys  12:14
  22:9 39:10
  42:14 74:3,5,23
  75:13,18 78:16
  85:24 86:8
  89:18 91:23
  94:2,10 97:19
  99:12,14 100:9
  100:18 102:7
attributable
  58:9
auburn  54:19,19
audio  104:12
audit  21:12
audited  19:3,14
  19:21 20:4
auditors  53:20
audits  21:12
august  6:18,22
  6:24 56:15
authorities
  74:11
authority  8:6
automatic  59:17
  59:20
automatically
  108:10
available  72:6
  88:15
avalon  1:3 24:22
  57:24 58:3
  60:11,20 61:7
  75:8,10 76:13,17
  76:25 112:5
  126:18 139:4
avenue  1:19 2:15
  3:6 4:20 5:16

average  119:11
  120:13
aware  17:19
  18:24 21:8
  33:15 53:14
  56:12,19 66:23
  75:2,16,20 76:5
awx  113:8

**b**

b  63:2
back  9:23 10:6
  15:11 17:10
  21:22 24:10,12
  24:14,16 31:21
  31:23 32:21,24
  39:21 42:21,25
  51:12,17 62:13
  62:17 64:3,5
  69:6 74:17
  78:12 82:8,9,17
  82:19,20 86:22
  92:9 94:13 96:6
  96:16,18 98:15
  115:25 119:22
  122:22
backup  87:6
bahamas  5:24
  6:4 7:6 8:7,16
  11:20 12:10,25
  15:12 17:18
  18:23 22:15
  25:24 26:6
  38:10 39:12
  40:25 41:12,17
  42:9 46:25
  47:10 60:22
  61:2 73:4,10,23

78:14,16,21 79:3
  81:5,8,13 82:18
  86:15 88:2 89:5
  89:20 93:6
  95:11,16 97:4
  102:10
bahamian  99:9
bank  17:23
banking  18:25
  19:2 20:5 49:4
  49:13 52:2
  53:10
barrister  43:17
  87:19 99:9
based  28:25
  52:13 59:16
  61:25 85:16,17
  112:16 118:7
basic  63:8
basically  20:14
  40:15 55:12
  62:16 70:8 82:6
  82:12,14 107:14
  115:9 119:3
  120:9,23
basis  54:13
  55:11
bates  118:14
  130:14,18
bdo  19:18 50:18
beating  96:14
beg  47:4
beginning  14:23
  15:3 32:9
behalf  17:16
  58:2,4 76:14
  85:14 87:25
  88:5,6 108:4

124:15
believe  6:15
  12:17 21:19
  33:10 34:4,8,12
  36:5 37:14,22,25
  42:12 46:2,3
  47:14 48:7
  51:14 55:5
  58:20 60:21
  65:17,23,25 66:7
  66:21 67:21
  71:14 72:16
  73:24 76:23
  77:4,11,17 79:19
  81:2 84:20,24
  85:23 86:23
  87:4,16 89:25
  93:11,12 94:6
  99:6 102:16
  114:10 132:24
  134:11
belong  68:14
beneficial  68:15
  124:16
benefit  32:17
  33:22 110:19
beresford  25:20
  32:5,9,15 33:2
  33:25 65:12
  134:15 138:2
best  34:3 39:5
  71:12 86:8
  101:13 104:13
big  92:6 95:19
bit  82:21 117:17
bitcoin  126:4
blood  136:17

**[bloomberg - chief]** Page 5

**bloomberg**
  51:19
**board**  8:23
**book**  111:8
**books**  73:19
  75:19 78:4
  79:10 80:5
  86:18,20,21
  87:14 89:9
  90:16 92:24
  93:16 97:13
  99:8,21 100:25
  101:21
**bottom**  112:11
  113:7
**bought**  110:12
  124:7
**box**  2:6 128:23
  138:14
**break**  35:2,3,8,9
  46:14,17,19
  68:12 71:22
  102:19,21
**breakdown**
  68:10 116:17
  119:9 120:7,23
  121:2,6,21
  126:20
**brief**  103:3
  138:7
**broke**  124:4
**broken**  92:16
**broker**  10:9
  124:13
**broker's**  67:24
**brokerage**  9:17
  12:9

**brokers**  11:6
  68:2 81:11,15,16
  82:9 84:17
  123:3 124:24
**brokers's**  68:7
**brought**  73:2,8
  73:21 74:23
  75:6,13 96:16
  123:23
**bunch**  68:13
**business**  7:21
  9:17 11:23 12:2
  12:9 21:14
  25:24
**buy**  59:4 61:21
  61:23 62:12
  69:22 71:10
  106:6,8,25
  107:16,16,19
  108:15 110:7
  112:24 113:8,15
  121:18 124:14
  125:15
**buying**  103:19
  107:24 108:3,24
**buys**  63:2 104:2
  109:3,7,13
  113:22 114:5,5
  115:11 124:21

**c**

**c**  94:25 136:2,2
**calculate**  30:22
  30:24 120:17,18
**calculating**
  25:17
**calculation**
  103:4 138:8

**calendar**  19:15
**call**  5:9 113:6
**called**  4:11 7:14
  15:9 17:5 60:8
  68:16 121:15
**calling**  80:14
  116:10 122:14
**calls**  81:3 98:16
**canada**  17:15,18
  18:16 20:17,22
  20:23,24,25 21:4
**canadian**  17:17
**capacities**
  134:21
**capacity**  18:11
**cara**  3:9
**carib**  86:13 87:7
**case**  14:9 51:3,5
  76:15,17,25 77:3
  96:13,15,18
  105:19 121:23
  131:16 134:19
  139:4
**cases**  6:18 41:15
  41:21 78:7
**cause**  16:18 17:8
  18:22 77:2
  80:22 97:2
  99:25
**caused**  77:4 85:3
  99:7 100:4
**cease**  15:22
  16:22 18:14,15
**cents**  69:20
**ceo**  6:25 83:6
**certain**  41:22
  138:19

**certify**  136:9,15
**cfilippelli**  3:11
**chain**  81:25
**challenge**  88:9
**challenged**  43:20
  45:11
**challenges**
  102:12
**change**  8:17,20
  8:24 9:11,19,25
  10:5 91:20
  134:5
**changed**  7:8
  8:13 45:18
**channels**  78:23
  80:17
**character**  50:10
  52:6,21
**characterizing**
  21:18
**charge**  9:17
**charges**  27:11
  29:21
**charging**  30:2
**chart**  102:22
  103:5,11,17
  111:23 113:2,6
  116:2,6,19,21,22
  116:22,24 118:7
  119:5,5,24 120:2
  121:15 138:10
**charts**  112:2
  121:12
**check**  46:6 62:3
  104:3
**checked**  55:22
**chief**  37:6
  101:20,23,25

**[chief - computer]**

102:3
**chiming**  9:8
**choose**  5:5 36:7
**christian**  25:19
  34:21 36:6 37:9
  65:12 134:15
  138:5
**christian's**  34:14
  38:4
**christina**  13:4
  14:16 23:21
  137:18
**cited**  22:13
**civil**  14:10 29:2
  50:14 51:7
**claimed**  50:4
  52:10
**claims**  75:2,16
  79:7
**clarify**  79:19
  103:15
**clarifying**  79:15
  118:5
**class**  16:8
**clean**  32:24
**clear**  38:2 46:7
  50:24 80:12
  111:15
**clearing**  11:4,5,7
  63:6 69:12
  82:10 105:22
**clearly**  21:3
  48:24 51:11
  69:24
**client**  18:16,18
  20:17,24 24:21
  28:7 34:7 35:24
  36:4 56:4 63:20

63:22,25 64:2
65:18 66:2,3,5
69:11,11,15,19
69:25 70:2,5,13
71:9 103:19
104:2 105:17,18
105:18 106:7,8
106:22,22,23,24
107:7,9,10,18,25
108:2,4,5,9,12
108:14,20,24
109:2,6,9,17,19
109:24,25 110:9
110:15,18 111:2
111:5,15,20
112:18 114:21
115:4,10,13,15
121:18,20 122:4
122:7,12,12,18
124:10,15,15
125:5,11 126:8
126:19,23
**client's**  125:3
**clients**  15:5,8,12
  15:16 17:16,19
  17:25 20:21,25
  21:3 67:16
  82:16 104:20
**closed**  9:22 17:2
  17:5,7 37:8
  40:20 41:23
  46:10 47:9 86:6
  94:5,18 97:11
  100:7,8
**cloud**  86:13 87:7
**clr**  1:21,24
**cocounsel**  2:13

**college**  54:17
**collie**  77:6 100:5
**come**  7:7 11:19
  20:12 38:13
  94:21 98:7
**comes**  114:8,10
  120:14 126:20
**coming**  39:7
  132:2
**commenced**
  44:15
**commentary**
  117:25
**commission**  8:7
  8:16 9:3,11,24
  11:20 12:18,24
  13:5 14:25
  15:21 16:20
  17:21 18:13,24
  19:4,22 20:6,12
  20:16 21:7,8,23
  24:19 29:16
  30:6 39:7 46:24
  47:21 49:13
  72:17 76:11
  83:11 86:2,9
  89:20 92:4
  93:25 94:10
  139:23
**commissions**
  120:18
**company**  9:22
  17:2 19:18,25
  30:13 37:10
  38:21,22 40:14
  42:11 43:5,14,19
  44:20 45:14,17
  46:5,10 48:6,24

50:18 54:14
57:4 83:13
87:20 89:10
90:10,11 100:4
101:9,10,17
102:10 105:22
133:9
**company's**  36:15
  37:11 44:16
  88:5
**comparison**  66:9
**complaint**  24:19
  48:4
**complaints**
  24:13,17 29:23
  29:25
**complete**  19:19
  22:2 65:19 66:6
**completely**
  16:10 82:12
  83:8
**completeness**
  32:12 33:5
**compliance**  9:6
  10:4 37:7 39:11
  39:18 40:4,9
  66:12 77:18,21
  77:21 78:10
  80:23 81:4
  85:18 95:13
  97:2,25 101:11
  102:2,3,4
**complied**  79:10
  80:6
**comply**  81:8
  91:2
**computer**  36:20
  55:3 58:23,25

