N221AVAH

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   AVALON HOLDINGS CORP.,
3
             Plaintiff,
4
          v.              18 Civ. 7291 (DLC)(RWL)
5
   GUY GENTILE and MINTBROKER
6  INTERNATIONAL, LTD.,
7            Defendants.
   ------------------------------x
8  NEW CONCEPT ENERGY, INC.,
9
             Plaintiff,
10
          v.              18 Civ. 8896 (DLC)(RWL)
11
   GUY GENTILE and MINTBROKER
12  INTERNATIONAL, LTD.,
13           Defendants.       Hearing
   ------------------------------x
14
                        New York, N.Y.
15                     February 2, 2023
                      9:35 a.m.
16
   Before:
17
                HON. ROBERT W. LEHRBURGER,
18
                          Magistrate Judge
19                  APPEARANCES
20
   LAW OFFICE OF DAVID LOPEZ
21      Attorney for Plaintiff
   BY:  DAVID LOPEZ, ESQ.
22
   MIRIAM TAUBER LAW
23      Attorney for Plaintiff
   BY:  MIRIAM D. TAUBER, ESQ.
24
   FORD O'BRIEN LANDY LLP
25      Attorneys for Defendants
   BY:  MATTHEW A. FORD, ESQ.

1              (Hearing resumed)

2              (Case called)

3              THE DEPUTY CLERK:  Attorneys, please state your name

4     for the record, starting with the plaintiffs.

5              MR. LOPEZ:  David Lopez for the plaintiff.

6              MS. TAUBER:  Miriam Tauber for the plaintiff.

7              MR. FORD:  Matthew Ford for defendants.

8              THE COURT:  All right.  Good morning, all.

9              I guess I'd just like to take care of housekeeping

10    first and find out the order of proceedings today.  So I'll

11    actually ask Mr. Ford how we are proceeding.  What's the

12    intended order?

13             MR. FORD:  So we're going to call Mr. Christian,

14    Robert Christian, one of our expert witnesses, first, followed

15    by Brendan Beresford, the other expert, and then plan to

16    introduce the deposition testimony of Mr. Darville, which I

17    wanted to raise as a separate issue.

18             THE COURT:  Okay.

19             MR. FORD:  So with regards to Mr. Darville, for the

20    benefit of the Court and everybody's time, I was able to go

21    through and sort of highlight what I believe to be sort of key

22    points of testimony.  I think it would go more smoothly from

23    our perspective if I could put those excerpts up on, you know,

24    an overhead projector and read them in.  I think I'd be done in

25    five to ten minutes, ten minutes at the most, to get all of my

1    excerpts in.  I'd also like to move to get the entire

2    deposition transcript.  Ms. Tauber would like to play the

3    video, and I don't have any opposition to that.  The issue we

4    ran into is, what plaintiffs did, as I understand, is they went

5    through and sort of chopped out bits and pieces —— sometimes

6    there will just be a minute missing —— and then compressed it

7    into its own 50-minute video.  Unfortunately, having woken up

8    at 4 a.m. to review it, and I don't know that this was

9    intentional, but it cut some of what I view to be the most

10   important testimony that Mr. Darville gives.  So I have no

11   problem with her introducing it, just with the caveat that

12   those are her selections, they have been edited, and then if I

13   can, you know, direct the Court to the parts of the transcript

14   that I believe are most critical.

15          THE COURT:  All right.  Ms. Tauber, is there anything

16   you wanted to say?

17          MS. TAUBER:  Yes.  Well, first of all, I believe that

18   the more logical order would be to have the Darville testimony

19   in whatever form first, just because I think that gives the

20   necessary context for understanding the expert testimony, since

21   they received all their information, all the facts that they

22   analyzed, from Mr. Darville.  But I guess I don't feel

23   particularly strongly about that.  I do think that it would be

24   helpful for the Court.  I also am concerned about truncating

25   the Darville testimony because I think it's very important as

N221AVAH

1    it is the factual basis, so --

2         THE COURT:  Sounds like you did some truncating

3    yourself, though, in terms of --

4         MS. TAUBER:  No.  I was going to say, I object to what

5    they're saying.  I took out -- I -- every part they quoted in

6    their briefing is in my video, so I didn't think that I took

7    out anything that was particularly important at all.  I think I

8    took out mostly, you know, just stuff that was not important,

9    but it's an hour.  The whole thing is -- my video is 50

10    minutes, the video -- up until the supplemental questions that

11    Mr. Ford had that we both agree are irrelevant, so up to that

12    point it's two hours.  We cut out about an hour.  But I have no

13    problem with what he's suggesting in terms of playing the video

14    and then having him add whatever transcript excerpts.  I just

15    don't think that his transcript excerpts should be introduced

16    without context.

17         THE COURT:  What is the entire length of the video?

18         MS. TAUBER:  Well, including the --

19         THE COURT:  The full, unedited video.

20         MS. TAUBER:  It's three hours, if you include the

21    cross -- I mean the redirect.

22         MR. FORD:  Two hours and ten minutes.

23         MS. TAUBER:  With your questions?

24         MR. FORD:  The entire video is two hours and ten

25    minutes, so that includes introductions.  The entire video,

N221AVAH

1   it's in two parts, so it's two hours and ten minutes.

2   Ms. Tauber's, I think she said it's like 50 minutes.

3            THE COURT:  All right.  Usually what happens is, the

4   parties, in advance of a proceeding like this, will confer with

5   each other, exchange the excerpts they want to include, and

6   sort of counter-designate to make sure there's appropriate

7   context.  I'm not going to take something from either side that

8   simply truncates out what may be important to the other side,

9   which itself may provide context for whatever is being heard.

10  What I'm going to do is I'm going to take the whole transcript

11  and video into evidence and if there is time after the two

12  experts today, we will play it.  If there is not time, I will

13  simply view it on my own.  Okay?

14           All right.  So let's call your first expert to the

15  stand.

16           MR. FORD:  Your Honor, if I may, just one other quick

17  point.  I know there's been a lot of Excel spreadsheets going

18  back and forth.  We cross-checked it.  Ms. Tauber had said

19  yesterday that she maybe had not received or seen the

20  Exhibit 8.  We cross-checked it against Mr. Christian's

21  deposition, and it's actually included in her folder of

22  deposition exhibits.  And there's a whole conversation on

23  page 56 about the individual tabs, so I think that was just an

24  issue of, you know, like I said, because we produced such a

25  significant volume of different Excel spreadsheets, but I don't

1    think there's any question that that document we were looking

2    at has been produced and seen by all parties.

3            MS. TAUBER:  That's not the issue we were talking

4    about.  It was a different document.

5            THE COURT:  Ms. Tauber, direct your conversation to

6    me.

7            MS. TAUBER:  I'm sorry.  So there were two documents,

8    when I was going through their exhibit book yesterday, I didn't

9    ever receive a copy -- there were two documents that I never

10   received before that seemed to be part of the expert

11   production, so I asked if I had seen it before, they said I

12   had.  It wasn't Exhibit 8.  It was two other exhibits.  I now

13   have them, and I am planning to show them to the expert --

14           THE COURT:  Again, keep your face forward to direct to

15   me and to the microphone for the reporter.

16           MS. TAUBER:  I'm sorry.  So I'm planning to show those

17   two exhibits to the experts, now that I've seen them.  So if

18   you have an objection, you can tell me, but now that I have

19   your exhibits, I'm going to use them.

20           THE COURT:  Okay.

21           MR. FORD:  We have no objection, your Honor.

22           THE COURT:  Was there anything else?  Anything else

23   from either party?

24           All right.  Please proceed, Mr. Ford.

25           MR. FORD:  The defense calls Robert Christian.

1          THE COURT:  All right.  Mr. Christian, please come up.

2          (Witness sworn)

3          THE COURT:  And Mr. Ford, you need not do a lengthy

4  recitation of whatever his credentials may be.  If there's

5  something you want to highlight, that's fine, but that's not

6  going to be particularly significant, and I do have his

7  credentials through his CV, I believe.

8          MR. FORD:  Could I move at this time to have him

9  qualified as an expert with regards to the calculations.

10          THE COURT:  Any objection from the plaintiff?

11          MR. LOPEZ:  No, your Honor.

12          THE COURT:  All right.  He's so qualified.

13          MR. FORD:  That will greatly expedite things.

14   ROBERT CHRISTIAN,

15       called as a witness by the Defendants,

16       having been duly sworn, testified as follows:

17  DIRECT EXAMINATION

18  BY MR. FORD:

19  Q.  Mr. Christian, I will, however, start by just asking you if

20  you could state for the record what your current employment is.

21  A.  I work as an audit manager for Freddie Mac.  I also

22  maintain a CPA practice, peer-reviewed CPA firm in the

23  Commonwealth of Massachusetts.

24  Q.  And prior to that what position did you hold?

25  A.  I was AVP of internal audit for Berkshire Residential

1    Investments.

2    Q.   And what is Berkshire Residential Investments?

3    A.   They are an RIA, registered investment advisor, with the

4    SEC.  They held publicly traded funds under New York Stock

5    Exchange as well.

6    Q.   Do you have any credentials or licenses?  And if so, can

7    you just state what they are.

8    A.   Yes.  I'm a certified, an active certified public

9    accountant; I'm a certified fraud examiner; a certified

10   internal auditor; and a certified information systems auditor.

11   Q.   There came a time where you were contacted by Guy Gentile,

12   the defendant in this action.  Can you recount the contents of

13   the conversation you had with Mr. Gentile.

14   A.   I'm sorry.  Can you repeat that last sentence.

15   Q.   Can you recount the contents of the conversation you had

16   with Mr. Gentile.

17   A.   Sure.  Mr. Gentile reached out to me, seeking for an

18   independent -- what we would call an agreed-upon procedures

19   engagement, under the guidelines of AICPA.  That's --

20   Q.   What type of engagement was it?

21   A.   An agreed-upon procedures engagement.  The AICPA, which is

22   the American Institute of Certified Public Accountants,

23   establishes the standards for those types of engagements.  The

24   coding, if you will, is called an AT-C 215 engagement.

25   Q.   And what were the terms of that agreed-upon engagement?

N221AVAH                    Christian - Direct

1   A.  As summarized, there was an allegation that -- he reached

2   out to me such that he was needing to verify the exposure with

3   respect to Rule 16(b) short-swing profit rule.  There was a

4   certain amount of regurgeable -- I'm sorry -- disgorgeable

5   profits that were being claimed against him.  He was seeking an

6   independent analysis to determine if that number was an

7   accurate number and, if it was not, what an accurate number

8   would be.

9   Q.  Prior to that conversation had you ever heard of

10  Mr. Gentile?

11  A.  I had not.

12  Q.  You'd never spoken to him?

13  A.  Never spoke to him.

14  Q.  You'd never heard his name before?

15  A.  Never heard his name before.

16  Q.  In discussing the terms of the engagement, were you

17  provided any information regarding documents that would be used

18  in performing the agreed-upon engagement?

19  A.  Yes.  Prior to this engagement, I would have needed to get

20  an understanding of what we would call a population of

21  transactions.  Population is simply the transactions, the scope

22  of the engagement.  But my understanding through Mr. Gentile

23  was that these trades that were in scope, the system of record

24  was a system called iBoss, and it was going to be from iBoss

25  that we would need to retrieve the transactions for the

1    purposes of my engagement.

2    Q.  And how did you obtain those records?

3    A.  Mr. Gentile introduced me to Stephen Darville.  Stephen

4    Darville is the system administrator, as I recall it, the

5    person who understood the system, was able to access the

6    system, and was able to provision access to the system.  We --

7    there was introduction; Mr. Darville and I met, virtually.

8    Today is the first time I'm meeting Mr. Darville.  And he gave

9    me a walk-through of iBoss through Google Meet —- I

10   screen-shared with him —- and showed me how the system works.

11   Very intuitive system, similar to other systems I've seen in

12   the past.  He also provided me with credentials to be able to

13   access the system, from which I was able to pull reports for

14   the purposes of the engagement.

15   Q.  And when you say credentials, what exactly did he provide

16   you?

17   A.  User name and password.

18   Q.  After receiving those you were able to successfully log

19   onto the system?

20   A.  I was.

21   Q.  Can you briefly describe the process you used to get

22   familiar with the system.

23   A.  Sure.  As with any software, there's what we call a user

24   interface.  Getting an understanding of the interface is

25   essentially -- more layman's terms would be where do you have

1    to click on the system to do what.  So getting an understanding

2    of user interface was -- user interface was the first step.

3              Subsequent to that, the question was, how do I pull

4    reports, what's the appropriate pull, what's the appropriate

5    report to use to retrieve the trades; got a walk-through of

6    that, as well as what would be an area that -- if you wanted to

7    see -- some of these reports that we were pulling would have

8    account numbers, but there was no context as to what that

9    account number meant, and that was critical to this engagement.

10   So I got an understanding of how you could look up that account

11   number and get more information about the nature of that

12   account, the -- who that person or entity is that holds the

13   account.

14   Q.  Prior to pulling any data off of the iBoss system, would

15   you have been able to manipulate any of the data contained in

16   that system?

17   A.  I couldn't have.  I didn't have the right access.

18   Q.  So to be clear, if you wanted to change a number or letter,

19   was there any functionality to permit you to do that, based on

20   the access you had?

21   A.  Not from what I could see, and it would have been apparent.

22             MR. FORD:  We're going to pull up Exhibit 8.

23             MS. TAUBER:  This is a different exhibit.

24             MR. FORD:  Yes.  It's labeled Rob Depo Exhibit 17.

25   It's the same Excel spreadsheet, just the version that was

1    presented to the witness at the deposition.

2              MS. TAUBER:  Is it the same as Exhibit 8?

3              MR. FORD:  Yes.  It is Exhibit 8.  We're using this

4    because there was discrepancy yesterday as to whether or not

5    Ms. Tauber had received this document so --

6              MS. TAUBER:  No, I -- sorry.  I want to clarify one

7    thing.  The document you're saying I didn't receive -- that I

8    didn't receive was not this document.  It was a different

9    document.  Okay.  Which we will review momentarily.

10   BY MR. FORD:

11   Q.  Mr. Christian, do you recognize this document?

12   A.  I do.

13   Q.  Can you tell me what it is.

14   A.  This is a document from which process I came to the

15   conclusion which trades were for the purposes of determining

16   the exposure for the -- the disgorgement of profits for the

17   short-swing Rule 16(b), which specific transactions needed to

18   be reviewed for the purposes of that calculation for AWX, which

19   I believe was Avalon.

20             MR. FORD:  If we could pull up the tab to the right

21   titled AWX Original Criteria.

22   Q.  And Mr. Christian, if you can describe to me what is --

23   what appears on this tab in the Excel spreadsheet.

24   A.  Sure.  This is the criteria of the report.  So essentially

25   what you can see here is a -- it's hard for me to point.

1          The top of that, under where it says Trade History,

2     you can see there are dates that are entered.  That is the

3     starting date and the ending date for the transactions that I'm

4     looking to pull.  So trades that occurred on that date

5     through -- which is June 29, 2018, through the end date, which

6     is August 23, 2018, that's the period I would have reviewed, as

7     well as the criteria of -- on that same line, where it says

8     Symbol AWX, that's the ticker for the -- for the security that

9     was --

10          MS. TAUBER:  Objection.  That's the wrong time period

11     for AWX.  I believe the time -- that's the time for New Concept

12     that you just recited, but we're looking at the AWX

13     spreadsheet.

14          MR. FORD:  I'm going to move to strike that.  I don't

15     think that's a legitimate basis.  There was no question to

16     object to.

17          THE COURT:  That is true.  Hold on.

18          MS. TAUBER:  Okay.

19          THE COURT:  Yes.  The objection made by Ms. Tauber is

20     overruled.  If there's misinformation, that can be brought out

21     on cross, or it may come out later during this direct.

22     BY MR. FORD:

23     Q.  Okay.

24     A.  As you can see, the name of this report is Trade History.

25     That was the -- the report, which is exactly what it sounds

1    like, which is the log of trades.

2              You can also see to the far right, there is a date and

3    time, and so that tells us, it corroborates the same date and

4    time at the top of this report.  That bottom row is from my

5    computer.  So what this screenshot is showing is the date and

6    time I ran this report is the date and time I ran this report,

7    double-confirming that.

8    Q.  And can you walk us through briefly your rationale in

9    selecting these particular data points when creating this

10   report.

11   A.  Well, the period of the allegation was that there was a

12   certain date range, and I can't recall the date range, but it

13   was important for me to ensure that I encompassed trading

14   activity within that date range.  And I believe this was either

15   the exact date range or it might have been a little bit before

16   and a little bit after.  What I would have done, and don't have

17   it here, which would probably be -- or certainly would have --

18   to play with this in the sense of making things just a little

19   earlier, just to see if there were trades before that could

20   have been in scope, and didn't see any.  So the point being, I

21   wanted to get comfortable that this date range is an

22   appropriate date range for the purposes of this analysis.

23   Q.  Do you see at the top where it says Login User and then it

24   says Backup?

25   A.  I do.

N221AVAH                      Christian - Direct

1  Q.  Can you explain to me what that is.

2  A.  The login user is the user name, and certainly I can show

3  you the password, but backup would have been the user name that

4  I used to log in.

5  Q.  If you look at the Account column on the left, do you have

6  an understanding as to what each of those account numbers

7  represent?

8  A.  I do.  I do today.  These are account numbers for either --

9  what's called for today, corporate trades, so the trades that

10  belong -- upon the execution of that trade, MintBroker is the

11  holder of the security.  There's also client accounts in there,

12  and there's also recordkeeping accounts in there.

13  Q.  Was this something that you spoke to Mr. Gentile about?

14  A.  Yes.  I needed to get an understanding of the nature of

15  these accounts.  So I can go into some detail.  I will probably

16  just respond to your questions.

17  Q.  What did Mr. Gentile tell you?

18  A.  Mr. Gentile told me that not all of these accounts are

19  corporate accounts.  They're -- there were client accounts in

20  there.  The -- the accounts that are corporate accounts are not

21  necessarily all of the accounts that start with 328.  What I

22  want to clarify and say is, the recordkeeping account has no

23  true trading activity.  The corporate account is what has the

24  true trading activity belonging to MintBroker.  The accounts

25  that begin with a letter were, are, client accounts.

1    Q.  Did you have any discussions with Mr. Darville about this

2    same subject matter?

3    A.  Yes, confirming that, as well as how could I see other than

4    just account number, whose account this is, gaining an

5    understanding from Mr. Darville.

6    Q.  In addition to what Mr. Gentile told you and what

7    Mr. Darville told you about what the account numbers

8    represented, what additional steps did you take to verify that

9    information?

10   A.  The first is -- and you'll see this in the original report,

11   which is untouched, by the way.  Not on this sheet, but I would

12   have what I call stratify --

13   Q.  We can pull up -- you can direct us to -- we can move to

14   the next tab.

15   A.  Sure.  So if you move on to the next tab, the Original

16   Report, this is the raw output using the criteria in that

17   previous tab.  So from here -- it's not on this sheet, but I

18   would have used what we call VLOOKUP, which has the account

19   number, which is column A and the -- I would have added a

20   column that would essentially make a sell negative and a buy

21   positive, the point to see what the net activity was, to see

22   where the volume is, for any high -- high-value client accounts

23   that would have gotten an understanding of what's the nature of

24   those accounts.  For the rest, on a random -- straight random

25   sample, and that would be appropriate, I would, did -- I'm

1    saying would because this is the practice that I would do for
2    any organization -- any type of engagement.  What I did do is
3    confirm the holder of the account, so would go into what's
4    called a master file, so any system has what we call a master
5    file, which is essentially account name, name of the entity,
6    name of the person, address, phone -- potentially phone numbers
7    and the like.  Because otherwise it's just a number.  So
8    through that process, I got comfortable that the -- the
9    accounts that started with a letter are client accounts.  And
10   then it became a question of, of the 328 accounts, which one
11   were recordkeeping accounts and which ones were true trades.
12   Q.  Okay.  Before we get into that, on the client accounts,
13   what would you have seen when you performed the sampling?
14   A.  What would I have seen when I performed the sampling.  Can
15   you clarify.
16   Q.  What information, if anything, did you see when you
17   performed the sampling of the lettered accounts to verify that
18   they were client accounts and not accounts through which the
19   company traded shares that it beneficially owned?
20   A.  Sure.  So within the iBoss system there would be like a --
21   I can't recall what the name of the -- the click is, but within
22   the system, you look up the master file.  So you would plug in
23   any given account here, any account, and you type it in and you
24   get an output, and that's the name of the client, address, so
25   on, so forth.

1   Q.  Was there any additional information other than the name

2   and address?

3   A.  Not that I recall.

4   Q.  And you had mentioned you observed multiple numerical

5   accounts that you said represented company accounts.  The first

6   question is:  How did you determine that those were company

7   accounts?

