UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
                        :

AVALON HOLDINGS CORPORATION,  :

         Plaintiff,         :

    - against -       :

GUY GENTILE and MINTBROKER    :
INTERNATIONAL, LTD.,         :

       Defendants.     :
----------------------------------------------------
                        :

NEW CONCEPT ENERGY, INC.,    :

         Plaintiff,         :

    - against -       :

GUY GENTILE and MINTBROKER    :
INTERNATIONAL, LTD.,         :

       Defendants.     :
----------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/6/2023_

18-CV-7291 (DLC)(RWL)

18-CV-8896 (DLC)(RWL)

**REPORT AND RECOMMENDATION
TO HON. DENISE L. COTE:
SHORT-SWING PROFITS AWARD**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

      In these two related cases, Plaintiffs Avalon Holdings Corporation ("Avalon") and

New Concept Energy, Inc. ("New Concept") sued Guy Gentile ("Gentile") and his offshore

brokerage company Mintbroker International, Inc. ("Mintbroker") for disgorgement of

short-swing profits under § 16(b) of the Securities Exchange Act of 1934 (the "Act").

Section 16(b) imposes strict liability on beneficial owners of more than 10% of a

company's stock who acquire and sell above that threshold within any six-month period.

The statute allows the company whose stock was traded to recover profits made by the

beneficial owner during that period.   The Honorable Vincent S. Broderick previously

1

granted summary judgment on liability, finding that the Defendants had exceeded the 10% beneficial ownership threshold and must disgorge profits to each Plaintiff. *Avalon Holdings Corp. v. Guy Gentile and Mintbroker International, Ltd.*, 597 F. Supp.3d 640 (S.D.N.Y. 2022) ("*Gentile I*"). The matter then came to me for determination of the amounts due to Plaintiffs. Currently, the action is stayed as to Mintbroker due to liquidation proceedings in the Bahamas. Gentile's application to stay the case as to him was denied.

Typically, calculation of damages in short-swing profits cases is not terribly difficult. Indeed, in the instant cases, the parties largely agree on how to calculate short-swing profits. However, the parties' calculations differ significantly. Plaintiffs assert that Avalon should receive $6,235,908, plus pre-judgment interest, and that New Concept should receive $6,102,002, plus pre-judgment interest. In contrast, Gentile contends that Plaintiffs have not met their burden to prove damages with reasonable certainty, but even if they had, short-swing profits payable to Avalon would be no more than approximately $1.2 million, and there would be zero short-swing profits with respect to New Concept. The total difference in the parties' calculations is thus more than eleven million dollars exclusive of pre-judgment interest.

The reason for the stark difference stems from trading data that Gentile produced long after closure of discovery and after summary judgment was granted against him (the "Post-Discovery Trading Records"). Gentile contends that the Post-Discovery Trading Records show that many trades previously attributed to Mintbroker on its own account are in fact attributable to Mintbroker customers for which they, not Mintbroker, were

beneficial owners. Excluding the purported customer trades from calculation of short-swing profits results in the dollar amounts advanced by Gentile.

Plaintiffs take the position that the Post-Discovery Trading Records, and any testimony about them, should be excluded from consideration for several reasons, including that Gentile's damages analysis premised on those records is fundamentally inconsistent with the summary judgment decision as well as with earlier representations made by Gentile and Mintbroker that no such customer data existed. Additionally, Plaintiffs contend that the Post-Discovery Trading Records, and testimony about them, should be excluded as unreliable evidence. And, Plaintiffs assert, even if the Court were to consider the Post-Discovery Trading Records, they would not change the multi-million short-swing profit numbers advanced by Plaintiffs.

Accordingly, the Court is tasked first with determining whether the Post-Discovery Trading Records, and testimony and opinions about them, should be excluded, and second with determining the amount of short-swing profits payable to Plaintiffs. Following extensive briefing and a two-day evidentiary hearing, and for the reasons set forth below, I find that Gentile's damages theory is barred by the law of the case and that, in any event, the records and expert testimony on which Gentile seeks to rely are unreliable. Accordingly, I recommend that (1) Avalon be awarded disgorged profits in the amount of $6,235,908; (2) New Concept Energy be awarded disgorged profits in the amount of $6,102,002; and (3) prejudgment interest be awarded to each Plaintiff.[1]

---

[1] To distinguish between docket entries in the Avalon action and the New Concept action, the Court uses the following abbreviations. "AV Dkt." refers to the docket for *Avalon Holdings Corp. v. Gentile et al*, No. 18-CV-07291. "NC Dkt." refers to the docket for *New Concept Energy, Inc. v. Gentile et al*, No. 18-CV-08896.

## The Short-Swing Profits Legal Framework

For context, the Court begins with the legal provisions and principles governing short-swing profits.

### A.    Short-Swing Profits Strict Liability

Section 16(b) of the Act requires an "insider" to disgorge short-swing profits.  *See* 15 U.S.C. § 78p(b).  Statutory insiders include directors, officers, and beneficial owners of more than 10% of any class of a company's registered equity securities.  15 U.S.C. § 78p(a)(1).  Liability requires proof of four elements: "'(1) a purchase and (2) a sale of securities (3) by an [insider] (4) within a six-month period.'"  *Chechele v. Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (quoting *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)).  Judge Broderick's summary judgment decision determined that those elements had been proven beyond dispute with respect to Defendants' trading in shares of both Avalon and New Concept.  *See Gentile I*, 597 F. Supp.3d at 655-56.

As explained by the Second Circuit, "§ 16(b) was designed to prevent an issuer's directors, officers, and principal stockholders from engaging in speculative transactions on the basis of information not available to others."  *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170, 173-74 (2d Cir. 2012) (internal quotation marks omitted).  The provision was "crafted as a blunt instrument to impose[ ] a form of strict liability," requiring "no showing of actual misuse of inside information or of unlawful intent."  *Id.* at 174 (internal quotation marks and citations omitted); *see also Rubenstein v. International Value Advisers, LLC*, 959 F.3d 541, 543 (2d Cir. 2020) (recognizing that Section 16(b) "imposes strict liability").  In other words, it "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing

4

corrupt insiders who skirt the letter of the prohibition." *Magma Power Co. v. Dow Chemical Co.*, 136 F.3d 316, 320-21 (2d Cir. 1998).  For this reason, courts have been "reluctant to exceed a literal, 'mechanical' application of the statutory text in determining who may be subject to liability." *Packer v. Raging Capital Management, LLC*, 981 F.3d 148, 154 (2d Cir. 2020).

## B.   Beneficial Owners

Defendants were not officers or directors of Avalon or New Concept.  Rather, their liability turns on their being "beneficial owners" of more than 10% of the companies' stock. The Act does not define the term "beneficial owner."  Rather, the term is defined in regulations promulgated by the SEC: "Solely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities … the term beneficial owner shall mean any person who is deemed a beneficial owner under section 13(d) of the Act."  17 C.F.R § 240.16a-1(a)(1).  In turn, Rule 13d-3(a) promulgated pursuant to section 13(d) of the Act, defines a "beneficial owner" of a security as "any person who has "(1) [v]oting power which includes the power to vote, or to direct the voting of, such security; and/or (2) [i]nvestment power which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. § 240.13d-3(a)(1)-(2).  Judge Broderick found, beyond dispute, that Defendants were beneficial owners of the shares at issue because they had the power to dispose of them and did so.[2] *Gentile I*, 597 at 656.

---

[2] Judge Broderick also invoked Rule 16a-1(a)(2), which, "[o]ther than for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities" defines beneficial owner as "any person who directly or indirectly … has or shares a direct or indirect pecuniary interest in the equity securities.  … The term pecuniary interest … shall mean the opportunity, directly or indirectly, to profit or share in

C.    **Calculation Of Short-Swing Profits**

The parties have not voiced any disagreement about the basic principles and methods for calculating short-swing profits.   Short-swing profits are to be calculated according to the lowest-in, highest-out method, which "has been consistently and diligently followed by courts in the Second Circuit."   *Morales v. Consolidated Oil & Gas, Inc.*, No. 81-CV-4871, 1982 WL 1328, at *4 (S.D.N.Y. July 17, 1982) (collecting cases); *see also Smolowe v. Delendo Corp.*, 136 F.2d 231, 239 (2d Cir. 1943) ("The only rule whereby all possible profits can be surely recovered is that of lowest price in, highest price out – within six months"); *Chechele v. Standard General L.P.*, No. 20-CV-3177, 2021 WL 2853438, at *10-11 (S.D.N.Y. July 8, 2021) ("In light of the 'broadly remedial' purposes of § 16(b), the Second Circuit has long applied the rule of 'lowest price in, highest price out'") (quoting *Smolowe*, 136 F.2d at 239).

"[T]he trades must be matched in a manner that maximizes the disgorgeable amount ….   This is accomplished by matching the highest sale prices with the lowest purchase prices within the six month period."   *Segen ex rel. KFx Inc. v. Westcliff Capital Management, LLC*, 299 F. Supp. 2d 262, 272 (S.D.N.Y. 2004).   "Pursuant to this method

---

any profit derived from a transaction in the subject securities."   *Gentile I*, 597 F. Supp.3d at 655 (quoting 17 C.F.R. 240.16a-1(a)(2)).   Judge Broderick suggested that the "pecuniary interest" provision applies to determining "how much short-swing profits [Defendants] have to disgorge."   *Id.*   In their calculation of short-swing profits, the parties do not train their focus on the "pecuniary interest" provision but instead on Rule 13d-3's standard of voting power and/or investment power.   *See* Def. Post-Hearing Mem. at 14 n.5 ("It is unclear whether Rule 16a-1(a)(2)'s reference to a 'pecuniary interest' even applies").   ("Def. Post-Hearing Mem." refers to Defendant Guy Gentile's Post-Hearing Brief, AV Dkt. 224, NC Dkt. 207.)   The Court does the same, although the result would be no different under the "pecuniary interest" standard.   *See Gentile I*, 597 F. Supp.3d at 655-56 (finding, beyond dispute, that Defendants have a pecuniary interest in the shares at issue).

of computation, [an insider's] short-swing profits may be calculated by matching … his highest-priced and hence most profitable sales transactions … with the same number of shares purchased for the least cost.  The remaining sales transactions that did not produce profits are dropped from the equation." *Donoghue v. MIRACOR Diagnostics, Inc.*, No. 00-CV-6696, 2002 WL 233188, at *3 (S.D.N.Y. Feb. 11, 2002).  When matching trades in this fashion, the trade taking a shareholder's beneficial ownership over the ten percent threshold is not deemed matchable, while the trade taking a shareholder under the 10% threshold is matchable.  *See Roth v. Goldman Sachs Group, Inc.*, 740 F.3d 865, 875 (2d Cir. 2014) ("Section 16(b) requires statutory insider status at the time of both purchase and sale"); 17 C.F.R. § 240.16a-2(c) ("The transaction that results in a person becoming a ten percent beneficial owner is not subject to section 16 of the Act unless the person otherwise is subject to section 16 of the Act"); Peter J. Romeo & Alan L. Dye ("Romeo & Dye"), *Section 16 Treatise and Reporting Guide* §10.02(2)(a)-(c) at 1006-12 (5th ed. 2019) (including purchase taking shareholder from above to below the 10% threshold).

The burden of proof with respect to determining the amount of disgorgement of short-swing profits begins with the plaintiff but shifts to the defendant.  Specifically, the "[p]laintiff in a § 16(b) action bears the burden of making a *prima facie* showing of the maximum profit made by the defendant on the short-swing sale.  The burden then shifts to defendant to prove the extent to which the actual profit was less than the maximum." *Lewis v. Realty Equities Corp. of New York*, 396 F. Supp. 1026, 1032 (S.D.N.Y. 1975); *accord Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299, 302 (2d Cir. 1956); *Schur v. Salzman*, 365 F. Supp. 725, 730 (S.D.N.Y. 1973) ("the burden of proof is upon the

7

defendant, a fiduciary, to establish that his profits are less than those claimed by the plaintiff, particularly where difficulty in ascertaining the precise damages is due to the insider's conduct").

### Factual Background

The facts of these cases have been set forth in the Court's opinion and order in *Gentile I* granting summary judgment in favor of Plaintiffs.  *See Gentile I*, 597 F. Supp.3d at 643-47.  In the time since then, however, the factual record has expanded with Gentile's production of the Post-Discovery Trading Records, further discovery, and a two-day hearing on damages, which included both fact and expert testimony.

### A.    Gentile And Mintbroker

Mintbroker, previously known as Swiss America Securities Ltd., was a day-trading broker-dealer firm registered under the securities laws of the Bahamas.  As explained further below, Mintbroker is no longer a going concern, having been liquidated by the Bahamian authorities.

