UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVALON HOLDINGS CORPORATION, | 18-CV-7291 (DLC)(RWL) |
| Plaintiff, | |
| -against- | 18-CV-8896 (DLC)(RWL) |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | |
| Defendants. | |
| NEW CONCEPT ENERGY, INC., | |
| Plaintiff, | |
| -against- | |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | |
| Defendants. | |

**DEFENDANT GUY GENTILE'S OBJECTIONS TO THE REPORT AND
RECOMMENDATION TO HON. DENISE L. COTE: SHORT-SWING PROFITS
AWARD**

## Table of Contents

Page

Preliminary Statement ..................................................................................................1

Statement of Facts .......................................................................................................3

    A.    Mr. Gentile and MintBroker .......................................................................3

    B.    Procedural History .....................................................................................4

    C.    The MintBroker Records, Damages Inquest, and Report and Recommendation .........................................................................................7

Legal Standard ..........................................................................................................10

Objections .................................................................................................................11

    I    THE R&R FAILED TO CONSIDER MR. GENTILE'S PECUNIARY INTEREST .................................................................................................11

    II    THE R&R FAILED TO PROPERLY WEIGH THE MINTBROKER RECORDS  AND EXPERT TESTIMONY RELATING TO THOSE RECORDS .................................................................................................14

        A.    The R&R Erred By Refusing to Consider the MintBroker Records and Related Testimony ........................................................................15

        B.    The R&R Improperly Excluded Mr. Gentile's Expert Witnesses. ...........17

    III    THE R&R INCORRECTLY DETERMINED SHORT-SWING PROFITS.........20

    IV    THE R&R ERRONEOUSLY AWARDED PRE-JUDGMENT INTEREST .................................................................................................22

    V    PLAINTIFFS LACK STANDING .......................................................23

Conclusion ................................................................................................................25

Table of Authorities

Page

CASES

*Avalon Holdings Corp. v. Gentile,*
  18-cv-7291, Dkt. Nos. 202, 204........................................................................3

*Avalon Holdings Corp. v. Gentile,*
  597 F. Supp. 3d 640 (S.D.N.Y. 2022)............................................................6, 12

*Avalon Holdings Corp. v. Gentile,*
  597 F. Supp. 3d at 655–56 ...............................................................................13

*Bernardez v. Graham,*
  No. 11-CIV-6463-NSR-JCM, 2016 WL 8715936 (S.D.N.Y. Apr. 15, 2016)
  (Román, J.)........................................................................................................10

*Chem. Fund, Inc. v. Xerox Corp.,*
  377 F.2d 107 (2d Cir. 1967)........................................................................19, 21

*Donoghue v. Bulldog Investors General Partnership,*
  696 F.2d 170 (2d Cir. 2012)..............................................................................23

*Donoghue v. Casual Male Retail Grp., Inc.,*
  375 F. Supp. 2d 226 (S.D.N.Y. 2005)...........................................................22, 23

*Editek, Inc. v. Morgan Capital, L.L.C.,*
  150 F.3d 830 (8th Cir. 1998) ............................................................................12

*Fed. Ins. Co. v. Mertz,*
  No. 12-CV-1597-NSR-JCM, 2017 WL 3206336 (S.D.N.Y. July 26, 2017)
  (Román, J.)........................................................................................................10

*Feder v. Frost,*
  220 F.3d 29 (2d Cir. 2000)................................................................................12

*Griffiths v. Francillon,*
  2012 WL 1341077 (E.D.N.Y. Jan. 30, 2012), *report and recommendation*
  *adopted,* 2012 WL 1354481 (E.D.N.Y. Apr. 13, 2012) .........................................10

*Huppe v. Special Situations Fund III QP, L.P.,*
  565 F. Supp. 2d 495 (S.D.N.Y. 2008)..................................................................12

*Lenard v. Design Studio,*
  889 F. Supp. 2d 518 (S.D.N.Y. 2012)..................................................................10

12253004-15

## Table of Authorities
(continued)

Page

*Levner v. Saud,*
    903 F. Supp. 452 (S.D.N.Y. 1994), *aff'd* 61 F.3d 8 (2d Cir. 1995) ...................................19, 21

*Levy v. Seaton,*
    358 F. Supp. 1 (S.D.N.Y. 1973)..................................................................................20, 21

*Morales v. Quintel Entm't, Inc.,*
    249 F.3d 115 (2d Cir. 2001)....................................................................................................19

*New Concept Energy Inc. v. Gentile,*
    18-cv-8896 ............................................................................................................................3

*RGI Brands LLC v. Cognac Brisset- Aurige, S.a.r.l.,*
    2013 WL 1668206 (S.D.N.Y. Apr. 18, 2013), *report and recommendation*
    *adopted*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013) ........................................................10

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.,*
    No. 88 CIV. 9127 (DNE), 1992 WL 296314 (S.D.N.Y. Oct. 6, 1992) .................................13

STATUTES

28 U.S.C. § 636(b)(1) ..........................................................................................................1, 10

Securities Exchange Act of 1934 § 16, 15 U.S.C. § 78p(b) ................................................. passim

Securities Exchange Act of 1934 § 13(d), 15 U.S.C. § 78m(d)............................................ passim

RULES

17 C.F.R. § 240.16a-1(a) ..................................................................................................... passim

17 C.F.R. § 240.13d-3(a) ..................................................................................................... passim

Fed. R. Civ. P. 72(b) ................................................................................................................1

Federal Rule of Evidence 702......................................................................................................10, 14

Fed. R. Civ. P. 37.....................................................................................................................15

OTHER AUTHORITIES

Peter Romeo & Alan Dye, Section 16 Treatise and Reporting Guide § 2.03(iv)
    (5th ed. 2019) ........................................................................................................................2

Defendant Guy Gentile ("Mr. Gentile") respectfully submits the following objections to Magistrate Judge Lehrburger's Report and Recommendation dated October 6, 2023 in the above-captioned actions (the "Report" or "R&R"). 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Preliminary Statement

The Report suffers from a fundamental flaw that permeates every aspect of its quantification of sums allegedly owed under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). The Report accepts as "law of the case" that Guy Gentile is the beneficial owner of all shares reported on Schedules 13D filed by MintBroker International, Ltd. ("MintBroker") for positions in Avalon Holdings Corp. ("Avalon") and New Energy Concepts Inc. ("New Energy" and together with Avalon, "Plaintiffs") and further, that as the beneficial owner he is liable for all profits earned on those shares, regardless of any beneficial ownership by others. While the District Court indeed determined that Mr. Gentile was a beneficial owner for reporting purposes under Sections 13(d) and Section 16 of the 1934 Act, it made no determination as to the amount of pecuniary interest that Mr. Gentile or MintBroker held. The very purpose of the referral for a damage computation was to make that determination. But the Report ignores that issue and wrongfully assumes that the determination of beneficial ownership by the District Court rendered Mr. Gentile liable for 100% of profits regardless of his actual pecuniary interest.

