**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| AVALON HOLDINGS CORP., | |
| Plaintiff, | No. 18-CV-7291 |
| v. | |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | |
| Defendants. | |

Related to:

|  |  |
|---|---|
| NEW CONCEPT ENERGY, INC. | |
| Plaintiff, | No. 18-CV-8896 |
| v. | |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | |
| Defendants. | |

**PLAINTIFFS' RESPONSE TO GENTILE'S R&R OBJECTIONS**

David Lopez (DL-6779)
LAW OFFICES OF DAVID LOPEZ
171 Edge of Woods Road | P.O. Box 323
Southampton NY 11969-0323
(631) 287-5520 | DavidLopezEsq@aol.com

Miriam Tauber (MT-1979)
MIRIAM TAUBER LAW PLLC
885 Park Ave. # 2A
New York NY 10075
(323) 790-4881| MiriamTauberLaw@gmail.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

| | | |
|---|---|---|
| **OVERVIEW** | | **1** |
| **BURDEN OF PROOF** | | **5** |
| **GENTILE'S OBJECTIONS** | | **6** |
| **I.** *DE FACTO* **OBJECTIONS** | | **6** |
| 1.The R&R supposedly fails to differentiate Gentile's pecuniary interest from pecuniary interests of Mintbroker's customers. (Objections pp.1-2). | | 7 |
| 2. Mintbroker records supposedly could not be produced during discovery. (Objections p.2) | | 12 |
| 3. Mintbroker's customers were purportedly not required to file §16(a) reports because "None of the customers remotely approached 10% beneficial ownership." (Objections p.2) | | 13 |
| 4.Gentile's accusation that Judge Lehrburger did not permit sufficient time to obtain documents through letters rogatory addressed to Mintbroker (via its appointed joint official liquidators in the Bahamas) (Objections p.2) | | 15 |
| 5."Mintbroker's omnibus account at Interactive Brokers functioned both as a method to hold its own positions and to execute client transactions." (Objections p.4) | | 15 |
| 6."In September 2019, Gentile left the Bahamas. Immediately upon leaving, Gentile was 'out of the firm' and no longer had any access to, or authority to obtain, Mintbroker's records." (Objections p.4) | | 16 |
| 7. Gentile Claims That He "was not the sole director of Mintbroker and did not have sole control over any … decision." (Objections p.5) | | 18 |
| 8.Gentile claims he "did not have access to or a copy of the thumbdrive" containing Mintbroker's books and records. (E.g., Objections p.16) | | 18 |
| 9."Gentile produced the records he had access to from the United States, such as records from Interactive Brokers, but could not produce records that were not in his possession, custody or control (including all documents held by Mintbroker's Bahamian counsel, and for which Bahamas law restricted disclosure." (Objections p.7) | | 19 |
| **II.** **FORMAL OBJECTIONS** | | **21** |
| 1.The R&R "failed to consider gentile's pecuniary interest in the shares at issue, instead relying on the definition of beneficial ownership applicable to reporting liability, not disgorgement." (Objections pp. 11-14) | | 21 |
| 2."The R&R failed to properly weigh the Mintbroker records and expert testimony relating to those records." | | 24 |
| 3.The R&R incorrectly determined short-swing profits. | | 24 |
| 4.Pre-judgment interest. | | 26 |
| 5.Plaintiffs' standing | | 28 |
| **CONCLUSION** | | **28** |

<u>**OVERVIEW**</u>

These five-year old cases resulted in findings of liability by Judge Broderick on October 4, 2022, and referrals to Magistrate Judge Lehrburger made at that time of entry to hear and report his recommendations concerning the quantum of damages to be assessed in favor of each Plaintiff. This Magistrate Lehrburger has done by holding a two-day inquest hearing, reviewing exhibits and briefing submitted by the parties prior to, during, and at the conclusion of the inquest hearing, and submitting a 60-page decision dated October 6, 2023, explaining the basis for recommending entry of Judgment in the amounts calculated by the Plaintiffs. (Av. Dkt. 240). Gentile, the only Defendant against whom proceedings have not been stayed by reason of a suggestion of bankruptcy (more specifically, Bahamian liquidation proceedings), has filed Objections. Plaintiffs oppose those Objections and urge that they be overruled.

Gentile's Objections take two forms:

A) At the first 10 pages of the Objections numerous ***de facto* objections** are made couched as misstatements of fact. We respond to them by summary characterization.

B) Beginning at page 11 of the Objections, four **formal objections** are stated and elaborated:

1. The Report & Recommendation ("R&R") failed to consider Gentile's pecuniary interest in the shares at issue, instead relying on the definition of "beneficial ownership" applicable to reporting liability, not disgorgement.

2. The R&R "failed to properly weigh the Minbroker Records and expert testimony."

3. The R&R "failed to properly compute short-swing profits where Plaintiffs failed to prove short-swing profits and Gentile submitted reliable evidence contradicting the computations proposed by Plaintiffs."

4. The R&R "improperly awarded pre-judgment interest."

Throughout case proceedings prior to the motions for summary judgment which resulted in findings of liability, the Plaintiffs sought to discover the books and records of Mintbroker International, Inc. ("Mintbroker"), Gentile's Co-Defendant, of which Gentile was

1

owner of all shares less one, and of which Gentile was one of a total of two directors (the minimum number that Gentile explained he believed Bahamian law required). The one share of Mintbroker stock not owned by Gentile was owned by one of his many lawyers; the role of the other director was filled by a Mintbroker employee appointed by Gentile, and then by the same lawyer. (Gentile Dep. Tr., 2/24/2020, PX-1, also filed at Av. Dkt. 112-1.)

After Judge Broderick denied Gentile's motion to dismiss on September 24, 2019, Plaintiffs' discovery requests were issued to Gentile in October 2019. At that time, Gentile had met with the Securities Commission of the Bahamas ("SCB") to discuss accusations that Mintbroker's business amounted to a Ponzi scheme. Rather than provide the account reconciliation information the Bahamas Securities Commission required to formally dissolve Mintbroker, Gentile voluntarily decided to give "directives to close down Mintbroker." (*See* R&R pp.13-14.)

Alarmed by the news of Mintbroker's abrupt closing, Plaintiffs requested a conference to determine whether records requested were being made "unavailable." Prominent among the records sought by Plaintiffs were account statements and financial records reflecting the execution of the trades reported in Mintbroker's SEC filings and the disbursement of the trading proceeds. Plaintiffs' discovery requests also specifically sought any information about client accounts in which any of the trades were executed. Plaintiffs' counsel observed in open court that to claim the existence of a securities brokerage firm without these types of records defied the laws of the universe.