59:5 123:7
computers 55:8
concealment
74:11
concept 1:10
56:14,21,22
58:12,14,19
60:15,24 61:7
65:4 75:10 77:3
127:17 128:18
138:12 139:5
concern 6:17
concert 61:6
conclusions
94:21
condoned 20:16
21:7
conduct 9:16
11:23 25:23
conducting 12:9
conference
26:14
confidential
137:13
confused 71:17
79:17
confusing 92:17
confusion 4:25
connect 59:6
connected 35:25
connection
12:22
consider 106:6
107:6
consolidated
120:25
consolidation
119:7,8

conspiracy
28:16
cont'd 3:2
containing 103:5
138:9
continue 71:24
93:20 119:20
continued 16:21
continuing 18:9
contradict 22:4
43:14
control 39:3,5,14
40:14 43:5,6,11
47:11 48:6 77:8
78:3,5,7 101:8
101:15,21
controlled 48:11
48:14 101:18
controller 43:12
controlling
57:19
conversation
30:17 94:22
95:3 103:17
conversational
117:23
conversations
33:24 34:2
convey 85:14
convicted 27:10
27:17,18,19 28:2
conviction 27:22
27:24,25,25
cooper 85:20
93:13 96:7
cooperation
88:15

coordinated
60:12,16
copied 91:9
92:25 93:3,8,10
93:12 94:7,15
133:10
copies 74:25
75:15 86:18
87:14,18 90:16
91:10,21 92:23
94:11,12
copy 22:20 37:7
83:10 85:23
86:3,5 91:19
93:13,16,25 95:6
96:9,10,13 99:7
99:20,23 135:9
copying 93:4
corp 1:3
corporate 35:23
correct 25:20
29:10,11 76:17
87:13 103:24
105:4,6,12
107:12,22 110:3
116:13 120:4
122:16
correspondence
15:2 37:4
counsel 2:2 3:2
10:8 25:4 40:2
40:21 76:8
88:19 101:10
count 63:6
112:19
counted 112:15
112:22

country 139:3
county 136:5
course 22:8,8
24:8,8 64:8
court 1:2,20 4:3
4:6 12:15 22:15
26:5,6,17 27:10
28:11,18,22
35:11 38:18
39:14,25 40:3,11
40:22,25 41:3,12
41:14,17 42:6,9
42:15 71:13,15
72:22 73:3,9,22
74:4,4 78:15
79:3 81:6 83:4
83:21 84:2,6,7
88:2 89:4,14
95:17 97:4,7,10
102:8
cover 14:15
15:18 107:2
137:17
cpas 25:16
created 120:22
crew 82:14
criminal 51:3
current 46:22
47:2,5
currently 29:16
custodian 10:25
11:11,16,17
custody 39:3,4
77:8 78:3 101:8
customer 60:8
60:12,16 61:20
62:25 63:2,4,5
63:11 91:17

122:23 130:9
132:5,23 134:7
**customer's**
132:20 133:24
**customers**  10:11
10:14,20,21
11:12 20:18
27:5 30:5 55:15
61:5,14 74:12
**cv**  1:5,12

**d**

**d**  15:10 133:8
137:2
**damages**  9:13
25:17 97:22
103:4 138:8
**dark**  120:10
**darville**  31:5
32:15 33:10,13
33:19,23 34:8
36:22 37:19
38:7 53:17,17,25
54:6,7,16 55:14
67:22 68:4 85:4
85:19,21 87:13
90:17,19 91:9,21
92:21 95:23
96:10 98:3,4,5,6
98:21 99:10
100:10,11
**darville's**  34:12
37:15
**das**  15:10 133:8
**data**  33:12 55:7
112:6 117:7
**date**  13:20 14:18
23:2 32:6 34:22

48:2 103:7
128:19,24 131:6
139:6
**dated**  13:10
14:17 137:19
**dates**  8:13 49:8
75:22
**dave**  90:8
**david**  2:5,8 28:4
71:21,23 103:18
**davidlopezesq**
2:9
**davis**  39:21,23
43:16 44:11
45:6 72:21
83:11 87:19,24
89:19,23,24
90:10,10 91:23
99:8
**day**  10:7 14:24
15:4 54:10,10,13
54:13 55:11,11
80:21 82:15
123:11 135:17
136:21 139:20
**days**  12:2,14
63:18 82:7
**de**  5:18,23
**deal**  39:19 77:18
**dealer**  10:9
**dealers**  124:13
**dealt**  39:18,19
**debatable**
124:18
**december**  85:3
89:15 91:9,12,22
92:22 93:20

**decided**  100:6
**decision**  28:18
28:21 43:4,4
**decreed**  42:15
**defamation**
27:16,20
**defendants**  1:8
1:14 3:4
**defended**  79:6
**defense**  101:3
**deficiencies**
18:11
**definitely**  16:17
25:11
**degree**  54:17
**delinquent**  19:15
**deliver**  122:22
**delivered**  72:16
83:10 84:25
87:14,18 91:10
93:25 94:9
**delivers**  115:12
**delivery**  115:15
135:11
**demonstrates**
18:10
**denied**  53:10
95:25
**dependent**  53:15
**depends**  59:2
**deposition**  1:18
84:9 104:22
110:21 118:2
130:19 136:11
136:13 139:6
**describe**  118:24
**described**  11:23
16:18 18:12

25:10 64:6,9
72:5 103:22
106:4 107:8
108:23 122:8
**describing**  6:10
23:25 124:22,23
134:3
**description**
15:24
**designed**  126:3,8
**desist**  16:23
**desk**  15:11
**destination**  59:8
**destroyed**  94:8
**details**  9:2 10:2
**determine**  32:16
33:20 77:23
**determined**
115:3
**determining**
65:10
**dialogue**  98:14
**diego**  5:18,23
**difference**  66:9
69:15 70:9,12
95:20 134:2
**different**  37:13
70:16 89:11,12
112:2 118:25
122:24 125:25
126:4 128:20
132:22
**direct**  36:14
37:11 42:10
104:15 130:19
**directing**  20:16
51:18

**direction** 36:7
**directions** 137:8
**directly** 15:5
  17:20 36:2
  81:16 118:19
  122:18
**director** 6:25
  13:5 40:12
  54:24 102:12
**directors** 40:13
  100:5 102:11
**disagree** 16:17
  18:3 24:7
**disagreement**
  24:9
**disbarred** 12:8
**discharge** 41:2
  41:13
**disclose** 50:5,13
  51:2 52:10,12
**disclosed** 50:18
  51:7
**discovered** 24:19
**discovery** 38:20
  41:20 91:2
  118:8
**discuss** 65:2
  71:21
**discussed** 8:21
  26:22 30:21
**discussing** 26:8
  112:4 131:13
**discussion** 14:20
**dismiss** 28:24
  29:4
**dismissed** 28:24
  29:5,9 51:3,5

**dispute** 124:19
**distracted** 42:20
**district** 1:2,2
  27:10,11 28:11
  29:17,19 38:18
  38:19 41:3,4,14
  41:15 84:2,3
  90:14
**ditty** 64:17
**diverting** 17:25
**document** 9:21
  14:9,14 22:23
  23:22 31:7,12,13
  32:3 34:19
  35:19 79:19
  95:9 103:2
  113:3 118:24
  119:4,13 121:15
  128:17,23 129:7
  130:15 131:5,19
  137:16,20,24
  138:3,6,11,13,16
**documents**
  12:15 22:25
  74:25 75:15
  78:19 81:5 93:9
  102:5 118:8,16
  118:18,18,25
  137:23
**doing** 18:8 20:8
  23:3 34:24
  40:11 46:14
  51:10 64:23,24
  67:14,17 93:8
  108:21
**doj** 29:11
**domain** 102:5,5

**domicile** 6:6,7
  6:14
**domiciliary** 6:3
**dorsett** 78:11,11
**double** 56:20
**download** 54:3
**downloading**
  84:23
**draft** 135:8
**drive** 72:15,16
**due** 48:4 51:9
**duly** 4:12 136:12
**dump** 24:21
**duties** 30:22
  54:12

**e**

**e** 4:11,11,18,18
  13:4 51:17
  78:12 86:25
  87:10 98:12
  100:15 129:12
  131:8,8,12,21,24
  133:5 136:2,2
  137:2
**earlier** 100:12
**early** 21:9 75:24
  79:11 82:13
  97:14
**easier** 113:8
**easily** 111:21
  126:8
**ect** 112:11
**edge** 2:6
**efforts** 16:22
**eight** 21:15
**either** 17:17 23:5
  25:22 26:16

27:8 30:8 32:14
  61:7 84:15
  88:23 104:7
  107:15 132:20
  133:18
**electronic** 59:14
  85:5 91:15
  93:17,19 94:7
**employed** 66:13
**employee** 54:8
  95:23 99:11,11
**employees** 40:20
  82:5 95:15,22
  96:23,24
**empty** 94:17
**enable** 15:5
**energy** 1:10
**engaged** 25:15
  32:11 33:4
**engaging** 24:20
**entered** 15:15
  22:14
**entire** 16:3
**entities** 20:5
**entity** 17:17 18:2
  48:13 51:9
  78:20 95:15
  101:19
**entries** 116:10
  122:14 125:8
**entry** 103:5
  114:24 115:22
  116:3 125:12
  138:9
**enumerating**
  76:14
**errata** 139:2

esq   2:8,17 3:8,9
essentially   30:3
  71:4 111:19
  126:11
establish   50:9
  52:4
established
  17:13
ethernet   104:16
event   97:12
eventual   22:13
eventually   12:5
  51:5
everybody   23:15
  24:10,11 46:13
  73:11 117:19
evidence   19:21
  29:6,13
exact   13:20
  29:20,24 34:2
  47:25 54:12
  62:14 69:23,24
exactly   9:2,20
  12:21 16:9,15
  17:4 30:20 34:2
  37:19,24 48:21
  49:7 52:7 53:8
  54:12 56:25
  65:14 88:22
  93:10 116:5
  120:14,16
examination
  4:22 103:8
  137:3
examined   4:13
example   61:15
  63:11 69:9 71:8
  71:9 78:6 81:10