8   A.  How do I determine if the 328 were company accounts?

9   Q.  Yes.

10  A.  Well, when you -- through the same procedure I just

11  explained.  The name that shows up would be Mint -- I can't

12  recall if it was MintBroker.  Sometimes the legal entity has a

13  much shorter name than MintBroker International.  But Mint --

14  would have had the word Mint in it, which would have suggested

15  that it's an entity -- that it is MintBroker.  I'm almost

16  certain that it actually just said MintBroker International.

17  But in either case, I was able to draw the conclusion that

18  these accounts are the MintBroker accounts.  The other accounts

19  don't have that name.  Or don't have a similar name.

20  Q.  How were you able to determine that some accounts were

21  recordkeeping accounts whereas others were trading accounts?

22  A.  The -- go over to wash entries.  Wash is the wrong term for

23  this case.  It's a loose term that we were using just for the

24  sake of using a quick word.  You'll note that column A has the

25  32812 account and it has some 32810 accounts.  32812, we saw

1    without question is a recordkeeping account, and the reason is,

2    through analysis, any time there was a trade in the 32812

3    account, there was also a trade in a client account —-

4    specifically, one starting with a letter —- at the exact same

5    time, at the exact same price, exact same quantity.  Every

6    time.  So it would be outside the realm of -- so what was

7    explained to me by both Mr. Darville and Mr. Gentile was that

8    32812 is a recordkeeping account for the purposes of

9    consolidating in one -- one repository what trades actually

10   happened, regardless of who effected the trade.  It would be

11   outside the realm of possibility for that amount of consistency

12   for an actual trade to replicate the exact same time, quantity,

13   everything, on a client account.  So it was very apparent to me

14   that what was told to me, that the 32812 account is a

15   recordkeeping account, was true.

16   Q.   If we could go back to the AWX Original Report, can you

17   just describe generally to me what this tab reflects.

18   A.   Which tab?

19   Q.   The AWX Original Report.

20   A.   When you say -- okay.  What this -- what this -- okay.

21   This is raw output out of the iBoss system.  So in the previous

22   tab, the first tab we looked at, AWX Original Criteria, this is

23   what the criteria are for generating the report.  As you can

24   see, some of the activity shows up here.  Just, you can't see a

25   whole report in one screen.  But it gives -- it's showing some

1    consistency, right?  The columns are all the same.  And if we

2    go over to the original report, or the one -- go back to AWX

3    criteria.  To the top right there's a download CSV button.

4    When you click that button, you're downloading this report into

5    a CSV file.  A CSV file is a text file that can be read by

6    spreadsheet applications, including Excel.  Original Report is

7    that output.

8    Q.  And included in this, you included in this report -- strike

9    that.

10          Can you describe what accounts you included in this

11   report.

12   A.  All accounts.

13   Q.  All accounts that had traded in stock symbol AWX?

14   A.  Within the time frame within the criteria, yes.

15   Q.  Did you run a separate report for GBR?

16   A.  Yes, I did.

17   Q.  Moving to the Wash Entries tab, you began to describe, but

18   I'll ask again, can you just describe what this tab reflects,

19   or represents.

20   A.  What this tab represents is what was removed from the

21   analysis, because they are not corporate trades.  It's just

22   documenting that, simple as that.

23   Q.  We're going to go to the next tab, which says Wash Pivot.

24          Can you describe what this tab reflects.

25   A.  Sure.  This is showing that virtually, some instances where

1    they're seconds apart, which would not surprise me.  Systems

2    sometimes have delays in processing.  That anything in the wash

3    entries tab nets to 0, so that means there was an offset

4    offsetting buy and sell at the exact same time for all of the

5    recordkeeping accounts.  And first of all, why would any entity

6    buy and sell a transaction at the exact same time?  And B, how

7    could you possibly accomplish it?  So what this is simply

8    showing is the client -- is fulfillment of orders.

9             So as an example, if you are buying a security and

10   you're a custodian, you're buying a security and you're selling

11   it to a client, essentially what you have done is you've bought

12   and sold it at the same time.  You're passing hands.  You're

13   not buying a security, holding onto it, and then selling it.

14   So this is showing me -- so the risk would be -- if I were

15   seeing days or even hours or what have you, multiple, long

16   periods of time in between the buy and the sell, it would leave

17   me to speculate, is this a recordkeeping account, but in this

18   case, no.  Even as we see row 13, 14, that second part, that

19   easily could be attributed to lags in system processing time.

20   Doesn't surprise me.

21            And if you go all the way to the bottom of the sheet,

22   you can see it nets to zero, so meaning there was no net buy or

23   net sell, which makes sense given these are fulfillments on a

24   recordkeeping basis, not -- right.  Okay.

25   Q.  To clarify, all of these tabs that we've reviewed in this

1   entire Excel spreadsheet was generated by you, correct?

2   A.  Correct.  In the analysis as well.

3   Q.  It was not generated by Mr. Darville?

4   A.  Correct.

5   Q.  If we go to the next tab, it says AWX In Scope.  The first

6   question is:  Can you describe, just briefly, what the purpose

7   was of generating this tab.

8   A.  Sure.  This was to isolate which trades needed to be

9   analyzed to determine whether there was a -- an entry into a

10  10 percent ownership window that is relevant to determining any

11  disgorgeable profits with respect to 16(b).

12  Q.  We're going to walk through some of the tabs.

13          The first one in column A is Account.  It appears that

14  only one account is reflected, which is 32810.  Can you explain

15  why you have only included that one account.

16  A.  This is the corporate trading account that's relevant for

17  the purposes of determining if there's disgorgeable profits.

18  Q.  Does this tab reflect all trades that were listed in the

19  32810 account?

20  A.  It does, substantially.  There were some isolated

21  circumstances where we saw 32810 account was used to fulfill a

22  client trade.  So as an example, if -- this was something we

23  went through in the deposition, but if there was a -- if the

24  client needed a -- let's say there was -- the actual example we

25  went through in the deposition, the client had a buy order for

1   800, the -- MintBroker had 300 shares in inventory.  You would

2   have seen a $500 buy -- I'm sorry -- 500-share buy to fulfill

3   that order.  Once again, we were able to isolate those and

4   take -- take them out of the analysis to isolate which ones

5   were the true corporate trades.

6   Q.  Under Tab F and G, it says Quantity and Quantity Reformat.

7   Can you explain what those columns reflect.

8   A.  What was that again?  One more time?

9   Q.  Row F and G, Quantity and Reformat.  Can you --

10  A.  Sure.  So with respect to -- all of the tabs that have a

11  red and yellow highlight are tabs that I inserted in order to

12  be able to do this analysis.  Everything else is from the raw

13  data.

14          So row F is simply the quantity, whether it's buy or

15  sell.  But in order for me to effectively perform this

16  analysis, I needed a sell to show up as negative so I could

17  show the rolling basis of MintBroker.  Otherwise, if you add up

18  your buys and sells, sells look like buys.  So all I did here

19  was turn a sell, using an Excel formula, this wasn't manual, to

20  make the sells negative.

21  Q.  In creating any of the new tabs were you required to

22  perform any manual exercises?

23  A.  No.  This is all -- well, define a manual exercise.  Not

24  plugging in numbers, if that's what you're asking.  This is all

25  done through Excel formulas.

1  Q.  In column N it says Total Trade Fee.  Can you explain the

2  purpose of creating that column.

3  A.  Sure.  It simply sums up Columns K, L, and M, to determine

4  the total commission in one number.

5  Q.  And column R, can you explain the purpose of creating that.

6  A.  Sure.  It would help if you could unfilter column T.  It

7  would make more sense.

8        So if you go to column T, there's a button, looks like

9  that -- yup, click that button and then go to -- Select All.

10  Yeah.  And then we can go back to that and I can show you

11  better.  And then go to the top of this.

12        And we are at the top.  Okay.  So column R is showing

13  on a rolling basis the position in this security.  The first

14  transaction is -- row 2, was the first trade.  That's a short

15  position, a short position being negative shares.  So borrowing

16  shares, essentially.  As you -- what this column is doing is

17  adding the -- so take cell R2 plus cell G3 and so on, so forth,

18  all the way down.  So respectively, what you've done, you're

19  tallying the basis in shares held.  Likewise, as we get further

20  down, when you start to see buys, it adds to the basis.

21        So as you can see, starting with this row 81, where

22  it's the first time in which MintBroker had a -- had a long

23  position, meaning owned shares versus borrowing shares.

24  Q.  In the next column it says Percentage of Ownership.  How

25  were you able to determine what percentage of ownership that

1  quantity of shares represented?

2  A.  Sure.  So we look at the prospectus for -- if you can go to

3  the top of row 1 -- or row 2.  And then go to S2 and -- no,

4  cell S2, click on that.

5      Okay.  So you can see that number 3191, right, that

6  number.  That number is 10 percent of outstanding shares, per

7  AWX's prospectus.  So what's relevant is we need to know at

8  what point MintBroker held more than 10 percent of shares.  So

9  that is the basis for percentage of ownership.

10      And then -- and also, this might be helpful now to

11 explain.  Column T is simply saying, is column S 10 percent or

12 more.  And that's done through a formula.  So if you keep

13 scrolling down, eventually you get to a point where we see --

14 yes, 10 percent.  Yup.  Here you go.  So remember, this has to

15 be, right -- okay.  So we have -- and remember, these are

16 rounding.  So if you go to -- highlight column S, meaning click

17 on the whole column.

18      Okay.  And then towards the middle of the top of the

19 ribbon at top, you see something that says Accounting, and then

20 you'll see -- I wish I could point.  A little higher.  Little

21 to the right.  Little to the right.  Yup.  Left.  Left.  Where

22 it says Accounting.  Do you see Accounting?  Do you see where

23 it says Accounting to the left?

24      THE COURT:  Accounting.

25      THE WITNESS:  Yeah.

1    A.   Now there's -- don't click on that.  Right below that

2    there's an arrow left and right.  Yup.  Click on that.  The

3    other one.  There you go.

4           All right.  Now -- oh, boy.  Hit Percentage.  And then

5    do that again.  Go ahead.

6           The other way.  Sorry.  There we go.

7           All right.  Now let's go back.  So you can see,

8    rounding up, 10 percent exactly.

9           So if you go to row 181 on 7/25/2018, at 10:42:26,

10   that was what -- actually just below that is the first time at

11   which point AWX -- I'm sorry -- MintBroker entered a trading

12   window with respect for determining what the short-swing profit

13   was.  And you'll see throughout this analysis, they go in and

14   out of that window.

15          THE COURT:  Can I just ask something of counsel.

16   There is certainly the issue of the data that underlies this,

17   but let me ask plaintiff counsel, if that data were accurate

18   and considered, do you challenge Mr. Christian's assessment of

19   what the short-swing profits are using that data?

20          MS. TAUBER:  Absolutely, because, well --

21          THE COURT:  Okay.  That's fine.  Okay.  Thank you.

22   BY MR. FORD:

23   Q.   Can we scroll down.  And I'm going to ask about situations

24   in which the company goes back down below the 10 percent

25   threshold.

1          So, right there.  Yeah, scroll back up.

2          Ultimately, in performing the calculations, did you

3    include situations where it dropped under 10 percent having

4    already gone above 10 percent?

5    A.   I should probably say we -- for purposes of calculating the

6    disgorgeable profits, we only included the transactions in

7    which MintBroker held a 10 percent or above position, above

8    10 percent position, yeah.

9    Q.   So to be clear, if we were to look at line 292, that would

10   not have been included in your calculation.

11   A.   Correct.

12   Q.   Okay.  Can we scroll down a little bit more.

13          Stop right there.

14          Now if we look at line 353, that, however, would

15   continue -- that would be included in your calculation?

16   A.   Correct.  My report shows that as well.

17   Q.   Did you -- were you -- did you have the opportunity to

18   review plaintiff's short-swing profit calculations in this

19   case?

20   A.   I have.

21   Q.   Starting with AWX, can you tell me your opinion on their

22   findings.

23   A.   They were certainly overstated.  First of all, there's

24   client trades included.  So I hope I wouldn't need to expand on

25   that, but I can if it's helpful why it would not be appropriate

1   to include client trades.

2           In addition, there's client -- recordkeeping.  So

3   32812, for example, are included in the calculation, which

4   would grossly overstate the exposure, meaning the disgorgeable

5   profits.

6   Q.  Before we get to the disgorgeable profits and the

7   conclusion -- strike that.

8           And what was your assessment of their calculation of

9   short-swing profits for GBR?

10  A.  They were overstated by at least $5 million.  I believe

11  my -- there's two ways that I calculated it.  We can get to

12  that.  But using the same methodology as the plaintiff, my

13  rounding disgorgeable profits would be 1.2 million versus

14  6.2 million of the plaintiff.

15          (Discussion off the record)

16  Q.  This is Defendant's Exhibit 6.  Mr. Christian, do you

17  recognize this document?

18  A.  I do.

19  Q.  Can you tell us what it is.

20  A.  Sure.  What this does is stratifies -- so the -- I'm trying

21  to remember the name of the tab on the Excel sheet.  But

22  essentially, as I stated, it's the second tab next to the

23  criteria, the raw data.  What this does is summarize activity

24  by the nature of the account and whether it was buy or sell.

25  So what's relevant to note is the -- the transactions in scope

1   are the first three lines, 32810 corporate account trade

2   activity, or rather, I should say, the -- the activity that

3   traded through -- activity that flowed from that account

4   number.  So 32812, fourth line, similar.  These are recording

5   entries, which we spoke about.  And then so on, so forth, are

6   all the client activities, buy or sell.  And this is for the

7   GBR security versus AWX on that other Excel spreadsheet.

8   Q.  And did you create this document?

9   A.  I did.

10  Q.  Did you do that manually or --

11  A.  This is what we call Excel VLOOKUP.  I'm sorry.  Pivot

12  table.

13  Q.  Pivot table.  If we scroll down just a little bit.

14          What you've done here is it appears laid out the buys

15  and sells of each respective account; is that accurate?

16  A.  Correct.

17  Q.  Can we go to the next one.

18          THE COURT:  Wait.  Scroll back up.

19          So the 32812 account, you refer to as no trade

20  activity, and that's because your understanding is that account

21  simply is a log or recording of trades that were made

22  elsewhere?

23          THE WITNESS:  I would say it was a recording account

24  for any trade that went through the system, which I was able to

25  corroborate by validating that there was a corresponding trade,

1    corporate or otherwise, that -- for every 32812 trade, so --

2              THE COURT:  So on this Exhibit E --

3              THE WITNESS:  I shouldn't say trade.  32812 record.

4              THE COURT:  So on this Exhibit E, 32812, you have

5    total activity of buy and sell of 14 million, plus.  Do all the

6    buy and sell in all the other accounts listed in Exhibit E —-

7    so 32810, then all the client accounts —- do those total

8    14 million plus?

9              THE WITNESS:  I believe.  That would be my

10   understanding, yes.

11             THE COURT:  Okay.

12   BY MR. FORD:

13   Q.  And it states on the right-hand column Quantity of Shares.

14   Does that number reflect the quantity of shares or the value of

15   the shares?

16   A.  Quantity.  It's how many shares.

17             THE COURT:  Wait.  And can you find the account on

18   here that is the 067 account that we were looking at yesterday.

19             And let me ask counsel, in this account, the GBR, what

20   was the total number of clients, approximately, that traded?

21             MR. FORD:  It's a little over 700 in GBR and a little

22   over 900 in AWX, and I'm almost certain I'm getting that right

23   and not flipping them.

24             THE COURT:  So if I'm looking at this and there are

25   going to be about 700 plus clients in there, maybe exactly 700,

1    5.7 million of the 14 plus million trades are in this one

2    account, 10067.  So that leaves roughly let's say 9 million

3    that should be accounted for by the other clients.  Many of the

4    other clients -- and at least pursuant to the testimony

5    yesterday was that many of the clients didn't trade in high

6    volume and did smaller trades, and we see examples here of

7    1,080 between buy and sell, another was 400 between buying and

8    selling.  If there are 700, I don't know what the average is,

9    and I don't know that anyone has said, but to get from 700

10   clients, or in this case 699, because we're already taking care

11   of 0067, you have to have 699 clients making up that 9 million.

12   If let's say those 699 clients were the smaller clients, let's

13   say they were all smaller, well, if they did a thousand, let's

14   say, each, that's only 699,000, not the millions I just said.

15   Are there other big clients is my question like the 067

16   account, even if not that same magnitude?

17            MR. FORD:  There's two things.  I don't think there's

18   anything -- there's no other client of that magnitude, one.

19            Two, the 3 -- the 32812 account by its nature I

20   believe includes duplicative entries.  I think Mr. Gentile

21   explained why that would be the case.  We did look at examples

22   yesterday of individual trades where, because they're being

23   partially routed to our -- to either IB or ETC, or let's say

24   they're being partially routed to IB and then some are being,

25   you know, executed through the inventory account, it goes out

1    to IB for execution and then returns back, and I think 32812 is

2    logging all of those transactions.  So I'm not certain that

3    this document -- what we just saw is the 14 million accurately

4    reflects the amount of trades that were executed.  It only

5    accurately reflects the number of 32812 journal entries.

6                THE COURT:  Okay.  All right.

7                MR. FORD:  Which, as I understand, could be

8    duplicative based on the routing of the actual execution.

9                THE COURT:  Okay.  All right.  Please continue.  Thank

10   you.

11               MR. FORD:  We can move on to the next one.

12   BY MR. FORD:

13   Q.  Mr. Christian, do you recognize this?

14   A.  I do.

15   Q.  And is this also a report that you generated?

16   A.  It is.

17   Q.  And can you describe what it reflects.

18   A.  Essentially the exact same thing we saw, but with respect

19   to the AWX trade activity.  This is a -- to be clear, this is a

20   register of the journals, the entries, through the I Broker

21   system, with respect to whether they were buy or sell and which

22   accounts, as well as identifying the -- the accounts with trade

23   activity, which is 32810, corporate trade activity.

24   Q.  Looking only at the first two entries for 32810, one is

25   labeled Corporate Account No Trade Activity, Corporate Account

1    Trade Activity.  Can you explain first the difference between

2    those two entries.

3    A.   Sure.  At times, through the 32810 account, the client

4    would -- would record fulfillment.  So this is an investment

5    firm.  So the client is seeking to buy, let's say 500 shares of

6    AWX.  MintBroker -- MintBroker would procure 500 shares of

7    AWX -- that's a buy -- and then sell to the client.  This is an

8    immediate transaction, custodial in nature versus belonging to

9    AWX.

10            THE COURT:  I just want to clarify.  I think I

11   understood that.  But is it fair to say that the no trade

12   activity designation are client-initiated trades that were

13   filled with MintBroker inventory?

14            THE WITNESS:  The -- your question was, are these

15   client-initiated trades but fulfilled by MintBroker what?

16            THE COURT:  Inventory of the stock.

17            THE WITNESS:  Not necessarily in total, no.

18            THE COURT:  All right.  So they are, but is it the no

19   trade activity means a client-initiated trade?

20            THE WITNESS:  Correct.

21            THE COURT:  Okay.  And did the GBR version of this in

22   Exhibit E, did that have a similar no trade activity for 32810?

23   I just don't remember.

24            MR. FORD:  We'll pull it back up.

25            THE COURT:  It does not for 32810.  Why not?

N221AVAH                          Christian - Direct

1    BY MR. FORD:

2    Q.  Mr. Christian, did you recall why you did not include a no

3    trade activity ledger on the GBR trades.

4    A.  Sure.  With respect to the GBR trades, first of all, even

5    with the 32810 account included, we saw that the -- MintBroker

6    never crossed that 10 percent window, so work stops right there

7    at that point.  More conservative.  So it's very possible that

8    32812 -- I'm sorry -- 10 here has -- would have had -- come to

9    a conclusion that there is exposure with respect to this

10   short-swing profit rule that further analysis would have

11   indicated that these should have been broken out.

12            So to restate that, with GBR, MintBroker never crossed

13   that 10 percent window.  No reason for further work.  On the

14   most conservative basis, meaning all 32810.  But with 328 --

15   I'm sorry -- with AWX, that wasn't the case.  We did see an

16   exposure.  So then the question is, for 32810, which were

17   fulfillments, which were -- were corporate trades.  And I can

18   go into some detail how we did that.

19   Q.  Okay.

20            THE COURT:  Okay.  Thank you.  You can go back.

21   BY MR. FORD:

22   Q.  You read my mind.  That was my next question, if you can

23   explain on the AWX spreadsheet how it was that you were able to

24   differentiate between 32810 corporate trades and client trades.

25   A.  Can you open up the 328 -- I'm sorry -- the Excel document.

1          For AWX, please.

2          Can you go to the Wash Entries tab.  All right.  So

3   highlight row 1.

4          Okay.  And then go to Data.  That's in the ribbon.

5          All right.  And then there is a little -- bottom

6   right, there is a button that says Filter.  It looks like an

7   upside down triangle.

8          All right.  Now go to column A1 and -- yup, yup.

9          Okay.  As you can see, both 32810 and 32812 accounts

10  are in here.