Gentile founded Mintbroker in 2008 in the Bahamas. (Hrg. 34.[3])  At its peak, Mintbroker may have had as many as 50,000 customer accounts and as many as 5,000 accounts trading at one time.  (*Id.*)  The company began with three employees and reached a high of 80 employees.  (*Id.* 34-35.)  Gentile served as Mintbroker's director and CEO (*Id.* 35).  In 2017, Gentile started actively trading on behalf of Mintbroker, not customers, and engaging in "proprietary" day-trading to generate money solely for Mintbroker's benefit.  (*Id.* 37, 42.)

---

[3] "Hrg." refers to the transcript of the evidentiary hearing held on February 1-2, 2023 (the "Hearing"), AV Dkts. 202, 204.  "Hrg. PX" refers to Plaintiffs' hearing exhibits; "Hrg. DX" refers to Defendants' hearing exhibits.

Mintbroker described its business model on its website as follows:  "All trades are executed in a principal capacity, our clients do not have direct market access.   All transactions are executed against Mintbroker International, Ltd. …" (Hrg. PX 18; *see also* Hrg. 51 ("[I]f a client sent us an order, the client couldn't choose where the order went.  The firm would choose [the executing broker for the trade].")   As a result, all of Mintbroker's trades, whether on behalf of Mintbroker or in response to a customer trade, were made through the firm's "omnibus" accounts with its clearing firms.  (Hrg. 40-41, 83.)

During the relevant time frame, Mintbroker primarily used two clearing firms for its trades – Interactive Brokers ("Interactive") and Electronic Transaction Clearing, Inc. ("ETC").  (Hrg. 38-39.)  Gentile testified at deposition that client equity trades generally went to ETC, while Mintbroker's principal trades went to Interactive; so, in the normal course, Interactive trades did not include client trades.[4]  (Hrg. 98-99; *see also* Gentile Dep. 67.)  At the Hearing, however, Gentile disavowed that testimony, based on the Post-Discovery Trading Records (discussed below), stating that at his deposition he had been "guessing to the best of my ability at the time how things were working at the time."  (Hrg. 100-01.)

Mintbroker held an omnibus account at Interactive, with two sub-accounts – one for long positions, the other for short positions.  (Klauseger Dep. 7.[5])  The only client identified on the Interactive omnibus account is Mintbroker; therefore, Interactive's trading

---

[4] While client equity orders generally were routed to ECT, client option orders generally were routed to Interactive.  (Gentile Dep. 68-70.)  "Gentile Dep." refers to the deposition of Guy Gentile taken on Oct. 26, 2022, the transcript of which is Hrg. PX 34.

[5] Klauseger Dep. refers to the deposition of Brad Klauseger, Interactive's corporate representative, the transcript of which is PX 2.

records do not differentiate between trades that Minbroker placed for its own account and those Mintbroker placed for a client.[6]   (Hrg. 64, 83; *see also* Klauseger Dep. 6-8 ("With an Omnibus Account, Interactive Brokers is unable to see the number of customers that hold any particular position behind the [sub-accounts]").)

When Mintbroker received a customer trade order, it could fulfill the order in multiple ways.   (Hrg. 38-39.)   First, an order would be filled with Mintbroker's own inventory of the stock. (Hrg. 53.)  Second, an order would be cross-traded against another customer's trade.   (Hrg. 54-55.)   In both those scenarios, the customer's trade did not go to "the market" or "the street"; rather, the trades were internal to Mintbroker.   In instances where neither inventory nor cross-trades were available, the customer trade would be sent to one of the clearing firms (i.e., would go to the street).   (Hrg. 39, 54-55; *see also id.* 94; Gentile Dep. 51.)

Mintbroker engaged in riskless principal trading, in which the firm took no risk in executing a customer trade because it filled an order with its own inventory or hedged by going to the market for its inventory account.   (Gentile Dep. 70, 72; *see also* Hrg. 93, 131, 182 (hedging consisted of Mintbroker's proprietary trades).)   When asked whether Mintbroker ever credited a client with a buy without having itself covered, Gentile

---

[6] According to Interactive's "Consolidated Account Clearing Agreement" (the "Interactive Agreement"), Mintbroker had the option of creating sub-accounts providing its customers with ability to place orders directly with Interactive.   (Dkt. 233-1.)   The Interactive Agreement was produced during the pre-summary judgment discovery period but was not included by either party as an exhibit at the Hearing.   Plaintiffs submitted it as an exhibit to an attorney declaration accompanying their Post-Hearing Reply.   Defendants have not objected to its submission, but the Court is not aware of any testimony authenticating or explaining terms of the agreement.   Accordingly, the Court will not consider the Interactive Agreement, although it makes no difference to the Court's determination of this matter.

responded that it could have happened, but it was not something that Mintbroker generally did.  (Hrg. 94; *see id*. 97 (testifying that the firm "at times … could have been short").)

## B.    The Trading At Issue

The trading at issue concerns the stock of both Avalon and New Concept during the summer of 2018.[7]  Mintbroker first opened a position in Avalon stock on June 15, 2018 through Interactive.  (*Gentile I*, 597 F. Supp.3d at 643.)  On July 27, 2018, Mintbroker filed with the Securities and Exchange Commission ("SEC") its "Initial Statement of Beneficial Ownership" ("SEC Form 3"), the form that stockholders are required to file under Section 16(a) when they become the beneficial owner of more than 10% of the equity shares of the issuer company.  (*Id.* at 643-44.)  The SEC Form 3 shows that Mintbroker had taken a position of 1,922,095 shares in Avalon.  (*Id.* at 644.)  Just several days before Mintbroker filed its SEC Form 3 for Avalon, the share price rose from approximately $2.00 to approximately $10.00, reaching a high of $20.20 three days after Mintbroker's filing.  (*Id*.)  By August 2, 2018, Mintbroker had reduced its holdings in Avalon to zero.  (*Id.*)  In the time period that Mintbroker held shares of Avalon, it traded the stock thousands of times.  (*Id.*)

On or about August 21, 2018, in connection with its trading in Avalon stock, Mintbroker filed a Schedule 13D "Beneficial Owner Report" with the SEC ("Schedule 13D").  Intentional misstatements or omissions of facts on a Schedule 13D are federal

---

[7] Avalon is an Ohio-based provider of waste management services and is listed on the New York Stock Exchange.  (*Gentile I*, 597 F. Supp.3d at 643.)  New Concept is a Texas-based oil and gas drilling and exploration company also listed on the New York Stock Exchange.  (*Id.* at 645.)

criminal violations.  18 U.S.C. § 1001; 15 U.S.C. § 78ff(a).  The Schedule 13D represented that "[t]he source of funding for the purchase of the Shares was the general working capital of Mintbroker together with margin borrowing" and stated that the purpose of its having acquired as much Avalon stock as it did was "an attempt to gain control over [Avalon] and replace its board of directors with the near-term goal of selling the assets of [Avalon]."[8]  (Hrg. PX6 at 5, items 3 & 4.)  Gentile, by virtue of his relationship to Mintbroker, represented that he "may be deemed to indirectly beneficially own (as that term is defined in Rule 13d-3 under the Exchange Act of 1934, as amended) those Shares which Mintbroker had owned" and that he "disclaim[ed] beneficial ownership of all such Shares for all other purposes."  (*Id.* at 6, item 5(c).)  At the same time, the Schedule 13D also represented that Mintbroker and Gentile beneficially owned zero shares, which would be consistent with Mintbroker having reduced its Avalon holdings to zero.  (*Id.* at 2-4.)

Mintbroker first opened a position in New Concept stock, also through Interactive, on May 24, 2018.  (*Gentile I,* 597 F. Supp.3d at 645.)  On June 29, 2023, Mintbroker filed an SEC Form 3, showing that it had taken a position of 1,073,713 shares in New Concept. (*Id.*)  Mintbroker closed out its position on New Concept on September 25, 2018.  (*Id.*) As with Avalon stock, Mintbroker engaged in thousands of trades between opening and closing its position.  (*Id.*)  As with Avalon stock, the New Concept share price surged, more than doubling on the day that Mintbroker filed its SEC Form 3, and reaching a peak of $12.75 on July 2, 2023.  (*Id.* at 645-46.)  And, as with Avalon stock, Mintbroker filed a Schedule 13D with the SEC stating that Mintbroker's working capital was the source of

---

[8] A Schedule 13D must be filed when a person acquires either directly or indirectly the beneficial ownership of more than 5% of a security.  17 C.F.R. § 240.13d-1(a).

funding to purchase the stock; that, by acquiring its position in New Concept, Mintbroker sought to attempt to gain control, replace the board of directors, and sell assets of the company; that Gentile may be deemed to indirectly beneficially own, as that term is defined in Rule 13d-3, those shares which MintBroker had owned, but disclaimed beneficial ownership for all other purposes; and that Mintbroker and Gentile were not then a beneficial owner of any New Concept stock.  (Hrg. PX 6A at 2-4; 5, items 3 & 4; 6, item 5(c).)

## C.    The SCB Proceedings

In September 2019, Christina Rolle, the Executive Director of the Securities Commission of the Bahamas ("SCB") asked Gentile to appear for a meeting with regulators.  (*See* Hrg. PX 32 at 1.)  The meeting took place on September 12, 2019.  (*See id*.)  On September 18, 2019, Rolle issued a letter to Gentile that accused Mintbroker of failing to trade any securities on behalf of clients, and instead "recording" client orders internally in a manner akin to a Ponzi scheme "with no transaction having been entered on the market."[9]  (*Id*.)  The letter further informed Gentile that Mintbroker was suspended for five days to allow the BSC to investigate further.  (*Id*. at 2.)  Mintbroker initiated court proceedings to challenge those actions and successfully overturned the temporary suspension.  (*Id.* at 12, 16.)

On September 23, 2019,[10] Gentile left the Bahamas and gave directives to close down Mintbroker such that by the end of October or early November 2019, the office was

---

[9] At the 2023 Hearing, Gentile denied having operated a Ponzi scheme, saying that it was an "impossibility."  (Hrg. 83-84.)

[10] This date comes from the timeline prepared by Defendants as a demonstrative and is referred to herein as "Timeline."

closed and only a few employees remained.  (Hrg. 74, 79; *see also* 107-09.)  On November 27, 2019, Mintbroker surrendered its license to operate in the Bahamas. (Timeline.)  The SCB then advised Mintbroker on February 4, 2020 that the SCB would pursue court-supervised winding up of the company.  (Timeline.)  On March 5, 2020, the SCB filed a winding up petition, officially placing Mintbroker in provisional liquidation. (Timeline; Hrg. PX 37.)  By December 2021, Gentile had lost his challenge to the provisional liquidation, and Mintbroker was placed into official liquidation.  (Timeline; *see* Hrg. 97 (Gentile admitting that the Supreme Court of the Bahamas granted the winding up petition).)

## **Procedural Background**

### **A.    Initial Proceedings**

Avalon commenced its action against Mintbroker and Gentile on August 13, 2018. (AV Dkt. 1.)  New Concept commenced its action on October 1, 2018.[11]  (NC Dkt. 7.) Both actions initially were assigned to, and accepted as related by, Judge Broderick.  On January 22, 2019, Defendants filed motions to dismiss in both actions, which Judge Broderick denied on September 24, 2019.  (AV Dkt. 35; NC Dkt. 28.)  Both actions were referred to me for general pretrial purposes.  (AV Dkt. 46; NC Dkt. 38.)  Discovery in both cases ended around June 29, 2020.  (AV Dkt. 64; NC Dkt. 57.)

---

[11] New Concept initially attempted to file its complaint on September 28, 2018, but refiled on October 1, 2018, due to filing deficiencies.  (*See* NC Dkt. 1, 7.)

**B.      Discovery About Mintbroker Proprietary Trades**

Both liability and damages in each case turn on the extent of Defendants' beneficial

ownership of Avalon and New Concept stock.  Discovery thus focused on unearthing that

information.

Plaintiffs issued discovery requests to Defendants on October 16, 2019.  (Hrg. PX

41 at 6; Timeline.)   Plaintiffs also subpoenaed records from Interactive, ETC, stock

exchanges, including the New York Stock Exchange and NASDAQ, Citadel Securities,

and transfer agents. (*See* Hrg. 249.)  Of particular relevance, Interactive produced its

trading records for Defendants' trading in Avalon and New Concept stock (the "Interactive

Trading Records").  (Hrg. PX 4, 4A, 5, 5A.)