Rule 16a-1(a)(2), 17 C.F.R. 240 § 16a-1(a), draws a distinction between "beneficial ownership" to determine reporting obligations for the ten percent threshold and the application of the term to the quantification of damages, where "the term beneficial owner shall mean any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect *pecuniary interest* in the equity securities.…" (emphasis added). As the Romeo & Dye treatise explains, "The broker's beneficial ownership of shares is not exclusive of the customer and it is possible that both the customer and the broker will

be deemed beneficial owners of the same shares." *See* Peter Romeo & Alan Dye, Section 16 Treatise and Reporting Guide § 2.03(iv) (5th ed. 2019). During the course of the hearing, Magistrate Judge Lehrburger ignored pecuniary interest, stating: "I just want to figure out what the evidence tells me in terms of whether the definition of beneficial ownership has or hasn't been met. So that's the scope of what I have to do." (Tr. at 310.)  The Report mistakes beneficial ownership for reporting purposes with pecuniary interest, which in the foregoing would be held by the customer, not the broker. Throughout, the Report ignores this distinction, treating the District Court's award as determinative of all aspects of pecuniary interest. MintBroker may have had dispositive or voting power over shares held at Interactive Brokers, but that position included shares where the profit and loss went to its customers, not to MintBroker.

The Report's flawed premise permeates its analysis of Mr. Gentile and the expert evidence that he put forth. The Report casts Mr. Gentile in a negative light for seeking to prove that customers indeed earned profits from trading in Avalon and New Energy, suggesting that he had been dilatory or perhaps acted in bad faith. The Report mistakenly criticizes Mr. Gentile for not producing documents he did not have, and for not requiring customers to make filings under Section 16(a), when no such filings were required since none of the customers remotely approached 10% beneficial ownership. Based on the same flawed reasoning, the Magistrate Judge did not permit Mr. Gentile time to obtain documents through letters rogatory addressed to MintBroker, via its appointed Joint Official Liquidators in The Bahamas, to establish the scope of customer ownership.

For the reasons set forth in detail below, we respectfully request that the Court decline to confirm the Report and further that it award $0 in damages or, alternatively $1,212,974 in damages, without prejudgment interest or fees. Alternatively, if the Court believes that more evidence is

required to verify customer accounts, Mr. Gentile requests that this Court schedule a new trial after Mr. Gentile has been afforded a reasonable opportunity to obtain further documents from MintBroker regarding customer ownership.

Statement of Facts

A.    Mr. Gentile and MintBroker

Defendant Gentile is the founder and former CEO of MintBroker. (Tr. at 34–35.[1]) In 2011, MintBroker became registered and licensed under Bahamian law as a broker-dealer to provide online day trading services to its clients. (Tr. at 34.) It began with three employees, but the company grew to 80 employees at one point. (Tr. at 34–35). MintBroker held a proprietary trading account, and also had customer (client) accounts.  In 2018, (the relevant time period of the trading at issue in these matters), MintBroker had three or four traders that would place trades on behalf of MintBroker in the company's proprietary trading account. (Tr. at 37.)  At its peak, MintBroker had as many as 50,000 customer (client) accounts. (Tr. at 34.) MintBroker only offered self-directed accounts, whereby its customers made their own trading decisions. (Tr. at 38.) It did not offer customer accounts whereby MintBroker employees made trading decisions, commonly referred to as managed accounts. (*Id*.)

MintBroker customer trades were submitted by customers through the web-based DAS Trader system. (Tr. at 37–38.) A customer would log onto their DAS Trader account with a username and password, search for the security they wanted to trade, choose the type of order to place and the number of shares, and enter the order. (Tr. at 48.) The order would then get sent to MintBroker's designated server in DAS Trader, which would then either route the order to one of

---

[1] References to the Tr. refer to the Transcript of the February 1 and February 2, 2023 hearing in these actions.  (*Avalon Holdings Corp. v. Gentile*, 18-cv-7291 ("*AV Action*"), Dkt. Nos. 202, 204). "*NC Action*" refers to *New Concept Energy Inc. v. Gentile*, 18-cv-8896. "DX-" refers to Defendant Gentile's exhibits introduced at that hearing.

3

12253004-15

the clearing firms it used (*e.g.*, InteractiveBrokers) to execute the order in the market, or it would be executed through an internal cross-trade within the DAS Trader system.[2] (Tr. at 48–49.)

MintBroker's omnibus account at InteractiveBrokers functioned both as a method to hold its own positions and to execute client transactions. (Tr. at 82–83.) As Gentile explained, when a foreign broker-dealer, like MintBroker, opens an account at a U.S. clearing firm, the clearing firm recognizes the broker-dealer as the account holder, but understands that it is utilizing the omnibus account to execute trades on behalf of its underlying clients. (Tr. at 82.) The shares held by MintBroker appeared as a single book entry at InteractiveBrokers, inclusive of customer and proprietary positions. InteractiveBrokers was not provided with the names of MintBroker clients who were trading through the omnibus account and had no way of identifying whether a trade in the omnibus account was placed on behalf of MintBroker or a client. (Tr. at 83; Plaintiffs' Exhibit ("PX") 2 (Dep. of Brad Klauseger) at 7–8.)

B.    Procedural History

The underlying actions were commenced against Mr. Gentile and MintBroker on August 13, 2018 (the *AV Action*) and September 28, 2018 (the *NC Action*). In each of those actions, Plaintiffs seek to recover short-swing profits under 15 U.S.C. § 78p(b) for trading alleged to have been done by MintBroker in the summer of 2018.