At that conference, Gentile's counsel represented to Judge Lehrburger, as recalled in the Report, that all records had been diligently searched and produced prior to Gentile's voluntary closure of Mintbroker. Gentile's "complete" production then consisted of a list of trades similar to the list filed on Mintbroker's Schedule 13D. Gentile asserted that any other records

relating to the trading could be obtained from third parties, including Interactive Brokers. (*See* 1/22/2020 Tr., described at R&R pp. 39-40. Mintbroker's omnibus account statements were later produced by Interactive in response to Plaintiffs' third-party subpoena.)

Unconvinced, Plaintiffs' counsel requested an order compelling Gentile to appear for the deposition Plaintiffs had noticed, which Judge Lehrburger granted. At his deposition held in February 2020, in advance of the parties' motions for summary judgment, Gentile testified that copies of the "thumb drive" containing Mintbroker's complete books and records had been delivered by Mintbroker's former IT manager Stephen Darville to *both* Mintbroker's counsel *and to Gentile's personal counsel in the Bahamas*. Stephen Darville confirmed that he delivered copies of the thumbdrive to *both* Mintbroker's lawyers *and* Gentile's lawyers. (*See* R&R p.24.)

A further discovery conference was then held to address Plaintiffs' motion to compel Gentile to produce the thumbdrive that Gentile acknowledged—and has never denied—was and remains in his own Bahamian counsel's possession. At that conference, which Plaintiffs again emphasize was held prior to entry of summary judgment in this case, Gentile's counsel did not advise the Court that the thumbdrive was unavailable or inaccessible or raise any objection that production of the thumbdrive would violate Bahamian "privacy laws," as he subsequently claimed he was then purportedly advised by his Bahamian counsel. As Judge Lerhburger notes, Gentile never offered any support for the contention that any Bahamian law or order would be violated by his production of documents in response to Plaintiffs' discovery requests.

Instead, Gentile's counsel insisted that the information on the thumbdrive was duplicative of information that had been produced or was simply not relevant to any of the trading at issue. As recounted by Judge Lehrburger, Gentile's counsel explained that all trading was executed by Gentile in an Interactive Brokers omnibus account, and that no customer or "managed

account" trading was involved—and offered to enter into a stipulation to that effect in order to avoid producing the thumbdrive records. The result of this episode was the Stipulation for Purposes of Summary Judgment, in which Gentile stated that all of the trading in the Interactive account was "proprietary" trading by Gentile— a term used by the parties specifically "to avoid the need for discussion of client accounts." (R&R p.19.)

In granting summary judgment for the Plaintiffs, Judge Broderick found that the Defendants had "investment power" over the shares "because they had the power to dispose of them, as admitted by Gentile himself … and shown by the fact that they successfully sold these shares on the market. Similarly, Judge Broderick found that Defendants had pecuniary interests in these shares because they had the opportunity to and did profit from them." (R&R pp.21-22.)

Once summary judgment of liability was rendered and the matter referred to Magistrate Lehrburger to conduct an inquest on damages, Gentile reported having discovered that the records sought by Plaintiffs did indeed exist on the very thumb drive he had resisted producing during discovery! And lo and behold, this thumb drive was right where he left it—in possession of Mintbroker's former IT manager Stephen Darville, who had created the thumbdrive copies and delivered them to both Mintbroker's lawyers and Gentile's lawyers in the first place.[1]

This same IT manager was suddenly able to provide full and unrestricted access to customer records, which were never shown to the Plaintiffs or to the Court, to accountants hired by Gentile as "experts" to submit reports challenging Plaintiffs' damages calculations. The fortuitous emergence of records from a thumbdrive that Gentile had previously refused to produce,

---

[1]     There was also a report, which Plaintiffs have not confirmed, that yet another copy of the thumbdrive had been delivered to the Securities Commission of the Bahamas. In the end, the records Gentile's counsel represented as having never existed appeared to litter the landscape of the Bahamas.

of customer trading that Gentile had previously sworn "did not exist," resulted in lengthy continuances to allow Plaintiffs to inspect the new list of transactions identified by Gentile after entry of summary judgment (the "Post Discovery Records"), to depose Gentile's experts and review their reports, and otherwise to prepare for the damages inquest.

Prior the inquest, Plaintiffs filed a motion *in limine* to preclude Gentile from introducing the Post Discovery Records and the expert evidence based on those Records at the inquest. Alternatively, Plaintiffs sought attorney's fees in connection with all discovery conducted in connection with the Post Discovery Records. Judge Lehrburger determined to hear evidence regarding the Post Discovery Records, including expert testimony based on the Post Discovery Request, at the inquest, and deferred consideration of Plaintiffs' alternative request for attorneys' fees and costs incurred in connection with the Post Discovery Records, until after the inquest. The inquest was held on February 1 and 2, 2023, and generated the Report and Recommendation (or "R&R") now before the Court. (R&R p.26.)

## BURDEN OF PROOF

As a threshold matter the burden of proof at the inquest was Gentile's. Many of his objections, without stating it, seek the benefit of the reverse. It is not available.

It has been the rule of the common law since the time of the Chimney Sweeper's Jewel Case, *Armory v. Delamirie,* 93 ER 664 (Vol. 93), that where damages cannot be determined with certainty as a result of the defendant's actions, damages will be found to the worth of the maximum amount demonstrated by the plaintiff; the burden of proof then shifts to the defendant to show a lesser amount to be warranted. This principle has been the governing rule in §16(b) matters from the earliest cases stretching back nearly 90 years. As Judge Lehrburger writes:

> The burden of proof with respect to determining the amount of disgorgement of short-swing profits begins with the plaintiff but shifts to the defendant. Specifically,

5

the 'plaintiff in a §16(b) action bears the burden of making a *prima facie* showing of the maximum profit made by the defendant on the short-swing sale. The burden then shifts to defendant to prove the extent to which the actual profit was less than the maximum.' *Lewis v. Realty Equities Corp. of New York*, 396 F. Supp. 1026, 1032 (S.D.N.Y. 1975); *accord Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299, 302 (2d Cir. 1956); *Schur v. Salzman*, 365 F. Supp. 725, 730 (S.D.N.Y. 1973) ("the burden of proof is upon the defendant, a fiduciary, to establish that his profits are less than those claimed by the plaintiff, particularly where difficulty in ascertaining the precise damages is due to the insider's conduct"). (R&R pp.7-8)

And as Judge Lehrburger found:

"Plaintiffs have proved their *prima facie* case of short-swing profits in the amount of $6,235,908 for Avalon and $6,102,002 for New Concept. Those calculations are based on the Interactive Trading Records and Mintbroker's corresponding Schedule 13-D filings and a detailed analysis of the dates and times when Defendants crossed the 10% beneficial ownership threshold, matching of the relevant trades, and application of the requisite lowest-in-highest-out methodology." (R&R p.56.)