91:16 103:19
107:23 108:19
109:21 111:4
115:7 116:18
121:3 123:2
131:12
examples   103:15
  131:10
excel   118:16
  130:25
exception   8:2
  23:24 24:4,5
  25:9
exchange   29:15
  76:10,12
exchanges   10:19
  10:19
excuse   20:11
  21:20
executed   113:5
  120:8 121:9
  123:9 126:12
executing   10:18
execution   122:22
  126:12
executions   127:6
executive   13:4
  101:25
exhibit   14:14,15
  22:16,23 32:3,4
  34:19,20 103:2
  119:21 128:16
  128:17,22
  129:13 130:4,22
  130:24 131:4
  137:15,16,17,20
  137:24,25 138:3
  138:4,6,11,13,15

138:19
exhibits   137:14
  138:18
exist   15:17
existed   74:21
existence   48:16
expected   15:17
expedited
  135:12
expert   25:16
  31:25 50:17
  53:22
experts   26:4,16
  27:9 30:9 31:2
  48:15 53:9,15,19
  60:7 67:19 72:6
  74:10
expired   16:21
  27:23 29:9
expires   139:23
explain   39:6
  71:12 79:8 80:4
  106:15 130:2
explainable
  111:22
explained   20:7
  37:5,16
explanation
  12:24 17:22,25
  64:11 124:10
expressed   53:15
expressly   31:2
extra   117:11
  129:3

**f**

f   34:20 136:2
  138:4

fabrication
  20:14
facilitate   20:5
facilities   14:24
  15:4,7
fact   9:15 19:13
  24:18 30:9,25
  32:14 34:10
  52:2 53:10
  54:15 55:18
  60:6 66:8 72:23
  73:19 85:2
  88:24 90:12
  99:7 125:7
factors   22:13
failed   76:9
false   28:7
far   27:2 89:16
  100:10
fashion   47:23
fault   19:17
favor   89:5
february   84:10
  104:22
federal   27:10
feel   44:2
figure   70:10,11
file   35:25 48:5
  50:16 68:11,12
  76:9 97:7,9
  112:6,22 120:22
  126:11 129:21
  130:3,11,20,20
  131:2,20 132:11
  132:15,25
  133:16
filed   12:15 14:10
  14:11 47:8

50:20 65:16,17
65:23 71:13,14
71:15 76:2,4,18
76:19,20
**files** 54:3 65:22
66:10 131:23
132:17
**filing** 31:9 51:10
76:13 77:2,7
**filings** 77:2 78:2
**filippelli** 3:9
**filled** 15:13
**filter** 36:4
**final** 26:5 33:17
44:8
**finally** 93:25
**financial** 19:3,14
19:24 20:4
**financials** 19:21
**find** 20:13 84:11
**finding** 88:24
**fine** 5:10 7:19
73:14
**fingertips** 25:5
**finish** 59:22 60:3
81:22
**finished** 91:25
**firm** 2:14 7:23
10:7 11:4 17:6
18:24 20:13
21:21 30:3 34:6
37:8 39:8,16,21
39:22,25 40:13
40:13,18,19,21
41:23,23 43:9,10
43:11,13 47:9,10
48:11 56:3 58:5
59:11 61:12,21

62:3 63:6,18,23
67:6,14,16 69:12
69:16 74:2
76:20 77:15
80:16,19,22 81:7
82:3,11 83:8
86:6 87:21
89:19 90:10
91:19 94:5,17
95:10,16,16,21
95:24 96:16,18
97:2,11 99:9,13
99:15 100:6,19
104:4 105:9,19
105:24 106:5,25
107:20,24 108:3
108:21,25 109:2
109:9,10 110:25
111:17,17
121:19 122:7,13
122:13,18,25
125:10 132:25
133:3
**firm's** 8:21,22
12:2 39:9,10
40:8 41:25
44:14 61:11
70:13,20 72:21
80:25 87:5,5,7
87:22 88:11,12
96:23 111:13,18
121:23
**firms** 11:5 16:7
**first** 6:13 12:22
20:19 22:24
23:17 30:14
32:4 34:20
36:13 45:9 62:3

79:19 84:22
88:11 98:23
102:19 104:3,7
104:11,19,20,21
106:18 108:6,23
112:2,14 113:11
119:9 120:2
121:17 131:9
137:21,24 138:4
**five** 12:2,13
30:19 46:14,17
46:19 71:22
82:7 85:6
102:19,20 112:2
127:25 128:5
129:3
**flag** 66:13
**flagged** 66:20
**flat** 108:16
**float** 56:23
**floor** 3:6
**florida** 29:17,19
46:23 48:16,22
**focus** 69:4
**focused** 67:24
**focusing** 68:16
68:19 82:16
**folder** 23:12
**follow** 101:12
135:3
**following** 72:13
**follows** 4:14
**foot** 82:21
**forced** 106:5
**ford** 3:5,8 4:10
28:4 32:22
34:23 35:9 41:5
42:17 43:24

44:10 46:9,13,18
47:14 64:22,25
68:18 69:2
73:15 74:14
79:14,21 80:14
81:18,21 84:4
91:4,7,24 99:15
99:17 101:4
117:13,15,22
119:16 127:21
128:3,25 129:23
130:14 131:25
132:6 135:4,7
**fordobrien.com**
3:10,11
**foreign** 124:12
124:24
**forensic** 21:12
53:20,22
**forever** 128:15
**forgive** 68:3
**form** 32:22 41:5
42:17 43:24
46:9 65:23
68:18 69:2
71:13 74:14
79:14 87:2 91:7
91:15,24 93:15
93:15 99:17
101:4
**format** 118:3,16
**former** 54:7
97:24 99:11
**forms** 65:22
**forth** 9:24 10:6
51:12,17 98:15
136:12

**four** 14:14
113:21 137:16
**fourth** 112:7
**front** 46:3 54:21
**frozen** 31:18
**fruitless** 73:2,6,7
**fulfill** 107:25
**full** 6:2
**fully** 60:4
**function** 77:15
**functions** 67:18
**funds** 17:16,20
18:2,16,18
**furnished**
137:10
**further** 14:8
124:9 136:15

**g**

**g** 4:11,11,18 32:4
76:22 137:25
**gained** 38:5
**gains** 15:18
**gallery** 5:18
**general** 27:5
**generally** 15:8
106:19
**generate** 53:24
**generated** 65:12
133:17,18
**gentile** 1:7,13,18
4:18,24 5:1,2,12
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1

25:1 26:1 27:1
28:1,10 29:1
30:1 31:1 32:1
33:1,14 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
46:22 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
81:21 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1

123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1,15 136:10
137:4 139:4,5,6
139:18
**gentile's** 87:19
**gentilli** 5:2
**gentle** 5:2
**getting** 80:20
82:4,16 101:14
104:13 117:17
117:24 121:19
**give** 14:4 21:23
23:7 32:2 38:7
44:25 45:5
61:14 62:5,9,25
71:8,9 78:6
85:23 94:24
96:2 97:22 98:2
98:6 99:23
110:6,14,18
116:18 124:9
**given** 53:16
67:20 73:25
85:4 103:19
117:2 118:15
136:14
**giving** 69:10
100:8 129:3
**gluck** 99:13
100:13
**gmail.com** 2:18
**go** 21:22 31:20
35:18 41:16

43:2 62:12
63:13,21 64:5,20
77:21 78:16
80:17,22 84:6
94:13 96:6 97:7
97:9 102:22
105:24 107:15
107:18 108:15
108:18,18 110:7
110:16 119:22
122:19,19,20
124:14 126:10
**goes** 41:25 62:17
64:19 108:11
109:3,13 115:11
**going** 14:2 22:19
23:18 28:8
31:24 34:10
46:18 48:8
51:22 67:15
71:5 78:23
86:12 87:10,12
95:10 100:8
108:7,8 119:12
121:19,23,25
122:2,17 127:23
128:14 129:9
**good** 35:7 46:16
50:9 52:6,21
64:18,20 102:21
102:24
**google** 30:12
**gotten** 12:15
16:16 86:3
117:23
**granted** 49:15
49:19 51:16

| | | | |
|---|---|---|---|
| **gross** 18:10 | **happening** 8:25 | **hide** 30:16 | **ib's** 116:22 |
| **grounds** 27:22 | **happens** 113:12 | **highest** 113:18 | **ibroker** 36:2,15 |
| **guess** 13:22 | 113:12,15 126:6 | **hired** 50:17 | 37:11 |
| 23:10,19 43:8 | **happy** 25:3 | 54:11 134:22 | **ibroker's** 36:16 |
| 134:25 | 92:19 | **hit** 104:24 | **identification** |
| **guide** 103:16 | **harassment** 28:9 | 112:19 | 14:8,18 23:2 |
| **guy** 1:7,13,18 | **hard** 72:15,16 | **hitting** 114:25 | 32:6 34:22 |
| 4:18 5:12 33:14 | 128:4 | **hmm** 67:2 | 103:6 128:19,24 |
| 55:2 128:3,5 | **head** 56:2,18,23 | **hold** 6:20 54:22 | 131:5 |
| 135:15 136:10 | 65:8 77:14 | 86:7 98:4 | **identified** 35:22 |
| 137:4 139:4,5,6 | 102:4 | 119:23 124:3 | 64:7 |
| 139:18 | **heading** 130:6 | **holdings** 1:3 | **identify** 69:14 |
| **guys** 71:13,14,17 | **hear** 23:5 31:15 | **holland** 99:13 | **ii** 32:10 33:3 |
| 84:12,14 | 49:25 59:24 | **home** 4:20 | **immediately** |
| | 73:12,13,15 | **hoping** 118:21 | 15:22 18:14,15 |
| **h** | 119:19 128:12 | **hospital** 128:8 | 48:25 72:13 |
| **half** 47:18 | 132:8 | **hosted** 86:22,23 | **imposed** 83:25 |
| **hand** 39:13 | **heard** 100:13 | 87:4 | **inability** 17:23 |
| 51:21 82:25 | **hedge** 111:3,10 | **hosting** 86:24 | 52:4 |
| 83:2 136:21 | 111:12 | 87:3 | **include** 86:17 |
| **handed** 84:25 | **hedged** 111:8 | **hum** 106:10 | **included** 9:17 |
| **handing** 84:23 | **hedges** 110:25 | 110:5 113:10 | 52:4 68:6 |
| **handle** 77:14 | 111:17 | 114:4,12 125:13 | **indicate** 36:3 |
| **handled** 9:4,6 | **hedging** 110:21 | 127:18 | **individual** 70:25 |
| 77:6,7 | **heightened** | **hundred** 51:4 | **inform** 25:22 |
| **hands** 13:21 | 39:11 | **hunt** 96:6 | 26:4,16 27:8 |
| 38:9 90:15 | **held** 1:18 7:4 | | 30:8 48:15 53:9 |
| **happen** 29:7 | 15:6 | **i** | **information** |
| 89:13 99:25 | **hello** 73:11 | **ib** 62:11 68:11 | 32:12 33:6,8,11 |
| 109:22 114:17 | **help** 97:20 | 84:22 100:19 | 33:16 34:9 54:9 |
| 121:21 125:11 | 103:16 118:21 | 114:6,8 115:11 | 54:18 78:22 |
| **happened** 10:5 | **helpful** 118:23 | 116:19,23 117:3 | 118:12 137:7 |
| 13:15,19 16:25 | **hereinbefore** | 117:5,12 118:16 | **initial** 12:23 84:9 |
| 20:20 40:6,15 | 136:11 | 119:4,6,6 120:3 | 110:20 111:4 |
| 52:24 83:9 | **hereunto** 136:21 | 120:7 121:3 | 112:6,6 119:24 |
| 94:14 97:16 | **hey** 40:9 96:7 | 122:2 124:11,14 | **initially** 8:11 |
| 120:12 126:10 | 97:25 120:9 | 126:14 133:18 | 12:13 43:18 |
| | | | 73:25 89:18 |