11         As we already discussed, going back to Wash Pivot,

12  I'll explain what the Wash Pivot is, and the wash being a loose

13  term.  What this is doing is this is tallying up for all those

14  accounts in 32810 and 32812 that were -- first of all, 32812 is

15  all the activity.  But we were able to isolate which 32810

16  transactions had an offsetting or I should say a duplicative

17  trade at the exact same time as a client trade, so meaning

18  something that started with a letter.  Once we went through

19  that analysis -- and that's not something you see here.  But

20  once we went through that analysis of determining, okay, what

21  instances did we have of the 32810 account, any trade in a

22  client trade, meaning a trade starting with a letter, with the

23  transaction having an account number that starts with a letter,

24  at the exact same time, at the exact same quantity, share

25  price, everything, same, so as part of that, what I did is I

1    extracted -- as a double-check, I extracted the 32810 activity

2    as part of that analysis and populated it in wash entries tab.

3    And to double-check it, included it in this VLOOKUP, and as you

4    can see, virtually always -- I'm sorry -- this pivot table, if

5    you go to Wash Pivot -- we're in the wrong tab.

6           As you can see, if you just were to scroll over 8,000

7    records -- just keep scrolling up.  Just keep going, so the

8    judge can see -- it's almost always zero.  I'll explain when

9    it's not zero.  Very frequently -- and here you can see,

10   there's probably a -- a situation, maybe the system is working

11   slower.  It's very consistently showing zero.  And it always

12   immediately nets to zero, within seconds, less than a minute.

13   So what that tells me is it corroborates -- first of all, this

14   is not the only validation.  We validate it three ways.  One is

15   there's an offsetting client trade for the exact same time,

16   exact same amount.  So that right there led me to be convinced

17   that these are fulfillments; it's just recording a fulfillment,

18   I should say.  Here, it's doing the wash at the exact same

19   time.  It's recording the fulfillment, the buy and sell, at the

20   exact same time.  That's the nature of the fulfillment, right?

21   You buy it and pass it to the client.  So in terms of time,

22   which is insignificant, having worked at investment banks, to

23   have a 30-second trade to get a quick profit, that doesn't

24   happen.  So that's just not -- doesn't make sense.  So what

25   this is telling me is that these are just recording the

1    fulfillment, and the -- the time is almost always the same, and

2    when it's not, it still nets to zero.  It's just a lag in the

3    system.  Could be interface with the client, could be many

4    reasons, but bottom line is, validated it through two different

5    approaches that those items, those trades -- I won't do air

6    quotes 'cause you can't see them -- but the journal notes,

7    journal entries for 32810 that showed up in that pdf where we

8    summarized activity, trade, no trade activity, so on, so forth,

9    that those recording entries we took -- I took out of 32810 are

10   in fact not trades.

11          So hopefully I explained that sufficiently.  I know it

12   can be complicated.

13   Q.  Thank you.

14          We're going to pull back up the -- I think it was

15   Exhibit 7, AWX.  So in this document, Exhibit 7, the process

16   you just described is how you were able to differentiate what

17   you're referring to as corporate account no trade activity and

18   corporate account trade activity; is that right?

19   A.  Yes.

20   Q.  And in performing your ultimate calculations on

21   disgorgeable profit, were both included?

22   A.  No.  The rows -- rows 5 and 6 of this document, so 32810

23   corporate account trade activity and subsequent buys and sells,

24   1.9 million each, were calculated for the purposes of

25   determining disgorgeable profits.

1    Q.  Can we go to the next exhibit.

2         Do you recognize this document?

3    A.  I do.

4    Q.  Is this something you created?

5    A.  It is.

6    Q.  This is Defendant's Exhibit 2.  Can you describe what this

7    document is.

8    A.  This is similar to the document that we went over for AWX.

9    It's virtually the same, but to reiterate, anything with the

10   yellow or red highlight is a field that I entered for purposes

11   of analysis.  The other fields are raw data from -- well, not

12   raw data but from the raw data for GBR -- I'm sorry -- GBR, all

13   activity within the 32810 account.

14        So as you recall, the first pass was to see, using all

15   activity within 32810 for GBR, did MintBroker ever cross into

16   the 10 percent window, and they did not, as you can see in this

17   document.  So similarly, starting with that first row, we -- we

18   record the first transaction.  In this case they started with

19   the long position.  The percentage of ownership -- which you're

20   not going to see the decimal as we did with the Excel -- does

21   show at what point -- the last two columns show what the

22   percentage of ownership was from the same method, using the

23   prospective of outstanding shares.  And the last column is at

24   what point did they have more than 10 percent ownership.  And

25   if you scroll down, it should say no all the way down.

1          THE COURT:  Mr. Ford, this is the GBR version of the

2    AWX version of what we saw before; is that right?

3          MR. FORD:  Yes, although I'll note that it's not in

4    Excel form.  I think this is a pdf version of it.  But

5    otherwise, yes.

6          THE COURT:  Okay.  Why don't we just establish that.

7    Don't go through the whole thing.  If you did it with the --

8    right, if there's a difference, then point that out, but

9    otherwise, do it summarily, please.

10          MR. FORD:  Yes, thank you.  We're moving on from that.

11    We'll pull up the next one.

12          THE COURT:  Okay.

13    A.  I believe this is a version I included in my report, the

14    Excel spreadsheet too, the pdf.

15    Q.  And do you recognize this document?

16    A.  I do.

17    Q.  And is this a document you created?

18    A.  It is.

19    Q.  And can you just describe very briefly what it represents.

20    A.  Exactly what we just saw.  On the GBR except for AWX.  Same

21    methodologies.  The fields are consistent with my previous

22    explanation.

23          MR. FORD:  If we can go to the next one.

24    Q.  Do you recognize this document?

25    A.  It is -- I do.

1  Q.  And this is something that you created?

2  A.  This -- this is a verification of something I created.

3  Q.  Okay.  Can you explain that.  By the way, this is

4  Defendant's Exhibit 4.

5  A.  Sure.  As part of calculating the short-swing disgorgeable

6  profits, using the Second Circuit Court of Appeals methodology,

7  it's quite a -- it's a manually intensive process.  I did

8  accomplish it manually, but I did ask for this to be confined

9  through some sort of computer software, so -- meaning I wanted

10  to get comfort that my number matched a number otherwise;

11  confirming, if you will.  But -- so this is the output from

12  that, and this is showing I believe the variance between my

13  number, and this was $800 total, so that gave me comfort

14  that -- obviously, any time you do something manually,

15  something is prone to error, and although I'm quite diligent,

16  I've been doing this for some time, it's always nice to have a

17  corroborating verification.  It wasn't necessary, and as you

18  can see, my number was accurate, but this was the version I

19  included in the report.  It's just cleaner.  Mine was many,

20  many tabs long, so --

21  Q.  And so to be clear, this is a computer-generated

22  confirmation of manual calculations that you did?

23  A.  Correct.

24  Q.  And can you describe the manual process of performing these

25  calculations.

A.    Sure.  So we can use this as an example because it's
virtually the same, even though it's not the source document.

           So starting with the Second Circuit Court of Appeals,
which, if it's relevant, I do not feel fairly represents
disgorgeable profits, and I can provide a very clear example
how it would be inconsistent in two cases.

Q.    We can come back to that.  For now, let's just --

           THE COURT:  Whether the Second Circuit is fair or not
doesn't matter.  We just need to follow what they do.  And I
assume this is the high/low matching; is that right?

           MR. FORD:  Yeah.

Q.    So that's all I'm asking about is manually how you
performed the calculations, so --

A.    Okay.  Sure.  But using that methodology, what we need to
do is first start -- start with the -- within that, within the
trading windows, where MintBroker held a more than 10 percent
position, starting with their highest sells.

           So as you can see, the first records, the sells get
lower and lower.  So to be more clear, the first column, the
first column is the match.  That's a sequential number.  It's
showing there's no break, just for verification purposes.  But
the column that says sale, share price, date, this is in order,
your -- your trades that had the highest price, or I should say
your -- MintBroker trades in the corporate account that had the
highest sell price.

1          Now you'll notice that the first two columns have the

2    same information.  And the reason is, it's very unlikely that

3    your lowest sell prices and your highest buy prices, that they

4    just so happen to have the same number of shares in the trade.

5    So it's a intensive process, where you first start with the --

6    just to provide an example, row 1, 5,000 shares, so 759.

7    Unfortunately, the lowest -- not unfortunately, but it just

8    makes it more labor intensive.  The lowest sell price was 3,000

9    shares, $3.331.  So you can only apply 3,000 of that to the

10   first 5,000.  So that's why, row 2, we then need to apply the

11   remaining -- remaining 2,000 shares, right, to -- to get -- to

12   fully cover that high sell price.  And then so on, so forth.

13   So this is -- it's difficult to put in words, but essentially

14   what you're trying to do, what you are doing is you're matching

15   on a share basis your highest sell trades with your lowest buy

16   trades.  And of course that maximizes your potential profit,

17   and as you go on, showing support, your margin on a per-share

18   basis gets smaller and smaller and smaller.  Eventually you get

19   to a point where your -- as part of my analysis, your sell

20   price and your buy price is the same, so it's net zero, and

21   that's where you stop, because the Second Circuit Court of

22   Appeals did not permit, in that case, for losses to be -- to be

23   included, so this just has profits, with respect -- to get that

24   analysis.

25   Q.  And having described the manual analysis, in your opinion,

1    did the data you have access to permit you to accurately make

2    that calculation?

3    A.  It did.

4              THE COURT:  How much more do you have with this

5    witness?

6              MR. FORD:  Just his expert report and that's it.

7              THE COURT:  When you say that, do you mean to get it

8    admitted or to go through it?

9              MR. FORD:  We're going to go through it fairly

10   quickly.  On the issue of admission, I have been, I'll admit,

11   kind of sloppy under the understanding that we were going to --

12             THE COURT:  That's in.

13             MR. FORD:  -- admit everything at the end unless

14   there's a specific objection.

15             THE COURT:  Correct.  But I of course can read the

16   report, and so you don't need to do it in detail.

17             MR. FORD:  I won't.  Have we gone through everything

18   but the report?  Right?

19             (Discussion off the record)

20   BY MR. FORD:

21   Q.  Mr. Christian, do you recognize this document?

22   A.  I do.

23   Q.  And is this a document you created?

24   A.  It is.

25   Q.  Can you describe briefly what it is.

1            THE COURT:  You can lead him on questions like this.

2            It's your expert report, right?

3            THE WITNESS:  It is.

4            THE COURT:  Okay.  Thank you.  Go ahead.

5   A.   There's some context about what needs to be in this report,

6   but other than that, yes, I agree.

7   Q.   Do you recall the conclusion of your expert report with

8   regards to the short-swing profits for AWX for MintBroker?

9   A.   Do I recall the nature of --

10  Q.   The conclusion of the amount of the short-swing profits in

11  AWX for MintBroker.

12  A.   For AWX, usually Second Circuit's Court of Appeals

13  methodology --

14  Q.   Go ahead.  We can --

15           THE COURT:  Let me do this, please.

16           THE WITNESS:  I remember what it is.

17           THE COURT:  Does your expert report accurately reflect

18  your conclusions and opinions in this case?

19           THE WITNESS:  It does, and I can show you --

20           THE COURT:  Okay.  And does it set forth the numbers

21  you have calculated for the short-swing profits for both AWX

22  and GBR?

23           THE WITNESS:  Correct.

24           THE COURT:  And if you want those numbers stated in

25  the record, why don't you go there and then just do that.

1    BY MR. FORD:

2    Q.  Can you state what your conclusion was with regard to AWX.

3    A.  Sure.  So for GBR, no disgorgeable profits.  For AWX, using

4    the Second Circuit Court of Appeals method, $1,202,110.

5    Q.  This is the last question -- last couple questions.  Did

6    you also perform a calculation of actual profits that were made

7    by the company?

8    A.  I did.

9    Q.  And what was that amount, with regard to AWX?

10   A.  100 -- it's right here.  178,000.  And there are some -- I

11   think there is some context here that --

12   Q.  That's okay.

13   A.  -- I'd be happy to share, but -- go ahead, yeah.

14        MR. FORD:  I think that's all we need for now.  We

15   appreciate you taking the time to testify.  I'm going to pass

16   the mic over to my colleague.  If you need a break, I would

17   suggest now would be a good time.

18        THE COURT:  Yes.  We're going to take a 10-minute

19   break and we'll resume with cross-examination of Mr. Christian.

20   I just remind you not to discuss the substance of your

21   testimony with Mr. Ford or other attorneys during the break.

22        THE WITNESS:  I'm sorry?

23        THE COURT:  Don't discuss the substance of your

24   testimony with the lawyers during the break.  Thank you.

25        THE WITNESS:  Oh, no problem.

1          THE COURT:  Thank you.  We'll resume at 11:15.

2          (Recess)

3          (In open court)

4          THE COURT:  You may begin your cross.

5          MS. TAUBER:  All right.  Great.

6   CROSS-EXAMINATION

7   BY MS. TAUBER:

8   Q.  Mr. Christian, who hired you for this matter?

9   A.  Guy Gentile.

10  Q.  Okay.  Did MintBroker also hire you?

11  A.  My engagement was with Guy Gentile.

12  Q.  I'm sorry?

13  A.  My engagement was with Guy Gentile, the CEO of MintBroker.

14  Or the -- the point of contact for the purpose of the

15  engagement.  You can't do an engagement with an organization

16  strictly.  You can do it -- meaning if you're addressing your

17  report, it needs to go to a person.  You can't -- right.  So

18  Guy Gentile, for that respect, was my point person.

19  Q.  Did you inquire whether Mr. Gentile was authorized to hire

20  you on behalf of MintBroker?

21  A.  Based on representations, yes.

22  Q.  Based on Mr. Gentile's representation?

23  A.  Yes.

24  Q.  Okay.  Is that normally how you would confirm that somebody

25  is authorized to hire you on behalf of an entity?

N221AVAH                    Christian - Cross

1    A.  Yes.  So we need to identify an appropriate point of

2    contact.

3    Q.  And usually you would rely on someone's representation to

4    that effect?

5    A.  Judgment, my professional judgment, yes.

6    Q.  Okay.  And how much were you paid?

7    A.  Boy.  I think I have to look back.  I don't remember.  With

8    respect of the engagement -- I do not remember.

9    Q.  Was it hourly or --

10   A.  1500, about $1,500.

11   Q.  Okay.  Total.

12   A.  Total.

13   Q.  Total?  Okay.  Was that for both cases or for one case?

14   A.  It includes the -- for the report that we went over today,

15   to deliver that report and perform the engagements,

16   encompassing AWX and GBR, yes.

17   Q.  Total of 1500.  Okay.  Okay.  Do you remember --

18           MR. FORD:  I'm sorry.  If I can just interject.  It's

19   unrelated, but is there a way we could get a wind guard on his

20   mic because we're having the same problem I had yesterday with

21   the popping.

22           (Discussion off the record)

23   Q.  Okay.  Do you recall testifying that accounts beginning

24   with letters were client accounts?

25   A.  Yes.

1   Q.  Where did you get that information from?

2   A.  Initially, from the initial discussions with Mr. Gentile,

3   subsequent discussions with Mr. Darville, and then direct

4   inspection, as I testified to earlier.

5   Q.  Okay.  Right.  As I recall, maybe I didn't hear you

6   correctly, but I think you said you pulled up a sample of

7   client accounts to see the names on them?

8   A.  Correct.

9   Q.  Okay.  And how many, approximately, did you pull up?

10  A.  Generally I go for 20 percent sample.  What I would do is

11  take out some high value samples.  So in the one case, we had

12  one that was a larger client.  And then the rest would be

13  straight --

14  Q.  Sorry.  Stop there.  Did you confirm that one?  Did you

15  look at that client?

16  A.  I cannot recall.  But being that was the highest one, if

17  you were to ask me what was the name, I won't be able to tell

18  you the name, but it would have been one that would have been

19  certainly the highest value.

20  Q.  So you took out the highest value, you took out that

21  number -- as we established --

22          THE COURT:  Wait.  Hold on.  Took out the number,

23  what?

24  Q.  You took out the highest value that you just discussed,

25  this MBS10067?

1          THE COURT:  But you're talking about confirming who

2     was a client.

3          MS. TAUBER:  Confirming whether it was a client

4     account, yes.

5          THE COURT:  Okay.  All right.

6     A.  Proper procedure would be to take -- the sampling would

7     have two components.  First you're identifying your highest

8     value, right.  So that would have been one we looked at.  I

9     can't remember the name of that one, what the client name was.

10    Q.  Do you remember if it was an individual or an entity?

11    A.  What was that?

12    Q.  Do you remember if it was an individual or an entity?

13    A.  I cannot recall.

14    Q.  If it was an individual, would that have surprised you,

15    based on the volume of trading?

16    A.  Not necessarily.  High-wealth individuals are major clients

17    of investment banks.

18    Q.  Okay.  And did you inquire about whether that client was

19    important to the firm in some way?

20    A.  It wouldn't have been relevant.  The nature of -- first of

21    all, it wasn't -- Mr. Gentile -- I would have confirmed if it

22    was a closely held entity.

23    Q.  How would you have confirmed that?

24    A.  Inquiry.  Inquiry.  Google search as well.  So certainly if

25    you -- there's no way I can verify with a hundred percent

1    certainty that the nature of who that person is isn't related

2    to MintBroker, but you ask multiple people, ask Stephen, ask

3    Mr. Gentile, and try to corroborate yourself.

4              The one thing —- you cut me off —- is, a piece of that

5    sampling is random sample.  So it's not just high value.  You

6    want to make sure that you're encompassing some of the lower

7    volume as well.  So you're stratifying essentially your

8    selections across --

9    Q.  As you sit here today --

10             THE COURT:  Let him finish.

11             MS. TAUBER:  Sorry.

12             THE COURT:  Let's not have what happened yesterday.

13             MS. TAUBER:  Sorry.

14   A.  So first of all, judgmental basis.  Use the figures which

15   are high value.  And you try to get amount of coverage on an

16   account basis, so 20 -- 10 percent to 20 percent.  That's

17   professional judgment.  It's common professional judgment, for

18   this nature of engagement.  Once you feel comfortable that

19   you've covered your high value, the rest you just do a straight

20   random sample.  You can accomplish that by Excel.  So you just

21   sample it and pick those ones.

22   Q.  So you're describing generally accepted procedure, and that

23   is the procedure you followed in this case?

24   A.  Yes, it's a -- it would be a procedure you would expect

25   somebody in that position for this type of engagement to

1  perform, yes.

2  Q.  I'm not asking what you would expect.  I'm asking if you in

3  fact performed that exact procedure you just described in this

4  case.  Did you take 20 percent of the clients and look at their

5  names?

6  A.  10 to 20 percent, yes.

7  Q.  10 percent or 20 percent?

8  A.  In this case, I can't recall which.  It's not really

9  relevant.  But the point is to say you need to have some kind

10  of practice for getting comfortable that you've gotten some

11  kind of sample coverage.  Keep in mind, the high value of

12  coverage in itself is covering -- I think we just covered this.

13  I can't recall what it was, but it was a large volume of the

14  transactions.  So just by looking at one account, you've

15  provided quite a bit of coverage.

16  Q.  Yes, you have.  So I have a question.  Do you remember

17  specifically whether you looked at that account?  I don't think

18  you gave a clear answer to that.

19  A.  As I told you, I don't remember the name of the account

20  that was on that.

21  Q.  I'm asking if you remember if you looked at that account as

22  a sample account.

23  A.  I had looked -- I can -- can't tell you the name of the

24  account, so it would be difficult for me to say definitively,

25  but however, due to the nature of my practice, how I would do

1   every engagement, regardless, what I'm trying to validate is

2   the complete population.  You always do the high-value sample.

3   So I'm going to say that by the nature of my practice, yes, I

4   did look at that.  But I'm sure you're going to ask me, what's

5   the name of that client.  I'm not going to be able to respond.

6   That doesn't mean I didn't do it.

7   Q.  No.  I'm asking if you remember that you actually did it,

8   not if you would have done it or you generally do it, if you

9   specifically remember doing it in this case.

10  A.  I remember picking high-value and random samples.

11  Q.  Okay.  You're not sure if it was 70 clients or 7 or 700

12  clients or -- sorry -- 70 or 7, 10 percent, 20 percent?  I

13  mean, what was the number that you think you looked at?

14  A.  I mean, 10 to 20 percent is something out of thin air.

15  It's a general practice.  So there's nothing in the guidelines

16  that says you have to have 10 to 20 percent.

17  Q.  No.  I'm asking you what you did in this case.  Not what's

18  in the guidelines; what you did in this case.

19  A.  So in this case, high-value and random sample.  So across

20  700, maybe looked at -- because the high value had so much

21  coverage, maybe 10 to 15 more.  But again, I'm speculating.