Plaintiffs diligently pursued discovery of all relevant trading records.  They also

issued interrogatories asking about the extent to which, if at all, Mintbroker's trading of

Avalon or New Concept shares was on behalf of clients.   Plaintiffs served the

interrogatories on October 16, 2019, and Defendants answered them on December 2,

2019.  (*See* Hrg. PX 41, 42.)  One of the interrogatories asked Gentile to:

> "Identify all Managed Accounts that held, traded, or voted
> AVALON [and NEW CONCEPT] securities (including at
> GENTILE's and/or MINTBROKER's direction); and identify
> the owners of any such  Managed Accounts or Avalon [and
> NEW CONCEPT] securities; and all persons with knowledge
> of the ownership of such Managed Accounts or AVALON
> [AND NEW CONCEPT] securities."

(Hrg. PX 42 at Interrogatory No. 6.)  Gentile responded simply, "None."  (Hrg. PX 41 at

Interrogatory No. 6.)  The interrogatories defined "Managed Account" as "any investment

account managed by the Defendants on behalf of one or more clients or customers, and

15

in which the Defendant directed or placed orders with respect to the purchase or sale of Avalon securities."[12]  (Hrg. PX 42 at 2.)

Concerned about the paucity of trading records, supporting documents, and related information – such as monthly statements, trade tickets, and confirmations – produced by Gentile and Mintbroker, Plaintiffs raised the issue with the Court.  The Court held a discovery conference on January 22, 2020.  At the conference, defense counsel repeatedly assured the Court that Mintbroker had produced all relevant trading documents.

When the Court asked defense counsel, "[d]oes [your client] have any other information related to the trades besides what he has given plaintiff?", counsel responded "He does not."  (1/22/2020 Conference Transcript ("1/22/2020 Tr."), AV Dkt 93 at 8-9.)  Defense counsel further assured the Court that Defendants had completed their production of all relevant documents prior to "shuttering" Mintbroker: "I've spoken with my client literally a dozen times, what do we have, and he says, [counsel], just I log on Interactive Broker, I downloaded all of the trades and we shipped it off .… he has done a diligent search, **there are no other records**." (1/22/2020 Tr. at 18 (emphasis added); *see also id.* at 16 ("there is no more information that Mintbroker, the original broker, it doesn't hold on to this information").)

---

[12] Gentile testified similarly at the Hearing, explaining that Mintbroker never offered managed accounts, which he defined as accounts in which the firm decides what to buy and sell for the customer as compared to self-directed accounts in which the customer makes their own trading decisions.  (Hrg. 38.)  Gentile's expert, however, testified that he understood Mintbroker's website disclosure – "All trades are executed in a principal capacity, our clients do not have direct market access.  All transactions are executed against Mintbroker International, Ltd. …" – to mean that Mintbroker was an investment manaqer that managed its clients' accounts.  (Hrg. 273.)

Explaining why no such documents ever existed, defense counsel explained that the account was for Mintbroker's proprietary trading, with all trades being placed by Gentile: "No, they **never existed**, the types of [trading] documents that are being described … and if they did, they **would merely be repetitive** of the information that they already have.  And here's what I mean, right, this was a proprietary trading account, [Mintbroker] has its own proprietary account, right, which it trades.  Mr. Gentile was in charge of that account and placed the trades.  Okay, **everyone agrees**."  (1/22/2020 Tr. at 15 (emphasis added).)  Defense counsel did not mention or suggest that any of the trading at issue was on behalf of Mintbroker customers or that customers would be among third parties having relevant information.

At Gentile's deposition on February 24, 2020, Plaintiffs' counsel asked a number of questions about whether any of the Mintbroker trading in Avalon and New Concept stock was executed for Mintbroker's clients rather than for Mintbroker itself.  Gentile testified equivocally, saying that he did not know for a fact that all the trades reflected in the trading records produced were Mintbroker's proprietary trades and that 'it's possible" the records might have included client trades.[13]  (Gentile Tr. at 44, 47, 55-57; *see also id.* at 44, 87, 101, 135, 186.)  In a colloquy, defense counsel suggested that any client trades would be reflected in a comparison of the Interactive Trading Records with Mintbroker's 13D beneficial ownership filings.  Neither counsel nor Gentile suggested that determining

---

[13] At the 2023 hearing, Gentile testified that at the time he was deposed he believed that Mintbroker had placed trades on behalf of clients with respect to both Avalon and New Concept shares.  (Hrg. 80-81.)

the extent of any trades on behalf of Mintbroker clients would require review of other records not yet produced.  (*See* Gentile Dep. 85-87.)

On April 23, 2020, the Court held a conference to address several discovery issues, including Plaintiffs' request to compel Defendants to produce a copy of a thumb drive that, according to Gentile, held all of Mintbroker's files and was in the custody of Mintbroker's Bahamian counsel.  (*See* 4/23/2020 Conference Transcript ("4/23/2020 Tr."), AV Dkt. 95 at 14.)  In introducing the issue, the Court stated its understanding of the Defendants' position with respect to the thumb drive:

> [N]ow we're at the heart of that issue. So he, I believe you were asking for, [Plaintiffs' Counsel], production of the entire thumb drive that has all of Mintbroker's information.  My understanding from defendant is that defendant believes it has produced everything that's responsive and that that thumb drive would not have anything other than duplicative documents or perhaps a few others that, you know, are not proportional and material to further review.

(*Id.* at 13-14.)  Defense counsel did not disagree or indicate that the Court had mischaracterized the contents of the thumb drive by saying they would either merely be duplicative of all information already produced or otherwise immaterial.

At the time of the April 23, 2020 conference, the focus of Plaintiffs' concern in obtaining the thumb drive was to access Mintbroker's books and ledgers in light of equivocal testimony Gentile had provided at deposition about exchanges of cash and stock shares.  (*See id.* at 14, 16-17.)  In response to defense counsel's explanation of the issue at hand, the Court asked: "Your defense is that there was an exchange of cash but not ever ownership of shares?"  (*Id.* at 18.)  Defense counsel confirmed, answering: "Yeah, that's exactly right, our argument is that he was never an ultimate beneficial owner or statutory insider because these were transactions in cash that were completely

divorced from any movement of shares." (*Id.*)  Notably, defense counsel did not suggest an alternative or additional argument that Defendants were not beneficial owners of some of the transactions reflected in the data already produced (i.e., the Interactive Trading Records) based on any distinction between trades for Mintbroker's proprietary account and trades for customers for which Mintbroker was not a beneficial owner.

Ultimately, to resolve the issue of what data is reflected in the Interactive Trading Records and obviate the need for production of data from the thumb drive, Defendants offered, and the parties ultimately agreed, to enter into a stipulation on May 13, 2020 (the "Joint Stipulation").  (Hrg. PX 3.)  The Joint Stipulation identified Mintbroker's "proprietary" trading account and two subaccounts held with Interactive, and confirmed the accuracy of the Interactive Trading Records.  (*Id.* ¶¶ 1-2; Hrg. 103.)

The correspondence culminating in the Joint Stipulation, and particularly the term "proprietary," is telling.  An email exchange reflects that Defendants agreed to the term "proprietary" specifically to "clarify that the accounts at issue are "proprietary" (which ***negates the need for discussion of client accounts which we know you want to be clear about and we are fine with***)."  (Hrg. PX 30) (emphasis added).)  Defendants deleted a last sentence proposed by Plaintiffs that the Interactive trades are "proprietary and do not reflect trading by Mintbroker's clients" because "we have agreed in the stip that Gentile is the sole owner of Mintbroker, so we don't believe the last sentence is necessary."  (*Id.*)  Defendants did not indicate that the deleted sentence was not true, or

that there was any confusion as to the facts or the meaning of the term "proprietary" as used at the beginning of the Joint Stipulation.[14]  (*See id.*)

At the end of discovery in June 2020, Defendants responded to requests for admission, admitting that no trades on Defendants' Schedule 13D statements were in or on behalf of managed accounts held for the benefit of Mintbroker's customers or clients:

> REQUEST FOR ADMISSION NO. 6
> Admit that you have not produced any documents reflecting that any of the Avalon trades during the Relevant Trading Period, as reported in the Avalon Schedule 13D, were trades executed in or on behalf of Managed Accounts held for the benefit of third-party customers or clients of MintBroker.
>
> RESPONSE TO REQUEST FOR ADMISSION NO. 6
> Mr. Gentile admits Request No. 4 because as Mr. Gentile asserted in his Responses and Objections to Plaintiffs' First Set of Interrogatories served on December 2, 2019, no trades reported in the Avalon Schedule 13D were executed in or on behalf of Managed Accounts held for the benefit of third-party customers or clients of MintBroker.

(Hrg. PX 31 at 6.)  As with Plaintiffs' Second Set of Interrogatories, the definition of Managed Account in the Requests for Admission was broad and included "any investment or trading account managed by You or MintBroker, whether directly or indirectly, for their own benefit, or for the benefit or on behalf of one or more clients or customers (including, but not limited to, affiliates of the Defendants), and in which you or MintBroker directed, executed, placed, received, cleared, handled, or in any way reviewed or processed orders."  (Hrg. PX 31A at 3.)

---

[14] At the Hearing, Gentile provided contradictory testimony about whether "proprietary" and "omnibus" mean the same thing.  (Compare Hrg. 102 (they mean the same thing) with Hrg. 116-17 (they mean different things "for different stuff").)

C.    **Summary Judgment**

In August 2020, both sets of parties filed motions for summary judgment.  (AV Dkt. 71-78; NC Dkt. 64-71.)   The trading records underlying the motions and on which the Court rendered its summary judgment decision were the Interactive Trading Records that were the subject of the Joint Stipulation.  (*See* Hrg. PX 3.)

Plaintiffs, in particular, relied on the Interactive Trading Records to determine the dates and times at which Defendants crossed the 10% beneficial ownership threshold for both Avalon and New Concept stock.  (*See* Pl. SJ Mem. at 9.[15])  Defendants did not make any argument on summary judgment that the trading reflected in the Interactive Trading Records included trades for which they were not the beneficial owners because the trades had been executed for orders placed by customers.

On April 8, 2022, Judge Broderick issued his decision granting Plaintiffs' motions for summary judgment and denying Defendants' motions for summary judgment.  *Gentile I*.  In the decision, Judge Broderick found – beyond dispute – that Mintbroker and Gentile were beneficial owners of the shares of Avalon and New Concept, as reflected in the Interactive Trading Records, that they traded between July 27, 2018 and August 1, 2018, with respect to Avalon, and between June 29, 2018 and July 3, 2018, with respect to New Concept.  *Gentile I* at 655-56.   More specifically, he found that the Defendants had "investment power" over the shares "because they had the power to dispose of them, as admitted by Gentile himself … and shown by the fact that they successfully sold these shares on the market."  *Id.* at 655.  Similarly, Judge Broderick found that "Defendants had

---

[15] "Pl. SJ Mem." refers to Brief In Support Of [Plaintiff's] Motion For Summary Judgment, AV Dkt. 76, NC Dkt. 71.

pecuniary interests in these shares because they had the opportunity to and did profit from them."  (*Id*. at 656; *see also id.* ("Defendants have failed to create a genuine dispute that they have not reaped the profits between the purchase price and the sale price").

Judge Broderick concluded that "the evidence demonstrates that Defendants purchased and sold shares within a six-month period while being a more than 10% beneficial owner of Avalon and New Concept."  (*Id*.)  Accordingly, "Defendants are strictly liable under § 16(b)."  (*Id*.)  In so finding, Judge Broderick rejected Defendants' arguments that they never "possessed" the shares because they were all made by book-entry, that many of the shares were never actually delivered because of "naked short selling," that there could not be more than one beneficial owner of the same shares for purposes of § 16(b) liability, and that whether Defendants intended to abuse inside information had any relevance.  (*Id.* at 651-56.)

While finding Defendants strictly liable, Judge Broderick noted that "the parties still dispute the amount of profits Defendants earned, including the exact period of time that Defendants were more-than-10% beneficial owners, as well as the calculation of damages."  (*Id.* at 656-57.)  He thus referred the case to me for the instant determination of damages.  (*Id.* at 657.)  Since then, the case has been reassigned from Judge Broderick to the Honorable Denise L. Cote.

## D.    Emergence Of The Post-Discovery Trading Records

On May 9, 2023, a month after Judge Broderick issued his summary judgment decision, Avalon and New Concept filed motions for judgment, along with supporting memoranda and exhibits.  (AV Dkts. 100-102; NC Dkts. 89-91.)  Based on the same records – the Interactive Trading Records – that had served as the basis for summary

judgment on liability, Avalon and New Concept sought disgorgement of $6,235,908 in short-swing profits to Avalon, and $6,102,002 in short-swing profits to New Concept. Plaintiffs also sought pre-judgment interest.  Plaintiffs' calculations followed the requisite matching and lowest-in-highest-out methodologies.  (AV Dkt. 101 at 7-10 and Exs. H, M; NC Dkt. 90 at 7-10 and Exs. H, M.)