In September 2019, Mr. Gentile left The Bahamas. Immediately upon leaving, Mr. Gentile was "out of the firm" and no longer had any access to, or authority to obtain, MintBroker's records. (Tr. at 79, 111–13.) At that time, MintBroker was in the process of shutting down and firing all

---

[2] The DAS Trader system enabled internal cross-trading as a method of efficiently executing multiple customer trades in certain circumstances (one buying, one selling the same security) because clearing firms do not allow wash trading in the market and, when trading in an omnibus account, clearing firms cannot see that the trades are on behalf of two separate beneficial owners. (Tr. at 39–40.)

4

staff. (Tr. at 111–13.) MintBroker's closure "was based on a board resolution between the board of directors" and unrelated to the present litigation. (DX-32 at 159.) Mr. Gentile was not the sole director of MintBroker and did not have sole control over any such decision. (Tr. at 111, 113.) In October 2019, Plaintiffs served their first set of document requests on Mr. Gentile and MintBroker. (DX-33 at 79; (*See* Plaintiffs' Motion In Limine to Exclude Defendants' Post-Discovery Production, Expert Testimony and Reports ("Pl. Motion In Limine") (*AV Action*, Dkt. No. 194; *NC Action*, Dkt. No. 183.) at App. 5 & 6).) As Mr. Gentile testified at his 2020 deposition, MintBroker's records, including those relating to customer accounts, were retained by MintBroker's attorneys in The Bahamas. (DX-32 at 159–160.) The records were delivered to MintBroker's Bahamian attorneys by MintBroker's IT or compliance department on a thumb drive. Mr. Gentile did not have access to or a copy of that thumb drive. (DX-32 at 161–63.)

Mr. Gentile produced the records he had access to from the United States, such as records from Interactive Brokers, but could not produce records that were not in his possession, custody or control (including all documents located in The Bahamas or held by MintBroker's Bahamian counsel, and for which Bahamas law restricted disclosure). (DX-33 at 78-81.) While Mr. Gentile requested additional records from MintBroker's attorneys, those attorneys stated that they would not provide them to Mr. Gentile or instruct anyone else on MintBroker's staff to do so. (Tr. at 114–15; DX-33 at 38–43.)

Among the records that Mr. Gentile did not have access to was data from a system used by MintBroker called iBoss (Internal BackOffice Support System). (Tr. at 44, 73.) The iBoss system self-populated data with information concerning executed trades. (Tr. at 119, 170.) The data contained in the iBoss system could not be altered, as it was a "view-only system." (Tr. at 46, 48, 72; DX-34 (Darville Tr.) at 21–22.) The InteractiveBrokers records for MintBroker's omnibus

5

account did not have identifiers distinguishing client accounts and company accounts. The iBoss system, on the other hand, had identifiers to distinguish client and MintBroker proprietary accounts. (*See* PX-2 (Dep. of Brad Klauseger.) at 7–8; Tr. at 140–142, 201; DX-34 (Darville Tr.) at 28.)

On April 8, 2022, this Court (Hon. Vernon S. Broderick) granted in part Plaintiffs' motion for summary judgment against both Mr. Gentile and MintBroker. The Court found that Defendants were strictly liable under Section 16(b), but that the amount of profits Defendants earned and the exact period that Defendants were more than 10% beneficial owners was in dispute. *See Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 654-56 (S.D.N.Y. 2022). The Court held, *inter alia*, that Defendants were "beneficial owners" as defined in Rule 13d-3 because they had or shared, or had a right to acquire within sixty days, voting power and/or investment power of more than 10% of Avalon and New Concept shares during the relevant time period. *Id*. The Court also held that Defendants generally had a pecuniary interest in at least some of the shares at issue, but did not quantify that interest, stating: "Defendants had pecuniary interests in these shares because they had the opportunity to and did profit from them. As I explained, the trading records demonstrate that Plaintiffs successfully sold thousands of shares that they bought at a much lower price, and Defendants have failed to create a genuine dispute that they have not reaped the profits between the purchase price and the sale price." *Id*. at 655-56. The Court referred the case to Magistrate Judge Lehrburger for an inquest on damages as "the parties still dispute[d] the amount of profits Defendants earned, including the exact period of time that Defendants were more-than-10% beneficial owners, as well as the calculation of damages." *Id*. at 656–57.

In November 2022, this Court stayed these actions as to MintBroker because MintBroker was subject to Bahamian liquidation proceedings giving rise to an automatic stay. (R&R at 26.)

12253004-15

The liquidation proceedings commenced in March 2020. In March 2023, this Court also denied Mr. Gentile's motion to dismiss for lack of standing. (*AV Action*, Dkt. No. 238; *NC Action*, Dkt. No. 92.)

       C.     <u>The MintBroker Records, Damages Inquest, and Report and Recommendation</u>

Following the Court's decision on summary judgment, in or around late April 2022, Mr. Gentile again reached out to Bahamian counsel to request information in the possession of MintBroker's attorneys. They again refused. This time, however, they advised that they did not object to Mr. Gentile contacting former MintBroker employees. Mr. Gentile then contacted MintBroker's former Chief Compliance Officer, Mr. Cooper. Mr. Cooper advised Mr. Gentile he had asked a former IT Manager for MintBroker, Stephen Darville, to keep a copy of MintBroker's records. Mr. Gentile contacted Mr. Darville, who told Mr. Gentile that he found a copy of a drive containing MintBroker records, including data from the iBoss system. Mr. Darville then rebuilt MintBroker's iBoss system, and provided the iBoss records to forensic accountants retained by Mr. Gentile. (Tr. at 72–74; DX-28.) Those records were produced to the Plaintiffs in May 2022 (the "MintBroker Records"), and identify account names with respect to MintBroker's trading activity. MintBroker's proprietary trading account was identified as account 32810, its journal entry recordkeeping account was identified as account 32812, and its client accounts were identified based on their account names starting with the letters "PFS" or "MBS." (DX-34 (Darville Tr.) at 28; Tr. at 47–53, 233–34.)

Mr. Gentile engaged two independent forensic accountants to calculate short-swing profits for shares beneficially owned by MintBroker in Avalon (AWX) and New Concept (GBR). The first accountant, Robert Christian ("Christian"), was shown by Darville a demonstration of the iBoss system through a videoconference "walk-through." (Tr. at 196.) Darville then provided Christian with credentials which gave him direct access to iBoss. (Tr. at 196.) Darville described

12253004-15

the process of providing Christian with direct access to the iBoss system and further testified that Gentile did not place any limits on the types of documents Darville could share with the experts. (DX-34 (Darville Tr.) at 42–44, 88.)