The burden of showing that lesser damages were warranted was then Gentile's to carry; and as Judge Lehrburger found, he did not. (*See* id.) ("Gentile has not carried his burden to show by a preponderance of the evidence that the short-swing profits calculated by Plaintiffs should be reduced to the numbers calculated by Gentile's experts"). Gentile's behavior in failing to make and/or affirmatively obstructing discovery of Mintbroker's customer records is egregious additional conduct in this case.

## GENTILE'S OBJECTIONS

Gentile objects to just about every aspect of the R&R and urges that the whole of it be set aside and the inquest repeated. Plaintiffs oppose do-overs.

## I. *DE FACTO* OBJECTIONS

Plaintiffs respond in opposition to Gentile's preliminary informal *de facto* objections in a manner according, roughly, to the subject of each such objection with page and line references identifying each.

1.  **The R&R supposedly fails to differentiate Gentile's pecuniary interest from pecuniary interests of Mintbroker's customers.** (Objections pp.1-2).

The Interactive records that were the basis for the Judge Broderick's entry of summary judgment and are the basis for Plaintiffs' damages computations in the amount of the Judgment recommended by the R&R, reflect that actual cash profits from trading these stocks were disbursed exclusively to Mintbroker at Gentile's direction. As discussed in Judge Lehrburger's thorough review of the history of this case, in cross-moving for summary judgment, Gentile did not claim that any of the Interactive trading was executed for Mintbroker customers, or that any trading proceeds were distributed to any customers. (*See* R&R pp.14-21.)

In granting summary judgment for Plaintiffs, Judge Broderick found that Plaintiffs demonstrated that Gentile had "beneficial ownership" over the shares as defined under Section 13(d) and for purposes of the Section 16(b) 10% "beneficial ownership" threshold conferring insider status—i.e., investment or dispositive authority—over the shares held in the Interactive account. Additionally, Judge Broderick found that Gentile had a "pecuniary interest" in the shares held in the Interactive account. As Judge Broderick concluded, the evidence presented by the Plaintiffs established that Gentile had an opportunity to profit—and did, in fact, profit—from the trading of these shares executed through the Mintbroker omnibus account at Interactive. (R&R pp.35-36.)

Judge Lehrburger heard two days of inquest testimony from Gentile and his experts, in which Gentile sought to prove that a portion of the trading reflected in the Post Discovery Records introduced over Plaintiffs' objections were ascribed to "customer" accounts. Judge Lehrburger determined that Gentile did not demonstrate that any of the trading executed in the Interactive account—based on which summary judgment was rendered, and on which Plaintiffs' base their computations of damages in the Recommended Judgment amounts—were excluded

from Gentile's beneficial ownership, whether defined by "investment/dispositive control" for purposes of determining his Section 16 insider status; or by "pecuniary interest" for purposes of determining his individual liability for trading in violation of the statute.

As Judge Lehburger observed, Gentile did not introduce any evidence establishing that the client trades that his experts testified were supposedly reflected in the Post Discovery Records were in fact executed for clients in the Interactive account, or at all. As stated in the R&R, "As Plaintiffs aptly note, however, not a single example of an account statement, trade order, or execution confirmation, and not a single receipt evidencing the withdrawal of cash or stock by any Mintbroker clients have been produced that can be confirmed or reconciled against the Post Discovery Records." (R&R p.32.) Accordingly, Judge Lehrburger concluded:

> "The fact remains that the Post-Discovery Trading Records are no more than Mintbroker's internal log of how it purportedly fulfilled orders. Neither expert did anything to confirm whether client-related transactions in the Post-Discovery Trading Records were 'actually effected for the clients.' (Hrg. 270, 296.) Nor did they attempt to verify whether any stock designated as bought or sold for a client was in fact actually credited to any client accounts, or in fact whether any segregated client accounts existed at all. (Hrg. 250-51, 296-97.) The only accounts that have been established with sufficient basis in fact are those evidenced in the Interactive Trading Records and that served as the basis for summary judgment: Mintbroker's proprietary account for which Mintbroker and Gentile conducted all trades." (R&R p.52.)

The Interactive records demonstrate that Gentile, as the sole owner of Mintbroker, profited from these trades, and withdrew the cash trading proceeds from the Interactive account. There is no evidence that any client received even one dollar of any of the trading proceeds reflected in the Interactive statements and withdrawn by Mintbroker in cash from the Interactive account. No book entries in Mintbroker's records; no payables journal; no ledger entry; no cancelled checks; no wire transfers; nothing. To this day, no purported account owner has been

identified by name, address, telephone number or any other means of contact—with the one untimely exception included in his Objections.

True to form, Gentile now attempts to introduce even more evidence at this stage of the case, which has never been seen throughout the more than 5 years in which this case has been pending—a time that has been protracted by Gentile's dilatory and sanctionable conduct, including his tactic of claiming to have suddenly obtained access to new documents when faced with an unfavorable Court ruling: An affidavit from an additional witness who identifies himself as a client of Mintbroker's and comes forward with a purported account statement, which Gentile previously testified Mintbroker did not generate for customers.

Gentile does not even attempt to explain why this client and his statement (and any others like them) were not previously identified and produced during discovery in this case; *or* during the period of post-summary judgment discovery that Judge Lehrubrger allowed in advance of the inquest; *or* even at the inquest itself; *or* even following the inquest, in connection with the parties' Post-Hearing briefing; *or* as a supplemental submission, at any time until Judge Lehrburger issued the Report & Recommendation.