97:20 106:4
117:2 118:13
**initiate** 83:20
**initiated** 68:10
69:15,16,25
70:13 106:7
107:7,9,18,20
108:2,5,12,20
109:17,19 110:9
111:13,15 123:8
123:8
**initiating** 111:20
**injunction** 12:16
16:11,14,21 17:3
**inquest** 9:13
97:21
**inspection** 25:3
35:24
**instance** 78:8
108:6
**instructed** 40:2
76:24 85:19
92:23
**instructing** 84:6
**instruction**
59:24
**instructions**
32:16 33:20
53:16 85:3,15,16
**interact** 55:14
**interactive** 11:6
68:2,3,7 81:11
81:15,16 82:9
104:7,25 105:9
105:11 109:3,14
109:21 112:3,21
115:25 118:17
118:19 123:2,15

123:17,25
129:11 130:17
131:14,23
**interested**
136:18
**interject** 127:21
131:25
**interjecting**
43:25
**internal** 68:8
112:17
**international** 1:7
1:14 8:14 49:4
52:2 67:24
84:17
**internet** 55:9
59:7,9
**interrupted**
81:24
**intervene** 117:13
**introduce** 13:23
14:3 119:13,20
**introduced**
130:5
**introducing**
131:18
**inventory** 10:21
10:23,24 11:2
61:13 62:20
63:6 64:3,4
99:22 108:16
109:10 110:2,7
110:11,17
**involved** 39:10
77:25
**involving** 24:21
**issue** 55:17

**issued** 8:23
**issues** 19:10
38:10 95:11

**j**

**j** 3:9
**jersey** 27:11
28:12 50:6
**job** 1:25 67:17
84:14
**joint** 74:9 89:21
89:22
**journal** 114:23
115:22 116:3,9
116:10 122:14
125:7,12
**juan** 1:19 4:21
5:14,19
**judge** 4:24 5:6
29:3
**judgment** 76:16
103:5 138:9
**june** 6:18,22
56:14
**jurisdiction**
101:13

**k**

**keep** 79:22
105:21 123:4
**kensington**
45:18,20,21
87:15 89:19
91:11,23
**kind** 71:2 81:24
**knew** 18:6 19:6
19:12,22 21:16
51:10,11

**knight** 99:13
**know** 6:5 9:21
10:2,3,5 14:6
16:8,15 18:20
19:3 20:6,10,21
20:25 21:3,12,14
24:11,23 25:14
28:6 29:24
30:10,18 31:6
33:23 34:8,10
36:25 37:17,19
37:22 38:9,10
39:6,12,15,20
40:18 44:15,18
44:21,21,24
51:18,19 53:21
53:23 54:9,20
55:10,18,19,23
56:2,10,18,22
57:11,15,20,21
60:9 61:5 65:4,7
65:8 66:6,8,17
66:17,25 67:3,4
68:13,14 70:8,14
70:22 71:10,11
71:19 72:7,15
77:11 78:24
82:6,8,24 83:9
84:21 86:2 87:9
87:9 88:21,22,23
89:3 90:18,21
91:14 93:5,7,10
93:22,23 94:2,16
94:22 95:19,22
96:4,8 98:14,17
99:18 100:11,13
104:2 108:7
111:18 117:4,10

117:15,22
118:11 122:25
122:25 123:7
129:17,25
130:10,11,16
131:15 132:11
132:15,17,21,24
133:2 134:12
**knowledge** 30:12

**l**

**l** 4:11,18 13:4,4
**landy** 3:5
**language** 75:4
**late** 75:24,25
76:2,4,13 79:11
92:22 97:14,16
**law** 2:5,14 39:21
39:22 44:21
45:19,20,21
87:15 90:10
91:11 95:16,24
97:2 99:9
**laws** 78:21 81:13
101:12
**lawsuit** 52:10
76:19,19 77:20
**lawyer** 43:23
117:24
**lawyers** 43:7
45:13 89:2,2
**learn** 36:22,24
**leaving** 116:6
**left** 18:22 82:14
82:18 106:24
114:9
**legal** 39:19 45:9
82:24 95:16

101:10 124:17
139:2
**legitimate** 38:20
**lehrburger** 4:24
**letter** 13:2,3,7,9
13:13,20 14:16
16:5 17:13
20:10,11 21:2,25
22:2 49:20,21
137:18
**letters** 90:13
134:6,9
**level** 28:22 63:6
**liability** 76:16
**license** 9:16
11:22 12:19
17:9 39:9 49:4
49:16,19 51:16
52:2 53:11
**licensed** 8:2,3
95:20
**licenses** 25:23
**lie** 21:2
**lifted** 18:21
**likes** 5:10
**limitations** 27:23
28:25 29:3,10
**line** 28:5 33:3
104:16 113:23
114:7 120:2,3
139:7
**lines** 98:10
113:21
**linkages** 55:3
**liquidating**
95:12
**liquidation**
22:14 26:6,17,23

26:25 27:3
43:20,22 44:6,9
44:13,14,23
45:11 83:14
88:10 89:14,15
96:17
**liquidator** 86:11
88:7 89:22
90:22 96:15,22
**liquidators** 42:4
42:5,7,10 48:7
72:12,18,25
73:21,21 74:8,10
79:2 88:14 89:5
90:15 99:12,12
**listed** 105:3
**litigation** 50:19
51:8 83:3
**litigations** 50:14
83:4
**little** 82:21
117:17
**liu** 133:7
**living** 6:2
**llp** 3:5
**location** 130:20
**lockstep** 67:9
**lodge** 29:21
99:20
**lodged** 99:7
**log** 126:11
**logged** 55:21
**logic** 61:25 62:7
62:8
**logical** 69:13
**long** 49:20 62:4
63:4,8,11,21,23
69:11 98:17,19

104:4,5 105:18
105:18 106:22
106:23 108:17
111:5,6 128:16
**longer** 43:12
48:11,12 65:24
95:23 96:23
**look** 37:3,15,24
69:18 111:23
113:2,5,5 116:19
120:16,22
126:24 133:16
**looked** 36:8
37:10 54:2,2
133:12
**looking** 21:20
38:13 67:15
115:25 116:7
118:6
**looks** 112:25
116:8 132:13,16
133:17
**lopez** 2:5,8 4:9
4:23 31:15
32:21 35:6
42:21 44:2,7
46:15,20 59:23
60:3,5 64:24
73:11 74:17
80:2,8 91:25
92:8,14 135:6
137:4
**lose** 83:14
**lost** 43:5,6,13
69:3 81:24 92:7
109:5,5
**lot** 24:17 117:24

**[loving - mischaracterizing]**                                                 Page 16

| | | | |
|---|---|---|---|
| **loving** 28:4 | 105:2,10,25 | 119:18 122:20 | 45:8,22,23 46:8 |
| **m** | 107:16,19 | 123:5 124:18 | 46:11,12 54:8 |
| **madison** 3:6 | 108:12,15 110:7 | 127:12 128:25 | 57:24 58:3,4,9 |
| **mail** 78:12 86:25 | 110:8 112:16,19 | 130:10 133:12 | 58:13,19 65:16 |
| 87:10 98:12 | 114:18 116:4,13 | 134:19 | 66:13 73:20 |
| 129:12 131:8,8 | 121:25 122:8,15 | **meaning** 24:5 | 75:20 77:9 78:5 |
| 131:12,21,24 | 122:20,20,21 | 30:4 70:5 | 78:9 80:6 85:6 |
| 133:5 | 123:6 125:11,18 | **meaningless** | 92:24 97:14 |
| **mailed** 100:15 | 126:13 | 17:8 78:14 | 112:18 115:4 |
| **mails** 51:17 | **markets** 10:14 | **means** 6:5 65:9 | 123:20,20,22 |
| **maintain** 37:7 | **marriage** 136:17 | 121:17 | 124:6,11,13,21 |
| 85:4,10 86:5 | **master** 35:25 | **meant** 113:20 | 131:23 133:23 |
| 96:10,13 | **matt** 135:3 | 123:19,20 | 134:12 139:5,5 |
| **maintained** 55:7 | **matter** 136:19 | **mechanically** | **mintbroker's** |
| **maintenance** | **matthew** 3:8 | 58:22 | 11:2,12 15:24 |
| 86:17 | **mbs** 56:4 70:7 | **meeting** 21:13 | 25:23 33:21 |
| **making** 88:15 | 113:8 114:15 | 21:24 | 58:11 59:11 |
| **manage** 55:5 | 116:7 123:12,14 | **memory** 57:10 | 68:5 74:12 78:3 |
| **managed** 55:6 | 123:17,18 | **mentioned** 49:2 | 90:16 91:11 |
| **management** | 133:20,22 134:2 | 100:14 128:3 | 97:18 98:24 |
| 54:18 67:14 | 134:11 | **met** 20:6 26:10 | 133:24 |
| **managing** 39:16 | **mbs10010067** | 26:11 57:18 | **minute** 46:14,17 |
| 61:12 | 126:22 | **mford** 3:10 | 46:19 71:22 |
| **manipulating** | **mbs10067** 55:20 | **miami** 47:6 | 102:19,20 129:4 |
| 28:12 | 55:24 131:21 | **michael** 7:6 | **minutes** 34:25 |
| **manipulation** | **mean** 5:20 6:6,8 | 45:17 | 35:13 127:25 |
| 27:12 | 7:17,25 10:13,15 | **mid** 40:19 | 128:6 129:4 |
| **manner** 15:19 | 10:16 11:3,25 | **middle** 119:17 | 132:3 |
| **mark** 92:2 | 13:6 16:15 | **miller** 7:6 45:17 | **miriam** 2:14,17 |
| **marked** 14:17 | 20:10 29:2,23 | **million** 57:4 | 31:15 71:14 |
| 22:25 32:5 | 30:11 38:21 | **mineola** 139:3 | 78:24 119:16 |
| 34:21 103:6 | 43:3 51:6 56:6 | **mintbroker** 1:7 | **miriamtauberl...** |
| 128:18,23 131:5 | 57:8 66:4 68:2 | 1:13 7:9,16,18 | 2:18 |
| **market** 10:17 | 71:11 75:25 | 7:22 8:5,14 9:16 | **mischaracteriz...** |
| 15:6,6,13,16,17 | 76:22 86:20 | 10:10 11:22 | 64:10 |
| 28:15 62:6,19 | 89:7 91:13,14 | 16:22 18:15 | **mischaracteriz...** |
| 63:13,14,20 | 92:6 101:6,17 | 24:20 26:7,17 | 20:20 |
| | 111:14 114:23 | 30:4 32:18 45:7 | |