22  This isn't something that I need to document as part of this

23  engagement.  It's something that I need to do to get

24  comfortable with the critical nature of the engagement, which

25  is identifying which are in scope for the purposes of

N221AVAH                    Christian - Cross

1    determining short-swing profit rule.  So through that process,
2    I got comfortable that those accounts starting with a letter
3    were client accounts.
4    Q.  So you said this is what you had to do for this engagement.
5    Is this the process you would have performed if you were
6    performing an audit?
7    A.   It would be similar in nature.  Obviously audits are for
8    far more prescriptive in terms of the doc -- what you document,
9    what you have to retain documentation for, for example.  So the
10   only difference in this situation, and with -- in the confines
11   of what we're talking about right now, in an audit, I would
12   have had to have retained all that documentation -- what was my
13   sample methodology, I had to write up my sampling methodology,
14   who did you sample, what did you see, in verbose detail.  The
15   standard of documentation is far more than agreed-upon
16   procedures engagement.
17   Q.   In an audit would you have had to give the names of the
18   clients you took for the sample?
19   A.   I would have had to have documented who I sampled and the
20   nature of what I did to invalidate that from the population, as
21   part of an audit.  Had to document it.  Meaning -- this was a
22   year ago I did this.  I wouldn't have to try to remember.  I
23   would just look at my work papers.  Now you're asking me if I
24   remember something I did from April of last year.  I don't
25   remember what it was.

1    Q.  I think it was actually May 30th.

2    A.  Sorry?

3    Q.  May 30th is the date of --

4    A.  So --

5         THE COURT:  Well, that's the date of the report.

6    Doesn't mean that's the date of when he did his work.

7         (Discussion off the record)

8    Q.  Did you print out a list of client -- you said there were

9    700 account numbers here, right, approximately?  Did you print

10   out the list of 700 client names?

11   A.  There's no need to.  There was no rationale for doing that.

12   I don't know if I had that capability in the iBoss system and

13   felt there was no need to do that at any point.

14   Q.  You had said to look at the corporate accounts or to

15   confirm the corporate accounts were corporate accounts you

16   looked at them and saw that their names were -- had some

17   version of Mint in them, correct?  Did you do that with respect

18   to the client accounts and look to see if any of the client

19   accounts had some version of the name Mint in them, similarly?

20   A.  I did not.

21   Q.  Okay.  Would you have remembered if that large account we

22   talked about had some version of that name in it?

23   A.  I would think -- I would think so, but I don't remember

24   that.

25   Q.  Okay.  Did you ask Mr. Gentile for a list of known aliases

1   or affiliates of MintBroker?

2   A.  I did not.  What I did do is asked if there are -- that's

3   not the way -- that's not how I would ask that question.  I

4   would ask are there -- to achieve that objective, I would have

5   asked him, any close -- any closely -- any client accounts that

6   are closely held affiliates.

7   Q.  Well, would you have wanted to confirm has answer?

8   A.  Not with an agreed-upon engagement, and the nature --

9   regardless of whether the name is on there or not, it's still

10  limited support.  Meaning a name itself, certainly if there's a

11  name Mint on it, it raises a question, but even if there is the

12  name Mint on there, doesn't necessarily mean it's a closely

13  held entity.  This is based on whether it needs to be

14  consolidated with the entity, which is a certain amount of

15  ownership.  It's limited in the sense that what I would be

16  better served is to gain an understanding of the nature of

17  those client accounts, who's in there, are these closely held

18  entities, are these subsidiaries, are these clients, and,

19  through the process of validating some of these responses, get

20  comfortable that those accounts starting with a letter were

21  client accounts.

22  Q.  So the fact that a corporate account had some variation of

23  Mint was confirmation enough that it was a corporate account,

24  but if that same fact happened in a client account, it wouldn't

25  have been confirmation that it was related.

1  A.  One more time.

2  Q.  I'm just confirming that you used one criteria -- you

3  looked to see if a corporate account was a corporate account by

4  looking at the name and seeing that it had some variation of

5  Mint in it, even if it wasn't the exact MintBroker

6  International.  But if you saw that same variation appearing in

7  a client account, or another variation similar to that

8  variation, you would have thought that wasn't proof of the fact

9  that it was related or an affiliate.

10  A.  I would have asked the question.

11  Q.  You would have asked the question.

12  A.  Certainly.

13  Q.  So yet it didn't occur to you to print out the list of 700

14  names and do a control F to see if any of them contained the

15  word Mint to ask that question.

16  A.  It was not a criteria, and you have to pick and choose what

17  work you're going to do.  You're billing the client for your

18  time.  You don't overdo an engagement.  Based on where you're

19  going with this.  I performed more than sufficient procedures

20  to get comfortable with the population in scope.

21  Q.  Okay.  Is what I just described about printing out the list

22  of names and doing a control F or just scanning them to see if

23  any known affiliates were in there, is that something you would

24  have done in an audit?

25  A.  Potentially.  We can't speculate.  You have to give me a

1    specific, what am I auditing, what's the entity am I auditing,

2    is this a --

3    Q.   This is -- Sorry about that.  I didn't mean to interrupt.

4    Let's say you're auditing a brokerage like MintBroker.  What

5    would you have done?

6    A.   Is this a financial statement audit?

7    Q.   Well, like an antifraud audit, for example.

8    A.   There's no such audit as an antifraud audit.

9    Q.   Didn't you say you were an antifraud auditor?

10   A.   What I did say during my deposition, which you described,

11   would be much more conducive of criminal investigation.  That's

12   what I would expect somebody who's doing a criminal

13   investigation to do, not in an audit.  I wouldn't

14   necessarily -- because first of all, you're getting a list of

15   700 client names, you now have to get some sort of comfort

16   level in terms of where is that information coming from, and

17   again, the risk here is, if you're doing an audit of financial

18   statements, the objective is the same -- which of these trades

19   belong -- are custodial in nature and which of these are --

20   belong to the corporation.  So the procedure would be the same.

21   Now could there be a situation where somebody may want to print

22   out a list of 700 employees to spot check them?  Potentially,

23   but I don't see that in a vacuum without compelling evidence

24   otherwise.  You would need to have some kind of compelling

25   evidence that that was a prudent activity.  And the reason is

1    because audits have certain prescribed -- there are certain

2    situations where you are -- you need to attest to something.

3    I'm not going to speculate.  But in an agreed-upon procedures

4    engagement, certainly -- let me back up and say, I don't think

5    that would be something that would be prudent to do in an

6    audit.  I don't think it would be -- certainly wasn't prudent

7    to do in a -- in a agreed-upon procedures engagement.  In a

8    criminal investigation where there were allegations to this

9    effect that there could be subsidiaries in there, certainly.

10   But no, not -- not in the nature of my engagement.  Probably

11   not in the nature of an audit.  So that's why I was saying you

12   need to go into far more detail as to what was happening during

13   the course of your audit that would lead somebody to do

14   something like spot checking 700; in other words, not a

15   standard procedure for an audit.

16   Q.  Mm-hmm.

17          THE COURT:  Ms. Tauber, you've established very well

18   that he did not follow standard auditing procedures for this

19   engagement and he has made clear that he did not think they

20   needed to be required, so I would move on.

21   Q.  Did you inquire whether Mr. Gentile or MintBroker had any

22   agreements with any of the clients, owners of these accounts?

23          MR. FORD:  Objection.

24   Q.  And I mean apart from the regular -- from the brokerage

25   agreement.  I mean an agreement, let's say, to coordinate their

1    trading or to trade shares amongst themselves, let's say, share

2    commissions, things of that nature.

3    A.  I'm sorry.  Am I answering?  I heard somebody else say

4    something.

5    Q.  There was an objection.  I don't know.

6    A.  Was it sustained or overruled?

7           THE COURT:  Well, she went on I thought to change her

8    question.

9           MR. FORD:  It's withdrawn.

10          THE COURT:  So why don't you state the question again.

11          MS. TAUBER:  I don't remember.

12          THE COURT:  I'll do it.

13          So apart from the regular brokerage agreement.  I mean

14   an agreement, let's say, to coordinate their trading or to

15   trade shares amongst themselves, let's say, share commissions,

16   things of that nature.

17   A.  That would have been -- first of all, you have to get an

18   understanding of the nature of these clients; what is their

19   relationship to MintBroker.  So that would qualify.  And that

20   would be something that could be included in the answer to my

21   questions.  Is what I'm asking, are there closely held

22   affiliates, whether it be by the ownership structure, are there

23   relationships -- related parties is the term that we would use;

24   are there related parties.  So what you're describing is a

25   related party.  If you are coordinating trading activity

1    together, that's –– so none were disclosed, per my inquiry of

2    Mr. Gentile or Mr. Darville, to get an understanding of his

3    nature –– his understanding of the nature of those client

4    accounts, and so there was no evidence otherwise that led me to

5    think that that was the case through the course of my

6    engagement.

7    Q.  You were engaged to determine MintBroker and Mr. Gentile's

8    beneficial ownership of these securities, right?

9    A.  I was retained to determine, with respect to MintBroker's

10   trading activity, at which point they crossed within the window

11   to the 10 percent ownership window for the purposes of

12   determining disgorgeable profits under Rule 16(b).  That was

13   the nature of my engagement.

14   Q.  Okay.  Did you have to look at the definition of beneficial

15   ownership?

16   A.  Well, certainly.  You have to expand upon what is your

17   question here.  Explain more.

18   Q.  Looking at that chart we looked at before, if you remember,

19   it said beneficial ownership more than 10 percent was one of

20   your columns; do you remember?

21   A.  Yes.

22   Q.  So did you have to look at the definition of beneficial

23   ownership to make that assessment?

24   A.  Yes.

25   Q.  And do you recall offhand what the definition of beneficial

1   ownership is?  And you can paraphrase.

2   A.   Sure.  The entity or group of closely held entities would

3   be lumped into a category of determining whether or not shares

4   held cross into this window with respect to 16(b).  So you

5   would need to -- you would need to take into account those

6   parties that fall into the definition of beneficial ownership.

7   Q.   Okay.  And apart from affiliates, what about coordinating

8   trading activity?  Does coordinating trading activity indicate

9   the existence of a group for purposes of Section 16 beneficial

10  ownership analysis?

11  A.   I would imagine so, yes.

12  Q.   Okay.  Did you look at whether there was evidence of

13  coordinating trading activity in these documents?

14  A.   How would you -- how would one do that?  Is this a --

15  generally, the risk between these kind of relationships, it's

16  unspoken or not documented agreements, so the best any -- even

17  in any type of engagement one could do would be to inquire of

18  multiple parties as to whether these entities' relationships

19  exist.  Certainly can't -- this -- if this were a different

20  type of engagement, there may be ways that you can confirm

21  that.  But the nature of this engagement not being criminal in

22  nature, no auditor or party accountant would be compelled to

23  try to confirm that.  But they do ask the question.  They ask

24  the question of multiple parties to try to gain an

25  understanding, yes, which I did.

1   Q.  Okay.  Do you recall the definition of beneficial ownership

2   also includes the right to control voting, acquisition, or

3   disposition of any securities?

4   A.  The ability to influence, yes.

5   Q.  Not influence.  Be able to control the voting, acquisition,

6   or disposition of any securities.

7   A.  Exactly.

8   Q.  Okay.  So did you inquire whether MintBroker had the right

9   to vote, dispose of, or acquire any securities on behalf of any

10  of these accounts?

11  A.  By -- by nature of owning securities, they have that right

12  to vote, so the shareholders -- all shareholders have that

13  ability to -- to vote, right?  So what's your question?

14  Q.  I said did MintBroker have the ability to vote, acquire, or

15  dispose of any securities in its customer accounts, did you

16  inquire about that?

17  A.  It would depend on the nature of the agreement with these

18  clients.

19  Q.  Did you inquire about that?

20  A.  No, I did not.

21  Q.  Okay.  When you looked at the names of your sample

22  accounts, did you also call up any account opening or account

23  closing documents?

24  A.  No.  That wasn't relevant to the engagement.

25  Q.  To confirm they actually held an active account at that

1   time, for example.

2   A.  Again, not relevant to the engagement.

3   Q.  Okay.  Are you aware -- did you review any of the documents

4   that were produced in this case?

5   A.  One more time?

6   Q.  Did you review any of the third-party discovery documents

7   produced by third parties in this case?

8   A.  No, there was no relevant -- wasn't required as part of

9   this engagement.

10  Q.  Are you aware that thousands of pages of discovery have

11  been produced by third parties, including Interactive Brokers,

12  ETC, the NYSE, NASDAQ, DTC, Citadel, CBOE, and the two transfer

13  agents for these stocks?

14  A.  Not relevant to the engagement.  Did not review those

15  documents.

16  Q.  Okay.  Do you know that it's relevant to review the actual

17  trading records to understand whether the trades that you

18  reviewed as recording entries were actual trades?

19          MR. FORD:  Objection.

20          THE COURT:  Overruled.

21  A.  In an agreed-upon procedures engagement, that's exactly

22  what it sounds like.  There's no requirement to vouch for the

23  system of the record to -- banking documents is essentially

24  what you're referring to.  It would have been outside the scope

25  of this engagement.

N221AVAH                    Christian - Cross

1  Q.  I'm not referring to any banking documents, although I was
2  going to ask about that.  I'm referring to documents produced
3  by the exchanges, transfer agents, clearing agents, holding
4  companies, custodians, and the like.
5  A.  I equate that to essentially the same nature.
6  Transactional records coming out of brokerages, banking
7  documents.  Same thing for --
8  Q.  So now I'll ask you about the financial statements.
9  A.  Semantics, perhaps, but in spirit, they're the same.
10 Q.  Sorry to interrupt.  About the financial documents, did you
11 review any of MintBroker's financial documents, banking
12 records, account statements, receipts of withdrawals or
13 transfers of funds, anything of that nature?
14 A.  I did not.
15 Q.  Do you know if MintBroker even held a bank account?
16 A.  I did not.  I imagine they would have to have in order to
17 effect trades, but --
18 Q.  Okay.
19 A.  -- no, I don't know the nature of their banking structure.
20 Q.  Okay.  Did you inquire whether it had any segregated client
21 bank accounts?
22 A.  Did I inquire of any entities that had --
23 Q.  Did you inquire whether MintBroker had any segregated
24 client bank accounts?
25 A.  No.  I don't see the relevance, but no, I did not.

1    Q.  You didn't inquire whether MintBroker held its own funds

2    separate from its client funds?

3    A.  Again, not relevant.

4    Q.  Okay.  What about shares?  Did you inquire whether

5    MintBroker -- whether shares held for MintBroker was inventory

6    or held separately from shares held for the benefit of its

7    clients?

8    A.  Again, not relevant.

9    Q.  Okay.

10   A.  Not something that was in the scope of the engagement or

11   had an impact on what my findings would be.

12   Q.  Did you review any of the discovery responses the

13   defendants have produced to us in this case -- for example, any

14   of their contention interrogatory responses or any of the

15   requests for admissions or any of those discovery documents?

16   A.  The nature of my engagement didn't involve any -- no.  I'm

17   not sure how that even falls into play and what the underlying

18   question --

19   Q.  If the defendants, under penalty of perjury, had told you

20   that there was no managed accounts or no client accounts

21   involved in these trades, would that have caused you to look

22   more closely at this data?

23          MR. FORD:  Objection.

24          THE COURT:  Sustained.

25   Q.  At your deposition, I think we discussed that you didn't

1   know that MintBroker had been forced into liquidation at the

2   time that you were hired; is that correct?

3   A.  I know that we discussed that during that deposition.

4   Q.  And did you know it before I told it to you at your

5   deposition?

6   A.  No.

7   Q.  Okay.  And if you had known that, would you have tried to

8   ask for documents from the liquidators?

9   A.  No.  That's the banks -- it doesn't surprise me that

10  another investment bank was liquidated.

11  Q.  Okay.  I want to show you an exhibit.  Sorry.  Maybe I

12  can -- hopefully I won't have trouble.  Sorry.

13          Okay.  So this is an exhibit from our docket.  It was

14  attached to Warren Gluck's letter that he filed.  It's a letter

15  from Ernst & Young, who were the liquidators for MintBroker, to

16  Davis & Co., who I believe is either MintBroker's or

17  Mr. Gentile's lawyer; maybe at some point both.  And I'm going

18  to scroll down to the bottom here.

19  A.  I don't see it on my screen, just so you know.

20  Q.  Sorry?

21  A.  I don't see anything on my screen, just so you know.

22  Q.  You don't see anything?

23          (Discussion off the record)

24  Q.  Okay.  This is a letter from Ernst & Young to the Davis &

25  Co. lawyers in Nassau, Bahamas.  I'm going to put it on a

 1    single page.  It's easier that way.  That way you can see the

 2    whole thing.

 3          And now I'll zoom in, and we can see that this letter

 4    is requesting certain documents be delivered to the liquidators

 5    from Davis & Co.  And the bottom here has a list of documents

 6    they're seeking, okay?  And I'm going to read these to you, or

 7    you can look them over with me.

 8          Starting with No. 1, personal information related to

 9    all clients; No. 2, all client account opening documents

10    including duly executed account opening forms, KYC and

11    compliance-related client documents; No. 3 --

12          THE COURT:  Let's not read through all of them.

13          MS. TAUBER:  Yeah, you see them.

14    Q.  If you could just look at this list and tell me if you

15    reviewed any of this type of information.

16    A.  At least I don't remember seeing any of this documentation.

17    Q.  Was any of this information made available to you?

18    A.  It was not, nor do I see why it was relevant.

19    Q.  Okay.  Do you remember discussing the letter from the

20    executive director of the Bahamas commission at your

21    deposition, Ms. Christina Rolle, and the accusation in that

22    letter that Mr. Gentile was running this business as a Ponzi

23    scheme?  Do you remember that?

24          MR. FORD:  Objection.

25          THE COURT:  Overruled.

N221AVAH                    Christian - Cross

A.    Sorry.   Rephrase the question.   Say the question again.

Q.    Do you recall reviewing a letter with me at your deposition

from Ms. Christina Rolle, the executive director of the

Securities Commission of the Bahamas, in which she accused

Mr. Gentile of running this business, MintBroker business, as a

Ponzi scheme?

A.    I recall that we discussed it.

Q.    Okay.   And if you had -- and I think you said that you were

not aware of that letter until I showed it to you at your

deposition; is that correct?

A.    Right.

Q.    Okay.   And if you had been aware of that letter, would you

have looked at these records more closely and tried to get any

of this information on this list?

A.    No, not based on what you just told me.

Q.    Okay.

A.    Nor do I see how it comes into play.   But certainly just

because somebody accuses somebody of running a Ponzi scheme,

regardless of their stature, that's a -- I cannot take that as

any evidence of itself.   And once again, it wouldn't have any

impact on the impact of the account trading activity, the

corporate bank.   I can understand how one would try to clump

this together, but it's two separate -- one is, the issue of my

engagement is with respect to the corporate activity.   Ponzi

schemes relate to client accounts.   We've already discussed

1    that the client accounts were outside the scope of the

2    engagement, so it doesn't affect the nature of my engagement,

3    how I would have proceeded.  I want to be very clear about why

4    that is the case.

5    Q.  And why was that?  I don't know if I understood the answer.

6    A.  Because the Ponzi scheme, even -- first of all, just

7    because somebody makes a statement that somebody's doing a

8    Ponzi scheme, it's just a statement.  There's no evidence --

9    there's no evidence to this, no criminal allegation.  I would

10   need to follow the court process.

11            Second of all, even if this were a Ponzi scheme, Ponzi

12   schemes are respected to treatment of client accounts.  As we

13   discussed, client accounts aren't in the scope of trying to

14   determine the exposure with respect to 16(b).  So --

15   Q.  Okay.  But --

16   A.  It wasn't relevant is my point.

17   Q.  Okay.  But wasn't a large part of what you did eliminating

18   client account trading?

19   A.  One more time?

20   Q.  Didn't we discuss how you eliminated the client accounts

21   from the analysis that you had done?

22   A.  That's exactly my point.  The client accounts were

23   eliminated, and you're stating if I had knowledge that there

24   was an allegation of a Ponzi scheme.  What I'm saying is, first

25   of all, allegations; second of all, it would not have any

1    impact on the nature of the engagement.

2    Q.  Well, do you remember the specific Ponzi scheme allegation

3    was that clients believed they owned shares when in fact they

4    do not own shares?

5    A.  Again, not relevant.  So let's take a circumstance where

6    the so-called client accounts that were removed from the

7    analysis 'cause they're client accounts, let's just say, just

8    respectfully, if that was -- if these were not actual trades,

9    regardless, they're eliminated.  It doesn't have any impact on

10   my analysis and calculation.

11   Q.  Okay.  Well, let me ask you this:  You had talked about the

12   recordkeeping entry accounts, 32812 -- do you recall that --

13   and I asked you if you reviewed any of the interactive

14   documents or any third-party discovery, and you had said no.

15   Now if you had known that the 32812 recordkeeping trades were

16   actually the trades executed through Interactive Brokers, would

17   that have changed your analysis?