Instead of filing a response based on the then-existing record, Defendants filed a letter on May 20, 2022, seeking leave to introduce at inquest the Post-Discovery Trading Records described as "newly obtained evidence not previously available to Defendants – specifically trading records from Mintbroker reflecting more detailed information regarding trades in [Avalon] and [New Concept] during the relevant time period."  (AV Dkt. 103 at 1, NC Dkt. 92 at 1.)  The Post-Discovery Trading Records consist of hundreds of pages of Mintbroker trading data, which, according to Defendants, "establish which trades are proprietary (and thus which shares Mintbroker beneficially owned) and which trades were client trades (and thus were not beneficially owned by Mintbroker)."  *Id.* at 6.  In addition to seeking admission of the Post-Discovery Trading Records, Defendants proposed allowing discovery relating to damages and holding a plenary hearing of at least one full day for the inquest.  (*Id.* at 1, 6.)  Defendants submitted seven affidavits in support of their letter, including affidavits from Gentile, four former Mintbroker employees, a regulatory expert, Joseph Leo Ely III, and an accounting expert, Robert Christian.  (AV Dkts. 103-1 to 103-7; NC Dkts. 91-1 to 92-7.)

Defendants' letter and affidavits sought to explain why the Post-Discovery Trading Records only recently had come to light.  Linking the belated production to the Bahamian regulatory proceedings, Defendants explained:

> Shortly **after** Mintbroker and Gentile first filed responses and objections to Plaintiffs' first document requests, in December 2019, Mintbroker **voluntarily** ceased operations under Bahamian law.  The SCB shortly thereafter commenced an action to formally wind down Mintbroker, placing it into provisional liquidation.

(AV Dkt. 103 at 3; NC Dkt. 92 at 3 (emphasis added) (affidavit citations omitted).)  On December 27, 2019, Mintbroker's Chief Compliance Officer, Edward Cooper, instructed Stephen Darville, Mintbroker's IT manager, to maintain and make a copy of Mintbroker's records and deliver them to Gentile's and Mintbroker's attorneys in the Bahamas. (Darville Dep. 23-24.[16])  Darville did so.  (*Id.* 25.)  As Gentile conceded at deposition, all of Mintbroker's records had been downloaded and provided to Mintbroker's attorneys on the thumb drive discussed above.  (2/24/2020 Gentile Dep. 160-162, 164, 172-73;[17] *see also* Hrg. 110-11 (Gentile testifying that the records had been provided to counsel in October or November 2019.)

As recounted above, on March 5, 2020, the SCB succeeded in obtaining a Bahamian court order placing Mintbroker into provisional liquidation.  (AV Dkt. 103 at 3; NC Dkt. 92 at 3.)  During provisional liquidation, neither Gentile nor Mintbroker could legally access Mintbroker records.  (*Id.* at 3-4.) However, in the wake of Judge Broderick's summary judgment decision and the order for a damages inquest, Gentile reached out to Darville in May 2022 to ask whether he had access to Mintbroker's trading records and, if so, to provide them to forensic auditors (i.e., Defendants' experts).  (*Id*. at 5; Hrg. 73-

---

[16] "Darville Dep." refers to the Deposition of Stephen Darville, taken January 25, 2023, the transcript of which is Hrg. PX 36A.

[17] "2/24/2020 Gentile Dep." refers to the Deposition of Guy Gentile, taken February 24, 2020, filed at AV Dkt. 107-8 and NC Dkt. 96-8.

74.)  Darville responded affirmatively and provided Defendants' experts with remote electronic access to the records.  (*Id.*)

In response to Defendants' request for admission of the Post-Discovery Trading Records, Plaintiffs objected, asserting that Defendants previously and repeatedly had represented that no customer trading records existed and that all discovery had been produced prior to Mintbroker's shutting down.  (AV Dkt. 104, NC Dkt. 93.)

On June 3, 2022, Defendants filed their formal opposition to Plaintiffs' motion for judgment.  (AV Dkt. 107; NC Dkt. 96.)  Defendants' brief was accompanied by many of the same affidavits previously submitted with their letter, as well as the expert reports of Christian and Brendan Beresford, both of whom calculated short-swing profits.  Plaintiffs filed their reply on June 23, 2022 (AV Dkt. 112; NC Dkt.102), and Defendants filed a sur-reply on July 6, 2022.  (AV Dkt. 118, NC Dkt. 106.)

E.    **Inquest Proceedings**

On September 7, 2022, I held a conference with the parties to discuss potential damages discovery and a hearing.  (*See* AV Dkt. 129; NC Dkt. 111.)  Following submissions from the parties, I issued an order on September 23, 2022, resolving certain damages-related discovery issues and establishing procedures for a two-day hearing devoted to determining (1) whether the Post-Discovery Trading Records should be admitted, and (2) the amount of short-swing profits to be disgorged.  (AV Dkt. 137; NC Dkt. 127.)

Discovery proceeded, during which time Plaintiffs deposed Gentile (a second time), Darville, Christian, and Beresford.  Additionally, Defendants, with the Court's approval, served letters rogatory seeking production of Mintbroker's customer account

and financial records from the Bahamian court-appointed liquidators overseeing Mintbroker's liquidation.  (*See* AV Dkts. 167, 176-77; NC Dkts. 153, 165-66.)  The Court is not aware of any records having been produced in response to the letters rogatory.

On January 28, 2023, Plaintiffs filed a motion in limine to exclude the Post-Discovery Trading Records as well as any other post-discovery documents and the testimony and reports of experts Christian and Beresford, which are based on those documents.  (AV Dkt. 194; NC Dkt. 183.)  Gentile filed his opposition on January 30, 2023. (AV Dkt. 195; NC Dkt. 184.)  I reserved judgment on the Plaintiffs' motion in limine pending the Hearing, which was held on February 1 and 2, 2023.  At the Hearing, testimony was received from Gentile, Christian, and Beresford.  The Court also received as evidence the deposition testimony of Darville.  The parties submitted post-hearing briefing and replies. (AV Dkts. 224-25, 232-233; NC Dkts. 207-08, 215-16.)

## F.   Defendants' Efforts To Forestall Resolution

Since the summary judgment decision and order issued against them in April 2022, Defendants have tried on multiple occasions to halt or end the proceedings.   On September 20, 2022, Gentile filed a motion to vacate the summary judgment decision as void and to dismiss the case against Mintbroker on the basis that since March 2020 Mintbroker was subject to Bahamian liquidation proceedings giving rise to an automatic stay.  (AV Dkt. 133 at 1; NC Dkt. 122 at 1.)  Following the filing of a suggestion of bankruptcy, the Court temporarily stayed the cases as to Mintbroker, on November 16, 2022, and confirmed the stay on November 29, 2022.  (AV Dkt. 168, 178; NC Dkt. 157, 167.)  Gentile then unsuccessfully sought to stay the cases as against him as well.  (AV Dkts. 182, 190; NC Dkts. 171, 179.)

Then, on March 23, 2023, Gentile filed a motion to dismiss the case for lack of standing.  (AV Dkts. 211-12; NC Dkts. 194-95.)  Gentile argued that Avalon and New Concept did not suffer any "concrete" harm from Defendants' short-swing trades, thus depriving them of standing despite the strict liability imposed by Section 16(b).  Gentile requested a stay of the scheduled inquest hearing pending determination of the motion to dismiss.  (AV Dkt. 210; NC Dkt. 193.)  I denied that application on March 28, 2023 (AV Dkt. 215; NC Dkt. 198), and Judge Cote denied the motion to dismiss for lack of standing on July 25, 2023 (AV Dkt. 238; NC Dkt. 221).

**G.     Gentile's Invocation Of The Foreign Broker-Dealer Defense**

In Gentile's post-hearing brief, he raises – for the first time in the five years these cases have been pending – the beneficial ownership exemption provided to qualified foreign broker-dealers under Section 16a-1(a)(1)(i), 17 C.F.R. § 240.16a-1.  (Def. Post-Hearing Mem. at 11-12.)  In relevant part, the exemption is available to certain qualified institutions, including U.S.-registered and "foreign equivalent" broker-dealers, that hold securities "for the benefit of third parties or in customer or fiduciary accounts in the ordinary course of business as long as such shares are acquired … without the purpose or effect of changing or influencing control of the issuer."  17 C.F.R. § 240.161-1.  "When a covered institution or person satisfies these requirements, it does not qualify as the beneficial owner of its customers' securities for the purpose of the short-swing profit rule's 10% ownership threshold (i.e., its customers' holdings do not count toward its own holdings)."  *Rubenstein*, 959 F.3d at 548-49.

Gentile's invocation of the foreign broker-dealer exemption is both procedurally foreclosed and meritless.  The availability of an SEC Rule exemption is an affirmative

defense.  *See Packer v. Raging Capital Management, LLC*, 242 F. Supp.3d 141, 149 (E.D.N.Y. 2017) (recognizing exemption under Section 16(b) to be affirmative defense that defendant must prove) (citing *Rosen v. Brookhaven Capital Management, Co., Ltd.*, 194 F. Supp.2d 224, 228 (S.D.N.Y. 2002)).  Yet, Defendants did not assert the defense in their answer or even in their opposition to summary judgment.  The defense therefore has been waived.  (*See National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 526 (2d Cir. 2004) ("Generally, a failure to plead an affirmative defense results in a waiver") (internal quotation marks and citation omitted*); Mooney v. City of New York*, 219 F.3d 123, 127 n.2 (2d Cir. 2000) ("Ordinarily, a failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case") (internal quotation marks and citation omitted).  Regardless of their procedural default, Defendants cannot avail themselves of the foreign broker-dealer exemption.  Defendants expressly stated in their Schedule 13D filings with the SEC that the purpose of their acquiring Avalon and New Concept stock was to gain control of the companies – precisely the purpose that the foreign broker-dealer exemption excludes.[18]  (Hrg. PX 6 and 6A at 5, item 4.)

Gentile waived his right to assert the foreign broker-dealer exemption defense. Even if he had not, he does not qualify for the exemption.  The Court thus will not consider the exemption further.  Turning to discussion of the relevant issues, the Court first addresses Plaintiffs' motion in limine to exclude the Post-Discovery Trading Records and

---

[18]  Plaintiffs have advanced several other reasons why Defendants cannot avail themselves of the foreign broker-dealer exemption.  (*See* Pl. Post-Hearing Reply at 5-6.) Because the Court finds that Plaintiffs have waived the exemption and that it would not apply for the reason explained above, the Court does not address Plaintiffs' additional arguments on this point.  "Pl. Post-Hearing Reply" refers to Plaintiffs Post-Hearing Reply Brief, AV Dkt. 233, NC Dkt. 216.

the testimony and reports of Gentile's two experts.  The Court then determines the amount of short-swing profits to be disgorged.

### Plaintiffs' Motion In Limine

Plaintiffs' motion in limine seeks to exclude any evidence or testimony about the Post-Discovery Trading Records as untimely and unreliable.  Plaintiffs specifically invoke Federal Rule of Civil Procedure 37 and Federal Rule of Evidence 403.  (AV Dkt. 194 at 9-12; NC Dkt. 183 at 9-12.)  Additionally, Plaintiffs move to exclude the testimony and reports of experts Christian and Beresford pursuant to Federal Rule of Evidence 702.  (AV Dkt. 194 at 15; NC Dkt. 183 at 15.)  There is, however, an even more fundamental problem noted by Plaintiffs with Defendants' efforts to base damages on the Post-Discovery Trading Records.  Doing so is squarely at odds with the Court's summary judgment decision and would require the Court to set aside that decision.  Defendants have not established a basis to do so.

The discussion that follows begins with a description of the Post-Discovery Trading Records, the testimony about them, and the opinions based on them.  Next, the Court explains why, under the law of the case, Defendants should not be allowed to use the Post-Discovery Trading Records to effectively relitigate the case.  The Court then turns to rule-based arguments for exclusion under Federal Rule of Civil Procedure 37 and Federal Rules of Evidence 403 and 702.[19]

---

[19] For the first time in reply, Plaintiffs also invoke the best evidence rule under Federal Rule of Evidence 1001, et seq. specifically with respect to the content of Mintbroker customer account agreements.  (Pl. Post-Hearing Reply. at 10.)  They devote only half a sentence to that argument.  Given that the argument was first raised in reply and is presented in cursory fashion, the Court does not address it.  *See Pettaway v. National Recovery Solutions, LLC*, 955 F.3d 299, 305 n.2 (2d Cir. 2020) (court may disregard arguments raised for first time in reply); *Flores v. Stanford*, No. 18-CV-2468, 2019 WL

A.    **The Post-Discovery Trading Records**

1.   **The Records And Their Contents**

The Post-Discovery Trading Records reflect Mintbroker's internal record-keeping systems and consist of line-by-line trading data.  (*See* Hrg. 44, 47 and DX 8.)  The records were generated by Gentile's expert Christian, when he received access to Mintbroker's electronic data from IT Manager Darville.[20]  (Hrg. 196, 199-200; *see* Hrg. PX 8.)  Christian extracted the data from Mintbroker's internal recordkeeping platform called iBoss, which was populated by data from Mintbroker's trading platform called DAS.  (*See* Hrg. 44, 46, 48.)