Through his remote access, Christian generated reports for AWX and GBR for the relevant time period. (Tr. at 196.) He was able to review the data provided (including random sampling of names provided for trades) to distinguish between client accounts and MintBroker accounts. He determined that account 32810 was the only "corporate trading account" relevant for purposes of determining short-swing profits. (Tr. 52–53, 208.) Both Gentile and Christian testified that the account 32810 featured both company propriety trades as well as some instances of inventory trades. (Tr. at 53, 208–09.) Gentile explained: "If the firm, for example, had a thousand shares of a particular stock long or short, and a client placed an offsetting trade, the system, meaning the DAS system, would automatically execute against inventory first before routing out to the market." (Tr. at 53.) He also explained that because trades reflected in the account 32810 could have been client orders filled from MintBroker's inventory, determination of beneficial ownership requires filtration of the data to determine who initiated the transaction, MintBroker or a client. (Tr. at 128–129.) This is precisely what the forensic accountant, Christian, did by locating exact replicate offsetting trades in client accounts. (Tr. 208–09, 221.)

Using these methodologies, Christian concluded that MintBroker did not cross the 10% beneficial ownership with respect to New Concept (GBR) and that MintBroker's short-swing profits with respect to Avalon (AWX) were approximately $1.2 million. (Tr. at 231; DX-1 (Independent Accountant's Report of R. Christian).) An additional forensic accountant, Brendan Beresford ("Beresford") relied on representations regarding the distinctions between client account

12253004-15

names, the MintBroker proprietary account, and client offset inventory trades and reached the same conclusion. (DX-19 (Forensic Accountant's Report of B. Beresford).)

Mr. Gentile also sought additional customer records directly from MintBroker through letters rogatory. (*AV Action*, Dkt. Nos. 167, 176-77; *NC Action*, Dkt. Nos. 153, 165-66.) Magistrate Judge Lehrburger granted Mr. Gentile's motion on October 18, 2022. However, as of the date of the inquest, the MintBroker liquidators had not yet produced responsive documents. (R&R at 25-26.)

Plaintiffs presented no expert testimony or evidence rebutting Defendants' experts' calculations, but sought a total award of over $12 million, plus pre-judgment interest, based on MintBroker's Interactive Brokers data and Schedule 13D filings. (*See generally* R&R; *AV Action*, Dkt. Nos. 225, 233; *NC Action*, Dkt. Nos. 208, 216.)

The Court held a two-day inquest on damages, at which only Mr. Gentile presented witnesses, on February 1-2, 2023. On October 6, 2023, Magistrate Judge Lehrburger entered the R&R. In the R&R, Judge Lehrburger held, *inter alia*, that:

1. The MintBroker Records reflecting customer trades are fundamentally incompatible with the Court's summary judgment finding that MintBroker and Mr. Gentile were beneficial owners subject to Section 16(b) liability, and thus the law-of-the-case doctrine barred consideration of the MintBroker Records;

2. Alternatively, the MintBroker Records should not be excluded as a discovery sanction, but an award of reasonable attorneys' fees would be warranted, if those records were allowed into evidence;

3. Testimony by Mr. Gentile's expert witnesses depended on the MintBroker Records, and thus should be disregarded as incompatible with the law of the case or, alternatively, based on Federal Rule of Evidence 702; and

4. Mr. Gentile is required to disgorge $6,235,908 with respect to Avalon and $6,102,002 with respect to New Concept, plus pre-judgment interest.

<u>Legal Standard</u>

This Court is empowered to "accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Upon a timely objection, "[a] district court 'must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." *Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2017 WL 3206336, at *1 (S.D.N.Y. July 26, 2017) (Román, J.). This *de novo* review requires the court to "consider the '[r]eport, the record, applicable legal authorities, along with … objections and replies." *Bernardez v. Graham*, No. 11-CIV-6463-NSR-JCM, 2016 WL 8715936, at *2 (S.D.N.Y. Apr. 15, 2016) (Román, J.) (alteration in original).

On an inquest for damages, the burden of proof falls on the plaintiff who must introduce sufficient evidence to establish the amount of damages. *RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l.*, 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013), *report and recommendation adopted*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013). "Where, on a damages inquest, a plaintiff fails to demonstrate its damages to a reasonable certainty, the court should decline to award damages, even though liability has been established . . . ." *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012); *see also Griffiths v. Francillon*, 2012 WL 1341077, at *1 (E.D.N.Y. Jan. 30, 2012), *report and recommendation adopted*, 2012 WL 1354481, at *1 (E.D.N.Y. Apr. 13, 2012).

12253004-15

<u>Objections</u>

This Court should reject the findings set forth in the R&R for the following reasons: (1) the R&R failed to consider Mr. Gentile's pecuniary interest in the shares at issue, instead relying on the definition of "beneficial ownership" applicable to reporting liability, not disgorgement; (2) the R&R failed to properly weigh the MintBroker Records and expert testimony; (3) the R&R failed to properly compute short-swing profits where Plaintiffs failed to prove short-swing profits and Mr. Gentile submitted reliable evidence contradicting the computations proposed by Plaintiffs; and (4) the R&R improperly awarded pre-judgment interest. Thus, the Court should reject Plaintiffs' claimed damages in their entirety or, alternatively, order that Mr. Gentile disgorge a total of $1,212,974 with respect to Avalon and zero with respect to New Concept, without prejudgment interest or fees.

I

<u>THE R&R FAILED TO CONSIDER MR. GENTILE'S PECUNIARY INTEREST</u>

This Court should reject the R&R in its entirety, because the R&R failed to consider the fundamental distinction between the definition of beneficial ownership under Section 13(d) (which focuses on control and voting power), and the pecuniary interest test required to compute the amount of disgorgement under Section 16(b).

In granting partial summary judgment, this Court recognized that in an action for disgorgement of short-swing profits under Section 16(b), there are two different relevant definitions of "beneficial owners." The first applies to determine whether a person is a more-than 10% beneficial owner. Under that test, "a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the

11

disposition of, such security." *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 654 (S.D.N.Y. 2022) (quoting 17 C.F.R. § 240.13d-3(a)).