As Judge Lehrburger writes, "The Court will not set aside a judgment because a frustrated litigant failed to present on a motion for summary judgment all facts known by or reasonably available to him." (R&R pp.37, 41 & n.28) (quoting *Tri-Star Pictures, Inc. v. Leisure Time Productions, B.V.,* No. 88-CV-9127, 1992 WL 296314, at *2 (S.D.N.Y. Oct. 6, 1992); and *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir.), *cert. denied*, 377 U.S. 934 (1964)). It goes without saying that Gentile's submission of a new witness affidavit introducing a purported customer account statement should not be considered, when Gentile failed to produce (and denied the existence of) customer account statements throughout discovery and on summary judgment,

and even throughout the post-summary judgment inquest proceedings held specifically to determine the extent to which any of the trading included in Plaintiffs' calculations were trades executed for clients. (*See, e.g.,* R&R p.16; *see also* Inquest Hearing Tr. p.116.)

But even if the Court were to address this supposed client affidavit, Plaintiffs note that this particular "client," Nicholas Abadiotakis, is not merely a customer of Mintbroker's. As Gentile testified at his deposition on February 24, 2020, during the discovery period in this case:

> **Q.** Okay. Just go past that. And then ***who is Nicholas Abatotakies***; is that how you pronounce his name? I don't know.
> **A. He's someone that used to work for Mint Global Markets, and he's also a trustee for a trust.**
> **Q. What trust?**
> **A. I mean, do I have to disclose the name of my trust**? It's not relevant to this.
> Q. What's his relationship with you?
> A. I just told you. He's a trustee. It's a trust that was created.
> Q. What's your relationship with the trust? Meaning—
> A. This is a trust that was created a decade ago. It has nothing to do with this.
> Q. I'm just trying to—how he's—does he work with you; like how—what's your relationship with him?
> A. He's a friend.
> Q. Is he not a business partner of yours?
> A. He's not a business partner of mine. **He's worked for my company when it was my company, my company in New York.**
> **Q. Okay. Is that Mint Global Markets or—**
> **A. Yes, he was working there. He's, I believe, one of the directors of that entity.**
> **Q. Okay. When you said your company in New York, that's what you meant?**
> **A. Yes. It's not my company anymore because that's the company I'm referring to that's in a trust.**

(Gentile Dep. Tr., 2/24/2020, PX-1, also filed at Av. Dkt. 112-1, pp.26-28.)

Mint Global Markets, a company owned by Gentile through the "trust" described above, was a U.S. broker through which Gentile testified that Mintbroker, the Bahamian broker Defendant in this case, also owned by Gentile, executed trades in an account held by Mint Global Markets at ETC, which was separate from the Interactive Brokers account. (*See* Hearing Tr. p.164.)

The Abadiotakis submission—the one example that Gentile has chosen to illustrate the basis for his "pecuniary interest" Objection—does not establish Gentile's absence of a "pecuniary interest" in shares held by "his" trustee of "his" trust. Nevertheless, it is telling that the one purported customer brought forward among the up to 50,000 customer accounts purportedly maintained at Mintbroker—at a time when the trial record is long past closed, and long past the time when this witness could have been deposed—is none other than Gentile's "trustee."

Plaintiffs refer the Court to Judge Lehrburger's discussion of the investigation by the Securities Commission of the Bahamas, in which Christina Rolle, Executive Chair of the Bahamas Securities Commission, accused Mintbroker of operating a "Ponzi scheme." Gentile was instructed by the SCB by letter dated September 18, 2019, that if he intended to liquidate Mintbroker he would need the Commission's permission; and that any application for such consent would need to be accompanied by certified annual financials for the two years preceding the year of proposed liquidation and for the year to date, plus a *reconciliation of customer accounts.* Within 5 days of receiving that instruction from the Commission Mr. Gentile caused Mintbroker to turn the key in its front door, discharge the bulk of its employees and he, individually, physically, to leave the jurisdiction of the Bahamas. He did not return for over two years. (*See* R&R p.13.)

A reconciliation of customer accounts, as directed by the Commission and as avoided by Gentile's scamper to the airport—and which Gentile has likewise resisted producing in this case—might have some probative bearing on whether any actual Mintbroker customers received any actual cash proceeds from the trades Gentile executed in the Interactive account, which are the basis for the Recommended entry of Judgment. But there is no evidence in the record to support Gentile's naked assertion that anyone other than Gentile ever had the opportunity to profit—or ever did profit—from those trades.

**2. <u>Mintbroker records supposedly could not be produced during discovery.</u>** (Objections p.2)

Gentile's counsel describes the R&R as the product of Judge Lehrburger's allegedly mistaken impression that Gentile had "been dilatory or perhaps acted in bad faith." Gentile asserts that the R&R mistakenly criticizes Gentile "for not producing documents he did not have."

Judge Lehrburger had ample experience with Gentile's conduct and degree of candor during discovery to form his own opinion of Gentile's good or bad faith. It was to Judge Lehrburger that Gentile's counsel declared in open court that no customer records existed or "ever existed." (R&R p.17.) But that was before summary judgment of liability was entered and the non-existent records needed to see a rebirth to contest damages.

Gentile claims that he managed to obtain a thumb drive containing Mintbroker's records from Stephen Darville, Mintbroker's former IT manager, after Judge Broderick granted summary judgment for the Plaintiffs. As Gentile testified during discovery and as Stephen Darville confirmed, a copy of this same thumb drive was delivered to Gentile's *<u>own counsel</u>* at the same time that the copy was delivered to Mintbroker's counsel.

Gentile contended at the inquest as he contends in his Objections that he was prohibited by Mintbroker's counsel from accessing Mintbroker's files. But as Judge Lehrburger notes, Gentile never provided any legal opinion or other support for his contention that producing these records would violate Bahamian law or that his access was restricted at any time. (*See* R&R p.39 n.27.) Moreover, as Judge Lehrburger also addressed, any claimed restriction imposed on Gentile's access to Mintbroker's files was the result of Gentile's own conduct in *<u>voluntarily</u>* shutting down Mintbroker while Plaintiffs' discovery requests were outstanding—contrary to his counsel's express representation to Judge Lehrburger in open court that his voluntary shutdown of

Mintbroker did not make any documents unavailable for production in this case, and that his production was complete _prior_ to Mintbroker's closing. (*See* R&R pp.38-39.)

Gentile's attempt to distinguish between "his" files and "Mintbroker's" files is yet another obfuscation of the timeline of events in this case and of his discovery obligations, as Judge Lehrburger previously admonished Gentile. And again, Gentile's _own counsel_ has been in possession of another copy of the thumb drive containing Mintbroker's records all along.