**misunderstood**
64:10
**mo** 80:2 91:4
**moment** 14:3
17:11 22:21
23:7
**monday** 135:12
**money** 20:21,23
20:24 21:4
24:10,12,14,16
82:17
**monies** 20:17
**month** 82:4 94:4
98:20
**months** 12:20
30:19,19 82:20
**moral** 50:9 52:6
52:21
**motion** 28:24
31:10 103:4
138:8
**motions** 137:12
**move** 91:4
**moving** 80:18
82:3
**ms010067** 66:14
**multiple** 83:2
**muted** 23:5

**n**

**n** 4:11,18 137:2
**name** 4:16 5:2
5:11 7:8,11 8:16
8:20,24 9:11,19
9:24 10:5 11:10
17:24 45:18
48:24 56:6
78:10 90:3,9

100:14 130:9
132:5,21,23
139:4,6
**names** 8:9,10
45:16
**nanosecond**
62:16
**nassau** 5:24
**native** 118:15
**nature** 45:13
55:8
**necessarily**
59:14
**need** 35:2,9
38:13,16 53:21
76:25 77:23
79:23 98:6
102:18 121:16
**needed** 38:15
48:3 100:6
**needs** 16:7 35:2
**negotiations**
73:2,8
**never** 5:25 16:2
22:3 27:16,19,24
28:2,23 29:12
85:10 86:4
91:18 97:18
100:14,15,15
123:25
**new** 1:2,10,22
2:7,16,16 3:7,7
27:11 28:12
38:19 41:4,15
50:6 56:13,21,22
58:12,13,19
60:15,24 61:3,7
65:4 75:10 77:3

84:3 90:14 93:5
99:14 100:18
113:3 120:22
121:15 127:17
128:18 130:21
136:3,5,8 138:11
139:3,5
**noise** 123:13
**nonexistent**
19:21
**normally** 80:17
**notary** 1:22 4:13
135:20 136:7
139:23
**noted** 135:13
**notified** 10:4
48:2
**notify** 8:15
**notifying** 20:17
**november** 40:19
80:10 82:13
**number** 14:9,9
29:5 37:18
38:11 39:9 62:7
62:8 66:14
113:2 116:19,21
116:25 119:5,5
120:2,19 121:15
125:22,25 126:4
126:5 127:8,14
127:16 130:18
133:21
**numbered** 14:22
35:21
**numbers** 30:22
30:24 34:5,6,7,7
36:2,3 55:25
56:3,4,5 67:4,5,7

120:5,6 134:3
138:19
**numeral** 32:10
**ny5527762** 1:25

**o**

**o** 13:4
**o'brien** 3:5
**o'clock** 129:2
**objecting** 32:22
**objection** 41:5
42:17 43:24
46:9 50:23
68:18 69:2
74:14 79:14
84:4 91:7,24
99:17 101:4
**objections** 4:7
**obligation** 38:17
41:2 48:10
83:25,25 84:18
100:25 101:6,7
**obligations**
41:13
**observe** 67:8
**obtain** 9:10
17:23 42:10
**obtained** 9:18
37:25 84:16
**obviously** 19:11
20:25 39:10
44:5 48:5 51:4
53:24 117:10
**occasions** 83:3
**october** 1:16
40:19 79:20
80:9,11 82:13
95:8 136:22

139:6
**offer** 10:10
**office** 13:8 15:11
  19:8 40:20 55:7
  82:22 83:9 87:5
  87:7 94:17
  97:25
**officer** 9:6 10:4
  37:7 54:23
  77:18 78:10
  81:4 85:18
  95:14 101:20,24
  101:25 102:4
**officers** 66:12
  101:11
**offices** 2:5 6:19
**official** 89:14,15
**offset** 70:2
**offsetting** 70:4,5
  108:13
**oh** 23:8 90:9
  114:2 123:19
**okay** 5:11 7:21
  14:5 22:21
  23:14 25:6
  31:11,19 35:15
  35:18 44:10
  46:13,20 49:3
  52:14 73:12
  75:11 79:21
  81:17 84:8
  92:13 94:25
  98:11 102:21,24
  104:10 105:13
  106:2 107:21
  108:22 109:4,8
  110:10,20 113:7
  115:14,19,23

116:5,11,23
  119:4,6 121:4
  122:6 126:16,22
  127:15,19,24
  129:6 130:12
  131:9 133:15,20
  134:18,24
**old** 64:17 139:3
**omnibus** 124:23
  131:4 138:15
**once** 42:2 44:23
  46:10 72:21
  74:2 86:5,5
  114:13
**ones** 20:22 48:7
  50:21 115:2,3
**online** 7:23
  10:12 14:23
  15:4,9 16:6 82:8
  82:9 86:25
**operated** 7:14
  21:14
**operating** 18:22
  21:16 74:9
  101:20,23
**operation** 18:11
  82:13
**operational**
  17:22
**opinions** 53:14
**oppenheimer**
  11:9
**opposite** 22:2
**option** 131:17
**order** 1:20 22:14
  26:5 39:14,25
  40:3,11,22 42:6
  42:8 44:6 61:22

61:25 62:2 70:5
  70:6,6,13,13
  78:15 81:6 83:4
  84:6,7 89:6
  95:17 97:4,7,10
  102:8 105:21
  107:2,17,24,25
  108:13 112:24
  113:13,15
  115:10 116:17
  120:20 122:21
  126:9 135:9
**ordered** 26:18
  26:23 27:4
  43:23 72:22
  74:5 89:15 90:2
**orders** 15:8,12
  15:14 61:13
  62:18 68:10
  70:24 120:7
  123:4 131:10
**original** 90:16
  91:14,15,17,18
  94:13 104:22
  119:13 129:21
  135:10
**originals** 91:8
  94:14 118:9
**outcome** 136:18
**outside** 101:11
**outstanding**
  56:21,24
**override** 40:4
  102:2,9
**overturn** 88:2,5
**owned** 48:13
  55:19,22,23 57:3

**owner** 7:2 61:9
  70:17 124:16
**owners** 60:7
  68:15

**p**

**p.m.** 135:13
**p.o.** 2:6
**page** 14:14,16,22
  22:23,24 30:14
  32:3 34:15,19,20
  35:19,20 103:2
  128:17,22 137:3
  137:16,18,20,21
  137:24 138:3,4,6
  138:11,13 139:7
**paged** 32:4
  137:25
**pages** 14:15
  137:17
**paid** 45:8,11,21
  45:23 46:4,11
**paragraph** 14:22
  17:12 18:9
  34:15 35:21
  36:13
**pardon** 47:4
**parenthetically**
  14:24
**park** 2:15
**part** 5:25 28:16
  43:10 87:8
  98:10 111:9,10
  114:16,19,20
  115:14 130:24
**particular**
  114:24

| | | | |
|---|---|---|---|
| **parties** 4:2 136:16 | **philip** 78:11,11 | **pled** 76:9 | **premise** 15:7 |
| **party** 4:8 133:19 | **phone** 26:14 55:6 98:16 | **plus** 119:8 | **preparation** 77:10 |
| **pass** 62:17 | **phonetic** 5:3 90:8 | **poetry** 64:23,24 | **prepared** 102:23 118:7 |
| **pause** 35:5 92:6 | **phonetically** 90:7 | **point** 12:17 16:4 18:18,20,22,23 | **preserve** 100:25 |
| **pay** 46:4 | **physically** 60:19 60:23 | 39:11 41:23 43:5 69:20 74:2 | **press** 59:3,4 |
| **paying** 45:6 46:7 | **pin** 44:3 | 83:15 89:21 96:9 97:10 | **pretty** 20:2 80:21 95:2 |
| **penny** 27:12 28:13 | **pinpoint** 79:24 | 107:15 120:21 120:24 134:5 | **previously** 27:9 |
| **people** 24:14,15 50:20 80:20,22 95:14,21 99:22 100:17 | **place** 53:3 59:12 112:16 | **pointing** 35:11 | **price** 62:6 63:20 69:23 70:5,7 108:12 119:11 120:13 122:4 |
| **people's** 67:17 | **placed** 15:9 112:25 123:12 123:14 | **points** 23:18 | **primarily** 10:15 |
| **percent** 7:3 51:4 | **places** 126:9 | **ponzi** 15:20 24:2 24:9 25:10,11 39:8 64:7,15 68:16,19 72:5,10 74:13,20,20 | **principal** 57:11 |
| **period** 57:6 65:6 79:16 | **placing** 59:15 | | **print** 115:20 |
| **permanent** 12:5 | **plaintiff** 1:4,10 | **pop** 31:21 | **prior** 5:22,22 8:16 9:10,18 80:3 82:4 94:4 |
| **permanently** 12:8,19 | **plaintiffs** 2:4,13 74:23 75:13 76:8 79:9 80:4 95:4 97:9 103:3 138:7 | **portion** 43:11 | **prison** 64:19,21 |
| **permission** 8:20 9:10,19 41:2,12 41:18 | | **position** 15:6 54:22 83:16 102:9 105:21 107:3 111:18 | **probably** 17:2 20:2 49:10 53:7 54:5 98:18 |
| **person** 38:14 39:14 52:6 54:11 57:16,18 67:13 90:4,5 131:10 133:6 | **platform** 15:9 36:15,17 37:12 59:11 61:23,23 61:24 | **positions** 6:19 15:16 | **problem** 20:9 21:10,18 131:13 |
| | **played** 51:15 | **possession** 38:25 74:3 101:8 | **proceeded** 76:16 |
| **personal** 43:16 134:16 | **plaza** 5:18 | **possible** 26:9 128:10 | **proceeding** 28:11,19 45:10 45:10 47:25 50:5 73:3,9,22 74:4 |
| **personally** 46:5 48:12 57:23 88:18 | **please** 4:17 9:9 32:21 40:9 41:6 41:8 42:18,21 48:19 59:21 61:19 74:15,17 79:8 80:3,4 92:8 94:24 97:20,22 98:2 101:5 | **powers** 43:13 | **proceedings** 46:23 47:2,5,21 48:16,22 87:25 |
| **pest** 129:2 | | **practice** 15:20 16:23 18:12 | **proceeds** 120:16 |
| **petition** 22:25 137:22 | | **preceding** 85:6 | **process** 50:15 52:13 80:19 |
| **pfs** 56:4 70:7 134:3,10 | | **preference** 5:3 | |
| | | **preliminary** 16:13,21 17:3 | |