18   A.  No.  We already discussed this in deposition in great

19   detail, and now we're going over and over it.  Remember, the

20   32812 account is duplicative of client trades, so I would

21   actually expect that.  But the 32812 account is not the --

22   that's not the entry.  You would have an offsetting -- well,

23   not an offsetting but a duplicate entry with Interactive

24   Brokers with that client number for each and every transaction

25   with 32812 account, meaning 32812 accounts are repeating as a

1    recordkeeping -- an entry that's a client account.  So how do
2    you know which one's the 32812 and which one's the client
3    account?  I would argue that the more realistic conclusion is
4    that Interactive Brokers activity was for the client version of
5    that same trade, if you will.  Remember, you have -- take a
6    simple example.  Today, client buys 5,000 shares.  You're going
7    to have a client account, 5,000 shares; you're going to have a
8    32812, 5,000 shares.  I would say that what you're seeing in
9    that Interactive Brokers is that client activity, not the 32812
10   account, and you would have no way of differentiating because
11   one's a system of record.  But the more plausible -- I don't
12   think you've arrived at the right conclusion, that the 32812 is
13   the Interactive Brokers.  That's not the accurate conclusion.
14   I think the accurate conclusion is that the Interactive Brokers
15   are in fact stated in there but 32812 is just a duplicative
16   recordkeeping entry.  Do you follow?  And we went through this
17   in deposition in great detail, and I was able to explain this
18   to you, and now we're going through it again.  So --
19   Q.  Well, my point is, you would know not just by the number of
20   shares but also there were other things on that chart, right,
21   but they were the price, the commission, the time of execution,
22   right?  So if all of those columns were identical to the
23   Interactive Brokers records, but there were some variants in
24   the client -- maybe it's the price, maybe it's the commission,
25   maybe it's the trade, there's some variance in that client

1  entry —— then wouldn't that tell you 32812 is the Interactive

2  Brokers account?

3  A.  I'm not going to speculate.  You need to show me an actual

4  example and then I would look at my records and we could

5  potentially look at it, and understand it.  But based on what

6  you told me, I am not led to believe that the 32812 account was

7  more than just a recordkeeping account.

8  Q.  Okay.  And what do you think is better evidence of the

9  trades that were executed, the Interactive Brokers statements

10  or this document that you looked at from the defendants?

11  A.  The prudent would be -- prudent way would be to start with

12  the system of record for sure.  If you gave me statement from

13  Interactive Brokers, statements from another broker, statements

14  maybe from all these clients and tried to merge them together,

15  first of all, you would still have to wonder, did you get all

16  the statements.  So the source, as with any accountant in this

17  situation would use, would be the system of record, which is

18  the iBoss system.  What you're suggesting as to whether I would

19  merge all these various brokerage accounts and try to get them

20  all in one sheet for purposes of analysis is outside the realm

21  of reason.  It's not at all a practice an accountant would take

22  in this place.  An accountant starts by the system of record,

23  which is the iBoss system.

24  Q.  Are you aware that the defense raised by the defendants in

25  this case initially was that their trades failed to clear?

1    A.  I'm sorry.  You have to repeat that.  I heard --

2    Q.  Are you aware that the defense raised by the defendants in

3    this case initially was that their trades failed to clear?

4    A.  What?  Their trades?  Who's their trades?

5    Q.  That MintBroker and Mr. Gentile's trades failed to clear.

6                MR. FORD:  Objection.

7    A.  I don't understand the question.

8                THE COURT:  I'm sorry.  There was an objection.  I

9    didn't hear.

10   Q.  Are you aware that the initial defense in this case was

11   that their trades failed to clear?

12               THE COURT:  I'm going to overrule the objection.

13   A.  What -- you're using pronouns.  You need to give me way

14   more detail.  These transactions failed to clear.  What?  To be

15   specific, what's your question?

16   Q.  This case was initially brought based on a Schedule 13D the

17   defendants had filed reporting their trading in these two

18   companies' stocks.  The defendants' initial defense to the

19   16(b) claim that we brought based on their reported trading,

20   which they filed with the SEC under penalty of perjury, was

21   that their trades failed to clear.  Were you aware of that?

22               THE COURT:  And when you say initial defense, based on

23   what, based on the formal answer they submitted or something

24   else?

25               MS. TAUBER:  Based on what they were arguing in

1  summary judgment on this case and what they lost on in summary

2  judgment, and -- I'm sorry.  The initial defense was the wrong

3  way of putting it.  You're right.  Their defense.

4           MR. FORD:  Mischaracterizes the defense, but --

5  there's maybe a way to get at what she's asking.

6           THE COURT:  All right.

7  BY MS. TAUBER:

8  Q.  Are you aware that there's a claim that these trades failed

9  to clear?

10  A.  No, nor do I see it as relevant.  I need way more context

11  before I could even ponder upon whether that has any impact on

12  what we're talking about today.

13  Q.  Okay.  Did you inquire whether any of these client trades

14  failed to clear?

15  A.  No.  In fact, by not asking that question, my analysis was

16  even more conservative, because we're operating under the

17  assumption that all of these cleared.  Now if you're saying

18  that some of these didn't clear, then that would bring down the

19  exposure, because they wouldn't have been trades.

20  Q.  Well, the only thing that's been established is that

21  MintBroker's trades did not fail to clear.  We have not

22  established whether the clients' trades failed to clear.

23  A.  Okay.  Then it has no relevance at all on the engagement.

24  Q.  Okay.  I'm going to show you that exhibit you were looking

25  at before with your attorney.  I think it was this one, the In

1   Scope tab, correct?  Okay.

2              THE COURT:  And this is from which exhibit?

3              MS. TAUBER:  This is the same document that you were

4   looking at.  It's just my version of it.  It's --

5              THE COURT:  Well, there were a few different exhibit

6   numbers referred to, so I just want to know.

7              MR. FORD:  Exhibit 8 -- oh.

8              MS. TAUBER:  No.

9              MR. FORD:  It's not 8?  One second.

10             MS. TAUBER:  It's the Exhibit 17 from the deposition.

11             MR. FORD:  Yes, which is Exhibit 8.  Or if not, then

12  we'll give it a number.

13             MS. TAUBER:  That's what it is.  It's your Deposition

14  Exhibit 17.  Okay.

15  BY MS. TAUBER:

16  Q.  So do you see on -- I'm trying to make it bigger.  I'm

17  sorry.  Hold on one second.

18  A.  No, I could see it.

19  Q.  No, but I can't really see it.

20             (Discussion off the record)

21  Q.  Do you see over here there are some negative numbers on

22  this column, in that column S?

23  A.  I do.

24  Q.  Okay.  So what does it mean to you if they have negative

25  ownership?

1    A.  We talked about this.  The short position.

2    Q.  Okay.  So if there's a short position, isn't there a

3    requirement that they cover it within three days?

4    A.  I don't think there is a requirement to cover a short

5    position in three days, no.  Where are you basing that from?

6    Q.  Deliver the stock within three days to their client.

7    A.  You can hold a short position for more than three days, for

8    sure.

9    Q.  Does this negative number represent to you that MintBroker

10   owed these shares to the client and was required to purchase

11   them, take delivery, and deliver them to the client?

12            MR. FORD:  Objection.  Foundation.

13            MS. TAUBER:  There's an objection, your Honor.

14            THE COURT:  Overruled, because she's just asking if

15   that's what it represents to him.

16            THE WITNESS:  So I may answer?

17            THE COURT:  Yeah.

18            THE WITNESS:  Okay.

19   A.  You don't own short positions.  You borrow shares.  The

20   terms of the agreement in terms of the custody of shares or

21   borrowing agreements is based on the agreement with the client.

22   I'm not going to say that I have read every client agreement

23   between MintBroker and all their clients, but MintBroker has a

24   responsibility to act as a custodian on behalf of the client,

25   certainly.  Whether there's a timing with delivery, that's

1   based on the agreement with the client, how -- what's the

2   nature of MintBroker's relationship with the client in terms of

3   what they're authorized to do, what they want MintBroker -- so

4   there's no explicit requirement to that regard.  It depends on

5   the nature of the agreement with the client.

6   Q.  So did you inquire about what the nature of the agreement

7   is with these clients that caused MintBroker to have what you

8   would put here as negative ownership?

9   A.  These are MintBroker; there's no client here.

10  Q.  Okay.  But is it fair to say that you start from this

11  negative position so that when they acquire shares from this

12  point on, you're taking in time to get back to zero and then

13  cross over zero and then only then cross 10 percent,

14  eventually?

15  A.  Again, this is MintBroker's activity.  If MintBroker

16  started in a short position, then they're technically, with

17  respect to -- one way of looking at it would be with respect to

18  crossing over the 10 percent window, they went negative.  So in

19  order to get to 10 percent, they first have to get back to

20  positive, meaning no net position, no long, no short position.

21  And then achieve a long position, that puts them in the window

22  of being -- of having 10 percent or more ownership.  So the

23  negative shares, as you put it, or the short position, is

24  relevant for the purposes of this calculation.

25  Q.  Is it possible to have a negative beneficial ownership?  I

N221AVAH                    Christian - Cross

1  get that's how you're speaking of it, but is that possible?

2  A.  It's possible to have a short position, yes.

3  Q.  Yes.  But would that mean you have negative beneficial

4  ownership, to your understanding?

5  A.  It's possible.  It's possible.

6  Q.  Okay.  You don't think that would mean that actually the

7  person that the MintBroker owed shares to and MintBroker are in

8  a group together and own each other's shares?

9  A.  Let me think about that a second.

10          MR. FORD:  Objection.

11          THE COURT:  Overruled.

12  A.  I'm trying to determine if it would be relevant.  Let me

13  think about -- ultimately, who MintBroker purchased the shares

14  from, whether it's related party or not, doesn't have

15  relevance.  The point is, we've established that MintBroker had

16  a short position.  The sourcing of those shares is not

17  relevant.  You would have to -- no, I'll leave it at that.

18  Q.  Okay.  Now if you had started, instead of having negative

19  numbers here in column S, if you had just had all negative

20  numbers be replaced with zeros on what I was saying about how

21  it's not possible to have negative beneficial ownership, would

22  that have changed your analysis of when they crossed the

23  10 percent threshold?

24  A.  If this were all negative, meaning?

25  Q.  No.  Instead of negative numbers, you just put zero.  If it

1    went to negative, if you replaced any negative number in column

2    S with zero, would that have changed your analysis about when

3    MintBroker crossed the 10 percent threshold?

4    A.  Well, certainly.

5    Q.  Yes.  Okay.  And do you think they would have crossed it a

6    lot sooner?

7    A.  Well, we would have to run the numbers again.  But what we

8    saw is that they started from a short position so it took some

9    trades to get back to a net zero position and then cross into a

10   long position, so it would have changed the analysis.

11   Q.  Now back what I was talking about an obligation to cover in

12   real life if you have a short position, don't you have an

13   obligation to cover that position, right?  So wouldn't you then

14   have an outstanding contract to buy the shares that you're

15   short?

16   A.  I'm sorry.  You're going to have to repeat that again.

17   Q.  Normally if you have a short position, wouldn't you also

18   expect that the person who has a short position also has an

19   outstanding contract to buy the shares that he's short?

20   A.  By -- by nature, yes, you must cover a short position or

21   sustain the losses.

22   Q.  And did you confirm whether these short positions

23   designated on your spreadsheet were also accompanied by

24   obligations to purchase?

25   A.  Not relevant to the purposes of this analysis.

N221AVAH                    Christian - Cross

```
 1   Q.  Well, do you know that beneficial ownership includes any
 2   shares that you have a right to purchase within 60 days?
 3   A.  Beneficial ownership requires -- one more time?
 4   Q.  Beneficial ownership definition includes any shares that
 5   you have the right to acquire within 60 days.
 6   A.  You have the right to what?
 7   Q.  Acquire.
 8   A.  Acquire.  That's not -- that's not something I'm familiar
 9   with, no, but I haven't come across that in my expertise.  That
10   somebody who has a short position has to cover?  Because
11   they're in a beneficial ownership, they have a beneficial
12   ownership, they have to cover the short position within 60
13   days?  That's not something --
14   Q.  No, I didn't say they had to cover in 60 days.  I told you
15   the beneficial ownership definition includes any shares with
16   voting authority, as we discussed, or disposition, acquisition
17   authority, any shares that you have the right to vote, acquire,
18   or dispose of, within 60 days.  So if you had option to
19   purchase shares and, within 60 days, you beneficially own the
20   shares.  Are you aware of that?
21   A.  No.  I'm not drawing the conclusion how this comes into
22   play with the analysis, but --
23   Q.  Well, because you're putting these short positions on your
24   spreadsheet, and I'm saying wouldn't you expect that every
25   short position would be accompanied with an obligation to
```

1  purchase those shares?

2  A.  Of course you have to cover a short position.

3  Q.  Correct.  And if you have the obligation --

4  A.  If you don't, you'll sustain the losses of it, so --

5  Q.  Right.  But if you had the obligation to purchase those

6  shares, as you would expect if you have a short position --

7  A.  Yes.

8  Q.  -- then you have beneficial ownership of those shares.

9  A.  Hmm.  That's interesting.  I -- I would say that's not

10  incongruent with my understanding.  I don't see how this falls

11  into play with this analysis.  But yes, if you -- in any

12  situation, beneficial ownership or not, if you have a short

13  position, you have an obligation to cover your short position.

14  Q.  Wouldn't that mean that all the negative numbers in your

15  spreadsheet should actually be positive, like a negative 3

16  should be positive 3?

17  A.  No, no.  What we're -- we're establishing the basis in the

18  entity.  So just because you have a obligation to cover those

19  shares, doesn't mean that you don't have a -- essentially a

20  negative basis, and as we saw, those shares were covered, so --

21  within that 60-day window, by the way.  So I don't see how any

22  of this has any impact on my analysis.  But the answer is no.

23  Q.  Okay.  Now you described looking at -- pulling up

24  information for different clients.  Did you ever look at any

25  client account statements?

1    A.  Not direct statements.  I looked through master files.

2    Q.  Okay.  When you see a client order, when you look at the

3    sample of a client order, did you ever look and see whether

4    those shares -- let's say it was a buy order -- whether those

5    shares were actually credited to the client's account at that

6    time?

7    A.  Not necessary since we -- we removed the client accounts

8    from the analysis, so the nature of the client transaction

9    relative to the reporting wasn't relevant.

10   Q.  Okay.  Well, Ms. Rolle describes how -- in her affidavit,

11   in her letter, which also is an affidavit too, as we discussed,

12   she describes how MintBroker would purchase the shares for

13   itself even though it told the clients it was purchasing the

14   shares for the client.  Now isn't that also an alternative

15   explanation for the -- for your data that you analyzed?  How

16   did you -- in other words -- let me rephrase.

17          How did you determine that if you see an order from a

18   client and an execution from MintBroker in that same amount,

19   right, that those shares purchased by MintBroker were actually

20   given to the client as opposed to simply kept on MintBroker?

21   A.  I didn't -- it wasn't necessary with respect to this

22   engagement.  It's not in the scope of the agreed-upon

23   procedures to determine if the clients' trades executed on

24   behalf of MintBroker were actually delivered to MintBroker and

25   not something which is necessary, and I saw no evidence that

1    that was occurring, so the answer is no.  But not because it

2    was something that I should have done as part of this

3    engagement.  It's not something anybody would have done as part

4    of this engagement.

5    Q.  Did you review the decision, the court decision on summary

6    judgment in this case?

7    A.  I believe you -- you showed me quite a few documents during

8    the deposition.  If you showed me them during the deposition,

9    maybe, but otherwise, no.

10   Q.  In this case, on summary judgment, the Court decided that

11   the evidence demonstrates that the defendants were able to

12   complete their transactions in these stocks such that they made

13   money, right?  Does the evidence demonstrate that, in your

14   opinion, for the clients?

15   A.  Well, you would expect a brokerage firm that is

16   facilitating trades for the clients to make money, so no, that

17   doesn't surprise me at all.

18   Q.  You're saying no, the answer is no, it does not demonstrate

19   that, right?

20   A.  No.  What I'm saying is that the nature of an investment

21   firm, or a bank, that is facilitating trades, there is an

22   expectation they would make some money on it, for commissions,

23   for example, or there could be an agreement -- as I say, if

24   it's a managed account, for example, there could be management

25   fees.  This is quite -- you would expect MintBroker to make

1    money off of those trades.

2    Q.  But did you see any records or anything that leads you to

3    confirm that the clients' transactions that are indicated on

4    the data that you reviewed, that those trades were actually

5    completed for the clients, from the clients' perspective?

6    A.  Did I confirm if any of the client activities in the data

7    that I pulled were actually effected for the clients?  No.

8    Q.  Okay.

9    A.  Because they were not in the scope of the engagement.  The

10   client -- whether or not the client -- what happened with the

11   client trades is not relevant.  What's relevant is we needed to

12   identify which -- what account activity was associated with

13   MintBroker's accounts, meaning held by MintBroker, owned by

14   MintBroker.  So what happened with the client trades isn't

15   relevant.

16   Q.  And did you see any evidence that any client made money

17   from any of these trades?

18   A.  It would surprise me -- ideally investment firms want to

19   make money for their clients, but if you told me MintBroker

20   wasn't very good at that and clients didn't make money, that

21   would not surprise me.  Unfortunately, some win, some lose.

22   You can't -- you can't expect every brokerage firm to -- like,

23   it's just the nature of economics.  Any time there's a trade,

24   there's a winner and a loser.  So if -- it would be sad to hear

25   that MintBroker wasn't making money for its clients, but it

1    wouldn't surprise me, nor would it raise any doubt as to the

2    nature of my engagement.

3    Q.  Now I want to show you one more document.  I think we

4    reviewed this document at your deposition as well.  Do you see

5    it on your screen?

6    A.  It's coming up.  I saw a flash.

7    Q.  Okay.  This is the disclosure that was on MintBroker's

8    website.  Do you remember reading that with me at your

9    deposition?

10   A.  I don't recall from my deposition, no.

11   Q.  It says:  All trades are executed in a principal capacity.

12   Our clients do not have direct market access.  All transactions

13   are executed against MintBroker International, Ltd.

14   A.  Okay.  It's a little out of context, but yes.

15   Q.  This is the disclosure that appears on MintBroker's

16   website.  It says SureTrader.  Do you know that to be an alias

17   of MintBroker?

18   A.  Okay.  If you're telling me that SureTrader is an alias,

19   then we can accept that for purposes of our discussion.

20   Q.  I mean, have you heard that before?  Have you heard the

21   name SureTrader before?

22   A.  Sounds very familiar.  I'm not going to --

23   Q.  Okay.

24   A.  I can't recall SureTrader.  I'm -- it does sound familiar.

25   Q.  How do you interpret this disclosure?

1  A.  It's a little out of context, but I would say --

2            THE COURT:  When you say the disclosure, what you're

3  asking him to interpret?  Are you talking about what's within

4  the box?

5            MS. TAUBER:  Yes.

6            THE COURT:  Okay.

7  A.  But these are managed accounts.  I need -- this is a

8  very -- it's not even finished.  There's a dot dot dot.  But

9  this sounds to me that MintBroker is disclosing that its

10  relationship with its clients is that MintBroker is the

11  investment manager, so meaning it is acting on behalf of the

12  client.  The client is not going to the market and purchasing

13  shares and selling shares.  MintBroker is doing it on behalf of

14  them on a custodial basis, so a fiduciary.

15  Q.  Okay.  You don't -- you don't take this disclosure to mean

16  that every client trade was executed against MintBroker as the

17  client's counterparty?

18  A.  I'm sorry.  I didn't hear that.

19  Q.  Do you not understand this disclosure to mean that every

20  trade by every client was executed against MintBroker as the

21  client's counterparty?

22  A.  Against MintBroker as the client's counterparty.  So the

23  term "against MintBroker as the client --" I'm not -- I

24  can't -- I can only speculate what they mean by that.

25  Q.  Well, if I buy stock from you, you're my counterparty,

1    right?  And if a client bought stock, the client's buying it

2    from MintBroker, do you understand the disclosure to mean that

3    as opposed to buying it from a stranger in the market?

4    A.  So we can get into the semantics of how a managed account

5    works, but I don't think we need to get lost in the definition

6    here.  The way I'm telling you how I interpret this is that

7    MintBroker is -- is managing its clients' accounts.  They're an

8    investment manager.  So in order -- strictly speaking, if

9    they're operating in that capacity, the client wants to effect

10   a trade, MintBroker is buying the stock and then now MintBroker

11   has the stock and it's technically selling it to the client.

12   Q.  To your knowledge is that how a normal US brokerage

13   operates?

14             MR. FORD:  Objection.

15             THE COURT:  Sustained.

16   Q.  Well, to your knowledge do brokers usually buy the stock

17   and then sell the stock to their clients?

18   A.  It depends on the nature of the relationship, but yes, and

19   there's -- depends on the nature of their setup and the terms

20   of how they're able to route ownership, but yes, if you're a

21   manage -- if you're an investment manager, you are buying stock

22   on behalf of the client, you're holding it, and then you're

23   selling it, either to the client or, depending on the nature of

24   your transaction, on behalf of the client.  So they are the

25   custodian.  They operate as the fiduciary.  So no, that doesn't

1    seem unusual to me, at all.

2    Q.  Are you familiar with the Dodd-Frank Act?

3    A.  One more time?

4    Q.  Dodd-Frank, have you ever heard of that?

5    A.  I'm not going to say I'm an expert in Dodd-Frank, no.

6    Q.  Are you aware that it prohibits taking positions opposite

7    than the positions taken by your client?