According to Gentile, the Post-Discovery Trading Records indicate whether a trade was initiated by a customer or Mintbroker, and from which source an order was routed and fulfilled.  (Hrg. 65, 68, 70, 171.)  The records include a column identifying accounts for which the trades were made.  Accounts beginning with numbers are Mintbroker's internal accounts; client accounts begin with letters, primarily MBS (short for "MintBroker Services"), as well as PFS.[21]  (Hrg. 50-51, 52.)  Client trades are also indicated by corresponding commissions charged for the trades; Mintbroker did not charge commissions to itself for trades it made on its own behalf.  (Hrg. 63.)  Another column

---

4572703, at *7 (S.D.N.Y. Sept. 20, 2019) (declining to address undeveloped one-sentence argument).  But even if the Court were to consider the argument, it would not alter the outcome of this Report and Recommendation.

[20] To provide access to the data, Darville had to restore the iBoss system, which had been shut down during the Bahamian liquidation proceedings.  (*See* Darville Dep. 32-33, 42-45.)

[21] Gentile could not recall what PFS stood for, but believes it may have been Penson Financial Services, a clearing firm that Mintbroker may have used in the past.  (Hrg. 50.)

indicates where trades were routed for fulfillment – IB (Interactive), ETC, and, for trades fulfilled from Mintbroker inventory or by the cross-trade of another customer, SURE (short for SureTrader, another name for Mintbroker).  (Hrg. 152, 180.)

Each listed trade also includes multiple references to one of two numbers, 32810 and 32812.  Gentile testified that trades designated by 32810 are those that were either trades made for Mintbroker's own account or customer trades filled from Mintbroker's inventory.  (Hrg. 53, 117.)  The 32810 account information, however, does not distinguish between the two; as a result, one cannot assume that all trades associated with the 32810 account reflect shares beneficially owned by Mintbroker.  (Hrg. 57.)   Once a customer trade was filled by shares from Mintbroker's inventory, according to Gentile, Mintbroker was no longer a beneficial owner of those shares; Mintbroker did become beneficial owner, however, when it initially acquired the shares for its inventory.  (Hrg. 59.)

Unlike the 32810 account, the 32812 account was an internal recordkeeping log reflecting how customer trades were fulfilled.  Gentile's description of the log, however, was far from clear: "It was like a log so that we would know, customer sends us an order, we receive the order, where did it go after that, and then when it comes back, it goes back to the client." (Hrg. 48; *see also* 51, 179-80.)  Gentile testified that for shares purchased by a client of Mintbroker, the client had the right to vote the shares, and that, with the exception of margin liquidation, Mintbroker could not dispose of the shares without permission from the client.[22]  (Hrg. 81-82.)

---

[22] Margin liquidation refers to liquidating a client's position in a stock if the client's equity went below a particular percentage of the client's margin requirement.  (Hrg. 82.)

Between the two of them, Darville and Gentile authenticated and provided an evidentiary foundation for the Post-Trading Discovery Records.  But exactly what underlies the data, like Gentile's testimony, is far from clear.  According to Christian, the Post-Trading Discovery Records include 700 accounts trading in Avalon stock that begin with letters, thus indicating customer accounts, and 921 such accounts trading in New Concept stock.  (*See* Hrg. DX 12 at 2; Hrg. 163.)  As Plaintiffs aptly note, however, "[n]ot a single example of an account statement, trade order, or execution confirmation, and not a single receipt evidencing the withdrawal of cash or stock by any Mintbroker clients have been produced that can be confirmed or reconciled against the Post Discovery Records." (Pl. Mem. to Exclude at 10.[23])  Nor did Defendants produce any agreements with actual customers, even though, according to Christian, whether Mintbroker had the ability to vote, acquire, or dispose of any securities in its customer accounts "would depend on the nature of the agreement with these clients."  (Hrg. 248; *see also id.* 263.)  And, even though Gentile's Hearing exhibits include an unsigned Mintbroker customer agreement (PX 37), no witness testified about it, not even to establish that it was representative of signed client agreements.[24]  Nor did Defendants ever provide the name, address, or any other identifying information for any customer.

---

[23] "Pl. Mem. to Exclude" refers to Plaintiffs' Motion In Limine To Exclude Defendants' Post-Discovery Production, Expert Testimony And Reports," AV Dkt. 194, NC Dkt. 183.

[24] The sample agreement provides that "Swiss America (i.e., Mintbroker) declares that the Customer will enjoy a beneficial ownership in … securities purchased on its behalf" and that the Customer "acknowledge[s] that Swiss America is acting solely as custodian with respect to such securities …."  (DX 37 ¶ 25.)  Even if representative of signed customer agreements, the form language does not lead to any different conclusion about beneficial ownership in this case.  As recognized by Judge Broderick on summary judgment, Section 16(b) "obviously contemplates situations where the same shares might be deemed 'beneficially owned' by more than one investor.  *Gentile I*, 597 F. Supp.3d at

### 2.      Expert Testimony Based On The Post-Discovery Trading Records

Gentile put forward two experts, Christian and Beresford, both who used the Post-Discovery Trading Records to calculate short-swing profits.  Of the two, Christian covered broader ground.

Christian is an audit manager and CPA.  (Hrg. 193.) The Court, without objection from Plaintiffs, accepted Christian as an expert, limited to the calculations he performed.  (Hrg. 193.)  Christian did not conduct an audit and was not asked to do so.  Rather, he described his endeavor as an "agreed-upon procedures engagement," pursuant to standards of the American Institute of Certified Public Accountants.  (Hrg. 194.)   If Christian had conducted an audit, he would have been far more rigorous in documenting what he did and what he reviewed.  (Hrg. 239.)  Among other things, Christian did not review any of the parties' discovery responses or any documents produced by any of the third parties.  (Hrg. 249, 251.)

Christian used the Post-Discovery Trading Records to isolate trades made on behalf of Mintbroker customers and remove them from the short-swing profits analysis.  (Hrg. 222-23.)  To do so, Christian relied on information provided by Gentile and Darville about which accounts were for Mintbroker – those starting with numbers – and which were for customers – those starting with letters.  (Hrg. 201-02.)  Christian also validated that the 32812 account was merely a record-keeping account by getting "comfortable"

---

655 (providing example of current owner of shares and a person who has the right to acquire the shares from the owner within 60 days).  The sample agreement refers to the customer having "a" beneficial ownership, not sole beneficial ownership.  Second, regardless of what Mintbroker client agreements say, they do not change anything about the shortcomings of the Post-Discovery Trading Records and the experts' analyses of them as discussed below.

that the letter accounts were client accounts; netting out transactions of the same number of shares; and observing the closeness in time of those offsetting numbers.  (Hrg. 282.)

Implementing the recognized lowest-in, highest-out matching rubric, Christian calculated Defendants' short-swing profits for Avalon to be $1,202,110 million.[25]  (Hrg. 214.)  For New Concept, Christian determined that Mintbroker **never** crossed the 10 percent threshold and therefore had **zero** short-swing profits.  (Hrg. 220, 231.)

Addressing reliability of the representation that lettered accounts were in fact customer accounts, Christian testified that, for a sample of accounts, he accessed a "master file" identifying customer names and addresses and thereby "got comfortable" that accounts starting with a letter were client accounts.  (Hrg. 203; *see also* Darville Dep. 76 ("from working in IT with different clients … I have seen the various accounts and the different names on particular accounts").)  But Defendants did not produce any master file account information, and Christian did not make any record of what he did in examining the master file.  Nor did he produce any screen shots, print outs, or other material to corroborate his assertions and that would provide a basis for fair and informed cross-examination.  Moreover, Christian did not recall the number or percentage of customer accounts he checked, other than to say that general practice would be 10-20 percent and that he would be "speculating" as to the number.  (Hrg. 237-38.)  Nor did he recall the name of any Mintbroker customer or whether they were individuals or entities.  (Hrg. 235.)  And, he did nothing to confirm whether client-related transactions in the Post-Discovery Trading Records were "actually effected for the clients."  (Hrg. 270.)  Deflecting,

---

[25] Christian calculated Defendants' "net" profits (not using the lowest-in, highest-out matching method) during the more-than-ten-percent short-swing window to be $177,491. (DX 1 at 1-2.)

Christian explained, "[w]hat happened in the client trades is not relevant" (Hrg. 270), because "the client accounts were outside the scope of the engagement" (*id.*, *see also id.* 255).

Gentile's other expert, Beresford, a CPA, also calculated short-swing profits using the Post-Discovery Trading Records as extracted by Christian. Beresford similarly removed all trades for lettered accounts based on Gentile's representation that such accounts were client accounts. (Hrg. 290, 293.) Employing the lowest-in, highest-out methodology, Beresford calculated short-swing profits in line with those calculated by Christian: $1,212,974 for Avalon stock, and *zero* for New Concept stock. (Hrg. DX 19)

Beresford did not attempt to validate the new trading record data and did not look at any corroborating data. (Hrg. 292.) Like Christian, he did not review any discovery documents. (Hrg. 295.) He did not inquire whether any customer accounts were held by Mintbroker affiliates, whether Mintbroker had discretionary authority over any of the accounts, whether client orders were executed in the amounts and at the prices at which they were placed, or whether Mintbroker actually transferred to clients the shares ostensibly purchased for their accounts. (Hrg. 296, 301.)

## B.   Incompatibility With Summary Judgment On Liability

The short-swing profits calculations advanced by Gentile are fundamentally incompatible with the summary judgment decision on liability. Judge Broderick determined that Mintbroker and Gentile indisputably were beneficial owners of the shares of Avalon and New Concept traded through Interactive and as reflected in Mintbroker's SEC filing statements of beneficial ownership. 597 F. Supp.3d at 643-45 (describing the shares at issue), 655 (finding Defendants to be beneficial owners); *see also* Pl. SJ 56.1 ¶

6 (stating that Mintbroker's Interactive trades are reflected in Schedule 13D), Def. SJ 56.1 ¶ 6 (not disputing same).[26]   Judge Broderick expressly rejected Defendants' argument that "they are entitled to summary judgment because the evidence is not sufficient to prove that they were ever 'beneficial owners' of Avalon or New Concept."  *Id.* at 655. Referencing the indicia of beneficial ownership, Judge Broderick found that:

> Defendants had "investment power" over **these shares** … because they had the power to dispose them, as admitted by Gentile himself (Gentile Dep. Tr. 105:16-106:9), and shown by the fact that they successfully sold **these shares** on the market.  Since I find that Defendants had investment power of **the shares**, I need not address whether they also had voting power over them.

*Id.* (emphasis added).  Judge Broderick reiterated that "the evidence demonstrates that Defendants purchased and sold shares within a six-month period while being a more-than 10% beneficial owner of Avalon and New Concept."  *Id.* at 256.

Yet Defendants now seek to base the damages determination on a different set of records, specifically the Post-Discovery Trading Records.   To accept Gentile's contentions, the Court would have to set aside its earlier summary judgment decision. That is most starkly demonstrated with respect to New Concept.   Under Defendants' calculations using the Post-Discovery Trading Records, Defendants incurred **zero** disgorgeable profits because they **never** crossed the 10% beneficial ownership threshold. (Def. Post-Hearing Mem. at 7.)  If that were so, then Defendants would not be liable under Section 16(b), even though that is exactly what Judge Broderick found.  Indeed, that is

---

[26] "Pl. SJ 56.1" refers to Plaintiff's 56.1 Statement submitted in support of summary judgment, AV Dkt. 77, NC Dkt. 70; "Def. SJ 56.1" refers to Defendants' Local Civil Rule 56.1 Statement In Support Of Their Memorandum Of Law In Opposition To [Plaintiff's] Motion For Summary Judgment, AV Dkt. 84, NC Dkt. 77.

exactly what Gentile argues, asserting that Defendants are "**not liable** to New Concept for any short-swing profits." (Def. Post-Hearing Mem. at 3 (emphasis added).) Similarly, with respect to Avalon, Defendants seek to establish a materially different set of facts on the merits than that which served as the basis for Judge Broderick's grant of summary judgment.