While this Court, on summary judgment, found that Mr. Gentile was liable under that definition of "beneficial owner" applied for purposes of *liability*, the Court acknowledged that a different definition of "beneficial owner" applies for purposes of *disgorgement – i.e.*, one that considers "pecuniary interest" in addition to voting and investment power.  As this Court held, "[o]nce a person meets th[e liability] criterion and becomes liable under § 16(b), the extent of their liability, i.e., how much short-swing profits they have to disgorge, is governed by another definition of 'beneficial owner' as provided under Rule 16a-1(a)(2):

> Other than for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities . . . the term beneficial owner shall mean any person who, directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the equity securities . . . The term pecuniary interest . . . shall mean the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities."

*Id*. at 655 (quoting 17 C.F.R. 240.16a-1(a)(2) and citing *Huppe v. Special Situations Fund III QP, L.P.*, 565 F. Supp. 2d 495, 499 (S.D.N.Y. 2008)); *see also Feder v. Frost*, 220 F.3d 29, 33 (2d Cir. 2000); *Editek, Inc. v. Morgan Capital, L.L.C.*, 150 F.3d 830, 834 (8th Cir. 1998) ("It may seem odd that [defendant] both was and was not a beneficial owner . . . , but the SEC has long recognized the two definitions of *beneficial owner* can result in different determinations of beneficial ownership.").

The R&R failed to properly consider Mr. Gentile's pecuniary interest in the shares at issue. Instead, it erroneously found that any holding that Mr. Gentile was not the "beneficial owner" of all shares of Avalon and New Concept traded by MintBroker was "fundamentally incompatible" with this Court's summary judgment decision. (R&R at 35-43.) On summary judgment, this Court considered in detail whether Mr. Gentile and MintBroker met the definition of "beneficial owner"

for purposes of liability, but did not consider the *extent* to which either Defendant met the second definition of beneficial ownership for purposes of disgorgement. While this Court did note that "Defendants had pecuniary interests in these shares because they had the opportunity to and did profit from them," this Court did not consider or determine the extent of those profits that could be attributed to either Defendant. *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d at 655–56.

The Court's error colored its analysis of the evidence, as it viewed Mr. Gentile and his experts in a negative light for seeking to contradict the partial summary judgment ruling.

The evidence presented to Magistrate Judge Lehrburger clearly shows that Mr. Gentile did not have a pecuniary interest in many of the trades at issue. *See infra*. Instead, MintBroker facilitated "riskless principal trading" for its customer trades, whereby MintBroker did not have any risk or interest in the outcome of the transaction passing through its inventory account and did not profit from those transactions. (Tr. at 93, 182.) MintBroker's customer trades thus should not have been included in the R&R's computation of short-swing profits.

Moreover, even if a holding that Mr. Gentile did not have a pecuniary interest in some of the trades at issue was incompatible with the Court's summary judgment decision – which it is not – the R&R incorrectly held that reconsideration of that decision would be inappropriate. Reconsideration is appropriate based on "the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." R&R at 37-38 (citing *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, No. 88 CIV. 9127 (DNE), 1992 WL 296314, at *3 (S.D.N.Y. Oct. 6, 1992)). Here, the MintBroker Records, and testimony of the witnesses, shows that Mr. Gentile was not a "beneficial owner" of many of the shares at issue for purposes of computation of short-swing

profits to be disgorged because MintBroker clients had a pecuniary interest in those shares, and not Mr. Gentile (or MintBroker). *See* Points II, III, IV *infra*.[3]

Moreover, the MintBroker Records from the iBoss system were unavailable to Mr. Gentile at the time of this Court's summary judgment decision, and could not have been discovered by Mr. Gentile with the exercise of reasonable diligence.  *See* pp. 4-6, 9 *supra*; Point II.A, *infra*. Nor were those records necessary to determine the issue addressed by the Court – status as a 10% beneficial owner under Section 16.  As soon as Mr. Gentile became aware that those records had become available, Mr. Gentile produced the records to Plaintiffs. And it would be manifestly unjust to compel Mr. Gentile to disgorge funds that he never received and had no pecuniary interest in the first place. Any such ruling is contrary to Rule 16a-1(a)(2). 17 C.F.R. § 16a-1(a)(2).

II

THE R&R FAILED TO PROPERLY WEIGH THE MINTBROKER RECORDS<br>AND EXPERT TESTIMONY RELATING TO THOSE RECORDS

The R&R also failed to properly weigh the MintBroker Records and expert testimony, holding that consideration of the MintBroker Records and testimony based on those records were barred by the law-of-the-case doctrine and, alternatively, that the expert testimony presented by Mr. Gentile's two expert witnesses should be excluded under Federal Rule of Evidence 702.

---

[3] The evidence at trial also shows that Mr. Gentile had no voting or investment power over the MintBroker customer trades.  For example, Mr. Gentile testified:

> Q. [M. Ford]: . . . Who would have the right to vote a share that was
> purchased by a client?
> A. [G. Gentile]: The client.
> Q. Would MintBroker have the capability to dispose of a share that
> a client purchased through MintBroker?
> A. Not without the permission of the client . . .

(Tr. at 81–82).

14

12253004-15

A.    <u>The R&R Erred By Refusing to Consider the MintBroker Records and Related Testimony</u>

The R&R failed to consider both the MintBroker Records, and expert reports and testimony based on those records, on the grounds that doing so would be at odds with the Court's determination on liability and the law-of-the-case. However, as set forth in detail above, there is no incompatibility with considering the MintBroker Records for determining the extent of Mr. Gentile's *pecuniary* interest in (rather than voting power or control over) the trades at issue, where the Court's summary judgment decision did not deal with that issue. Since Mr. Gentile's pecuniary interest is key to a determination of the amount of short-swing profits to be disgorged, the R&R improperly refused to consider that information, which was reflected in the MintBroker Records. *See* Point I., *supra*.