Nothing changed about the mechanics or feasibility of Gentile's access to these files after Judge Broderick granted summary judgment for Plaintiffs. What changed was that it was no longer advantageous for Gentile to claim that client records did not exist because he needed them to construct a damages defense. The same goes for the affidavit and statement from his trustee and supposed "client," which have apparently surfaced just in time to file with Gentile's Objections to Judge Lehrburger's thorough Report.

**3. Mintbroker's customers were purportedly not required to file §16(a) reports because <u>"None of the customers remotely approached 10% beneficial ownership."</u>** (Objections p.2)

Gentile asserts that the Court incorrectly considered that Mintbroker's customers did not file their own Section 16 reports as statutory insiders because, Gentile claims, none of the customers independently approached the 10% beneficial ownership threshold. This assertion contradicts Gentile's contention that all of the trading reported on Mintbroker's New Concept Schedule 13D, which reflects the acquisition of shares well exceeding 10% of outstanding New Concept stock, was supposedly executed for a single "customer" account (Account MBS010067, discussed at R&R pp.51-52 & n.30.)

Moreover, Gentile's Schedule 13D filings with respect to both Avalon and New Concept stated that the shares of these companies were acquired with the "working capital" of Mintbroker as part of "an attempt to gain control over the Issuer." (*See* R&R p.12.) If Gentile's

claim is that Mintbroker's customers pooled their "working capital" together with Mintbroker in "an attempt to gain control" of these companies, then those customers, along with Gentile and Mintbroker, would be members of a "group" under §13(d) and for purposes of determining their "beneficial ownership" under §16(b). Gentile, Mintbroker, and each customer and group member would be a statutory §16(b) "insider" as a deemed a "beneficial owner" of all shares held by the group; and each would be required to file §16(a) reports detailing their respective trades. Gentile is simply wrong on the law as applied to his stated (but unproven) facts. *See generally* Romeo & Dye, *§16 Treatise* §2.03[6].

Gentile argues that Judge Lehrburger should not have relied on Defendants' Schedule 13D statements, made under penalty of perjury, citing cases where courts allowed the introduction of evidence supporting or contradicting statements made in Schedule 13D disclosures. But none of those cases allowed that evidence to be introduced after summary judgment was rendered on an extensive record. And the fact is that is that Gentile has never claimed in this case that either Schedule 13D was incorrect, and as Judge Lehrburger noted, he has never sought to withdraw or amend any of his SEC filings. (*See* R&R p.53 n.31.)

In any event, Plaintiffs' calculations and the proposed Recommended Judgment are not based on Mintbroker's Schedule 13D filings, but on the discovery diligently pursued by Plaintiffs—including the Interactive records relied on by the Court in entering summary judgment for the Plaintiffs—which establish the trades that Gentile executed in the omnibus account that he controlled, and from which he directed the disbursement of all cash trading proceeds. (*See, e.g.,* R&R p.19.)

4. **Gentile's accusation that Judge Lehrburger did not permit sufficient time to obtain documents through letters rogatory addressed to Mintbroker (via its appointed joint official liquidators in the Bahamas)** (Objections p.2)

Gentile claims that Judge Lehrburger deprived him of the opportunity to obtain documents from the liquidators that were always in his counsel's possession and in his custody and control; and which he himself, directly or through Mintbroker, had supplied to the liquidators in the first place. Gentile raised no objection to holding the inquest without the documents sought by his outstanding letters rogatory, nor did he claim to need those documents in order to make his case for a lesser damage award. Delay, delay, and delay has been Gentile's defense strategy for the five years this case has been pending. It is remarkable that Gentile missed an opportunity to make one more attempt to prolong proceedings.

To say, as Gentile does, that Magistrate Judge Lehrburger "did not permit Gentile time to obtain documents" implies some affirmative act impeding or barring Gentile from pursuing rights the Court had granted him. This implication is not even remotely grounded in truth.

5. **"Mintbroker's omnibus account at Interactive Brokers functioned both as a method to hold its own positions and to execute client transactions."** (Objections p.4)

The implication of this contention bears emphasis. Gentile claims that a substantial portion of the trades were executed by Mintbroker for the benefit of customers in a "riskless principal" capacity. ***But as Gentile admits, none of the shares or cash held in the Interactive Brokers account were segregated for or withdrawn by customers***. Gentile, at his discretion, determined when and whether to sell shares on the market through the Interactive account, and he alone controlled the disbursement of funds into and out of the Interactive account. The Interactive account was funded from, and trading proceeds disbursed to, accounts held by Mintbroker, which Gentile controlled. No evidence has been presented that any of these funds came from or were paid to anyone else.

Mintbroker's client transactions were recorded "internally" on the post-discovery records that Gentile sought to introduce at the inquest. There is no evidence that these recorded transactions represented actual trades executed on the market or in the Interactive account, which Gentile's experts did not review. Indeed, Mintbroker's clients were advised in a disclaimer stated prominently on Mintbroker's website that "all trades were executed against Mintbroker in a principal capacity. Clients do not have direct market access." (R&R p.9.) And the SCB Executive Director accused Mintbroker of "failing to trade any securities on behalf of clients, instead "recording" client orders internally in a manner akin to a Ponzi scheme "with no transaction having been entered on the market." (R&R p.13.)

As the R&R concludes, the only trades proven to have been executed at all are the trades executed through Interactive Brokers. And Gentile controlled all of the trading and the trading proceeds in the Interactive account—i.e., he had *both "investment power" over and a "pecuniary interest"* in all of the shares traded—fulfilling the requirements of *both* definitions of "beneficial ownership" applicable under §16(b), for purposes of determining liability *and* damages.

6. **"In September 2019, Gentile left the Bahamas.
Immediately upon leaving, Gentile was 'out of the firm' and no longer
<u>had any access to, or authority to obtain, Mintbroker's records."</u>** (Objections p.4)

The circumstances under which Gentile left the Bahamas are reviewed in the Report at pp.6-7. After meeting with the Bahamas Securities Commission on September 12, 2019, to discuss the accusations that Mintbroker was operating as a "Ponzi" scheme, Gentile made haste for the airport "and gave directives to close down Mintbroker such that by the end of October or early November 2019," ***while Plaintiffs' discovery requests were outstanding***, "the office was closed and only a few employees remained."