100:7

**produce** 22:20
74:24 75:14

**produced** 77:23
77:24 130:17

**producing** 80:15
95:6

**production**
118:11 129:11

**profit** 98:8,9

**prohibit** 78:21

**promotion** 28:15

**pronounce** 4:25

**proper** 78:23

**proprietary**
67:10

**prosecution**
101:3

**protection** 27:4

**provide** 22:3
25:16 33:8,19
38:24 39:23
40:2,9 41:19
67:22 81:17
84:18,19 86:21
101:7 131:10

**provided** 32:13
32:15 33:6,11,13
33:24 34:9,11
47:16 68:5
84:20 86:17,19
86:20 89:24
90:21 98:13
102:6,8

**provider** 86:14

**provisional** 44:6
72:12 74:8
83:13 86:10

88:7,10 89:21
90:22 96:14,17
96:22

**public** 1:22 4:13
27:5 30:12
135:20 136:8
139:23

**publicly** 105:3

**puerto** 1:20 4:21
5:14 6:13 49:13
50:18 61:3 93:5

**pull** 31:13 34:16
37:23 38:2
49:22 59:3
65:13 71:18
119:7

**pump** 24:21

**purchase** 105:20

**purchased** 56:13
69:19 109:21
116:4

**purely** 29:8

**purported** 15:11
17:14

**purpose** 17:15
30:21 74:11
96:11 116:14

**purposes** 6:7
19:2 70:22,23
121:24

**pursuant** 1:20

**put** 22:17,18
50:22 51:2
66:10 77:13
83:13 84:13

**putting** 86:10
115:24

## q

**question** 25:7
35:16 41:9,10
42:19,22 44:19
48:18 51:24,25
52:15 56:17
59:22 60:3
64:23,25 70:14
73:16,18 79:22
80:3 91:5,20
92:2,7,9,11,17
92:18 94:14
99:18 101:5
119:17 124:4
131:16 132:6
133:25

**questioning** 28:5

**questions** 9:14
44:5 54:4 79:23
102:17 117:18
118:3 129:24
135:5

**quick** 128:12

**quickbooks** 71:4
71:5,6

**quickly** 127:24
128:9

**quite** 38:2 69:16

**quote** 27:4

**quotes** 17:14
33:4

## r

**r** 13:4 136:2

**raided** 19:8

**raise** 35:4

**reach** 62:19,20

**read** 17:12 32:21
35:17 36:10
42:21,25 69:6,8
74:17,18 92:8,12
92:15 124:5

**reading** 14:21
23:9 32:23

**ready** 129:8

**real** 80:19 82:3
126:12

**really** 9:12 35:10
51:23 91:18
120:19 125:21
128:11,16

**reason** 49:18
52:3 53:20
96:24 131:18

**reasons** 12:25
26:22 29:5
49:24

**recall** 8:19,25
26:2,21 27:3
48:25

**receive** 12:23
22:10 40:24
54:4 61:25

**received** 8:20
17:21 19:6
72:20 88:12
98:15

**receiving** 17:16

**recess** 31:22
46:21 72:3
102:25

**recited** 99:22

**recognize** 83:24

**recollection**
13:12 34:4

**reconcile** 118:20
119:2 125:6
**record** 4:16
14:19,20,22
35:17 56:17
65:3,20 66:6
68:21 69:8
71:23 74:18
76:5,7 79:12
92:12,15 95:18
112:21 117:21
118:6 124:5
135:6 136:13
**recorded** 15:14
**recordkeeping**
70:22
**records** 37:8,10
38:14,25 39:13
39:17,24 40:3,8
40:10,23 41:18
41:19,24 42:3,11
42:14 45:2 46:3
51:12 53:22
57:9,14 65:11
67:19,21,23 68:4
68:6 72:4,11,19
72:20,24 73:19
73:25 74:6,7
75:20 77:9,13,15
77:19,23 78:4,9
79:4,10 80:5,15
81:9,11,15,18
82:5,23,25 83:2
83:5,10,17,22
84:11,13,16,19
84:20,23 85:5,11
85:12 86:7,18,20
86:21,23,24 87:4

87:14 88:12,15
89:9,16,17,23
90:14,17,20
92:24 93:9,16,19
93:21,23 94:3,4
94:7,20,24 95:5
95:25 96:5,19,20
96:25 97:3,13,19
97:23 98:2,7,14
98:16,24 99:8,21
99:24 100:9,11
100:12,18,20,21
101:2,7,14,18,22
123:10
**refer** 130:8
**referring** 19:20
72:8,8 90:4,6
103:12 118:17
**refers** 33:9
129:17 132:5,18
**reflect** 57:9
**reflected** 104:25
106:20 126:18
**reflective** 126:17
**refresh** 13:11
**refusal** 52:4 53:2
**refused** 52:3
53:6 83:2
**regarding** 48:22
51:13
**registered** 8:12
30:6
**registration**
11:21
**regulated** 17:17
48:12 78:20
95:15,21 101:19
102:11

**regulator** 38:12
77:20
**regulatory** 8:6
**related** 1:9 15:25
51:4 55:9
131:15,17
136:16
**relating** 74:25
75:15
**release** 41:18
42:3,5 81:5,9
**released** 42:6
78:22 95:18
**releasing** 40:22
**relevancy** 9:14
**relevant** 9:13
57:2 74:25
75:15
**reliable** 65:24
**relied** 10:7 53:23
65:21
**rely** 15:18 121:7
121:11,13,14
**relying** 36:6
**remember** 8:12
8:18,25 9:20,23
9:25 10:3,3
11:10 12:21
13:7,13,20 16:9
17:4 18:20
22:18 24:23
26:8,19,24 27:6
30:10,17,20
31:12 33:25
37:6 42:23
47:25 48:21
49:7,21,23,25
50:11,24 52:7,9

52:11,17,19,21
52:25 53:8,12
54:12 55:25
56:10,25 57:8
60:21 61:4
66:22 67:7 74:4
76:6 77:13
79:12 80:13
81:23 84:22
85:22 98:9,19
100:4,16,21
103:20 110:22
127:11,12,13
133:14 134:10
**remind** 48:19
**remove** 88:6
**removed** 12:16
16:12,16
**repeat** 13:17
26:15 42:19
106:11 108:8
**repeated** 106:5
**rephrase** 73:17
**reply** 103:3
138:6
**report** 32:5
34:14,21 48:10
53:24 54:2
98:18 138:2,5
**reported** 1:23
46:24 47:10
127:17
**reporter** 4:2,3,6
4:15 9:7 13:16
31:20 35:11
42:24 59:21,25
60:2 64:20
68:23 69:5 73:5

73:13 92:10,13 104:12,17 124:3 130:21,25
**reporting** 76:12
**reports** 25:3 31:2,24 32:8,13 33:7,18 51:19 53:19
**representation** 45:7,9,22 46:8
**representations** 31:4
**represented** 43:18,19,21
**representing** 43:9,10 44:19,23 46:5
**request** 22:6 78:18 79:9,20 80:5,24 82:5 83:20 88:14 95:9,13
**requested** 101:2
**requests** 38:20 41:20 76:6,7 77:19 79:13,16 91:2 137:7,11
**required** 9:18 79:25 102:11
**requirement** 50:13,25 52:12 52:20
**requirements** 50:8,12
**requiring** 26:6
**reside** 5:13,17,23
**residency** 6:12

**resigned** 44:16
**resigning** 82:6
**resolution** 8:24
**respond** 38:19 48:8
**responded** 75:18
**response** 16:4 41:20 48:4
**responses** 79:25
**responsibilities** 54:10
**responsibility** 39:16 90:24,25
**responsive** 51:24
**rest** 36:10 74:5 123:12 127:5
**restroom** 102:18
**resume** 54:21
**retail** 10:10
**rico** 1:20 4:21 5:14 6:14 49:14 50:18 61:3 93:5
**right** 11:4 13:10 13:24 21:24 23:4 25:15 26:13,15 27:16 29:23 30:14,22 33:12 40:21 46:3 47:12 51:23 52:18 58:21 62:6,17 63:9,21 64:14 69:11,20 71:4,7 71:11 72:23 76:4,8,23 78:25 80:2,14 82:8 83:18 90:6 91:17,20 92:20

95:7 101:12 102:16 104:9 105:11,15,22 106:9 107:5,6,9 107:13,15 108:25 109:4,11 109:14 110:4,15 111:3 112:24 113:8,9 114:7,16 114:18,22 115:8 116:2,6,24 117:3 118:10,22 120:3 120:15 121:17 123:3,14,16,18 124:18,23 125:4 125:4,12,15,19 125:20 126:5,15 127:4 128:8 133:11
**risk** 67:14 111:19
**rjl** 1:6,12
**road** 2:6 139:3
**rogatory** 90:13
**role** 51:15 55:12
**rolle** 13:4 14:16 15:25 23:21 64:7 72:5 137:19
**rolle's** 23:25
**roman** 32:9
**room** 4:6
**rough** 135:8,11
**roughly** 56:20
**routed** 15:10 62:11 104:6 105:9 125:18,18