8              MR. FORD:  Objection.

9              THE COURT:  Overruled.

10   A.  You're asking me if I'm aware that a firm can't take a

11   position opposite of the client; is that what you're saying?

12   Well, yes, certainly, I'm aware of that.  I don't see how that

13   is relevant to this disclosure, but go ahead.

14   Q.  Well, if MintBroker is short and its clients are long,

15   isn't that opposite?

16             MR. FORD:  Objection.

17             THE COURT:  Overruled.

18   A.  Yes.  However, again, I'm not -- I'm not an expert on

19   Dodd-Frank, but I don't see it as being an infraction to take a

20   different position than a client position.  I believe there

21   needs to be some sort of burden of proof that this is done in a

22   way that is -- they're not operating on a fiduciary basis.  But

23   just because a client wants to be long and a firm wants to be

24   short, doesn't necessarily strike me as unusual.  There's a

25   difference -- MintBroker can still operate as a fiduciary and

1    execute the client's wishes and take a different position.  So

2    no, I don't see that as being an infraction.  Again, I'm not --

3    I'm not an expert in Dodd-Frank, but this is not something I

4    haven't seen before in the way the allegations were brought

5    against the firm.

6    Q.  Okay.  Did you inquire whether MintBroker was permitting

7    any clients to trade at the expense of any other clients?

8    A.  Am I aware of any -- if MintBroker was -- I'm sorry.

9    Q.  Let's just talk about that one large client that we spoke

10   about.  Did you inquire whether MintBroker allowed that

11   particular client to trade at the expense of any other clients?

12   A.  No.  I don't see how that would have been relevant to the

13   engagement.  This is a agreed-upon -- no, I did not inquire,

14   nor would I.

15   Q.  I want to show you one last document, just for

16   completeness.  I know we've talked about the GBR, one of these.

17   This is your Exhibit E.

18           This is F.  This is the AWX version of a document you

19   prepared, right?  Okay.  This is definitely not seen before,

20   just for the record, not the other one.  And then I want to

21   scroll down to that one account, or I'll just search for it,

22   and I want to look and see.

23           Do you see how, similarly, there's far and away more

24   trading in this account of AWX?

25           THE COURT:  Let's be a little more precise.  So your

1    client number 10067, which indeed we looked at in the parallel

2    to this for GBR, and you're indicating that the number of

3    trades indicated for that client are well in excess of any or

4    all of the other client accounts.

5        MS. TAUBER:  Combined.

6    A.  It doesn't strike me as unusual.  There's -- it's not

7    unusual to have larger clients.  So for the purposes of my

8    engagement, yes, this would have been one where, if we talked

9    about high value, looking at the client records and -- not the

10   client records, the master file, seeing the name, trying to

11   gain an understanding of who this client is, but having --

12   absent any other compelling evidence, this doesn't strike me as

13   unusual, that this isn't a client account.  This is the client

14   account.  It's just a large client, which is highly typical of

15   investment banks.

16   Q.  Yesterday Mr. Gentile testified that the iBoss system which

17   you described, updated at night; I think he said it was at

18   midnight.  Are you aware of that?

19   A.  I remember this engagement was talking about 2018 activity,

20   and my engagement was in 2022, so I don't -- yes, I'm -- what I

21   hear you saying is the data refreshed every midnight; is that

22   what you're saying?

23   Q.  Right.  Meaning the data, from my understanding —- and tell

24   me if this is your understanding —- is not contemporaneous with

25   the trading orders, that the trade order is entered by the

1   client and then it's only updated with the price and all the

2   other stuff at midnight of that day; is that right?

3   A.    That's fine.  The -- that's typical.  Rarely is a system of

4   records refreshed in realtime.  Sometimes they are.

5   Q.    But you have trades that happened at the exact minute and

6   second, right?  Wouldn't you expect there to be some delay

7   between an order and a fulfillment or an order and an

8   execution?

9   A.    Well, it depends on the nature of the recordkeeping.  So I

10  have to get -- what I saw is that the buy and the sell were --

11  in certain circumstances, were the same date and time, for

12  example.  What I equate that as it's not actually a buy and

13  sell, it's a recordkeeping of a fulfillment, meaning that's the

14  timing that there was a -- a request to -- to fulfill that

15  order.  Whether -- I agree that it wouldn't be practical to

16  actually, on the market, buy and sell at that time.  But

17  that's -- that's just how this recordkeeping system was

18  recording those types of trades.  And there were some

19  circumstances where there was a -- it was a slight difference,

20  but anyway, not relevant whatsoever.  It would depend on the

21  execution time whether or not that is based on the request or

22  based on the actual fulfillment.  In either case, we're not

23  measuring this by the minute.  We're measuring this -- that

24  level of precision would not be relevant for the purposes of

25  this engagement.  Recall that we're recording at what point

1  they crossed the window of 10 percent, what have you.  The

2  timing isn't very relevant.  It's just -- I still expect, even

3  under those circumstances where the database is refreshed at

4  midnight, for the timing to be quite similar, but it doesn't

5  surprise me that the way this system works, that the buy and

6  sell at the same time, based on how it was explained to me this

7  recordkeeping system is maintained, no, that doesn't surprise

8  me.  And I don't think it has a relationship with actual

9  fulfillment.

10 Q.  So the buy and sell I think you testified being at the same

11 time, orders being at the same time, hour, minute, second, that

12 proved to you that they were record entries or duplicates of

13 each other or some kind of recording, right?

14 A.  As to your point, the buy and sell couldn't possibly happen

15 at the exact --

16 Q.  Well, that wasn't my point.  I'll ask the question.  I'm

17 looking at your Wash Pivot chart here on your screen, and there

18 were -- it seems to me like you're netting out trades that also

19 happened at different times.  Like all those numbered ones that

20 weren't zero that we looked at, you are you netting out trades

21 from 9:30, this one, row 119, 120, 9:31:41, 9:31:42 and

22 9:31:43?  Sorry, just -- it's just 119 and 120, I think, for

23 this one, I think, right?  9:31:42 and 9:31:43, are you netting

24 those out?

25 A.  There's a difference of one second here.  It doesn't

1   surprise me there are delays in the system in recording these.

2   The software is not something that I have any -- an

3   understanding of the ins and outs.  However, once again,

4   seconds in between buy and sell, whereas if we were to look at

5   the profit on that, it will be nothing -- I'm going to bet,

6   same price, or very, very similar price.  It is not conducive

7   of actual trading activity; it's more conducive of a

8   recordkeeping.

9   Q.  Manipulation, perhaps?

10          MR. FORD:  Objection.

11  Q.  Would it be conducive of market manipulation?

12          MR. FORD:  Objection.

13          THE COURT:  Sustained.

14  Q.  Okay.  Well, so -- just to be clear, you were explaining

15  that if trades are executed at the exact same second, that's

16  enough evidence for you to eliminate both of them, but even if

17  they're not, you'd still eliminate them if they're close.

18  A.  Can you rephrase the question with less negatives.

19  Q.  My question is, I think you had said that if trades that

20  had the same exact minute and second, then they net to zero,

21  that that's efficient for you to eliminate them as

22  recordkeeping, both of them.

23  A.  That was one way we validated it --

24  Q.  Right.

25  A.  -- but the other was --

N221AVAH                    Christian - Cross

1  Q.  But then I also asked you if it's all -- if you also, in

2  addition to that, decided that it was also okay to eliminate

3  trades that didn't exactly match up at the same time if they

4  were close enough.

5  A.  As I mentioned, there were two ways I validated this.  Just

6  today.  You heard me.  First was to see if these accounts, with

7  these activities, also had a corresponding client account

8  entry, so beginning with the letter, what have you.  And that

9  was how I got to this population.  This is another layer of

10  validation to prove the point that these are not -- these are

11  the recordkeeping.  This is the second validation.  So this in

12  itself, I would argue yes, that that would be, because the

13  times are so close, and if you would do a profit, it doesn't

14  make sense that this is actual market activity.  However --

15  Q.  But is there -- sorry.  Go ahead.

16          MR. FORD:  Before the next question, could I just

17  request that our -- our screens have not been working for

18  this --

19          MS. TAUBER:  Oh.

20          MR. FORD:  -- portion.

21          MS. TAUBER:  Oh, I don't know what happened.

22          MR. FORD:  I apologize for interrupting.

23          THE COURT:  Mine's working.  Is the witness's screen

24  working?

25          THE WITNESS:  I can see the screen.

1           THE COURT:  So it's just the back row.  And again,

2      reminder to let each other finish before you start.

3           THE WITNESS:  You're speaking very quickly.  You speak

4      very quickly, and that's why I keep asking you to repeat

5      yourself.

6           MS. TAUBER:  I'm sorry.  I guess my next question was,

7      was there an outside time limit at which you --

8           MR. LOPEZ:  Wait, wait, wait, wait, wait.

9           MS. TAUBER:  Oh.

10          (Discussion off the record)

11     BY MS. TAUBER:

12     Q.  Was there an outside time limit at which you would not feel

13     comfortable netting out transactions even if they netted to

14     zero -- for example, if they were a minute apart, 30 seconds

15     apart, 20 seconds apart, 10 seconds?  Was there an outside time

16     limit?

17     A.  That's professional judgment.  It would require me to take

18     into account all the activity, but once again, this is the

19     second layer of validation.  The first layer of validation is

20     what led me to be more comfortable.  This was extra.  And as we

21     see, the windows are very tight.

22     Q.  Wouldn't -- by layer, isn't this actually just additional

23     trades that you eliminated; you eliminated certain --

24     A.  Let me restate my testimony.  The first step was to verify

25     that the 32810 and 32812 were in fact recording of --

N221AVAH                    Christian - Cross

 1    fulfillment recording entries.  Now if that were the case, what
 2    I would have expected to see —— and this is what I did see ——
 3    is that there would be a corresponding line item for the client
 4    trade.  So at least two transactions.  Just as an example,
 5    32812 has a buy of 500.  If that's a recordkeeping account,
 6    then I need to see a -- an account that starts with a letter,
 7    A, A, B, C, D, E, 500 shares.  And I did.  Now to get extra
 8    comfortable, what I also said was, well, if this is a
 9    fulfillment, then the buy and sell should be happening at the
10    same time.  It should be a wash.  Actually, now that I think
11    about it, it's three validations.  Two, yes, they were a wash.
12    It was net zero.  Three, the wash, if you will —— if you just
13    allow me to use that term, it's not technically a wash —— is
14    that the net impact of two recording entries happened at the
15    exact same time.  So now I've validated it three ways.  By
16    first, matching it up to actual client records; two, by showing
17    that the recordkeeping is net zero because there's a buy and
18    sell for the exact same amount —— one's positive and one's
19    negative; three, that wash, if you will, happened at the exact
20    same time.  So three layers of validation to show that these
21    32810 and 32812 transactions were recordkeeping entries.
22    Q.  And all of those criteria had to be met for a trade to be
23    eliminated or only some of them?
24    A.  All of them.
25    Q.  Well, but we just talked about how some trades that weren't

1  at the exact same time were also eliminated, right?

2  A.  Well, we can spot check and I can show you what I did.

3  That's why I stratified it that way.  I wanted to see that the

4  window was pretty tight, the timing was the same.  And when you

5  asked the question about delays in the system processing,

6  that's not something that is at all surprising to me.

7  Computers are recording when the job is done.  It doesn't go

8  back and say I was supposed to get the job done 10 seconds ago

9  but this is when -- that's not how computers work.

10  Q.  That's what I just asked you about, wouldn't you expect

11  there to be a delay between order and fulfillment, and you said

12  the system seems to have worked this way.  And I just repeated

13  it.

14          THE COURT:  Hold on.  He hasn't said it's all or

15  nothing.  He hasn't said there's always a delay.  He said he

16  wasn't surprised if there was delay.  Those are two different

17  things.

18  Q.  Okay.  But there was no systematic methodology you used to

19  say, I won't eliminate it if it's more than X number of seconds

20  apart.

21  A.  Nor did I need to.

22  Q.  Okay.

23  A.  Due to the other validations.

24  Q.  Okay.  You talked about the definition of beneficial

25  ownership for the purposes of this case.  Are you aware that

1    definition is different from the definition that may be

2    applicable for accounting and tax purposes?

3    A.   I -- I will disclose I'm not a tax expert.

4    Q.   How about accounting?

5    A.   I'm a CPA, yes; I'm an accounting expert, yes.

6    Q.   Right.  So are you aware the definition of beneficial

7    ownership for purposes of Section 16 and Section 13 of the

8    Securities Exchange Act is different from the definition that

9    may be applicable under accounting principles?

10   A.   For accounting purposes, I have an understanding of the

11   definition, but generally accounting and tax, finance

12   accounting guys and tax guys work together or separately.  I

13   can't speculate what the differences between GAAP and tax code

14   are.

15   Q.   No, I'm asking you about the differences between

16   accounting -- I'm putting aside tax.  You said you weren't a

17   tax expert, so just accounting on the one hand and the

18   statutory requirements here on the other hand.

19           THE COURT:  Under the securities law.

20           MS. TAUBER:  Mm-hmm.

21   A.   So it would surprise me if there was a different system of

22   accounting for securities law than GAAP.  GAAP is the basis

23   that the SEC uses for system of accounting in all publicly

24   traded organizations in the United States.  So if you're

25   telling me that the SEC has a different definition -- different

1    method of accounting would be the term —- that it applies in

2    certain situations than GAAP, I'd be surprised, but yes, it's

3    certainly possible.

4              MS. TAUBER:  I have no further questions.  Thank you.

5              THE COURT:  Any redirect?

6              MR. FORD:  No, your Honor.  We're done with this

7    witness.

8              THE COURT:  All right.  Mr. Christian, thank you very

9    much.  You are dismissed.

10             THE WITNESS:  Thank you very much.

11             (Witness excused)

12             MR. FORD:  Your Honor, I suspect we'll be going on our

13   break, but if I could just raise one quick issue.  The next

14   witness, we deposed; it was a very short deposition, about 45

15   minutes.  It's a secondary expert witness.  If you look at his

16   report, he did not do any independent confirmation of any

17   underlying data or information.  He was basically provided the

18   Excel spreadsheet that we've been talking about and then ran

19   the numbers.  To expedite, if you envision a way of expediting

20   it, I don't feel that I need to ask questions.  If there's no

21   objection to, one, qualifying him, and two, entering the report

22   for your review, I would then just defer to plaintiffs to

23   conduct an examination, if that would expedite things.  I

24   just —- I raise it only because I don't think I need to do a

25   two-hour examination.

1          THE COURT:  No, absolutely not.  And it is not

2    uncommon at all in this court for a judge in a bench trial to

3    take a report and affidavits from witnesses and then just have

4    cross-examination.  So I am fine in the case of Mr. Beresford

5    of taking his report.  And is there an affidavit from him or

6    just -- oh, you said the deposition.

7          MR. FORD:  There's a deposition, there's a deposition

8    transcript that will be included; there is an expert report

9    that he provided, but he specifies that he did not do anything

10   beyond the calculations --

11         THE COURT:  Right.

12         MR. FORD:  -- and then there are attachments to it

13   which really just reflect the same Excel spreadsheets in

14   varying ways that we've been looking at.

15         THE COURT:  Understood.

16         MR. FORD:  So that's all we have, and if that's

17   admitted and you're going to review it, I would have no

18   questions of him beyond that.

19         THE COURT:  Ms. Tauber, or Mr. Lopez?

20         MR. LOPEZ:  Your Honor, we don't object to having the

21   report admitted into evidence, but we do point out that it is

22   entirely hearsay since Mr. Beresford did not do any research

23   into the underlying facts.

24         THE COURT:  Well, I don't know that I agree with that.

25   What he did was he was given data, and I think he could be

N221AVAH                    Beresford – Cross

1    looked at as a check, if you will, or verification of sorts on

2    calculations that were done by Mr. Christian.  It would be

3    relevant, if that data comes in, that the two experts came out

4    to the same calculation but for $800, if I remember what was

5    previously said.  So I would overrule that objection.  I'm

6    going to take the expert report and his deposition and allow

7    you to cross.

8             MR. LOPEZ:  Thank you, your Honor.

9             THE COURT:  Okay.  So with that, we'll take our break.

10   We'll resume here at 1:45, okay?

11            (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                       AFTERNOON SESSION

 2                          1:48 p.m.

 3          (In open court)

 4          THE COURT:  All right.  So we are going to proceed

 5  with the examination —— in this instance, cross-examination ——

 6  of Mr. Beresford.

 7          Mr. Beresford, I am Judge Lehrburger, and we have the

 8  attorneys here in the courtroom.  I'm sure that counsel for the

 9  defense has briefed you on how we are going to proceed.  I have

10  already taken into evidence your expert report, and we also

11  have I believe your deposition as well.  But we are going to

12  proceed with plaintiff's attorney examining you.  Okay?

13          THE WITNESS:  Sounds good.

14          THE COURT:  Okay.  I'm going to need a voice response

15  to any question that's asked so the court reporter can take it

16  down.  And I need to swear you in, so please raise your right

17  hand.

18          (Witness sworn)

19          THE COURT:  Plaintiff's counsel is going to proceed.

20   BRENDAN BERESFORD,

21      called as a witness by the Defendants,

22      having been duly sworn, testified as follows (remotely):

23  CROSS-EXAMINATION

24  BY MS. TAUBER:

25  Q.  Can you see me okay?

1    A.  Yeah, yeah, I can.

2    Q.  All right.  So I'm going to ask you a few questions about

3    your report.  I know that we've done this before at your

4    deposition, so it might be a little repetitive but hopefully

5    won't take too long.

6           Just looking at your report, it says -- let me just

7    pull it up.

8           Sorry.  I had the right page before I moved over here.

9    Okay.  So under paragraph 2, do you have it in front of you,

10   your report?

11   A.  Yes, I do.

12   Q.  Okay.  Under paragraph 2, it says:  I was not engaged to

13   and did not verify the accuracy of or completeness of

14   information provided to me in these reports.  So what do you

15   mean by that?

16   A.  Oh, as a CPA, in many of the engagements that I do, there

17   is information provided to me that I will either test and

18   verify the accuracy and completeness of the data or not, and in

19   this case, and in many cases, I include this language in my

20   reports for which I did not verify or test the accuracy,

21   completeness, validity of that data.

22   Q.  Okay.  So was your assignment basically to take this data

23   and compute short-swing profits within a certain time frame?

24   A.  Yes.

25   Q.  Okay.  And you talk about how you removed certain trading

1    entries before doing that computation, correct?

2    A.  Correct.

3    Q.  And you removed that information that you understood

4    corresponded to client trades for one?

5    A.  Correct.

6    Q.  Okay.  And when you say you didn't verify that they were

7    client trades, on what basis did you remove those?

8    A.  They were removed based on the definition of client trades,

9    which I received from Mr. Gentile.

10   Q.  Okay.  And that definition was just that if accounts are

11   with letters, they were clients?

12   A.  Correct.

13   Q.  Okay.  Did you happen to notice that there was one

14   particular client who was trading more significantly than any

15   other client in both of these stocks?

16   A.  No, I did not.

17   Q.  Okay.  In the course of your work did you group any of the

18   trading data by client or by account number?

19   A.  No.

20   Q.  Now you say -- you also removed journal entries; is that

21   correct?

22   A.  That is correct, yes.

23   Q.  And how did you confirm that certain entries were journal

24   entries and not actual trades?

25   A.  So based on my understanding of broker-dealers and the way

1    that they conduct business, clients will essentially buy a

2    stock or a security through the broker-dealer, and at that time

3    the broker-dealer often will have to go to the market, buy the

4    security, and then essentially sell it to the client, right?

5    So my understanding of that type of transaction is that at a

6    certain time, when that transaction occurs, there will be an

7    internal what I've called in my report a journal entry, where

8    MintBroker will buy a certain security at a certain price,

9    time, date, quantity, and then sell it -- quote-unquote sell it

10   to the ultimate client at that exact same date, time, quantity,

11   and price.

12   Q.  Now why are you saying quote-unquote?

13   A.  In which part?

14   Q.  In the -- I think you said the broker will quote-unquote

15   sell it to the client.

16   A.  I mean, truly, it is just a buy to the firm's account and

17   then an immediate sell, so it's not really a buy and a sell;

18   it's more so fulfilling the buy for the client.

19   Q.  Okay.  Did you consider whether the firm actually sold

20   shares from its own inventory to a client?

21   A.  Yes, and from what I saw in -- I mean, all -- all of the

22   cases, I want to say, there was a buy and a sell at the exact

23   same time, meaning that there was, you know, no longstanding

24   inventory of shares that were used to fulfill client

25   transactions.

N221AVAH                        Beresford - Cross

1    Q.  Okay.  Did you look at whether there was actually an

2    inventory account?

3    A.  No.

4    Q.  Okay.  Did you look at any client account statements?

5    A.  No.

6    Q.  Did you ask to see any of this information, any

7    corroborating information for any of the data that you

8    analyzed?