The law-of-the-case doctrine requires "that when a court has ruled on an issue, that decision should generally be adhered to … in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). The "doctrine is premised on the principle that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Tri-Star Pictures, Inc. v. Leisure Time Productions, B.V.*, No. 88-CV-9127, 1992 WL 296314, at *2 (S.D.N.Y. Oct. 6, 1992) (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir.), *cert. denied*, 377 U.S. 934 (1964)). "The decision whether to reconsider an interlocutory opinion is discretionary with the district court." *Id.*; *see also Virgin Atlantic Airways, Ltd. v. National Mediation Board*, 956 F.2d 1245, 1255 (2d Cir. 1992) (law of the case doctrine is discretionary "and does not limit a court's power to reconsider its own decisions prior to final judgment"). Reconsideration of a previous decision "should be exercised sparingly, however, in light of the strong policy considerations favoring finality with regard to adjudicated issues. Thus, the law-of-the-case doctrine generally militates against reconsideration of a judicial decision absent a truly compelling justification." *Tri-Star Pictures,* 1992 WL 296314, at *2 (internal citations omitted).

Grounds justifying reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest

injustice." *Id.* (citing cases) (internal quotation marks omitted).  To obtain reconsideration of a judgment based on newly discovered evidence, as Defendants seek to do here, each of four factors must be met: "(1) newly discovered evidence is of facts existing at the time of the prior decision; (2) the moving party is excusably ignorant of the facts despite using due diligence to learn about them; (3) newly discovered evidence is admissible and probably effective to change the result of the former ruling; and (4) the newly discovered evidence is not merely cumulative." *Fields v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 03-CV-8363, 2004 WL 626180, at *2 (S.D.N.Y. Mar. 30, 2004).

"When newly discovered evidence is the basis for reconsideration, the proponent must demonstrate that the newly discovered evidence was neither in his possession ***nor available upon the exercise of reasonable diligence*** at the time the interlocutory decision was rendered."  *LaSalle Bank National Association v. Capco America Securitization Corp.*, No. 02-CV-9916, 2006 WL 177169, at *2 (S.D.N.Y. Jan. 25, 2006) (emphasis added; internal quotation marks, citation, and emphasis omitted); *Tri-Star Pictures*, 1992 WL 296314, at *3 (same).  "The test here is the same as under Federal Rule of Civil Procedure 60(b): If evidence was in the possession of the party before the judgment was rendered, or reasonably would have been available to him, it is not 'newly discovered' and does not entitle him to relief."  *Tri-Star Pictures*, 1992 WL 296314, at *3.

Despite Gentile's protestations to the contrary, the Post-Discovery Trading Records are not new and would have been available to him with the exercise of reasonable diligence.  Gentile claims he could not access the records during the discovery period because of the Bahamian liquidation proceedings and his loss of control of Mintbroker.  By his own admission, however, Gentile ***voluntarily*** shut down Mintbroker

*after* Plaintiffs already had served their discovery requests.  (AV Dkt. 103 at 3; NC Dkt. 92 at 3 ("Shortly after Mintbroker and Gentile first filed responses and objections to Plaintiffs' first document requests, in December 2019, Mintbroker voluntarily ceased operations under Bahamian law.  The SCB shortly thereafter commenced an action to formally wind down Mintbroker, placing it into provisional liquidation."); *see also* Def. Post-Hearing Mem. at 9 ("Mintbroker was shutting down *prior* to the time his discovery responses in these matters *were due*") (emphasis added).)

The timeline of events confirms as much.  Plaintiffs served their discovery requests in mid-October 2019 (Timeline); then, starting at the end of October, Gentile began to shut down Mintbroker.  (Hrg. 74, 79, 107-109.)  In December 2019, Mintbroker had downloaded all of its records and provided them to Mintbroker's attorneys on a thumb drive.  (2/24/2020 Gentile Dep. 160-162, 164, 172; Darville Dep. 23-25; *see also* Hrg. 110-11 (Gentile testifying that the records had been provided to counsel in October or November 2019.)  Yet it was not until March 5, 2020 that the BSC succeeded in placing Mintbroker under provisional liquidation and thereby disempowering Gentile from taking any action.[27]  (AV Dkt. 103 at 3; NC Dkt. 92 at 3.)

Rather than accept responsibility for his own failure, Gentile foists the blame on Plaintiffs by faulting them for not more assiduously pursuing discovery from third parties.  But Plaintiffs did seek discovery from several third parties, and it was not Plaintiffs'

---

[27] Gentile argues, and cites only his own self-serving affidavit, that due to strict Bahamian privacy laws, producing records "would likely have taken many months, effectively barring Gentile (or Mintbroker) from providing relevant documents prior to December 2019 or March 2020."  (Dkt. 107 at 5; *see also* Def. Post-Hearing Reply at 4 n.2 (asserting that "[t]hroughout discovery, it was made clear to Plaintiffs" that producing signed copies of client agreements would violate Bahamian privacy laws).)  That contention is mere speculation for which Gentile has not provided any authority.

responsibility to pursue documents from others that Defendants wrongly failed to produce. What's more, Gentile's argument blindly overlooks the fact that he and his attorneys repeatedly represented that all trading records had been produced and that any other records **did not exist** or were merely duplicative of what had been produced.  *See, e.g.*, 1/22/2020 Tr. at 8-9, 16, 18 (representing that Gentile "downloaded all of the trades and we shipped it off … he has done a diligent search, there are no other records"); 4/23/2020 Tr. at 14 (defense counsel making no correction to the Court's statement that Defendant "has produced everything that's responsive and … that thumb drive would not have anything other than duplicative documents or perhaps a few others that … are not proportional and material to further review").

The argument also ignores Gentile and his attorneys' repeated representations, despite Gentile's equivocal deposition testimony, that Mintbroker had no relevant customer accounts.  (*See, e.g.*, Hrg. PX 41 at Interrogatory Nos. 6 and 7 (Defendants attesting that they had no accounts managed by them on behalf of one or more clients or customers); 1/22/2020 Tr. at 15 (defense counsel stating that "this was a proprietary trading account, [Mintbroker] has its own proprietary account, right, which it trades.  Mr. Gentile was in charge of that account and placed the trades.  Okay, everyone agrees.").) And, the argument ignores the stipulation the parties entered into on summary judgment representing that the Interactive Trading Records, were "proprietary" to Mintbroker and "negate[d] the need for discussion of client accounts."  (Hrg. PX 3, 30; *see also* Hrg. PX 6 and 6A, p.5 item 3 (Defendants' certified representation to the SEC that "[t]he source of funding for the purchase of the Shares was the general working capital of Mintbroker together with margin borrowing").)

In short, Gentile either purposefully, or for lack of sufficient diligence, did not produce during discovery the Post-Discovery Trading Records on which he now seeks to rely.   The record simply does not support a conclusion that Gentile was "**excusably** ignorant of the facts despite using due diligence to learn about them." *Fields*, 2004 WL 626180, at *2 (S.D.N.Y. Mar. 30, 2004) (emphasis added).   The Court thus does not find a basis to make a determination based on those records that is incompatible with the Court's summary judgment decision and the factual record on which it is predicated.   "The Court will not set aside a judgment because a frustrated litigant failed to present on a motion for summary judgment all facts known by or reasonably available to him."[28]  *Tri-Star Pictures*, 1992 WL 296314, at *3.

To be sure, Judge Broderick referred this matter for determination of damages because "the parties still dispute the amount of profits Defendants earned, including the exact period of time that Defendants were more-than-10% beneficial owners, as well as a calculation of damages."  *Gentile I*, 597 F. Supp.3d at 656-57.  But the parties' dispute about damages had nothing to do with whether the Interactive Trading Records were incomplete or with any distinction between Mintbroker's trades for its proprietary account and those for client accounts.   Rather, from Plaintiffs' point of view, the dispute focused on the complexity of the matching exercise:

> Because of the large number of trades, the matching exercise
> – the accounting – will involve considerable complexity and
> will best be carried out by an officer vested with fact-finding

---

[28] Gentile grounds his short-swing profits analysis on the Post-Discovery Trading Records, which he claims, wrongly, is newly discovered evidence.  As noted earlier, another basis for deviating from the law of the case is manifest injustice.  There is no manifest injustice here, however, because, as explained below, there are other reasons for rejecting the analysis and the evidence on which it is based.

> powers. Nonetheless, the numbers (i.e., the shares traded by the Defendants, and the prices of Defendants' trades) have been known to the parties since inception of this case, and Defendants' brokerage records, which more specifically identify Defendants' executed trades, have now been produced and stipulated as accurate by the Defendants."

(Pl. SJ Mem. at 11.)

In response, Defendants disputed damages based on the same arguments underlying their arguments on the merits, which had nothing to do with determining which Interactive trades were for Mintbroker customers rather than Mintbroker itself:

> [A]s set forth above, there are genuine (and considerable) disputes of material fact as to whether Defendants "beneficially owned" the shares set forth in Plaintiff's Exhibit H, particularly as to the "impossible" ownership position of greater than of 48% of Avalon stock, but equally as to which of Defendants' trades involved Avalon "securities" and actually settled. All of these disputes of material fact correlate directly to the existence, and extent, of damages. All of these elements are Plaintiff's burden to establish at trial, making summary judgment here improper.

(Def. SJ Opp. Mem. at 16-17.[29])  Those are the very arguments that Judge Broderick rejected in granting Plaintiffs summary judgment on liability.  The parties also disputed "the exact minutes when Mintbroker's position shortly dipped below 10%" during one the short-swing periods, as well a few other numerical discrepancies. *Gentile I*, 597 F. Supp.3d at 657 n.10, 13.  Again, none of those disputes had anything to do with the theory now championed by Gentile.

Judge Broderick's acknowledgment of a dispute about the amount of damages had nothing to do with resolving any issue about the extent to which customers, not

---

[29]  "Def. SJ Opp. Mem." refers to Defendants' Memorandum Of Law In Opposition To [Plaintiff's] Motion For Summary Judgment,  AV Dkt. 83; *see also* NC Dkt. 76.

Defendants, were beneficial owners of Avalon and New Concept stock that Gentile has newly introduced through the Post-Discovery Trading Records.  Nor did it provide license to Gentile to advance a damages analysis – e.g., that Defendants disgorgeable profits are zero because Defendants never crossed the 10% beneficial ownership bar of Section 16(b) – that is fundamentally at odds with the Court's determination of liability.  Although Defendants did not formally move to set aside the summary judgment decision, their position on damages effectively asks the Court to do just that.   As Gentile was not sufficiently diligent in producing the records on which his theory of damages is predicated, however, the law of the case should not be disturbed.

**C.      Discovery Sanctions Pursuant To Fed. R. Civ. P. 37**

Invoking Fed. R. Civ. P. 37, Plaintiffs request that the Court impose discovery sanctions by excluding from evidence the Post-Discovery Trading Records, or, in the alternative an award of attorney's fees incurred in connection with pre-inquest discovery. (AV Dkt. 233 at 11; NC Dkt. 216 at 11.)  Because the Court finds that Gentile cannot introduce the Post-Discovery Trading Records in contravention of the law of the case, the Court need not address exclusion as a sanction.   Nonetheless, for completeness, the Court offers the following analysis concluding that exclusion pursuant to Fed. R. Civ. 37 would not be warranted, but an award of reasonable attorney's fees would be warranted.

**1.      Legal Standards For Exclusion**

The operative provision is Fed. R. Civ. P. 37(c), which provides that: "If a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).   The Rule

further provides, however, that "[i]n addition to or instead of this sanction, the court …
may order payment of the reasonable expenses, including attorney's fees, caused by the
failure; inform the jury of the party's failure; and impose other appropriate sanctions,
including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).   *Id*. In turn, Rule
37(b)(2)(A)(i)–(vi) lists a range of available sanctions, ranging from directing that certain
facts be taken as established, to rendering a default judgment.

"The purpose of Rule 37(c) is to prevent the practice of 'sandbagging' an adversary
with new evidence."  *Ritchie Risk–linked Strategies Trading (Ireland), Ltd*. *v. Coventry
First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) (citing *Ebewo v. Martinez*, 309 F. Supp.2d
600, 607 (S.D.N.Y.2004); *Johnson Electric North America Inc. v. Mabuchi Motor America
Corp.*, 77 F. Supp.2d 446, 458–59 (S.D.N.Y.1999)).   "Yet despite the seeming 'self-
executing' nature of the preclusion sanction contained in the Rule, *see* Fed.R.Civ.P. 37(c)
advisory committee's note (1993 Amendment), imposition of the preclusion sanction
remains within the trial court's discretion.  Indeed, 'the plain text' of the rule provides that,
after affording the dilatory party an opportunity to be heard, the Court has the discretion
to impose less severe sanctions."  *Id.* (citing *Design Strategy, Inc. v. Davis*, 469 F.3d 284,
298 (2d Cir.2006)).