For the avoidance of doubt, the R&R's related contention that Mr. Gentile "was not sufficiently diligent in producing the records" has no merit.[4] At the time that Plaintiffs served discovery requests in these actions, only MintBroker and its Bahamas counsel, and not Mr. Gentile, had access to the iBoss data underlying the MintBroker Records. (Tr. at 79, 111–13; DX-32 at 165–168.) At that time, MintBroker was in the process of shutting down and firing all staff for reasons unrelated to the instant litigation. (Tr. at 111–13; DX-32 at 159.) As Mr. Gentile testified at his 2020 deposition, MintBroker's records, including those relating to customer accounts, were retained by MintBroker's attorneys in The Bahamas and he did not have access to those documents due to his departure from MintBroker and Bahamas law which precluded disclosure of the

---

[4] Even if those records were not timely produced, the R&R properly refused to exclude the MintBroker Records on that basis under Rule 37. (R&R at 43-48.) The R&R noted, however, that if it did not recommend exclusion of the MintBroker Records based on the law of the case doctrine, then the circumstances "would fully justify" awarding Plaintiffs attorneys' fees incurred as a result of Mr. Gentile's "belated disclosure." (R&R at 48.) Since there was no "belated disclosure," any such award should be rejected.

12253004-15

documents. (DX-32 at 160, 165–168.) Mr. Gentile informed Plaintiffs in 2020 that the records were delivered to MintBroker's Bahamian attorneys by MintBroker's IT or compliance department on a thumb drive, and that Mr. Gentile did not have access to or a copy of the contents of that drive. (DX-32 at 160–63.)

There is no dispute that Mr. Gentile produced the records that he had access to. However, he simply could not produce records that were not in his possession, custody or control. (DX-33 at 78–81.) Mr. Gentile requested records from MintBroker's attorneys, but they informed him that they would not provide those documents or instruct anyone else on MintBroker's staff to do so. (Tr. at 114–15; DX-33 at 38–43.)

In 2022, following developments in this litigation and The Bahamas liquidation proceedings, Mr. Gentile again reached out to Bahamian counsel to request information in the possession of MintBroker. They again refused. Thereafter, Mr. Gentile learned for the first time that a former employee, Mr. Darville, had a copy of a drive containing MintBroker records, including data from the iBoss system. Mr. Darville then rebuilt MintBroker's iBoss system, and provided the iBoss records to forensic accountants retained by Mr. Gentile. (Tr. at 73–74; DX-28.) Those records were promptly produced to the Plaintiffs in May 2022. (*AV Action*, Dkt. No. 103 at 1; *NC Action*, Dkt. No. 92 at 1.) Any claim that Mr. Gentile did not act diligently or appropriately is belied by the record.

Magistrate Judge Lehrburger's suggestion that Mr. Gentile made prior statements that were inconsistent with the MintBroker Records is also incorrect. For example, the Report points to an interrogatory response stating that there were no "Managed Accounts" that traded or voted in Avalon and New Concept securities. (R&R at 15, 20.) "Managed Accounts" was defined as "any investment or trading account managed by You or MintBroker, whether directly or indirectly, for

their own benefit, or for the benefit or on behalf of one or more clients or costumers . . . , and in which you or MintBroker directed, executed, placed, received, cleared, handled, or in any way reviewed or processed orders." (R&R at 20.) But as Mr. Gentile testified, MintBroker did not manage any customer accounts. (Tr. at 38, 81–82; DX-32 at 30, 50.) Holding securities for a customer and managing a customer account are two separate matters. Nor did Mr. Gentile's counsel represent that MintBroker's lawyers in The Bahamas or any third parties possessed no additional documents – instead, his representation that all documents were produced referred solely to Mr. Gentile. (*See* R&R at 16 (quoting 1/22/2020 Conference Transcript in which defense counsel responded that "***He*** does not" have any other information and "***he*** has done a diligent search") (emphasis added).)

    B.    <u>The R&R Improperly Excluded Mr. Gentile's Expert Witnesses.</u>

The R&R recommended exclusion of the testimony and reports of Mr. Gentile's expert witnesses, Christian and Beresford, as contrary to the law of the case and also on the grounds that their opinions "are not based on 'sufficient facts or data' and are not 'the product of reliable principles and methods.'" (R&R at 50-56.)

Magistrate Judge Lehrburger took issue with Christian's methodology, complaining that his procedure to identify customer accounts was not sufficiently clear. But Christian testified at length about his procedure. For example, Christian testified that he reviewed account names, names of entities, names of the persons, addresses, phone numbers, and the like, for trades. That information would reveal whether or not an account belonged to a client or was a proprietary MintBroker account. Christian reviewed this information for a random sampling of accounts – including the highest value accounts as well as typically 20% of other accounts, to assure that the relevant account identifiers belonged to customers and/or MintBroker. (Tr. at 203–05, 234.)

17

Magistrate Judge Lehrburger also took issue with the fact that "[n]either expert did anything to confirm whether client-related transactions . . . were 'actually effected for the clients.'" (R&R at 52.) According to Judge Lehrburger, there was not enough evidence to show that customer accounts actually belonged to customers. But that is precisely what Christian found in his expert review of the MintBroker Records, and what Mr. Gentile testified to repeatedly. (Tr. at 81-82, 93, 182, 256–257; DX-1 (Independent Accountant's Report of R. Christian).) The Magistrate Judge's suggestion that MintBroker's thousands of customers were fictitious has no factual basis. Why would MintBroker have complex liquidation proceedings if it had no customers?[5]

Moreover, Mr. Gentile sought additional information regarding customer accounts from MintBrokers through its letters rogatory. If Mr. Gentile and Christian's testimony and the MintBroker Records was not sufficient to segregate client trades – and it was – then Judge Lehrburger should have allowed time for that evidence to be obtained from The Bahamas. Mr. Gentile expects that any records received in response to his letters rogatory will show evidence of trades in which only MintBroker's customers held a pecuniary interest.

None of the other purported defects identified by Magistrate Judge Lehrburger merit exclusion or any discounting of the experts' opinions. For example, the R&R claims that the analysis of "wash" trades was unreliable as a result of the issues with customer trades. (R&R at 53-54.) But that proposition should be rejected as the experts' analysis of customer trades is reliable. *See supra*. And Magistrate Judge Lehrburger takes issue with the inclusion of "negative"

---

[5] In response to this surprising contention, Gentile obtained a declaration from one customer that he made trades in both Avalon and New Concept shares through MintBroker for his own customer account during the relevant time period. *See* Declaration of Nicholas Abadiotakis dated November 2, 2023.

beneficial ownership to MintBroker. But that "negative" ownership occurred only when MintBroker had a short position. (R&R at 54-55; Tr. at 210.) And Magistrate Judge Lehrburger did not consider the alternative possibility of valuation with removal of negative positions, and instead improperly threw out the experts' entire reports, increasing purported disgorgement by over ten times. The R&R also takes issue with the fact that the expert witnesses did not consider the Interactive Broker records or MintBroker's Schedule 13Ds. (R&R at 55.) But as Mr. Gentile testified, the Interactive Broker records (and thus any Schedule 13D based on those records) did not contain any information that would enable a viewer to distinguish between customer trades and proprietary trades.