Gentile does not explain what he means when he says he was "out of the firm." Gentile "left the Bahamas." The "firm" was his abandoned ship left adrift in Bahamian waters. Gentile did not resign his corporate offices or dispose of his 99% share ownership of Mintbroker. He continued to be in control of Mintbroker, with "custody and control" over Mintbroker's records when his discovery responses were due, when the Court held numerous conferences requested by Plaintiffs to address his production deficiencies, and when he was initially deposed by Plaintiffs in February 2020. Interim liquidators were ultimately appointed by the Supreme Court of the Bahamas, "for the protection of clients and the public," in March 2020, many weeks later, on adversarial application of the Securities Commission of the Bahamas.

In any event, there is no evidence that there were any restraints, placed by the SCB or otherwise, on Gentile's access to Mintbroker's records or his authority to act on Mintbroker's behalf in producing those records at any time. In fact, communications from the SCB had laid out requirements, including submission of audited financials and *a reconciliation of customer accounts* to be followed by Gentile in applying for permission to liquidate Mintbroker. The SCB did not restrict Gentile's authority over Mintbroker or his access to Mintbroker's records, but rather demanded that he exercise that authority and access to produce the required records. Nonetheless, Gentile simply skipped town and had his remaining employees "close down" the office under cover of darkness, without regulatory oversight.

As soon as it suited Gentile's perception of his interests, he knew exactly how to get access to additional records that he repeatedly and affirmatively claimed did not exist: He simply had to ask Stephen Darville, who had been instructed to create and make the "thumbdrive" copies, for selective records that Gentile believed would assist in preparing his damages defense. Even now, Gentile continues to make a mockery of his discovery obligations by submitting a

supposed client account statement along with his Objections—yet another type of record that he refused to produce and claimed as recently as the inquest did not exist.

**7. Gentile claims that he "was not the sole director of Mintbroker and did not have sole control over any … decision."** (Objections p.5)

Gentile was the 99% owner of Minbroker, the remaining 1% owned by one of his many lawyers; Gentile was not the sole director of Mintbroker; the 1% lawyer-shareholder was there beside him. It would take a more-than-willing suspension of disbelief to accept that Gentile "did not have sole control over any … decision." Gentile's improbable claim that he did not have sole and even unfettered control over any Mintbroker decision is a matter of context and of his credibility, which Judge Lehrburger unfavorably assessed.

After meeting with the Securities Commission of the Bahamas, Gentile snapped his fingers and Mintbroker promptly underwent an unauthorized and unregulated liquidation. Gentile got out of town as quickly as he could, delegating the firing of staff, the shuttering of physical plant and the preservation of records to subordinates. There is nothing in the record that suggests that these events were not under his control.

More importantly, all of the evidence in the record demonstrates that Gentile had sole control over all trades and cash trading proceeds in the Interactive account, i.e., he had "beneficial ownership" of all shares in the account—both as defined by investment control and dispositive authority under §13(d), and for purposes of determining §16 "insider" status as a 10% "beneficial owner; and as defined by "pecuniary interest" for purposes of §16(b) liability.

**8. Gentile claims he "did not have access to or a copy of the thumbdrive" containing Mintbroker's books and records.** (*E.g.,* Objections p.16)

As discussed above, Gentile acknowledged during discovery and has never denied that: (1) his own counsel was in possession of a copy of the thumb drive, in addition to the copy

that was in possession of Mintbroker's counsel; and (2) he knew that Stephen Darville had made both of these copies, and he could have asked for the records during discovery just as easily as he did after the Court ruled against him on summary judgment.

Gentile's excuse for withholding these documents during discovery is that he was advised by his counsel not to access the and/or something about "Bahamian privacy laws." As discussed above and at length in the R&R, Gentile did not raise this objection or claim that his access to documents were in any way restricted during discovery, and he offers no evidence or support for his claim that any of Mintbroker's records were ever inaccessible to him at any time.

9. **"Gentile produced the records he had access to from the United States, such as records from Interactive Brokers, but could not produce records that were not in his possession, custody or control (including all documents held by Mintbroker's Bahamian counsel, and for which Bahamas law restricted disclosure." (**Objections p.7)

To be clear: All of the Interactive Brokers records were obtained by Plaintiffs' counsel by subpoena to Interactive Brokers, and authenticated by Plaintiffs' deposition of an Interactive Rule 30(b)(6) witness. *Gentile did **not** produce them.* As Judge Lehrburger notes, Gentile took the indefensible position that Plaintiffs were required to obtain his account statements from third parties, including Interactive, that were within Gentile's custody and control. (R&R pp.39-40.)

Again, Gentile always had full access to all of Mintbroker's records. There is no evidence that there were ever any restrictions on Gentile's access or ability to produce any records. As highlighted in Gentile's Objections, Darville, at Gentile's direction, was able to provide complete access, without any restrictions, to Gentile's experts in advance of the inquest. Gentile had that same complete access and ability to produce these records during discovery and at all times. (*See* R&R p.38.)

**10. "Through his remote access, Christian generated report for AWX and GBR for the relevant time period. … He was able to review the data provided (including random sampling of names provided for trades)."** (Objections p.8).

The customer accounts in the records that Gentile sought to introduce at the inquest (after representing throughout discovery that no customer records existed that were relevant to this case) were identified by Gentile, to his retained experts and to the Court, as beginning with letter prefixes. Names of putative customers have never been identified at any time in this case before Gentile filed his Objections, and the one example included with his Objections is not a third-party customer but Gentile's friend and "trustee."

In reviewing the numerous flaws in the methods and analysis applied by Gentile's experts, Judge Lehrburger specifically describes the deficiencies in the "random sampling" that Christian applied to "confirm" that letter-prefix accounts were customer accounts. Most glaring is Christian's failure to pay particular attention to Account MBS010067, which is the account identified in Mintbroker's Schedule 13D as executing all of the reported trading in New Concept, and which Mr. Christian's own analysis indicates was responsible for the vast majority of all of the so-called "client" trading. (R&R p.51 & n.30.)

Nonetheless, the experts did not inquire as to whether the owner of this account (or any purported customer account) was in fact an affiliate of Gentile's, or otherwise had any "arrangement" with Gentile concerning the trading of these stocks. The Affidavit submitted from Gentile's "trustee" and purported "customer" of Mintbroker only underscores Judge Lehrburger's conclusions about the inadequacy and unreliability of the work performed by the experts to corroborate Gentile's representations about so-called "customer accounts."