**router** 62:2 70:23
**routes** 115:10
**routing** 61:13 115:8,9
**rq** 25:2
**rule** 29:25 89:5
**rules** 39:12 81:8
**rulings** 137:9
**running** 25:10

**s**

**s** 15:10 133:8 134:13
**san** 1:19 4:21 5:14,19
**sasl** 14:25 15:11 15:14 17:13,16 17:20
**sasl's** 14:23 15:3 15:8,18 17:19,23 18:11
**sat** 36:19
**satisfaction** 52:5
**satisfactory** 17:21
**saw** 33:17 55:2
**saying** 12:12,19 20:15 21:8 27:6 37:9 40:21 52:11 57:3,3 65:18 75:23 76:18 78:12 95:8 99:25 104:18 106:19 106:21 114:17 119:19,20 120:9 121:18 124:8

125:4,6
**says** 22:2 31:8
31:14 33:12,12
35:19 52:23
53:18 71:9
87:17 91:9
93:11,13,24
106:8 108:9
112:11 113:8,24
118:10 129:14
130:5,6 131:10
131:22 132:19
133:6
**scenario** 62:24
62:25 104:8,23
105:17 106:13
106:15 109:6
**scenarios** 62:22
103:21
**schedule** 65:15
76:11
**schedules** 76:25
77:10
**scheme** 15:20
24:2,10,21 25:10
25:12 39:8 64:7
64:16 72:6,10
74:13,20,20
**scope** 32:10 33:3
**screen** 22:21
23:13 31:17
32:2 35:15
103:10 106:16
111:24 119:22
129:9 130:2
**scroll** 23:18
**search** 48:23

**seb** 100:9
**sec** 40:7 46:22
50:5,20 51:5,15
51:16 52:9,10
78:8
**second** 14:4
17:12 23:6 32:2
34:15,18 45:10
62:15 66:24
69:24 112:4
113:12,14
**secondly** 21:6
**section** 33:3
76:11
**secure** 42:10
**securities** 6:20
7:8,17 8:7,11,15
9:3 11:20 12:18
15:3 21:23
29:15 30:6 39:7
46:24 47:20
72:17 76:10
83:11 86:9
89:20 94:10
**see** 5:7 9:12 13:6
14:4,13 22:16,17
23:4,17,20 24:15
28:8 30:14
36:12,13 37:24
38:3 62:3 65:14
66:9 67:16
69:21 70:3,21
84:6 104:4
110:11 112:23
113:20,21 114:4
114:6 119:9,14
123:25 125:4,16
126:13,14,25

127:4,5 129:14
130:2,5,7 131:8
131:18
**seeing** 24:24
52:22
**seen** 24:17
**self** 11:17
**sell** 10:20,23
59:4 62:13
63:12,14,19,19
63:24 64:3
69:22 70:4
104:20 107:10
108:9,18,19
109:23 110:10
111:6,7,11
113:25 114:2,3
**sells** 64:18
105:19 106:23
109:2,9 114:14
114:21 122:3
125:5
**send** 22:20 61:22
86:8
**sending** 17:20
20:21,22,23,24
21:3
**sends** 113:15
**sense** 25:12 43:8
69:13 112:9
122:21
**sent** 21:25 40:7
46:6 51:17
79:24 81:18
95:9,13 100:19
122:21 129:12
131:23 133:5

**sentence** 16:3
32:10
**separate** 70:25
101:9 115:17,21
116:16 118:18
121:5 123:5
**september** 12:3
13:11,14,16,19
14:17 19:14
21:11 82:19,22
86:11 137:19
**sequence** 134:5
**served** 79:20
**server** 55:6 87:5
94:18,19
**service** 86:14,16
86:17
**services** 10:10
10:12 46:12
**set** 45:12 87:8
136:11,21
**seven** 52:24 53:3
**share** 7:4 22:22
23:13 31:24,25
35:14 129:9,22
130:3
**shared** 103:10
111:25
**shares** 7:3 10:20
11:2,13 27:12
56:13,20,21 57:4
57:6 61:21,24
62:4,6,9,10,13
63:2,3,4,5,7,12
63:13,14,16,19
63:20,23,23,25
64:3 65:5 66:24
69:19 70:8

71:10,17 103:20
104:2,4,5,6,11
104:20 105:3,4,8
105:20 106:6,9
106:23,25
107:11,24 108:3
108:10,11,19,20
108:24 109:7,10
109:14,23 110:2
110:12 111:5,7
111:12 112:15
112:22,24 113:9
113:16,22 114:6
114:7,8,9,11,13
114:14,21
115:11,12,22,23
115:24 116:3,3
116:20 120:15
121:18,19 122:3
122:3 123:15,16
123:23 124:7,14
124:21 125:2
126:14,18,19,21
127:2,5,7
**sheet**  139:2
**shipping**  18:16
18:18
**short**  57:7 63:5,8
63:25 64:2 65:6
69:11 98:8,9
105:17,25
106:22,24 107:2
107:14,14,17
108:11
**shortable**  63:17
63:18 105:23,24
106:3

**shortening**
121:24
**shortly**  74:22
75:5,12 83:7,12
**shorts**  63:3
**show**  13:22
24:25 31:6,8
48:24 56:16,24
57:9,13 116:15
116:20 127:7,20
129:20 130:12
**showed**  19:8
**showing**  20:4
52:8,22 113:4
116:17 123:11
125:19 126:11
126:18,19
**shown**  19:24
**shows**  69:22
120:23 125:17
**shut**  20:13 21:20
82:12 83:8
**shuts**  82:10
**shutting**  95:12
**sic**  66:14 67:24
84:17 126:22
**signature**  136:23
**simple**  64:13
69:17
**simply**  28:17
94:23 97:19
**simultaneously**
62:15 114:15
**sinco**  90:8
**single**  126:2
**situation**  40:16
81:7 102:14
104:10,19 106:3

106:14 107:5
108:22,23 130:9
**six**  30:19 52:24
53:3
**skeleton**  82:14
**skipped**  138:20
**smart**  62:2 70:23
**sold**  56:13
**sole**  7:2
**solely**  40:14
43:23
**soliciting**  30:5
**solicitor**  99:10
**solicitors**  45:13
91:11
**solutions**  139:2
**somebody**  9:7
**son**  128:7
**sorry**  22:21 23:6
32:20 35:6
42:19 64:22
106:12 108:17
109:5 113:19,20
119:12,23
123:19 128:11
**sort**  28:16
**sought**  90:13
**sound**  35:6
46:16
**sounded**  90:7
**sounds**  76:23
102:24 104:9
**south**  5:18
**southampton**
2:7
**southern**  1:2
29:19 38:19
41:4,14 84:3

90:13
**speak**  85:11
**speaking**  26:13
**specific**  9:25
21:16
**specifically**
71:16 90:19
127:9 134:22
**speculate**  34:11
37:23
**speculative**  29:8
**spell**  90:3
**spoke**  80:25
**spoken**  26:12
100:14
**spreadsheet**
112:7,8 117:2
118:13 129:10
130:3,23 131:11
**spy**  128:23
131:17 138:14
**ss**  136:4
**staff**  54:14
**stamped**  118:14
130:15
**stand**  134:8
**stands**  134:10
**start**  56:3
**started**  44:24
134:6
**state**  1:22 4:16
5:11 136:3,8
**stated**  13:18
49:18 66:3
77:12 95:10
**statement**  19:24
20:4 27:15 91:5
116:2 117:12

**[statement - talks]**                                                           Page 25

127:2
**statements** 19:3
19:14 105:2,11
112:3 126:25
**states** 1:2 30:7
31:3 33:2 38:18
41:3,14 76:10
84:2
**stating** 28:6
**statute** 27:23
28:25 29:3,9
**stephen** 33:10,13
53:17 54:6,7
55:14
**stepped** 82:21
**steven** 85:4
**stick** 118:2
**stipulated** 4:8,10
**stock** 27:13
28:15 63:16
71:10 105:19,25
108:15
**stocks** 28:13
63:17 131:16
**stood** 134:12
**stop** 128:4 129:2
**strategy** 62:7
**street** 104:24
114:25 115:20
**strike** 79:22 80:3
91:4
**structure** 17:22
20:8 85:20
**struggling**
104:13
**study** 54:18
**stuff** 55:9 130:17

**subject** 8:6
**subjects** 74:13
**submitted** 19:4
85:19 91:16
**subparagraph**
35:22
**subpoena** 40:7
78:13 84:17
**subpoenaed** 78:8
79:2
**subscribed**
135:16 139:19
**subsequent** 44:8
**subsequently**
74:9
**subsidiaries**
18:25 19:25
20:3
**subsidiary** 17:14
17:15
**successful** 96:14
**successfully**
16:11
**sudden** 21:15
**sufficient** 42:13
**suing** 29:16
**suit** 99:14
**suits** 74:22 75:5
75:7,7,12 76:2
91:3 101:3
**supervision** 26:7
26:18
**supply** 25:4
**support** 103:3
138:7
**supreme** 22:14
26:5 40:25
41:11,17 42:8

73:3,9,22 88:2
89:4
**sure** 19:5 21:9
34:25 87:9
107:21 121:10
**suretrader** 7:12
7:14 59:11
61:23 133:22
**sureview** 56:6,8
56:12 57:6,12,19
57:21,22 66:14
66:23,25 67:3,9
127:11,13
129:15 130:6
131:22
**surrendered**
17:9
**suspend** 11:25
**suspended** 11:21
12:13,18 18:17
18:19 25:25
82:4
**suspending** 39:9
**suspense** 13:15
**suspension** 9:16
12:4,5,17,23,25
13:14,19 16:12
17:8 18:21 88:3
88:5
**suspicious** 66:15
**swear** 4:4
**swears** 98:21
**swing** 57:7 65:6
98:8,9
**swiss** 6:20 7:7,17
8:5,10 11:12,15
11:15,22 12:7
15:2 30:4 54:23