9    A.  No.

10   Q.  Were you told that you could not see or you could not have

11   access to any information other than this data?

12   A.  No, I was not told that.

13   Q.  Did you inquire whether any of the client accounts were

14   owned by affiliates or aliases of MintBroker?

15   A.  No.

16   Q.  Did you ever see a list of client names or any client

17   names?

18   A.  No.

19   Q.  Did you speak to Mr. Christian before preparing your

20   report?

21   A.  No.

22   Q.  Okay.  Did you speak to Mr. Darville personally?

23   A.  Via email, yes.

24   Q.  Okay.  Is the only person that you understood to be

25   affiliated with MintBroker that you spoke to before preparing

1    this report Mr. Gentile?

2    A.  The only people I spoke to were Mr. Gentile and

3    Mr. Darville.  I'm not aware of anybody else that was

4    affiliated with MintBroker and I was not told about anybody

5    else affiliated with MintBroker.

6    Q.  Okay.  Did you actually speak to Mr. Gentile personally or

7    on the phone, or by email?

8    A.  Yes.

9    Q.  Okay.

10   A.  Both.

11   Q.  Okay.  And was it Mr. Gentile or Mr. Darville who told you

12   about the trades representing records entries -- journal

13   entries?  I'm sorry.

14   A.  That was Mr. Gentile.

15   Q.  Okay.  And you talk about -- you say for all journal entry

16   transactions removed, I was able to confirm the total buys and

17   sells netted to zero.  Did you perform a netting analysis?

18   A.  I did, yes.

19   Q.  Okay.  And did you -- was that attached to your report?

20   A.  No.  That was not attached to my report.

21   Q.  Okay.  And did you compare that netting analysis to the

22   netting analysis prepared by Mr. Christian?

23   A.  No.

24   Q.  So in your report you calculated short-swing profits,

25   correct?

N221AVAH                         Beresford - Cross

1    A.  Correct.

2    Q.  Did you also calculate beneficial ownership for both of the

3    stock -- both of the securities?

4    A.  Yes.

5    Q.  Okay.  And at some point did you ever calculate a negative

6    beneficial ownership for any of the -- either of these stocks?

7    A.  I don't know off the top of my head.  I'd have to go back

8    and scan through the report.

9    Q.  Okay.  And would you -- do you -- if there was a negative

10   beneficial ownership indicated on either your report or on

11   Mr. Christian's analysis, what would you have understood that

12   to mean?

13   A.  I don't have an answer off the top of my head.  I'd need to

14   look at the data, underlying data, and try and understand why

15   that would occur.

16   Q.  Mm-hmm.  Okay.  I'm looking at your GBR analysis -- that's

17   the New Concept analysis that was attached to your report --

18   and I don't believe that there's any negative values there.  Is

19   that consistent with what you recall?

20   A.  Yes.

21   Q.  Okay.  But for AWX, which is Avalon, I do see some negative

22   values.  Is that also consistent with what you recall?

23   A.  Let me take a quick look at it.

24   Q.  So it's page 7 of -- well, it's, page 7 is the docket

25   entry.  I don't know what exhibit to you or --

1  A.  Yes, I do see a few negative percent ownership lines.

2  Q.  Okay.  And what does that represent to you?

3  A.  Again, I'm not sure at this moment.  I would have to go

4  back and look at it, look at the underlying data and see why

5  that would have occurred.

6  Q.  Okay.  And are you aware that the first entry on this, on

7  your AWX analysis, is from July 24th?  Do you see that?

8  A.  Yes.

9  Q.  Okay.  But are you aware there was trading on AWX before

10  that time?

11  A.  No.

12  Q.  Okay.  Did you review any of the discovery documents

13  produced in this case, for example, any of the Interactive

14  Brokers trading statements?

15  A.  No.

16  Q.  Did you review any of the Schedule 13Ds filed by

17  MintBroker, Mr. Gentile in this case?

18  A.  No.

19  Q.  Okay.  Have you ever done a Section 16 short-swing profit

20  analysis prior to this case?

21  A.  No.

22  Q.  Now when you calculate beneficial ownership, how are you

23  defining that term?

24  A.  Defining beneficial ownership as shares that were owned

25  directly by MintBroker.  Again, that definition is kind of

1    based on which accounts or which transactions were actually

2    benefiting or the shares were actually going to MintBroker.

3    Q.   So did you inquire whether any of the customer accounts

4    were held by affiliates, of MintBroker?

5    A.   No.

6    Q.   Did you inquire whether MintBroker had discretionary

7    authority over any of the accounts?

8    A.   No.

9    Q.   Okay.  Did you inquire whether MintBroker had the right to

10   vote any of these shares that were held in the client accounts?

11   A.   No.

12   Q.   Okay.  Did you inquire whether any -- whether client orders

13   were executed in the amounts and the prices at which they were

14   placed?

15   A.   No.

16   Q.   Was there a way to confirm that from this data, as far as

17   you can tell?

18   A.   Not as far as I can tell, no.  But again, I didn't look

19   into it.

20   Q.   Okay.  The quote-unquote sales that you described before,

21   would it be fair to characterize those as allocations?

22   A.   I would say not necessarily.  Again, the reason I used

23   quote-unquote is because those buys and sells are not true buys

24   and sells; they're just buys and assignments to clients of

25   MintBroker.  I'm not an expert in broker-dealers by any

N221AVAH                          Beresford – Cross

1    stretch, but I do understand the basic flow of transactions,

2    and the language I'm using might not be, you know, what the

3    technical language truly is, but that's my understanding of

4    what happened.

5    Q.  Did you inquire whether there were any segregated client

6    accounts?

7    A.  No.

8    Q.  Okay.  And whether MintBroker ever held funds for clients

9    separately from its own funds?

10   A.  No.

11   Q.  Did you ever -- did you inquire about whether there was any

12   customer complaints about this trading?

13   A.  No.

14   Q.  Are you aware that trading was halted in these stocks

15   during this time period?

16   A.  No.

17   Q.  Did you examine whether any of the trading as reported in

18   these stocks would have triggered any circuit breakers under

19   the stock exchange rules?

20   A.  No.

21   Q.  Okay.  If you were conducting an audit, would you have

22   performed a different analysis?  Let me ask you that

23   differently.

24          Would you have -- would you have confirmed any of the

25   information that I asked about -- for example, whether there

1    were segregated client accounts?

2    A.  Possibly.  I can't tell you exactly what I would have done

3    in an audit because there is a specific different type of

4    scoping process that needs to be gone through with an audit,

5    and since I did not perform that scoping, I can't tell you what

6    steps I would have taken to verify or not verify any data.

7    Q.  I don't know what you mean by scoping.  Maybe you can

8    define that for me or help me understand.

9    A.  Scoping means doing a lot of due diligence on the front end

10   and doing a risk analysis and essentially understanding what

11   needs to be done in terms of fieldwork for an audit.  Since

12   this wasn't an audit, I didn't go through that specific audit

13   scoping analysis so I can't tell you exactly what I would have

14   done in an audit.

15   Q.  Okay.  And were you engaged by Mr. Gentile and by

16   MintBroker in this case, to your knowledge?

17   A.  I was engaged by Mr. Gentile.

18   Q.  So you do not understand that you were engaged by

19   MintBroker?

20           MR. FORD:  Asked and answered.  Objection.

21           THE COURT:  Sustained.

22   Q.  Okay.  And I think that at your deposition we talked about

23   how MintBroker had been forced into liquidation at the time

24   that you prepared these reports.  Do you recall that?

25   A.  Yes.

N221AVAH                    Beresford - Cross

1   Q.  Okay.  And I think you had told me you didn't know that

2   until I told you at your deposition; is that correct?

3   A.  Correct.

4   Q.  And if you had known that, would you have requested

5   information from the liquidators?

6   A.  Hard to say without having known that at the time that I

7   prepared the report.

8   Q.  Okay.  And do you recall going over a letter from the SEC

9   chairwoman -- sorry -- the chairwoman of the SEC of the

10  Bahamas, the Securities Commission of Bahamas, accusing

11  Mr. Gentile of running MintBroker's business as a Ponzi scheme?

12  A.  I vaguely remember that from the deposition, I assume.

13  Q.  Okay.  And would that change your analysis or your

14  assumptions about which trades were client -- about whether

15  trades were client trades or MintBroker trades?

16        THE COURT:  Would what change?

17  Q.  Oh, right.  I think when we spoke, you said you weren't

18  aware of that letter until I showed it to you at your

19  deposition, correct?

20  A.  Yes, that's my -- consistent with my recollection.

21  Q.  Okay.  If you had been aware of that letter, would that

22  have changed your assessment about whether certain trades

23  represented client trades and certain trades represented

24  MintBroker trades?

25  A.  No.

N221AVAH                    Beresford - Cross

1   Q.  Okay.  Do you recall the letter specifically said that

2   clients believe they own shares but do not in fact own shares?

3   A.  I did not recall that, but again, it's been a while.

4   Q.  Did anything that you did in your analysis -- based on your

5   analysis that you've done, do you have any reason to believe

6   that that statement is not true?

7   A.  Sorry.  Can you ask that question again.

8   Q.  Ms. Rolle, the SEC of the Bahamas chairwoman's statement

9   that clients believe they own shares but do not in fact own

10  shares, do you have any reason to think that that statement is

11  not true?

12  A.  No.

13  Q.  Okay.  Nothing in your analysis that you've done disproves

14  that, right?

15  A.  No.

16  Q.  Okay.  And couldn't the data that you analyzed also be

17  construed, especially in light of that letter, to mean that

18  clients placed orders and MintBroker placed trades, or executed

19  trades, but that MintBroker actually kept the shares it

20  purchased for itself and did not give them to clients?

21  A.  I don't believe I have done the work to answer that

22  question with a yes or a no.

23  Q.  Okay.  But did you ask -- you did say that you didn't

24  actually confirm whether shares that were -- I used the word

25  allocated, you used the word quote-unquote sold to clients --

1    in fact were transferred to those clients.

2    A.  I have -- did not do the work, was not engaged to do the

3    work to answer that question with a yes or a no.  That was not

4    part of my analysis.

5    Q.  Okay.  And did you determine whether the inventory account

6    balance changed in corresponding to any participant sales from

7    the client -- by the clients from the inventory account?  In

8    other words, if the data reflected a purchase by a client from

9    MintBroker inventory, did you look at the inventory account to

10   see if you could corroborate that trade?

11   A.  Consistent with the journal entry explanation that we went

12   over a few minutes ago, I did confirm that for every buy at the

13   same quantity, price, date, time, that there was a sell to a

14   client, yes.  I did not specifically analyze an inventory

15   account, but I did confirm that there were ins and outs at the

16   exact same date, quantity, price, time.

17   Q.  Okay.  I'm looking, for example, at the end of your

18   analysis for -- I believe it's AWX, and you end up with a

19   balance of four shares on July 31st.  Do you see that, the

20   very last line, like the last page of your attachments?

21   A.  Just a second to pull it up.

22           I'm not seeing that.

23   Q.  Okay.  Let's look at the --

24   A.  But the four that you're seeing is something different,

25   conceptually.

N221AVAH                    Beresford - Cross

1  Q.  Okay.  So is it 406?  I guess the column headings are one

2  over.

3          Let's look at the GBR one, and that one, I believe

4  you're ending up with a balance of 5,288 shares; is that

5  correct?  Am I reading this correctly?

6  A.  I'm not seeing that.  Did you say 5,288?  I'm not seeing

7  that number.

8  Q.  On August 2nd.  It's the last page of the GBR report.

9  A.  Apologize.  I'm just double-checking.  I need to scroll all

10  the way back up to the top for the header.

11          I do see that 5,288 that you're referring to, and so

12  would you mind asking the question again about what it is.

13  Q.  Okay.  So, well, let me do the line before that.  The line

14  before that shows I believe a sale of 5,288?

15  A.  That column where you're seeing a negative 5,288 --

16  Q.  That's the ownership.

17  A.  Ownership.

18  Q.  Okay.  So then that -- and you've had the negative

19  .17 percent, right?

20  A.  Yes, I'm seeing that.

21  Q.  Okay.  Is that because, in your assessment, MintBroker owed

22  5,288 shares to somebody?

23  A.  I don't know that.  I would -- like I said, with any

24  negative ownership percentage, I'd have to look at the data

25  again and try and understand why that occurred.

1   Q.  Okay.  You can't recall why you've put those numbers here?

2   A.  Can you ask that question again?

3   Q.  Well, you have negative ownership throughout your report,

4   and I'm wondering if you could explain that.

5   A.  I don't know off the top of my head why there would be a

6   negative ownership percentage.

7   Q.  Okay.  So if MintBroker owed shares to somebody, in your

8   view would that leave MintBroker with a negative beneficial

9   ownership?

10  A.  Possibly.  That is one reason that that could occur.

11  Q.  Okay.  And what about if one of these clients owed those

12  shares to somebody, would that leave the client with a negative

13  beneficial ownership?

14  A.  That, again, I don't know.  Possibly, but it's -- I -- I

15  don't know.

16  Q.  Okay.  Well, did you inquire whether any of these clients

17  were purchasing shares in order to cover short positions?

18  A.  No, I did not.

19  Q.  Okay.  Would that change your analysis?

20  A.  No.

21  Q.  What if one of the clients owed shares to MintBroker?

22  A.  Would that change my analysis?  No.

23  Q.  Right.  Okay.  Are you aware that the definition of

24  beneficial ownership includes shares that you have the right to

25  acquire, vote, or dispose of within 60 days?

N221AVAH

1  A.  Yes.

2  Q.  Okay.  So if MintBroker was owed shares by somebody, that

3  wouldn't increase MintBroker's beneficial ownership?

4  A.  Say that one more time for me?

5  Q.  If MintBroker was owed shares by somebody, whether a client

6  or a third party, do you agree that the number of shares

7  MintBroker was owed should be included in MintBroker's

8  beneficial ownership?

9  A.  I think you should go back and look at the analysis and see

10  how that would change the numbers.

11  Q.  But it would be fair to say that it would change the

12  numbers, correct?

13  A.  It sounds like it would.

14       MS. TAUBER:  Okay.  I think I might -- I have no

15  further questions.

16       THE COURT:  All right.  Any redirect?

17       MR. FORD:  No, your Honor.

18       THE COURT:  All right.  Mr. Beresford, thank you for

19  participating remotely.  Your testimony is done and you are

20  free to go.

21       THE WITNESS:  Okay.  Thank you very much.

22       THE COURT:  Thank you.

23       (Witness excused)

24       THE COURT:  All right.  So we've now heard from

25  Mr. Gentile, Mr. Christian, Mr. Beresford, and I am taking the

1    Darville deposition, which is essentially his testimony

2    preserved for this proceeding, and I, again, will be reviewing

3    the whole thing.  I have the exhibits from the parties in their

4    exhibit notebooks.  By any chance did you also provide an

5    electronic version of your exhibits on thumb drive or anything

6    like that, or send it?

7              MS. TAUBER:  I didn't, but I can do that.

8              THE COURT:  I'm going to ask that that be done,

9    please.

10             And --

11             MS. TAUBER:  A thumb drive or a disc or a certain --

12             THE COURT:  Thumb drive is fine.  Either that or some

13   download.  Either way.

14             (Discussion off the record)

15             THE COURT:  So the parties are going to provide the

16   Court in some way with electronic versions of the documents.

17             And I would like the time line that was a

18   demonstrative, I think, in the opening.  Just helpful to have

19   as a point of reference at times.

20             So is there any other evidence or housekeeping that we

21   need to take into account before I get into some legal

22   discussion with you all?  Ms. Tauber?

23             MS. TAUBER:  You wanted the exhibit book?  I know that

24   yesterday there was a -- yesterday there was an issue that

25   there was some mislabel -- the deposition transcript was the

N221AVAH

1  wrong document in there, so I'll correct that in the file, but

2  it will just be corrections of the right documents that were

3  supposed to be in here.

4         THE COURT:  Okay.

5         MS. TAUBER:  Okay.

6         THE COURT:  Thank you.

7         MR. FORD:  The only other issue we had was that we had

8  included three documents that I may have used to refresh

9  recollection.  We did not ultimately use them, so I don't know

10  how we want to handle that.  If Ms. Tauber is objecting to you

11  looking at them, then we would move to have everything admitted

12  into evidence but for those three documents.

13         MS. TAUBER:  You mean the affidavits or --

14         MR. FORD:  Not the affidavits.  It's a plane ticket.

15         THE COURT:  Why don't you do this.  Why don't you

16  identify for Ms. Tauber, after today or tonight, whatever, what

17  those exhibits are, ask her if she has any objection to their

18  being admitted.  Maybe you'll agree, both of you, that they

19  don't need to be admitted, or even presented, because they

20  weren't used, essentially, and then we can identify what those

21  are, you can let me know in a letter, and if they're not to be

22  included, then we just won't include them with what's filed

23  electronically and we can take them out of the paper copies.

24         MS. TAUBER:  But I don't think the Court has a copy of

25  the Darville video.

1              THE COURT:  Oh, I need that.

2              MS. TAUBER:  So maybe on the same secure file.

3              THE COURT:  Well, I would love to have that, if

4    someone could get that to me today, like tonight.  Can someone

5    email that?

6              MR. FORD:  We should be able to provide it probably in

7    the next five or ten minutes.

8              THE COURT:  Okay.  Just email it to chambers.  That's

9    fine.

10             All right.  Anything else?

11             All right.  Well, thank you very much.  This has been

12   very, very helpful and I think useful for sure.

13             As I said, I have some questions.  One question I

14   have, just overall procedurally, is:  Do you all think you want

15   an opportunity for any post-hearing briefing?  Not on the issue

16   of exclusion —— we have plenty of briefing on that —— but on

17   the implications of what the data shows or doesn't show and

18   what implications that has for the short-swing profit rule.

19   I'm not saying you need to.  I'm just asking you if either of

20   you think you would.  Ms. Tauber or Mr. Lopez?

21             MR. LOPEZ:  Plaintiff would very much like to.  We

22   especially want to address the fundamental mistake underlying

23   all of the expert testimony.  Beneficial ownership is a

24   specified defined term which neither of the experts seemed to

25   grapple with.  They were defining the wrong ——

1              THE COURT:  Hold on.  Okay.  That's fine.  And hold

2     that thought because that's one of the questions I have is

3     about what beneficial ownership really is.

4              And so any position on briefing on your end, Mr. Ford?

5              MR. FORD:  Certainly if they're going to put in

6     briefing, we would like to too.  So I don't feel particularly

7     strongly at this moment.  I was waiting to see what questions

8     your Honor had.  To the extent it would be helpful to you, we

9     would love to provide whatever additional information.

10             THE COURT:  And I suspect that coming under these

11    questions, there will be things you'll want to go possibly

12    canoodle about and apply briefing on.  So I'm going to have

13    briefing at the end.  Let's just talk about whether that's

14    going to be simultaneous or you each get a response or whether

15    we'll just do a brief from Mr. Ford, opposition, and reply.

16    But we'll figure that out.

17             All right.  Some of these are big questions, so I

18    don't need the whole song and dance.  But the plaintiff's brief

19    that was filed in limine used terms such as illusory shares

20    ledger and pretend to sell.  And I understand why they're using

21    those terms.  That's in keeping with the theory of the alleged

22    Ponzi-like scheme.  But I really haven't grasped —— and I don't

23    know if you put it before me —— what that really means.  And

24    how do you piece together whether -- are you saying

25    factually —— and I'm asking the plaintiffs here —— that the

N221AVAH

1   ostensible client trades aren't in fact client trades because

2   it was somehow illusory?  If so, please explain that.

3         MR. LOPEZ:  We are relying heavily on the findings of

4   the Bahamian Securities Commission.

5         THE COURT:  Before you follow up on that, when you say

6   their findings, what did they submit and in what context?

7         MS. TAUBER:  That is an exhibit.  It's --

8         MR. LOPEZ:  There are two sources.  One is the letter

9   of September 18th from Ms. Rolle to Mr. Gentile; the second

10  is Ms. Rolle's affidavit in support of the -- not sure whether

11  the terminology is --

12        MR. FORD:  Winding up petition.

13        THE COURT:  Aren't those just hearsay?  How could I

14  rely on those?

15        MR. FORD:  Moreover, they're not findings.  In fact,

16  there was a five-day suspension during which Mr. Gentile

17  challenged it and was successful and the suspension was

18  removed.  Obviously we vigorously argue that the securities

19  commission suggestion is outlandish.

20        THE COURT:  Look, and this is an even bigger-picture-

21  issue, which is, I'm not going to be deciding whether there was

22  a Ponzi-like scheme.  I'm not really setting out to do that.  I

23  understand that I have to figure out what the beneficial

24  ownership is, which means I have to figure out whether data

25  actually represents customer accounts and whether there were

N221AVAH

1    trades on behalf of the customers and how that worked, etc., so

2    it may be relevant to whether there is a Ponzi-like scheme.