Under Rule 37, courts have "broad discretion" to determine the nature of any
sanction that should be imposed under Rule 37, "based on all the facts of the case."
*AAIpharma Inc. v. Kremers Urban Dev. Co.*, No. 02 Civ. 9628, 2006 WL 3096026, at *5,
(S.D.N.Y. Oct. 31, 2006) (quoting *Dimensional Sound, Inc. v. Rutgers Universtity*, No. 92-
CV-2350, 1996 WL 11244, at *3, (S.D.N.Y. Jan. 10, 1996)).  And because "preclusion of
evidence is a 'harsh remedy,' it 'should be imposed only in rare situations.'"  *Ritchie Risk-*

*Linked Strategies*, 280 F.R.D. at 156 (quoting *Izzo v. ING Life Insurance & Annuity Co.*, 235 F.R.D. 177, 186 (E.D.N.Y.2005) (quoting *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 71 (2d Cir.1988)).

"Before [granting] the extreme sanction of preclusion," the Court "should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses." *Id.* at 257 (quoting *Outley v. New York*, 837 F.2d 587, 591 (2d Cir.1988) and also citing *Webb v. Buchanan Marine*, No. 99 Civ. 3573, 2000 WL 347159, at *2 (S.D.N.Y. Mar. 31, 2000)).   In making that inquiry, the court should consider the following factors: "(1) the party's explanation for the failure to comply with the discovery [requirement]; (2) the importance of ... the precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance."   *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, 118 F.3d 955, 961 (2d Cir.1997); *see also Ritchie Risk-Linked Strategies*, 280 F.R.D. at 157 (listing same factors).

A party need not have acted in bad faith to warrant preclusion under Rule 37(c), but bad faith "can be taken into account" by the Court in considering the party's explanation for its failure to satisfy its discovery obligations.   *Ritchie Risk-Linked Strategies*, 280 F.R.D. at 157 (quoting *Design Strategy*, 469 F.3d at 296).   "In determining whether a party's 'bad faith' in discovery should dictate a severe sanction, the Court should view the party's conduct in the case as a whole.   *Id.* (citing *Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir.1991); *Ashkinazi v. Sapir*, No. 02-CV-0002, 2005 WL 937597, at *6 (S.D.N.Y. Apr. 20, 2005)).

"Even where preclusion is not ordered under Rule 37, it is generally appropriate, at a minimum, to require a party that has not complied with its discovery obligations to pay the reasonable fees and costs incurred by the moving party in seeking disclosure and/or in seeking discovery sanctions." *Id.* Indeed, the Second Circuit has characterized the imposition of reasonable expenses, including attorney's fees, … as "the mildest" of the sanctions authorized by Rule 37. *Cine Forty–Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir.1979); *accord Ritchie Risk-Linked Strategies*, 280 F.R.D. at 157.

## 2. Application

The Post-Discovery Trading Records indisputably should have been produced during discovery, not two years after discovery had closed and after summary judgment on liability had been granted against Defendants. The Court thus considers the requisite *Softel* factors.

The first factor weighs in favor of exclusion. As set forth above, Gentile was not sufficiently diligent in producing the Post-Discovery Trading Records. And his insistence on having acted in good faith is belied by the record showing that he voluntarily shut down Mintbroker after Plaintiffs served their discovery.

The second factor in assessing whether to exclude – the importance of the precluded evidence – weighs against exclusion. As positioned by Gentile, the Post-Discovery Trading Records potentially have a multi-million-dollar impact on the amount of short-swing profits subject to disgorgement. Plaintiffs contend that even if the Post-Trading Records are considered, they do not change the short-swing profit analysis. Regardless, there is no disputing the importance of the records if the Court were to admit

46

them and find that they reliably establish the basis for Defendants' short-swing profits analysis.

The third factor – prejudice to Plaintiffs from having to prepare to address the new evidence – initially favored exclusion but has been ameliorated by the proceedings since the Post-Discovery Trading Records came to light.  In particular, Plaintiffs have had a fulsome opportunity to take discovery with respect to the Post-Discovery Trading Records.  Plaintiffs took depositions of relevant fact witnesses (Darville and Gentile) as well as Gentile's experts (Christian and Beresford).  Additionally, Plaintiffs could have tendered their own experts but opted not to do so.  In short, Plaintiffs have had full and fair opportunity to "meet the new [evidence]."  *Softel*, 118 F.3d at 961.

The fourth factor – the possibility of a continuance – similarly weighs against preclusion.  That is because the Court already provided for a continuance by allowing several months of discovery with respect to the Post-Discovery Trading Records.  Plaintiffs have not suggested they were not provided with sufficient time or opportunity to take that discovery.

Given the foregoing, particularly having provided Plaintiffs with the opportunity to take further discovery, the Court does not believe that this is one of those "rare situations" where the "harsh remedy" of exclusion is warranted as a sanction pursuant to Rule 37(c).  *Update Art, Inc.*, 843 F.2d at 71.  The Court may well have been within its discretion to exclude the Post-Discovery Trading Records when Defendants first sought to interpose them.  But the passage of time and events since then have borne out that a continuance and further discovery were appropriately ameliorative measures.

That said, absent exclusion of the Post-Discovery Trading Records or Gentile's damages theory for other reasons as discussed herein, the circumstances would fully justify awarding Plaintiffs any reasonable additional expenses, including attorney's fees, incurred by Plaintiffs as a result of Gentile's belated disclosure.  Responsibility for the unexpected, eleventh-hour emergence of the Post-Discovery Trading Records falls squarely on Gentile.  Plaintiffs should not have to pay for his missteps.  *See, e.g.*, *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133–34 (2d Cir.1998) (affirming award of attorney's fees as sanctions for party's production of box of documents after the close of discovery); *Ritchie Risk–linked Strategies* 280 F.R.D. at 156 (requiring defendants to pay reasonable attorney's fees and expenses incurred by plaintiff in meeting discovery with respect to component of damages disclosed a year after close of discovery); *Powell v. Metro One Loss Prevention Services Group (Guard Division NY), Inc.*, No. 12-CV-4221, 2015 WL 9255338, at *1 (S.D.N.Y. Dec. 15, 2017) (awarding attorney's fees and costs for production of documents after close of discovery);  *Kosher Sports, Inc. v. Queens Ballpark Co., LLC,* No. 10-CV-2618, 2011 WL 3471508, at *14, 18 (E.D.N.Y. Aug. 5, 2011) (requiring payment of reasonable attorney's fees and expenses for discovery incurred in connection with recordings produced late in discovery).

## D.    Exclusion Under Federal Rule Of Evidence 403

As with the discussion of exclusion pursuant to Fed. R. Civ. P. 37(c), the following analysis under Federal Rule of Evidence 403 only would be relevant absent the Court's determination that the Post-Discovery Trading Records should be disregarded for other reasons.   Rule 403 allows for the exclusion of evidence the relevance of which is substantially outweighed by other considerations.  The rule provides that "[t]he court may

48

exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  Fed. R. Ev. 403.  Plaintiffs ask the Court to exclude the Post-Discovery Trading Records under this provision because the records are "unreliable."  (AV Dkt. 194 at 11-12; NC Dkt. 183 at 11-12.)

"Reliability" is not mentioned in Rule 403, although admission of unreliable evidence theoretically may cause undue delay and wasted time.  Concerns for prejudice and confusion are minimal as no jury is involved.  In any event, many of the reasons that Plaintiffs argue that the Post-Discovery Trading Records are unreliable largely have been addressed through damages discovery and the Hearing.  For instance, Plaintiffs argue that the Post-Discovery Trading Records "cannot be competently introduced" because Darville, who maintained and provided access to the records, knew nothing about what the records reflect, whether the records were complete, or how the records were generated.  (AV Dkt. 194 at 12; NC Dkt 183 at 12.)  Those characterizations are not accurate.  Darville testified that he pulled the data directly from Mintbroker's trading platform, that the records reflect Mintbroker's trading data, that the records were complete, and that the records were not corrupted or subject to alteration (Darville Dep. at 21-22, 32-33, 42-44, 83.)  And although Darville had limited understanding of what much of the trading data represented (*see, e.g., id.* 58-61), Gentile spoke to that issue at the Hearing.

To be sure, there are problems with the Post-Discovery Trading Records, but they, along with reliability issues, are more appropriately discussed in the context of Federal

Rule of Evidence 702 and the testimony of Gentile's experts, which rely entirely on the Post-Discovery Trading Records.

**E.      Exclusion Of The Expert Reports And Testimony Under Fed. R. Ev. 702**

The testimony and reports of Gentile's experts Christian and Beresford depend on the Post-Discovery Trading Records and advance a short-swing profits analysis that the Court recommends be disregarded as incompatible with law of the case.   The expert reports and testimony should be disregarded for that reason alone.

Plaintiffs contend that the expert reports and testimony also warrant exclusion because they do not meet the requirements for admission of expert testimony under Federal Rule of Civil Procedure 702.   Rule 702 permits expert opinion testimony if four criteria are satisfied:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Civ. P. 702; *Hunt v. CNH America LLC*, 511 F. App'x 43, 46 (reciting Rule 702 standards).  "Where the judge is the trier of fact, the Court has greater flexibility in satisfying its gatekeeping function vis a vis expert testimony given the absence of the need to protect juries from dubious expert evidence."  *Bank of New York Mellon Trust Co., National Association v. Solstice ABS CBO II, Ltd.*, 910 F. Supp.2d 629, 639 (S.D.N.Y. 2012) (internal quotation marks and modifications omitted).   In this instance, the Court agrees that the opinions of neither Christian nor Beresford satisfy the requirements of Rule 702, particularly because their opinions are not based on "sufficient facts or data" and are not "the product of reliable principles and methods."   Whether

excluded or accepted and considered, they do not survive scrutiny sufficient for the Court to adopt their calculations of damages.

The information on which the experts rely consists principally of the Post-Discovery Trading Records and Gentile and Darville's representations that the accounts in those records beginning with letters are customer accounts. Additionally, Christian testified that he got "comfortable" that the lettered accounts were in fact customer accounts based on having looked at some unspecified number of unspecified account numbers in a "master file" that Defendants did not produce and for which Christian did not make any record. Even if Christian was sufficiently comfortable with that approach, the Court is not.

As set forth above in describing the Post-Discovery Trading Records, Defendants did not produce any master file account information, and Christian did not make any record of what he did in examining the master file. Nor did he produce any screen shots, print outs, or other material to corroborate his assertions. He recalled neither how many customer accounts he "got comfortable" with, nor the name or type of any Mintbroker customer. (Hrg. 235, 237-38.) And, even though Christian testified that, in addition to verifying a sample of accounts, "proper procedure" would be to verify the account with the highest value, he could not recall if he did so in this instance. (Hrg. 234-35; *but see id.* 238 ("I remember picking high value and random samples").) That is particularly surprising given that the largest account, MBS010067, stood out as the largest by far, accounting for the substantial majority of all purported client account transactions, more than all the others combined.[30] (Hrg. DX 6 at 2; DX 7 at 2; Hrg. 276.)

---

[30] Plaintiffs calculate the 067 account as having engaged in 3,001 Avalon transactions and 7,792 New Concept transactions; the second highest accounts had 66 Avalon transactions and 161 New Concept transactions, while most of the client accounts

Beresford, who had never previously performed a short-swing profits analysis (Hrg. 295), based his calculations on the Post-Discovery Trading Records – as extracted from iBoss by Christian – but made no effort to verify or test the accuracy, completeness, validity of that data.  (Hrg. 289; *see also* Hrg. 292-93, 296-97 (admitting to steps he did not perform).)  As a result, Beresford's report and testimony are no more reliable than Christian's.