If anything, the Magistrate Judge's reliance on Schedule 13D's filed by MintBroker was error. Courts have recognized that, in light of the disclaimers associated with reporting under Section 13(d), disclosure of a position on such a filing carries no weight. *See Levner v. Saud*, 903 F. Supp. 452, 461 (S.D.N.Y. 1994), *aff'd* 61 F.3d 8 (2d Cir. 1995) ("I find it irrelevant that . . . the filed Schedule 13D . . . represented Alwaleed to be a beneficial owner. . . . Regardless of Alwaleed's representative's interpretation of the law, liability will not be imposed unless he meets the statutory definition of an insider.") The court in *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 129 (2d Cir. 2001), for example, rejected the argument that defendants' Schedule 13D "constitute[d] [an] admission[] of membership in a § 13(d) group," because "it [was] undisputed that the [the defendant had] explicitly disclaimed beneficial ownership in the text of the Schedule 13D he filed with the SEC. . ." The court also found that even when such disclaimers of beneficial ownership were absent, SEC filings still were not "persuasive." *Id.* Thus, it is black-letter law that a filing under Section 13 cannot establish beneficial ownership, nor can any filing on Form 3 or 4 under Section 16(a). *See Chem. Fund, Inc. v. Xerox Corp.*, 377 F.2d 107, 112 (2d Cir. 1967) ("there

was no dispute [that defendant] was [not] the beneficial owner of the securities in question [and f]ailure to [include a Rule 13d-4] disclaimer [in defendant's Forms 3 and 4] cannot fairly be read to dispose of the question of statutory interpretation presented in this case."); *Levy v. Seaton*, 358 F. Supp. 1, 4 (S.D.N.Y. 1973) (finding it irrelevant that the defendant filed a form 4).

Thus, the expert reports were reliable and should have been afforded significant weight by Magistrate Judge Lehrburger.

III

THE R&R INCORRECTLY DETERMINED SHORT-SWING PROFITS

Upon consideration of the MintBroker Records and expert testimony, short-swing profits subject to disgorgement, if any, are at most approximately $1.2 million.

*First*, the customer accounts identified by Mr. Christian in the MintBroker Records may not be counted for purposes of short-swing profits since Mr. Gentile lacks any pecuniary interest in those trades. *See supra*. A pecuniary interest is an "opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R § 240.13d-3(a)(2)(i). As Mr. Gentile described at the hearing, MintBroker facilitated "riskless principal trading" whereby MintBroker and Mr. Gentile had no risk or interest in the outcome of the trades and did not profit from those transactions. (Tr. at 93, 182.) Thus, MintBroker did not profit from short-swing profits realized in its customers' accounts, including those trades that passed through its inventory account.

*Second*, the recordkeeping account identified by Christian in the MintBroker Records did not reflect any actual trading activity, and thus could not be considered for purposes of computing short-swing profits. (Tr. at 48, 51, 204–205.)

*Third*, what remains, with respect to MintBroker's short-swing profits analysis, is the activity reflected in MintBroker's propriety trading account, account 32810. (Tr. at 53.) Because

20

that account included both company propriety trades as well as some instances of client trades facilitated through MintBroker's inventory, it is not possible to determine on the face of the entries in that account alone who the beneficial owner of the shares was. (Tr. at 53, 57–58.) Instead, the data for that account had to be filtered to determine who initiated the transaction, MintBroker or a client. (Tr. at 58, 128–129.) This is precisely what the forensic accountant, Christian, did by locating exact replicate offsetting trades in client accounts. (Tr. 208–209, 221.) Specifically, Christian testified that he was able to "isolate . . . the true corporate trades" of MintBroker from those client trades executed through inventory by locating "offsetting" account 32810 trades "at the exact same time as a client trade." (Tr. 209, 221.) MintBroker's initial acquisition of those shares into inventory, purchased through its proprietary account, were counted as part of the experts' calculations of MintBroker's short-swing profits. (Tr. at 58–59.)

Upon proper exclusion of the account 32812 journal entries and trades of shares beneficially owned by clients, both experts concluded that MintBroker never crossed the 10% threshold with respect to trading in New Concept (GBR) and that its short-swing profits of shares of Avalon (AWX) beneficially owned by MintBroker totaled approximately $1.2 million.  (DX-1; DX-19; Tr. at 214.)

Plaintiffs have presented no evidence to refute or rebut the accuracy of the experts' reports or calculations. Instead, the evidence presented by Plaintiffs – the Interactive Broker records and Schedule 13D – carry no weight in determining short-swing profits. *See Levner v. Saud*, 903 F. Supp. at 461 *Chem. Fund, Inc. v. Xerox Corp.*, 377 F.2d at 112 ("there was no dispute [that defendant] was [not] the beneficial owner of the securities in question [and f]ailure to [include a Rule 13d-4] disclaimer [in defendant's Forms 3 and 4] cannot fairly be read to dispose of the question of statutory interpretation presented in this case."); *Levy v. Seaton*, 358 F. Supp. 1, 4

(S.D.N.Y. 1973). Moreover, evidence establishes that it is impossible to differentiate customer trades and proprietary trades in MintBroker's omnibus account at InteractiveBrokers. That account functioned both as a method to hold MintBroker's own positions and to execute client transactions. (Tr. at 82.) InteractiveBrokers was not provided with the names of MintBroker clients who were trading through the omnibus account and had no way of identifying whether a trade in the omnibus account was placed on behalf of MintBroker or a client. (Tr. at 83; PX-2 (Dep. of Brad Klauseger) at 7–8.) Any data obtained from InteractiveBrokers thus does not show whether or not Mr. Gentile (or MintBroker) held a proprietary interest in the trades at issue.