## II. __FORMAL OBJECTIONS__

**1. The R&R "failed to consider gentile's pecuniary interest in the shares at issue, instead relying on the definition of beneficial ownership <ins>applicable to reporting liability, not disgorgement.</ins>"** (Objections pp. 11-14)

As discussed above and at length in the R&R, Judge Broderick's decision on summary judgment held that Plaintiffs established Gentile's "beneficial ownership" over the shares traded in the Interactive Brokers account, for purposes of both "reporting liability" and "disgorgement." As Judge Broderick held, Gentile had dispositive authority—i.e., the right to sell all of the shares in the Interactive account; and a pecuniary interest, or the opportunity to profit, from all of the shares in the Interactive account. The Interactive brokerage records reflect that Gentile had the exclusive and ultimate right to direct the trading in the Interactive and the disbursement of trading proceeds from the Interactive Account.

The purpose of the assignment to Judge Lehrburger following summary judgment was to determine the amount of damages owed from trading that Judge Broderick held violated §16(b). Nonetheless, over two full days of inquest testimony, Gentile sought to overturn the law of the case by establishing that he was not the "beneficial owner" of shares that Judge Broderick already held were within his investment authority and pecuniary interest.

Gentile attempted this through his two expert witnesses. Both were certified public accountants. Neither had any prior experience with §16(b). Only one of Gentile's experts, Mr. Christian, actually claimed to have seen the Mintbroker records on the notorious "thumbdrive." As discussed in the R&R, the process that Mr. Christian applied to confirm Gentile's representation that certain accounts were in fact "customer" accounts was inadequate. Mr. Christian did not confirm that any of the client transactions were ever actually executed. And he did not even review the Interactive records on which summary judgment was entered, let alone confirm whether any

of the cash or shares held in the Interactive account were ever segregated or disbursed to any clients.

More fundamentally, neither expert applied or was even aware of either definition of "beneficial ownership" applicable under the statute. Mr. Christian testified that he understood that Mintbroker's customer accounts were discretionary managed accounts in which Gentile was authorized to place trades on behalf of clients. But Gentile testified, as he asserts in his Objections, that Mintbroker was *not* the discretionary manager for any customers. As Gentile acknowledges, but his experts were apparently unaware, exercising discretionary authority over customer accounts would necessarily confer Gentile with beneficial ownership over the accounts for purposes of determining his "insider" status.

Mr. Christian was solely concerned with determining when Gentile became a 10% beneficial owner. But he did not apply the applicable "investment authority" standard to this analysis. Instead, he purported to separate "Mintbroker" trades from "customer" trades reflected in the Post Discovery Records by "netting" out transactions that were recorded at the same time and price. Only the transactions that could not be "netted" were included in Mr. Christian's "threshold" determinations. Gentile's other witness, Mr. Beresford, did not perform any "beneficial ownership" or "pecuniary interest" analysis. Mr. Beresford's assignment was to perform the lowest-in, highest-out matching algorithm to the transactions that Mr. Christian told him to include. (R&R pp.34-35, 52.)

The netting analysis that produced the set of transactions included by both of Gentile's experts was tailor made by Christian as instructed by Gentile, does not comport with any standards, has never been subject to peer review and has never been applied in any §16(b) case. The criteria employed has no relevance to any definition of beneficial ownership relevant to

§16(b). Even putting aside the total unreliability of their methods to corroborate the existence of third-party customer accounts, including their total failure to investigate the owner of Account MBS 1067, neither of the experts examined any of the Interactive brokerage records or any of Mintbroker's financial records to determine whether any shares or funds were actually segregated or disbursed to customers.

Consider SCB Executive Director's determination that Mintbroker "recorded client orders internally in a manner akin to a Ponzi scheme with no transaction having been entered on the market." (R&R p.13.) Regardless of any customer orders recorded by Mintbroker, shares acquired in Mintbroker's Interactive account remained in the Interactive account within Gentile's sole control. None of the shares were segregated for Mintbroker customers. Gentile had the ability to sell all of the shares and keep all of the profits at his discretion. And that is in fact precisely what he did.

Moreover, even if Gentile's experts had successfully established any beneficial ownership interest held by customers in any shares, which they have not, they have still not established that the same shares were not *also* within Gentile's beneficial ownership, under either applicable definition. As Judge Broderick recognized, SEC Rules contemplate that more than one shareholder may have beneficial ownership of the same stock; and, as Judge Lehrburger recognized, the same is true under both definitions. (*See* R&R pp.5-6 n.2.) The seller of a covered call option, for example, retains investment authority over *and* a pecuniary interest in the underlying shares of stock referenced by the option. But at the same time, the purchaser of the option *also* acquires beneficial ownership for threshold reporting purposes (as defined by the right to acquire investment authority within 60 days), *and* a pecuniary interest in, or opportunity to profit from, the underlying stock that the option provides the right to acquire.

It was Gentile's burden to demonstrate that any shares that Plaintiffs have proven were executed in the Interactive account should be excluded from their beneficial ownership for either reporting or disgorgement purposes. No client account agreements or financial records have been produced to demonstrate the scope of his investment authority or the segregation or disbursement of shares or trading proceeds. The "netting" analysis performed by the experts simply has no bearing on the relevant analysis.

2. **"The R&R failed to properly weigh the Mintbroker records and expert testimony relating to those records."**

The entire purpose of the two-day inquest held before Judge Lehrburger was to consider the claimed unavailability and significance of the Post Discovery Mintbroker records and the expert testimony purporting to explain their meaning and significance.

As reviewed above and in the R&R, Judge Lehrburger determined that the records were never unavailable or inaccessible to Gentile, and that there was no excuse for his having failed to produce them during discovery. Moreover, Magistrate Judge Lehrburger properly disallowed all expert witness evidence as seeking to overturn the law of the case; and, additionally, as unreliable under Rule 702, F.R.E., which requires, *inter alia,* that the testimony or evidence be "based on sufficient facts or data." (R&R p.50.) Magistrate Lehrburger's assessment of the evidence that was presented to him should be credited by this Court.

3. **The R&R incorrectly determined short-swing profits.**

The principal thesis of Gentile's Objections under this caption are that Gentile argues that even if Judge Lehrburger determined that Gentile was the "beneficial owner" of all of the shares for purposes of the 16(b) threshold, Judge Lehrburger should still have excluded the "customer account" transactions eliminated by Mr. Christian in calculating Gentile's liability.