65:5 67:10 85:5
99:10
**sworn** 4:12
135:16 136:12
139:19
**symbol** 59:3
**synthetically**
107:14
**system** 36:2 55:6
55:21 86:25
87:2,11,11 123:4
126:3,7
**systems** 54:18

**t**

**t** 4:11,18 136:2,2
**take** 16:8 23:24
24:3 46:18
71:22 86:22
102:19 115:5
119:10 120:13
122:25 127:25
128:15 135:8
**taken** 94:18
**talk** 71:23
**talked** 53:25,25
110:21 134:14
**talking** 25:14
26:24 63:15
64:13 71:19
75:8 83:18
85:17 89:2
97:17 102:23
103:21 111:16
117:19 119:15
126:24 127:9
**talks** 71:15

**tauber** 2:14,17
  13:23 14:2,6,11
  14:19 22:19
  23:6,10,15,20
  31:19,21,23 32:7
  34:17,23 35:14
  35:18 71:20
  79:18 80:9,11
  81:14 102:17,20
  103:9 104:15
  117:20 118:5
  119:18 127:23
  128:11,20 129:6
  129:23 130:16
  130:23 131:3
  132:8 134:25
  135:10 137:5
**tax** 6:7,11
**technical** 55:17
**technician** 54:16
**technology** 54:9
  55:13
**telephones** 55:3
**tell** 27:2,14 31:7
  31:14 37:21
  47:20,20 49:23
  85:20 102:6
  119:4,25 121:7
  122:7
**telling** 21:13
  50:25 51:9
  53:12 97:2
  121:8 132:16
**temporarily**
  11:21 25:24
**temporary** 12:4
**ten** 132:3

**tenth** 66:24
**term** 7:15 14:25
  124:17
**terminate** 44:17
**terminated**
  44:17 80:20
**terminology**
  107:22
**testified** 4:14
  79:17 92:21
**testifying** 12:7
  75:9
**testimony** 25:17
  112:17 117:17
  117:25 136:14
**thank** 60:5 92:20
**theirs** 42:16
**theresa** 1:21,24
  34:25 136:7,25
**thing** 113:11,12
  115:15 116:20
**things** 28:6
  51:19 55:8 78:6
  79:5 89:12
  132:22
**think** 11:3,8
  14:11 24:16
  28:14 31:17
  32:23 35:19
  42:23 44:15
  45:18 47:22
  51:21 53:19
  58:7 65:20 66:2
  77:5 79:23
  81:20 85:24
  91:19 96:16
  103:11,16,25
  108:7 112:12,12

117:22 124:22
  128:16,21 132:2
  132:6
**third** 62:24
  112:5 113:2
**thought** 23:9
  81:25 115:2
  123:19
**thousand** 62:4,5
  63:4,5,11,12,14
  63:16,20 103:20
  104:2,5 106:9
  107:11 108:10
  108:11,24 109:7
  109:25 111:5,7
  111:11
**three** 9:22 14:16
  21:11,12 80:21
  95:22 100:22
  103:21 113:21
  120:6,17 128:22
  137:18 138:13
**throwing** 71:3
**time** 5:25 6:2 7:7
  10:22,23 11:19
  16:25 17:3
  18:21 32:19
  37:2 40:17 44:3
  49:11 55:16,16
  66:4 70:15
  72:13 77:10
  78:2,10 79:13,16
  80:14,18,19 82:3
  83:6,19 87:21,22
  89:13,22 95:7
  96:17 106:12
  120:12 122:5
  126:2,4,5 127:22

128:2 135:2,4,13
**timeline** 12:11
**timely** 46:23
  47:23
**times** 6:17 20:7
  21:13
**titled** 14:15 32:4
  34:20 137:17,25
  138:4
**told** 16:2 18:7
  21:19 34:3 37:6
  47:24 48:3,22,23
  52:16 81:3
  84:10 85:10,23
  85:25 86:4
  89:17 93:13
  96:9,12 97:6
  104:23 125:7
**tom** 133:7
**tone** 9:8
**tonight** 135:8
**top** 56:2,18,23
  65:7 77:14
  113:7 117:5
**total** 56:20
  114:11
**touching** 38:8,9
**tower** 5:18
**track** 123:4,8
  126:8
**trade** 7:11 15:5
  57:23 58:3,21
  66:10 67:15
  69:15,16,21,25
  70:2,3,6 71:16
  87:3,4 90:20
  93:8 94:24 96:5
  100:20 104:24

106:7 107:7,18
107:20 108:2,5
108:13,20,21
110:9 111:10,13
111:15,20
112:17 115:5,17
115:18,21 116:7
116:16 117:7
122:16,17 123:9
123:12,14
125:10,14
**traded** 10:16,17
65:5 105:3
110:11
**trader** 15:10
130:5,8 131:22
132:4,18,20,23
133:8
**trader's** 132:21
**trades** 10:18
33:21 57:25
58:8,9,13,15,17
59:13,13,15
65:19 66:2,3,5,7
68:7,8,8,13,17
68:20 70:25
71:3,5,6 72:4,7,9
98:6 107:8
109:16,19
110:25 111:21
112:15,20
114:24 116:8,9,9
116:12,13
117:11 121:5,8
121:21 123:6
125:8 131:17
**trading** 7:23
10:12 14:24

15:4,7,11 16:7
16:18 36:15,17
37:12 57:7
58:11,18 59:18
60:11,13,15,17
60:20,24 61:7
66:24 67:9,11,21
67:23 68:5 77:9
98:24
**tramondo** 1:21
1:24 136:7,25
**transacting**
18:25
**transaction**
15:15 126:6
**transactions**
70:21 76:13,15
122:7,9,12,15
**transcript** 21:24
22:7 135:11
**trial** 28:22,23
**trick** 28:7
**tried** 27:9 82:7
**true** 16:24 21:5
27:15,21 28:17
36:9 91:6 92:5
101:19 117:14
136:13
**truth** 20:14
**try** 60:10 63:14
70:15 84:12
108:8
**trying** 20:12
28:7 117:15
118:20,25 119:3
119:25 124:20
128:9

**turn** 9:8 34:14
42:14 59:3,5
68:20 74:5
78:19 89:9 97:3
**turned** 89:18
91:22 96:25
**turning** 83:21
89:16
**turnover** 57:5
73:3,8,22 89:6,8
**two** 11:8 25:15
27:12 40:13
47:8 54:17 62:8
62:22 74:22
75:5,7,12 80:21
89:11,12 99:12
100:5,23 102:11
113:21 118:25
129:5 132:22
**type** 12:16 28:15
77:19
**typo** 112:13

**u**

**u** 4:11
**u.s.** 10:19 30:5
78:13 81:10,12
101:12
**uh** 106:10 110:5
113:10 114:4,12
125:13 127:18
**unacceptable**
15:21 18:13
**unclear** 73:16
**understand** 7:16
7:20 16:6 64:12
100:24 106:18
121:16

**unfortunately**
129:19
**unique** 126:5
**united** 1:2 30:7
38:18 41:3,13
76:10 84:2
**university** 54:19
**unregulated**
18:2
**unsatisfactory**
17:24
**unusual** 66:15
**upload** 128:15
129:7
**use** 7:15 29:24
102:18
**usr** 14:10

**v**

**vacated** 27:22
28:2
**verified** 31:3
**verify** 32:11 33:5
53:22 60:7,10
**veritext** 139:2
**version** 130:4
**versus** 34:6
35:24 68:11
69:16
**victims** 74:13,19
**view** 109:17
**violation** 81:13
**virtually** 4:4
**volume** 66:16
105:3
**vs** 1:5,11 139:4,5
**vsb** 1:6,12

[wait - zoom]

| w |
|---|

**wait** 64:2 116:21 129:20
**waiting** 19:18 129:6
**walk** 106:19
**want** 13:24 35:3 35:4 37:21 38:8 41:16 42:24 49:25 61:14 69:5 70:16 71:20 91:14,20 93:7 102:15 103:15 106:17 106:18 107:21 108:9,17 111:6 117:20 119:19
**wanted** 61:21 129:25
**wants** 63:12 107:10 109:25
**warren** 100:13
**way** 5:9,9 6:9 12:11,12 16:17 16:19 18:5 20:8 20:13 21:16,17 26:12 39:5 60:12,16 67:12 70:16 71:12 78:24 80:18 95:24 122:24 123:7 126:7 136:18
**we've** 35:12
**website** 7:13
**week** 93:19
**weeks** 98:20

**went** 12:12 28:23 40:8 67:6 70:24 80:16 96:21 97:24 108:14 111:4 114:6,7 116:16 120:9,10,10 121:3 123:5,10
**whereof** 136:20
**whichever** 5:5
**wholly** 15:20 18:12
**winding** 22:24 80:20,23 137:22
**wish** 83:17
**withdrawals** 15:19
**withheld** 72:12 72:24 73:20 74:8
**witness** 4:4,5,12 13:25 14:5 23:3 23:8,14,17,23 31:17 35:10 43:2 44:4 69:7 72:2 79:17 81:23 93:4 102:24 128:7 136:10,14,20 137:3 139:6
**wonder** 22:3
**woods** 2:6
**wording** 29:24
**work** 16:7 32:10 33:4 61:15 68:25 71:25 77:22 82:7 117:16 124:13

134:20
**worked** 16:19
**working** 30:13 48:7 55:4 82:11
**works** 44:22 71:18
**wounding** 40:18
**wrap** 127:23 128:9 129:24
**write** 31:11
**written** 131:9
**wrong** 16:5,10 103:25
**wrote** 13:2,7 51:20 52:8 78:11

| x |
|---|

**x** 1:3,8,9,15 137:2

| y |
|---|

**y** 4:11
**yeah** 13:13 43:10 55:22 57:25 58:16 75:9 76:22,23 79:18 102:20 109:15 116:5 123:21
**year** 5:20 6:21 11:5 17:2,6,6 47:17,18 53:7 97:14,15,17,18 100:12 133:13
**years** 9:22 19:7 19:15 21:11,15 38:12 47:8 52:24 53:3 54:17 85:7

95:22 100:22
**york** 1:2,22 2:7 2:16,16 3:7,7 38:19 41:4,15 61:3 84:3 90:14 93:5 99:14 100:18 136:3,5,9 139:3
**yup** 107:4 109:12

| z |
|---|

**zero** 63:22 64:5 68:21,24,25 69:12 105:21
**zoom** 1:19 4:5,12 26:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.