3    But I'm certainly not focusing on figuring that out.  I just

4    want to figure out what the evidence tells me in terms of

5    whether the definition of beneficial ownership has or hasn't

6    been met.  So that's the scope of what I have to do.

7            And so in that context then, Mr. Lopez, I cut you off

8    because I want to put a pin in it, but I'll just have you

9    articulate now your point about beneficial ownership.  And

10   there's beneficial ownership under 13D and then there's

11   beneficial ownership under 16(a)(2), and they're slightly

12   different, but I believe both relevant.  One is for liability,

13   I believe, and one is sort of what I would consider for

14   damages.  But I don't know.  You tell me.

15           MR. LOPEZ:  The definition of Section 13D is two-part.

16   For purposes of determining 10 percent beneficial ownership —

17   and that is what we are looking at — the definition is having

18   the power to acquire, hold, sell, or vote shares.  For purposes

19   of Section 16, that definition is carried over, whole, from

20   word one to word — to the period at the end of the sentence.

21           Mr. Christian, by his answers, pretty clearly did not

22   understand that that is not the same as the accounting —

23           THE COURT:  We're not relying on him for a definition

24   of beneficial ownership or whether the customer trades that

25   allegedly occurred, whether those are — I don't think we can

N221AVAH

1    rely on him for that.  He's just essentially, based on the

2    information he was told, or customer accounts, he purported to

3    verify some sample of that, but I don't think he's saying what

4    is or is not beneficial interest, is he?  That doesn't really

5    matter.

6           MR. LOPEZ:  I think he is.  His analysis is directed

7    toward determining when, at what time greater than 10 percent

8    beneficial ownership was present.  And to do that, you can't

9    just say beneficial ownership.  You have to look to the

10   definitions.

11          For example, toward the end of his testimony,

12   Ms. Tauber asked him about negative net worth, or negative

13   beneficial ownership.  And there was some discussion of

14   probably having short positions affect that.  Mr. Christian's

15   assumptions were pretty clear that if you have a short

16   position, your beneficial ownership goes down.  That does not

17   necessarily hold --

18          THE COURT:  And I have that as a related point and

19   question, because I understand -- and I want you to explain in

20   your briefing about that point because it does seem interesting

21   to me that there are these calculations that have negative

22   ownership rather than zero ownership or some value, right?  So

23   that's something I will definitely want addressed and why is it

24   okay to have numbers that are negative ownership, is that

25   really valid, what does that mean for the 10 percent.  I guess

N221AVAH

1    what I'm --

2              MS. TAUBER:  Also --

3              THE COURT:  Go ahead.

4              MS. TAUBER:  I think it's pretty accepted that when

5    there's ownership reported that it can include short interests,

6    which means that shares that you have to buy to cover a short

7    position.

8              THE COURT:  And if it's within those 60 days, you're

9    considered to have beneficial interest.

10             MS. TAUBER:  Right.  Meaning if you -- beneficial

11   ownership, it could be that you're reporting it because you

12   have a short position you have to cover, so you do own the

13   shares that are underlying your short position, under the

14   Section 16 rule.

15             MR. LOPEZ:  And if I may add one more sentence.  A

16   short does not deprive the seller, the short seller, of

17   beneficial ownership because he retains voting power.  Short

18   diminishes beneficial ownership when it settles, when the

19   shares go out -- when shares in fulfillment are delivered.  At

20   that point you're physically pushing shares out the door.

21   Until then, two persons own beneficially the same shares -- the

22   recipient, because he has a claim, and the seller, because he

23   has not parted with voting power.

24             THE COURT:  And that was explicitly recognized by

25   Judge Broderick in the summary judgment decision where he said

1    there could be more than one beneficial owner.  I still don't

2    know where that leaves us in terms of the data that's been

3    presented, assuming it's accepted at the moment, and what we

4    necessarily can or can't draw from that evidence.

5           Okay.

6           MS. TAUBER:  Can I make one further point --

7           THE COURT:  Yes.

8           MS. TAUBER:  -- that I raised in my questioning as

9    well.  There was initially -- or not initially -- at summary

10   judgment there was this defense of failure to clear, right?

11          THE COURT:  Yes.

12          MS. TAUBER:  Because of that -- and we at that time

13   had this ledger, spreadsheet, a similar spreadsheet from the

14   defendant's.  Since we were aware that their defense was, these

15   trades are here on paper but they failed to clear, then we had

16   to then get evidence from third parties that these trades in

17   fact did clear.  And we've only included the ones that we have

18   confirmed cleared and confirmed existed in MintBroker's account

19   and resulted in money in that account that MintBroker then

20   withdrew to MintBroker's bank account, and all of that is in

21   evidence on our summary judgment motion.

22          THE COURT:  Yes.

23          MS. TAUBER:  Okay.  I guess my longer point is, this

24   second ledger, we're back at square one now, right?  We haven't

25   confirmed that these trades on paper, any of them, actually,

1    except for the ones that are the subset we've already

2    confirmed, right, the additional ones, we haven't confirmed

3    that they existed anywhere in the market, right?  That they

4    existed in anyone's account other than MintBroker's, that

5    anyone made money from these trades other than MintBroker.

6            THE COURT:  Well, except that Mr. Gentile testified to

7    what that represents and what the customer accounts were.  And

8    I understand there are going to be evidentiary issues like

9    that.  In other words, even if they come in, there are going to

10   be questions about can you draw any conclusion from it, right?

11   But --

12           MS. TAUBER:  He initially said these are all paper

13   trades.  That was his initial claim, right?  We said, no, some

14   of them actually are real trades, right?  Now we're saying back

15   to him, well, these are all paper trades.  Now it's their

16   burden of proof to prove that they're not.

17           THE COURT:  Okay.  But there was testimony from

18   Mr. Gentile that if a customer placed an order, it would either

19   go to market or it would be net with inventory, basically.  And

20   I shouldn't say it would go to market; I should say that

21   MintBroker would go to market and get the shares and then

22   supposedly bring them in and transfer.

23           MR. LOPEZ:  Your Honor, there is a third

24   possibility --

25           THE COURT:  Okay.

1           MR. LOPEZ:  -- that which the Securities Commission of

2    the Bahamas seized on to put them out of business, that he was

3    making it up.

4           THE COURT:  Oh, put that one aside.  There was certain

5    testimony; I'm just trying to understand the implications.  And

6    that's --

7           MR. FORD:  Your Honor, if I may interject.  I think

8    one of the problems we're having here is one of evidence that's

9    going to lead to a lot of speculation.  The plaintiffs had, you

10   know, as I've pointed out, nearly a year with these documents

11   during which time they could have brought in experts or pursued

12   things to make these arguments.

13          THE COURT:  You can argue that again in the briefs,

14   but --

15          MR. FORD:  But it's highly relevant, because if we

16   look at what happened at the hearing, we have Mr. Gentile come

17   in and he testifies that essentially this omnibus account is

18   functioning like a custodial account.  Remember, we're

19   interested in beneficial ownership and we're agreeing that that

20   definition is based on the ability to vote or dispose of a

21   share.  Now the fact that the vehicle that a foreign

22   broker-dealer, or even a US broker-dealer, uses, such as

23   Citadel, to place those trades on behalf of the client does not

24   answer, as I've been saying, the *a priori* question of who the

25   beneficial owner was, and what's so fascinating about these

1    16(b) cases, if you take an entity, US entity like Citadel,

2    they would be violating this rule with a high degree of

3    frequency.

4            THE COURT:  All right.  Hold on.  Let me cut you off.

5    I'll give you a chance.  While it's still in my head, let me

6    break it down.

7            For those transactions that supposedly were for

8    customers and were filled from inventory of MintBroker,

9    supposedly, if that in fact happened, is that something that is

10   included or not included for short-swing profit purposes?  In

11   other words, let's say there really is a customer transaction

12   and it is still by inventory.  I thought I heard testimony that

13   that is something that actually happens all the time in the US,

14   but I don't know.  So I just want a little clarification on

15   that specific point.

16           MR. FORD:  I mean, one thing that's happening,

17   remember, we have to keep in the context that we're talking

18   about a high-frequency day trading firm, and that's why things

19   are moving with this pace.  The way that it has been calculated

20   is that if MintBroker buys from the market for its inventory,

21   that is obviously calculated in the short-swing profit analysis

22   to the extent it's over 10 percent.  To the extent there's a

23   sell that isn't executed against inventory, that would not be

24   calculated.  It would not be until MintBroker went and then

25   sold the actual share back into the market that we would be

1    offsetting them, both for purposes of determining the

2    10 percent threshold, one, and then, two, for ultimately

3    calculating the profits.

4           There was one other thing, which this sort of almost

5    touches on, but it has to do with the negative ownership.

6    What -- before we go down this rabbit hole, we really should

7    stick to the facts of what's going on, and if you go back to

8    Beresford's report, what he's showing, we're seeing a balance

9    of negative 3 percent, negative 5 percent.  He's looking at it

10   before the, you know, the 10 percent threshold is even closely

11   approximated by the company.  So to the extent we're going to

12   have this argument —- and we're prepared to do so on the

13   briefs —- about the relevance of short sales in relation to

14   beneficial ownership and to the calculation, let's bear in mind

15   that that is triggered at or around the 10 percent threshold

16   and not a month prior, where there's just raw data that's

17   showing that they were shorting, for example, shares in late

18   June or early July, which is outside even of what anybody

19   agrees to be the relevant trading period.

20          MS. TAUBER:  Well, my point is the negative 5 should

21   be a positive 5, which would of course make the 10 percent

22   threshold reached a lot sooner than if it was negative, and you

23   go to 0 and then you go to 5 and then --

24          THE COURT:  That's what I understood your point to be.

25   So Mr. Ford, what do you have to say to that?

1          MR. FORD:  Well, that would be -- I mean, it's

2     operating on the assumption that that short position is held.

3     It could be positive for a moment in time, to the extent that

4     you're required, when you short, to enter into a contract to

5     buy and sell that share.  But it describes only a specific

6     moment in time.  So you can't look at a short that occurred on

7     June 29th as, you know, fulfilled, and then add it into a

8     calculation that occurs a month down the line.

9          THE COURT:  You're sort of talking past each other,

10    but I want to reframe to see if I understand what you're

11    saying, Mr. Ford.  Which is that when we see in the charts or

12    the tables that were provided by Mr. Christian and

13    Mr. Beresford, and I guess also testified to by Mr. Gentile --

14    or maybe not.  He didn't do the percent calculations.  So

15    whatever the tables were that had the percent calculations of

16    ownership on a day where it has some negative value, negative

17    5, let's say, and then another day it's at 8, you're saying

18    that that negative 5 from a few days ago is just irrelevant to

19    whether the value, that it might actually be 13, because you

20    went negative rather than positive.

21          MR. FORD:  And more precisely, because the entity

22    that, when entering a short sale as a certain settlement date,

23    it's not holding that short open for 30 days or 60 days.

24    You're shorting a stock.  And even as a recordkeeping entry,

25    you're closing it by the -- by virtue of purchase.  I

1    understand that's one thing.  I'm saying set that aside, and

2    I'll grant them that.  We still have the situation where the

3    short contract is entered with a T plus 2 settlement date.  Not

4    held open.  These are not contracts to purchase over the next

5    60 days.  In other words, there is not a contract.  Either the

6    contract has been sold and is off the books prior to that or by

7    the settlement date it either settles or it doesn't.  But we

8    can't say, well, you entered a short sale on July 5th and

9    therefore we're going to carry that over for the next 60 days.

10    That contract had been executed or expired by that time.

11            MR. LOPEZ:  Mr. Ford is describing the state of

12    affairs on shore.  This is Bahamas.  These rules don't apply.

13            THE COURT:  Which rules?

14            MR. LOPEZ:  It's the Wild West.

15            THE COURT:  Wait, wait, wait.  Which rules don't

16    apply?

17            MR. LOPEZ:  The 30-day settlement, the need to close

18    the short *tout de suite*.

19            THE COURT:  Okay.  Well, put the rules aside.  I think

20    it's a day trading firm, so there, the transactions are

21    happening within a day, presumably, and if that's happening,

22    then yes, at a moment you have taken possession of something

23    that has a short position that you are beneficial owners of,

24    but if that is then being -- once it's off the market, once

25    you've canceled, once you've done the counter to that short

1   position during the day -- oh, you're saying you would actually

2   acquire the thousand shares?

3          MS. TAUBER:  No.  I'm saying the frequency at which

4   he's trading, yes, you might close, but between the time where

5   he gets rid of the short and opens the short, he might have

6   also bought like 10,000 more shares.  So now you have the short

7   interest plus all those shares.  It would have maybe hit

8   10 percent a few times in between that before -- before the

9   threshold was reached.  According to the experts, the threshold

10  was actually reached all along, up and down the whole way.

11         MR. FORD:  My problem here is we don't have -- setting

12  aside that I disagree with certain things on principle, we

13  don't even have any evidence and no effort was made by the

14  plaintiffs during this extended period of discovery or at this

15  hearing to present this.  So we're now at the end of a hearing.

16  We were given all this time to conduct extra discovery, and I'm

17  hearing for the first time theories for which I don't see any

18  evidence, which are not reflected in the trade records that

19  we've seen.  So we can -- as an academic exercise, I think it's

20  fascinating, but I'm not seeing it in the records other than

21  them pointing to some initial short sales before even the

22  relevant time period where it was -- where the accountants were

23  calculating it as a negative balance.

24         And I do think I agree with your Honor that the role

25  of both of these individuals had nothing to do with determining

N221AVAH

1  beneficial ownership.  I think beyond the narrow testimony of

2  Mr. Christian that he had made some sampling at times to verify

3  that they were customer --

4           THE COURT:  Well, they had to make an assumption about

5  beneficial ownership as they were calculating the 10 percent,

6  right, so they're obviously figuring out what counts towards

7  that, and plaintiff's position is that they didn't have a

8  correct understanding of beneficial ownership, but I get it.

9           MS. TAUBER:  Can I also address that thing about

10  Citadel, the market maker?

11           THE COURT:  Sure.

12           MS. TAUBER:  Market makers are authorized to sell

13  shares to customers from inventory, but they're specifically

14  licensed and authorized to do that by the exchanges.  And only

15  certain institutions can serve as market makers for certain

16  companies.  So there were specific market makers for these two

17  stocks.  We took discovery from those market makers.  The other

18  broker-dealers can't -- I don't -- I do not believe they're

19  authorized to just sell from inventory.  I think that would

20  violate all kinds of regulations.

21           MR. FORD:  I think it's, one, outside the scope, but

22  we disagree.  An entity or individual engaged in bona fide

23  market-making activity receives an exemption from the locate

24  requirement.  In order to even make that determination, we need

25  facts upon facts to determine whether that's satisfied or

1    whether there was naked shorting going on, but, again, we're

2    discussing something that's completely in a vacuum because no

3    evidence was presented or sought by the plaintiffs, no experts

4    were presented, and so we're hearing a theory of two lawyers

5    about the way the world works that we have no factual evidence

6    to look at.

7         MR. LOPEZ:  Your Honor, there is a background fact

8    that seems to be ignored here.  The burden of proof is not on

9    the plaintiff at this hearing; it is on the defendants.

10        THE COURT:  Well, let's clarify that.  Who has the

11    burden of proof with respect to proving what damages are?

12        MR. LOPEZ:  The plaintiff needs to make a *prima facie*

13    showing.  Once that showing is made —- and we have made it —-

14    the burden shifts.

15        THE COURT:  Okay.

16        MR. FORD:  We of course disagree that the *prima facie*

17    showing is made.  What they did was they obtained data of an

18    omnibus account, which your Honor is very familiar with this

19    from the *Alliance* case, the *Microbot* case, where we had, as

20    Mr. Gentile even testified, a very similar situation, an

21    offshore broker-dealer firm that was trading in an omnibus

22    account.  They were advised that, if the omnibus account itself

23    went over, a certain threshold of 13D or G was required to be

24    filed.  But at the end of the day, when you look into the

25    omnibus account and determine that it was trading on behalf of

1    both, you know, the entity itself as beneficial owner and the

2    clients, the next step is to then remove those shares.  We have

3    answered that *a priori* question as to who beneficially owns

4    those shares.  And so I think this situation is, you know,

5    really, for our purposes, is indistinguishable from that.  So

6    we don't even think they've made a *prima facie* showing.  I

7    don't think there's anything before the Court at this point to

8    impose the sort of $15 million, 37(c) sanction that they're

9    seeking.  I don't think we have reliable evidence, and

10   certainly none, you know, was presented at this hearing.

11           THE COURT:  Well, they of course think there's no

12   reliable evidence going your way.  But I agree the burden will

13   play a role here, potentially, and so your briefs certainly

14   should state what that is, set out what the burdens are, and

15   make your case as to why your damages numbers control.

16           So I guess I would ask, do you prefer doing

17   simultaneous briefing or do you prefer the call and response

18   briefing?

19           MR. LOPEZ:  I think we should have simultaneous

20   briefing.  We have all the evidence such as it is on the table

21   and it's in front of all of us.

22           THE COURT:  Mr. Ford, do you have a position?

23           MR. FORD:  I'm okay with approaching it as a sort of a

24   post-hearing brief rather than, you know, as you said, an

25   opening and opposition.

1    THE COURT:  All right.  So we'll do simultaneous

2   briefs, but I do want to give each of you the opportunity to

3   respond to the other.  So how long would you need to do

4   briefing?  Let's say no more than 25 pages?  30 days?  Do you

5   need more?

6    MR. LOPEZ:  I'm leaving for Patagonia on the 14th.

7    THE COURT:  I'm envious.

8    MR. LOPEZ:  I hate to have the -- to impose on the

9   Court my desires for pleasure, but I return, I believe, on the

10  4th of March.  Ten days after that?

11   THE COURT:  So we're talking March 14th for the

12  initial briefs.  Okay.

13   Mr. Ford, is that okay with you?

14   MR. FORD:  That schedule is fine for us.

15   THE COURT:  All right.  And then to do the responses,

16  do you need two weeks or 30 days or 21?  What do you think?

17   MR. LOPEZ:  Two weeks should be ample.

18   THE COURT:  So briefs no more than 25 pages on

19  March 14th, responding briefs no more than 10 pages on the

20  28th.

21   Let me just look at my questions.

22   I'm good, I think.  I think you're going to be giving

23  me what I need in the briefs afterwards.  Definitely a much

24  more interesting inquest hearing than most other cases, right?

25  This one's challenging.

N221AVAH

1              All right.  Anything else?  Anything else we need to

2      do that we haven't addressed?  Anything from the plaintiff?

3              MS. TAUBER:  Transcripts, when could we get -- could

4      we get like a rough copy, or how does that work?

5              THE COURT:  Depends on what you want it for.

6              (Discussion off the record)

7              THE COURT:  Anything else?

8              MR. FORD:  Just to clarify, we've agreed, your Honor,

9      that all -- both parties' records are in evidence, with the

10     exception of the three that we discussed, so it's all fair game

11     for --

12             THE COURT:  Yes.  And that doesn't mean, but I still

13     may be considering things as hearsay or, you know, otherwise

14     evidentiarily compromised.

15             MS. TAUBER:  The affidavits as well or --

16             THE COURT:  Well, those we said were out, right?

17             MR. FORD:  We don't plan to rely on affidavits of the

18     individuals that did not testify.  We presume it's okay to rely

19     on Mr. Gentile's, Mr. Darville's, and the experts'.  But if the

20     answer is no, just let us know for purposes of, you know

21     drafting these briefs.  That's what I'm concerned with.

22             THE COURT:  I'd rather go with the testimony that they

23     gave during the hearing.  But do plaintiffs have a view on

24     this?

25             MS. TAUBER:  I mean, I'm more concerned about not

N221AVAH

1    getting affidavits from the other people who didn't testify.

2              THE COURT:  They're not coming in.

3              MR. FORD:  Yes, we're agreed.

4              MR. LOPEZ:  We'd like to have a finite record.

5              THE COURT:  Yes.  I think so too.  And I think we had

6    previously discussed this.  So the affidavits of the testifying

7    witnesses and nontestifying witnesses are not in evidence, and

8    I don't believe any of them were used for impeachment purposes,

9    so --

10             MS. TAUBER:  Except of course maybe Darville's was

11   during his.

12             THE COURT:  Okay.  We'll still consider his testimony.

13   We'll consider the extent to which he was impeached or not

14   impeached there.

15             All right.  Anything else?  Going once, going twice.

16   Sold.

17             All right.  Well, thank you all for doing this in two

18   days.  I appreciate it.  And thanks for putting up with all my

19   questions.

20             MR. FORD:  Thank you, your Honor, for taking the time.

21             MR. LOPEZ:  Thank you.

22             MS. TAUBER:  Thank you, your Honor.

23                            oOo

24

25

```
1                        INDEX OF EXAMINATION

2   Examination of:                              Page

3    ROBERT CHRISTIAN

4   Direct By Mr. Ford . . . . . . . . . . . . . 193

5   Cross By Ms. Tauber  . . . . . . . . . . . . 232

6    BRENDAN BERESFORD

7   Cross By Ms. Tauber  . . . . . . . . . . . . 288

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```