Even assuming the lettered accounts correspond to Mintbroker customers, the fact remains that the Post-Discovery Trading Records are no more than Mintbroker's internal log of how it purportedly fulfilled orders.  Neither expert did anything to confirm whether client-related transactions in the Post-Discovery Trading Records were "actually effected for the clients."  (Hrg. 270, 296.)  Nor did they attempt to verify whether any stock designated as bought or sold for a client was in fact actually credited to any client accounts, or in fact whether any segregated client accounts existed at all.  (Hrg. 250-51, 296-97.)  The only accounts that have been established with sufficient basis in fact are those evidenced in the Interactive Trading Records and that served as the basis for

---

recorded only two transactions.  (Pl. Post-Hearing Mem. at 21.)  The 067 account also realized the greatest profits by far, with $2,221,090 from Avalon stock and $5,762,336 from New Concept stock.  (*Id.*)  The Court has not independently verified those numbers, but notes that Gentile did not challenge them in his response.  Neither expert inquired whether Mintbroker had or shared beneficial ownership (i.e., voting or investment power) of stock allocated to the 067 account.  (Hrg. 248 ; 296; *see also id.* 290 (Beresford did not even notice that one particular account was trading more than others).)  Nor did they do anything to verify whether the 067 account – or any other lettered account for that matter – was affiliated with Mintbroker; instead, Christian merely asked Gentile if Mintbroker had any accounts that were closely-held affiliates but did nothing to confirm Gentile's answer.  (Hrg. 241-42, 292, 296.)

summary judgment: Mintbroker's proprietary account for which Mintbroker and Gentile conducted all trades.[31]

Additionally, the Court has reservations about the methods and principles employed by Christian. He explained that his engagement was not an audit but rather procedures agreed upon for the specific engagement; in other words, he performed a bespoke analysis of the Post-Discovery Trading Records. (See Hrg. 194-95 (explaining what he did).) In defending his approach, Christian testified that he validated the analysis by having gotten comfortable that the lettered accounts belonged to customers (Hrg. 203), and identifying off-setting "wash" trades; i.e., buy and sell transactions of offsetting amounts that occurred at the same, or "close" to the same, time. (Hrg. 280, 282.) Yet his confirmation of client accounts was far from reliable (as discussed above), and he imposed no specific time frame on what he considered to be close enough to qualify as a "wash" trade, leaving it to his "professional judgment." (Hrg. 281, 283.) Without a defined limit, however, the Court cannot place much stock in the reliability of what qualifies

---

[31] During argument at the Hearing, defense counsel likened Defendants' trading platform and arrangement to that used in another short-swing profits case with which this Court is familiar, *Microbot Medical, Inc. v. Alliance Investment Management Ltd.* In Microbot, Alliance, an asset management defendant based in Jamaica, moved for summary judgment on the basis that the true beneficial owner of the shares at issue was one of its individual day-trading clients. No. 19-CV-3782, 2020 WL 5755061, at *5 (S.D.N.Y. Aug. 18, 2020). Alliance identified that investor, who was then made a defendant, while Alliance was dismissed. *See Microbot Medical, Inc. v. Mona*, No. 19-CV-3782, 2020 WL 8671943, at * 1 (S.D.N.Y. Dec. 17, 2020). But therein lies a significant difference between the instant case and *Microbot*. Defendants have not identified any such alternative beneficial owner, let alone one that could be named as a defendant as in Microbot. Additionally, Alliance admitted that it had made an error in its SEC filings by identifying itself as the beneficial owner, and formally requested that the SEC delete the incorrect documents. *Alliance*, 2020 WL 5755061, at *2. Meanwhile, the individual investor came forward and filed his own SEC forms, informing the SEC that he, not Alliance, was the beneficial owner. *Id.* Here, in contrast, Defendants did not take any corrective measures.

as "close" enough to be deemed validated.  *See Connecticut Municipal Electric Energy Cooperative v. National Union Fire Insurance*, No. 3:19-CV-839, 2021 WL 4170757, at *19 (D. Conn. Sept. 14, 2001) ("Rule 702 demands more than the exercise of an expert's subjective judgment for his or her testimony to be 'reliable' under the Federal Rules"); *In re Mirena IUD Products Liability Litigation*, 169 F. Supp.3d 396, 440 (S.D.N.Y. 2016) (rejecting expert opinion as not based on objective standards).  Christian dismissed that concern by saying the nearness of the time was just one of the validation factors.  (Hrg. 283.)  But given the insufficient reliability of the first validation factor (lettered accounts), that defense does not hold.

Another defect in both Christian and Beresford's methods is that they ascribed "negative" beneficial ownership to Mintbroker.  (Hrg. 263, 294-95.)  Neither expert could adequately or credibly explain the concept of negative beneficial ownership.  (*See* Hrg. 263-64, 294, 302-03.)  Beresford did not even recall that he had included negative values in his analysis, even though he had (Hrg. 294-95), while Christian equated negative beneficial ownership with Mintbroker having started off in a short position (Hrg. 263-64.)  Defendants have not provided any authority, and the Court is aware of none, recognizing the concept of negative beneficial ownership, let alone suggesting that being short – selling shares an investor does not own – generates negative beneficial ownership.  *Cf. ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 96 n.1 (2d Cr. 2007) ("An investor sells short when he sells a security that he does not own by borrowing the security, typically from a broker.  At a later date, he 'covers' his short position by purchasing the security and returning it to the lender") (internal citation omitted).  As Christian conceded, eliminating the negative numbers in the analysis would change the

results, and he would have to "run the numbers again" to see to what extent.  (Hrg. 264-65.)

Also of note, neither expert even reviewed or considered, among other documents and information, the Interactive Trading Records, which underpinned summary judgment. Nor did they review Defendants' SEC filings.  They thus did not consider that Defendants provided certified statements that (1) the source of funding for the purchase of all Avalon and New Concept shares were Mintbroker's working capital, together with margin borrowing; and (2) Defendants had acquired the stock in an attempt to gain control of the companies.  (Hrg. PX 6 and 6A, at 5, items 3-4.)  Both those statements are inconsistent with Defendants disclaimers of beneficial ownership and assertions that much of the trading was on behalf of customers.  *See In re Mirena Ius Levonorgestrel-Related Products Liability Litigation (No. II)*, 341 F. Supp.3d 213, 261 (S.D.N.Y. 2018) (excluding expert opinion in part due to expert's failure to consider evidence that did not support his opinion); *Bank of New York Mellon Trust*, 910 F. Supp.2d at 640 ("Where the record indicates that the expert failed to consider necessary factors or that his analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value") (quoting *Lightfoot v. Union Carbide Corp.*, No. 98–7166, 175 F.3d 1008 (table), 1999 WL 110424, at *2 (2d Cir. Mar. 1, 1999), *cert. denied*, 528 U.S. 817 (1999)).

In sum, the Court finds that the reports and opinions of Gentile's experts are based on unreliable information, using unreliable methods, and do not meet the demands of Federal Rule of Evidence 702.  They thus merit exclusion.  But even if the expert reports and opinions are accepted into evidence, the Court finds they are entitled to little weight

for the same reasons and that Gentile has not carried his burden to show by a preponderance of the evidence that the short-swing profits calculated by Plaintiffs should be reduced to the numbers calculated by Gentile's experts.  *See Stella*, 232 F.2d at 302; *Lewis*, 396 F. Supp. at 1032.

### Determination Of Short-Swing Profits

Plaintiffs have proved their prima facie case of short-swing profits in the amount of $6,235,908 for Avalon and $6,102,002 for New Concept.  Those calculations are based on the Interactive Trading Records and Mintbroker's corresponding Schedule 13-D filings and a detailed analysis of the dates and times when Defendants crossed the 10% beneficial ownership threshold, matching of the relevant trades, and application of the requisite lowest-in-highest-out methodology.  (*See* Pl. Damages Mem.[32] at 6-10 and PX 8 (combined Avalon trading activity from Interactive Trading Records), 8A (same for New Concept), 13 (computation of Avalon short-swing profits), 13A (computation of New Concept short-swing profits).)  The Court is not aware of any error in those calculations, and Defendants have not pointed to any errors or necessary adjustments.

Instead, Defendants have disputed Plaintiff's profit calculations based solely on their argument that the Post-Discovery Trading Records reflect trades initiated by or for customers for which Mintbroker was not a beneficial owner and therefore should not be included in the short-swing profit analysis.  The Court has determined, however, that Defendants' analysis is incompatible with the Court's summary judgment decision that is grounded in the Interactive Trading Records and is otherwise based on unreliable data

---

[32] "Pl. Damages Mem." refers to Brief In Support Of [Plaintiff's] Calculation Of Damages, And Motion For Entry Of Judgment, AV Dkt. 101, NC Dkt. 90.

and expert testimony.  Even giving consideration to the Post-Discovery Trading Records and the testimony of Gentile's experts, the Court finds that Gentile has not met his burden to prove the extent, if at all, to which the short-swing profits calculated by Plaintiffs should be reduced.  Accordingly, Avalon is entitled to disgorgement of $6,235,908, and New Concept is entitled to disgorgement of $6,102,002.

### Pre-Judgment Interest

Plaintiffs request an award that includes pre-judgment interest.  "Prejudgment interest is generally awarded as part of § 16(b) recoveries, but the question of whether such interest should be given in a particular case is within the discretion of the trial court." *Morales v. Freund*, 163 F.3d 763, 767 (2d Cir. 1999); *accord Roth v. Jennings*, No. 03-CV-7760, 2009 WL 1440670, at *6 (S.D.N.Y. May 21, 2009) (quoting *Morales*). Prejudgment interest is "given in response to considerations of fairness.  It is denied when its exaction would be inequitable."  *Blau v. Lehman*, 368 U.S. 403, 414 (1962).

In determining whether to award pre-judgment interest in short-swing profit cases, courts in this District have considered several non-exhaustive factors, including "(1) whether the insider acted innocently or knowingly; (2) the type and degree of the insider's inadvertence; (3) the position of the insider in the corporation; (4) when an insider repays the corporation; and (5) the length of time involved between the complaint and judgment." *Donoghue v. MIRACOR Diagnostics, Inc.*, No. 00-CV-6696, 2002 WL 233188, at *3 (S.D.N.Y. Feb. 11, 2002) (internal quotation marks and alterations omitted) (citing *Whittaker v. Whittaker Corp.*, 639 F.2d 516, 533-34, *cert. denied*, 454 U.S. 1031 (1981)). More generally, consideration also should be given to "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the

relative equities of the award, (iii) the remedial purpose of the statute involved, and (iv) such other general principles as are deemed relevant by the court." *Roth*, 2009 WL 1440670 at \*6 (citations omitted).

Weighing all the factors in the circumstances of this case, the Court finds that it would be fair and equitable to award prejudgment interest. First, there is no indication that Defendants acted innocently, inadvertently, or unknowingly in crossing the 10% threshold. To the contrary, their stated purpose in acquiring Avalon and New Concept stock was to gain control of the companies (Hrg. PX 6 at 5, item 4, PX 6A at 5, item 4), and their holdings did not simply exceed the threshold but instead, consistent with Defendants' stated purpose, reached a high of more than 58% for Avalon and more than 53% for New Concept. (*E.g.*, PX 8 at row 1461; PX 8A at row 762.) Defendants engaged in a concentrated period of rapid day-trading, executing hundreds of trades during a period of just days, at speeds characterized by Defendants as "'too fast to be captured by' the law." *Gentile I*, 597 F. Supp.3d at 652 (quoting Defendants' memorandum of law in opposition to summary judgment at 5).

True, Defendants were not corporate officers or directors within the companies, but they have not made any effort to repay the company in any amount despite their strict liability. Meanwhile, the case has dragged on for almost five years, largely due to Defendants' machinations, including advancing arguments "unsupported by the law" and that "make[ ] no sense against the evidence." *Gentile I*, 597 F. Supp.3d at 652; *see also* AV Dkt. 35 at 15 (denying Defendants' motions to dismiss and stating "I … decline to reach the novel conclusion that, as a matter of law, high-frequency trading positions by briefly-tenured shareholders such as Defendants, fall outside the ambit of § 16(b)"). Even

after summary judgment was granted against them, Defendants attempted to derail the proceedings with unsuccessful motions to stay and to dismiss for lack of standing.  Finally, there is indicia of bad faith, particularly in Gentile's voluntary closure of Mintbroker without sufficiently preserving documents for this litigation, and his turn-about with respect to the existence of additional records.   Imposing prejudgment interest in this case is fully consistent with the remedial purpose of Section 16(b).

Gentile contends that none of the relevant factors weigh in favor of pre-judgment interest but provides no reason other than that Defendants were not actual insiders "with access to information or other powers and instead satisfy the statutory definition only narrowly and technically … for a short duration of time pursuant to high-frequency day trading."  (Def. Memo. Opp. Calculation, AV Dkt. 107, at 9; NC Dkt 96, at 9.)  As set forth above, the Court already has considered Defendants' status, the duration of their violative activity, and their method of trading.   None of those tip the scales in favor of denying prejudgment interest.  Plaintiffs should be awarded prejudgment interest.

## Conclusion

For the foregoing reasons, I recommend that (1) Avalon be awarded disgorged profits in the amount of $6,235,908; (2) New Concept Energy be awarded disgorged profits in the amount of $6,102,002 for New Concept; and (3) each Plaintiff be awarded prejudgment interest.   Plaintiffs' previous calculations of prejudgment interest are outdated at this juncture.   In the event the District Judge adopts this Report and Recommendation, I recommend that Plaintiffs be directed to submit revised prejudgment interest calculations.

**<u>Objections And Right To Appeal</u>**

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Denise L. Cote, United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, New York, New York 10007.  **Failure to file timely objections will result in a waiver of objections and will preclude appellate review.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:   October 6, 2023
             New York, New York

Copies transmitted to all counsel of record.