IV

THE R&R ERRONEOUSLY AWARDED PRE-JUDGMENT INTEREST

This Court should also reject the portion of the R&R that recommended an award of prejudgment interest. "The decision of whether interest should be awarded in a particular Section 16(b) action is within the discretion of the Court . . . Because 'Section 16(b) says nothing about interest one way or the other,' the Supreme Court has held that interest should be 'given in response to considerations of fairness'" and "denied when its exaction would be inequitable.'" *Donoghue v. Casual Male Retail Grp., Inc.*, 375 F. Supp. 2d 226, 238 (S.D.N.Y. 2005). Here, it would be unfair and inequitable to award prejudgment interest against Mr. Gentile for at least three reasons.

*First*, there is zero evidence that Mr. Gentile himself had any pecuniary interest in many of the trades at issue. In fact, the evidence shows that only customers – and not Mr. Gentile or MintBroker – held a pecuniary interest in those trades. *See* Points II and III, *supra*. And while Mr. Gentile's expert Christian calculated short-swing profits at $1.2 million based on the lowest-in, highest-out method, he also determined that *actual* profits were only $177,491 (DX-1.) It would be inequitable to force Mr. Gentile to disgorge interest in addition to profits that he never received.

12253004-15

*Second*, the R&R incorrectly found that Mr. Gentile did not act innocently based on a Schedule 13D. But Mr. Gentile had no role in reviewing or preparing that document. (*See* Tr. at 154–55; DX-32 at 46–48.)

*Third*, Mr. Gentile did not attempt to "derail" the proceedings just because motions that he made to stay or dismiss for lack of standing were unsuccessful. *See Donoghue v. Casual Male Retail Grp., Inc.*, 375 F. Supp. 2d 226, 238 (S.D.N.Y. 2005) (denying request for prejudgment interest despite argument that "Defendants have prolonged proceedings by denying liability" because there defendants did not act in bad faith). Nor is there any "indicia of bad faith" (R&R at 59) and the R&R's assertion that Mr. Gentile failed to preserve documents that were not in his possession, custody or control for litigation has no merit. *See* Point II.A, *supra*. The R&R also blamed Mr. Gentile for delaying the proceeding but ignored several other factors that contributed to progress of the proceedings, including the COVID-19 pandemic that began in early 2020, and the fact that summary judgment was initially briefed in October 2020 but not decided until April 2022. (AV Action, Dkt. Nos. 238; NC Action, Dkt. Nos. 91, 97.)

V

<u>PLAINTIFFS LACK STANDING</u>

Defendant Gentile acknowledges that the Court has previously ruled that *Donoghue v. Bulldog Investors General Partnership*, 696 F.2d 170 (2d Cir. 2012), remains controlling precedent in this Circuit. (*AV Action*, Dkt. No. 238; *NC Action*, Dkt. No. 221.) To preserve his appeal rights on standing, Mr. Gentile objects to confirmation on the ground that neither Plaintiff established concrete injury in the hearing before the Magistrate Judge—or at any other time in this proceeding.

Neither Plaintiff offered any evidence at the hearing that Mr. Gentile had access to, much less utilized, confidential corporate information in connection with the trading at issue. Nor did

23

either Plaintiff offer any evidence of any fiduciary or quasi-fiduciary relationship involving plaintiff. This Court may take judicial notice of each Plaintiff's filings with the Securities and Exchange Commission which refute any contention that Mr. Gentile was, or could be deemed, a corporate fiduciary by virtue any beneficial ownership in excess of 10% of the shares at issue.

Under no conceivable scenario could Mr. Gentile acquire control over the affairs of Avalon. MintBroker purchased Class A common stock, a junior voting class. On all corporate matters other than the election of directors, the Class B shareholders controlled 66% of the vote. For the election of directors, the Class A shareholders could elect only 25% of the Board. Avalon's Form 10-K for the year ended December 31, 2018 discloses at page 6:

> Avalon has two classes of common stock, Class A and Class B. Each share of Class A Common Stock is entitled to one vote and each share of Class B Common Stock is entitled to ten votes on all matters submitted to a vote of the shareholders. Except for the election of Avalon's Board of Directors, the Class A Common Stock and the Class B Common Stock vote together as a single class on all matters presented for a vote to the shareholders. The holders of the Avalon Class B Common Stock, which consists principally of the management of Avalon, have approximately 66 percent of the aggregate voting power of the outstanding Avalon Common Stock. Currently, the holders of the Avalon Class A Common Stock will not, either alone or acting collectively, be able to elect a majority of the members of Avalon's Board of Directors (the "Avalon Board") or control many corporate actions. However, the holders of the Avalon Class A Common Stock, voting as a separate class, have the right to elect the number of directors equal to at least 25 percent of the total Board of Directors of Avalon until the outstanding Avalon Class B Common Stock constitutes less than 50 percent of the total voting power of the outstanding Avalon Common Stock....[6]

The New Concept Energy Form 10-K for the year ended December 31, 2018 discloses that one shareholder beneficially owned 59.63% of the outstanding shares. (*See* Fleming Decl., Ex. 2 (Form 10-K) at p. 17.) That shareholder, Realty Advisors Inc., filed a Schedule 13D on June 27,

---

[6] *See* Declaration of Thomas J. Fleming dated November 3, 2023 ("Fleming Decl."), Ex. 1 (Form 10-K) at p. 6.

12253004-15

2018 disclosing its share ownership. (*See* Fleming Decl., Ex. 3.) The share purchases by MintBroker therefore could not possibly have exerted control over New Concept Energy.

<u>Conclusion</u>

For all of the foregoing reasons, Defendant Guy Gentile respectfully requests that the Court reject the Report and Recommendations of Magistrate Judge Robert W. Lehrburger, dated October 6, 2023, and award $0, alternatively $1,212,974 in disgorgement, without prejudgment interest or fees. Alternatively, if the Court believes that more evidence is required to verify customer trades, Mr. Gentile requests that this Court schedule a new trial after Mr. Gentile has been afforded a reasonable opportunity to obtain documents from MintBroker regarding customer ownership.

Dated: New York, New York
   November 3, 2023

          OLSHAN FROME WOLOSKY LLP


      By: /s/ Thomas J. Fleming
        Thomas J. Fleming
        Kerrin T. Klein
        1325 Avenue of the Americas
        New York, New York 10019
        (212) 451-2300

        *Counsel for Defendant Guy Gentile*

12253004-15