Gentile faults Judge Lehrburger for not performing an alternate profit calculation based on this theory.

This argument is nonsense. Judge Lehrburger rejected Mr. Christian's proposed exclusion of the shares because his methodology was unreliable and his analysis irrelevant to any beneficial ownership inquiry. After a two-day inquest, Judge Lehrburger found no support for excluding any of the shares traded through the Interactive omnibus account—i.e., there was no evidence that any shares were segregated or removed from Gentile's investment control, or that any trading funds or proceeds were transferred to, withdrawn by, or custodied for, any customers.

The audacity of Gentile's suggestion that Judge Lehrburger should have performed an alternate profit calculation is most starkly demonstrated with respect to New Concept. Once Mr. Christian excised the so-called "customer account" transactions, he concluded that Mintbroker itself never crossed the 10% threshold. Although Gentile's experts do not propose that any New Concept trades are subject to "matching," Gentile would have Judge Lehrburger (or the Plaintiffs, for that matter) attempt to parse the voluminous Post Discovery Records into "beneficial ownership" categories that were neither attested to nor proposed by either of the experts, and then apply the lowest-in, highest-out algorithm that Gentile believed was complex enough to warrant retaining an expert solely devoted to performing the calculation. Nothing prevented Gentile from submitting any proposed alternate calculations himself at the inquest, or in briefing submitted to Judge Lehrburger following the hearing.

Moreover, for the Court to accept Gentile's alternate calculations, the Court would have to:

a) Consider the Post Discovery Records, which Judge Lehrburger determined should be excluded as wrongly withheld during discovery; *and*

b) Consider expert testimony based on those Records, which Judge Lehrburger has determined is unreliable and irrelevant; *and*

c) Disregard Judge Lehrburger's assessment of Gentile's and his counsel's credibility and good faith, in the context of evidence, testimony and statements made under oath and in open court in proceedings overseen by Judge Lehrburger for the past five years; *and*

d) Overturn the law of the case as established by Judge Broderick's order on summary judgment.

Plaintiffs demur. Gentile has not come close to carrying his burden of refutation.

## 4. Pre-judgment interest.

Although the Second Circuit has opined that "[p]re-judgment interest is generally awarded as part of §16(b) recoveries," *Morales v. Freund,* 163 F. 3d 763, 687 (2nd Cir. 1999), the Supreme Court had some 37 years earlier stated that pre-judgment interest may be awarded "in response to considerations of fairness [and] denied when its exaction would be inequitable." *Blau v. Lehman,* 368 U.S. 403, 414 (1962), a possibly less draconian interpretation. The issue of whether the recommendation for the award of pre-judgment is erroneous is thus either measured against a standard of general and routine practice, or an inquiry into whether the award is inequitable. Plaintiffs look to the more exacting latter standard for this discussion.

In any case, a showing of inequity is clearly the burden of the defendant. Magistrate Judge Lehrburger personally oversaw most proceedings relating to damages and was in a position to have observed the conduct of Gentile and of his lawyers. Beginning at page 16, the R&R thoroughly describes the dilatory and obfuscatory tactics they employed, beginning with Gentile's voluntary closing of Mintbroker in his haste to leave the Bahamas without complying in the slightest with Plaintiffs' discovery demands, lying to the Court about whether documents were made "unavailable" as a result of those actions, and from there, beginning at page 26 and

continuing for more than 20 pages, the R&R describes Gentile's continued and incessant efforts to delay, delay, and delay the resolution of this case. His Objections to the R&R are the latest example.

The profits at issue were generated during the summer of 2018, in two manipulative pump-and-dump schemes. We are now at the beginning of the winter of 2023-2024, more than five years later. For that more-than-five years Gentile has enjoyed the use of moneys belonging to the Plaintiffs and, as Magistrate Judge Lehrburger notes, Gentile has taken every opportunity to prolong that arrangement, changing his story whenever convenient.

In his Schedule 13D filings and in statements to the press at the time of his operations, Gentile claimed that his accumulations were for control purposes. These suits then drove home the point that he had massively violated the short-swing trading statute. Prior to summary judgment, it suited Gentile's strategy to claim the customer and trading records of Mintbroker to be unavailable or never to have existed, so that was the claim he made. When Gentile was found liable by Judge Broderick and the issue became that of minimizing damages, previously non-existent customer trading records experienced a resurrection simply by Gentile's asking Mintbroker's former IT manager to make another copy of records he had been holding all along. For the inquest hearing, Gentile hired two experts, neither of whom had prior experience in computing profits under §16(b) and charged them with identifying the "beneficial ownership" of unnamed customers (nevermind that Gentile had filed Schedule 13D reports describing his "control purpose" in acquiring shares with "Mintbroker's working capital"), based on criteria irrelevant to the statute, in order to exculpate Gentile from a determination of liability that is the law of the case.

It is for Gentile to explain how the assessment of interest for the intervening years between realization of profits and assessment of judgments in amounts determined after extended

27

proceedings at which he was afforded the right to introduce every form of documentary and expert evidence of his selection would be inequitable to him. Gentile has not carried his burden.

**5.   Plaintiffs' standing**

        Gentile continues his unvarying practice of making bad faith arguments for the sake of delay. The issue of Plaintiffs' standing was ruled upon in Plaintiffs' favor by Your Honor on July 25, 2023. It is the law of these cases and Plaintiffs, unless instructed otherwise, decline to be drawn into relitigating the matter. This topic is one to be reserved for appeal if raised at all.

        As to Gentile's argument that there was no proof offered that Gentile, as a more-than-10% beneficial owner held any fiduciary or quasi-fiduciary relationship involving the Plaintiffs, the statute disagrees with him. His argument is with the framers of the statute acting 90 years ago, and all the courts that in similar circumstances have decided otherwise—including Judge Broderick in denying Gentile's original motion to dismiss these very cases. (*See* R&R pp.58-59.)

**CONCLUSION**

        The Report and Recommendation should be accepted in full, subject to the minor amendments suggested in Plaintiffs' Objections of October 9, 2023.

Dated: Southampton, New York
       November 20, 2023

        */s/ Miriam Tauber*                */s/ David Lopez*

        _____    _____
        Miriam Tauber, Esq. (MT-1979)         David Lopez, Esq. (DL-6779)
        *Attorney for Plaintiffs*             *Attorney for Plaintiffs*